# ORIGINAL

```
┌─────────────────────────┐
│  FILED                  │
│  DEC 3 0 2003           │
│  U.S. COURT OF          │
│  FEDERAL CLAIMS         │
└─────────────────────────┘
```

IN THE

## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON, | **1·03 - 2869C** |
| Plaintiff, | |
| vs. | Civil Action No. _____ |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## COMPLAINT FOR DAMAGES
## FOR BREACH OF CONTRACT

Plaintiff SOUTHERN CALIFORNIA EDISON ("SCE") hereby files this complaint against the Defendant United States of America, and complains and alleges as follows:

### I.

### INTRODUCTION

1.     In 1988, SCE and the Bonneville Power Administration ("BPA"), part of the United States Department of Energy, entered into a contract ("Contract") that obligates BPA to sell or exchange energy to SCE and, if requested by SCE, to sell capacity to SCE ("Option Capacity") under specific terms and conditions. Attached hereto as Exhibit 1 is a true and correct copy of the Contract, which is incorporated herein by reference. The present dispute relates only to the Contract provisions governing SCE's purchases of Option Capacity. SCE and BPA are presently litigating a separate dispute regarding the sale and exchange provisions of the Contract, which is pending in this Court as Case No. 02-1953-C.

2.     Paragraph 12(a) of the Contract requires BPA to provide Option Capacity to SCE at SCE's request. The Contract also provides that: "Edison shall pay for Option

Capacity at the *demand charge* associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule." *Id.*, § 12(4) (emphasis added). Thus, in entering into the Contract, BPA expressly agreed that only the demand charge of the SP-87 rate schedule or its successor rate schedule could be applied to SCE's purchases of Option Capacity. The Contract does not permit BPA to add a new rate that is *not* a successor to the demand charge in SP-87 and apply it to SCE's purchases of Option Capacity. Yet this is exactly what BPA did, thereby breaching an express contractual term and effecting a unilateral modification of the express terms of the Contract without consideration.

## II.

## JURISDICTION

3.    This Court has jurisdiction over the claim for relief pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a)(1) ("CDA"), and the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1491(a)(2).

4.    When a final action of the BPA can only be contested through a Petition for Review in the Ninth Circuit, a 90-day statute of limitations is in effect. As a matter of precaution, SCE originally filed a Petition for Review of this controversy in the Ninth Circuit on June 16, 2000. BPA filed a motion to dismiss for lack of jurisdiction based on its contention that SCE was not seeking review of a final agency action. Subsequently, SCE filed a motion to clarify jurisdiction, following the decision in *City of Burbank v. United States*, 273 F.3d 1370 (Fed. Cir. 2001), arguing that jurisdiction properly came under the Contract Disputes Act and the Tucker Act and the case should be in the Court of Federal Claims. BPA responded by stating that the Ninth Circuit lacked subject matter jurisdiction but requesting that the case be dismissed rather than transferred to the Court of Federal Claims. The Ninth Circuit's response was to deny both motions and transfer the case to this court based on the authority of *Public Utility District No. 1 of Clark County v. Johnson*, 855 F.2d 647, 650 (9th Cir. 1988) ("This court has never reviewed a breach of contract claim based upon alleged facts outside the administrative record of

an agency action under the Act."). By this action, the Ninth Circuit indicated that it agreed that jurisdiction was not proper in the Ninth Circuit and belonged in the Court of Federal Claims.

5.     SCE dismissed the action in this Court without prejudice in order to submit the underlying Claim for this action to BPA's contracting officer as required by the CDA. The Claim was submitted on July 19, 2002. 41 U.S.C. § 605(c) requires the contracting officer to issue a determination on the claim within sixty days or, on claims greater than $100,000, within sixty days to "notify the contractor of the time within which a decision will be issued."

6.     On September 23, 2002 the contracting officer informed SCE that a final decision on the Option Capacity claim would be issued by January 31, 2003. On January 24, 2003, Mr. Wright, the attorney for BPA, informed SCE that BPA would not consider the Option Capacity claim because it viewed the claim as "not cognizable under the CDA." BPA claimed that SCE was trying to appeal a rate determination, not a contract dispute, and the Ninth Circuit has exclusive jurisdiction over a rate dispute. BPA's position is wrong, both factually and legally, and is directly contrary to the Ninth Circuit's previous transfer of this dispute to this court. Further, in previous actions it has taken in related proceedings, BPA argued that SCE's dispute before this Court is a contract action, not an argument cognizable in a rate determination. Thus BPA has been heard on every side of the jurisdictional arguments over SCE's dispute. SCE is not challenging the rate determination by BPA. It challenges whether the application of that rate determination is a breach of its Contract with BPA.

7.     BPA had sought approval for the new rate in FPS-96R in an expedited administrative proceeding entitled "1996 Firm Power Services Rate Scheduling Correction Proceeding." On November 2, 1999, BPA filed a Motion to Strike Portions of SCE's Direct Testimony in that proceeding. In that motion, BPA argued at p.4:

### Contractual Obligations under BPA's Contract with SCE

Part of SCE's direct case is premised upon the notion that the rate being established in this proceeding does not apply to its contract with BPA. To support this proposition, SCE points to various contractual provisions. The entire line of questioning should be stricken because the issues raised are not relevant and do

- 3 -

not respond to issues raised by BPA's initial proposal. See, Special Rules of Practice to Govern These Proceedings, FPS-96R-O-01. The scope of this proceeding is framed by the FRN. *Whether the rate set in this proceeding applies to SCE's contract is an issue of contractual interpretation. If a rate for capacity without energy is established in this rate proceeding and BPA applies it to SCE's contract, SCE may pursue any concerns it has with this determination through a contract action in the proper forum.* Bringing questions of contractual interpretation into this rate proceeding provides no substantive evidence regarding the appropriate nature of the rate being established. (emphasis added)

8.     At the Administrative hearing, the Administrator stated that whether the rate being determined would apply to SCE's contract, "that's going far beyond the scope here." Further, SCE would not be permitted to argue its "interpretation of [SCE's] contract and how and why the rate schedule might fit it." Transcript of November 22, 1999 Hearing at 140-142.

9.     In the Final Record of Decision for the expedited proceedings, it is clear that BPA prevailed in preventing a hearing at that time on SCE's contract dispute:

> The Hearing Officer noted that questions regarding the applicability of the rate to SCE's contract should be raised in the proper forum.

10.     SCE disputes that the Posted Rate added at section 1.3.2 in the FPS 96-R rate schedule applies to its Contract with BPA and has raised that issue in the proper forum – this Court.

11.     Contrary to the position taken by BPA during the rate approval hearings, BPA now claims that these contract issues should have been litigated as part of the rate approval process and appealed to the Ninth Circuit because they are not contract issues at all. Having prevailed in removing this point from the rate approval process, BPA cannot now take a contrary position to obtain a tactical and procedural advantage over SCE.

12.     The January 24, 2003 letter from Mr. Wright constitutes a denial of SCE's claim. SCE's claim is for damages for breach of contract. Therefore, the jurisdictional requirements for submitting this action to this Court have been met.

-4-

## III.

## GENERAL ALLEGATIONS

### A.    The Contract

13.    This claim for damages is based on an express written contract dated July 12, 1988 between SCE and the United States of America, by and through the United States Department of Energy and through its agency, the BPA. The Contract is subject to the CDA.

14.    SCE is a public electric utility organized and existing under the laws of the State of California, with its principal place of business in Rosemead, California. SCE is engaged in the business of purchasing, transmitting, and distributing electric energy to approximately 12 million customers in Central and Southern California.

15.    BPA is a federal agency within the Department of Energy. Congress created BPA in 1927 to market low-cost hydroelectric power in the Pacific Northwest, and to sell power outside the Pacific Northwest under certain circumstances.

16.    The Contract sets forth terms under which BPA will sell or exchange energy with SCE and, in addition, establishes a right for SCE to purchase Option Capacity from BPA under specified terms. Only the Option Capacity provisions are at issue here. The Contract specifies the rate schedule and demand charge to be used for charging SCE for Option Capacity. These terms are found in Section 12 of the Contract. That provision states in pertinent part:

> (12) Option Capacity and Option Energy
>
> Bonneville shall have the obligation to provide Option Capacity to Edison and Edison shall have the obligation to provide Option Energy to Bonneville.
>
> (a)    Option Capacity.
>
> Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a). For any year in which such capacity is requested, Bonneville shall make the Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity.
>
> . . .

(3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9(2)(1). If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).

(4) Edison shall pay for Option Capacity at the *demand charge* associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized representatives may agree upon another applicable rate schedule. (Emphasis added.)

## B.  The Rates Set By BPA.

17.     The SP-87 rate schedule is for "surplus firm power." Since 1988, when the Contract was first executed, BPA has implemented several new rate schedules for surplus firm power that are successor rate schedules to the SP-87 rate schedule. All those rate schedules contained a demand charge associated with the contract rate for firm power. As of 1999, the applicable schedule was the FPS-96 rate schedule, a schedule that BPA has admitted, in correspondence with SCE, is the successor rate schedule to SP-87. The demand charge is the rate set forth at 1.1.1 of the FPS-96 Rate Schedule.

18.     On January 15, 1999, SCE informed BPA that it would exercise its option to purchase 250 MW of Option Capacity pursuant to the Contract during June through October 1999 at the FPS-96 demand charge of $0.87/kW-month.

19.     On February 12, 1999, BPA informed SCE that it would not sell Option Capacity to SCE at the FPS-96 demand charge, even though it was the successor rate to SP-87. BPA claimed that the product SCE was buying under the Option Capacity provision in the Contract was different from the product priced in the FPS-96 rate schedule. BPA asserted that it had erred by not making clear in the rate setting process that FPS-96 did not cover that product. After negotiations, the parties agreed that BPA would make the capacity available to SCE and the dispute over the proper rate in 1999 would be submitted to arbitration.

20.     The next year, SCE again indicated that it would take Option Capacity. In January 2000, BPA's manager for this Contract admitted to *Clearing Up*, an industry publication: "OK, fine – take it at 87 cents for one year, and we'll adjust the rate and make it

- 6 -

prohibitively expensive in the future." Thus, BPA admitted that its decision drastically to increase the rate charged SCE had nothing to do with the contractual requirements, but was driven by BPA's dislike of the rate specified in the contract.

21.     When SCE sought to exercise its right to purchase Option Capacity for the June through October 2000 season, as predicted by BPA in *Clearing Up*, BPA demanded that SCE pay at a new rate (the "Posted Rate") it had added in section 1.3.2 of the FPS-96R revised rate schedule. The rate that BPA had previously conceded was the successor to the SP-87 rate schedule is listed in FPS-96R under section 1.1.1. The Posted Rate is *not* the successor rate to the demand charge in SP-87. In 2002, it was *eight to eighteen times higher* than the rate called for in the Contract. SCE refused to purchase at that rate.

22.     When BPA applied for approval of the FPS-96R rate schedule, it published a notice in the Federal Register, as required under Exhibit B, page 3 of the Contract. However, during the course of the Expedited Rate hearing, BPA modified its description of the entities to whom the new rate would apply, without filing a new notice in the Federal Register. Moreover, the Contract requires that the date of a rate change shall not occur sooner than "9 months from the date that such notice of intent is published."   The failure to re-file the Federal Register notice violates Exhibit B to the Contract and the new rate cannot be applied as a valid rate for Option Capacity under the Contract.

23.     The government is not permitted unilaterally to modify its contracts without consideration. BPA has never pointed to any specific contract clause that would permit it to apply a rate other than that specified in section 12(a)(4) of the Contract.

24.     The Demand Charge of $.87/kW-month in the FPS-96 rate schedule is listed as Rate 1.1.1 of the FPS-96R schedule and is still the successor "demand charge associated with the contract rate of Bonneville's SP-87 rate schedule". The Posted Rate BPA added at 1.3.2 of the FPS-96R rate schedule is not the successor to the "demand charge associated with the contract rate of Bonneville's SP-87 rate schedule". Therefore, under the unambiguous terms of

- 7 -

the Contract, it is not the rate that applies to Option Capacity. BPA's refusal to provide Option Capacity at the price specified in the Contract was a breach of the Contract.

## IV.

## CLAIM FOR RELIEF

### (Breach of Contract)

25.     SCE realleges and incorporates by reference as though fully set forth its allegations of paragraphs 1 through 24 above.

26.     SCE and BPA entered into a valid contract in 1988 that includes the option for SCE to purchase Option Capacity at a specified price.

27.     The Contract specifies with precision the price SCE is to pay for Option Capacity. In particular, the Contract, Exhibit 1, section 12(a)(4) states:

> Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or, if the SP-87 rate schedule is no longer in effect, a successor rate schedule.

28.     The Contract specifies that adjustments to rates under the Contract must be noticed in the Federal Register, and the date of the adjustment must be at least nine months after the notice.

29.     SCE fulfilled all contractual requirements for requesting Option Capacity at the rate provided for in the Contract for the June through October 2000 time period.

30.     BPA's refusal in May 2000 to provide Option Capacity to SCE for the June through October 2000 time period unless SCE paid the FPS-96R Posted Rate, which is not a successor rate to the demand charge in the SP-87 schedule, was a breach of Section 12 of the Contract.

31.     BPA's failure to conform with the Federal Register notice and timing requirements set out in Exhibit B of the Contract is a breach of the Contract that precludes its use as the price for Option Capacity.

32. BPA's May 2000 breach of the Contract has caused SCE to incur net damages of $31,594,436. These damages represent the total value ($50,582,069) that SCE should have received for energy that would have been delivered had BPA not breached the contract, less the cost ($18,987,634) that SCE would have incurred for returning the energy or paying for it at the proper contract rate.

957605.3

## V.

## REQUEST FOR RELIEF

WHEREFORE:  Plaintiff prays for judgment against defendant as follows:

1.  Damages in the sum of $31,594,436.

2.  Interest on said amount at the legal rate under 41 U.S.C. § 611;

3.  Costs incurred in this proceeding; and

4.  For such other relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED,

_Charles D. Siegal_

Charles D. Siegal

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071-1560
Telephone:  (213) 683-9181
Facsimile:  (213) 687-3702

**COUNSEL OF RECORD FOR
PLAINTIFF SOUTHERN CALIFORNIA
EDISON**

DATED:  December 29, 2002

**OF COUNSEL:**

Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA  91770
Telephone:  (626) 302-6967
Facsimile:  (626) 569-4145

Marsha Hymanson
Munger, Tolles & Olson LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
 Telephone:  (213) 683-9502
Facsimile:  (213) 687-3702

957605.3

Contract No. DE-MS79-88BP92275

<u>SALE AND EXCHANGE AGREEMENT</u>

executed by the

<u>UNITED STATES OF AMERICA</u>

<u>DEPARTMENT OF ENERGY</u>

acting by and through the

<u>BONNEVILLE POWER ADMINISTRATION</u>

and

<u>SOUTHERN CALIFORNIA EDISON COMPANY</u>

<u>Index to Sections</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| <u>Section</u> | | <u>Page</u> |
|---|---|---|
| 1. | Term of Contract . . . . . . . . . . . . . . . . | 4 |
| 2. | Exhibits . . . . . . . . . . . . . . . . . . . | 5 |
| 3. | Definitions . . . . . . . . . . . . . . . . . . | 5 |
| 4. | Point of Delivery . . . . . . . . . . . . . . . | 10 |
| 5. | Amounts of Surplus Firm Power . . . . . . . . . . | 10 |
| 6. | Conversion to Capacity-Energy Exchange . . . . . | 14 |
| 7. | Capacity-Energy Exchange . . . . . . . . . . . . | 23 |
| 8. | Scheduling Provisions . . . . . . . . . . . . . | 32 |
| 9. | Payment and Rates . . . . . . . . . . . . . . . | 37 |
| 10. | Transmission Limitations . . . . . . . . . . . . | 48 |
| 11. | Transmission for Other Arrangements . . . . . . . | 50. |

5

Section

12.  Capacity-Energy Options . . . . . . . . . . . . . . . . . . .   52

13.  Restriction of Deliveries . . . . . . . . . . . . . . . . . .   56

14.  Termination . . . . . . . . . . . . . . . . . . . . . . . . .   57

15.  Uncontrollable Forces . . . . . . . . . . . . . . . . . . . .   58

16.  Assignment of Agreement . . . . . . . . . . . . . . . . . . .   59

17.  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

18.  Governing Law . . . . . . . . . . . . . . . . . . . . . . . .   61

19.  Authorized Representatives . . . . . . . . . . . . . . . . .   61

20.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . .   61

21.  Audits . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

22.  Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

23   Signature Clause . . . . . . . . . . . . . . . . . . . . . .   64

     Exhibit A (Bonneville Wholesale Power Rate Schedules and
        General Rate Schedule Provisions). . . . . . . . . . . . . . . . . . . .   5

     Exhibit B (General Provisions). . . . . . . . . . . . . . . . . . . .   5

     Exhibit C (Plan of Delivery). . . . . . . . . . . . . . . . . . .   5

     Exhibit D (Tables and Sample Calculations). . . . . . . . . . . . . .   5

     Exhibit E (Fuel Cost Methodology). . . . . . . . . . . . . . . . . . .   5

     Exhibit F (Nonfirm Rate Ceiling). . . . . . . . . . . . . . . . . . .   5

     Exhibit G (Termination Cost Table). . . . . . . . . . . . . . . . . .   5

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This SALE AND EXCHANGE AGREEMENT, executed as of _____, 1988, by
the UNITED STATES OF AMERICA, (the Government), Department of Energy, acting
by and through the BONNEVILLE POWER ADMINISTRATION (Bonneville), and SOUTHERN
CALIFORNIA EDISON COMPANY (Edison), a corporation organized and existing under

the laws of the State of California, hereinafter sometimes referred to individually as "Party" and collectively as "Parties".

W I T N E S S E T H :

WHEREAS Bonneville is engaged in the sale of electric capacity and energy at wholesale, and is projecting an availability of capacity and energy in excess of its existing firm obligations to deliver such capacity and energy; and

WHEREAS Bonneville is authorized pursuant to law to dispose of electric capacity and energy generated at various federal hydroelectric projects in the Pacific Northwest or acquired from other resources, to construct and operate transmission facilities, to provide transmission and other services, and to enter into agreements to carry out such authority; and

WHEREAS Edison is a utility engaged in the generation and transmission of electric energy in the States of California, Arizona, New Mexico and Nevada, and is engaged in the distribution of electric energy in California; and

WHEREAS the long-term capacity/energy exchange agreement between Edison and Bonneville, Contract No. 14-03-54126, terminated on July 31, 1987; and

WHEREAS Edison desires to purchase and Bonneville desires to sell surplus firm power under the terms specified herein and as permitted under applicable law; and

WHEREAS there is a FERC-approved rate schedule in effect under which Bonneville is able to make sales on the effective date of this Agreement; and

WHEREAS Bonneville and Edison also desire to enter into a seasonal capacity-energy exchange at such time as Bonneville determines it is unable to continue the sale of surplus firm capacity with energy, or either of the

3

Parties elects to commence an exchange under the terms and conditions set forth herein; and

WHEREAS, as part of a joint venture among Bonneville, Edison and The Washington Water Power Company (WWP) as described in Bonneville's final Long Term Intertie Access Policy, Bonneville agrees to provide a transmission agreement with WWP providing assured delivery for WWP to extend its seasonal exchange agreement with Edison; and

WHEREAS, Bonneville has, pursuant to the requirements of Public Law No. 88-552 and other applicable laws, given timely public notice of its intent to enter into this Agreement and complied with requirements of the National Environmental Policy Act, Public Law No. 91-190;

NOW, THEREFORE, in consideration of these premises, the Parties hereto agree as follows:

1.  <u>Term</u>.

    (a)  This Agreement shall become effective upon the date of execution by both Parties.

    (b)  This Agreement shall remain in force and effect until May 31, 2009 unless this Agreement is terminated pursuant to section 9(c)(3) or section 14. All liabilities accrued hereunder shall be preserved until satisfied.

2.  Exhibits.

Bonneville Wholesale Power Rate Schedules and General Rate Schedule
Provisions (Exhibit A), General Provisions (Exhibit B), Plan of Delivery
(Exhibit C), Tables and Sample Calculations (Exhibit D), Fuel Cost
Methodology (Exhibit E), Methodology and Procedures for Determining an
Average Cost of Energy Rate (Exhibit F), and Termination Cost Table
(Exhibit G) are attached hereto and are hereby made a part of this
Agreement.

3.  Definitions.

The following terms, when used in this Agreement with initial
capitalization, whether singular or plural, shall have the meanings
specified:

(a)  "Agreement" means this Sale and Exchange Agreement between Bonneville
     and Edison.

(b)  "Annual Amount of Energy" means the amount of electric energy as
     specified in section 5(b).

(c)  "Calendar Week" means the week beginning at 0001 hours on Sunday, and
     ending at 2400 hours on the following Saturday.

(d) "COB/NOB" means the points at the California-Oregon border and the Nevada-Oregon border, respectively, where the Pacific Northwest-Pacific Southwest Intertie transmission facilities are interconnected.

(e) "Contract Demand" means the maximum contract rate of delivery for surplus firm power when this Agreement operates as a sale, or the maximum availability of firm capacity when this Agreement operates as an exchange. If there are periods when this Agreement operates as both a sale and an exchange, "Contract Demand" may reference either component, or the combination of the two.

(f) "CPUC" means the Public Utilities Commission of the State of California, or its successor.

(g) "Delivery Year" means the year beginning at 0001 hours on August 1 and ending at 2400 hours the following July 31.

(h) "Exchange Energy" means the energy Edison is obligated to deliver to Bonneville in exchange for Bonneville making available capacity to Edison when the power sale has converted to an exchange pursuant to section 6.

(i) "FERC" means the Federal Energy Regulatory Commission, or its successor.

(j) "Fiscal Year" means the year beginning at 0001 hours on October 1 ending at 2400 hours the following September 30.

6

(k)  "Intertie" means the portion of the extra high voltage electric transmission system between California and the Pacific Northwest in which the Parties have an ownership or contractual interest.  Said extra high voltage transmission consists, for the purpose of this Agreement, of two 500-kV AC lines extending from John Day Substation in Oregon to Vincent Substation in Southern California, a 1000-kV DC line extending from Celilo Substation in Oregon to Sylmar Substation in Southern California, two 220-kV AC lines between Vincent Substation and Sylmar Substation, and expansions, improvements, or additions thereto.

(1)  "Option Capacity" means the capacity made available by Bonneville to Edison pursuant to section 12.

(m)  "Option Energy" means the energy made available by Edison to Bonneville pursuant to section 12.

(n)  "Peaking Energy" means the energy associated with the capacity made available by Bonneville to Edison pursuant to section 7(a) when all or a portion of the power sale has converted to an exchange pursuant to section 6.

(o)  "Peaking Replacement Energy" means energy which Edison is obligated to deliver to Bonneville to replace the Peaking Energy supplied by Bonneville.

(p) "PNW Coordination Agreement" means the contract among Bonneville a Pacific Northwest (PNW) generating entities, providing for coordinated operation of resources, designated as Contract No. 14-03-48221, as amended or replaced.

(q) "PSW IOU Contracts" means sale or sale and exchange agreements of two years or more, executed by Bonneville with other investor-owned utilities outside the Pacific Northwest region, for which initial deliveries have commenced after July 1, 1989.

(r) "Supplemental Energy" means the energy Edison is obligated to make available to Bonneville pursuant to section 7(d).

(s) "System Disturbance" means (1) for Edison's system, the unplanned outage during any hour of a generating resource or a transmission line where the scheduled MW amount of generation or import of firm power to Edison's system lost during such hour and the ensuing two (2) hours due to the outage is expected to exceed the amount of nonthermal operating reserves on Edison's system; and (2) for Bonneville's system, the delivery of Edison's requested increase in prescheduled amounts of Peaking Energy which would require Bonneville to purchase power from third parties or exercise contractual rights to reserves of industrial customers to avoid violating power or nonpower constraints on operation of the Federal System.

(t) "Transmission Outage" means a planned or forced reduction of transmission capability on the AC or DC portions of the Intertie.

(u) "Uncontrollable Force" (1) means any act or event beyond the control of a Party which adversely affects the ability of the Party to perform, which by exercise of due diligence such Party could not reasonably have been expected to avoid, and which by exercise of due diligence it shall be unable to avoid; (2) includes, but it is not limited to, failure or threat of failure of facilities, flood, earthquake, storm, fire, lightning and other natural catastrophes, epidemic, war, labor or material shortage, strike or labor dispute, or sabotage; and (3) also includes restraint by court order or by regulatory authorities and action or nonaction by or failure to obtain the necessary authorizations or approvals from any governmental agency or regulatory authority but excludes (A) any regulatory restraint, action or nonaction, authorization or lack thereof, or approvals or lack thereof as described in Section 14; and (B) any cost disallowances regarding purchases under this Agreement imposed by the CPUC in Energy Cost Adjustment Clause proceedings.

(v) "Workday" means each day which both Parties observe as a regular day of work.

9

4. Point of Delivery.

Unless otherwise agreed by the Parties' schedulers or dispatchers for a specific delivery, deliveries under this Agreement shall be at COB or NOB, with the share at each as specified by Edison.  At either Party's request and subject to the other Party's agreement, deliveries shall be made by Bonneville or by Edison to the accounts of third parties at COB or NOB. Each Party shall bear its own costs for delivery to COB or NOB.

5. Surplus Firm Power Sale.

Beginning July 1, 1989, Bonneville shall make available and Edison shall purchase surplus firm power according to the terms specified below, unless conversion is made to an exchange pursuant to section 6 or the Agreement is terminated.  Bonneville shall not be obligated to acquire resources to delay such conversion.

(a) Contract Rate of Delivery.

The Contract Demand for surplus firm power which Bonneville shall make available to Edison is 250 MW.

(b) Amount of Energy.

Based upon a Contract Demand of 250 MW, Bonneville shall make available 1,173,000 megawatthours (MWh) of surplus firm energy and Edison shall purchase said amount (Annual Amount of Energy) each

10

Delivery Year. The Contract Demand associated with the power sale may decrease if there is a partial conversion to an exchange pursuant to section 6(b)(4). The Annual Amount of Energy shall change proportionately with any change in Contract Demand associated with the power sale, and with the portion of the Delivery Year during which the change is effective. This sale shall continue until conversion is made to an exchange pursuant to section 6 or until termination of this Agreement. During each calendar month, Edison shall establish schedules pursuant to section 8(a) requesting the monthly amount of energy within the limits established and adjusted pursuant to this section 5. Edison may distribute the Annual Amount of Energy into monthly and weekly amounts in accordance with notices provided pursuant to sections 5(c) and 8(a) below, within the following limits:

(1)   up to 42,000 MWh in any Calendar Week falling entirely or partially in the months of June through December, and 130,200 MWh in any month during the months of June through December, or

(2)   up to 30,000 MWh in any Calendar Week, and 100,000 MWh in any month not covered by section 5(b)(1); provided that:

(3)   no less than 65,100 MWh shall be taken in any month.

11

(4)  The monthly and weekly limits specified in sections 5(b)(1),
     5(b)(2) and 5(b)(3) are based upon a Contract Demand associa...
     with the power sale of 250 MW.  At times when a Contract Demand
     associated with the power sale other than 250 MW is in effect,
     such limits shall be changed proportionately to the change in
     Contract Demand associated with the power sale.

     Unless otherwise agreed, deliveries of energy at rates of
     delivery up to the portion of Contract Demand associated with
     the power sale shall be made only with energy purchased under
     this section 5(b).

(c)  Distribution of Monthly Amounts.

     (1)  Each year Edison shall submit a plan of delivery to Bonneville
          showing the distribution of the monthly amounts of energy in
          accordance with Edison's rights under section 5(b) for the
          ensuing Delivery Year and the following three Delivery Years in
          the form set forth in Exhibit C.  If any portion of a plan of
          delivery becomes effective at a Contract Demand different from
          that upon which the plan was based, the monthly amounts of
          energy shall be changed proportionately to the change in
          Contract Demand associated with the power sale.

          (A)  For the period July 1, 1989 to July 31, 1989, the monthly
               amount of energy pursuant to section 5(b) shall be
               99,643 MWh.

(B)   Edison shall submit prior to January 1 of each year its plan of delivery for the ensuing Delivery Year and the three following Delivery Years.  If requested by Edison, Bonneville shall consult with Edison at the time such plans of delivery are being prepared.  By April 1 of each year, Bonneville shall submit to Edison a preliminary determination of its ability to adopt Edison's most recent plan of delivery for the ensuing Delivery Year.  At any time in the planning process, the Authorized Representatives may agree to changes in the plan Edison has submitted.

(2)   The Parties shall rely on the most recent plan of delivery for the amount of energy to be delivered in August unless Bonneville notifies Edison's Authorized Representative by July 15 that such August amount shall be based on another Edison plan of delivery.  Bonneville shall notify Edison at the earliest opportunity, but not later than August 10, if other than the most recent plan of delivery is to become effective for the balance of the Delivery Year.

(d)   Operational Flexibility.

To provide operational flexibility from the monthly distribution of energy specified in the plan of delivery for the current Delivery Year, Edison may increase any monthly amount of energy for the months

of September through April, and June by up to 5 percent each month providing at least 1 month's advance written notice to Bonneville. Decreases, which exactly offset the ....ested .ncrease, shall be made to subsequent monthly amounts in the period O ober through April, and June and July. Decreases shall be included in the notice and shall not change the Annual Amount of Energy. All changed monthly amounts must remain within the limits specified in section 5(b). Such changes shall be provided at no cost to Edison.

(e)   Additional Operational Flexibility.

Bonneville may, but shall not be obligated to, agree to increases of larger amounts of energy, decreases of energy, or shorter notice than that specified in section 5(d). When Edison requests such addition. changes, if such changes are possible for Bonneville, Bonneville shall quote a price for the change requested. Edison shall have the option to either: (1) pay the quoted price and have Bonneville implement the change, or (11) decline the quoted price and forgo the change.

6.   Conversion to Capacity-Energy Exchange.

This Agreeme : shall convert in whole or in part from a surplus firm power sale to a s: .onal capacity-ener:y exchange u:.on the exercise of options as specified in section 6(a), upon determination of a surplus firm power insufficiency as specified in section 6(b), upon determination that

14

Bonneville would otherwise be prohibited from continuing the power sale as specified in section 6(c), or during the last year of this Agreement pursuant to section 6(d). Except for conversion rights specified in this section 6, neither Party may convert to an exchange unless agreed.

(a) Conversion upon Exercise of Options.

The power sale may convert to the exchange upon the exercise of options described in this section. The first effective date for which a conversion is possible due to the following options shall be August 1, 1994.

(1) Option by Edison.

Edison may elect such conversion when, for any calendar year after 1992, the rate for surplus firm power under this Agreement exceeds 50 mills/kWh in 1987 dollars. Beginning January 1, 1993, the constant dollar rate of 50 mills/kWh shall be escalated at 3 percent per year.

(2) Option by Bonneville.

Bonneville may elect such conversion when, for any calendar year after 1992, the weighted average annual cost of natural gas and fuel oil consumed by Edison exceeds 62 mills/kWh in 1987 dollars. Beginning January 1, 1993, the constant dollar rate of 62 mills/kWh shall be escalated at 3 percent per year.

(3) References in section 6(a) to 1987 dollars use the U.S. Gross National Product deflator, as reported in the then most current monthly edition of the "Review of the U.S. Economy," by Data Resources, Inc.  Should the index or the publication change in the future, the Authorized Representatives shall agree upon a successor.

(4) The criterion used for each option in sections 6(a)(1) and 6(a)(2) shall be examined for each complete calendar year.  If there is a reasonable likelihood that the fuel price criterion described in section 6(a)(2) may be met for a calendar year, Edison shall give written preliminary notice to Bonneville's Authorized Representative no later than the subsequent January 1 of its best estimates of such average annual fuel cost and written final notice no later than the subsequent January 20. If the conversion criterion is met, and a Party desires to exercise its option, such Party shall provide written notice to the other Parties' Authorized Representative by the following February 1.

