No. 03-2869C
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SOUTHERN CALIFORNIA EDISON,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S APPENDIX TO DEFENDANT'S MOTION TO DISMISS

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARTIN F. HOCKEY, JR.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-6288

Attorneys for Defendant

OF COUNSEL:

JON D. WRIGHT
Office Of The General
Counsel
Bonneville Power Admin.
905 N.E. 11th Avenue
Portland, OR 97208

November 29, 2004

# Index to Appendix


| Description | Page(s) |
| --- | --- |
| Excerpt Bonneville Power Administration ("Bonneville") 1996 Final Rate Proposal, Administrators Record of Decision, Part 2, dated June 1996 | 1-13 |
| Excerpt Bonneville 1996 Wholesale Power and Transmission Rates, Appendix, dated June 1996 | 14-21 |
| Final Firm Power Products and Services Rate Adjustment Proposal (FPS-96R), Administrators Record of Decision, dated March 15, 2000 | 22-76 |
| Excerpt 1996 Final Rate Proposal, Development Study, dated June 1996 | 77-79 |
| Excerpt FPS-96 Rate Schedule | 80-87 |
| Bonneville letter to Southern California Edison ("SCE"), dated February 12, 1999 | 88-92 |
| Excerpt SCE Brief re BPA Docket FPS-96R, dated December 2, 1999 | 93-96 |
| Excerpt SCE Brief of Exceptions re BPA Docket FPS-96R, dated January 10, 2000 | 97-100 |
| SCE Petition for Review before the United States Court of Appeals for the Ninth Circuit, file June 16, 2000 | 101-103 |
| SCE Response to BPA Motion to Dismiss, dated August 13, 2001 | 104-113 |
| Order of Court of Appeals, dated October 16, 2001 | 114 |
| SCE Motion for Clarification, dated December 19, 2001 | 115-131 |
| Bonneville Motion to Dismiss and Response to Motion for Clarification, dated January 22, 2002 | 132-144 |
| Bonneville Reply to SCE Response, dated February 8, 2002 | 145-148 |

Index to Appendix
(cont'd)


| Description | Page(s) |
| --- | --- |
| SCE Reply and Correction of Misstatement, dated February 14, 2002 . . . . . . . . . . . . . . . . | 149-153 |
| Bonneville letter to SCE, dated January 24, 2003 . . . . . . . . . . . . . . . . . . . | 154-155 |
| SCE Administrative Claim, dated July 19, 2002 . . . . . . . . . . . . . . . . . . . . | 156-167 |
| Bonneville Motion to Strike re BPA Docket FPS-96R, dated November 2, 1999 . . . . . . . . . . . . . . . . . . . | 168-173 |

B O N N E V I L L E P O W E R A D M I N I S T R A T I O N

J U N E 1 9 9 6

# 1996 FINAL RATE PROPOSAL

## ADMINISTRATOR'S RECORD OF DECISION
## PART 2 OF 2

WP-96-A-02

000821

BONNEVILLE POWER ADMINISTRATION

developed an aluminum price forecast for this rate case as well. *See* Supplemental Loads and Resources Study, WP-96-E-BPA-57A, at 10-11; Ross, *et al.*, E-BPA-35, at 18-20. Because the DSI aluminum smelters are a substantial segment of BPA's load, BPA has had a long-standing interest and expertise in aluminum prices.

As is evident from the testimony, BPA has also spent considerable effort developing a hedging strategy, including issuing multiple drafts for review. *See* Ross, *et al.*, E-BPA-35, Attachment A and Ross, *et al.*, E-BPA-56, Attachment A. BPA has developed a prudent strategy for managing risk while leaving itself the flexibility to maximize revenues. According to BPA's hedging policy, BPA's "competitive success will depend on its ability to manage business and financial risks associated with its commercial operations in a changing competitive environment." Ross, *et al.*, E-BPA-56, Attachment A, at A-1. BPA adopted the policy to ensure that "its decisions to manage various price risks be conducted in an intelligent, business-like manner." *Id.* at A-2. Under the policy, one element BPA will consider in comparing hedging alternatives is "the liquidity of the hedge instrument should future circumstances dictate restructuring or unwinding the hedge." *Id.* at A-5. Thus, BPA's agency-wide policy contemplates flexibility in all its hedging transactions.

