however, nowhere acknowledges the impact of a deregulated, fiercely competitive market on BPA's ability to recover its costs and meet its repayment obligations. BPA has stated that before entering into a transaction under the FPS-96 rate schedule it "would have to have a fairly high level of confidence that the transaction we were entering into would be a profitable one." Tr. 842. This is no different from the essential business criteria BPA currently applies to sales under the SP-93 schedule, which is also a market-based rate. The criteria for assessing that profitability would include BPA's costs, the market prices over the period and product availability. These limits are not built into the rate schedule but they have been articulated by BPA on the rate case record. *See e.g.*, Hill, *et al.*, E-BPA-51, Attachment G; Tr. 843, line 19 to 844, line 11.

Rapidly changing market conditions militate against including these criteria in the schedule itself. Limitations that are not subject to change during the rate period deny the Administrator the ability to effectively apply his business judgment to evolving market conditions, and thereby render the rate schedule inflexible and unresponsive to market conditions. It is this inflexibility that puts BPA's ability to recover costs at risk. Saven, E-NI-02; and Hill, *et al.*, E-BPA-51, at 16.

BPA's witness on re-direct examination summarized why such flexibility is so important to BPA, and the manner in which BPA intended to use the schedule:

> Q. What is your opinion as to what Bonneville's competitive ability or position would be were it unable to offer flexibility inherent in the FPS rate schedule?
>
> A. Currently the prices in the market are pretty low and I think we would have a difficult time selling any surplus power we have at the contract rate under the FPS rate schedule. We need the flexible rate to sell power that is not sold under the requirement service or any of our other rate schedules.

Tr. 916.

The IOUs also argue that section 7(f) of the Northwest Power Act effectively caps the price for in-Region sales of firm power under FPS-96 at BPA's "fully embedded cost" of service. IOU Brief, B-GE/PL/PS-02, at 17. Section 7(f) states that

> Rates for all other firm power sold by the Administrator for use in the Pacific Northwest shall be *based upon the cost* of the portions of Federal base system resources, purchases of power under section [5(c)] of this title and additional resources *which, in the determination of the Administrator, are applicable to such sales.*

16 U.S.C. § 839e(f) (emphasis added). The IOUs argue that BPA should modify the FPS schedule to comport with their view of the section 7(f) standard to the extent that FPS sales are made for customers for use within the Region. IOU Brief, B-GE/PL/PS-02, at 17. The IOUs state that this cap on the Administrator's discretion is based on the "plain

000905

language" of section 7(f). The provision, however, clearly gives the Administrator ample discretion in its application, and BPA has never interpreted section 7(f) in a manner that required the agency to calculate a cap for any sales based on BPA's fully embedded cost. For example, BPA established and FERC approved the SP-93 rate schedule, which permitted BPA to price sales above its fully embedded costs. The IOUs' argument, if accepted, would also frustrate BPA's ability to recover its costs under the FPS schedule, an issue on which the IOUs have expressed great concern.

The Northwest Power Act, however, grants the Administrator discretion in the design of rates. This broad discretion is found in section 7(e) of the Act, 16 U.S.C. § 839e(e), which provides:

> Nothing in this Act prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.

The legislative history of the Act confirms the Administrator's discretion. H.R. Rep. No. 976, 96th Cong., 2d Sess., pt. 1, at 69 (1980); H.R. Rep. No. 976, 96th Cong., 2nd Sess., pt. 2, at 53, *reprinted in* 1980 U.S. Code Cong. & Admin. News 6023, 6051. The Ninth Circuit has recognized this authority, finding that "the statute does not require BPA to impose any particular type of rate on its customers. Rather it restricts BPA only to 'sound business principles' in setting rates to meet its revenue requirements." *City of Seattle v. Johnson*, 813 F.2d 1364, 1367 (9th Cir. 1987). Thus, the Administrator's primary rate setting authority and obligation is to set rates to meet BPA's revenue requirements, consistent with sound business principles. *See* 16 U.S.C. § 839e (a)(1).