(5) Unless otherwise agreed by the Parties, the conversion to the exchange pursuant to this section shall apply to the entire Annual Amount of Energy and shall become effective for the duration of the subsequent Delivery Year only.

(b)  Conversion Upon Surplus Firm Power Insufficiency.

The sale of surplus firm power shall convert in whole or in part to
an exchange if Bonneville has a surplus firm power insufficiency as
determined in the PNW Coordination Agreement planning process.

(1)  Preliminary Notice.

By April 1 of each year, Bonneville shall provide Edison's
Authorized Representative a written preliminary notice of
Bonneville's assessment of the likelihood that there will be
sufficient surplus firm power to satisfy Edison's most recent
plan of delivery in the ensuing Delivery Year.

Based upon such planning, the Parties may agree to begin an
exchange at any time after such notice but not prior to June 1.

(2)  Selection of Option and Second Notice.

Edison shall have the option to either:  (i) remain in the power
sale mode until after other PSW IOU Contracts have converted to
an exchange or are otherwise terminated; or (ii) convert to an
exchange prior to the conversion of such other PSW IOU Contracts.

(A)  By July 1 of each year, Bonneville shall provide to
Edison's Authorized Representative an updated notice of
Bonneville's assessment of the likelihood that there will

17

be sufficient surplus firm power to satisfy Edison's mo
recent plan of delivery and any deliveries pursuant to PSW
IOU Contracts in the ensuing Delivery Year.

(B) If it is Bonneville's assessment that there is a reasonable
likelihood that Bonneville will experience a surplus firm
power insufficiency, Edison shall provide Bonneville's
Authorized Representatve with a written notice by July 10
of Edison's election of either option (i) or option (ii).
Such option shall be effective if Bonneville issues a final
notice pursuant to section 6(b)(3) stating that Bonneville
does not have sufficient surplus firm power to serve PSW
IOU Contracts but does have sufficient energy to serve an
Edison plan of delivery.

(3) **Final Notice**.

By August 10 of each year, Bonneville shall provide written
notification to Edison's Authorized Representative stating
whether Bonneville has sufficient surplus firm power to serve
PSW IOU Contracts and the adopted Edison plan of delivery.  The
final notice shall indicate alternatives as follows:

(A) If Bonneville has sufficient energy to serve all PSW IOU
Contracts and the Edison plan of delivery, then this
Agreement shall continue as a power sale.

18

(B)  If Bonneville has sufficient energy to serve some but not all of the PSW IOU Contracts and can serve the Edison plan of delivery, then the option Edison selected under section 6(b)(2) shall become effective.

(C)  If Bonneville does not have sufficient energy to serve any of the PSW IOU contracts or the Edison plan of delivery, then the power sale shall convert to an exchange. If the power sale converts to an exchange, unless otherwise agreed by the Authorized Representatives, the exchange shall begin 30 days after Bonneville provides notice to Edison under this section 6(b)(3) and shall be effective for the balance of the Delivery Year.

(4)  Partial Conversion.

If Bonneville determines that the planning insufficiency above is such that less than 100 percent but greater than 50 percent of the monthly amount of energy for any month in Edison's effective plan of delivery for the current Delivery Year, determined in accordance with section 5(c), is available for a power sale to Edison under this Agreement, Bonneville shall continue to sell 50 percent of the Annual Amount of Energy, at the maximum rate of delivery of one-half the Contract Demand and 50 percent of the Contract Demand shall convert to the exchange. If Bonneville determines that 50 percent or less of

19

the monthly amount of energy for any month is available, the power sale shall convert in whole to the exchange. Other amounts may be agreed to by the Authorized Representatives.

If on an annual basis Bonneville may have sufficient surplus firm power to meet 50 percent or 100 percent of the Annual Amount of Energy, but not sufficient to meet each monthly amount of Edison's Plan of Delivery, consistent with the limits in section 5(b), revisions in Edison's plan of delivery may be agreed to by the Authorized Representatives such that all Edison's monthly amounts are within Bonneville's monthly amounts of surplus firm power availability.

If during any period both power sale and exchange occur, pertinent provisions of this Agreement that relate to amounts of the power sale or exchange shall be adjusted proportionately. Examples of this adjustment are provided in Exhibit D.

(5) <u>Conversion Back to Power Sale</u>.

Except as provided in section 13, a conversion from a power sale to an exchange due to surplus firm power insufficiency shall be effective for the duration of the Delivery Year. This Agreement shall automatically convert back from an exchange to a power

sale for subsequent Delivery Years unless Bonneville provides written notice of an expected surplus firm power insufficiency for the ensuing Delivery Year pursuant to section 6(b) or the sale is otherwise triggered to an exchange pursuant to sections 6(a) or 6(c).

(6) <u>PNW Coordination Agreement.</u>

In the event that Bonneville considers an amendment to the PNW Coordination Agreement that would reduce or eliminate the availability of the Annual Amount of Energy under this Agreement, Bonneville shall provide Edison with reasonable notice and Edison shall have the opportunity to advise Bonneville of Edison's recommendations on such amendment prior to Bonneville adopting such amendment. If the PNW Coordination Agreement expires and is not replaced, Bonneville shall use a planning process similar to that used in the PNW Coordination Agreement to make a determination of surplus firm power insufficiency.

(c) <u>Conversion upon No Effective Applicable Rate or Rate Schedule.</u>

(1) Bonneville shall use best efforts during the term of this Agreement to assure that the contract rates specified in section 9 of this Agreement are approved by FERC, or that there is a rate or rate schedule approved by FERC under which sales can be made at the contract rates. If at any time during the

term of this Agreement Bonneville does not have FERC approval -
the contract rates or FERC approval of other rate or rate
schedules under which sales can be made at the contract rates,
Edison shall have the option to convert from a power sale to an
exchange pursuant to section 6(c) of this Agreement, using the
exchange ratios set forth in Table 2 of Exhibit D.  Table 2
ratios shall remain in effect only during Delivery Years in
which this Agreement is in an exchange due to such lack of FERC
approval.

(2)  If at any time Bonneville does not have a rate or rate schedule
in effect as specified above, for the next 2 calendar months
under which sales can be made at the prices specified in
section 9(b), then the Agreement shall convert from a power sa
to an exchange.  On the first day of the last full calendar
month that Bonneville has a rate in effect pursuant to.
section 6(c)(1), the conversion to the exchange shall take
effect for that Delivery Year and shall become effective on the
first day of the next calendar month.  Such conversion shall
remain in effect as an exchange for the remainder of the
Delivery Year unless otherwise agreed by the Authorized
Representatives.  If, 30 days prior to the end of the Delivery
Year, Bonneville does not have such a rate or rate schedule in
effect, this Agreement shall continue in the exchange mode for
the ensuing Delivery Year.

(d)   Conversion During Last Year.

This Agreement shall convert from a surplus firm power sale to a seasonal capacity-energy exchange on July 1, 2008.

7.   Capacity-Energy Exchange.

Upon conversion to an exchange, Bonneville shall make capacity available to Edison for the period June 1 through October 31 each year, except for periods of transition as provided in section 6.  Edison shall be obligated to provide Peaking Replacement Energy to Bonneville as specified in section 7(b), unless Bonneville elects compensation as specified in section 7(f).  In exchange for Bonneville making capacity available, Edison shall deliver Exchange Energy as specified in section 7(c), unless Bonneville elects compensation as specified in section 7(f).  Edison shall also make available Supplemental Energy to Bonneville, as specified in section 7(d).

(a)   Peaking Capacity and Energy.

During periods of complete or partial conversion to an exchange, Bonneville shall make available to Edison firm peaking capacity in any hour in an amount equal to the then-effective Contract Demand less the then-effective capacity made available to Edison under the power sale provisions hereunder.  Peaking Energy shall be delivered pursuant to the scheduling provisions of section 8(b), in daily

amounts, Monday through Saturday, including holidays, up to 10 MWh per MW of firm peaking capacity, and in Calendar Week amounts up to 50 MWh per MW of firm peaking capacity.

(b)  <u>Peaking Replacement Energy.</u>

Edison shall be obligated to deliver Peaking Replacement Energy to Bonneville for the amounts of Peaking Energy delivered to Edison, unless Bonneville elects other compensation pursuant to section 7(f).

Deliveries of Peaking Replacement Energy shall be made during hours as scheduled by Edison at up to 100 percent of the firm peaking capacity being provided as an exchange, subject to Bonneville's right to limit such return deliveries to not less than 60 percent of the firm peaking capacity being provided as an exchange on any such hour except that Bonneville may not, unless agreed by Edison, restrict return deliveries during more than 60 hours for any period from the hour ending 0800 Monday to the following Monday at the hour ending 0800. The Parties shall endeavor to accomplish return deliveries at the first available opportunity.

To the extent Bonneville is not exercising its right to limit return deliveries, Edison shall return at rates up to 100 percent and make return deliveries within 24 hours.

To the extent Bonneville restricts return deliveries to less than 100 percent on any hour, the restricted quantity of Peaking Replacement Energy may either be returned by Edison on hours other than the hours described below or be returned on the next available return hour on which Bonneville can accept Peaking Replacement Energy; provided, however, that Bonneville is not obligated to accept Peaking Replacement Energy on any return hour above a level equivalent to 60 percent of the firm peaking capacity being provided under the exchange.

Edison shall deliver all Peaking Replacement Energy by the hour ending 0800 on Monday for the week beginning the previous Monday at the hour beginning 0800 during which capacity was made available by Bonneville.  The hours for these return deliveries are as follows:

(1)  hour beginning 2200 on Monday to hour ending 0800 on Tuesday
(2)  hour beginning 2200 on Tuesday to hour ending 0800 on Wednesday
(3)  hour beginning 2200 on Wednesday to hour ending 0800 on Thursday
(4)  hour beginning 2200 on Thursday to hour ending 0800 on Friday
(5)  hour beginning 2100 on Friday to hour ending 0900 on Saturday
(6)  hour beginning 2100 on Saturday to hour ending 0900 on Sunday
(7)  hour beginning 2100 on Sunday to hour ending 0800 on Monday

If Edison desires to extend the hours for return delivery, Bonneville shall accept deliveries during additional hours prior to the hour ending 0800 on Monday, except that Bonneville shall have the right to

restrict the level of deliveries on any return hours to no less than 60 percent of the firm peaking capacity being provided under the exchange.

The Parties' schedulers or dispatchers may agree to hours other than the above or delay the return beyond the hour ending 0800 Monday following the week of delivery of the Peaking Energy by Bonneville.

(c) Exchange Energy.

During periods of complete or partial conversion to an exchange, Edison shall deliver Exchange Energy to Bonneville in exchange for Bonneville's obligation to make capacity available during the preceding June through October. Edison shall deliver each year's total amount of Exchange Energy in equal weekly amounts, or pro rata portions thereof, during the period November 16 through March 31 in accordance with schedules established by Edison pursuant to section 8(b). The total amount of Exchange Energy to be delivered during said period shall be determined by a ratio of kilowatthours for each kilowatt of Contract Demand associated with the exchange. Such total amount shall be proportionately reduced for any portion of the June through October period during which the power sale is in effect. The amount of this ratio for each year is set forth in Exhibit D.

(d)  Supplemental Energy.

    (1)  Availability.

During periods of complete or partial conversion to an exchange, if Bonneville has made capacity available during the preceding June through October Edison shall make available Supplemental Energy to Bonneville.  Edison shall deliver each Delivery Year's total amount of Supplemental Energy during the period November 16 through April 15.  The maximum amount of Supplemental Energy to be made available during said period shall be determined by a ratio of kilowatthours for each kilowatt of Contract Demand associated with the exchange.  Such total amount shall be proportionately reduced for any portion of the June through October period during which the power sale is in effect.  The amount of this ratio is set forth in Exhibit D.

    (2)  Notice.

Bonneville may elect to purchase Supplemental Energy in weekly amounts, up to the maximum amount available to Bonneville in any Delivery Year, by serving notice to Edison as follows:

    (A)  Bonneville shall provide Edison with at least 8 weeks' preliminary notice prior to the start of each week's deliveries.

(B) Within 1 week of receiving preliminary notice by Bonneville, Edison shall apprise Bonneville whether Edison expects that it would be burning oil to make such deliveries to Bonneville.

(C) Bonneville shall provide Edison with at least 2 weeks' final written notice prior to the start of each week's deliveries unless Edison has apprised Bonneville of an oil burning situation pursuant to section 7(d)(2)(B). If Edison continues to expect to be in an oil burning situation, Bonneville shall provide Edison with at least 6 weeks' final notice prior to the start of each week's deliveries. In either case, Edison shall provide an estimate of the cost of such Supplemental Energy to Bonneville prior to Bonneville's final notice.

(D) Notwithstanding the other notice provisions in this section 7(d)(2), one time during each Delivery Year, Bonneville may give Edison a 2-weeks' final notice prior to the start of deliveries pursuant to section 12(b)(4), for up to a maximum of 160,000 MWh total of both Supplemental Energy and Option Energy. If only Supplemental Energy is requested, the maximum amount provided pursuant to this section 7(d)(2)(D) shall not exceed the maximum amount set forth in section 7(d)(3).

(3)  Amount.

The amount of Supplemental Energy delivered to Bonneville pursuant to such notice shall be limited to the lesser of:

(A)  the maximum amount of Supplemental Energy available to Bonneville pursuant to Exhibit D; or

(B)  the amount of energy that Edison can provide each week (i) during 70 hours at 200 percent of the Contract Demand associated with the exchange, less (ii) the capacity necessary to provide Exchange Energy during 84 hours, and (iii) increased by the capacity made available through Edison's election to provide Supplemental Energy during other than 70 hours.  Sample calculations illustrating this provision are included in Exhibit D.

(4)  Payment.

(A)  Energy Payment.

Bonneville shall pay Edison 115 percent of Edison's incremental costs of providing Supplemental Energy under this section 7(d).  Such costs shall include fuel costs, variable transmission charges, transmission losses, and operating and maintenance costs, incurred from the date of final notice.

(B)  Mitigated Costs.

If Bonneville rescinds a final notice for Supplemental
Energy, Bonneville shall pay Edison any otherwise
unrecoverable costs accrued by Edison in response to
Bonneville's final notice, including fuel procurement and
storage costs.  Edison shall use best efforts to mitigate
such costs, but in no case shall Bonneville's obligation
exceed 4.5 mills/kWh in nominal dollars for the amount of
energy specified in its rescission.

(C)  Payment.

Payment shall be pursuant to section 9(a)(2).

(e)  Edison Deliveries of Exchange and Supplemental Energy.

Edison shall deliver the weekly amounts of Exchange Energy determined
in section 7(c), and Supplemental Energy, if any, determined in
section 7(d), by 2400 hours Saturday of each Calendar Week in
accordance with schedules provided by Edison pursuant to
section 8(b).  Unless otherwise agreed, during any hour the total
rate of delivery for Exchange Energy plus any Supplemental Energy
shall not exceed 200 percent of the Contract Demand associated with
the exchange.

Any Exchange Energy obligation resulting from a Transmission Outage pursuant to section 10(c)(1), and for which Bonneville must pay Edison its incremental costs, shall be associated with the weekly amount(s), or portions thereof, at the end of the period for Exchange Energy deliveries.  If Bonneville elects to purchase such energy, Bonneville shall notify Edison two (2) months prior to the start of deliveries.

(f)   Cash-Out of Peaking Replacement and Exchange Energy.

Upon notice to Edison by 1400 hours on any Thursday, Bonneville may elect to require Edison to pay Bonneville the amount specified in section 9(c) in lieu of Edison's providing (i) Peaking Replacement Energy to Bonneville on the day or days specified during the ensuing week beginning at 0800 hours on Monday; or (ii) Exchange Energy to Bonneville on the day or days specified during the ensuing Calendar Week.

Bonneville's right to such election shall not prohibit the Parties' schedulers and dispatchers from agreeing to Edison's payment in lieu of Peaking Replacement Energy and Exchange Energy at rates other than those specified in section 9(c) or notice other than that specified above.  This election may be made only if the rate stated in section 9(c) is authorized under Bonneville's then-effective rate schedules.

31

(g) Edison Scheduling Rights.

Except for Bonneville's elections as provided in section 7(f), Edison shall retain the right to schedule Peaking Energy, Peaking Replacement Energy and Exchange Energy under this Agreement.

8. Scheduling Provisions.

(a) Power Scheduling for Power Sale.

When all or a portion of this Agreement operates as a power sale, submission of all schedules between the Parties shall be subject to the following provisions, unless otherwise agreed by the Parties' respective schedulers or dispatchers for a specific schedule:

(1) Preschedules shall be completed on each Workday for each hour of the following day or days through the next Workday.

(2) Prescheduled amounts shall be submitted by 0530 hours.

(3) If Edison desires to schedule other than the average rate of delivery for each month in any Calendar Week, as permitted under section 5(b), Edison shall notify Bonneville by 1500 hours on the Wednesday preceding such week.

(4)  Bonneville may request by 1200 hours on any Wednesday estimates of the amounts that Edison anticipates that it will schedule from Bonneville each day for the following ten days.  Edison shall submit such estimates to Bonneville by 1200 hours on the first Workday following the request.  Such estimates are for the purpose of information only and shall not obligate Edison or Bonneville to schedule such amounts.

(5)  The Parties shall coordinate ramping of prescheduled amounts and shall normally complete ramping during the 20-minute period beginning 10 minutes prior to the start of a schedule hour.

(6)  The Parties shall endeavor to avoid requesting changes from the amounts prescheduled.  Requests for changes in schedules shall normally be submitted no later than thirty (30) minutes before any hour.  Changes in prescheduled amounts for any hour shall be only as mutually agreed.

(b)  <u>Power Scheduling for Exchange</u>.

When this Agreement operates as an exchange, submission of all schedules between the Parties shall be subject to the following provisions, unless otherwise agreed by the Parties' respective schedulers or dispatchers for a specific schedule:

(1)  Preschedules shall be completed on each Workday for each hour of the following day or days through the next regular Workday.

33

(2)  Preschedules shall be submitted by 0930 hours.

(3)  Bonneville shall schedule Peaking Energy to Edison in hourly amounts as requested by Edison pursuant to section 7(a).

(4)  Edison shall schedule Peaking Replacement Energy to Bonneville in hourly amounts pursuant to section 7(b).  Edison shall schedule Exchange Energy, and Supplemental Energy if applicable, to Bonneville pursuant to sections 7(c), 7(d) and 7(e).

(5)  The Parties shall endeavor to avoid requesting changes from the prescheduled amounts of Peaking Energy.  Requests for changes in schedules shall normally be submitted no later than thirty (30) minutes before any hour.  Changes in schedules for any hou. shall be only as mutually agreed except for peaking energy reserve service provided under section 8(b)(8).

(6)  The Parties shall endeavor to avoid requesting changes in Peaking Replacement Energy, Exchange Energy, and Supplemental Energy preschedules, except that Edison reserves the right, upon oral notice, to interrupt or curtail deliveries of Peaking Replacement Energy, Exchange Energy or Supplemental Energy preschedules at any time as follows:

(A)  for an Uncontrollable Force; or

34

(B)  for unanticipated causes which, if Edison continued such
     deliveries, would place the continuity of service to
     Edison's customers in jeopardy or would require Edison to
     start up a combustion turbine or other generating unit
     which Edison would not have planned to run on that hour to
     avoid such jeopardy.  However, such deliveries shall be
     made within 24 hours of the time the interruption or
     curtailment no longer exists; or, for Exchange Energy and
     Supplemental Energy, within 168 hours if agreed to by
     Bonneville's schedulers or dispatchers.

(7)  At times when Edison purchases energy from Northwest or Canadian
     utilities, Edison, for the purposes of satisfying its Peaking
     Replacement Energy obligation to Bonneville under this
     Agreement, shall counter schedule such purchase against the
     delivery of Peaking Replacement Energy such that the net
     schedule at COB or NOB does not exceed Edison's total available
     transmission capability.

(8)  In the event of a System Disturbance on the Edison system,
     Edison may request increases in the prescheduled amounts of
     Peaking Energy, and Bonneville shall increase such schedules
     within 10 minutes of Edison's request so long as at the time of
     such request a System Disturbance on Bonneville's system would
     not be created by such increase.  Edison's right to request
     increases in the prescheduled amounts of Peaking Energy shall be
     subject to the following limitations:

(A)  Such requests shall only be made for schedules of Peaking Energy during the hours beginning at 0700 and ending at 2200 on Monday through Saturday.

(B)  The sum of the prescheduled amounts and such requests shall not exceed the Contract Demand for firm peaking capacity and the daily amounts or weekly amounts of Peaking Energy specific in section 7(a).

(C)  The MWh amount of requested increases in Peaking Energy on any day shall not exceed two (2) hours times the Contract Demand for firm peaking capacity under the exchange.

(D)  Corresponding changes in prescheduled amounts of Peaking Replacement Energy within the limits of section 7(b) shall be made at the same time as the requested increase in Peaking Energy; and

(E)  The generating unit or transmission line outage that caused the System Disturbance on Edison's system shall be specified by Edison's schedulers or dispatchers at the time of the request.

9. <u>Payment and Rates</u>.

(a) <u>Payment</u>.

(1) <u>Payment by Edison</u>.

In accordance with Bonneville's General Rate Schedule Provisions in Exhibit A, Bonneville shall submit monthly bills to Edison, and Edison shall pay Bonneville each month, for all amounts described in this section and section 12(a).  All rates used to prepare bills shall be rounded to the nearest one-tenth of a mill.

(2) <u>Payment by Bonneville</u>.

Edison shall render monthly bills to Bonneville for each month that Bonneville has taken delivery of Supplemental Energy, Option Energy, Exchange Energy that it must pay for, or any costs incurred by Bonneville in rescinding a notice for such energy.  Bills shall be payable at Edison's Accounts Receivable Department at the address specified in section 17.  Failure to receive a bill shall not release Bonneville from liability for payment.  Each calculated monetary amount in a power bill shall be rounded to a whole dollar amount, by elimination of any amount of less than 50 cents and increasing any amount from 50 cents through 99 cents to the next higher dollar.

If Edison is unable to render Bonneville a timely monthly bill which includes a full disclosure of all billing factors, it may elect to render an estimated bill for that month to be followed by the final bill. Such estimated bill, if so issued, shall have the validity of and be subject to the same payment provisions as shall a final bill; however, payment required under the estimated bill shall be adjusted as appropriate in the final bill.

Bills not paid in full on or before close of business on the due date shall be subject to a penalty charge of $25. In addition, an interest charge of one-twentieth percent (0.05 percent) shall be applied each day to the sum of the unpaid amount and the penalty charge. This interest charge shall be assessed on a daily basis until such time as the unpaid amount and penalty charge are paid in full.

Remittances received by mail will be accepted without assessment of the charges referred to in the preceding paragraph provided the postmark indicates the payment was mailed on or before the 20th day after the date of the bill. If the 20th day after the date of the bill is a Sunday or other nonbusiness day of Bonneville, the next following business day shall be the last day on which payment may be made to avoid such further charges. Payment made by metered mail and received subsequent to the 20th day must bear a postal department cancellation in order to avoid assessment of such further charges.

38

Edison may, whenever a power bill or a portion thereof remains unpaid subsequent to the 20th day after the date of the bill, and after giving 30 days' advance notice in writing, cancel the contract for service to Bonneville, but such cancellation shall not affect Bonneville's liability for any charges accrued prior thereto.

(b) Surplus Firm Power.

Payment for surplus firm power delivered during the surplus firm power sale shall be at the rate in this section 9(b). The rates specified in this section 9(b) include the Intertie service charge. The effective rate, rate ceiling, rate floor and BASC shall be rounded to the nearest one-tenth of a mill. The rate for surplus firm power is as follows:

(1) Initial Fiscal Year.

During the period beginning July 1, 1989, through the Fiscal Year ending on September 30, 1989, the rate shall be 28.5 mills/kWh.

(2) Subsequent Fiscal Years.

(A) For all subsequent Fiscal Years, beginning with the Fiscal Year that starts on October 1, 1989, the rate shall be calculated as follows:

$$R_n = R_{n-1} \cdot \frac{\dfrac{(OP \times DO)_{n-1} + (GP \times DG)_{n-1}}{(DO + DG)_{n-1}}}{\dfrac{(OP \times DO)_{n-2} + (GP \times DG)_{n-2}}{(DO + DG)_{n-2}}} \cdot$$

where:

$n$ = the calendar year during which the Fiscal Year begins;

$R_n$ = the rate, in mills per kilowatthour, for the Fiscal Year that begins in calendar year n;

$R_{n-1}$ = the rate in mills per kilowatthour, for the Fiscal Year that begins in calendar year n-1;

$OP$ = the Price of Oil to Electric Utilities in the Pacific Region No. 2 in calendar years (n-1) and (n-2), expressed in dollars per million BTUs and as set forth in Table A-30 of Data Resources, Inc. (DRI) Energy Report as published in the spring of calendar year n (Access Code POILEUB@PAC2);

$DO$ = the Electric Utilities Demand for Oil in the Pacific Region No. 2 in calendar years (n-1) and (n-2), expressed in trillions of BTUs and as set forth in Table A-36 of DRI's Energy Report as published in the spring of calendar year n (Access Code DFOILEUB@PAC2);

$GP$ = the Price of Natural Gas to Electric Utilities in the Pacific Region No. 2 in calendar years (n-1) and (n-2), expressed in dollars per million BTUs and as set forth in Table A-31 of DRI's Energy Report as published in the spring of calendar year n (Access Code PNGEUB@PAC2).

$DG$ = the Electric Utilities Demand for Natural Gas in the Pacific Region No. 2 in calendar years (n-1) and (n-2), expressed in trillions of BTUs and as set forth in Table A-37 of DRI's Energy Report as published in the spring of calendar year n (Access Code DFNGEUB@PAC2).

During the Fiscal Year beginning on October 1, 1991, the rate shall also be changed on April 1, 1992, if the rate

calculated using the rate ceiling in section 9(b)(2)(B)(ii)
differs from the rate calculated using the rate ceiling in
section 9(b)(2)(B)(i).

If the DRI Energy Report, or any of its factors referred to
above, ceases to exist or is substantially modified during
the term of this Agreement, the Authorized Representatives
shall agree upon appropriate replacement factors or reports.

(B)  <u>Rate Ceiling</u>.

The rate for surplus firm power in section 9(b)(2)(A) shall
not exceed the rate ceiling determined as follows:

(1)  Through March 31, 1992:

$$RC_n = RC_{n-1} \cdot \frac{BASC_n}{BASC_{n-1}}$$

        $n$ =    The Fiscal Year for which the rate
                 ceiling is being calculated.

      $n-1$ =    The Fiscal Year prior to the one for
                 which the rate ceiling is being
                 calculated.

where:  $RC_n$ =    The effective rate ceiling during
                 Fiscal Year n, expressed in mills per
                 kilowatthour; 35.0 mills/kWh in the
                 Fiscal Year ending September 30, 1989.

      $RC_{n-1}$ =    The effective rate ceiling during
                 Fiscal Year n-1, expressed in mills
                 per kilowatthour.

41

$BASC_n$ = The Bonneville average system cost (in mills per kilowatthour) as forecast and adopted by Bonneville in the most recent rate case that determines the generally applicable Bonneville wholesale power rates to be in effect on October 1 of Fiscal Year n. Bonneville's average system cost shall equal Bonneville's total revenue requirement divided by Bonneville's total energy sales forecasted for the test period of the rate case. The BASC for the Fiscal Year ending September 30, 1989, is 23.2 mills/kWh.

(ii) Effective April 1, 1992:

$$RC_x = RC_{x-1} \cdot \frac{BASC_x}{BASC_{x-1}}$$

x = The Fiscal Year for which the rate ceiling is being calculated.

x-1 = The Fiscal Year prior to the one for which the rate ceiling is being calculated.

where: $RC_x$ = The effective rate ceiling during Fiscal Year x, expressed in mills per kilowatthour; 36.9 mills/kWh in the Fiscal Year ending September 30, 1989.

$RC_{x-1}$ = The effective rate ceiling during Fiscal Year x-1, expressed in mills per kilowatthour.

$BASC_x$ = The Bonneville average system cost (in mills per kilowatthour) as forecast and adopted by Bonneville in the most recent rate case that determines the generally applicable Bonneville wholesale power rates to be in effect on October 1 of Fiscal Year x. Bonneville's average system cost shall equal Bonneville's total revenue requirement divided by Bonneville's total energy sales forecasted for the test period of the rate case. The BASC for the Fiscal Year ending September 30, 1989, is 23.2 mills/kWh.

42

(C) <u>Rate Floor</u>.

(1) The rate for surplus firm power in section 9(b)(2)(A) shall not be less than the rate floor determined as follows:

$$RF_n = RF_{n-1} \cdot \frac{BASC_n}{BASC_{n-1}}$$

$n$ = As defined in section 9(b)(2)(B)

$n-1$ = As defined in section 9(b)(2)(B)

where: $RF_n$ = The effective rate floor during Fiscal Year n, expressed in mills per kilowatthour; 28.5 mills/kWh in the Fiscal Year ending September 30, 1989.

$RF_{n-1}$ = The effective rate floor during Contract Year n-1, expressed in mills per kilowatthour.

$BASC_n$ = As defined in section 9(b)(2)(B)

Each time Bonneville files with FERC a change in its wholesale rates following a section 7(i) general rate hearing under Public Law No. 96-501, Bonneville shall provide to Edison such filed rates and the percent change in its BASC for the subsequent year(s) and the resulting rate floor and ceiling for the applicable Fiscal Year. Bonneville shall also provide to Edison any changes to the BASC that may occur as a result of interim or final FERC approval and shall make resulting adjustments to the rate floor and rate ceiling.

(2)   Rate Floor Adjustment.

The rate floor shall be adjusted downward for the ensuing Fiscal Year when certain threshold levels for oil and gas prices are reached.

(A)   For each Fiscal Year through the Fiscal Year ending September 30, 1993, the rate floor shall be adjusted downward if the weighted average price for oil and gas to Edison for the previous calendar year is less than:

(i)   20 mills/kWh in 1987 dollars; and

(ii)  the rate floor otherwise in effect.

(B)   For each Fiscal Year beginning October 1, 1993, the rate floor shall be adjusted downward if the weighted average price for oil and gas to Edison for the previous calendar year is less than:

(i)   24 mills/kWh in 1987 dollars, and

(ii)  the rate floor otherwise in effect.

The rate floor shall be adjusted downward by any difference by which the lower of threshold levels (i) and (ii) above exceeds the weighted average price for oil and gas to Edison for the calendar year immediately prior to the Fiscal Year.  If for any Fiscal Year this adjustment becomes effective, Edison shall provide to Bonneville copies of the appropriate sections of its <u>Financial and Operating Report</u> showing Edison's consumption and cost of oil and gas generation upon which the determination was made.

Whenever the rate floor has been adjusted pursuant to this section 9(b)(2)(C)(2), $RF_{n-1}$ shall equal the adjusted rate floor in calculating the new rate floor $RF_n$ for the ensuing Fiscal Year pursuant to section 9(b)(2)(C)(1).

(c)   <u>Cash Out</u>.

If, pursuant to section 7(f), Bonneville elects to have Edison provide a payment rather than provide Peaking Replacement Energy or Exchange Energy, such payments shall be calculated as follows:

(1)   For transactions relating to Peaking Replacement Energy as provided for in section 7(f), the rate shall be the lesser of the rate as calculated in section 9(c)(1)(A) or section 9(c)(1)(B).

(A) $PE_x = 0.4\ FC_{x-1}$

where: $FC_{x-1}$ = The weighted average fuel cost of oil gas as consumed by Edison during the three calendar month period ending one month preceeding the month for which such rate is being calculated, using the methodology described in Exhibit E.

$PE_x$ = The rate per kWh to be effective during the calendar month during which Edison would otherwise have provided Peaking Replacement Energy pursuant to section 7(b).

(B) Bonneville's average cost of energy as determined by the methodology set forth in Exhibit F.

(2) For transactions relating to Exchange Energy as provided for in section 7(f), the rate shall be the lesser of the rate as calculated in section 9(c)(2)(A) or section 9(c)(2)(B).