BPA is not approaching its risk management decisions in a haphazard fashion. It has developed a detailed policy, and intends to take prudent actions to assure cost recovery while maximizing revenues in a dynamic environment. In such an environment, it would be imprudent to eliminate options for the entire five-year rate period.

***Decision***

*BPA must maintain flexibility in the dynamic electricity market in order to minimize risk while maintaining the ability to maximize revenues. Therefore, BPA should not guarantee to fully hedge the risk of the Variable Industrial Rate in all circumstances.*

## 11.7 FPS Schedule

### 11.7.1 Structure and Limitations

***Issue***

*Whether the Firm Power Products and Services (FPS-96) rate schedule exposes BPA's customers and Federal taxpayers to cost underrecovery risk and should therefore be further structured to contain limitations that will govern prospective sales.*

**Parties' Positions**

The investor-owned utilities (IOUs) argue that the FPS-96 rate schedule is totally unstructured and exposes BPA's customers and Federal taxpayers to unnecessary risk. IOU Brief, WP-96-B-GE/PL/PS-02, at 8. They state that the FPS schedule does not meet the standards set by FERC for approval of BPA's long-term rates, and that the

Commission has approved such rates only where the rate was sufficiently structured and contained adequate safeguards to ensure cost recovery and the future adequacy of BPA's revenues. *Id.* at 12. Specifically, the IOUs note that: 1) there is no floor or ceiling rate as provided for in several past BPA long-term rates; 2) there is no limit on the quantity of power available for sale under the FPS schedule; 3) BPA may acquire any amount of resources for resale under the FPS schedule; 4) there are no specified rate escalators; and 5) there is no costing methodology required as a basis for setting prices, such as BPA has proposed in its flexible PF schedule. *Id.* at 9-10. The IOUs maintain that FPS-96 gives BPA so much discretion as to what rate it will actually charge any particular customer that FERC will be unable to evaluate whether BPA's power rates proposal in this proceeding meet the cost recovery and repayment requirements of section 7(a)(2) of the Northwest Power Act. *Id.* at 16.

In their brief on exceptions the IOUs argue that the Draft ROD dismisses the argument that the FPS schedule fails to meet the standards for long-term rates set by FERC in connection with prior rate filings by BPA. IOU Ex. Brief, WP-96-R-GE/PL/PS-02, at 7. They state that the Draft ROD wrongly implied that the IOUs were suggesting that the FPS schedule contain each and every condition traditionally applied by FERC to longer-term rates, and that they believe some combination will be sufficient to protect BPA's cost recovery and mitigate BPA's risks under the FPS schedule. *Id.* at 10-11.

Clark asserts in its initial brief that the lack of structure or limits in the proposed FPS-96 schedule raises the likelihood of serious, substantial and sustained revenue underrecoveries. Clark Brief, WP-96-B-CP-01, at 27. It contends that such underrecoveries will expose other BPA customers to the risk of cost shifts to cover these underrecoveries. *Id.*

The Full Meal Deal Utilities (FMD) argue that putting strict limits on BPA's authority to market surplus power under the proposed FPS-96 rate schedule would cripple BPA's efforts to retain its load and to be successful in today's unregulated market, and would give a one-sided and unfair advantage to BPA's competitors. Wagner, *et al.*, WP-96-E-FM-02, at 9. They argue that the flexibility of the FPS-96 schedule will benefit both BPA and its existing customers. *Id.* at 12. FMD utilities note the competition that BPA has been facing from wholesale power marketers and argue that the restrictions recommended by the IOUs would only serve to put BPA at a disadvantage in its efforts to retain load and secure needed revenue. FMD Pr. Brief, WP-96-P-FM-01, at 7.

NIU opposes the IOUs' proposals to restrict BPA's ability to market power under FPS-96, and argues that such limitations are unwarranted and would only serve to inhibit BPA and give the IOUs a competitive advantage. NIU Pr. Brief, WP-96-E-NI-01, at 4-5. NIU states that the only parties "safeguarded" by the adoption of the limits recommended by the IOUs are the IOUs themselves. Saven, WP-96-E-NI-02, at 9. They state that changed circumstances, including fish flow requirements which increase non-firm resources, and the changed federal laws and regulations governing electric industry competition fully justify BPA's proposal to offer competitively priced surplus power

products under FPS-96. NIU Pr. Brief, WP-96-E-NI-01, at 6. NIU argues that the greatest risk of cost underrecovery is posed by BPA's inability to flexibly respond to market conditions, and that the IOUs' recommendations to add structure and safeguards would significantly increase the chance of BPA experiencing underrecovery, not reduce it. Saven, E-NI-02, at 13. NIU argues that the caps proposed by the IOUs on sales of energy and capacity under FPS-96 are artificial limits designed to tie BPA's hands. *Id.* at 15. They note that while competition has made FPS-96 necessary there is ample historical precedent for BPA to propose unique products and flexible rates to develop or retain load. *Id.* at 9-10.