Section 7(f) does not curtail that authority, and does not require that Regional sales of surplus firm power must be capped at BPA's fully embedded cost. Rather, the provision requires the Administrator to price such sales "based upon" the cost of the resources which in his determination are applicable to such sales. Language in other BPA rate directives similar to that in section 7(f) have been held not to limit the Administrator's broad discretion to set rates. In *Pacific Power & Light v. Duncan*, 499 F. Supp. 672 (D. Or. 1980), plaintiffs contended that section 7 of the Bonneville Project Act, which requires in part that rates shall be set "having regard to the recovery of the cost of producing" the power sold, and be "based upon an allocation of costs," imposed a cost of service standard for BPA's nonfirm energy rate. 16 U.S.C. § 832f. The court rejected this claim:

> Despite all the references to cost, the two quoted passages do not support an inference that cost is the <u>only</u> basis upon which rates may be computed. The qualifying phrases "having regard to," "may include," and "to the maximum extent practicable," indicate that the discretion granted in 16 U.S.C. §§ 825s, 832e, 838g . . . were not significantly altered by the requirement to <u>consider</u> costs in calculating rates.

*Id.* at 683 (emphasis in original).

The Administrator is granted similar discretion in designing rates by the language of section 7(f), which requires only that rates for such power be "based upon" the costs of the resources that "in the determination of the Administrator" are used to service the sale. BPA has never interpreted the "based upon" language in section 7(f) to require that the price be capped at BPA's fully embedded cost, in part because BPA's fully embedded cost for any given sale is not susceptible to rote calculation, and in part because the amount of recovery is dictated by market conditions. In some cases, market conditions will permit BPA to recover only a portion of its fully embedded costs. Nevertheless, that recovery absolves BPA's other customers from having to shoulder those fixed costs. Capping sales at BPA's fully allocated cost would deny BPA potential opportunities to offset market-dictated below cost sales with above market sales. The IOUs interpretation therefore works to frustrate the Administrator's section 7(a) cost recovery obligations, and conflict with BPA's obligations to establish rates consistent with sound business principles. 16 U.S.C. § 839e (a)(1).

NIU views the IOUs' positions regarding the FPS schedule as a "thinly disguised" effort to gain a near term competitive advantage over BPA in the wholesale power markets. Saven, WP-96-E-NI-02, at 1. NIU presents evidence demonstrating that the IOUs are beleaguering BPA for its intentions to market surplus firm power in ways the IOUs themselves are using to raid BPA's customer base and protect their own. *Id.* at 8-9. Indeed, FERC has recognized pricing flexibility should improve competition:

> A competitive market simply cannot function unless the participants can make their own pricing decisions and put them into practice to take advantage of fast changing market conditions. At times, a seller needs the flexibility to reduce prices quickly to make or retain a sale, even though its profits may be small. At times when demand is high, prices need to be raised quickly to allocate scarce resources to those customers who value them the most. Without competitive pricing flexibility, competitive markets cannot function efficiently.

Pacific Gas and Electric Company, 38 FERC ¶ 61,242, at 61,790 (1987).

Counsel for Pacificorp in oral argument maintained that the IOUs object to FPS-96 as concerned customers, and not competitors of BPA. Or. Tr. 2475. The relevant fact remains, however, that limiting BPA's flexibility to design products which meet the competition hurts BPA and BPA's customers, in particular its public agency customers. *See e.g.*, Wagner, *et al.*, WP-96-E-FM-02, at 9; NIU Brief, WP-96-B-NI-01; Or. Tr. 2425. For example, BPA's public and cooperative utility customers are under tremendous pressure from their retail industrial customers to tailor services, unbundle products and reduce rates. Hill, *et al.*, E-BPA-51, at 5. They are looking to BPA for assistance in tailoring products for their industrial customers, at a competitive wholesale price *Id.* The FPS-96 schedule is a key tool to enabling not only BPA, but also its customers, to retain sales.

# 1996

# WHOLESALE

# POWER AND TRANSMISSION

# RATES

PREPARED BY
BONNEVILLE POWER ADMINISTRATION
U.S. DEPARTMENT OF ENERGY

June 1996

WP-96-A-02
Appendix

001155

# 1996 WHOLESALE POWER AND TRANSMISSION RATES

## TABLE OF CONTENTS

Page

Commonly Used Acronyms ..... ii

Rate Schedules

Power Rates ..... 1

Transmission Rates ..... 77

General Rate Schedule Provisions ..... 122

# SCHEDULE FPS-96
# FIRM POWER PRODUCTS AND SERVICES

## SECTION I. AVAILABILITY

This rate schedule is available for the purchase of Firm Power, Supplemental Control Area Services, Shaping Services, and Reservation and Rights to Change Services for use inside and outside the Pacific Northwest during the period beginning October 1, 1996, and ending September 30, 2005.