(A) $EE_x = 0.3\ FC_{x-1}$

where: $FC_{x-1}$ = As described in section 9(c)(1).

$EE_x$ = The rate per kWh to be effective during the calendar month during which Edison would otherwise have provided Exchange Energy pursuant to section 7(c).

(B) Bonneville's average cost of energy as determined by the methodology set forth in Exhibit F.

(3) If Edison's oil and gas generation represent less-than 10 percent of the resource mix utilized on Edison's system in kilowatthours in any calendar year and Edison desires a readjustment of the formulas in sections 9(c)(1) and 9(c)(2),

Edison shall notify Bonneville in writing by January 31 of this change in generation. Within 90 days of such notice, Edison shall propose and the Parties shall negotiate an alternate methodology to calculate rates pursuant to this section 9(c). Such negotiations shall recognize appropriate factors such that the rates under this section 9(c) shall not exceed Edison's cost of otherwise supplying Peaking Replacement Energy and Exchange Energy pursuant to sections 7(b) and 7(c). If the Parties agree on an alternate methodolodgy, such alternate methodology shall become effective beginning June 1. If the Parties are unable to agree on such an alternate methodology, Edison shall have the option:

(A) if the Agreement is completely or partially in an exchange, to terminate the Agreement upon 60 days written notice; or

(B) if the Agreement is completely in a power sale, to terminate the Agreement whenever the Agreement would otherwise convert, completely or partially, into an exchange pursuant to sections 6(a), 6(b); or 6(c).

If Edison elects to terminate under this section 9(c)(3), Edison shall not be required to provide any additional compensation to Bonneville.

(4) During periods of complete or partial exchange, Edison shall provide the information required under this section 9(c) to Bonneville each month.

47

10. Transmission Limitation.

In the event of Transmission Outages the following provisions apply:

(a) Curtailment of Deliveries.

Both Pa ies shall curtail nonfirm energy transactions on the AC or
DC Intertie or both, unless otherwise prohibited by law or by
agreements executed prior to this Agreement, to the extent necessary
to continue or reschedule deliveries under this Agreement. Both
Parties shall also curtail on an hourly basis any deliveries of firm
energy or capacity over the AC and the DC Intertie pursuant to
agreements executed after this Agreement prior to curtailment of
deliveries under this Agreement. However, during the first 720 hou
of a Transmission Outage(s) on the DC Intertie due to scheduled
inspection and repair during any delivery year, the Parties shall
schedule deliveries under this Agreement on the AC Intertie, subject
only to sections 10(b) and 10(c) below.

(b) Outage during Power Sale.

During the power sale, both Parties shall make reasonable efforts to
reschedu interrupted or curtailed amounts of energy under
conditi approximately equivalent the conditions under which the
interrup..on or curtailment occurred within 60 days following the end
of the interruption or curtailment, unless otherwise agreed by the

Authorized Representatives.  If the Parties are unable to reschedule any amounts of energy, Bonneville shall be relieved of its obligation to deliver and Edison shall be relieved of its obligation to pay for such amounts of energy.

(c)  <u>Outage during Exchange or during Option Capacity or Option Energy Deliveries.</u>

During an exchange or during any period of the power sale when Bonneville has restricted firm energy deliveries pursuant to section 13 and is delivering capacity only, during provision of Option Capacity, or during provision of Option Energy, both Parties shall make reasonable efforts to reschedule any interrupted or curtailed amounts of Peaking Energy, Peaking Replacement Energy, Exchange Energy, Supplemental Energy, Option Energy, or the energy associated with Option Capacity, under conditions approximately equivalent to the conditions under which the interruption or curtailment occurred, provided that in rescheduling Peaking Energy Edison shall not exceed the limits for Peaking Energy set forth in Section 7(b), unless the Authorized Representatives agree.  Peaking Replacement Energy, Exchange Energy, Supplemental Energy, Option Energy or the energy associated with Option Capacity shall be rescheduled within 60 days following the end of the interruption or curtailment, unless the Authorized Representatives agree otherwise. To the extent the Parties have not so rescheduled any amounts of the above, the following provisions shall apply:

(1)  Exchange Energy.

Edison shall continue to be obligated to deliver Exchange Energy
pursuant to section 7(c).

Interrupted or curtailed deliveries of Exchange Energy shall be
rescheduled at mutually agreeable times.

To the extent Edison's total daily schedule of Peaking Energy
from Bonneville has been completely interrupted on more than
10 days during the previous summer and never rescheduled,
Bonneville shall pay Edison its incremental costs in delivering
the associated Exchange Energy, if such energy is requested by
Bonneville pursuant to section 7(e).

(2)  Supplemental Energy and Option Energy.

Edison shall be relieved of its obligation to deliver such
amounts of Supplemental Energy and Option Energy, and Bonneville
shall be relieved of its obligation to pay for any such
requested Supplemental and Option Energy.

11. Transmission for Other Arrangements.

(a)  Upon request by Portland General Electric Company, Pacific Power &
Light Company, or other utilities agreed to by the Authorized
Representatives and if Bonneville determines that transmission

capability is available for that purpose, Bonneville shall accept deliveries of energy from Edison at COB or NOB and deliver such energy to the account of the requesting utility as agreed by Bonneville's schedulers or dispatchers. Edison's deliveries shall be made pursuant to Edison's other agreements with such third parties.

(1) All such deliveries shall be prescheduled for each hour of the following day or days through the next Workday. Changes in prescheduled amounts shall be only as agreed by the Parties' schedulers or dispatchers.

(2) Edison shall bear its own costs for delivery of such energy to COB or NOB. The requesting utility shall pay Bonneville for transmission services from COB or NOB to its system and provide for transmission losses imposed by Bonneville for such deliveries. Charges for transmission services shall be established by Bonneville's schedulers and dispatchers at the time of the request in accordance with Bonneville's then-effective transmission rate schedules. Transmission losses shall be established by Bonneville's schedulers and dispatchers in accordance with standard practices.

(b) If Edison executes an agreement with WWP to extend its existing seasonal exchange agreement prior to May 1, 1989, Bonneville agrees to provide a transmission agreement to WWP as part of the joint venture provisions described in Bonneville's Long Term Intertie Access Policy. Such transmission contract shall provide assured delivery for WWP to extend its agreement to deliver 60 MW to Edison

51

during June through September in exchange for delivery of 80 MW to WWP during December through February.

12. Option Capacity and Option Energy.

Bonneville shall have the obligation to provide Option Capacity to Edison and Edison shall have the obligation to provide Option Energy to Bonneville.

(a)  Option Capacity.

Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a).  For any year in which such capacity is requested, Bonneville shall make Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity.

(1)  Edison shall schedule the energy associated with this Option Capacity and the return of such energy in accordance with the scheduling provisions for Peaking Energy and Peaking Replacement Energy, respectively, pursuant to section 8(b).

(2)  Unless otherwise agreed by the Authorized Represen- tatives, Edison shall provide Bonneville with 1-month's written notice for the Option Capacity.

(3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9(c)(1).  If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).

(4) Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule.  The Parties' Authorized Representatives may agree upon another applicable rate schedule.

(b) Option Energy.

Upon Bonneville's request, and in addition to other obligations under this Agreement, Edison shall provide Option Energy to Bonneville during a period of 13-calendar weeks, or less, depending upon the amount requested by Bonneville, ending no later than April 15 each year.  The amount of Option Energy available shall be a maximum of 48,000 MWh each calendar week up to a maximum of 624,000 MWh each Delivery Year.

(1) Bonneville shall provide Edison with at least 8-weeks' preliminary written notice prior to the start of each week's deliveries.

(2)  Within 1 week of receiving preliminary notice by Bonneville, Edison shall apprise Bonneville whether Edison expects that it would be burning oil to make such deliveries to Bonneville.

(3)  Bonneville shall provide Edison with at least 2-weeks' final written notice prior to the start of each week's deliveries unless Edison has apprised Bonneville of an oil burning situation pursuant to section 12(b)(2).  If Edison continues to expect to be in an oil burning situation, Bonneville shall provide Edison with at least 6-weeks' final notice prior to the start of each week's deliveries.  In either case, Edison shall provide an estimate of the cost of such Option Energy to Bonneville prior to Bonneville's final notice.

(4)  Notwithstanding the other notice provisions in this section 12(b), one time during each Delivery Year, Bonneville may give Edison a 2-weeks' final notice prior to the start of deliveries, for up to a maximum of 160,000 MWh total of both Option Energy and any Supplemental Energy requested pursuant to section 7(d)(2).

(5)  Edison shall limit its rate of delivery of Option Energy to not more than 350 MW during the first 7 weeks, and 300 MW during the last 6 weeks, of the delivery period.  Scheduling shall be done in accordance with the provisions for Supplemental Energy in section 8(b).  Edison may interrupt deliveries pursuant to section 8(b)(6), provided that the requested weekly amounts of Option Energy are delivered.

(6)  Bonneville shall pay Edison 115 percent of Edison's incremental costs of providing Option Energy under this section 12.  Such costs shall include fuel costs, variable transmission charges, transmission losses, operating and maintenance costs, and applicable start-up costs incurred from the date of final notice.  Bonneville may rescind a final notice for Option Energy, and pay Edison for any otherwise unrecoverable costs accrued by Edison in response to Bonneville's final notice for such Option Energy, including fuel procurement and storage costs.  Edison shall use best efforts to mitigate such costs, but in no case shall Bonneville's obligation exceed 4.5 mills/kWh in 1987 dollars for the amount of Option Energy specified in its rescission.  Escalation shall be calculated based on the U.S. Gross National Product deflator, as reported in the then most current monthly edition of the "Review of the U.S. Economy," by Data Resources, Inc.  Should the index or the publication change in the future, the Authorized Representatives shall agree upon a successor.  Payment shall be pursuant to section 9(a)(2).

(c)  <u>Cancellation</u>.

Either Party shall have the right to cancel the provisions of this section 12 only upon 5-years' written notice.  Bonneville shall not enter into PSW IOU Contracts for surplus firm power or capacity sales if entering into such PSW IOU Contracts would cause Bonneville to concurrently issue such 5-year notice to terminate the options under this section 12.

55

13. Restriction of Deliveries.

Pursuant to Public Law No. 88-552, Bonneville shall have the right to restrict all or a portion of the capacity and the energy associated with the power sale if such capacity or energy is needed to meet the capacity or Energy Requirements of Any Pacific Northwest Customer, as the case may be, consistent with Public Law No. 88-552 and Public Law No. 96-501. Such restrictions to Edison shall be limited to the amounts and duration neces- sary to cover the projected Northwest needs in specific months. The sale of capacity and energy to Edison under this Agreement shall continue in months during which such capacity and energy is not needed in the Northwest.

During any period that Bonneville restricts the delivery of energy as provided above, Bonneville shall make capacity available to Edison at the Contract Demand or the pro rata amount of Contract Demand in the event of a partial restriction of energy. Prior to the effective date of the restriction, Edison shall give notice to Bonneville of the amount of capacity it desires for the anticipated duration of the restriction. Terms for the delivery of such capacity and the proportionate amount of the exchange ratio, and for the delivery of Peaking Replacement Energy and Exchange Energy, shall be as provided in section 7, except that deliveries of Exchange Energy shall be made on a weekly basis during the period capacity is delivered to Edison.

Edison shall not use energy delivered under this Agreement to serve any load such that restriction on a 60-day notice would adversely impact the reliability of service to its customers, and Edison hereby acknowledges full responsibility if such adverse impact occurs.

14. Termination.

    (a) Parties' Unilateral Right.

        Edison and Bonneville shall have the right to terminate this Agreement at any time upon provision of 5 years' written notice to the other Party.  If a Party chooses to terminate this Agreement pursuant to this section 14(a), such Party shall make a lump sum payment to the other Party in the amount as shown in Exhibit G.  Such payment shall be made on the effective date of the termination.

    (b) Regulatory Approvals.

        (1) FERC Approval.

        Following execution of this Agreement by both Parties, Edison shall timely file this Agreement with FERC and seek FERC acceptance of the terms and conditions herein.  Following such execution and appropriate public review of the contract rates, Bonneville shall timely file the contract rates with FERC and seek final confirmation and approval of such rates.

        If, upon such filings or any subsequent filings, FERC (i) does not accept for filing the terms and conditions contained in this Agreement; (ii) fails to confirm and approve the contract rates on a final basis; (iii) imposes review unacceptable to either Party; (iv) accepts this Agreement with terms and conditions unacceptable to either Party; or (v) refuses to accept Edison's

57

filing of this Agreement because such filing is not in compliance with 18 C.F.R. §35.3 and FERC refuses to grant a waiver of 18 C.F.R. §35.3 pursuant to 18 C.F.R. §35.11, either Party shall have the option to terminate this Agreement prior to April 1, 1989. If a Party elects to terminate this Agreement pursuant to this section 14(b), such Party shall provide written notice of such election to the other Party not later than March 31, 1989.

(2) <u>CPUC Approval</u>.

Edison has the right to terminate this Agreement at any time prior to April 1, 1989, if Edison determines, in its sole discretion, that this Agreement has not received acceptable regulatory treatment by the CPUC.

15. <u>Uncontrollable Forces</u>.

(a) <u>Obligations of the Parties</u>.

Obligations of the Parties, other than those to pay money under section 9, shall be excused when failure to perform such obligations is due to an Uncontrollable Force, provided, however, that the Parties shall comply with sections 10(b) and 10(c), and provided further, that if either Party is unable to perform due to an Uncontrollable Force, such Party shall exercise due diligence to remove such inability with reasonable dispatch. Nothing in this

section 15(a) shall be construed to require either Party to settle any strike or labor dispute in which it may be involved..

(b) <u>Notice</u>.

Each Party shall notify the other as soon as possible of any Uncontrollable Force which may adversely affect performance under this Agreement.  Failure to give notice shall not be deemed a waiver of such Uncontrollable Force.

(c) <u>Exception</u>.

If an Uncontrollable Force causes a Transmission Outage, this section 15 shall not apply until 1 year after the commencement of the Transmission Outage.

16. <u>Assignment of Agreement</u>.

(a) Except as provided in section 16(b) or otherwise agreed, either Party shall have the right to transfer or assign this Agreement or any part hereof subject to the prior written consent of the other Party.  Such consent shall not be unreasonably withheld.

(b) This Agreement or any part hereof may be transferred or assigned without the prior written consent of the other Party provided that (i) the assigning Party shall not be relieved of any obligation hereunder; and (ii) the assignee is a financially responsible entity,

is an experienced and prudent operating entity and has the rights
title interests necessary to perform the assigned obligations.

17. <u>Notices</u>.

(a)  Unless the Agreement requires otherwise, any notice, demand or
request provided for in this Agreement, or served, given or made in
connection with it, shall be in writing and shall be deemed properly
served, given, or made if delivered in person or sent by telegraph,
or by acknowledged delivery, or sent by registered or certified mail,
postage prepaid, to the persons specified below:

    To Edison:        ce President of System Planning and Research
                      Southern California Edison Company
                      2244 Walnut Grove Avenue
                      Rosemead, California  91770

    To Bonneville:  The Administrator
                    United States Department of Energy
                    Bonneville Power Administration
                    P.O. Box 3621
                    Portland, Oregon  97208-3621

Copies of all notices shall be provided to the Authorized
Representatives and the Alternates.

(b)  Either Party may, by written notice to the other Party, change the
designations or address of the person so specified as the one to
receive notices pursuant to this Agreement.

18. Governing Law.

   This Agreement shall be interpreted, governed by and construed under the laws of the State of California and Federal laws applicable to Bonneville.

19. Authorized Representatives.

   (a) Each Party shall designate one person as an Authorized Representative and one person as an Alternate. Each Party shall notify the other Party within thirty (30) calendar days after execution of this Agreement of the designated Authorized Representative and Alternate and shall promptly notify the other Party of any subsequent changes in such designations.

   (b) The Authorized Representatives shall establish written procedures, as required, for implementing the provisions of this Agreement. Such procedures shall be adopted by mutual agreement. Authorized Representatives may delegate authority to act on a particular matter.

   (c) Except as otherwise provided in this Agreement, Authorized Representatives and Alternates shall have no authority to modify any of the provisions of this Agreement.

20. Disputes.

   Pending resolution of a disputed matter, the Parties shall continue performance of their respective obligations pursuant to this Agreement. Disputes regarding any matter relating to this Agreement shall be

discussed by the Authorized Representatives who shall use their best efforts to amicably and promptly resolve the dispute.  Should the Authorized Representatives be unable to resolve the dispute, the matter shall be referred to the individuals designated in section 17.

21. Audits.

(a)  Each Party shall reserve the right to designate contracted representatives from a certified public accounting firm who shall have the right to audit and to examine any cost, payment, settlement or supporting documentation, including, but not limited to, audit reports, resulting from any items set forth in this Agreement.  All audits shall be limited to only those items which pertain directly to sections 6, 7(d), 8(b)(6), 8(b)(8), 9, 10, 12(a), and 12(b) of this Agreement.  Data made available to the accounting firm conducting the audit shall remain confidential and shall not be shared with the other Party.  Any such audit(s) shall be undertaken by either Party's representative(s) at reasonable times and in conformance with generally accepted auditing standards.  The Party being audited agrees to fully cooperate with any such audit(s).  The right to audit a cost shall extend for a period of five (5) years following the first billing for such cost under this Agreement.  The Parties agree to retain all records and documentation prepared in the normal course of business for the entire length of this audit period.

(b)  The Party being audited shall be notified in writing of any exception taken as a result of an audit promptly after completion of the audit.

(1) If the Parties agree upon any exception(s) found as a result of the audit, the owing Party shall directly refund the amount of such exception(s) to the other Party, with interest calculated in the same manner as in Bonneville's Wholesale Power Rate Schedules and General Rate Schedule Provisions (Exhibit A) within ten (10) days of receipt of written notification of exception.

(2) If the Parties dispute any exception(s) taken as a result of the audit, the owing Party shall so notify the other Party in writing promptly after its receipt of the written notification of exception. Such dispute shall then be submitted under the provisions set forth in section 20. If upon resolution of the dispute, it is determined that a Party shall make payment to the other Party, such payment shall be made within ten (10) days of resolution of the dispute, with interest calculated in the same manner as set forth in Bonneville's Wholesale Power Rate Schedules and General Rate Schedule Provisions (Exhibit A).

22. Waivers.

Except as otherwise provided herein or as agreed by the Parties, no provision of this Agreement may be waived except in writing. Any waiver at any time by a Party of its right with respect to a default under this Agreement, or with any other matter arising in connection therewith, shall not be deemed a waiver with respect to any subsequent default or matter.

23. <u>Signature Clause</u>.

The signatories hereto represent that they have been appropriately authorized to enter this Agreement on behalf of the Party for whom they sign.

UNITED STATES OF AMERICA
Department of Energy
Bonneville Power Administration

By _____
                        Administrator

Date ___October 19, 1988___

THE SOUTHERN CALIFORNIA EDISON COMPANY

By _____
                        Vice President

Date ___July 12, 1988___

(VS6-PMCG-3649c)

64

Contract No. DE-MS79-88BP92275

# 1987 Wholesale Power Rate Schedules

## and General Rate Schedule Provisions



**United States Department of Energy**
**Bonneville Power Administration**
905 N.E. 11th Avenue
Portland, Oregon 97232

Bonneville Power Administration's 1987 Wholesale Power Rate Schedules and General Rate Schedule Provisions, contained herein, were approved on an interim basis effective October 1, 1987. These rate schedules and provisions were approved by the Federal Energy Regulatory Commission, United States Department of Energy, in a Commission Order issued September, 1987 (Docket No. EF87-2011-000).

These rate schedules and provisions supersede in their entirety the Administration's Wholesale Power Rate Schedules and General Rate Schedule Provisions effective July 1, 1985.

# WHOLESALE POWER RATE SCHEDULES
## AND GENERAL RATE SCHEDULE PROVISIONS
### TABLE OF CONTENTS

**Wholesale Power Rate Schedules** — **Page**

| | | |
|---|---|---|
| PF-87 | Priority Firm Power Rate | 1 |
| IP-87 | Industrial Firm Power Rate | 5 |
| VI-87 | Variable Industrial Power Rate | 7 |
| NF-87 | Nonfirm Energy Rate | 11 |
| CF-87 | Firm Capacity Rate | 14 |
| CE-87 | Emergency Capacity Rate | 15 |
| NR-87 | New Resource Firm Power Rate | 16 |
| SI-87 | Special Industrial Power Rate | 19 |
| SP-87 | Short-Term Surplus Firm Power Rate | 22 |
| SL-87 | Long-Term Surplus Firm Power Rate | 24 |
| SS-87 | Share-the-Savings Energy Rate | 25 |
| RP-87 | Reserve Power Rate | 26 |

**General Rate Schedule Provisions**

| | | |
|---|---|---|
| Section I | Adoption of Revised Rate Schedules and General Rate Schedule Provisions | 30 |
| Section II | Types of BPA Service | 30 |
| Section III | Billing Factors and Billing Adjustments | 32 |
| Section IV | Other Definitions | 40 |
| Section V | Application of Rates under Special Circumstances | 44 |
| Section VI | Billing Information | 45 |
| Section VII | Variable Industrial Rate Parameters and Adjustments | 47 |

SCHEDULE PF-87

# PRIORITY FIRM POWER RATE

## SECTION I.  AVAILABILITY

This schedule is available for the contract purchase of firm power or capacity to be used within the Pacific Northwest. Priority Firm Power may be purchased by public bodies, cooperatives, and Federal agencies for resale to ultimate consumers, for direct consumption, construction, test and start-up, and station service.

Utilities participating in the exchange under section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act) may purchase Priority Firm Power pursuant to their Residential Purchase and Sale Agreements.

In addition, Bonneville Power Administration (BPA) may make power available to those parties participating in exchange agreements which use this rate schedule as the basis for determining the amount or value of power to be exchanged.

This schedule supersedes Schedule PF-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II.  RATE

This rate schedule includes the Preference rate and the Exchange rate. The Preference rate is available for the general requirements of public body, cooperative and Federal agency customers and includes credit attributed to the provision of section 7(b)(2) of the Northwest Power Act. The Exchange rate is available for all purchases of residential and small farm exchange power pursuant to the Residential Purchase and Sale Agreements.

### A.  Preference Rate

#### 1. Demand Charge

a. $3.46 per kilowatt of billing demand occurring during all Peak Period hours.

b. No demand charge during Offpeak Period hours.

#### 2. Energy Charge

a. 18.4 mills per kilowatthour of billing energy for the billing months September through March;

b. 14.4 mills per kilowatthour of billing energy for the billing months April through August.

### B.  Exchange Rate

#### 1. Demand Charge

a. $3.56 per kilowatt of billing demand occurring during all Peak Period hours.

b. No demand charge during Offpeak Period hours.

#### 2. Energy Charge

a. 19.1 mills per kilowatthour of billing energy for the billing months September through March;

b. 15.1 mills per kilowatthour of billing energy for the billing months April through August.

## SECTION III.  BILLING FACTORS

In this section, billing factors are listed for each of the following types of purchasers: computed requirements purchasers (section III.A), purchaser of residential exchange power pursuant to the Residential Purchase and Sale Agreements (section III.B), and metered requirements purchaser and those Priority Firm Power purchasers not covered by sections III.A and III.B (section III.C).

### A.  Computed Requirements Purchasers

Purchasers designated by BPA as computed requirements purchasers pursuant to power sales contracts shall be billed in accordance with the provisions of this subsection.

#### 1. Billing Demand

The billing demand for actual, planned, and contracted computed requirements purchasers shall be the higher of the billing factors "a" and "b," below:

a. the lower of:

(1) the larger of the Computed Peak Requirement or the Computed Average Energy Requirement; or

(2) the Measured Demand, before adjustment for power factor.

b. the lower of:

(1) the Computed Peak Requirement, or

(2) 60 percent of the highest Computed Peak Requirement during the previous 11 billing months (Ratchet Demand).

## 2. Billing Energy

The billing energy for actual, planned, and contracted computed requirements purchasers shall be:

a. for the months September through March, the sum of:

(1) 78 percent of the Measured Energy (excluding unauthorized increase), and

(2) 22 percent of the Computed Energy Maximum;

b. for the months April through August, the sum of:

(1) 57 percent of the Measured Energy (excluding unauthorized increase), and

(2) 43 percent of the Computed Energy Maximum.

## B. Purchasers of Residential Exchange Power

Purchasers buying Priority Firm Power under the terms of a Residential Purchase and Sale Agreement shall be billed as follows:

### 1. Billing Demand

The billing demand shall be the demand calculated by applying the load factor, determined as specified in the Residential Purchase and Sale Agreement, to the billing energy for each billing period.

### 2. Billing Energy

The billing energy shall be the energy associated with the utility's residential load for each billing period. Residential load shall be computed in accordance with the provisions of the purchaser's Residential Purchase and Sale Agreement.

## C. Metered Requirements Purchasers, Other Purchasers Not Covered by Sections III.A and III.B, Above

Purchasers designated as metered requirements customers and purchasers taking or exchanging power under this rate schedule who are not otherwise covered by sections II and III.B shall be billed as follows:

### 1. Billing Demand

The billing demand shall be the Measured Demand as adjusted for power factor, unless otherwise specified in the power sales contract.

### 2. Billing Energy

The billing energy shall be the Measured Energy, unless otherwise specified in the power sales contract.

# SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

## A. Power Factor Adjustment

The adjustment for power factor, when specified in this rate schedule or in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand by 1 percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

## B. Low Density Discount (LDD)

BPA shall apply a discount to the charges for all Priority Firm Power sold to purchasers who are eligible for an LDD. Eligibility for the LDD and the amount of the discount (3, 5, or 7 percent) shall be determined pursuant to section III.C.3 of the GRSPs.

## C. Irrigation Discount

BPA shall apply an irrigation discount, equal to 4.6 mills per kilowatthour, to the charges for qualifying energy purchased under this rate schedule. The irrigation discount shall be applied after calculation of the Low Density Discount. The discount shall apply only to energy purchased during the billing months of April through October. Eligibility for the irrigation discount and reporting requirements shall be

determined pursuant to section III.C.4 of the GRSPs.

## D. Conservation Surcharge

The Northwest Power Planning Council has recommended that a conservation surcharge be imposed on those customers subject to such surcharge as determined by the Administrator in accordance with BPA's Policy to Implement the Council-Recommended Conservation Surcharge. The Conservation Surcharge shall be applied pursuant to section III.C.7 of the GRSPs and subsequent to any other rate adjustments.

## E. Cost Recovery Adjustment Clause

The Cost Recovery Adjustment Clause described in section III.C.5 of the GRSPs shall be applied to all purchases and exchanges under this rate schedule. The percentage increase or decrease calculated in section III.C.5.c and III.C.5.d of the GRSPs shall be applied uniformly to the demand and energy charges contained in section II.A and II.B and the irrigation discount contained in section IV.C of this rate schedule. An additional increase of .046 mills per kilowatthour shall be made to the irrigation discount for each percentage increase in the PF rates due to the Cost Recovery Adjustment Clause. An additional decrease of .046 mills per kilowatthour shall be made to the irrigation discount for each percentage decrease in the PF rates due to the Cost Recovery Adjustment Clause.

## F. Outage Credit

Pursuant to section 7 of the General Contract Provisions, BPA shall provide an outage credit to any purchaser for those hours for which BPA is unable to deliver the full billing demand during that billing month due to an outage on the facilities used by BPA to deliver Priority Firm Power. Such credit shall not be provided if BPA is able to serve the purchaser's load through the use of alternative facilities or if the outage is for less than 30 minutes. The amount of the credit shall be calculated according to the provisions of section III.C.2 of the GRSPs.

## G. Unauthorized Increase

BPA shall apply the charge for Unauthorized Increase to any purchaser of Priority Firm Power taking demand and energy in excess of its contractual entitlement.

### 1. Rate for Unauthorized Increase

67.3 mills per kilowatthour.

### 2. Calculation of the Amount of Unauthorized Increase

Each 60-minute clock-hour integrated or scheduled demand shall be considered separately in determining the amount that may be considered an unauthorized increase. BPA first shall determine the amount of unauthorized increase related to demand and shall treat any remaining unauthorized increase as energy-related.

#### a. Unauthorized Increase in Demand

That portion of any Measured Demand during Peak Period hours, before adjustment for power factor, which exceeds the demand that the purchaser is contractually entitled to take during the billing month and which cannot be assigned:

(1) to a class of power that BPA delivers on such hour pursuant to contracts between BPA and the purchaser; or

(2) to a type of power that the purchaser acquires from sources other than BPA and that BPA delivers during such hour.

shall be billed:

(1) in accordance with the provisions of the "Relief from Overrun" exhibit to the power sales contract; or

(2) if such exhibit does not apply or is not a part of the purchaser's power sales contract, at the rate for Unauthorized Increase, based on the amount of energy associated with the excess demand.

#### b. Unauthorized Increase in Energy

The amount of Measured Energy during a billing month which exceeds the amount of energy which the purchaser is contractually entitled to take during that month and which cannot be assigned:

(1) to a class of power which BPA delivers during such month pursuant to contracts between BPA and the purchaser; or

(2) to a type of power which the purchaser acquires from sources other than BPA and which BPA delivers during such month,

shall be billed:

(1) in accordance with the provisions of the "Relief from Overrun" exhibit to the power sales contract; or

3

(2) as unauthorized increase if such exhibit does not apply or is not a part of the purchaser's power sales contract.

## H. Coincidental Billing Adjustment

Purchasers of Priority Firm Power who are billed on a coincidental basis and who have diversity charges or diversity factors specified in their power sales contracts shall have their charges for billing demand adjusted according to the provisions of section III.C.6 of the GRSPs. Computed requirements purchasers are not subject to the Coincidental Billing Adjustment for scheduled power.

## I. Energy Return Surcharge

Any purchaser who preschedules in accordance with sections 2(a)(4) and 2(c)(2) of Exhibit E of the power sales contract and who returns, during a single offpeak hour, more than 60 percent of the difference between that purchaser's computed peak requirement and computed average energy requirement for the billing month shall be subject to the following surcharge for each additional kilowatthour so returned:

1. 3.49 mills per kilowatthour for the months of April through October;

2. 1.48 mills per kilowatthour for the months of November through March.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the PF-87 rate is 78.5 percent FBS and 21.5 percent Exchange.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE IP-87
# INDUSTRIAL FIRM POWER RATE

## SECTION I. AVAILABILITY

This schedule is available to direct-service industrial (DSI) customers for both the contract purchase of Industrial Firm Power and the purchase of Auxiliary Power if requested by the DSI customer and made available by BPA. If a DSI customer purchasing power under this rate schedule requests and BPA makes available power under another applicable wholesale rate schedule, the IP-87 rate schedule is available for that portion of power purchased not covered under the alternative rate schedule. This rate schedule supersedes Schedule IP-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

The following rates shall be applied when first quartile service is provided under this rate schedule in accordance with the terms of a purchaser's Power Sales Contract dated August 25, 1981. A separate billing adjustment for the reserves provided by the purchasers of Industrial Firm Power is not contained in this rate schedule; the value of reserves credit has been included in the determination of the demand and energy charges.

Any contractual reference to the IP Premium Rate shall be deemed to refer to the demand and energy charges set forth below. Any reference to the IP Standard Rate shall be deemed to refer to the same demand and energy charges minus the Discount for Quality of Service.

### A. Demand Charge

1. $4.14 per kilowatt of billing demand occurring during all Peak Period hours.

2. No demand charge during Offpeak Period hours.

### B. Energy Charge

1. 19.5 mills per kilowatthour of billing energy for the billing months September through March;

2. 15.6 mills per kilowatthour of billing energy for the billing months April through August.

## SECTION III. BILLING FACTORS

### A. Billing Demand

The billing demand shall be the BPA Operating Level during the Peak Period as adjusted for power factor. If there is more than one BPA Operating Level during the Peak Period within a billing month, the billing demand shall be a weighted average of the BPA Operating Levels during the Peak Period for the billing month. The BPA Operating Level is defined in section III.A.10 of the General Rate Schedule Provisions (GRSPs). If BPA has agreed to serve a portion of a DSI load under an alternative rate schedule, the billing demand under the IP-87 rate schedule shall be specified in the contract initiating such arrangement.