The PPC argues that the term and pricing flexibility proposed by BPA in the FPS-96 schedule is appropriate. Carr, *et al.*, WP-96-E-PP-08, at 3. They state that that cap proposed by the IOUs on the amounts of energy and capacity available under FPS-96 may unduly and arbitrarily limit BPA's ability to make FPS-96 sales. *Id.*

WPAG argues that any resource acquisition and sale poses some risk that costs will not be collected, and that BPA's customers face this risk now. Beck, *et al.*, WP-96-E-WA-11, at 26. They state the flexibility of the FPS-96 schedule is essential if BPA is to compete effectively. *Id.*

**BPA's Position**

The FPS-96 rate schedule is a market-based rate that will apply to power sales derived from a mix of power purchases and surplus resources. Hill, *et al.*, WP-96-E-BPA-51, at 15. The FPS-96 rate schedule is flexible to allow BPA to meet individual customers' product needs and provide BPA with pricing flexibility to respond to changing market conditions, thereby improving BPA's ability to maximize net revenues for long-term business stability. Moorman, Evans, WP-96-E-BPA-09, at 30. In a fully competitive market, with the bulk of BPA's sales vulnerable to being served by other parties, BPA faces greater challenges in recovering the revenues it needs to meet its costs and meet its Treasury repayment obligations. Hill, *et al.*, E-BPA-51, at 7. BPA's experience with other long-term flexible schedules, however, shows that efforts to assure FERC that BPA would recover its fully allocated costs, by including in the schedule the kind of structure and limitations proposed by the IOUs, only helped assure that it would not. *Id.* at 13.

Contrary to the IOUs' assertion in their brief on exceptions, BPA has not ignored the conditions placed on longer-term rates in the past by FERC. The Draft ROD in its evaluation of the parties' positions presents a detailed discussion of each of the conditions noted by the IOUs. That evaluation is carried over into this Final ROD.

**Evaluation of Positions**

The IOUs fail to adequately recognize or evaluate in either their testimony or briefs the competitive environment that justifies BPA's proposal to adopt the flexible FPS-96 schedule. Taken in the context of yesterday's highly regulated market, when BPA was

both the low cost provider and a dominant market force, the IOUs' arguments are more persuasive. Taken in the context of today's vigorously competitive wholesale power market, however, the IOUs' arguments have little or no merit. BPA has undertaken considerable redesign of its power products and prices to ensure that its rate schedules contain competitive rates. *See generally* Buchanan, *et al.*, WP-96-E-BPA-11. The majority of BPA's proposed rate schedules contain fixed rates designed to recover BPA's costs. *See generally* Supplemental Rate Proposal - Wholesale Power and Transmission Rate Schedules, WP-96-E-BPA-64, at 1-75 (hereafter cited as "Rate Schedules"). In fact, it is under these rate schedules that BPA has provided, and will continue to provide, service to the majority of its customers.

Competition for BPA's historical loads has intensified in recent years, due to several factors, including large West Coast surpluses, low gas prices, rising BPA costs and market deregulation. Moorman, Evans, E-BPA-09, at 12. Such competition, primarily from IOUs, their affiliates and marketers, has resulted in significant load loss from BPA's requirements and direct-service industry customers. Hill, *et al.*, E-BPA-51, at 3; *see generally* Norman, Oliver, WP-96-E-BPA-10. This competition has been flavored by BPA's limited ability to respond with terms and conditions that match the competition. Some competitors have made open-ended offers to BPA customers with prices that will beat BPA's requirements rate, whatever that rate turns out to be. Norman, Oliver, E-BPA-10, at 10. Customers have stated that if BPA cannot begin to offer unique products and services as needed to compete head-to-head with other sellers, including the IOUs, it places its customer base at risk. Saven, E-NI-02, at 6-7.