Products and services available under this rate schedule are described in section III.A. of BPA's General Rate Schedule Provisions (GRSPs). BPA is not obligated to enter into agreements to sell products and services under this rate schedule or make power or energy available under this rate schedule if such power or energy would displace sales under the PF-96, NR-96, IP-96, or VI-96 rate schedules or their successors. Sales under the FPS-96 rate schedule are subject to BPA's GRSPs. Transmission service over Federal Columbia River Transmission System facilities shall be charged under the applicable transmission rate schedule. Ancillary services shall be available under, or at charges consistent with, the Ancillary Products and Services (APS) rate schedule.

This rate schedule supersedes the Surplus Firm Power (SP-93) and Emergency Capacity (CE-95) rate schedules. Rates under contracts that contain charges that escalate based on rates listed in this rate schedule shall include applicable transmission charges. For sales under this rate schedule, bills shall be rendered and payments due pursuant to BPA's Billing Procedures and/or as agreed to in purchase agreements.

## SECTION II. RATES, BILLING FACTORS, AND ADJUSTMENTS

For each product, the rate(s) for each product along with the associated billing factor(s) are identified below. Applicable adjustments, charges, and special rate provisions are listed for each product. This rate schedule contains four subsections, corresponding to the products offered under this rate schedule:

Section II.A. Firm Power.

Section II.B. Supplemental Control Area Services.

Section II.C. Shaping Services.

Section II.D. Reservation and Rights to Change Services.

## A. FIRM POWER

## 1. RATES AND BILLING FACTORS

### 1.1 Contract Rate

#### 1.1.1 Demand Charge

The charge for demand shall be $0.87 per kilowatt per month in all months of the year, *multiplied by*
the Contract Demand unless otherwise agreed by BPA and the Purchaser.

#### 1.1.2 Energy Charge

The total monthly charge for energy shall be the sum of (1) and (2):

(1) the applicable HLH rate for that month, *multiplied by* the Purchaser's HLH Contract Energy unless otherwise agreed by BPA and the Purchaser, and

(2) the applicable LLH rate for that month, *multiplied by* the Purchaser's LLH Contract Energy unless otherwise agreed by BPA and the Purchaser.

| *Applicable Months* | *HLH Rate* | *LLH Rate* |
|---|---|---|
| September - December | 49.63 mills/kWh | 46.45 mills/kWh |
| January - March | 50.39 mills/kWh | 47.25 mills/kWh |
| April | 44.74 mills/kWh | 42.73 mills/kWh |
| May - June | 24.36 mills/kWh | 21.21 mills/kWh |
| July | 29.94 mills/kWh | 26.09 mills/kWh |
| August | 42.68 mills/kWh | 37.06 mills/kWh |

### 1.2 Flexible Rate

Demand and/or energy charges may be specified at a higher or lower average rate as mutually agreed by BPA and the Purchaser. Billing factors shall be Contract Demand and Contract Energy unless otherwise agreed by BPA and the Purchaser.

## 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

### 2.1 Rate Adjustments

| ***Rate Adjustment*** | ***Section*** |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

### 2.2 Special Rate Provisions

| ***Special Rate Provisions*** | ***Section*** |
|---|---|
| Cost Contributions | II.D. |

## B. SUPPLEMENTAL CONTROL AREA SERVICES

### 1. RATES AND BILLING FACTORS

The charge for Supplemental Control Area Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Supplemental Control Area Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

#### 2.1 Rate Adjustments

| *Rate Adjustment* | *Section* |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

#### 2.2 Special Rate Provisions

| *Special Rate Provisions* | *Section* |
|---|---|
| Cost Contributions | II.D. |

## C. SHAPING SERVICES

### 1. RATES AND BILLING FACTORS

The charge for Shaping Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for use of Shaping Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

#### 2.1 Rate Adjustments

| *Rate Adjustment* | *Section* |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

#### 2.2 Special Rate Provisions

| *Special Rate Provisions* | *Section* |
|---|---|
| Cost Contributions | II.D. |

## D. RESERVATION AND RIGHTS TO CHANGE SERVICES

### 1. RATES AND BILLING FACTORS

The charge for Reservation and Rights to Change Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Reservation and Rights to Change Services shall be as established by BPA or mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

There are no additional adjustments, charges, or special rate provisions for the Reservation and Rights to Change Services.