However, if BPA has agreed, pursuant to section 4 of the direct-service industrial power sales contract, to sell Industrial Firm Power on a daily demand basis (transitional service), this section of the rate schedule shall not apply, and BPA shall bill the purchaser in accordance with the provisions of section V.C.3 of the GRSPs.

### B. Billing Energy

The billing energy shall be the Measured Energy for the billing month, minus any kilowatthours on which BPA assesses the charge for unauthorized increase.

However, if BPA has agreed to serve only a portion of the DSI's load under the IP rate schedule, the billing energy for the power purchased under the IP rate shall be specified in the contract initiating such arrangement.

## SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

### A. Discount for Quality of First Quartile Service

1. **Application and Amount of First Quartile Discount**

If a purchaser requests discounted rate service, a discount of 0.6 mills per kilowatthour of billing energy shall be granted. This billing credit shall be applied to the monthly billing energy under section III.B for all power purchased under this rate schedule. No credit shall be applied to those purchases subject to unauthorized increase charges under section IV.D of this rate schedule.

2. **Eligibility Requirements for First Quartile Discount**

To qualify for the First Quartile Discount the purchaser must request discounted rate serv

ice in writing by April 2 of each calendar year. By virtue of making such request, the Purchaser is agreeing to accept the level and quality of First Quartile service described in section 6 of the Variable Industrial Rate contract. Such acceptance includes the waiver of contract rights provided in section 6.a(2)(a) of said contract.

### B. Curtailments

BPA shall charge the DSI for curtailments of the lower three quartiles in accordance with the provisions of section 9 of the power sales contract. BPA shall apply the demand charge in effect at the time of the curtailment in the computation of the amount of the curtailment charge. In the event that a purchaser is found to be eligible to have a portion of their load served under an alternative rate schedule, application of the curtailment charge shall be specified in the contract instituting such arrangement.

### C. Cost Recovery Adjustment Clause

The Cost Recovery Adjustment Clause is described in section III.C.5 of the GRSPs and shall be applied to all power purchases under this rate schedule.

Application of the Cost Recovery Adjustment Clause shall result in a uniform adjustment applied to the demand and energy charges, contained in sections II.A and II.B of this rate schedule, and the first quartile discount, if applicable, contained in section IV.A.1 of this rate schedule. A uniform adjustment will be made only if it causes demand and energy charges and the first quartile discount to increase. No downward adjustment resulting from the Cost Recovery Adjustment Clause shall be made to any portion of this rate schedule.

The uniform percentage (CRAC%) determined in section III.C.5.c.(1) of the GRSPs shall be applied in the following manner:

$$(1 + \frac{CRAC\%}{100}) \cdot \frac{22.8}{23.5} \text{ times the demand, energy, and first quartile discount charges.}$$

where: 22.8 represents the average IP-87 margin-based rate in mills per kilowatthour, and 23.5 represents the average IP-87 floor rate in mills per kilowatthour.

### D. Unauthorized Increase

#### 1. Rate for Unauthorized Increase

67.3 mills per kilowatthour.

#### 2. Application of the Charge

During any billing month, BPA may assess the unauthorized increase charge on the number of kilowatthours associated with the DSI Measured Demand in any one 60-minute clock-hour, before adjustment for power factor, that exceed the BPA Operating Level for that clock-hour, regardless of whether such Measured Demand occurs during the Peak or Offpeak Period.

### E. Power Factor Adjustment

The adjustment for power factor, when specified in this rate schedule or in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the GRSPs. The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

### F. Outage Credit

Pursuant to section 7 of the General Contract Provisions, BPA shall provide an outage credit to any DSI for those hours for which BPA is unable to deliver the full billing demand during that billing month due to an outage on the facilities used by BPA to deliver Industrial Firm Power. Such credit shall not be provided if BPA is able to serve the DSI's load through the use of alternative facilities or if the outage is for less than 30 minutes. The amount of the credit shall be calculated according to the provisions of section III.C.2 of the GRSPs.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

### A. The approximate cost contribution of different resource categories to the IP-87 rate is 99.3 percent Exchange and 0.7 percent New Resources.

### B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

### C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE VI-87
# VARIABLE INDUSTRIAL POWER RATE

## SECTION I. AVAILABILITY

This schedule is available to direct-service industrial (DSI) customers for purchases under the Power Sales Contract implementing the Variable Industrial Power rate schedule (Variable Rate Contract) of: (1) Industrial Firm Power and (2) Auxiliary Power if requested by the DSI customer and made available by BPA. This schedule is available only for that portion of a DSI's load used in primary aluminum reduction including associated administrative facilities, if any. By virtue of incorporation of this rate schedule and associated General Rate Schedule Provisions (GRSPs) in the Variable Rate Contract, DSIs electing to purchase power under this rate schedule contractually agree to the terms and conditions of this rate schedule. A DSI further agrees to waive for that portion of their load designated to purchase power at the VI rate, all rights they might otherwise have to purchase power at the Industrial Firm Power Rate Schedule for the duration of the Variable Rate Contract. Section VI.J. supplements schedule VI-86. GRSPs effective July 1, 1985, as revised effective August 1, 1986, and as revised in the 1987 rate case and in subsequent wholesale rate filings are applicable to this rate schedule. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. TERM OF THE RATE

This rate schedule shall take effect on August 1, 1986, and shall terminate on midnight June 30, 1993, unless BPA elects to exercise its unilateral option to terminate the rate at midnight June 30, 1991. This termination right is described in section VI.E. of this rate schedule. Actions to invoke an early termination shall comply with section VI.E. of this rate schedule and with the provisions and stipulations set forth in the Variable Rate Contract.

## SECTION III. RATE

### A. Revised Rate Charges Subject to Rate Case Adjustments

The following rates shall apply to Industrial customers that meet the eligibility requirements and elect to purchase power under the Variable Industrial Power Rate Schedule. These rates shall remain in effect until the next Rate Adjustment Date, at which point the rates shall be adjusted following the procedures set forth in section VI.C. of this rate schedule, unless the Cost Recovery Adjustment Clause triggers, which point the rates shall be adjusted following the procedures set forth in section VI.J of this rate schedule. In addition, the Lower Rate Limit also will be subject to a biennial adjustment pursuant to section VI.B. of this rate schedule. The formula to be used in the calculation of the monthly power bill is contained in section IV. A separate billing adjustment for the value of the reserves provided by purchasers of Industrial Firm Power is not contained in this rate schedule; the value of reserves credit has been included in the determination of the Plateau Energy Charge.

### 1. Base Variable Industrial Rate

#### a. Demand Charge

$5.33 per kilowatt of billing demand occurring during the Peak Period. No demand charge is applied during Offpeak Period hours.

#### b. Plateau Energy Charge

16.1 mills per kilowatthour of billing energy.

### 2. First Quartile Service Discount

0.5 mills per kilowatthour of billing energy.

### 3. Lower Rate Limit

8.3 mills per kilowatthour of billing energy.

### 4. Upper Rate Limit

21.9 mills per kilowatthour of billing energy

### B. Initial Rate Parameters Subject to Annual Adjustments

The following rate parameters shall be used in determining the power bills for customers electing to purchase power under the Variable Industrial Power rate schedule. These parameters will be adjusted annually starting on July 1, 1987, and every July 1 thereafter, in accordance with the procedures contained in section VII.B. of the GRSPs.

### 1. Lower Pivot Aluminum Price

60.8 cents per pound.

2. Upper Pivot Aluminum Price

73.4 cents per pound.

## SECTION IV. FORMULA

The Variable Industrial Power rate is a formula rate tied to the U.S. market price of aluminum. Under this rate schedule, the monthly energy charge varies in response to changes in the average price of aluminum in U.S. markets.

### A. Demand Charge

1. The Demand Charge, as stated in section III.A.1.a. of this rate schedule, remains constant over all aluminum prices. The demand charge is applied to billing demand occurring during all Peak Period hours for all billing months.

2. No demand charge during Offpeak Period hours.

### B. Energy Charge

#### 1. Plateau Energy Charge

When the monthly billing aluminum price (described in section VII.A. of the GRSPs) is between the Lower Pivot Aluminum Price and the Upper Pivot Aluminum Price inclusive (as stated in sections III.B.1. and III.B.2. of this rate schedule), the monthly energy charge shall be the Plateau Energy Charge as stated in section III.A.1.b. of this rate schedule.

#### 2. Reductions to Plateau Energy Charge

When the monthly billing aluminum price is less than the Lower Pivot Aluminum Price, the monthly energy charge shall be the greater of:

a. The Plateau Energy Charge $-(LP-MAP)*(LS)$

where:

LP = the Lower Pivot Aluminum Price as stated in section III.B.1. of this rate schedule.

MAP = the monthly billing aluminum price in cents per pound determined pursuant to section VII.A. of the GRSPs.

LS = lower slope $= \dfrac{1 \text{ mill per kilowatthour}}{1 \text{ cent per pound}}$

or

b. the Lower Rate Limit as stated in section III.A.3. of this rate schedule.

#### 3. Increases to Plateau Energy Charge

When the monthly billing aluminum price is greater than the Upper Pivot Aluminum Price, the monthly energy charge shall be the lesser of:

a. The Plateau Energy Charge $-(MAP-UP)*(US)$

where:

MAP = the monthly billing aluminum price in cents per pound, as determined according to section VII.A. of the GRSPs.

UP = the Upper Pivot Aluminum Price as stated in section III.B.2. of this rate schedule.

US = upper slope $= \dfrac{0.75 \text{ mills per kilowatthour}}{1 \text{ cent per pound}}$

or

b. the Upper Rate Limit, as stated in section III.A.4. of this rate schedule.

## SECTION V. BILLING FACTORS

### A. Billing Demand

1. **Billing Demand for Customers Whose Entire BPA Load is Served at the Variable Industrial Power Rate**

The billing demand for power purchased shall be the BPA Operating Level during the Peak Period as adjusted for power factor. If there is more than one BPA Operating Level during the Peak Period within a billing month, the billing demand shall be a weighted average of the BPA Operating Levels during the Peak Period for the billing month. The BPA Operating Level is defined in section III.A.10 of the GRSPs.

2. **Billing Demand for Customers When Only a Portion of Their Total BPA Load is Served at the Variable Rate**

The Billing Demand shall be the portion of the BPA Operating Level attributable to the VI rate as determined by the method specified in the Variable Rate Contract.

3. **Billing Demand During Periods of Transitional Service**

If BPA has agreed, pursuant to section 4 of the direct-service industrial power sales contract, to sell Industrial Firm Power on a day-demand basis (transitional service), this sec-

8

tion of the rate schedule shall not apply, and BPA shall bill the purchaser in accordance with the provisions of section V.C of the GRSPs.

## B. Billing Energy

The billing energy for power purchased shall be the Measured Energy for the billing month, minus any kilowatthours on which BPA assesses the charge for unauthorized increase.

# SECTION VI. OTHER ADJUSTMENTS AND SPECIAL PROVISIONS

## A. Lower and Upper Pivot Aluminum Prices

Effective July 1, 1987, and every July 1 thereafter, the Lower and Upper Pivot Aluminum Prices set forth in section III.B of the rate schedule shall be adjusted following the procedures set forth in section VII.B of the GRSPs. The adjusted Lower and Upper Pivot Aluminum Prices shall supersede the Lower and Upper Pivot Aluminum Prices contained in section III.B of the rate schedule. The revised Lower and Upper Pivot Aluminum Prices shall be used for billing purposes and subsequent adjustments to the Lower and Upper Pivot Aluminum Prices.

## B. Lower Rate Limit

Beginning with the July 1, 1988 annual adjustment date and every second July 1 thereafter, the Lower Rate Limit as stated in section III.A.3 shall be increased by 1 mill per kilowatthour. The revised Lower Rate Limit shall supersede the Lower Rate Limit as stated in section III.A.3 of the rate schedule. This increase is in addition to rate adjustment increases in the Lower Rate Limit described in section VI.C of this rate schedule. In the event that a rate adjustment date and the annual adjustment date occur simultaneously, the Lower Rate Limit shall be adjusted first for changes in the Plateau Energy Charge pursuant to section VI.C. of this rate schedule, and then increased by 1 mill per kilowatthour. The revised Lower Rate Limit shall be used for billing purposes and subsequent rate adjustments.

## C. Rate Adjustments

The overall rate level of this rate shall be subject to adjustment in BPA's general wholesale power rate case following the procedures and directives of the Northwest Power Act. The overall rate level consists of the Demand Charge, Plateau Energy Charge, and First Quartile Service Adjustment contained in sections III.A.1 and III.A.2; these shall be adjusted by a uniform percentage based on the percentage change in the overall rate level. The Lower and Upper Rate

Limits as stated in sections III.A.3 and III.A.4 of this rate schedule shall be adjusted by an amount equal to the change, in mills per kilowatthour, in the Plateau Energy Charge. The Lower and Upper Pivot Aluminum Prices shall not be adjusted in the rate case; rather, they shall be adjusted pursuant to the procedures described in section VII.B of the GRSPs. The lower and upper slopes shall not be adjusted. The rate for unauthorized increase shall be separately determined in each rate case.

## D. Discount for Quality of First Quartile Service

If a purchaser requests First Quartile service with other than Surplus FELCC, a discount contained in section III.A.2 of this rate schedule shall be granted. This billing credit shall be applied to the monthly billing energy under section V.B. for all power purchased under this rate schedule. No credit shall be applied to those purchases subject to unauthorized increase charges under section VI.G of this rate schedule. To qualify for the First Quartile Discount, the purchaser must request discounted rate service in writing by April 2 of each calendar year. By virtue of making such request, the Purchaser is agreeing to accept the level and quality of First Quartile service described in section 6 of the Variable Industrial Rate contract. Such acceptance includes the waiver of contract rights provided in section 6.a(2)(a) of said contract.

## E. Termination Provision

The Administrator may terminate the Variable Industrial Power rate effective midnight June 30, 1991, upon a determination that significant changes in the conditions and expectations under which this rate was offered render the continuation of the Variable Industrial rate inconsistent with BPA's stated goals and objectives. BPA shall provide notification of such a determination pursuant to the provisions of the Variable Rate Contract. As part of the notification procedures, BPA shall provide a reasonable opportunity for interested parties to comment on BPA's determination, as well as to examine the comments submitted by other parties, prior to BPA taking final action to cancel the rate. If BPA determines that the Variable Industrial rate will remain in place until midnight June 30, 1993, BPA shall provide notice that so states and no additional action by BPA will be required.

## F. Curtailments

BPA shall charge the customer for curtailments of the lower three quartiles in accordance with the provisions of section 9 of the power sales contract and the provisions contained in the Var

iable Rate Contract.

## G. Unauthorized Increase

### 1. Rate for Unauthorized Increase

67.3 mills per kilowatthour.

### 2. Application of the Charge

During any billing month, BPA may assess the unauthorized increase charge on the number of kilowatthours associated with the DSI Measured Demand in any one 60-minute clock-hour, before adjustment for power factor, that exceed the BPA Operating Level for that clock-hour, regardless of whether such Measured Demand occurs during the Peak or Offpeak Period.

## H. Power Factor Adjustment

The adjustment for power factor, when specified in this rate schedule or in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the GRSPs. The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the BPA Operating Level by 1 percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

## I. Outage Credit

Pursuant to section 7 of the General Contract Provisions, BPA shall provide an outage credit to any DSI to whom BPA is unable to deliver the full billing demand during that billing month due to an outage on the facilities used by BPA to deliver Industrial Firm Power. Such credit shall not be provided if BPA is able to serve the DSI's load through the use of alternative facilities or if the outage is for less than 30 minutes. The amount of the credit shall be calculated according to the provisions of section III.C.2 of the GRSPs.

## J. Cost Recovery Adjustment Clause

The Cost Recovery Adjustment Clause described in section III.C.5 of the GRSPs shall be applied to all power purchases under this rate schedule consistent with the procedures to adjust the Variable Industrial rate and the provisions of the Variable Rate Contract. A uniform adjustment will be made only if it causes demand and Plateau Energy charges and the

First Quartile Service Discount to increase. No downward rate adjustment resulting from the Cost Recovery Adjustment Clause shall be made to any portion of this rate schedule.

The uniform percentage (CRAC%) determined in section III.C.5.c.(1) of the GRSPs shall be applied in the following manner:

$$\left(1 + \frac{CRAC\%}{100}\right) \cdot \frac{22.4}{23.0}$$ times the demand and Plateau Energy charges contained in section III.A.1 of this rate schedule and to the First Quartile Service Discount specified in section III.A.2 of this rate schedule.

where: 22.4 represents the average VI-87 margin-based plateau rate in mills per kilowatthour, and 23.0 represents the average VI-87 floor rate in mills per kilowatthour.

The Lower and Upper Rate Limits stated in sections III.A.3 and III.A.4 of this rate schedule shall be adjusted by an amount equal to the change, in mills per kilowatthour, to the Plateau Energy charge due to application of the Cost Recovery Adjustment Clause. The adjusted rate parameters shall be used for billing purposes and supersede the rate charges subject to the adjustment contained in section III.A of this rate schedule. The adjusted rate parameters shall also be used in subsequent rate adjustments pursuant to section III.B of this rate schedule and to subsequent biennial adjustments to the lower rate limit pursuant to section VI.B of this rate schedule.

# SECTION VII. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different to resource categories to the VI-87 rate is 99.3 percent Exchange and 0.7 percent New Resources.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE NF-87
# NONFIRM ENERGY RATE

## SECTION I.  AVAILABILITY

This schedule is available for the purchase of non-firm energy to be used both inside and outside the United States including sales under the Western Systems Power Pool (WSPP) agreements and sales to consumers. This schedule also applies to energy delivered for emergency use under the conditions set forth in section V.A of the General Rate Schedule Provisions (GRSPs). BPA is not obligated to offer nonfirm energy to any purchaser that results in displacement of firm power purchases under BPA's Power Sales Contracts. The offer of nonfirm energy under this schedule shall be determined by BPA. Schedule NF-87 supersedes Schedule NF-85 which went into effect on an interim basis on July 1, 1985, and was subsequently revised on an emergency basis and approved on an interim basis on May 1, 1986. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II.  RATES

The average cost of nonfirm energy is 18.0 mills per kilowatthour. The NF-87 rate schedule provides for upward and downward pricing flexibility from this average nonfirm energy cost. All rates and any subsequent adjustments contained in this rate schedule shall not exceed in total the NF Rate Cap defined in section IV.C of the GRSPs.

### A.  Standard Rate

The Standard rate is any offered rate not to exceed 21.6 mills per kilowatthour.

### B.  Market Expansion Rate

The Market Expansion rate is any offered rate below the Standard rate in effect. BPA may have one or more Market Expansion rates in effect simultaneously.

### C.  Incremental Rate

The Incremental rate is the Incremental Cost of energy plus 2.0 mills per kilowatthour, where the Incremental Cost is defined as all identifiable costs (expressed in mills per kilowatthour) that BPA would have avoided had it not produced or purchased. the energy being sold under this rate.

### D.  Contract Rate

The Contract rate is 14.9 mills per kilowatthour of billing energy.

## SECTION III.  ADJUSTMENTS TO RATES

### A.  Guaranteed Delivery Surcharge

A surcharge of 2.0 mills per kilowatthour billing energy is applied to guaranteed delivery of nonfirm energy under the Standard rate and Market Expansion rate.

### B.  Intertie Charge

Rate offers, under any of the rates specified above, greater than or equal to 18.0 mills per kilowatthour shall be increased by 1.4 mills per kilowatthour for nonfirm energy scheduled for delivery over the Pacific Northwest-Pacific Southwest Intertie.

## SECTION IV.  BILLING FACTORS

The billing energy for nonfirm energy purchases under this rate schedule shall be the Measured Energy unless otherwise specified by contract.

## SECTION V.  APPLICATION AND ELIGIBILITY

Any time that BPA has nonfirm energy for sale, the Standard rate, the Market Expansion rate, the Incremental rate, the Contract rate, or a combination of these rates may be in effect.

### A.  Standard Rate

The Standard rate:

1. is available for all purchases of nonfirm energy; and

2. applies to nonfirm energy purchased pursuant to the Relief from Overrun Exhibit to the power sales contract.

### B.  Market Expansion Rate

1. Application of the Market Expansion rate

The Market Expansion rate applies when BPA determines that all markets at the Standard rate have been satisfied and BPA offers additional nonfirm energy.

## 2. Market Expansion Rate Qualification Criteria

In order to purchase nonfirm energy at the Market Expansion rate, a purchaser must:

a. have a displaceable resource, displaceable purchase of electricity, or

b. be an end-user load with a displaceable alternative fuel source.

In addition, a purchaser must demonstrate one of the following:

a. shutdown or reduction of the output of the displaceable resource in an amount equal to the amount of Market Expansion rate energy purchased; or

b. reduction of a displaceable purchase and the output of the resource associated with that purchase, in an amount equal to the amount of Market Expansion rate energy purchased; or

c. shutdown or reduction of the identified output of the resource(s) indirectly in an amount equal to the amount of Market Expansion rate energy purchased (for example, the purchase may be used to run a pumped storage unit); or

d. decrease of an end-user alternate fuel source in an amount equivalent to the amount of Market Expansion rate energy purchased.

## 3. Eligibility Criteria for Market Expansion rate

a. When only one Market Expansion rate is offered:

Purchasers qualifying under section V.B.2. who purchased nonfirm energy directly from BPA are eligible to purchase power under the Market Expansion rate offered if the decremental cost of the qualifying resource, purchase, or qualifying alternative fuel source is lower than the Standard rate in effect plus 2.0 mills per kilowatthour.

Purchasers qualifying under section V.B.2. who purchase nonfirm energy through a third party are eligible to purchase power under the Market Expansion rate offered if the cost of the qualifying alternative fuel source is lower than the Standard rate in effect plus 4.0 mills per kilowatthour.

b. When more than one Market Expansion rates are offered:

Purchasers qualifying under section V.B.2. who purchase nonfirm energy directly from BPA are eligible to purchase power under the Market Expansion rate if the decremental cost of the qualifying resource, purchase, or qualifying alternative fuel source is lower than the Standard rate in effect plus 2.0 mills per kilowatthour. The rate applicable to a purchaser shall be the highest Market Expansion rate offered that is below the purchaser's qualifying decremental cost minus 2.0 mills per kilowatthour.

Purchasers qualifying under section V.B.2. who purchase nonfirm energy through a third party are eligible to purchase power under the Market Expansion rate if the decremental cost of the qualifying alternative fuel source is lower than the Standard rate plus 4.0 mills per kilowatthour. The rate applicable to a purchaser shall be the highest Market Expansion rate offered that is below purchaser's qualifying decremental cost minus 4.0 mills per kilowatthour.

## C. Incremental Rate

The Incremental rate applies to sales of energy:

1. that is produced or purchased by BPA concurrently with the nonfirm energy sale;

2. that BPA may at its option not produce or purchase; and

3. that has an Incremental Cost greater than the Standard rate (plus the Intertie Charge, if applicable) less 2.0 mills per kilowatthour.

## D. Contract Rate

The Contract rate applies to contracts (except power sales contracts offered pursuant to sections 5(b), 5(c), and 5(g) of the Northwest Power Act) that refer to the Contract rate:

1. for the sale of nonfirm energy; or

2. for determining the value of energy.

## E. Western Systems Power Pool Transactions

BPA may make available nonfirm energy for transactions under the Western Systems Power Pool (WSPP) agreement. WSPP sales shall be subject to the terms and conditions specified in the WSPP agreement and shall be consistent with regional and public preference. The rate for transactions under the WSPP agreement is any rate within the limits specified by the Stan

dard. Market Expansion, and incremental rates but may differ from the actual rate offered for non-WSPP transactions in any hour. The rate for WSPP transactions is independent of any other rate offered concurrently under this rate schedule outside that agreement.

F. **End-User Rate**

BPA may agree to a rate or rate formula for nonfirm energy purchases by end-users. Such rate or rate formula shall be within the limits specified for the Standard and Market Expansion rates but may differ from the actual rates offered during any hour.

## SECTION VI. DELIVERY

### A. Rate of Delivery

BPA shall determine the amount of nonfirm energy to be made available for each hour. Such determination shall be made for each applicable nonfirm energy rate.

### B. Guaranteed Delivery

#### 1. Availability

BPA will determine the amount and duration of nonfirm energy to be offered on a guaranteed basis. Such daily or hourly amounts may be as small as zero or as much as all the nonfirm energy that BPA plans to offer for sale on such days.

#### 2. Conditions

Scheduled amounts of guaranteed nonfirm energy may not be changed except:

a. when BPA and the purchaser mutually agree to increase or decrease the scheduled amounts; or

b. when BPA must reduce nonfirm energy deliveries in order to serve firm loads because of unexpected generation or transmission losses.

## SECTION VII. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the average cost of nonfirm energy is 99.6 percent FBS and 0.4 percent New Resources.

B. The forecasted average cost of resources available to BPA under average water conditions 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

13

SCHEDULE CF-87
# FIRM CAPACITY RATE

## SECTION I. AVAILABILITY

This schedule is available for the purchase of Firm Capacity without energy on a Contract Demand basis. This schedule is available only to those purchasers holding Firm Capacity contracts executed prior to July 1, 1985. It supersedes Schedule CF-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

$42.48 per kilowatt per year of Contract Demand, billed monthly at the rate of $3.54 per kilowatt-month of Contract Demand.

## SECTION III. BILLING FACTORS

The billing demand shall be the Contract Demand.

## SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

### A. Conservation Surcharge

The Conservation Surcharge shall be applied in accordance with section III.C.7 of the General Rate Schedule Provisions (GRSPs) and subsequent to any other rate adjustments.

### B. Extended Peaking Surcharge

The monthly capacity rate specified in section II above shall be increased by the following extended peaking surcharge to compensate BPA for each hour that the purchaser's monthly demand duration exceeds 8 hours:

1. $0.0908 per kilowatt per hour of extended peaking for the months April through October;

2. $0.0512 per kilowatt per hour of extended peaking for the months November through March.

The charge shall be adjusted pro rata for each portion of an hour of extended peaking supplied to the purchaser.

The purchaser's monthly demand duration shall be determined by dividing:

1. the kilowatthours supplied to the purchaser under this rate schedule between the hours

of 7 a.m. and 10 p.m. on the day of maximum kilowatthour use during those hours, provided such day is not a Sunday, by

2. the purchaser's Contract Demand for such month.

The purchaser's extended peaking shall be the amount by which the purchaser's monthly demand duration exceeds 8 hours. The extended peaking surcharge shall not be applied during periods when BPA does not require the delivery of peaking replacement energy by the purchaser.

### C. Energy Return Surcharge

The energy associated with the delivery of Firm Capacity must be returned to BPA in accordance with the terms of the purchaser's Firm Capacity Contract. Unless waived by BPA, any purchaser whose energy returns during any single hour exceed 60 percent of the purchaser's Contract Demand during any single hour shall be subject to the following surcharge for each additional kilowatthour so returned:

1. 3.49 mills per kilowatthour for the months April through October, and

2. 1.48 mills per kilowatthour for the months November through March.

### D. Cost Recovery Adjustment Clause

The Cost Recovery Adjustment Clause described in section III.C.5 of the GRSPs shall be applied to all purchases under this rate schedule. The percentage increase or decrease calculated in sections III.C.5.a and III.C.5.b of the GRSPs shall be applied to the demand charges contained in sections II.A and II.B of this rate schedule.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the CF-87 rate is 75.1 percent FBS and 24.9 percent Exchange for contract year service.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE CE-87

# EMERGENCY CAPACITY RATE

## SECTION I. AVAILABILITY

This schedule is available for the purchase of capacity:

A. when an emergency exists on the purchaser's system, or

B. when the purchaser wishes to displace higher-cost firm capacity resources which are otherwise available to meet the purchaser's load, provided the purchaser requests such capacity and BPA has capacity available for such purpose.

This schedule supersedes Schedule CE-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

### A. Demand Charge

$1.06 per kilowatt of demand per calendar week or portion thereof.

### B. Intertie Charge

The demand charge specified above shall be increased by $0.15 per kilowatt per week for capacity made available at the Oregon-California or Oregon-Nevada border for delivery over the Pacific Northwest-Pacific Southwest (Southern) Intertie.

## SECTION III. BILLING FACTORS

The billing demand shall be the maximum amount requested by the purchaser and made available by BPA during a calendar week. If BPA is unable to meet subsequent requests by a purchaser for delivery at the demand previously established during such week, the billing demand for that week shall be the lower demand which BPA is able to supply.

## SECTION IV. BILLING PERIOD

Bills shall be rendered monthly.

## SECTION V. SPECIAL PROVISION

Energy delivered with such capacity shall returned to BPA within 7 days of the date of delive and shall be returned at times and rates of delive delivery. BPA may agree to accept the retu energy after the normal 7 day return period pr vided that such delay has been mutually agre upon prior to delivery.

## SECTION VI. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of differe resource categories to the CE-87 rate is 75.1 pe cent FBS and 24.9 percent Exchange.

B. The forecasted average cost of resources avai ble to BPA under average water conditions 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet lo growth is 28.7 mills per kilowatthour.

15

SCHEDULE NR-87

# SCHEDULE NR-87
# NEW RESOURCE FIRM POWER RATE

## SECTION I. AVAILABILITY

This schedule is available for the contract purchase of firm power or capacity to be used within the Pacific Northwest. New Resource Firm Power is available to investor-owned utilities (IOUs) under net requirements contracts for resale to ultimate consumers, direct consumption, or use in construction, test and start up, and station service. New Resource Firm Power also is available to any public body, cooperative, or Federal agency to the extent such power is needed to serve any New Large Single Load. In addition, BPA may make this rate available to those parties participating in exchange agreements that use this rate schedule as the basis for determining the amount or value of power to be exchanged. This schedule supersedes Schedule NR-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

### A. Demand Charge

1. $4.13 per kilowatt-month of billing demand occurring during all Peak Period hours.

2. No demand charge during Offpeak Period hours.

### B. Energy Charge

1. 25.5 mills per kilowatthour of billing energy for the billing months September through March;

2. 21.2 mills per kilowatthour of billing energy for the billing months April through August;

## SECTION III. BILLING FACTORS

In this section billing factors are listed for computed requirements purchasers (section III.A) metered requirements purchasers, and those purchasers not covered by section III.A. (section III.B.).

### A. Computed Requirements Purchasers

Purchasers designated by BPA as computed requirements purchasers pursuant to power sales contracts shall be billed in accordance with the provisions of this section.

#### 1. Billing Demand

The billing demand for actual, planned, and contracted computed requirements purchasers shall be the higher of the billing factors "a" and "b," below:

a. the lower of:

   (1) the larger of the Computed Peak Requirement or the Computed Average Energy Requirement;

   (2) the Measured Demand, before adjustment for power factor; or

b. the lower of:

   (1) the Computed Peak Requirement; or

   (2) 60 percent of the highest Computed Peak Requirement during the previous 11 billing months (Ratchet Demand).

#### 2. Billing Energy

The billing energy for actual, planned, and contracted computed requirements purchasers shall be:

a. for the months September through Mar. the sum of:

   (1) 56 percent of the Measured Energy, and

   (2) 44 percent of the Computed Energy Maximum;

b. for the months April through August, the sum of:

   (1) 39 percent of the Measured Energy, and

   (2) 61 percent of the Computed Energy Maximum.

### B. Metered Requirements Purchasers and Other Purchasers Not Covered By Section III.A. Above

Purchasers designated as metered requirements customers and purchasers taking power under this rate schedule who are not otherwise covered by section III.A shall be billed as follows:

#### 1. Billing Demand

The billing demand shall be the Measured Demand as adjusted for power factor, unless otherwise specified in the power sales contract. However, purchasers who previously used the Firm Energy rate schedule, FE- either in the computation of their power bi or in the determination of the value of an

exchange account, shall not be charged for demand under this rate schedule.

2. Billing Energy

The billing energy shall be the Measured Energy, unless otherwise specified in the power sales contract.

# SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

## A. Power Factor Adjustment

The adjustment for power factor, when specified in this rate schedule or in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

## B. Cost Recovery Adjustment Clause

The Cost Recovery Adjustment Clause described in section III.C.5 of the GRSPs shall be applied to all purchases and exchanges under this rate schedule. The percentage increase or decrease calculated in section III.C.5.a and II.C.5.b of the GRSPs shall be applied uniformly to the demand and energy charges contained in section II.A and II.B and the irrigation discount contained in section IV.C of this rate schedule. An additional increase of .046 mills per kilowatthour shall be made to the irrigation discount for each percentage increase in the NR rates due to the Cost Recovery Adjustment Clause. An additional decrease of .046 mills per kilowatthour shall be made to the irrigation discount for each percentage decrease in the NR rates due to the Cost Recovery Adjustment Clause.

## C. Irrigation Discount

BPA shall apply an irrigation discount, equal to 4.6 mills per kilowatthour, to the charges for qualifying energy purchased under this rate schedule. The irrigation discount shall be applied after calculation of the Low Density Discount. The discount shall apply only to energy purchased during the billing months of April through October. Eligibility for the irrigation

discount and reporting requirements shall be determined pursuant to section III.C.4 of the GRSPs.

## D. Conservation Surcharge

The Conservation Surcharge shall be applied in accordance with section III.C.7 of the GRSPs and subsequent to any other rate adjustments.

## E. Unauthorized Increase

BPA shall apply the charge for Unauthorized Increase to any purchaser of New Resource Firm Power taking demand and/or energy in excess of its contractual entitlement.

### 1. Rate for Unauthorized Increase

67.3 mills per kilowatthour.

### 2. Calculation of the Unauthorized Increase

Each 60-minute clock-hour integrated or scheduled demand shall be considered separately in determining the amount which may be considered an unauthorized increase. BPA shall first determine the amount of unauthorized increase related to demand and shall then treat any remaining unauthorized increase as energy-related.

#### a. Unauthorized Increase in Demand

That portion of any Measured Demand during Peak Period hours, before adjustment for power factor, that exceeds the demand which the purchaser is contractually entitled to take during the billing month and that cannot be assigned:

(1) to a class of power which BPA delivers on such hour pursuant to contract between BPA and the purchaser; or

(2) to a type of power which the purchaser acquires from sources other than BPA and which BPA delivers during such hour,

shall be billed:

(1) in accordance with the provisions of the "Relief from Overrun" exhibit to the power sales contract; or

(2) if such exhibit does not apply or is not part of the purchaser's power sales contract, at the rate for Unauthorized Increase, based on the amount of energy associated with the excess demand.

#### b. Unauthorized Increase in Energy

The amount of Measured Energy during billing month that exceeds the amount of energy which the purchaser is contractually entitled to take during that month and

17

that cannot be assigned:

(1) to a class of power that BPA delivers during such month pursuant to contracts between BPA and the purchaser; or

(2) to a type of power that the purchaser acquires from sources other than BPA and that BPA delivers during such month.

shall be billed:

(1) in accordance with the provisions of the "Relief from Overrun" exhibit to the power sales contract; or

(2) as unauthorized increase if such exhibit does not apply or is not a part of the purchaser's power sales contract.

## F. Coincidental Billing Adjustment

Purchasers of New Resource Firm Power who are billed on a coincidental basis and who have diversity charges or diversity factors specified in their power sales contracts shall have their charges for billing demand adjusted according to the provisions of section III.C.6 of the GRSPs. Computed requirements purchasers are not subject to the Coincidental Billing Adjustment for scheduled power.

## G. Outage Credit

Pursuant to section 7 of the General Contract Provisions, BPA shall provide an outage credit to any purchaser for those hours for which BPA is unable to deliver the full billing demand during the billing month due to an outage on the facilities used by BPA to deliver New Resource Firm Power. Such credit shall not be provided if BPA is able to serve the purchaser's load through the use of alternative facilities or if the outage is for less than 30 minutes. The amount of the credit shall be calculated according to the provisions of section III.C.2 of the GRSPs.

## H. Energy Return Surcharge

Any purchaser who preschedules in accordance with sections 2(a)(4) and 2(c)(2) of Exhibit E of the Power Sales contract and who returns, during a single offpeak hour, more than 60 percent of the difference between that purchaser's estimated computed peak requirement and estimated computed average energy requirement for the billing month shall be subject to the following surcharge for each additional kilowatthour so returned:

1. 3.49 mills per kilowatthour for the months of April through October, and

2. 1.48 mills per kilowatthour for the months of November through March.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the NR-87 rate is 100.0 percent Exchange.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE SI-87
# SPECIAL INDUSTRIAL POWER RATE

## SECTION I. AVAILABILITY

This rate schedule is available to any DSI purchaser using raw minerals indigenous to the region as its primary resource and qualifying for this special power pursuant to the procedures established in section 7(d)(2) of the Northwest Power Act. This schedule is available for the contract purchase of this special class of industrial power and also for the purchase of Auxiliary Power if requested by the DSI and made available by BPA. The Special Industrial Offpeak rate available for Hanna Nickel Smelting Company pursuant to the Amendatory Agreement executed July 1, 1985, remains in force and is retained herein. Except for the Special Industrial Offpeak rate, schedule SI-87 supersedes schedule SI-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

This rate schedule contains the Standard Special Industrial Power Rate and the Special Industrial Offpeak Rate. The Standard Special Industrial Power Rate is available to any qualifying DSI for full service provided during all hours of the day. The Special Industrial Offpeak Rate is a lower rate available to the Hanna Nickel Smelting Company (Hanna) for service during periods specified by BPA. A separate billing adjustment for the value of the reserves provided by purchasers of this special class of Industrial Power is not contained in the rate schedule; the adjustment is reflected in the Standard Special Industrial Power Rate.

### A. Standard Special Industrial Power Rate

#### 1. Demand Charge

a. $3.08 per kilowattmonth of billing demand occurring during all Peak Period hours.

b. No demand charge during Offpeak Period hours.

#### 2. Energy Charge

a. 16.9 mills per kilowatthour of billing energy for the billing months September through March; .

b. 12.9 mills per kilowatthour of billing energy for the billing months April through August.

### B. Special Industrial Offpeak Rate

#### 1. Demand Charge

No demand charge in any hour of the day.

#### 2. Energy Charge

7.0 mills per kilowatthour of billing energy during all billing months.

## SECTION III. BILLING FACTORS

### A. Billing Demand

#### 1. Standard Special Industrial Power Rate

The billing demand for power purchase under the Standard Special Industrial Power Rate shall be the BPA Operating Level during the Peak Period as adjusted for power factor. If there is more than one BPA Operating Level during the Peak Period within a billing month, the billing demand shall be a weighted average of the Peak Period BPA Operating Levels for the billing month. The BPA Operating Level is defined in section III.A.3 of the General Rate Schedule Provisions (GRSPs).

However, if BPA has agreed, pursuant to section 4 of the direct-service industrial power sales contract, to sell Special Industrial Power on a daily demand basis (transitional service), this section of the rate schedule shall not apply, and BPA shall bill the purchaser in accordance with the provisions of section V.C of the GRSPs.

#### 2. Special Industrial Offpeak Rate

There is no billing demand for purchase under the Special Industrial Offpeak rate.

### B. Billing Energy

The billing energy under both the Standard Special Industrial and Special Industrial Offpeak Rates shall be the Measured Energy for the billing month, minus any kilowatthours of which BPA assesses the charge for unauthorized increase.

The kilowatthours of billing energy shall be prorated among the respective billing demands for the billing month.

19

## SECTION IV. SELECTION OF THE SI-87 RATE FOR THE HANNA NICKEL SMELTING COMPANY

All purchasers, except for Hanna, shall purchase power under the Standard Special Industrial Power rate. Hanna shall have the option to select one of two types of service, standard service or offpeak service. In this case, BPA will provide standard service under the Standard Special Industrial Power Rate and offpeak service under the Special Industrial Offpeak Rate. Unless BPA receives a formal request from Hanna for service under the Special Industrial Offpeak Rate, all service will be standard service provided under the Standard Special Industrial Power Rate. To change the type of service provided and the associated rate, Hanna shall submit a formal request for service under the preferred rate option in accordance with the terms of the power sales contract providing for purchases under this rate schedule. Once Hanna has elected to purchase under one of the two options, all purchases of Special Industrial Power shall be subject to the terms and conditions of that rate option until such time that Hanna requests the other type of service.

## SECTION V. SERVICE UNDER THE SPECIAL INDUSTRIAL OFFPEAK RATE

BPA shall designate the hours during which offpeak service will be available, and shall provide at least 2 weeks' notice before changing those designated hours. BPA shall identify at least 10 and up to 13 hours on each day Monday through Friday, 15 hours on Saturday, and 24 hours on Sunday, during which offpeak service will be available to the purchaser.

If Hanna has elected to be served under the Special Industrial Offpeak Rate, Hanna may request, during the designated offpeak periods, service in an amount not to exceed the purchaser's Contract Demand. During all other hours Hanna shall curtail service to a level not to exceed 15 percent of Contract Demand.

## SECTION VI. ADJUSTMENTS AND SPECIAL PROVISIONS

### A. Curtailments

BPA shall charge the DSI for curtailments in accordance with the provisions of the DSI's power sales contract. Any curtailment charge levied shall be computed using the Standard Special Industrial Power Rate.

### B. Unauthorized Increase Charge

1. Rate for Unauthorized Increase

   67.3 mills per kilowatthour.

2. Application of the Charge

   During any billing month, BPA may assess the unauthorized increase charge on the number of kilowatthours associated with the DSI Measured Demand in any one 60-minute clock-hour, before adjustment for power factor, that exceed the BPA Operating Level for that clock-hour, regardless of whether such Measured Demand occurs during the Peak or Offpeak Period.

   If BPA is providing service to Hanna under the Special Industrial Offpeak Rate, the amount by which Hanna's Measured Demand exceeds 15 percent of its Contract Demand during any hour other than the specified special hours shall be considered unauthorized increase.

### C. Power Factor Adjustment

The adjustment for power factor, when specified in this rate schedule in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the GRSPs. The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment for service under the Standard Special Industrial Power Rate, BPA shall increase the billing demand by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. For service under the Special Industrial Offpeak Rate, BPA shall increase the billing energy by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

### D. Outage Credit

Pursuant to section 7 of the General Contract Provisions, BPA shall provide an outage credit to any purchaser for those hours for which BPA is unable to deliver the full billing demand during that billing month due to an outage on the facilities used by BPA to deliver Special Industrial Power. Such credit shall not be provided if BPA is able to serve the purchaser's load through the use of alternative facilities or if the outage is for less than 30 minutes. In addition

no credit shall be applied to purchases under the Special Industrial Offpeak Rate. The amount of the credit shall be calculated according to the provisions of section III.C.2 of the GRSPs.

E. **Extended Service Provision**

The terms of this rate schedule may be extended for a period not to exceed June 30, 1990, in accordance with the Amendatory Agreement effective July 1, 1985, with the Hanna Nickel Smelting Company (Hanna). The Amendatory Agreement contains Hanna's agreement to make certain investments in a wet screening process at its Riddle facility.

## SECTION VII. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The SI-87 rate is not based on the cost of resources.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

21

SCHEDULE SP-87

# SHORT-TERM SURPLUS FIRM POWER RATE

## SECTION I. AVAILABILITY

This rate schedule is available for the purchase of Surplus Firm Power for the period ending September 30, 1992, including purchases under the Western Systems Power Pool (WSPP) agreements. BPA is not obligated to make power or energy available under this rate schedule if such power or energy would displace sales under the IP-87, VI-87, PF-87, or NR-87 rate schedules. Schedule SP-87 supersedes schedule SP-85 and associated GRSPs, except in the case of contracts for sales under schedule SP-85 which become effective on or before September 30, 1987. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

### A. Contract Rate

#### 1. Demand Charge

a. For contracts that specify 12 months of service per year, $51.48 per kilowatt per year of Contract Demand billed monthly at the rate of $4.29 per kilowatt of Contract Demand occurring during all Peak Period hours in each billing month.

b. For contracts that specify service for fewer than 12 months per year, the monthly demand charge shall be assessed only for the specified service months at the rate of $4.29 per kilowatt of Billing Demand occurring during the Peak Period plus:

$$\frac{\$4.29\ (12 - \text{specified service months}) .25}{\text{specified service months}}$$

c. No demand charge during Offpeak Period hours.

#### 2. Energy Charge

24.3 mills per kilowatthour of Billing Energy.

### B. Flexible Rate

Energy charges or demand and energy charges may be specified at a higher or lower average rate as mutually agreed by BPA and the purchaser. In no case shall the rate exceed 100 percent of the fixed and variable unit costs of generation and transmission of BPA's highest cost resource including exchange resources. No resource cost determination is needed for sales at less than or equal to the Contract rate.

### C. Intertie Charge

Rates in sections II.A and II.B that equal or exceed the Contract rate shall be increased by the following charges for transactions over the Pacific Northwest-Pacific Southwest Intertie.

1. $.36 per kilowatt per month of billing demand and

2. 0.69 mills per kilowatthour of billing energy.

Rates in section II.B having an energy-only charge that equals or exceeds 30.2 mills per kilowatthour shall be increased by 1.4 mills per kilowatthour for transactions over the Pacific Northwest-Pacific Southwest Intertie.

## SECTION III. BILLING FACTORS

The billing factors shall be the Measured Demand and Measured Energy, unless otherwise specified in the contract.

## SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

### Power Factor Adjustment

The adjustment for power factor for BPA customers that are billed for Short-Term Surplus Firm Power on metered amounts, when specified in this rate schedule or in the contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand or energy by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

22

## SECTION V. RESOURCE COST
## CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the SP-87 rate is 99.3 percent Exchange and 0.7 percent New Resources.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE SL-87
# LONG-TERM SURPLUS FIRM POWER RATE

## SECTION I. AVAILABILITY

This rate schedule is available for the long-term purchase of Surplus Firm Power and Firm Displacement Power under BPA contracts. This rate schedule shall be offered for an amount of purchases not to exceed 1350 MW peak and 725 MW average, less purchases under the SC-86 rate schedule. This rate schedule shall not be available for contracts that obligate BPA to acquire energy resources to support the sale. Schedule SL-87 supersedes schedule FD-85 and associated GRSPs except in the case of contracts for sales under FD-85 that become effective on or before September 30 1987. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATES

The rate for the long-term purchase of Surplus Firm Power and Firm Displacement Power shall be mutually agreed by the parties, provided that the present value of the forecasted revenue under the contract rate, as projected for the contract term at the date of contract execution, shall be equal to or greater than the forecasted revenue under the Floor projection, specified in subsection A below, and less than or equal to the forecasted revenue under the Ceiling projection, specified in subsection B below.

### A. FLOOR PROJECTION

For firm power sales, the Floor projection shall be the greater of BPA's average Priority Firm rate or BPA's opportunity cost of surplus firm power, as projected for each year of the contract term in accordance with section IV.D. of the GRSP's. The average PF rate or successor rate(s) shall be calculated at the load factor of the proposed sale and assume a uniform demand in all months. If there is more than one PF rate, the average shall be determined by a weighting based on forecasted sales in the relevant rate case.

For firm capacity sales, the Floor projection shall be the Priority Firm demand charge, as projected for each year of the contract term in accordance with section IV.D. of the GRSP's.

### B. CEILING PROJECTION

The ceiling projection for firm power sales shall be the fully-allocated cost of BPA's highest cost resource including transmission costs, as pro-jected for each year of the contract term in accordance with section IV.D. of the GRSP's. For firm capacity sales, the ceiling projection shall be the demand component of BPA's highest cost resource including transmission costs, as projected.

## SECTION III. BILLING FACTORS

The billing factors shall be the Contract Demand and Measured Energy, unless otherwise specified in the contract.

## SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

### Power Factor Adjustment

The adjustment for power factor for BPA customers that are billed for the long-term purchase of Surplus Firm Power and Firm Displacement Power on metered amounts, when specified in this rate schedule or in the contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand or energy by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The approximate cost contribution of different resource categories to the SL-87 rate is 99.3 percent Exchange and 0.7 percent New Resources.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

24

SCHEDULE SS–87

# SHARE-THE-SAVINGS RATE

## SECTION I. AVAILABILITY

This rate schedule is available for the contract purchase of Nonfirm Energy under an experimental rate and is limited to the term of the rate experiment. Nonfirm Energy will be made available under this rate schedule for use both inside and outside the United States for the displacement of a qualifying resource, displaceable purchase of electricity, or end-user load that can be served with alternate fuel sources. This rate schedule is only available to purchasers who execute a contract with BPA specifying use of the Share-the-Savings Rate. BPA is not obligated to offer Nonfirm Energy to any purchaser that results in displacement of firm power purchases under BPA's Power Sales Contracts. Schedule SS-87 supersedes Schedule SS-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

The rate shall be a formula rate based solely or in part on decremental cost information submitted by the purchaser. The rate formula and decremental cost, for purposes of establishing charges under this rate schedule, shall be defined in the applicable contract. The rate formula agreed upon by BPA and the purchaser shall in no event result in a rate higher than the NF Rate Cap defined in section IV.C. of the GRSPs or lower than one mill per kilowatthour.

## SECTION III. BILLING FACTORS

The billing energy for Nonfirm Energy purchased under this rate schedule shall be the Measured Energy unless otherwise specified in the Share-the-Savings Rate contract.

## SECTION IV. APPLICATION AND ELIGIBILITY

### A. General Requirements

In order to purchase Nonfirm Energy under the Share-the-Savings Rate, the purchaser must:

1. have executed a contract specifying application of the Share-the-Savings Rate Schedule.

2. have a displaceable resource, displaceable purchase of electricity, or be an end-user load with a displaceable alternate fuel source. End-user loads with alternate fuel sources may not use the Decremental Cost a displaceable purchase of electricity to qualify for this rate.

### B. BPA Service Priority

Offers of Nonfirm Energy under this rate schedule shall be made pursuant to the terms and conditions setforth in the Share-the-Savings rate contract. BPA will sell Nonfirm Energy under this rate schedule consistent with regional and public preference.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The SS-87 rate is not based on the cost of BPA resources.

B. The forecasted average cost of resources available to BPA under average water conditions 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

SCHEDULE RP-87

# RESERVE POWER RATE

## SECTION I. AVAILABILITY

This schedule is available for the purchase of power:

A. in cases where a purchaser's power sales contract states that the rate for Reserve Power shall be applied;

B. for which BPA determines no other rate schedule is applicable; and

C. to serve a purchaser's firm power load in circumstances where BPA does not have a power sales contract in force with such purchaser, and BPA determines that this rate should be applied.

This rate schedule may be applied to power purchased by entities outside the United States. This rate schedule supersedes Schedule RP-85 which went into effect on an interim basis on July 1, 1985. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

### A. Demand Charge

1. $3.64 per kilowatt of billing demand occurring during all Peak Period hours.

2. No demand charge during Offpeak Period hours.

### B. Energy Charge

25.3 mills per kilowatthour of billing energy.

## SECTION III. BILLING FACTORS

The factors to be used in determining the billing for power purchased under this rate schedule are as follows:

### A. Billing Demand

If applicable, the billing demand shall be the Contract Demand as specified in the power sales contract. Otherwise the billing demand shall be the Measured Demand as adjusted for power factor.

### B. Billing Energy

The billing energy shall be the Contract Demand multiplied by the number of hours in the billing month, if use of the Contract Demand for determining billing energy is speci-

fied in the power sales contract. Otherwise the billing energy for such purchasers shall be the Measured Energy.

## SECTION IV. POWER FACTOR ADJUSTMENT

The adjustment for power factor, when specified in this rate schedule or in the power sales contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.

## SECTION V. RESOURCE COST CONTRIBUTION

BPA has made the following determinations:

A. The RP-87 rate is not based on the cost of resources.

B. The forecasted average cost of resources available to BPA under average water conditions is 17.7 mills per kilowatthour.

C. The forecasted cost of resources to meet load growth is 28.7 mills per kilowatthour.

26

# OUTLINE FOR GENERAL
## RATE SCHEDULE PROVISIONS

Page

I.   Adoption of Revised Rate Schedules and General Rate Schedule
       Provisions ................................................................. 30
     A.   Approval of Rates ...................................................... 30
     B.   General Provisions ..................................................... 30

II.  Types of BPA Service ......................................................... 30
     A.   Priority Firm Power .................................................... 30
     B.   New Resource Firm Power ............................................... 30
     C.   Industrial Firm Power ................................................. 30
     D.   Special Industrial Power .............................................. 31
     E.   Auxiliary Power ....................................................... 31
     F.   Firm Capacity ......................................................... 31
     G.   Surplus Firm Power .................................................... 31
     H.   Nonfirm Energy ........................................................ 31
     I.   Reserve Power ......................................................... 31
     J.   Firm Displacement Power ............................................... 31

III. Billing Factors and Billing Adjustments ..................................... 32
     A.   Billing Factors for Demand ............................................ 32
          1. Measured Demand ................................................... 32
             a.  Metered Demand ................................................ 32
             b.  Scheduled Demand .............................................. 32
          2. Ratchet Demand .................................................... 32
          3. Contract Demand ................................................... 32
          4. Computed Peak Requirement ......................................... 32
          5. Computed Average Energy Requirement ............................... 33
          6. Operating Demand .................................................. 33
          7. Curtailed Demand .................................................. 33
          8. Restricted Demand ................................................. 33
          9. Auxiliary Demand .................................................. 33
          10. BPA Operating Level .............................................. 33
     B.   Billing Factors for Energy ............................................ 34
          1. Measured Energy ................................................... 34
             a.  Metered Energy ................................................ 34
             b.  Scheduled Energy .............................................. 34
          2. Computed Energy Maximum ........................................... 34
          3. Contract Energy ................................................... 34
     C.   Billing Adjustments ................................................... 34
          1. Power Factor Adjustment ........................................... 34
          2. Outage Credit ..................................................... 35
          3. Low Density Discount .............................................. 35
             a.  Basic LDD Principles .......................................... 35
             b.  Eligibility Criteria .......................................... 36
             c.  Discounts ..................................................... 36
          4. Irrigation Discount ............................................... 36
             a.  Basic Irrigation Discount Principles .......................... 36
             b.  Qualifying Energy Purchases ................................... 36
             c.  Initial Reporting Requirements ................................ 37
             d.  Annual Report Requirements .................................... 37
          5. Cost Recovery Adjustment Clause ................................... 37
             a.  Terms and Conditions .......................................... 37
             b.  Cost Recovery Adjustment Formula .............................. 37
             c.  Application if CRV is Negative ................................ 38

## OUTLINE FOR GENERAL RATE
## SCHEDULE PROVISIONS (Cont.)

Page

d. Application if CRV is Positive ................................... 38
e. Application to Irrigation Discount ............................. 39
f. Cost Recovery Adjustment Clause Implementation Process ....... 39
6. Coincidental Billing Adjustment ................................ 40
7. Conservation Surcharge ........................................ 40
D. Billing-Related Definitions ........................................ 40
1. Peak Period ................................................... 40
2. Offpeak Period ................................................ 40

IV. Other Definitions ...................................................... 40
A. Computed Requirements Purchasers ................................ 40
1. Designation as a Computed Requirements Purchaser ............. 40
2. Purpose of the Computed Requirements Designation ............. 40
B. Definitions Relating to Nonfirm Energy ............................ 40
C. NF Rate Cap ....................................................... 41
1. Application of the NF Rate Cap ................................ 41
2. Monthly Notification of NF Rate Cap ........................... 41
3. NF Rate Cap Formula .......................................... 41
4. Determination of BASC ........................................ 41
5. Determination of Decremental Fuel Cost ....................... 41
6. California Gas Price .......................................... 42
7. California Petroleum Price .................................... 42
8. Weighting Factors ............................................ 43
a. Historical Gas Use in California ........................... 43
b. Historical Petroleum Use in California ..................... 43
D. Determination of SL Floor and Ceiling Rates ....................... 44

V. Application of Rates Under Special Circumstances ..................... 44
A. Energy Supplied for Emergency Use ................................ 44
B. Construction, Test and Start-up, and Station Service .............. 44
C. Application of Rates During Initial Operation Period-
Transitional Service .............................................. 45
1. Eligibility for Transitional Service .......................... 45
2. Calculation of the Daily Demand .............................. 45
3. Billing for Transitional Service ............................. 45
D. Changes in a DSI's BPA Operating Level ........................... 45
E. Restriction of Deliveries ......................................... 45

VI. Billing Information .................................................... 45
A. Determination of Estimated Billing Data .......................... 45
B. Load Shift and Outage Reports .................................... 46
C. Billing for New Large Single Loads ............................... 46
D. Determination of Measured Demand ................................ 46
E. Determination of Measured Energy ................................ 46
F. Billing Month .................................................... 46
G. Payment of Bills ................................................. 46
1. Computation of Bills .......................................... 46
2. Estimated Bills ............................................... 47
3. Due Date ...................................................... 47
4. Late Payment .................................................. 47
5. Disputed Billings ............................................. 47
6. Revised Bills ................................................. 47

# OUTLINE FOR GENERAL RATE
## SCHEDULE PROVISIONS (Cont.)

Page

VII. Variable Industrial Rate Parameters and Adjustments . . . . . . . . . . . . . . . . . . . . . . .    47
   A.   Monthly Average Aluminum Price Determination . . . . . . . . . . . . . . . . . . .    47
       1. Calculation of the Monthly Billing Aluminum Price . . . . . . . . . . . . . . . . . .    47
       2. Notification of the Monthly Average Aluminum Price . . . . . . . . . . . . . . .    47
       3. Changes in Aluminum Price Indicators . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47
   B.   Annual Adjustments to the Lower and Upper Pivot Aluminum Prices . . . . .    48
       1. Implementation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
       2. Annual Adjustment Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
          a.   Annual Adjustment of the Lower Pivot Aluminum Price . . . . . . . . . .    48
          b.   Annual Adjustment of the Upper Pivot Aluminum Price . . . . . . . . . .    48
       3. Cost Escalators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
       4. Average Historical Aluminum Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49
       5. Average Historical Lower Pivot Aluminum Price . . . . . . . . . . . . . . . . . . . . .    49
       6. Price Deflator Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

# SECTION I. ADOPTION OF REVISED RATE SCHEDULES AND GENERAL RATE SCHEDULE PROVISIONS

## A. Approval of Rates

These 1987 rate schedules and General Rate Schedule Provisions (GRSPs) shall become effective upon interim approval or final confirmation and approval by the Federal Energy Regulatory Commission (FERC). BPA will request FERC approval effective October 1, 1987. BPA proposes that the following schedules, and the GRSPs associated with these schedules, be effective for two years: PF-87, IP-87, CE-87, CF-87, NR-87, SS-87, NF-87, and RP-87. The VI-87 rate schedule reflects adjustments of and supplements to the rate schedule VI-86 and associated GRSPs (which are to be in effect for 7 years). Sections III.A and VI.J of the VI-87 rate schedule are to be in effect for two years. BPA proposes that rate schedule SI-87 be effective two years, except for the Special Industrial Offpeak rate provision, which is to remain in effect through June 30, 1990, pursuant to an Amendatory Agreement between BPA and Hanna Nickel Smelting Company executed July 1, 1985.

BPA proposes that the SP-87 rate schedule, and the GRSPs associated with this schedule, be effective for 5 years. BPA proposes that the Nonfirm Energy Rate Cap be effective for 12 years. BPA proposes that the SL-87 and the GRSPs associated with this schedule be effective for as long as BPA has surplus firm power available for sale.

## B. General Provisions

These 1987 rate schedules, and the GRSPs associated with these rate schedules, supersede BPA's 1985 rate schedules (which became effective July 1, 1985) to the extent stated in the Availability section of each 1987 rate schedule. These schedules and GRSPs shall be applicable to all BPA contracts, including contracts executed both prior to and subsequent to enactment of the Northwest Power Act. All sales of power made under these rate schedules are subject to the following acts as amended: the Bonneville Project Act, the Regional Preference Act (P.L. 88-552), the Federal Columbia River Transmission System Act, and the Northwest Power Act.

# SECTION II. TYPES OF BPA SERVICE

## A. Priority Firm Power

Priority Firm Power is electric power (capacity, energy, or capacity and energy) that BPA will make continuously available for resale to ultimate consumers, or for direct consumption, construction, test and start-up, and station service by public bodies, cooperatives, and Federal agencies. (Construction, test and start-up, and station service are defined in section V.B of these GRSPs.)

Utilities participating in the exchange under section 5(c) of the Northwest Power Act may purchase Priority Firm Power pursuant to their Residential Purchase and Sale Agreements.

In addition, BPA may make Priority Firm Power available to those parties participating in exchange agreements specifying use of the Priority Firm rate for determining the amount or value of power to be exchanged.

Power purchased under the power rate schedule is to be used to meet the purchaser's actual firm load within the Pacific Northwest. Such power may be restricted in accordance with the Restriction of Deliveries section of these GRSPs (section V.E). However, BPA shall not restrict Priority Firm Power until Industrial Firm Power has been restricted in accordance with the provisions of section II.C of these GRSPs.

Priority Firm Power is not available to serve New Large Single Loads.

## B. New Resource Firm Power

New Resource Firm Power is electric power (capacity, energy, or capacity and energy) that BPA will make continuously available:

1. New Large Single Load,

2. for firm power purchased by investor-owned utilities pursuant to power sales contracts with BPA, and

3. for construction, test and start-up, and station service for facilities owned or operated by investor-owned utilities.

New Resource Firm Power is to be used to meet the purchaser's actual firm load within the Pacific Northwest. Such power may be restricted in accordance with the Restriction of Deliveries section of these GRSPs (section V.E). However, BPA shall not restrict New Resource Firm Power until Industrial Firm Power has been restricted in accordance with the provisions of section II.C of these GRSPs.

## C. Industrial Firm Power

Industrial Firm Power is electric power that BPA will make continuously available to a direct-service industrial (DSI) purchaser pursuant to the DSI's power sales contract and subject to:

1. the restriction applicable to deliveries of all firm power pursuant to the Uncontrollable Forces and Continuity of Service provisions of the General Contract Provisions of the power sales contract, and

2. the restrictions given in the Restriction of Deliveries section of the power sales contract.

## D. Special Industrial Power

Special Industrial Power is electric power which BPA will make continuously available to any DSI that qualifies for the Special Industrial Power rate pursuant to section 7(d)(2) of the Northwest Power Act. This power is similar in nature to Industrial Firm Power, but is subject to greater restriction by BPA. Special Industrial Power is made available to the qualifying DSI upon adoption of, and subject to, an amendment modifying its power sales contract.

## E. Auxiliary Power

Auxiliary Power is that power which a DSI requests and which BPA agrees to make available to serve that portion of the DSI's load which is in excess of the DSI's Operating Demand for Industrial Firm Power or Special Industrial Power.

## F. Firm Capacity

Firm Capacity is capacity that BPA assures will be available in the amount(s) and during the period(s) specified in the power sales contract. The energy associated with this capacity must be returned to BPA. Firm Capacity may be restricted pursuant to the Restriction of Deliveries section of these GRSPs (section V.E).

## G. Surplus Firm Power

Surplus Firm Power is firm power (capacity, energy, or capacity and energy) in excess of the amount required to meet BPA's existing contractual obligations to provide firm service. Surplus Firm Power may be used either for resale or direct consumption by purchasers both inside and outside the United States. Such power, however, may be restricted pursuant to the Restriction of Deliveries section of these GRSPs (section V.E).

## H. Nonfirm Energy

Nonfirm Energy is supplied or made available by BPA to a purchaser under an arrangement that does not have the guaranteed continuous availability feature of firm power. Nonfirm energy is mostly sold under the Nonfirm Energy rate schedule, NF-87. Nonfirm energy also may be supplied under the Share-the-Savings rate schedule, SS-87, which is available as an experimental rate for contract purchase.

In addition, BPA also can make nonfirm energy available under the Nonfirm Energy rate schedule to the Western Systems Power Pool (WSPP) subject to terms and conditions agreed upon b the members participating in the WSPP and i accordance with BPA policy for suc arrangements.