FPS-96 is a market-based rate intended to provide BPA sufficient rate flexibility to respond to market needs either on a contractual basis or in the spot market. Dinsmore, *et al.*, WP-96-E-BPA-21, at 4. It allows for both short- and long-term sales of varying types of firm energy and capacity products and at various load factors. *Id.* A diversity of products, sold with a diverse set of terms and conditions such as contract duration, will help support BPA's revenues in a competitive market. *Id.* As long as BPA must offer its requirements service at a fixed, published rate, BPA's competitors know exactly what price they have to beat to make an attractive offer. Hill, *et al.*, E-BPA-51, at 7. In the event BPA cannot retain a customer under its fixed rate schedules, BPA must be allowed the flexibility to staunch its losses. BPA seeks maximum flexibility in its FPS-96 rate schedule to keep lost sales and lost revenues to a minimum. Hill, *et al.*, E-BPA-51, at 7.

The IOUs argue that BPA should not seek approval for the proposed FPS-96 schedule without adopting safeguards sufficient to protect the agency's cost-recovery and revenue adequacy. IOU Brief, B-GE/PL/PS-02, at 19. In testimony they specifically recommend that the total sales under the FPS schedule should be subject to a cap of 575 average megawatts of energy (including BPA's existing surplus firm sales) and 1,350 megawatts of capacity (including existing sales). Brattebo, *et al*, WP-96-E-GE/PL/PS-03, at 16-17. In addition, the IOUs imply in their initial brief that each of the conditions required by FERC prior to its approval of past long-term rates proposed by BPA should be included in the schedule. In their brief on exceptions the IOUs state that they do not contend that each

and every safeguard applied in the past must be applied to the FPS schedule. IOU Ex. Brief, R-GE/PL/PS-02, 10. They state that only "some combination" of these safeguards are needed. *Id.* at 11. Nevertheless, because BPA believes none of the limitations are appropriate to include in the schedule, each one raised by the IOUs is addressed here, or in other issues addressed in this section 11.7.

The IOUs go to great lengths in their initial brief to compare the FPS-96 schedule with prior long-term rates proposed by BPA and reviewed by FERC. They assert that BPA's proposed FPS schedule does not meet the standards set by FERC for approval of BPA's long-term rates. IOU Brief, B-GE/PL/PS-02, at 12. They state that there were several "key features common to those rates" that have been approved. *Id.* These included caps on the quantity of power available for sale under the rate, automatic adjustment clauses, and floors and ceilings. They argue that because the FPS-96 schedule does not contain these same key features, that it is not sufficiently structured and lacks the safeguards required by FERC. *Id.* Additionally, the IOUs argue that the FPS-96 schedule is defective in that it lacks a specified costing methodology. *Id.* at 10.

The IOUs' argument that the FPS schedule must contain these safeguards is supported chiefly by their heavy reliance on FERC's treatment of BPA's long-term schedules during the late 1980's, and for that reason is unpersuasive. Since that time, the intensity of competition has increased enormously, as the industry evolves toward a less regulated generation sector and comparable transmission access. Dinsmore, *et al.*, E-BPA-21, at 5; *see generally* Moorman, Evans, E-BPA-09; Norman, Oliver, E-BPA-10. Passage of the Energy Policy Act and subsequent rulemakings have increased the risk of doing business for everyone concerned. Hill, *et al.*, E-BPA-51, 7. At the same time, BPA's costs have increased, due in large part to a loss of resources from additional nonpower constraints. Dinsmore, *et al.*, E-BPA-21, at 5-6. With its loads and revenues no longer secure, BPA must have the flexibility that FPS provides in order to compete successfully to retain load and sustain its revenue base. The market-based FPS rate schedule is designed to reduce BPA's overall revenue risk by diversifying it. Dinsmore, *et al.*, E-BPA-21, at 8. Wholesale utilities cannot simply design schedules that lack substantial flexibility, or that set their rate at fully allocated costs and expect to retain their customers. Hill, *et al.*, E-BPA-51, at 13-14. Any comparisons with FERC's treatment of past long-term rates must be made in light of this new competitive environment.