# FINAL FIRM POWER PRODUCTS AND SERVICES RATE ADJUSTMENT PROPOSAL (FPS-96R)

## ADMINISTRATOR'S RECORD OF DECISION FPS-96R-A-02

## APPENDIX: REVISED FPS-96 RATE SCHEDULE

BONNEVILLE POWER ADMINISTRATION

# Final Firm Power Products and Services Rate Adjustment Proposal (FPS-96R)

**Administrator's Record of Decision** FPS-96R- A-02

**Appendix: Revised FPS-96 Rate Schedule**

# Final Firm Power Products and Services Rate Adjustment Proposal (FPS-96R)

**Administrator's Record of Decision** FPS-96R-A-02

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| **1.0** | **INTRODUCTION** | 1 |
| 1.1 | Background | 1 |
| 1.2 | Procedural History of This Rate Proceeding | 2 |
| 1.3 | Legal Guidelines Governing Establishment of Rates | 3 |
| 1.4 | Broad Ratemaking Discretion Vested in the Administrator | 4 |
| 1.5 | Confirmation and Approval of Rates | 4 |
| **2.0** | **SUBSTANTIVE ISSUES** | 6 |
| 2.1 | Introduction | 6 |
| 2.2 | Use of Marginal Cost Analysis | 6 |
| 2.3 | Setting the Rate for Capacity Without Energy Equal to NR-96 | 9 |
| 2.4 | Use of New York Mercantile Exchange (NYMEX) | 12 |
| 2.5 | Developing a Seasonal Pattern to the CCCT Costs | 13 |
| 2.6 | Link Between Pricing Capacity Without Energy and SCE's Contract | 14 |
| 2.7 | Equitable Pricing of Capacity Without Energy | 16 |
| 2.8 | Applicability of the Rates Proposed in This Proceeding | 20 |
| 2.9 | Value of Capacity Without Energy Vs. Value of Capacity | 21 |
| **3.0** | **SCE CONTRACT ISSUES** | 23 |
| 3.1 | Ability to Change Rates Applicable to SCE's Contract | 23 |
| 3.2 | Risk Management and Rate Development | 24 |
| 3.3 | Necessary Rates Development | 26 |
| 3.4 | Contract Demand Charge | 27 |
| 3.5 | Generally Applicable Rates | 29 |
| 3.6 | Good Faith and Fair Dealing | 31 |
| 3.7 | Seasonally Adjusted Rates | 32 |
| **4.0** | **PROCEDURAL ISSUES** | 34 |
| 4.1 | Expedited Proceeding | 34 |
| 4.2 | Discovery Issues | 37 |
| 4.3 | Complete Record | 41 |
| 4.4 | Environmental Considerations | 45 |
| **5.0** | **CONCLUSION** | 47 |


**APPENDIX**


Schedule FPS-96R: Firm Power Products and Services ........ 48

## COMMONLY USED ACRONYMS

| | |
|---|---|
| AANR | Audited Accumulated Net Revenues |
| AC | Alternating Current |
| AER | Actual Energy Regulation |
| AFUDC | Allowance for Funds Used During Construction |
| AGC | Automatic Generation Control |
| aMW | Average Megawatt |
| ANRT | Accumulated Net Revenue Threshold |
| AOP | Assured Operating Plan |
| APS | Ancillary Products and Services (rate) |
| ASC | Average System Cost |
| BASC | BPA Average System Cost |
| BO | Biological Opinion |
| BPA | Bonneville Power Administration |
| Btu | British Thermal Unit |
| C&R | Cost and Revenue |
| C&R Discount | Conservation and Renewables Discount |
| California PX | California Power Exchange |
| CBP | Columbia Basin Project |
| CCCT | Combined-Cycle Combustion Turbine |
| CEC | California Energy Commission |
| Cfs | cubic feet per second |
| COB | California-Oregon Border |
| COE | U.S. Army Corps of Engineers |
| Con/Mod | Conservation Modernization Program |
| COSA | Cost of Service Analysis |
| CRAC | Cost Recovery Adjustment Clause |
| CRC | Critical Rule Curves |
| CSPE | Columbia Storage Power Exchange |
| CT | Combustion Turbine |
| CTPP | Conditional TPP |
| CY | Calendar Year (Jan-Dec) |
| DC | Direct Current |
| DDC | Dividend Distribution Clause |
| DMP | Data Management Procedures |
| DOE | Department of Energy |
| DSIs | Direct Service Industrial Customers |
| ECC | Energy Content Curve |
| EIA | Energy Information Administration |
| EIS | Environmental Impact Statement |
| Energy Northwest | Formerly Washington Public Power Supply System (Nuclear) Project |
| EPP | Environmentally Preferred Power |
| F&O | Financial and Operating Reports |
| FBS | Federal Base System |
| FCCF | Fish Cost Contingency Fund |