However, Nonfirm Energy that has been purchased under a guarantee provision in the Nonfirm Energy rate schedule shall be provided t the purchaser in accordance with the provision of that schedule and the power sales contract applicable. BPA may make Nonfirm Energy available to purchasers both inside and outside the United States.

## I. Reserve Power

Reserve Power is firm power sold to purchaser:

1. in cases where the purchaser's power sale contract states that the rate for Reserve Powe shall be applied;

2. to provide service when no other type c power is deemed applicable; and

3. to serve the purchaser's firm power load under circumstances where BPA does nc have a power sales contract in force with th purchaser.

Sales of Reserve Power are subject to the Restriction of Deliveries section of these GRSP (section V.E).

## J. Firm Displacement Power

Firm Displacement Power is firm power (capacity, energy, or capacity and energy) that BP makes available to Pacific Northwest utilities fc use within the Pacific Northwest. The pur chased power will replace the generation fror resources that is exported from the Pacifi Northwest on a firm basis for a period of at leas 3 years. Such power may be restricted pursuar to the Restriction of Deliveries section of th GRSPs (section V.E).

# SECTION III. BILLING FACTORS AND BILLING ADJUSTMENTS

## A. Billing Factors for Demand

### 1. Measured Demand

The purchaser's Measured Demand shall be determined in the manner described in this section. Measured Demand shall be that portion of the metered or scheduled demand that is purchased from BPA under the applicable rate schedule. For those contracts to which BPA is a party and that provide for delivery of more than one class of electric power to the purchaser at any point of delivery, the portion of each 60-minute clock-hour integrated demand assigned to any class of power shall be determined pursuant to the power sales contract. The portion of the total Measured Demand so assigned shall constitute the Measured Demand for each such class of power.

The Measured Demand shall be determined from the metered de and or the scheduled demand, as hereina er defined. The Measured Demand shall be determined on either a coincidental or a noncoincidental basis, as provided in the purchaser's power sales contract.

#### a. Metered Demand

The metered demand in kilowatts shall be the largest of the 60-minute clock-hour integrated demands, adjusted as specified in the power sales contract, at which electric energy is delivered to a purchaser:

(1) at each point of delivery for which the metered demand is the basis for determination of the Measured Demand,

(2) during each time period specified in the applicable rate schedule, and

(3) during any billing period.

Such largest integrated demand shall be determined from measurements made either in the manner specified in the power sales contract or as provided in section VI.A. herein. In determining the metered demand, BPA shall exclude any abnormal integrated demnds due to or resulting from:

(1) emergencies or breakdowns on, or maintenance of, the Federal system facilities, and

(2) emergencies on the purchaser's facilities, provided that such facilities have been adequately maintained and prudently operated, as determined by BPA.

#### b. Scheduled Demand

The scheduled demand in kilowatts shall be the largest of the hourly demands at which electric energy is scheduled for delivery to a purchaser:

(1) to each system for which scheduled demand is the basis for determination of the Measured Demand,

(2) during each time period specified in the applicable rate schedule, and

(3) during any billing period.

Scheduled amounts are deemed delivered for the purpose of determining billing demand.

### 2. Ratchet Demand

The Ratchet Demand in kilowatts shall be the maximum demand established during a specified period of time either during or prior to the current billing period. The demand on which the ratchet is based is specified in the relevant rate schedule or in these GRSPs. For utilities purchasing under the PF or NR rate schedules, the Ratchet Demand is based on the highest demand during prior billing months. When the Ratchet Demand is use as a billing factor, BPA shall have specified in the appropriate schedules or GRSPs:

a. the period of time over which the ratchet shall be calculated,

b. the type of demand to be used in the calculation, and

c. the percentage (if any) of that demand which will be used to calculate the Ratchet Demand.

### 3. Contract Demand

The Contract Demand shall be the maximum number of kilowatts that the purchaser agrees to purchase and BPA agrees to make available, subject to any limitations included in the power sales contract. BPA may agree to make deliveries at a rate in excess of the Contract Demand at the request of the purchaser, but shall not be obligated to continue such excess deliveries. Any contractual or other reference to Contract Demand as expressed in kilowatthours shall be deemed, for the purpose of these GRSPs, to refer to the term "Contract Energy."

### 4. Computed Peak Requirement

For purchasers designated to purchase on the basis of computed requirements, the Co puted Peak Requirement shall be dete. mined as specified in the purchaser's power

sales contract. That specification is provided
in:

a. sections 16, 17(c), and 17(f), as adjusted by
other sections of the contract, for actual
computed requirements purchasers;

b. sections 16, 17(a), and 17(f), as adjusted by
other sections of the contract, for planned
computed requirements purchasers; and

c. sections 16 and 17(b), as adjusted by other
sections of the contract, for contracted
computed requirements purchasers.

## 5. Computed Average Energy Requirement

For computed requirements purchasers, the
Computed Average Energy Requirement
shall be determined as specified in the pur-
chaser's power sales contract. That specifica-
tion is provided in:

a. sections 16, 17(c), and 17(f), as adjusted by
other sections of the contract, for actual
computed requirements purchasers;

b. sections 16, 17(a), and 17(f), as adjusted by
other sections of the contract, for planned
computed requirements purchasers; and

c. sections 16 and 17(b), as adjusted by other
sections of the contract, for contracted
computed requirements purchasers.

## 6. Operating Demand

The Operating Demand is that demand
which is established by each DSI in accor-
dance with section 5(b) of the DSI's power
sales contract. Unless the DSI has requested,
and BPA has granted, an Auxiliary Demand,
the Operating Demand establishes a limit
with respect to:

a. the demand which the purchaser may
impose on BPA; and

b. the total amount of energy during a billing
month which the DSI is entitled to pur-
chase from BPA.

## 7. Curtailed Demand

A Curtailed Demand is the number of kilo-
watts of industrial power (Industrial Firm
Power or Special Industrial Power) during the
billing month which results from the DSI's
request for such power in amounts less than
the Operating Demand therefor. Each pur-
chaser of industrial power may curtail its
demand according to the terms of its power
sales contract (which permits up to three
levels of Curtailed Demand each month).

## 8. Restricted Demand

Restricted Demand is the number of kilo-

watts of industrial power (either Industrial
Firm Power or Special Industrial Power) that
results when BPA has restricted delivery of
such power for one clock-hour or more. BPA
shall make such restrictions according to the
terms of the DSI's power sales contract. In a
given billing month, there are as many possi-
ble levels of Restricted Demand for a DSI as
there are number of restrictions.

## 9. Auxiliary Demand

Auxiliary Demand is the number of kilowatts
of Auxiliary Power that a DSI requests and
that BPA agrees to make available to serve a
portion of the DSI's load during the period
specified in the DSI's request. The DSI may
request up to three levels of Auxiliary
Demand during a billing month.

If BPA agrees to a request for Auxiliary Power
but later becomes unable to supply such
demand, the Restricted Demand for Auxil-
iary Power is deemed to be the Auxiliary
Demand for such period of restriction. Auxil-
iary Power may be curtailed by the DSI
according to the provisions of section 9(a) of
the DSI's power sales contract.

BPA shall make Auxiliary Power available to
Industrial Firm Power purchasers under the
Industrial Firm Power Rate Schedule at the
Standard Industrial Rate. Auxiliary Power
sales to DSIs electing to purchase under the
Variable Industrial Power Rate Schedule
(VI-87) shall be made at the rate determined
pursuant to section III of the VI-87 rate sched-
ule. Auxiliary Power sales to DSIs purchasing
under the Special Industrial Rate will be
made only at the Standard Special Industrial
Power Rate.

## 10. BPA Operating Level

The BPA Operating Level is, for the purpose
of these rate schedules and GRSPs, an hourly
amount of industrial power (Industrial Firm
Power or Special Industrial Power) for a DSI
that is equal to the lowest of the following
demands during that hour:

a. Operating Demand plus Auxiliary
Demand, if any;

b. Curtailed Demand; or

c. Restricted Demand.

The weighted average BPA Operating Level
for each DSI can be determined by summing
the hourly BPA Operating Levels and dividing
by the number of hours in the billing month.

Each DSI must request service from BPA for
each billing month in accordance with the
terms of the power sales contract. The re-

quested level of service will be the BPA Operating Level, provided BPA does not need to restrict the DSI and provided BPA agrees to supply any requested Auxiliary Demand. Each requested level of service may include a designation for both the Peak Period and the Offpeak Period. A DSI may request and BPA may agree to a level of service for the Offpeak Periods other than that in the Peak Period. If a DSI does not separately designate a requested level of service for the Peak and Offpeak Periods, the BPA Operating Level is the basis for determining if a DSI has incurred an unauthorized increase.

Any DSI whose Measured Demand, before adjustment for power factor, during any 1 hour exceeds the BPA Operating Level for that hour shall be subject to unauthorized increase charges for each kilowatthour of unauthorized increase associated with each overrun.

Only the BPA Operating Level applicable during the Peak Period will be used in determining the Billing Demand for power purchased under the Industrial Firm Power rate schedule, the Variable Industrial Power rate schedule, and the Standard Rate under the Special Industrial rate schedule. During the Peak Period the BPA Operating Level may be no greater than the Operating Demand for the billing month unless the customer has requested, and BPA has agreed to supply, the Auxiliary Demand.

## B. Billing Factors for Energy

### 1. Measured Energy

Measured Energy shall be that portion of the metered or scheduled energy that is purchased from BPA under the applicable rate schedule. For those contracts to which BPA is a party and that provide for delivery of more than one class of electric power to the purchaser at any point of delivery, the portion of each 60-minute clock-hour integrated demand assigned to any class of power shall be determined pursuant to the power sales contract. The sum of the portions of the demands so assigned shall constitute the Measured Energy for each such class of power.

The Measured Energy shall be determined from the metered energy or the scheduled energy, as hereinafter defined.

#### a. Metered Energy

The metered energy for a purchaser shall be the number of kilowatthours that are recorded on the appropriate metering equipment, adjusted as specified in the power sales contract, and delivered to a purchaser:

(1) at all points of delivery for which metered energy is the basis for determination of the Measured Energy, and

(2) during any billing period.

The metered energy shall be determined from measurements made either in the manner specified in the power sales contract or as provided in section VI.A herein.

#### b. Scheduled Energy

The scheduled energy in kilowatthours shall be the sum of the hourly demands at which electric energy is scheduled for delivery to a purchaser:

(1) for each system for which scheduled energy is the basis for determination of the Measured Energy, and

(2) during any billing period.

Scheduled amounts are deemed delivered for the purpose of determining billing energy.

### 2. Computed Energy Maximum

The Computed Energy Maximum equals the product of the number of hours in the billing month and the Computed Average Energy Requirement.

### 3. Contract Energy

The Contract Energy shall be the maximum number of kilowatthours that the purchaser agrees to purchase and BPA agrees to make available, subject to any limitations included in the power sales contract.

## C. Billing Adjustments

### 1. Power Factor Adjustment

The formula for determining average power factor is as follows:

$$\text{Average Power Factor} = \frac{\text{Kilowatthours}}{\sqrt{(\text{Kilowatthours})^2 + (\text{Reactive kilovoltamperehours})^2}}$$

The data used in the above formula shall be obtained from meters that are ratcheted to prevent reverse registration. These data then shall be adjusted for losses, if applicable, before determination of the average power factor.

When deliveries to a purchaser at any point of delivery either:

a. include more than one class of power, or

34

b. are provided under more than one rate schedule and it is impracticable to meter the kilowatthours and reactive kilovolt-amperehours for each class or rate schedule separately, the average power factor of the total deliveries for the month will be used, where applicable. as the power factor for all power delivered to such point of delivery.

To maintain acceptable operating conditions on the Federal system, BPA may, unless specifically otherwise agreed, restrict deliveries of power to a purchaser with a low power factor. Such restriction may be made to a point of delivery or to a purchaser's system at any time that the average leading power factor or average lagging power factor for all classes of power delivered to such point or to such system is below 75 percent.

## 2. Outage Credit

To the extent that BPA is unable to provide full service to a purchaser during the billing month as a result of interruptions in service due to reasons cited in the General Contract Provisions, BPA shall adjust the charges for those hours for billing demand for such purchaser to reflect BPA's inability to provide full service. provided such adjustment is mandated by the purchaser's power sales contract. The adjustment is provided on a point of delivery basis. To compute the adjustment for noncoincidentally billed systems, BPA shall determine the monthly demand charge(s) for the point(s) of delivery where the outage(s) occurred, multiply by the number of hours of outage, and divide by the total number of hours in the billing month. For coincidentally billed points of delivery, the adjustment shall apply only to those points of delivery at which BPA was unable to provide full service. For partial outages (such as an outage on one feeder in a substation with several feeders), BPA shall determine an equivalent interruption in order to arrive at the number of hours to be used in the calculation of the credit.

## 3. Low Density Discount (LDD)

### a. Basic LDD Principles

A predetermined discount shall be applied each billing month to the charges for all power purchased under the Priority Firm Power rate schedule by eligible purchasers as defined in section b, below. The discount shall be calculated on an annual basis and shall become effective with the first billing period in the calendar year. Retroactive billing for the LDD may be required if the data are not available by the

January billing date. The level of the discount shall be determined from the following ratios:

(1) the purchaser's total electric energy requirements during the previous calendar year (the purchaser's firm sales, nonfirm sales to firm retail load, sales for resale, and associated losses but excluding nonfirm sales to nonfirm retail loads. such as boiler loads served under BPA's alternate fuel policy) divided by the value of the purchaser's depreciated electric plant (excluding generation plant) at the end of such year, and

(2) the average number of consumers (annual and seasonal consumers with residential, industrial, commercial, and irrigation accounts, but excluding separately billed services for water heating, electric space heating, and security lights) during the previous calendar year divided by the number of pole miles of distribution line at the end of such year. Distribution lines are defined as those that deliver electric energy from a substation or metering point, at a voltage of 34.5 kV or less, to the point of attachment to the consumer's wiring and include primary secondary, and service facilities.

These calculations shall be based on data provided in the purchaser's annual financial and operating report In calculating these ratios, BPA shall use data pertaining to the purchaser's entire electric utility system within that region. Results of the calculations shall not be rounded.

Customers who have not provided BPA with all four requisite pieces of annual data (see a.(1) and a.(2) above) by June 30 of each year shall be declared ineligible for the LDD effective with the June billing period for that year. BPA shall extend a customer's eligibility from the previous year through the June billing period of the following year and shall make any necessary retroactive adjustments once the new data have been processed. If no data have been received by December 31 for the previous calendar year, BPA shall assume that the utility did not qualify for a LDD for that year. Low Density Discounts issued from January 1 to June shall be assumed to have been in error and the utility shall be billed for any such discounts issued.

35

Revisions to the data used to calculate the amount of the LDD may be made by the purchaser for a period of up to 2 years from the first day to which the data apply. However, such revisions shall not apply to periods when the customer was ineligible for a discount due to late data submission.

### b. Eligibility Criteria

To qualify for a discount, the purchaser must meet all six of the following eligibility criteria:

(1) the purchaser must serve as an electric utility offering power for resale;

(2) the purchaser must agree to pass the benefits of the discount through to the purchaser's consumers within the region served by BPA;

(3) the purchaser's average retail rate for the reporting year must exceed the average Priority Firm Power rate in effect for the qualifying period by 10 percent. For CY 1987, the average Priority Firm Power rate shall be the average of the PF-85 rate for 9 months and the PF-87 Preference rate for 3 months. For CY 1988, the average Priority Firm Power rate shall be the PF-87 Preference rate.

(4) the purchaser's kilowatthour-to-investment ratio (Ratio 3.a.(1)) must be less than 100;

(5) the purchaser's consumers-per-mile ratio (Ratio 3.a.(2)) must be less than 12; and

(6) the purchaser must qualify for a discount based on criteria in section .c. below.

### c. Discounts

The purchaser shall be awarded the greatest discount for which that purchaser qualifies. The discounts and the qualifying criteria for those discounts are listed below.

(1) Three percent, for any purchaser for whom:

(a) the kilowatthour-to-investment ratio is equal to or greater than 25 but less than 35; or

(b) the consumers-per-mile ratio is equal to or greater than 5 but less than 7.

(2) Five percent, for any purchaser for whom:

(a) the kilowatthour-to-investment

ratio is equal to or greater than 15 but less than 25; or

(b) the consumers-per-mile ratio is equal to or greater than 3 but less than 5.

(3) Seven percent, for any purchaser for whom:

(a) the kilowatthour-to-investment ratio is less than 15; or

(b) the consumers-per-mile ratio is less than 3.

## 4. Irrigation Discount

### a. Basic Irrigation Discount Principles

A discount of 4.6 mills per kilowatthour shall be applied to the charges for qualifying irrigation energy purchased under the Priority Firm Power and New Resource Firm Power rate schedules, during the billing months of April through October. This discount shall be applied subsequent to calculation of the Low Density Discount, if applicable. Any energy on which the irrigation discount is claimed shall be metered separately by the Purchaser, and used exclusively for agricultural irrigation or drainage pumping.

### b. Qualifying Energy Purchases

The qualifying irrigation energy shall be determined as follows:

(1) All irrigation energy must be used exclusively for the purpose of irrigation and drainage pumping on agricultural land and be measured at the end-use irrigation customer's meter. The discount shall apply to the measured energy sales at the end-use.

(2) Energy subject to the discount must be purchased during the billing months of April through October.

(3) Purchasers of exchange energy under the Residential Purchase and Sale Agreement (RPSA) are eligible for the irrigation discount for the portion of their irrigation sales qualifying for the exchange under the RPSA contracts.

(4) General requirements customers are eligible for an irrigation discount for a portion of their irrigation sales equal to the share of their total sales served by BPA firm purchases (i.e., total irrigation and drainage pumping sales multiplied by BPA billing energy for Priority Firm or New Resources firm purchases divided by the total firm utility system requirements for the billing month).

### c. Initial Reporting Requirements

Requests for the Irrigation Discount must include the following information:

(1) To receive an irrigation discount, a purchaser must file a request for the discount with its local BPA Area or District office by April 1 each year.

(2) In the request, the purchaser must certify that the irrigation energy is sold exclusively for use in irrigation and drainage pumping on agricultural land and that the discount is passed, in its entirety, to the irrigation consumer, regardless of whether the utility has raised its rates. BPA retains the right to verify, in a manner satisfactory to the Administrator, that the discounted energy is used for the sole benefit of the purchaser's irrigation load.

### d. Annual Reporting Requirements

Purchasers shall submit an annual irrigation report to their local BPA Area or District office in order to receive the irrigation discount. Purchasers are required to report information related to monthly irrigation energy sales. If a utility does not read its irrigation meters monthly, the utility must estimate its monthly irrigation sales. These estimates shall be reviewed by BPA area and/or district offices. Purchasers must read their meters within 3 working days of the beginning and ending of the irrigation discount period (April-October). In order to qualify for the discount, the purchaser must submit all data to BPA by December 31 of the calendar year in which the sales occurred. Irrigation reports to BPA shall include the following monthly information for the reporting period:

(1) utility name and period for which the report is being made;

(2) total irrigation sales and total qualifying irrigation energy sales (in kilowatthours) by month;

(3) total qualifying irrigation sales (in kilowatthours) by month under 400 horsepower, for exchanging utilities;

(4) total utility firm system requirements for other than full requirement customers by month (in kilowatthours);

(5) total energy purchased from BPA under the Priority Firm or New Resource rate by month in kilowatthours; and

(6) the Purchaser shall list each irrigation and drainage account number in its annual report and whether each irrigation consumer is billed monthly, bimonthly, or seasonally. If the Purchaser is an exchanging utility, the Purchaser shall also identify the size (in horsepower) of the connected load for each active account. A utility may submit monthly reports, if it chooses. In that case, the active list of accounts should be included in the last monthly report submitted.

## 5. Cost Recovery Adjustment Clause

### a. Terms and Conditions

The Cost Recovery Adjustment Clause applies to the Priority Firm Power (Exchange and Preference), Industrial Firm Power, Variable Industrial Power, Firm Capacity, and New Resource Firm Power rate schedules.

After September 30, 1988, BPA shall evaluate actual financial performance, by comparing BPA's actual fiscal year 1988 funds from operations (net revenues plus charges not requiring funds), to the fiscal year 1988 funds from operations that rates were designed to achieve. When this evaluation is performed, if actuals differ from planned funds from operations for the evaluation period (fiscal year 1988) as specified herein, BPA shall adjust applicable 1987 wholesale power rate schedules over an adjustment period beginning January 1, 1989, and ending September 30, 1989.

Rate schedules subject to the Cost Recovery Adjustment Clause shall be adjusted only if BPA's actual fiscal year funds from operations are either:

(1) Greater than $80 million above planned funds from operations, or

(2) Greater than $45 million below planned funds from operations.

Any resulting upward rate adjustment shall not be greater than 10.0 percent.

### b. Cost Recovery Adjustment Formula

BPA shall determine the variance between actual and planned funds from operations for the evaluation period using the following formula:

$$CRV = AFFO - PFFO$$

where:

CRV = Fiscal year 1988 cost recovery variance (in millions of dollars); total underrecovery (if CRV is negative) or overrecovery (if CRV is positive) of planned funds from operations;

AFFO = Actual fiscal year 1988 funds from operations (in millions of dollars): BPA's reported fiscal year 1988 funds from operations calculated as the sum of net revenues, depreciation, and amortization of conservation and fish & wildlife investment;

PFFO = Planned fiscal year 1988 funds from operations (in millions of dollars); PFFO = $222.530.

## c. Application if CRV is Negative

If the absolute value of CRV is greater than $45 million, and if CRV is negative, the percentage increase, rounded to the nearest tenth of a percent, shall be calculated as follows:

(1) If CRU is greater than $28.9 million, then the CRAC% is the lesser of:

(a) $CRAC\% = \frac{(28.9 + CRU - 28.9)}{FR1 \quad FR2} \cdot 100$; or

(b) CRAC% = 10.0 percent.

(2) If CRU is less than or equal to $28.9 million, then, for PF, CF, and NR rate schedules (IP and VI are not adjusted):

$CRAC\% = \frac{CRU}{FR1} \cdot 100.$

where:

28.9 = 3 percent of FR1.

Three percent is the percentage that IP and VI floor rates exceed their respective margin-based rates. $28.9 million is the revenue increase from PF-87, CF-87, and NR-87 classes for which there would be no corresponding revenue increase from IP-87 and VI-87 classes.

CRAC% = Uniform percentage applied to PF-87 (Exchange and Preference), IP-87, VI-87, CF-87, and NR-87 rate schedules and the irrigation discount.

CRU = Cost-Recovery Underrun, in millions of dollars, beyond $45 million: the absolute value of CRV greater than $45 million;

FR1 = the sum of the forecasted revenues from the PF, NR, and CF classes of service subject to the Cost Recovery Adjustment

Clause for the adjustment period in millions of dollars. For the period January 1, 1989 through September 30, 1989, FR1 = $964.0 million.

FR1 does not include forecasted revenues from public exchange sales and sales from utilities where average system cost is deemed equal to BPA's PF rate. These two types of sales are subject to the Cost Recovery Adjustment Clause, but significant additional revenues could not be collected from them during the rate period through application of the Cost Recovery Adjustment Clause. IP and VI revenues are excluded because no revenue can be expected from these classes of service when the rate adjustment is less than 3 percent (CRU less than or equal to $28.9 million).

FR2 = the sum of the forecasted revenue for PF, NR, CF, and IP and VI at margin based rates for the period January 1, 1989 through September 30, 1989. FR2 = $1319.5 million.

## d. Application if CRV is Positive

If CRV is greater than $80 million, the percentage decrease rounded to the nearest tenth of a percent, unless otherwise specified in a rate schedule, shall be calculated as follows:

$CRAC\% = \frac{CRO}{FR1} \cdot 100$

where:

CRAC% = Uniform percentage applied to PF-87 (Exchange and Preference), CF-87, and NR-87 rate schedules and the irrigation discount;

CRO = Cost Recovery Overrun in millions of dollars: the amount that (AFFO-PFFO) is greater than $80 million.

FR1 = the sum of the forecasted revenues from the PF, NR, and CF classes of service subject to the Cost Recovery Adjustment Clause for the adjustment period in millions of dol-

lars. For the period January 1,
1989 through September 30,
1989, FR1 = $964.0 million.

IP and VI revenues are
excluded because rates for
those customer classes are at
the floor and thus receive no
adjustment when CRV is
positive.

### e. Application to Irrigation Discount

In addition to the direct application of the
Cost Recovery Adjustment percentage to the
irrigation discount, an additional adjustment
shall be made so that irrigation loads are not
disproportionately affected by a 9-month
adjustment period as compared to a 12-
month adjustment period. This additional
adjustment is reflected in the following for-
mula which represents the total CRAC
adjustment to the irrigation discount:

Adjusted Irrigation Discount (in mills per
kilowatthour) =

$$4.6 * (1 + \frac{CRAC\%}{100}) + (.046 * CRAC\%)$$

where:

| | |
|---|---|
| 4.6 = | Irrigation discount applicable to PF-87 and NR-87, in mills per kilowatthour; |
| CRAC% = | Uniform percentage applied to PF-87 (Exchange and Preference), IP-87, VI-87, CF-87, and NR-87 rate schedules and the irrigation discount; |
| .046 = | Mills per percentage CRAC adjustment; difference between 9- and 12-month CRAC adjustment periods. |

### f. Cost Recovery Adjustment Clause Implementation Process

(1) Within 30 days of the end of Fiscal Year
1988, BPA shall make an initial calculation
to identify the difference between prelim-
inary unaudited AFFO and PFFO.

(2) On or about November 1, 1988, BPA shall
notify interested persons and the pur-
chasers under each applicable rate sched-
ule of BPA's initial findings concerning
the difference between AFFO and PFFO
for the evaluation period.

   (a) If no adjustment is required, or if the
   Administrator waives implementation
   of an adjustment, BPA shall state in the
   notice the basis for its decision.

   (b) If BPA determines that an adjustme
   to applicable rates is required, BF
   shall state in the notice the amount
   the adjustment, the calculation of th
   adjustment and the resulting level
   the adjustment to each applicab
   rate schedule. The notice shall al
   contain the data and assumptio
   prepared and relied upon by BP
   with references to additional doc
   mentation, if any, prepared and relie
   upon by BPA. Such documentation
   nonproprietary and/or nonpriv
   leged, shall be available upon reque
   unless unduly burdensome. T
   notice shall also contain the tentati
   schedule for the remainder of t
   implementation process.

(3) On or about November 4, 1988, BPA sh
conduct a public meeting in which inte
ested persons and purchasers under ea
applicable rate schedule may seek o
the-record clarification of the adjustme
amount, calculation, and application
specific rate schedules. For the purpose
further mailings, a list of the names a
addresses of interested persons and pu
chasers (hereafter referred to as "maili
list") shall be compiled at this meeting

(4) On or about November 8, 1988, purch
ers under each applicable rate schedu
may submit information requests to B
regarding the adjustment. The reque
shall also be mailed to all persons on t
mailing list. BPA shall respond to t
requests within 2 working days of th
receipt, or as soon as practicable if 2 d
is insufficient time within which
respond.

(5) On or about November 15, 1988, int
ested persons and purchasers under ea
applicable rate schedule may submit w
ten comments to BPA regarding
adjustment. The comments shall also
mailed to all persons on the mailing li

(6) On or about December 1, 1988, comme
ters may respond to any comments.

(7) On or about December 1, 1988, BPA n
release, if available, revised prelimin
unaudited AFFO and any result
revised adjustment to applicable r
schedules.

(8) On or about December 15, 1988, BPA s
conduct an on-the-record public cc
ment forum in which interested pers
and purchasers under each applica
rate schedule may present oral comme

to BPA.

(9) On or about December 20, 1988, BPA shall notify interested persons and purchasers under each applicable rate schedule of the audited AFFO, the amount of the adjustment, the calculation of the adjustment and the resulting level of the adjustment to each applicable rate schedule. The notice shall also contain the data and assumptions prepared and relied upon by BPA, with references to additional documentation, if any, prepared and relied upon by BPA.

(10) The rate adjustment shall be in effect from January 1, 1989, through September 30, 1989.

### 6. Coincidental Billing

Purchasers of Priority Firm Power and New Resource Firm Power shall be billed on a noncoincidental demand basis for power purchased at each point of delivery under the applicable rate schedule(s) unless the power sales contract specifically provides for coincidental demand billing among particular points of delivery. For the purpose of these rate schedules and GRSPs, the purchaser's noncoincidental demand is the sum of the highest hourly peak demands during the billing month for each of the purchaser's points of delivery. The purchaser's coincidental demand is the highest demand for the billing month calculated by summing, for each hour of every day, the purchaser's demands for power purchased under the applicable rate schedule at all coincidentally billed points of delivery. See the Special Provisions Exhibits of the Power Sales Contract, GCP, E, 17.

### 7. Conservation Surcharge

The Conservation Surcharge shall be applied monthly and shall equal 10 percent of the customer's total monthly charge for all power purchased under each rate schedule subject to the surcharge. The PF, CF, and NR rate schedules are subject to the Conservation Surcharge. If only a portion of the customer's service area is subject to the surcharge, then the amount of the surcharge shall equal 10 percent of the total charge for all power purchases multiplied by: (a) the portion of the customer's total retail load that is subject to the surcharge, divided by (b) the customer's total retail load.

### D. Billing-Related Definitions

#### 1. Peak Period

The Peak Period includes the hours from 7 a.m. through 10 p.m. on any day Monday through Saturday inclusive. There are no exceptions to this definition; that is, it does not matter whether the day is a normal working day or a holiday. Any charges based on Peak Period hours shall be computed starting with the 8 a.m. meter reading since this reading applies to the 7 o'clock hour (7 a.m. to 8 a.m.). The 10 p.m. meter reading (for the 9 p.m. to 10 p.m. period) is the last meter reading of the day applicable to the Peak Period.

#### 2. Offpeak Period

The Offpeak Period includes all hours which do not occur during the Peak Period. Thus, the Offpeak Period consists of the hours from 10 p.m. to 7 a.m., Monday through Saturday and all hours on Sunday. This definition does not apply to the Special Industrial Offpeak Rate.


## SECTION IV. OTHER DEFINITIONS

### A. Computed Requirements Purchasers

#### 1. Designation as a Computed Requirements Purchaser

A purchaser shall be designated as a computed requirements purchaser if it is so designated pursuant to the provisions of its power sales contract.

When a purchaser operates two or more separate systems, only those systems designated by BPA will be covered by this section.

#### 2. Purpose of the Computed Requirements Designation

Use of the computed requirements designation is intended to assure that each purchaser who purchases power from BPA to supplement its own firm resources will purchase amounts of firm capacity and firm energy substantially equal to that which the purchaser would otherwise have to provide on the basis of normal and prudent operations.

The amount of capacity and energy required for normal and prudent operations shall be determined pursuant to the purchaser's power sales contract.

### B. Definitions Relating to Nonfirm Energy

#### Decremental Cost

Unless otherwise specified in a contractual arrangement, decremental cost as applied to Nonfirm Energy transactions shall be defined as:

a. All identifiable costs (expressed in mills per kilowatthour) associated with the us

of a displaceable thermal resource or end-user load with alternate fuel source to serve a purchaser's load that the purchaser is able to avoid by purchasing power from BPA, rather than generating the power itself or using an alternate fuel source; or

b. All identifiable costs (expressed in mills per kilowatthour) to serve the load of a displaceable purchase of energy that the purchaser is able to avoid by choosing not to make the alternate energy purchase.

All identifiable costs as used in the above definition may be reduced to reflect costs of purchasing BPA energy such as transmission costs, losses, or loopflow constraints that are agreed to by BPA and the purchaser.

## C. NF Rate Cap

### 1. Application of the NF Rate Cap

The NF Rate Cap defines the maximum nonfirm energy price for general application. At no time shall the total price for nonfirm energy, including any applicable service charges or rate adjustment, sold under any applicable rate schedule exceed the NF Rate Cap. The level of the NF Rate Cap is based on formula tied to BPA's system cost and California fuel costs. The NF Rate Cap applies to all sales of nonfirm energy under any applicable rate schedule over a 12-year period beginning from the date the 1987 Wholesale Power Rates and associated GRSPs are made effective on an interim or final basis by the Federal Energy Regulatory Commission (FERC).