The IOUs note that the FPS-96 schedule has no floors or ceilings, and state that the SL-87 rate was not initially approved by FERC because it contained an inadequate description of a floor and ceiling. Brattebo *et al.*, WP-96-E-GE/PL/PS-03, at 7, 13; Brattebo, WP-96-E-PL-04, at 3. Under SL-87 the floor, which could not fall below BPA's priority firm (PF) or preference rate, was designed to assure that BPA would not sell its power under this schedule below the fully allocated cost of preference power. Hill, *et al.*, E-BPA-51, at 15. The ceiling, which was the fully allocated cost of BPA's highest cost resource, was designed to assure that BPA would not extract excessive profits from an inefficient market. *Id.* Other than making this comparison to past treatment by FERC and noting that FERC required the floor to help safeguard revenue recovery, the IOUs present no

evidence for why a floor or ceiling remains an appropriate part of a rate schedule in a competitive power market. Today's competitive market provides the appropriate ceiling on FPS sales, so a rate ceiling was not included. Dinsmore, *et al.*, WP-96-E-BPA-21, at 3. Furthermore, a rate ceiling would be impracticable because if market prices rise, so could the cost to BPA of purchasing power to meet its contractual obligations to FPS customers. Hill, *et al.*, E-BPA-51, at 15. Regarding the floor, BPA's opportunity cost plus some small margin will be its floor, which will sometimes approach its variable cost, sometimes the value of the next best use of its resources, and sometimes the cost of purchased power. *Id.* Because the floor will vary significantly with each transaction, it would be meaningless and impractical to insert one in the rate schedule. *Id.* In addition, BPA has presented substantial evidence that its customers are receiving offers for firm power at or below BPA's proposed rates. *See generally* Norman, Oliver, E-BPA-10. Competitive pressures require BPA to have the downward flexibility to follow the market below any artificially imposed floor, where it would be prudent to do so. Upward flexibility allows BPA to offset, if possible, sales at less than fully allocated costs.

The IOUs note that there is no limit on the quantity of power available for sale under the FPS schedule. Brattebo, *et al*, E-GE/PL/PS-03, at 5. They argue that the FPS schedule should be subject to a cap of 575 average megawatts of energy (including BPA's existing surplus firm sales) and 1,350 megawatts of capacity (including existing sales). *Id.* at 16. As support they cite the fact that FERC has required BPA to limit the quantity of power available under past long-term rates in order to mitigate the down-side risk to BPA's ability to recover its costs. IOU Br., B-GE/PL/PS-02, at 12-15. The IOUs have provided no record support for the quantities they propose for the caps, other than to note that these were the caps under the modified SL-87 rate. Brattebo, WP-96-E-PL-04, at 3. The IOUs proposal is unreasonable, however, inasmuch as BPA's existing surplus firm sales presently exceed the proposed cap - thereby effectively capping FPS-96 sales at zero. Hill, *et al.*, E-BPA-51, at 10. The PPC stated in testimony that the caps proposed by the IOUs "may unduly and arbitrarily limit BPA's ability to make FPS sales." Carr, *et al.*, E-PP-08, at 3. BPA concurs with the PPC characterization, and believes it would be counterproductive to set any cap in the rate schedule. With a substantial proportion of BPA's firm sales at risk in the market, BPA may need to resell unforeseen amounts of surplus power under the FPS schedule. *Id.* Market forces affecting price and supply, and fish mitigation measures affecting BPA's load-resource balance, will dictate the opportunities and viability of additional sales under the FPS schedule. *Id.* Caps set in the schedule will decrease BPA's ability to take full advantage of market opportunities. *Id.*

The IOUs note that the FPS schedule contains no rate escalators, such as previously contained in BPA long-term rate proposals approved by FERC. IOU Br., B-GE/PL/PS-02, at 10. They cite several FERC opinions for the proposition that the inclusion of such rate escalators in BPA's long-term schedules is a necessary precondition to FERC approval. *Id.* at 12. They state in testimony that the SP-93 rate schedule, which the FPS-96 schedule would succeed, was subject to various automatic adjustments, including the interim rate adjustment (IRA). Brattebo, *et al.*, E-GE/PL/PS-03, at 5. SP-93 was subject to the IRA, but did not contain any other automatic rate adjustment clause. Hill, *et al.*, E-