| | |
|---|---|
| FCRPS | Federal Columbia River Power System |
| FCRTS | Federal Columbia River Transmission System |
| FELCC | Firm Energy Load Carrying Capability |
| FERC | Federal Energy Regulatory Commission |
| Fourth Power Plan | NWPPC's Fourth Northwest Conservation and Electric Power Plan |
| FPS | Firm Power Products and Services (rate) |
| FSEA | Federal Secondary Energy Analysis |
| FY | Fiscal Year (Oct-Sep) |
| GEP | Green Energy Premium |
| GI | Generation Integration |
| GRI | Gas Research Institute |
| GRSPs | General Rate Schedule Provisions |
| GSP | Generation System Peak |
| GSU | Generator Step-Up Transformers |
| GTA | General Transfer Agreement |
| GWh | Gigawatthour |
| HELM | Hourly Electric Load Model |
| HLH | Heavy Load Hour |
| HNF | Hourly Non-Firm |
| HOSS | Hourly Operating and Scheduling Simulator |
| ICNU | Industrial Customers of Northwest Utilities |
| IJC | International Joint Commission |
| IOUs | Investor-Owned Utilities |
| IPTAC | Industrial Firm Power Targeted Adjustment Charge |
| IP | Industrial Firm Power (rate) |
| ISC | Investment Service Coverage |
| ISO | Independent System Operator |
| KAF | Thousand Acre Feet |
| kcfs | kilo (thousands) of cubic feet per second |
| ksfd | thousand second foot day |
| kV | Kilovolt (1000 volts) |
| kW | Kilowatt (1000 watts) |
| kWh | Kilowatthour |
| L/R Balance | Load/Resource Balance |
| LDD | Low Density Discount |
| LLH | Light Load Hour |
| LME | London Metal Exchange |
| LOLP | Loss of Load Probability |
| m/kWh | Mills per kilowatthour |
| MAF | Million Acre Feet |
| MC | Marginal Cost |
| MCA | Marginal Cost Analysis |
| MCS | Model Conservation Standards |
| MIP | Minimum Irrigation Pool |
| MMBTU | Million British Thermal Units |
| MOP | Minimum Operating Pool |

| | |
|---|---|
| MORC | Minimum Operating Reliability Criteria |
| MPC | Montana Power Company |
| MT | Market Transmission (rate) |
| MW | Megawatt (1 million watts) |
| MWh | Megawatthour |
| NCD | Non-Coincidental Demand |
| NEPA | National Environmental Policy Act |
| NERC | North American Electric Reliability Council |
| NF | Nonfirm Energy (rate) |
| NFRAP | Nonfirm Revenue Analysis Program (model) |
| NLSL | New Large Single Load |
| NMFS | National Marine Fisheries Service |
| NOB | Nevada-Oregon Border |
| NORM | Non-Operating Risk Model |
| Northwest Power Act | Pacific Northwest Electric Power Planning and Conservation Act |
| NR | New Resource Firm Power (rate) |
| NRU | Northwest Requirements Utilities |
| NT | Network Transmission |
| NTP | Network Integration Transmission (rate) |
| NTSA | Non-Treaty Storage Agreement |
| NUG | Non-Utility Generation |
| NWPP | Northwest Power Pool |
| NWPPC C&R | Northwest Power Planning Council Cost and Revenues Analysis |
| NWPPC | Northwest Power Planning Council |
| O&M | Operation and Maintenance |
| OMB | Office of Management and Budget |
| OY | Operating Year (Aug-Jul) |
| PA | Public Agency |
| PBL | Power Business Line |
| PDP | Proportional Draft Points |
| PDR | Power Discharge Requirement |
| PF | Priority Firm Power (rate) |
| PFBC | Pressurized Fluidized Bed Combustion |
| PMDAM | Power Marketing Decision Analysis Model |
| PNCA | Pacific Northwest Coordination Agreement |
| PNRR | Planned Net Revenues for Risk |
| PNUCC | Pacific Northwest Utilities Conference Committee |
| PNW | Pacific Northwest |
| POD | Point of Delivery |
| PPC | Public Power Council |
| PSE | Puget Sound Energy |
| PSW | Pacific Southwest |
| PTP | Point to Point |
| PUD | Public or People's Utility District |
| PURPA | Public Utilities Regulatory Policies Act |
| RAM | Rate Analysis Model (computer model) |