### 2. Monthly Notification of the NF Rate Cap

Prior to the beginning of a calendar month BPA shall perform the calculations contained in section IV.C.3. of these GRSPs to determine the effective NF Rate Cap for that calendar month. BPA is obligated to provide advance notification of the NF Rate Cap to purchasers of nonfirm energy. BPA may waive this requirement only if BPA does not intend to offer Nonfirm Energy at prices above BASC at any time during a month. The notification will be given at least 10 calendar days prior to the first day of any calendar month in which the NF Rate Cap applies. BPA shall also maintain, on file for public review, a record of the NF rate Cap by month throughout the period the cap is in effect.

### 3. NF Rate Cap Formula

The NF Rate Cap shall be equal to the greater of the following:

a. BASC; or

b. BASC + .30(DEC — BASC)

Where:

BASC = BPA's average system cost determined by dividing BPA's total system costs by BPA's total system sales. For this rate period BASC has been determined to be 23.2 mills per kilowatthour.

DEC = The Decremental Fuel Cost determined in accordance with section IV.C.5. of these GRSPs.

### 4. Determination of BPA's Average System Cost

For purposes of determining BPA's average system cost (BASC), the following definitions shall apply:

a. BPA's total system costs shall be the sum of all BPA's costs forecasted in each general rate case for the applicable rate period including total transmission costs, Federal base system costs, new resource costs, exchange resource costs, and other costs not specifically allocated to a rate pool such as section 7(g) costs.

b. BPA's total annual system sales shall be the sum of all BPA's system firm and nonfirm sales forecasted each general rate case for the applicable test period.

BASC shall be redetermined in each subsequent general rate case according to the above formula and will be in effect for the entire rate period over which the rates are in effect.

### 5. Determination of Decremental Fuel Cost

The Decremental Fuel Cost shall be determined monthly by BPA. For purposes of calculating the NF Rate Cap, a weighted average of gas and petroleum prices for California will be used for approximating decremental fuel costs. The monthly decremental fuel cost shall be:

a. the sum of:

(1) the average California price for gas determined by multiplying the monthly gas use (WGU) developed pursuant to section IV.C.8.a. times the monthly California gas price (MCGP) determined pursuant to section IV.C rounded to the nearest tenth of a mill, and

(2) the average California price for petroleum determined by multiplying monthly petroleum use (WOU) developed pursuant to section IV.C.

times the monthly California petroleum price (MOP) determined pursuant to section IV.C.7. rounded to the nearest tenth of a mill.

b. divided by the sum of the monthly gas use (WGU) and monthly petroleum use (WOU) developed in section IV.C.B.a. and b. respectively rounded to the nearest tenth of a mill.

## 6. California Gas Price

The monthly gas price (MGP) for purposes of calculating the decremental cost component of the rate cap shall based on the following formula:

$$MGP = \frac{AGP \cdot HGP}{10}$$

Where:

AGP = the average gas price for California electric utility plants expressed in cents per million Btu as reported in the most recent monthly issue of Electric Power Monthly (EPM) published by the Energy Information Adminstration (EIA), U.S. Department of Energy. Prices shall be rounded to the nearest one-tenth of a cent.

HGP = the historical relationship between gas prices in the effective month of the NF Rate Cap (month t) and the month in which the gas prices are reported in EPM (month r) using the following procedures:

   a. summing all California gas prices, expressed in the nearest one-tenth of a cent per million Btu, reported in EPM for month t for the years beginning with calendar year 1982 up to and including the prior calendar year. The sum of the historical monthly California gas prices shall be divided by the number of years for which monthly gas prices were reported and rounded to the nearest one-tenth of a cent.

   b. summing all California gas prices, expressed in the nearest one-tenth of a cent per million Btu, reported in EPM for month r for the years beginning with calendar year 1982 up to and including the prior calendar year. The sum of the historical monthly California gas prices shall be divided by the

number of years for which monthly gas prices were reported and rounded to the nearest one-tenth of a cent.

   c. dividing the average monthly California gas price in a. above, by the average monthly California gas price in b. above, and rounding to the nearest one-tenth, or three significant places.

10 = the factor for converting gas prices stated in cents per million Btu to mills per kWh. The factor assumes a heat rate of 10,000 Btu per kilowatthour.

## 7. California Petroleum Price

The monthly petroleum price (MOP) for purposes of calculating the decremental cost component of the rate cap shall based on the following formula:

$$MOP = \frac{AOP \cdot HOP}{10}$$

Where:

AOP = the last available average oil price for California electric utility plants expressed in cents per million Btu reported in Electric Power Monthly (EPM) published by the Energy Information Administration (EIA), U.S. Department of Energy. Prices shall be rounded to the nearest one-tenth of a cent.

HOP = the historical relationship between petroleum prices in the effective month of the NF Rate Cap (month t) and the last month in which the petroleum prices are reported in EPM (month r) using the following procedures:

   a. summing all California petroleum prices, expressed in the nearest one-tenth of a cent per million Btu, reported in EPM for month t for the years beginning with calendar year 1982 up to and including the prior calendar year. The sum of the historical monthly California petroleum prices shall be divided by the number of years for which monthly petroleum prices were reported and rounded to the nearest one-tenth of a cent.

   b. summing all California petroleum prices, expressed in the nearest

one-tenth of a cent per million Btu, reported in EPM for month r for the years beginning with calendar year 1982 up to and including the prior calendar year. The sum of the historical monthly California petroleum prices shall be divided by the number of years for which monthly petroleum prices were reported and rounded to the nearest one-tenth of a cent.

c. dividing the average monthly California petroleum price in a. above, by the average monthly California petroleum price in b. above, and rounding to the nearest one-tenth of a percent, or three significant places.

10 = the factor for converting petroleum prices stated in cents per million Btu to mills per kWh. The factor assumes a heat rate of 10,000 Btu per kilowatthour.

## 3. Weighting Factors

For purposes of determining a California fuel prices for the month, gas and petroleum prices will be weighted based on California's historical use of these two alternative fuels.

### a. Historical Gas Use in California

The following formula shall be used to determine the weighting factor for gas prices (WGU):

WGU = CGU * HGU

Where:

CGU = the monthly net gas-fired generation, expressed in gigawatthours, for California in the most recent monthly issue of *Electric Power Monthly* (EPM) published by the Energy Information Administration (EIA), U.S. Department of Energy.

HGU = the historical relationship between gas consumptions in the effective month of the NF Rate Cap (month t) and the month for which gas consumption is reported in EPM (month r) using the following procedures:

(1) summing the reported net-gas fired generation for California, expressed in gigawatt-hours, from EPM for month t

for the years beginning wi calendar year 1982 up to ar including the prior calend year. The sum of Californi: historical monthly consum tion shall be divided by t: number of years for which g consumption was reporte and rounded to the neare gigawatthour.

(2) summing the reported n gas-fired generation for Ca fornia, expressed in gigawa hours, from EPM for montr for the years beginning wi calendar year 1982 up to ar including the prior calend year. The sum of Californi: historical monthly consum tion shall be divided by t: number of years for which g consumption was reporte and rounded to the neare gigawatthour.

(3) dividing the average co sumption of gas in Califorr for the month t as determine in (1) above by the avera consumption of gas for t: month r as determined in : above and rounding to t: nearest one-tenth, or thre significant places.

### b. Historical Petroleum Use in California

The following formula shall be used determine the weighting factor for petr leum prices (WOU):

WOU = COU * HOU

Where:

COU = the monthly net petroleum-fire generation, expressed in gigawa hours, in California in the mc recent monthly issue of *Electr Power Monthly* (EPM) publishe by the Energy Informatic Administration (EIA), U. Department of Energy.

HOU = the historical relationsh between petroleum consum tions in the effective month of t: NF Rate Cap (month t) and t: month for which petroleum co sumption is reported in EP (month r) using the followi procedures:

· 43

(1) summing the reported net-petroleum generation for California, expressed in giga-watthours, from EPM for month t for the years begin-ning with calendar year 1982 up to and including the prior calendar year. The sum of Cali-fornia's historical monthly consumption shall be divided by the number of years for which petroleum consump-tion was reported and rounded to the nearest gigawatthour.

(2) summing the reported net-petroleum generation for California, expressed in giga-watthours, from EPM for month r for the years begin-ning with calendar year 1982 up to and including the prior calendar year. The sum of Cali-fornia's historical monthly consumption shall be divided by the number of years for which petroleum consump-tion was reported and rounded to the nearest gigawatthour.

(3) dividing the average con-sumption of petroleum in California for the month t as determined in (1) above by the average consumption of pet-roleum for the month r as determined in (2) above and rounding to the nearest one-tenth, or three significant places.

## D. Determination of SL Floor Projection and Ceil-ing Projection

By October 1 of each year, BPA shall determine the present value of the forecasted Priority Firm rate or successor rate(s), BPA's opportunity cost of surplus power, and the cost of BPA's highest cost resource for each fiscal year of the succeed-ing 21-year period. This determination shall be used to calculate the Floor projection and Ceil-ing projection for any contract using the SL-87 rate schedule executed during the succeeding 12 months. The Floor projection and Ceiling projection shall be calculated as stated in Sec-tion II.A and II.B of Rate Schedule SL-87.

An initial determination of the present value of the Priority Firm rate, BPA's opportunity cost, and the cost of BPA's highest cost resource shall be published on or about August 1 of each year. Within 14 days of the date of BPA's notice, any

interested parties shall notify BPA's Office of Public Involvement in writing that they reques to be placed on a list of interested parties. The request shall state the name and address of the person, and shall designate no more than two persons on whom service shall be made. There-after, communications by and between BPA and interested parties will be limited to those parties appearing on the interested parties list.

Following BPA's notice of its initial determina-tion, BPA shall afford interested parties the opportunity to:

(1) Obtain or be provided reasonable access to nonproprietary and nonprivileged BPA financial data and support relevant to BPA's determination.

(2) Submit written comments to BPA by Sep-tember 15 regarding the determination. Interested parties shall mail copies of their comments to all parties appearing on the list of interested parties compiled by BPA.

Consideration of comments and more current information may result in a different calculation from that initially proposed. The final determi-nation shall be published on October 1.

## SECTION V. APPLICATION OF RATES UNDER SPECIAL CIRCUMSTANCES

### A. Energy Supplied for Emergency Use

A purchaser taking Priority Firm or New Resource Firm Power shall pay in accordance with the Nonfirm Energy rate schedule, NF-87, and Emergency Capacity rate schedule, CE-87, for any electric energy or capacity which has been supplied:

1. for use during an emergency on the purchas-er's system, or

2. following an emergency to replace energy secured from sources other than BPA during such emergency.

   Mutual emergency assistance may, however, be provided and payment therefore settled under exchange agreements.

### B. Construction, Test and Start-Up, and Station Service

Power for the purpose of construction, test and start-up, and station service shall be made avail-able to eligible purchasers under the Priority Firm and New Resource Firm Power Rate Sched-ules. Such power must be used in the manner specified below:

1. Power sold for construction is to be used the construction of the project.

44

2. Power sold for test and start-up may be used prior to commercial operation both to bring the project on line and to ensure that the project is working properly.

3. Power sold for station service may be purchased at any time following commercial operation of the project. Station service power may be used for project start-up, project shut-down, normal plant operation, and operations during a plant shut-down period.

## C. Application of Rates During Initial Operation Period—Transitional Service

1. Eligibility for Transitional Service

For an initial operating period, as specified in the power sales contract, beginning with the commencement of operation of a new industrial plant, a major addition to an existing plant, or reactivation of an existing plant or important part thereof, BPA may agree to bill the purchaser in accordance with the provisions of this section. This section shall apply to both:

a. DSIs having new, additional or reactivated plant facilities, and

b. utility purchasers serving industrial purchasers with power purchased from BPA. BPA will provide transitional service to utilities for only those industrial loads for which the demand can be separately metered by the utility and recorded on a daily basis.

2. Calculation of the Daily Demand

If the purchaser requests billing on a Daily Demand basis pursuant to its power sales contract and if BPA agrees to such billing, the billing demand for the billing month shall be the average of the Daily Demands as adjusted for power factor.

Demand for each day shall be defined as 100 percent of the Measured Demand for the day (regardless of whether such Measured Demand occurs during the Peak Period or the Offpeak Period).

3. Billing for Transitional Service

Utilities receiving transitional service shall provide BPA with Daily Demand information for the industrial consumer for whom transitional service is provided. To compute the power bill for the point of delivery which includes the load being served with transitional service, BPA shall, at its discretion, either:

a. determine the demand for the pertinent point of delivery without the industrial

load and then add the average ca demand for such industrial load; or

b. bill the entire point of delivery on a da demand basis.

Daily demand billing shall not affect the lev of any curtailment charge or energy char assessed by BPA.

## D. Changes in a DSI's BPA Operating Level

If a DSI requests a waiver regarding the noti requirements specified in the DSI's power sa contract for a voluntary change in its BPA Ope ating Level, and if BPA does not grant t waiver, or if the DSI fails to give notice of suc change and does not request a waiver, the C shall be billed as if no notice has been provid until such time as the number of days in t notice period have passed. If, however, B agrees to waive the notice requirement, t power bill shall reflect the requested chang as of the requested effective date specified the notice, or, at BPA's discretion, a date of BP choosing within the notice period.

## E. Restriction of Deliveries

Deliveries of capacity or energy to any pu chaser may be restricted when operation of t facilities used by BPA to serve such purchaser

1. suspended,

2. interrupted,

3. interfered with,

4. curtailed, or

5. restricted

by the occurrence of any condition described the Uncontrollable Forces or Continuity of S vice sections of the General Contract Provisic of the power sales contract.

## SECTION VI. BILLING INFORMATION

## A. Determination of Estimated Billing Data

If the amounts of capacity, energy, or the minute integrated demands for energy p chased from BPA must be estimated from d other than metered or scheduled quantit historical patterns, and pertinent weather d; BPA and the purchaser will agree on billing d to be used in preparing the bill. If the part cannot agree on estimated billing quantit derived by any method, a determination bi ing on both parties shall be made in accordar with the arbitration provisions of the pov sales contract.

B. Load Shift and Outage Reports

Load shift and outage reports must be submit-
ted to BPA within 4 days of the corresponding
load shift or outage. Reports may be made by
telephone, mail, or other electronic processes
where available. If customer reports are not
received in a timely manner, BPA has the option
to withhold load shift or outage credit.

C. Billing for New Large Single Loads

Any BPA customer whose total load includes
one or more New Large Single Loads (NLSL)
shall be billed for the NLSL(s) at the New
Resource Firm Power Rate. The power
requirements associated with the NLSL shall be
established in a manner consistent with the
provisions of this section.

The purchaser shall warrant to BPA that NLSLs
are separately metered. The metering must
include provisions for determining:

1. the NLSL demand during BPA's diurnal capac-
ity billing periods,

2. the NLSL energy during BPA's energy billing
periods, and

3. the NLSL reactive energy for the billing
month.

The design for the metering equipment for
the NLSL must be approved by BPA. Testing
and inspections of such metering installa-
tions shall be as provided in the General
Contract Provisions.

On a monthly basis, each purchaser of New
Resource Firm Power shall report to BPA the
quantity of power used by the NLSL during
the purchaser's billing period. Data provided
to BPA by the purchaser must be submitted to
BPA within 2 normal working days of the date
the purchaser reads the meters. BPA may
elect to adjust the NLSL data for losses from
the point of metering to the closest BPA point
of delivery for the purchaser.

D. Determination of Measured Demand

1. For points of delivery with fully operational
metering under the Revenue Metering Sys-
tem (RMS), demand shall be measured from
0000 hours on the first day of the billing
period through 2400 hours on the last day of
the billing period.

2. For points of delivery that do not have RMS
metering, demand shall be measured from
0000 hours on the first complete (24 hour) day
of the available metering data through 2400
hours on the last complete day of the availa-
ble metering data. Billing demand will be
determined from the period of available

metering data that most closely matches the
official billing period of the customer.

E. Determination of Measured Energy

1. For points of delivery with fully operational
metering under RMS, energy shall be mea-
sured from 0000 hours on the first day of the
billing period through 2400 hours on the last
day of the billing period.

2. For points of delivery that do not have RMS
metering, measured energy shall be the
quantity of usage recorded on the meter
between meter readings.

F. Billing Month

Meters normally will be read and bills com-
puted at intervals of 1 month. A month is
defined as the interval between meter-reading
dates which normally will be approximately 30
days. If service is for less than or more than the
normal billing month, the monthly charges
stated in the applicable rate schedule shall be
adjusted appropriately.

The calendar month in which the purchaser's
meter is scheduled to be read determines the
billing month. (Thus, a bill associated with a
meter scheduled to be read on April 10 would
be an April bill.) The charges for the winter and
summer periods identified in the rate schedule
apply to the purchaser's billing months.

G. Payment of Bills

Bills for power shall be rendered monthly by
BPA. Failure to receive a bill shall not release the
purchaser from liability for payment. Bills for
amounts due BPA of $50,000 or more must be
paid by direct wire transfer; customers who
expect that their average monthly bill will not
exceed $50,000 and who expect special difficul-
ties in meeting this requirement may request,
and BPA may approve, an exemption from this
requirement. Bills for amounts due BPA under
$50,000 may be paid by direct wire transfer or
mailed to the Bonneville Power Administration,
P.O. Box 6040, Portland, Oregon 97228-6040, or
to another location as directed by BPA. The
procedures to be followed in making direct
wire transfers will be provided by the Office of
Financial Management and updated as
necessary.

1. Computation of Bills

Demand and energy billings for power pur-
chased under each rate schedule shall be
rounded to whole dollar amounts, by elimi-
nating any amount which is less than 50 cents
and increasing any amount from 50 cents
through 99 cents to the next higher dollar.

## 2. Estimated Bills

At its option. BPA may elect to render an estimated bill for that month to be followed at a subsequent billing date by a final bill. Such estimated bill shall have the validity of and be subject to the same payment provisions as a final bill.

## 3. Due Date

Bills shall be due by close of business on the 20th day after the date of the bill (due date). This requirement holds also for revised bills (see section 6 below). Should the 20th day be a Saturday, Sunday, or holiday (as celebrated by the purchaser), the due date shall be the next following business day.

## 4. Late Payment

Bills not paid in full on or before close of business on the due date shall be subject to a penalty charge of $25. In addition, an interest charge of one-twentieth percent (0.05 percent) shall be applied each day to the sum of the unpaid amount and the penalty charge. This interest charge shall be assessed on a daily basis until such time as the unpaid amount and penalty charge are paid in full.

Remittances received by mail will be accepted without assessment of the charges referred to in the preceding paragraph provided the postmark indicates the payment was mailed on or before the due date. Whenever a power bill or a portion thereof remains unpaid subsequent to the due date and after giving 30 days' advance notice in writing, BPA may cancel the contract for service to the purchaser. However, such cancellation shall not affect the purchaser's liability for any charges accrued prior thereto under such contract.

## 5. Disputed Billings

In the event of a disputed billing, full payment shall be rendered to BPA and the disputed amount noted. Disputed amounts are subject to the late payment provisions specified above. BPA shall separately account for the disputed amount. If it is determined that the purchaser is entitled to the disputed amount, BPA shall refund the disputed amount with interest, as determined by BPA's Office of Financial Management.

BPA retains the right to verify, in a manner satisfactory to the Administrator, all data submitted to BPA for use in the calculation of BPA's rates and corresponding rate adjustments. BPA also retains the right to deny eligibility for any BPA rate or corresponding rate adjustment until all submitted data have been accepted by BPA as complete, accurate and appropriate for the rate or adjustment under consideration.

## 6. Revised Bills

As necessary, BPA may render a revised bill revised bill shall replace all previous b issued by BPA that pertain to a specified c. tomer for a specified billing period if t amount of the revised bill is less than t amount of the original bill. If the amount the revision causes an additional amount be due BPA beyond the original bill, a revis bill will be issued for the difference.

The date of the revised bill shall be dete mined as follows:

**a.** If the amount of the revised bill is equal or less than the amount of the bill which is replacing, the revised bill shall have t same date as the replaced bill.

**b.** If the amount of the revised bill is grea than the amount of the bill which it replacing, the additional amount will billed on a separate bill, and the date of t revised bill shall be its date of issue.

# SECTION VII. VARIABLE INDUSTRIAL RATE PARAMETERS AND ADJUSTMENTS

## A. Monthly Average Aluminum Price Determination

### 1. Calculation of the Monthly Billing Aluminu Price

The monthly billing aluminum price shall determined by BPA for each billing mon For purposes of this rate schedule, monthly billing aluminum price shall based on the average price of aluminum U.S. markets during the third calendar mor prior to the billing month. The average pr of aluminum in U.S. markets shall be defin as the average U.S. Transaction Price repor for the month by *Metals Week*, in cents pound, rounded to the nearest tenth o cent.

### 2. Notification of the Monthly Average Alui num Price

BPA shall provide, 45 days prior to the bill month, written notification to purchas under this rate schedule of the monthly b ing aluminum price to be used for bill purposes. Upon written request support documentation shall be provided.

### 3. Changes in Aluminum Price Indicators

In the event that BPA determines that factors outside its control render the monthly average U.S. Transaction Price unusable as an approximation of U.S. market prices. BPA may develop and substitute another indicator for prices in U.S. markets. BPA shall notify interested parties of its intent to do so at least 120 days prior to the billing month in which the change would become effective. In this notification. BPA shall explain the reason for the substitution and specify the replacement indicator it intends to use. BPA also shall describe the methodology to determine the monthly billing aluminum price to be used for billing purposes under this rate schedule and shall provide the necessary data to be used in the calculation. Interested persons will have until close of business 3 weeks from the date of the notification to provide comments. Consideration of comments and more current information may cause the final methodology and the substitute aluminum price index to differ from those proposed. BPA shall notify all affected parties. and those parties that submitted comments. of its final determination 90 days prior to the billing month the new indicator shall be effective.

### B. Annual Adjustments to the Lower and Upper Pivot Aluminum Prices

On July 1. 1987. and every July 1 thereafter. the Lower and Upper Pivot Aluminum Prices. as stated in section III.B of the rate schedule. shall be subject to change for billing purposes as herein described. The term "annual adjustment date" shall refer to July 1 of each year.

#### 1. Implementation Procedures

Beginning in 1987 and every year thereafter. prior to April 1 of that year. BPA shall provide the purchasers under this rate schedule preliminary written estimates of proposed adjustments to the Lower and Upper Pivot Aluminum Prices. By the last working day of the month of April. BPA shall notify interested parties in writing of BPA's revised determinations concerning changes to the Lower and Upper Pivot Aluminum Prices. BPA shall describe how the adjustments were determined and provide the data used in the calculations. In addition to written notification. BPA may. but is not obligated to, hold a public comment forum to clarify its determinations and solicit comments. Interested persons may submit comments on the determinations to BPA and other parties. Comments will be accepted until close of business on the last working Friday in May. Consideration of comments and more cur-

rent information may result in the final adjustment differing from the proposed adjustment. By June 30 of each year. BPA shall notify all VI purchasers. those parties that submitted comments. and parties that requested notification. of the final determination.

### 2. Annual Adjustment Procedures

#### a. Annual Adjustment of the Lower Pivot Aluminum Price

Beginning with the July 1, 1987. annual adjustment date. for each year that the Variable Industrial rate is in effect. the Lower Pivot Aluminum Price as stated in section III.B.1 of the rate schedule shall be adjusted on the July 1 annual adjustment date. The Lower Pivot Aluminum Price shall be revised by multiplying 59 cents per pound by the Cost Escalation Index described in section VII.B.3.b of these GRSPs and rounded to the nearest tenth of a cent. The revised Lower Pivot Aluminum Price shall replace the Lower Pivot Aluminum Price as stated in section III.B.1 of the rate schedule and shall be used to determine the energy rate in the subsequent 12 billing months.

#### b. Annual Adjustment of the Upper Pivot Aluminum Price

For each year that the Variable Industrial rate is in effect. the Upper Pivot Aluminum Price as stated in section III.B.2 of the rate schedule shall be adjusted on the July 1 annual adjustment date.

##### (1) Annual adjustment for the period beginning July 1, 1987, and ending June 30, 1991

The Upper Pivot Aluminum Price shall be revised by multiplying 72 cents per pound by the Cost Escalation Index described in section VII.B.3.c of these GRSPs and rounded to the nearest tenth of a cent. The revised Upper Pivot Aluminum Price shall supersede the Upper Pivot Aluminum Price as stated in section III.B.2 of the rate schedule and shall be used to determine the energy rate in the subsequent 12 billing months.

##### (2) Annual adjustment for the period beginning July 1, 1991, and ending June 30, 1993

The Upper Pivot Aluminum Price will be adjusted such that the Average Historical Aluminum Price described in section VII.B.4 of these GRSPs is the

mid-point between the adjusted Upper Pivot Aluminum Price and the Average Historical Lower Pivot Aluminum Price described in section VII.B.5 below, except as limited to the greater of 65 cents per pound or the adjusted Lower Pivot Point for the year.

The Upper Pivot Aluminum Price shall equal the greater of:

(a) (2)(AAP) — ALP:

where

AAP = the Average Historical Aluminum Price described in section VII.B.4 of these GRSPs.

ALP = the Average Historical Lower Pivot Aluminum Price described in section VII.B.5 of these GRSPs.

(b) 65.0 cents per pound escalated to current dollars using the Cost Escalator for the Upper Pivot Aluminum Price described in section VII.B.3.c of these GRSPs.

or

(c) The adjusted Lower Pivot Aluminum Price for the year.

The revised Upper Pivot Aluminum Price shall supersede the Upper Pivot Aluminum Price as stated in section III.B.2 of the rate schedule and shall be used to determine the energy rate in the subsequent 12 months.

### 3. Cost Escalators

a. The cost indices described below shall be used in calculating the appropriate cost escalators. Each index shall be rounded to the nearest one-tenth of a percent, or three significant places.

#### (1) Electricity Cost Index

The average V1-86 rate in mills per kilowatthour based on the Plateau Energy Charge and the Discount for Quality of First Quartile Service in effect on the April 1 preceding the annual adjustment date and a load factor of 98.5 percent; divided by 22.8 mills per kilowatthour (the average V1-86 rate assuming the plateau energy charge and the Discount for Quality of First Quartile Service in 1986).

#### (2) Labor Cost Index

The annual average hourly earnings for the U.S. primary aluminum industry

(SIC 3334) over the previous complete calendar year, from the Employment and Earnings, published by the U.S. Department of Labor, Bureau of Labor Statistics (BLS), divided by $14.20 per hour (the value of SIC 3334 earnings reported for 1985).

#### (3) Alumina Cost Index

The annual average of the monthly billing aluminum prices described in section VII.A of the GRSPs for the previous 1-year period beginning July 1 through June 30 divided by 50.8 cents per pound (the average U.S. Transaction price over the period April 1985 through March 1986).

#### (4) Other Costs Index

The annual average GNP Implicit Price Deflator for the previous complete calendar year, as published by the U.S. Department of Commerce, Bureau of Economic Analysis, divided by 1.115 (the value of the GNP Implicit Price Deflator for 1985 with 1982 = 1.000).

In the event the indices delineated above are discontinued or revised in a manner that BPA determines renders them unusable for calculating a consistent cost index, BPA will adjust or substitute another similar price index, following advance notification and opportunity for public comment as described in section VII.B.1 of these GRSPs.

b. The Cost Escalator for the Lower Pivot Aluminum Price shall be a weighted average of the four indices contained in section VII.B.3.a above. The following weights shall be assigned each index:

| | |
|---|---|
| Electricity Cost Index | .30 |
| Labor Cost Index | .20 |
| Alumina Cost Index | .20 |
| Other Costs Index | .30 |

c. The Cost Escalator for the Upper Pivot Aluminum Price shall be a weighted average of the Electricity Cost and Other Cost Escalators as stated in sections VII.B.3.a.(1) and VII.B.3.a.(4) above. The following weights shall be assigned each index:

| | |
|---|---|
| Electricity Cost Index | .25 |
| Other Costs Index | .75 |

### 4. Average Historical Aluminum Price

Prior to the July 1, 1991, annual adjustment date and every annual adjustment date thereafter, an average historical aluminum price shall be calculated for the period the variable rate has been in effect. The average historical

aluminum price shall be determined follow-ing the procedures set forth below:

a. Each monthly billing aluminum price determined pursuant to section VII.A of these GRSPs for the period August 1, 1986, through June 30 immediately preceding the annual adjustment date, shall be escalated to the current year dollars using the Price Deflator procedures described in section VII.B.6 below.

b. The sum of the escalated monthly billing aluminum prices shall be divided by the number of months in the period and rounded to the nearest tenth of a cent to obtain the Average Historical Aluminum Price.

## 5. Average Historical Lower Pivot Aluminum Price

Prior to the July 1, 1991, annual adjustment date and every annual adjustment date thereafter, the average of the Lower Pivot Aluminum Prices for the period the Variable Industrial rate has been in effect shall be calculated following the procedures set forth below:

a. The Lower Pivot Aluminum Price in each month for the period August 1, 1986, through June 30 immediately preceding the annual adjustment date, shall be escalated to the current year's dollars using the Price Deflator procedures described in section VII.B.6 below.

b. The sum of the escalated monthly Lower Pivot Aluminum Prices shall be divided by the number of months in the period, and rounded to the nearest tenth of a cent to obtain an Average Historical Lower Pivot Aluminum Price.

## 6. Price Deflator Procedures

For purposes of converting nominal dollars to real dollars in the calculation of the Average Historical Aluminum Price and the Average Historical Lower Pivot Aluminum Price, the following Price Deflator procedures shall be used:

a. Monthly billing aluminum prices and Lower Pivot Aluminum Prices for any calendar months July through December shall be inflated by multiplying the price by the ratio of the GNP Implicit Price Deflator for the calendar year prior to the annual adjustment date divided by the Implicit Price Deflator for the calendar year in which the price occurred.

b. Monthly billing aluminum prices and Lower Pivot Aluminum Prices for any calendar months January through June shall be inflated by multiplying the price by the ratio of the Implicit Price Deflator for ·· · · lendar year prior to the annual adjustment date divided by the Implicit Price Deflator for the calendar year prior to the year in which the price occurred.

Each price shall be rounded to the nearest tenth of a cent.

## GENERAL PROVISIONS

### Index to Sections

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Section

Page

IN REFERENCE TO MEANING

1.  Definitions................................................... 2
2.  Interpretation............................................... 2

IN REFERENCE TO RATES

3.  Equitable Adjustment of Rates................................ 3
4.  Retail Rates................................................. 4

IN REFERENCE TO DELIVERY OF POWER

5.  Character of Service......................................... 4
6.  Point(s) of Delivery and Delivery Voltage.................... 4
7.  Metered Quantities........................................... 4
8.  Continuity of Service........................................ 4

IN REFERENCE TO PAYMENT FOR POWER

9.  Payment of Bills............................................. 4
10.  Determination of Estimated Billing Data..................... 5

IN REFERENCE TO USE OF POWER

11.  Electric Disturbance........................................ 5

MISCELLANEOUS PROVISIONS

12.  Net Billing................................................. 6
13.  Additional Provisions....................................... 6
14.  Notices and Computation of Time............................. 6
15.  Interest of Member of Congress.............................. 6

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## IN REFERENCE TO MEANING

1.  <u>Definitions</u>.  The definitions in the body of this contract and the following additional definitions apply to this exhibit.

(a)  "Contractor" means the purchaser.