BPA-51, 15. BPA, however, has proposed to eliminate the interim rate adjustment from all its rate schedules, not just the FPS-96 rate. Hill, *et al.*, E-BPA-51, at 14. The IRA was designed to protect BPA from unforeseen cost increases that may occur in the middle of a rate period, and to enhance BPA's probability of meeting its repayment obligations. *Id.* BPA's proposed elimination of the IRA is engendered by the pressures of the competitive wholesale power market. BPA's customers desire rate stability and are finding competitors who will offer it. Moorman, Evans, WP-96-E-BPA-09, at 10-11. An IRA implies the possibility of unplanned rate increases within a rate period, damaging BPA's ability to compete; as such it is a risk mitigation strategy that will no longer meet BPA's needs and, in fact, runs counter to BPA's needs. Arnold *et al.*, WP-96-E-BPA-15, at 4-5. A generic escalation clause in the schedule will only serve to weaken BPA's position to compete in the market and reduce its ability to recover costs and meet its repayment obligations. While BPA intends to negotiate escalators with prospective customers where appropriate, it would run counter to sound business principles to design the FPS schedule with escalators that may run counter to market demands. In a competitive market BPA needs the flexibility to design escalators on a case-by-case basis.

Other criteria for approval of BPA long-term rates used by FERC in the past and discussed in the opinions cited by the IOUs are addressed in this section 11.7 under the issue addressing the proposed 10-year term of the FPS schedule.

The IOUs state in their brief that BPA asserted at cross-examination that it retained "complete discretion" to make FPS offers to its preference and DSI customers, and that BPA could substitute sales of FPS power for sales of priority firm (PF) or industrial firm (IP) power. IOU Brief, B-GE/PL/PS-02, at 10. The IOUs conclude this will encourage load shedding by BPA's customers, *i.e.*, reducing their load on BPA, and makes it likely that BPA will recover less than forecasted revenues. *Id.* First, the IOUs have mischaracterized the witnesses' testimony, and ignored testimony regarding BPA's intent. In fact, the witness responded to opposing counsel's assertion that BPA's intent was to seek "complete discretion":

> I hesitate at the word "complete," but yeah, we're trying to maintain discretion to make offers to these [preference] customers.

Tr. 830. BPA's witness later testified that

> I think there are certain things which prevent us from making FPS offers to public and IP [DSI] customers, that being any customer who requests or wants requirements service, we are obligated to provide it. We cannot offer FPS to a customer who wants requirement service.

Tr. 836. In fact, BPA has made clear its intent to displace PF sales to preference customers under the FPS schedule only when it will otherwise lose the load. Hill, *et al.*, E-BPA-51, at 8. Often that load loss will be occasioned by the same IOUs that are now arguing for constraints on the FPS schedule. As is made clear in the FPS schedule, BPA is

under no obligation to make power or energy available under the FPS schedule if such power or energy would displace sales under the PF, IP, NR or VI rate schedules. Rates Schedules, E-BPA-64, at 59. The retention of customers, however, is essential to keeping BPA's rates at the lowest possible levels and meeting its cost recovery and Treasury repayment obligations, and BPA will use the FPS schedule where it would otherwise lose sales, when such action is otherwise a good business deal for BPA.

Nor did BPA's witness testify that BPA retained "complete discretion" to make FPS offers to the DSIs. Rather, BPA's witness merely answered in the affirmative when asked by counsel if BPA reserved to itself the right to make offers to DSIs and to negotiate a price for those offers. Tr. 831. The phrase "complete discretion" was not part of the question or the answer.

Second, the IOUs' argument that the FPS rate will encourage load shedding also has no merit. They argue in testimony that by announcing that it wants flexibility to offer lower prices to customers threatening to drop load from it, BPA has invited its customers to treat the PF and IP rate as a price lid while searching for a third-party offer in an effort to generate a BPA offer below the established rate. Brattebo, *et al.*, E-GE/PL/PS-03, at 14. In fact, the PF and IP rates are a price lid on the market today, with or without the FPS schedule. Hill, *et al.*, E-BPA-51, at 8. Those rates are the only fixed points in a very fluid market. *Id.* The IOUs suggest that while they and other marketers actively court BPA's sales with below-PF and IP offers, BPA should send out a resolute signal that it will not compete and that under no circumstances will it lower its prices below those rates. This approach poses a much greater threat of encouraging load shedding than an approach that allows BPA to meet market prices. *Id.*