| | |
|---|---|
| Reclamation | Bureau of Reclamation |
| REP | Residential Exchange Program |
| RFP | Request for Proposal |
| RiskMod | Risk Analysis Model (computer model) |
| RiskSim | Risk Simulation Model |
| RL | Residential Load (rate) |
| RMS | Remote Metering System |
| ROD | Record of Decision |
| RPSA | Residential Purchase Sale Agreement |
| RTF | Regional Technical Forum |
| SCCT | Single-Cycle Combustion Turbine |
| SS | Share-the-Savings Energy (rate) |
| STREAM | Short-Term Evaluation and Analysis Model |
| TAC | Targeted Adjustment Charge |
| TACUL | Targeted Adjustment Charge for Uncommitted Loads |
| TBL | Transmission Business Line |
| tcf | Trillion Cubic Feet |
| TCH | Transmission Contract Holder |
| TPP | Treasury Payment Probability |
| TRL | Total Retail Load |
| UDC | Utility Distribution Company |
| URC | Upper Rule Curve |
| USFWS | U.S. Fish and Wildlife Service |
| VB | Visual Basic |
| VBA | Visual Basic for Applications |
| VOR | Value of Reserves |
| WEFA | WEFA Group (Wharton Econometric Forecasting Associates) |
| WPRDS | Wholesale Power Rate Development Study |
| WSCC | Western Systems Coordinating Council |
| WSPP | Western System Power Pool |
| WY | Watt-Year |

# 1.0 INTRODUCTION

## 1.1 Background

In this rate proceeding, the proposed adjustments to the Firm Power Products and Services (FPS-96) rate schedule clarify the FPS-96 rate schedule and establish posted rates that will apply to the capacity without energy product. Prior to the 1996 rate case, the Contract Rate demand charge in Bonneville Power Administration's (BPA) Surplus Firm Power rate schedules (i.e., SP-93, SP-91, SP-89, and SP-86) was set to accommodate all of the following products: (1) firm energy; (2) firm capacity without energy; and (3) firm power. The rates ranged from $5.79/kW-month in 1987 to $6.09/kW-month in 1993. The FPS-96 rate schedule replaced the SP-93 rate schedule. However, due to significant product unbundling which occurred in 1996, the FPS-96 rate schedule includes a Contract Rate demand charge of only $0.87/kW/month. Unlike the predecessor rate schedules, this rate was designed and priced to be used exclusively in conjunction with the purchase of the separate energy product included in the same section of the FPS-96 rate.

As part of the 1996 product unbundling, separate sections for the capacity without energy product were included in both the Priority Firm Power (PF-96) and New Resource Power (NR-96) rate schedules. Although clarifying language was mistakenly omitted from the FPS-96 rate schedule itself, BPA made it clear in other rate case documentation that it intended to sell the capacity without energy product under the FPS-96 rate schedule only at negotiated prices that would not be based on the Contract Rate demand charge. Section 4.7 of BPA's Final 1996 Wholesale Power Rate Development Study (WPRDS), WP-96-FS-BPA-01 states:

> "Firm capacity without energy is available under PF-96 and NR-96 rate schedules for Computed Requirements customers purchasing under the 1981 Contract. Firm capacity without energy is also available under the FPS-96 rate schedule, at negotiated prices and terms that may vary from those in the PF and NR rate schedules."

In nearly identical language, the 1996 Record of Decision also confirms that the capacity without energy product would be offered under the FPS-96 rate at negotiated, rather than posted, rates. 1996 Final Rate Proposal, Administrator's Record of Decision (WP-96-A-02) at 323.