(b)  "Federal System" or "Federal System Facilities" means the facilities of the Federal Columbia River Power System, which for the purposes of this contract shall be deemed to include the generating facilities of the Government in the Pacific Northwest for which Bonneville is designated as marketing agent; the facilities of the United States under the jurisdiction of Bonneville; and any other facilities:

(1)  from which Bonneville receives all or a portion of the generating capability (other than station service) for use in meeting Bonneville's loads, such facilities being included only to the extent Bonneville has the right to receive such capability; <u>provided, however</u>, that "Bonneville's loads" shall not include that portion of the loads of any Bonneville customer which are served by a non-Federal generating resource purchased or owned directly by such customer which may be scheduled by Bonneville;

(2)  which Bonneville may use under contract, or license; or

(3)  to the extent of the rights acquired by Bonneville pursuant to the Treaty, between the United States and Canada, relating to the cooperative development of water resources of the Columbia River Basin, signed in Washington, D.C., on January 17, 1961.

(c)  "Integrated Demand" means the number of kilowatts which is equal to the number of kilowatthours delivered at any point during any clock hour.

(d)  "Non-Federal Utility" means any utility not owned or controlled by the United States, including any entity (1) which such a utility owns or controls, in whole or in part, or is controlled by; (2) which is controlled by those controlling such utility; or (3) of which such utility is a member.

(e)  "Pacific Northwest" means the same as such term is defined in P.L. 96-501.

(f)  "Point(s) of Delivery" means the point(s) of delivery listed either in the Points of Delivery Exhibit to this contract or in the body of this contract.

(g)  "Treaty" means the Treaty between the United States and Canada relating to the cooperative development of water resources of the Columbia River Basin, signed in Washington, D.C. January 17, 1961.

2.  <u>Interpretation</u>.

(a)  The provisions in this exhibit shall be deemed to be a part of the contract body to which they are an exhibit.  If a provision in such contract body is in conflict with a provision contained in this exhibit, the former shall prevail.

(b)  If a provision in the General Rate Schedule Provisions incorporated in the Wholesale Power Rate Schedules and General Rate Schedule Provisions Exhibit is in conflict with a provision contained in this exhibit or the contract body, this exhibit or the contract body shall prevail.

(c) Nothing contained in this contract shall, in any manner, be construed to abridge, limit, or deprive any party hereto of any means of enforcing any remedy, either at law or in equity, for the breach of any of the provisions of this contract which it would otherwise have.

## IN REFERENCE TO RATES

3.  **Equitable Adjustment of Rates.**
    Unless otherwise specifically provided for in the contract:
    (a) The Contractor shall pay Bonneville for the electric power, capacity or energy made available under this contract at the rates specified in the contract.
    (b) To the extent the contract references Bonneville rates or rate schedules of general applicability for purposes of payment for electric power, capacity or energy made available, the following provisions apply:
    (1) Bonneville shall establish and periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.
    (2) As used in this section, the words "Rate Adjustment Date" mean any date as specified by Bonneville in a notice of intent to file revised rates as published in the Federal Register; provided, however, that such date shall not occur sooner than (A) 9 months from the date that such notice of intent is published; or (B) 12 months from any previous Rate Adjustment Date. By giving written notice to the purchaser 45 days prior to such Rate Adjustment Date, Bonneville may delay such Rate Adjustment Date for up to 90 days if Bonneville determines either that the revenue level of the proposed rates differs by more than 5 percent from the revenue requirements indicated by most recent repayment studies entered in the hearings record or that external events beyond Bonneville's control will prevent Bonneville from meeting such Rate Adjustment Date. Bonneville may cancel a notice of intent to file revised rates at any time (A) by written notice to the Purchaser; or (B) by publishing in the Federal Register a new notice of intent to file revised rates which specifically cancels a previous notice.
    (3) The purchaser shall pay Bonneville for the electric power, capacity or energy made available under this contract during the period commencing on each Rate Adjustment Date and ending at the beginning of the next Rate Adjustment Date at the rate specified in any rate schedule available at the beginning of such period for service of the class, quality, and type provided for in this contract, and in accordance with the terms thereof, and of the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule. New rates shall not be effective on any Rate Adjustment Date unless they have been approved on a final or interim basis by a governmental agency designated by law to approve Bonneville rates. Rates shall be applied in accordance with the terms thereof, the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule and the terms of this contract.

4.   Retail Rates.  Copies of the purchaser's retail rate schedules, including special contract rates, if any, in effect when this contract is executed, and those hereafter amended or adopted, shall be furnished to Bonneville, and Bonneville shall keep said rates on file.  The retail rates and charges shall be reasonable and nondiscriminatory, consistent with the principles of the Bonneville Project Act, 16 U.S.C. §832 et seq.; provided, however, that rates and charges which have been approved in accordance with the procedures of a state regulatory agency having jurisdiction shall be deemed reasonable and nondiscriminatory.

## IN REFERENCE TO DELIVERY OF POWER

5.   Character of Service.  Unless otherwise specifically provided for in the contract, electric power, capacity or energy made available pursuant to this contract shall be in the form of three-phase current, alternating at a nominal frequency of 60 hertz.

6.   Point(s) of Delivery and Delivery Voltage.  Electric power, capacity or energy shall be delivered to each purchaser at the Point(s) of Delivery and at such voltage(s) as specified.  Unless otherwise agreed, delivery at more than one voltage shall constitute delivery at more than one point.

7.   Metered Quantities.  The amount(s) of energy, integrated Demands therefor and amount(s) of reactive energy delivered to the Point(s) of Delivery during each month shall be determined from measurements made by meters installed for such Point(s) of Delivery in the circuit specified.

8.   Continuity of Service.  The purchaser or Bonneville may temporarily interrupt or reduce deliveries of electric power, capacity or energy if the purchaser or Bonneville determines that such interruption or reduction is necessary or desirable in case of system emergencies, or in order to install equipment in, make repairs to, make replacements within, make investigations and inspections of, or perform other maintenance work on, the purchaser's facilities or the Federal System.  Except in case of emergency and in order that the purchaser's operations will not be unreasonably interfered with, Bonneville shall give reasonable notice to the purchaser.of any such interruption or reduction, the reason therefor, and the probable duration thereof to the extent Bonneville has knowledge thereof.  The purchaser or Bonneville shall effect the use of temporary facilities or equipment to minimize the effect of any such interruption or outage to the extent reasonable or appropriate.  This section 8 shall not relieve the Parties of their obligation to perform under section 10 of this Agreement.

## IN REFERENCE TO PAYMENT FOR POWER

9.   Payment of Bills.  Bills for power shall be rendered monthly and shall be payable at Bonneville's headquarters.  Failure to receive a bill shall not release the purchaser from liability for payment.  Each calculated monetary amount in a wholesale power bill shall be rounded to a whole dollar amount, by elimination of any amount of less than 50 cents and increasing any amount from 50 cents through 99 cents to the next higher dollar.

If Bonneville is unable to render the purchaser a timely monthly bill which includes a full disclosure of all billing factors, it may elect to render an estimated bill for that month to be followed by the final bill. Such estimated bill, if so issued, shall have the validity of and be subject to the same payment provisions as shall a final bill; however, payment required under the estimated bill shall be adjusted as appropriate in the final bill.

Bills not paid in    11 on or before the date specified in the Payment of Bills section, or its su  essor, of the General Rate Schedule Provisions incorporated in the Wholesa.. Power Rate Schedules and General Rate Schedule Provisions Exhibit shall bear additional charges as specified therein.

Remittances received by mail will be accepted without assessment of the charges referred to in the preceding paragraph provided the postmark indicates the payment was mailed on or before the 20th day after the date of the bill. If the 20th day after the date of the bill is a Sunday or other nonbusiness day of the purchaser, the next following business day shall be the last day on which payment may be made to avoid such further charges. Payment made by metered mail and received subsequent to the 20th day must bear a postal department cancellation in order to avoid assessment of such further charges.

Bonneville may, whenever a power bill or a portion thereof remains unpaid subsequent to the 20th day after the date of the bill, and after giving 30 days' advance notice in writing, cancel the contract for service to the purchaser, but such cancellation shall not affect the purchaser's liability for any charges accrued prior thereto.

10. Determination of Estimated Billing Data. If the amounts of power or energy which have been delivered hereunder must be estimated from data other than metered quantities, scheduled quantities or tabulations of hourly interchange prepared by the purchaser, Bonneville and the purchaser shall agree on estimated billing data to be used in preparing the bill.

## IN REFERENCE TO USE OF POWER

11. Electric Disturbance.

(a) For the purposes of this section an electric disturbance is any sudden, unexpected, changed, or abnormal electric condition occurring in or on an electric system which causes damage.

(b) Each party shall design, construct, operate, maintain, and use its electric system in conformance with accepted electric utility practices:

(1) to minimize electric disturbances such as, but not limited to, the abnormal flow of power which may interfere with the electric system of the other party or any electric system connected with such other party's electric system; and

(2) to minimize the effect on its electric system and on its customers of electric disturbances originating on its own or another electric system.

(c) A party to this Agreement shall not be liable to the other party for damage to the other party's system or facilities caused by an electric disturbance on the first party's system, whether or not such electric disturbance is the result of negligence by the first party, if the other p has failed to fulfill its obligations under subsection (b)(2) above.

(d)   Each party to this contract shall hold harmless and indemnify the other party, its officers and employees, from any claims for loss, injury or damage suffered by those to whom the first party delivers power not for resale, which loss, injury, or damage is caused by an electric disturbance or the other party's system, whether or not such electric disturbance results from the negligence of such other party, if such first party has failed to fulfill its obligations under subsection (b)(2) above, and such failure contributed to the loss, injury, or damage.

(e)   Nothing in this section shall be construed to create any duty to, any standard of care with reference to, or any liability to any persons not a party to this contract.

## MISCELLANEOUS PROVISIONS

12.   <u>Net Billing</u>.  Upon mutual agreement of the parties, payments due one party may be offset against payments due the other party under all contracts between the purchaser and Bonneville for the sale and exchange of electric power and energy, use of transmission facilities, operation and maintenance of electric facilities, lease of electric facilities, mutual supply of emergency and standby electric power and energy, and under such other contracts between such parties as the parties may agree unless otherwise provided in existing contracts between the parties.  Under contracts included in this procedure all payments due one party in any month shall be offset against payments due the other party in such month, and the resulting net balance shall be paid to the party in whose favor such balance exists unless the latter elects to have a balance carried forward to be added to the payments due it in a succeeding month.

13.   <u>Additional Provisions</u>.  The Contractor agrees to comply with the clauses for United States contracts contained in the following statutes, Executive Orders, and regulations to the extent applicable:
(a)   the Rehabilitation Act of 1973, Public Law 93-112, as amended, and 41 CFR Part 60-741.4 (Affirmative Action for Handicapped Workers);
(b)   the Vietnam Era Veterans Readjustment Assistance Act of 1972, Public Law 92-540, as amended, and 41 CFR Parts 60-250.4 and 60-250.10 (Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era);
(c)   the Small Business Act, as amended;
(d)   Executive Order 11246 and 41 CFR Part 60-1.4 (Equal Opportunity):  Such clauses, as amended, are incorporated by reference herein as if fully set forth.

14.   <u>Notices and Computation of Time</u>.  Any notice required by this contract to be given to any party shall be effective when it is received by such party, and in computing any period of time from such notice, such period shall commence at 2400 hours on the date of receipt of such notice.

15.   <u>Interest of Member of Congress</u>.  No Member of or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to such contract if made with a corporation for its general benefit.

(VS6-PMCG-3649c)

Exhibit C, Table 1, Page 1 of 1
Contract No. DE-MS79-88BP92275

PLAN OF DELIVERY

1.  Monthly Amounts of Surplus Firm Energy.

| Year | / | 1989 | / | 1990 | / | 1991 | / | 1992 |
|------|---|------|---|------|---|------|---|------|
| Month |  |  |  |  |  |  |  |  |
| August |  |  |  |  |  |  |  |  |
| September |  |  |  |  |  |  |  |  |
| October |  |  |  |  |  |  |  |  |
| November |  |  |  |  |  |  |  |  |
| December |  |  |  |  |  |  |  |  |
| January |  |  |  |  |  |  |  |  |
| February |  |  |  |  |  |  |  |  |
| March |  |  |  |  |  |  |  |  |
| April |  |  |  |  |  |  |  |  |
| May |  |  |  |  |  |  |  |  |
| June |  |  |  |  |  |  |  |  |
| July |  |  |  |  |  |  |  |  |

This Exhibit will be revised each year upon Edison's submission of new data.

2.  Example, assuming 1992 Power Sale.

Upon Edison's submittal of plans of delivery each year in accordance with section 5, Bonneville shall use such plans in its PNW Coordination Agreement planning. That is, the information from such submittals shall be included in initial, modified, and final coordinated system regulations. Assuming energy sufficient to serve Edison under this Agreement as a power sale, the plan of delivery to be used is based upon the degree to which the coordinated system refills.

At 2400 hours on July 31, 1992, or shortly thereafter, parties to the PNW Coordination Agreement determine reservoir elevations corresponding to the level of refill. If the system refills, Bonneville will implement the most recent plan of delivery submitted by Edison. If the system does not refill, such parties to the PNW Coordination Agreement will use the system capability associated with actual elevations to most closely match planning done in previous years (earlier 'Critical Periods'). This can be shown as follows:

| Critical Period | Edison Plan of Delivery |
|-----------------|-------------------------|
| 1992 - 1995 (refill) | year 1992 from 1992 submittal |
| 1991 - 1994 | year 1992 from 1991 submittal |
| 1990 - 1993 | year 1992 from 1990 submittal |
| 1989 - 1992 | year 1992 from 1989 submittal |

If less than a 4 year Critical Period is ever used, there may be fewer than 4 alternatives to be considered.

(VS6-PMCG-3649c)

TABLES AND SAMPLE CALCULATIONS

1.   Table 1 - Exchange and Supplemental Energy Obligations.

| Year Of June 1 - Oct. 31<br>Deliveries of Capacity | Exchange Energy<br>Ratio | Supplemental Energy<br>Ratio |
|---|---|---|
| 1989 | 1500 | 1075 |
| 1990 | 1500 | 1075 |
| 1991 | 1480 | 1095 |
| 1992 | 1460 | 1115 |
| 1993 | 1440 | 1135 |
| 1994 | 1420 | 1155 |
| 1995 | 1400 | 1175 |
| 1996 | 1356 | 1219 |
| 1997 | 1312 | 1263 |
| 1998 | 1268 | 1307 |
| 1999 | 1224 | 1351 |
| 2000 | 1180 | 1395 |
| 2001 | 1139 | 1436 |
| 2002 | 1098 | 1477 |
| 2003 | 1057 | 1518 |
| 2004 | 1016 | 1559 |
| 2005 | 975 | 1600 |
| 2006 | 975 | 1600 |
| 2007 | 975 | 1600 |
| 2008 | 975 | 1600 |

The following examples illustrate calculation of the energy obligations
associated with this Table:

Example No. 1

An exchange takes place in 1997 with Bonneville making capacity available to
Edison for the entire period June 1 through October 31.

Exchange Energy obligation:
250 MW x 1312 (exchange ratio) = 328,000 MWh
Repayment of this obligation of 328,000 MWh is distributed equally among
the Calendar Weeks, or portions thereof, during the pay back period of
November 16, 1997 through March 31, 1998 (136 days in a nonleap year).
For this period in 1997, this is a Saturday, followed by 19-Calendar
Weeks, and ending with a Sunday/Monday as follows, rounded to the nearest
MWh:

$$\frac{328,000 \text{ MWh}}{136 \text{ days}} \times 1 \text{ day} \qquad\qquad = 2,412 \text{ MWh}$$

$$\frac{328,000 \text{ MWh}}{136 \text{ days}} \times 7 \text{ days/week} = 16,882 \text{ each week, } \times 19 \text{ weeks} = 320,758 \text{ MWh}$$

$$\frac{328,000 \text{ MWh}}{136 \text{ days}} \times 2 \text{ days} = 4,824 \qquad\qquad = \underline{4,824} \text{ MWh}$$

Total before adjustment = 327,994 MWh

Balance the account (to get a total of 328,000 MWh) by adding 6 MWh to the last period of 2 days.

Supplemental Energy obligation:
250 MW x 1263 (Supplemental ratio) = 315,750 MWh
This obligation is distributed among weeks in the period only upon exercise of the option, and using the methodology described in section 2 of this Exhibit.

Example No. 2
The exchange occurring in 1997 takes place only from August 1 through October 31, where a power sale took place June 1 through July 31.

Power sale obligation:
The obligations under the power sale for June and July are unaffected.

Exchange Energy obligation:
$$250 \text{ MW} \times 1312 \times \frac{92 \text{ days}}{153 \text{ days}} = 197,229 \text{ MWh}$$

The fraction 92 ÷ 153 represents the pro rata portion of the full 5 month period that the exchange was actually in effect. Repayment of this obligation is distributed in the ensuing period November 16 through March 31 using the procedure described in Example 1.

Supplemental Energy obligation:
$$250 \text{ MW} \times 1263 \times \frac{92}{153} = 189,863 \text{ MWh}$$

This obligation is distributed among weeks in the period only upon exercise of the option, and using the methodology described in section 2 of this Exhibit.

Example No. 3
As above, the power sale takes place June 1 through July 31, but only a partial conversion to the exchange takes place for August 1 through October 31, such that for these 3 months there is 125 MW Contract Demand for each of power sale and exchange. The 60% to 100% return limitations for Peaking Replacement Energy under the exchange during this time apply to the lower exchange Contract Demand of 125 MW.

Power Sale obligation:
The obligations under the power sale for June and July are unaffected.
Beginning August 1, all limitations under section 5(b) of this Agreement
and all monthly amounts of energy as submitted by Edison under
section 5(c) are reduced by one-half, corresponding to the ratio of 125 MW
power sale Contract Demand to 250 MW total Contract Demand.

Exchange Energy obligation:
$$250 \text{ MW} \times 1263 \times \frac{92 \text{ days}}{153 \text{ days}} \times \frac{125 \text{ MW}}{250 \text{ MW}} = 94,931 \text{ MWh}$$

Repayment distributed within the period as before.  Maximum rate of
delivery for the total of Exchange and any Supplemental Energy at 200% of
Contract Demand is now 2 x 125 MW = 250 MW.

Supplemental Energy obligation:
$$250 \text{ MW} \times 1188 \times \frac{92}{153} \times \frac{125}{250} = 89,294 \text{ MWh}$$

This obligation is distributed among weeks in the period only upon
exercise of the option, and using the methodology described in section 2
of this Exhibit.

2.  Calculation of Supplemental Energy Option:

An exchange takes place in 1997, with Exchange Energy deliveries from
November 16, 1997 to March 31, 1998, and Supplemental Energy deliveries to
begin as early as November 16, 1997 and continue through April 15, 1998.

The Exchange Energy obligation is 250 MW x 1312 = 328,000 MWh.  As
calculated in example 1 of section 1 in this Exhibit, this equals
16,882 MWh each week or 201.0 MWh in each of 84 off-peak hours, assuming a
uniform delivery rate.  Since total delivery is 200% of Contract Demand,
or 500 MW, at times when both Exchange and Supplemental Energy are being
delivered (that is, through March 31), the rate of delivery for
Supplemental Energy is 500 less the rate of delivery for Exchange Energy.
On this particular hour, that works out to 500 - 201.0 = 299.0 MW.

The Supplemental Energy obligation is 250 MW x 1263 = 315,750 MWh.
Deliveries from Edison are assumed to occur during 70 off-peak hours each
week, or 10 hours each day.  To calculate the minimum time necessary to
deliver this energy obligation, the rate of delivery is 500 MW for
April 1-15, and 299.0 MW prior to that.

Exhibit D, Page 4 of 5
Contract No. DE-MS79-88BP92275

April 1-15 deliveries: 500 MW x 10 hrs/day x 15 days = 75,000 MWh.
Therefore, the balance of this obligation for deliveries prior to
April 1 = 315,750 - 75,000 = 240,750 MWh

Prior to April 1 deliveries: 299.0 MW x 10 hrs/day x d = 240,750 MWh
                                                    where   d = 80.54 days

So for these circumstances, deliveries of Supplemental Energy from Edison
to Bonneville can begin as late as 81 days prior to April 1, or by
January 10, with notice of such given by Bonneville pursuant to
section 7(d)(2).

If Edison agrees, the above calculation can be made assuming more than the
70 off-peak hours. In any case, once the calculation is made, Edison is
constrained only by the contract provisions for its deliveries, not by any
assumptions made in the calculation.·

3.   Table 2 - Exchange Energy Obligations at Times when a FERC-approved
     Rate Schedule is not in Effect.

| Year of June 1 - Oct. 31 Deliveries of Capacity | Exchange Energy Ratio |
|---|---|
| 1989 | 1115 |
| 1990 | 1115 |
| 1991 | 1101 |
| 1992 | 1086 |
| 1993 | 1071 |
| 1994 | 1056 |
| 1995 | 1041 |
| 1996 | 1008 |
| 1997 | 976 |
| 1998 | 943 |
| 1999 | 910 |
| 2000 | 877 |
| 2001 | 847 |
| 2002 | 816 |
| 2003 | 786 |
| 2004 | 755 |
| 2005 | 725 |
| 2006 | 725 |
| 2007 | 725 |
| 2008 | 725 |

Exhibit D, Page 5 of 6
Contract No. DE-MS79-88BP92275

4.    Illustrative Table Showing Application of the Rate Trigger.

| Calendar Year | Assumed GNP Deflator (%) | Compound Index GNP Deflator Related to 1987 1/ (%) | Trigger Threshold in 1987 $ 2/ | Trigger Threshold in nominal $ 3/ | Assumed Values for Edison Surpl Firm Rate 4 (nominal $) |
|---|---|---|---|---|---|
| 1987 | - | 1.000 | — | — | — |
| 1988 | 4.4 | 1.044 | 50. | 52.200 | 28.5 |
| 1989 | 4.1 | 1.087 | 50. | 54.350 | 31.4 |
| 1990 | 4.4 | 1.135 | 50. | 56.750 | 34.5 |
| 1991 | 4.8 | 1.189 | 50. | 59.450 | 37.9 |
| 1992 | 5.0 | 1.249 | 50. | 62.450 | 41.7 |
| 1993 | 5.1 | 1.312 | 51.5 | 67.568 | 45.9 5/ |
| 1994 | 5.3 | 1.382 | 53.045 | 73.308 | 50.5 |
| 1995 | 5.5 | 1.458 | 54.636 | 79.659 | 55.5 |

1/  Assume 1987 dollars as end of year.  For example, the 1989 GNP deflator is used to determine 1989 dollars.  Use the entry for each year, carried to three decimal places, to derive the next year's entry.

2/  The threshold for the rate trigger is as stated in section 6(a)(1) of this Agreement, at 50 mills/kWh through 1992, and escalated at 3 percent thereafter, all in 1987 dollars.

3/  This is the fourth column as adjusted by the third column.  For example, in 1994, 53.045 x 1.382 = 73.308.

4/  The rates are in nominal dollars and are used solely for the purpose of this example to illustrate the rate trigger.  For illustrative purposes a 10 percent annual increase has been applied to the base rate.

5/  Beginning with the 1993 calendar year, this Agreement will trigger to an exchange in a given year if the Edison rate in the sixth column exceeds the trigger level in the fifth column.  In this example, no calendar year could trigger to an exchange.

Exhibit D, Page 6 of 6
Contract No. DE-MS79-82BP92275

5. __Illustrative Table Showing Application of the Fuel Cost (Oil/Gas) Trig__

| Year | Assumed GNP Deflator (%) | GNP Deflator Related to 1987 1/ (%) | Oil/Gas Threshold in 1987 $ 2/ | Oil/Gas Threshold in nominal $ 3/ | Assumed Avera Price of Oil/ to Edison |
|------|------|------|------|------|------|
| 1987 | — | 1.000 | — | — | 26. |
| 1988 | 4.4 | 1.044 | 62. | 64.728 | 28.6 |
| 1989 | 4.1 | 1.087 | 62. | 67.394 | 31.46 |
| 1990 | 4.4 | 1.135 | 62. | 70.370 | 34.606 |
| 1991 | 4.8 | 1.189 | 62. | 73.718 | 38.067 |
| 1992 | 5.0 | 1.249 | 62. | 77.438 | 41.873 |
| 1993 | 5.1 | 1.312 | 63.860 | 83.784 | 46.061 5/ |
| 1994 | 5.3 | 1.382 | 65.776 | 90.902 | 50.667 |
| 1995 | 5.5 | 1.458 | 67.749 | 98.778 | 55.733 |

1/  Assume 1987 dollars as end of year. For example, the 1989 GNP deflator is used to determine 1989 dollars. Use the entry for each year, carried to three decimal places, to derive the next years' entry.

2/  The threshold for the oil/gas trigger is as stated in section 6(a)(2) this Agreement, at 62 mills/kWh through 1992, and escalated at 3 perce thereafter, all in 1987 dollars.

3/  This is the fourth column as adjusted by the third column. For example, in 1994, 65.776 x 1.382 = 90.902.

4/  The oil/gas prices are in nominal dollars and are used solely for the purpose of this example to illustrate the oil/gas trigger. The methodology to determine these oil/gas prices is described in Exhibit E. For illustrative purposes a 10 percent annual increase has been applied to an assumed 1987 price of 26 mills/kWh.

5/  Beginning with the 1993 calendar year, this Agreement will trigger to an exchange in a given year if the oil/gas price in the sixth column exceeds the trigger level in the fifth column. In this example, no calendar year could trigger to the exchange.

(VS6-PMCG-3649c)

## FUEL COST METHODOLOGY

Example 1:  Calculate the monthly rate for August 1986, pursuant to
section 9(c)(1)(A), if Bonneville had required Edison to provide
monetary compensation rather than Peaking Replacement Energy.

The fuel cost of oil and gas is obtained from Edison's monthly
Financial and Operating Report:

|  |  | kWh | Cost $ |
|---|---|---|---|
| April 1986: | oil | 7,059,000 | 543,000 |
|  | gas | 1,224,552,000 | 31,708,000 |
| May 1986: | oil | 9,516,000 | 668,000 |
|  | gas | 1,616,810,000 | 38,450,000 |
| June 1986: | oil | 5,531,000 | 378,000 |
|  | gas | 1,892,125,000 | 42,917,000 |
|  |  | 4,755,593,000 | 114,664,000 |

Net cost:

$114,664,000 divided by 4,755,593,000 kWh = $.024111/kWh or
24.1 mills/kWh

Following the formula in section 9(c)(1)(A):

$$PE_X = .4\ FC_{X-1}$$
$$PE_X = .4 \cdot 24.1 \qquad = \qquad 9.6\ mills/kWh$$

The monthly rate for August 1986 would have been 9.6 mills/kWh
or Bonneville's average cost of energy pursuant to
section 9(c)(1)(B), whichever was lower.

Example 2:   Calculate the monthly rate for November 1986, pursuant to
section 9(c)(2)(A), if Bonneville had required Edison to provide
monetary compensation rather than Exchange Energy.

The fuel cost of oil and gas is obtained from Edison's monthly
<u>Financial and Operating Report</u>.

|  | | kWh | Cost $ |
|---|---|---|---|
| July 1986: | oil | 3,913,000 | 257,000 |
|  | gas | 1,841,999,000 | 31,708,000 |
| August 1986: | oil | 608,916,000 | 43,961,000 |
|  | gas | 1,426,365,000 | 36,193,000 |
| September 1986: | oil | 8,245,000 | 657,000 |
|  | gas | 1,202,083,000 | 35,540,000 |
|  |  | 5,091,521,000 | 148,416,000 |

Unit cost:

$148,416,000 divided by 5,091,521,000 kWh = $.0291496/kWh or
29.1 mills/kWh

Following the formula in section 9(c)(2)(A):

$$EE_X = .3 \ FC_{X-1}$$
$$EE_X = .3 \cdot 29.1 \quad = \quad 8.7 \ mills/kWh$$

The monthly rate for November 1986 would have been 8.7 mills/kWh
or Bonneville's average cost of energy pursuant to
section 9(c)(2)(B), whichever was lower.

(VS6-PMCG-3649c)

Exhibit F
## METHODOLOGY AND PROCEDURES FOR DETERMINING
## AN AVERAGE COST OF ENERGY RATE

For purposes of determining the average cost of energy rate applicable to Edison under section 9(c)(1)(B) and 9(c)(2)(B) of this Agreement, the average cost of energy shall be defined by the following formula:

$$\text{AVERAGE COST OF ENERGY} = \frac{\text{ADJUSTED GEN SYSTEM COSTS} + \text{ADJUSTED TRANS SYSTEM COSTS}}{\text{TOTAL ADJUSTED SYSTEM SALES}}$$

WHERE:

ADJUSTED GEN SYSTEM COSTS = Bonneville's total Generation Revenue Requirement less the cost of resources offered by utilities pursuant to the residential and small farm power exchange forecasted for the applicable test period in each general Bonneville rate case and expressed in thousands of dollars. Resources offered by utilities to be exchanged for Bonneville resources shall be defined pursuant to section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act, Public Law No. 96-501. The cost of industrial reserves does not enter into the determination of Bonneville's total Generation Revenue Requirement.

ADJUSTED TRANS SYSTEM COSTS = Federal Columbia River Transmission System generation/integration and network segment costs associated with firm power sales forecasted for the applicable test period in each general rate case expressed in thousands of dollars.

TOTAL ADJUSTED SYSTEM SALES = Bonneville's total system firm energy and nonfirm energy sales, excluding sales for the exchange of resources under section 5(c) Public Law No. 96-501, forecasted for the applicable test period in each general Bonneville rate case expressed in gigawatthours. The forecast of nonfirm energy sales shall be based on an assumption of average water conditions.

The average cost of energy shall be determined in each Bonneville general rate case and will become effective concurrent with the Bonneville rates.

(VS6-PMCE-3649c)

Exhibit G
Page 1 of 1
Contract No. DE-MS79-88F

### TERMINATION COSTS

| NOTICE GIVEN BY: | TO BECOME EFFECTIVE BY: | PAYMENT: $ |
|---|---|---|
| July 1, 1989 | July 1, 1994 | $26,000,000 |
| July 1, 1990 | July 1, 1995 | 26,000,000 |
| July 1, 1991 | July 1, 1996 | 25,000,000 |
| July 1, 1992 | July 1, 1997 | 23,000,000 |
| July 1, 1993 | July 1, 1998 | 23,000,000 |
| July 1, 1994 | July 1, 1999 | 23,000,000 |
| July 1, 1995 | July 1, 2000 | 23,000,000 |
| July 1, 1996 | July 1, 2001 | 22,000,000 |
| July 1, 1997 | July 1, 2002 | 21,000,000 |
| July 1, 1998 | July 1, 2003 | 20,000,000 |
| July 1, 1999 | July 1, 2004 | 18,000,000 |
| July 1, 2000 | July 1, 2005 | 15,000,000 |
| July 1, 2001 | July 1, 2006 | 11,000,000 |
| July 1, 2002 | July 1, 2007 | 7,000,000 |
| July 1, 2003 | July 1, 2008 | 5,000,000 |

(VS6-PMCE-3649c)

Exhibit G
Page 1 of 1
Contract No. DE-MS79-88BP922~

## TERMINATION COSTS

| NOTICE GIVEN BY: | TO BECOME EFFECTIVE BY: | PAYMENT: $ |
|---|---|---|
| July 1, 1989 | July 1, 1994 | $26,000,000 |
| July 1, 1990 | July 1, 1995 | 26,000,000 |
| July 1, 1991 | July 1, 1996 | 25,000,000 |
| July 1, 1992 | July 1, 1997 | 23,000,000 |
| July 1, 1993 | July 1, 1998 | 23,000,000 |
| July 1, 1994 | July 1, 1999 | 23,000,000 |
| July 1, 1995 | July 1, 2000 | 23,000,000 |
| July 1, 1996 | July 1, 2001 | 22,000,000 |
| July 1, 1997 | July 1, 2002 | 21,000,000 |
| July 1, 1998 | July 1, 2003 | 20,000,000 |
| July 1, 1999 | July 1, 2004 | 18,000,000 |
| July 1, 2000 | July 1, 2005 | 15,000,000 |
| July 1, 2001 | July 1, 2006 | 11,000,000 |
| July 1, 2002 | July 1, 2007 | 7,000,000 |
| July 1, 2003 | July 1, 2008 | 5,000,000 |

(VS6-PMCE-3649c)