The IOUs also note that the FPS schedule contains no costing methodology. IOU Brief, B-GE/PL/PS-02, at 10. They state in testimony that because BPA has not included in the schedule a methodology to determine whether sales are beneficial, BPA is essentially proposing a "Trust Me" approach to ratemaking. Brattebo, *et al.*, E-GE/PL/PS-03, at 15. BPA has not proposed a generic costing methodology to be included in the schedule since no single methodology will work for all the various combinations of resources BPA may utilize for sales under the FPS schedule. Hill, *et al.*, E-BPA-51, at 11. BPA's costs are probabilistic in nature because BPA has limited control over the use of its resources, and the market value and availability of those resources fluctuates considerably. *Id.* As a consequence, a costing methodology in the rate schedule would be either too vague to be meaningful or too restrictive to be useful in making competitive offers. *Id.* BPA has, however, outlined in detail the costing methodology that it will use to determine the viability of any transaction on a case-by-case basis. *Id.*, Attachment G. Each transaction that is negotiated under the FPS-96 rate schedule, whatever the duration, will provide the structure and safeguards needed to provide BPA a reasonable assurance of overall cost recovery. Hill, *et al.*, E-BPA-51, at 16

Nevertheless, the IOUs argue in their initial brief that the FPS schedule gives BPA so much discretion as to what rate it will actually charge any particular customer that FERC

000903

will not be able to evaluate whether BPA's power rates meet the requirements of section 7(a)(2) of the Northwest Power Act. IOU Brief, B-GE/PL/PS-02, at 16; 16 U.S.C. § 839e(a)(2). They argue that the Commission must reject rates where the record provides insufficient information to evaluate the long-term effect of a rate schedule on BPA's overall revenues. IOU Brief, B-GE/PL/PS-02, 16. However, FERC review of BPA's rates focuses on the overall cost/revenue relationship of BPA's rate schedules in the aggregate, rather than solely on the merits of each individual rate schedule. *United States Department of Energy - Bonneville Power Administration*, 36 FERC ¶61,350, at 61,849 (1986). The FPS rate is a marketing tool that BPA must have if it is to position itself to assure cost recovery. The IOUs also state that BPA's witness on cross examination suggested that FPS sales would not be made at a level that would fully recover costs, but this conclusion is not supported by the cited text. IOU Brief, B-GE/PL/PS-02, at 16-17 (citing Tr. 838, lines 2-7). The cited portion of the transcript states:

> Q. Thank you. Now, in fact then, isn't it true that there's no way to know today how much power will be sold in the upcoming five-year rate period under the PF and IP rates as compared to power sold under different rates using the FPS schedule?
>
> A. That's fair to say at this moment.

How this exchange can be viewed to be a suggestion by the witness that BPA did not expect to fully recover costs under the FPS schedule is not apparent. BPA does expect to recover its costs associated with the FPS schedule, and has so stated in testimony. Dinsmore, *et al.*, E-BPA-21, at 14; Hill, *et al.*, E-BPA-51, at 6-7. Moreover, BPA has presented substantial evidence indicating that BPA faces the prospect of significant loss of sales as customers seek to further diversify their resource portfolio. *See generally* Moorman, Evans, E-BPA-09, and E-BPA-65; Norman, Oliver, E-BPA-10. In light of the clear competitive pressures it faces, the risk of revenue underrecovery is greater without the FPS schedule than with it. Buchanan, *et al.*, WP-96-E-BPA-11, at 13; Saven, WP-96-E-NI-02, at 14-15. Additionally, while the Administrator's discretion to enter into contracts to sell power under the FPS schedule is substantial, including making purchases to support such sales, it is not completely without limits. Most importantly, the Administrator must act consistent with sound business principles. In a competitive market, BPA's customers have indicated in their testimony they will not respond to either above-market prices or suppliers offering inflexible rate terms and conditions. *See e.g.*, Beck, *et al.*, E-WA-11, at 26; Wagner, *et al.*, E-FM-02, at 9; Saven, E-NI-02, at 6. This fact in and of itself is strong evidence for the proposition that the flexible FPS schedule is required for BPA to compete to retain sales and revenues. In sum, the record contains evidence sufficient for FERC to conclude that BPA's rate schedules in the aggregate, including the FPS-96 schedule, meet the requirements of section 7(a)(2) of the Northwest Power Act.

BPA is not unmindful that the use of the flexible FPS schedule presents issues of cost recovery, as the IOUs have gone to great lengths pointing out. The IOUs' testimony,

000904