Long before establishment of the FPS-96 rate schedule, BPA had entered into a small number of power sales contracts that provided for BPA to supply, under specified circumstances, capacity without energy to be priced under the Contract Rate demand charge section of the then applicable Surplus Firm Power rate schedule. As noted previously, the FPS-96 rate schedule is the nominal successor to prior Surplus Firm Power rate schedules, but it is not designed to accommodate pricing the product in that manner. Issues related to these individual contracts were not raised by parties to the 1996 rate proceeding. At the time BPA made a final decision to negotiate rates for capacity without energy under the FPS-96 rate, there was no obvious indication of any conflict with individual provisions in a few surplus power sales contracts which had used a previous Contract Demand rate as the basis for a posted rate for that product.

As designed, the Contract Demand rate was intended to be used only in conjunction with a firm power sale. Under the FPS-96 rate schedule, such transactions would always require payment of the additional energy charge, which was designed to reflect seasonal and diurnal effects on the value of energy. Because the capacity without energy product typically permits flexibility with respect to return energy, this value would not be recovered through the current Contract Demand rate standing alone. Consequently, the Contract Demand rate is not an appropriate vehicle for pricing the capacity without energy product.

The purpose of this proceeding is to correct this error. Because some contracts may require a posted, as opposed to a negotiated, rate for capacity without energy, BPA is proposing to amend the FPS-96 rate schedule to include a seasonally and diurnally adjusted rate for the capacity without energy product. This step is necessary to correct an inadvertent oversight that could distort the revenue requirement approved by FERC, change the cost allocations adopted by BPA, and provide an extraordinary windfall to one customer class at the expense of others.

## 1.2 Procedural History of this Rate Proceeding

Section 7(i) of the Northwest Power Act, 16 U.S.C. §839e(i), requires BPA to establish its wholesale power and transmission rates according to certain procedures. These procedures include, among other things, issuance of a Federal Register Notice announcing the proposed rates; one or more hearings; the opportunity to submit written views, supporting information, questions, and arguments; and a decision by the Administrator based on the record. Proceedings conducted pursuant to §7(i) are governed by BPA's *Procedures Governing Bonneville Power Administration Rate Hearings*, 51 Fed. Reg. 7611 (1986) (hereinafter Procedures).

On August 13, 1999, BPA filed notice in the Federal Register (FRN) that it was proposing to amend the FPS-96 rate schedule pursuant to §1010.10 of the Procedures. 64 Fed. Reg. 44362 (1999). BPA's initial proposal was published on August 24, 1999. Testimony, a study and documentation, along with the proposed changes to the FPS-96 rate schedule, were provided in support of the initial proposal.

A prehearing conference was held on August 24, 1999. At the conference parties agreed upon modifications to the schedule included in the FRN. The most important of the adjustments was an agreement among the parties to extend the date for publishing the Final Record of Decision (ROD) from December 6, 1999, to January 18, 2000. In order to make this adjustment, written approval of the Administrator was required. The Administrator approved the schedule changes on August 27, 1999.

The parties' direct cases were due on October 16, 1999, but the deadline was extended until October 27, 1999, after Southern California Edison (SCE) sought additional time to file its direct case. SCE was the only party to file a direct case in this proceeding. On November 17, 1999, SCE sought leave to file supplemental testimony. This request was granted by order of the Hearing Officer on November 19, 1999. On November 19, 1999, BPA filed its rebuttal testimony. Cross-examination was held on November 22 and 23, 1999. SCE filed its initial brief on December 2, 1999. The Administrator issued a Draft Record of Decision (DROD) on

December 17, 1999. SCE filed its Brief on Exceptions on January 10, 2000. The Final Record of Decision was originally scheduled for release on January 18, 2000. However, due to other demands on BPA staff caused by a an ongoing general power rate proceeding, the Administrator authorized a delay until now.

## 1.3 Legal Guidelines Governing Establishment of Rates

Section 6 of the Bonneville Project Act (Project Act), 16 U.S.C. § 832e, requires that the Administrator prepare schedules of rates and charges for electric energy sold to purchasers. Under the Project Act, rate schedules become effective upon confirmation and approval by the Federal Power Commission (succeeded by the Federal Energy Regulatory Commission (FERC)). Section 6 of the Project Act directs the Administrator to establish rates with a view to encouraging the widest possible diversified use of electric energy. Section 7 of the Project Act, 16 U.S.C. § 832f, provides that rate schedules are to be established having regard to the recovery of the cost of producing and transmitting electric energy, including amortization of the capital investment over a reasonable period of years.

The Federal Columbia River Transmission System Act, 16 U.S.C. § 838 (Transmission System Act), contains requirements similar to those of the Project Act. Section 9 of the Transmission System Act, 16 U.S.C. § 838g, provides that rates shall be established: (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates consistent with sound business principles; (2) with regard to the recovery of the cost of producing and transmitting electric power, including amortization of the capital investment allocated to power over a reasonable period of years; and (3) at levels that produce such additional revenues as may be required to pay when due the principal, premiums, discounts, expenses, and interest in connection with bonds issued under the Transmission System Act.

The Flood Control Act of 1944 (Flood Control Act) contains ratemaking requirements similar to the Project Act and the Transmission System Act. Section 5 of the Flood Control Act directs that rate schedules should encourage the most widespread use of power at the lowest possible rates to consumers consistent with sound business principles. 16 U.S.C. § 825s. Section 5 also provides that rate schedules should be drawn having regard to the recovery of the cost of producing and transmitting electric energy, including the amortization of the Federal investment over a reasonable number of years.

In addition to the Bonneville Project Act, the Transmission System Act, and the Flood Control Act, the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839 (Northwest Power Act), provides numerous rate directives. Section 7 of the Northwest Power Act directs the Administrator to establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Rates are to be set to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (FCRPS) (including irrigation costs required to be repaid by power revenues) over a reasonable period of years. 16 U.S.C. § 839e(a)(1). Section 7 also contains rate directives describing how rates for individual customer groups may be derived.

### 1.4 Broad Ratemaking Discretion Vested in the Administrator

The Administrator has broad discretion to interpret and implement statutory standards applicable to ratemaking. These standards focus on cost recovery but they do not restrict the Administrator to any particular rate design methodology or theory. *See Pacific Power & Light v. Duncan*, 499 F. Supp. 672 (D.C. Or. 1980); *accord City of Santa Clara v. Andrus*, 572 F.2d 660, 668 (9th Cir. 1978) ("widest possible use" standard is so broad as to permit "the exercise of the widest administrative discretion"); *Electricities of North Carolina v. Southeastern Power Admin.*, 774 F. 2d 1262, 1266 (4th Cir. 1985). In addition, section 7(f) of the Northwest Power Act provides that "[n]othing in this Act prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms." 16 U.S.C. §839e(f).

The United States Court of Appeals for the Ninth Circuit has also recognized the Administrator's ratemaking discretion. *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101, 1120-29 (9th Cir. 1984) ("[b]ecause BPA helped draft and must administer the Northwest Power Act, we give substantial deference to BPA's statutory interpretation"); *PacifiCorp v. F.E.R.C.*, 795 F.2d 816, 821 (9th Cir. 1986) ("BPA's interpretation is entitled to great deference and must be upheld unless it is unreasonable"); *Atlantic Richfield Co. v. Bonneville Power Admin.*, 818 F.2d 701, 705 (9th Cir. 1987) (BPA's rate determination upheld as a "reasonable decision in light of economic realities"); *Aluminum Company of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 389 (1984) ("The Administrator's interpretation of the Regional Act is to be given great weight"); *Dep't of Water and Power of the City of Los Angeles v. Bonneville Power Admin.*, 759 F.2d 684, 690 (9th Cir. 1985) ("Insofar as agency action is the result of its interpretation of its organic statutes, the agency's interpretation is to be given great weight").

### 1.5 Confirmation and Approval of Rates

BPA rates become effective upon confirmation and approval by FERC. 16 U.S.C. § 839e(a)(2). FERC's review is appellate in nature, and is based on the record developed by the Administrator. *United States Dep't of Energy--Bonneville Power Admin.*, 13 F.E.R.C. ¶ 61,157, 61,339 (1980). The Commission is not authorized to modify rates proposed by the Administrator, but may confirm, reject or remand them. *United States Dep't of Energy--Bonneville Power Admin.*, 23 F.E.R.C. ¶ 61,378, 61,801 (1983).

With respect to all rates other than those for sales of nonfirm energy outside the Pacific Northwest and rates for transmission access ordered by FERC, FERC determines whether: 1) rates are sufficient to assure repayment of the Federal investment in the FCRPS over a reasonable number of years after first meeting BPA's other costs; 2) rates are based on BPA's total system costs; and 3) transmission rates equitably allocate the cost of the Federal transmission system between Federal and non-Federal power using the system. 16 U.S.C. § 839e(a)(2). *See United States Dep't of Energy--Bonneville Power Admin.*, 23 F.E.R.C. ¶ 61,378 (1983).