In its order giving final approval to BPA's 1987 rates, FERC summarized the scope of its review as follows:

> In *Central Lincoln Peoples' Utility District v. Johnson*, the court interpreted the Northwest Power Act as setting a narrow scope for the Commission review of Bonneville's regional wholesale power and transmission rates. The Commission's review of these rates is limited to a determination of whether they meet the three specific, limited requirements of section 7(a)(2): (1) the rates must be sufficient to assure repayment of the federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting Bonneville's other costs; (2) the rates must be based on Bonneville's total system costs; and (3) the transmission rates must equitably allocate the cost of the federal transmission system between federal and nonfederal use of the system. Under this narrow review, *the Commission does not address either the rate design or cost allocation between customer classes except as they relate to the equitable allocation of transmission costs* between federal and nonfederal users of the federal transmission system.

*United States Dep't of Energy--Bonneville Power Admin.*, 54 FERC ¶ 61,235, 61,691 (1991) (*emphasis added*)(*citing* 735 F.2d 1101, at 1115 (9th Cir, 1984)). Moreover, FERC has indicated that its regulatory responsibility focuses on the overall cost/revenue relationship of BPA rate schedules in the aggregate, not the merits of each individual rate schedule. 18 CFR §300.21(c)(1); *United States Dep't of Energy--Bonneville Power Admin.*, 36 FERC ¶ 61,350, 61,849 (1986).

# 2.0 SUBSTANTIVE ISSUES

## 2.1 Introduction

In this section, BPA identifies key substantive issues, SCE's and BPA's positions on each issue, and the Administrator's final decision on each issue.

## 2.2 Use of Marginal Cost Analysis

***Issue***

*Whether BPA can use marginal cost analysis to establish the rates for a capacity without energy product.*

**Parties' Position**

In its Brief on Exceptions, SCE argues that BPA is improperly trying to recover market costs in the rates proposed in FPS-96R. FPS-96R-B-SO-01, at 16. SCE argues that BPA has not shown it does not have sufficient surplus capacity to meet its obligations under the SCE contract. *Id.* SCE contends that in both the 1996 and 2002 rate cases BPA has stated that it has sufficient surplus capacity to serve SCE's contract. *Id.* SCE also notes that there has been no notice of insufficiency. Thus, SCE argues, it is inappropriate to use the proxy plant approach because BPA is not presently required to purchase the resource. *Id.*

SCE also maintains that BPA's reliance on Northwest Power Act section 7(f) is misplaced because the statute does not allow for market based rates. *Id.* at 18. Rather, SCE contends that its contract with BPA establishes how the product should be priced. SCE alleges further that BPA's pricing methodology is designed to overcollect BPA's costs and thereby discourage SCE from exercising its contract rights. *Id.* at 17.

For these reasons, SCE concludes that surplus capacity prices must be based on BPA's costs and the NR-96 rate schedule is proposed as a surrogate. *Id.* According to SCE, BPA did not present information regarding the market costs of the resources on the West Coast to support not adopting the NR-96 rate schedule. *Id.* at 19. Moreover, SCE argues there is no evidence of market research or comparison of product characteristics to support the proposed pricing. *Id.* In fact, SCE argues that BPA is attempting to establish a price for capacity using a market forecast where no market exists. *Id.*

SCE raises several other arguments regarding the choice of pricing methodology. SCE asserts that such an approach is inconsistent with section 7(k) of the Northwest Power Act. 16 U.S.C. §839e(k). *Id.* at 17. SCE also argues that BPA is claiming that its actual costs and marginal costs are the same. *Id.* SCE states that BPA is not using the same rate development methodology in the WP-02 rate proceeding because that methodology would not withstand the scrutiny of the parties in that proceeding. SCE also believes that BPA's rate methodology inappropriately uses only the first year costs of a combined-cycle combustion turbine (CCCT) in

the development of the proposed rates. *Id.* SCE further maintains that since BPA admits it does not know the costs to produce the product, it is violating sound business practices. *Id.*

**BPA's Position**

BPA has established posted rates for capacity without energy based on the marginal costs of production. FPS-96R-E-BPA-01, at 3-4. BPA is not asserting that its actual costs of providing the product will be equal to the marginal costs. FPS-96R-E-BPA-05, at 15-16. BPA is using marginal costs to set these rates for the reasons stated in its rebuttal testimony. *Id.* at 13. In its analysis, BPA relied on the marginal cost of a CCCT because it represents the incremental resource on the West Coast. FPS-96R-E-BPA-03, at 5. As such, the cost of the CCCT sets the costs, on the margin, of capacity on the West Coast. *Id.* at 15. BPA believes the proxy plant approach to pricing at the margin for the capacity without energy product is appropriate pricing for this product. *Id.* at 15. Contrary to SCE's assertion, BPA did not use only the first year costs of a CCCT to price this product. *Id.* at 13.

BPA disagrees with SCE's assertion that it must demonstrate an insufficient supply of capacity or show some need to purchase capacity on the market to fulfill its obligations in order to price this product in the manner proposed. BPA interprets its ratemaking directives as not limiting its rates to strict cost of service standards. BPA maintains that the discretion provided by section 7(e) ensures that rates for each class of customer recovers appropriate costs, and that the sum of the rates for all customer classes recovers, in the aggregate, the Administrator's total system costs.

***Evaluation***

BPA has relied on marginal cost analysis based on the incremental cost resource for power products on the West Coast. *Id.* at 15. Within that market, the incremental resource is a CCCT. *Id.* The use of a CCCT, therefore, is a reasonable way to determine the incremental, or marginal, costs of capacity without energy. BPA's methodology uses the incremental cost of a CCCT based on the costs of an actual plant purchased in actual markets. Tr. 34-36. Thus, the rates for capacity without energy developed in this proceeding have been established using the costs of the type of facility that is applicable to providing this type of power product. Procter, *et al.*, FPS-96R-E-BPA-05, at 15. BPA is not asserting that its actual out-of-pocket costs to serve this particular contract will equal the capital costs of the CCCT used to estimate the rates in this analysis. *Id.* By developing rates for this product using the type of resource companies will likely rely on in the future to meet power requirements, BPA is simply following sound business principles, recognizing the risks inherent in such a product, and maintaining its statutory obligation to recover costs and repay Treasury. *Id.*

SCE contends this approach to pricing is inconsistent with the Northwest Power Act. FPS-96R-B-SO-01, at 17. SCE provides no factual or legal analysis to support its position and such an argument lacks merit. The Northwest Power Act grants the Administrator discretion in the design of rates. This broad discretion is found in section 7(e) of the Act, 16 U.S.C. § 839e(e), which provides:

> Nothing in this Act prohibits the Administrator from establishing, in rate schedules of general application, a uniform rate or rates for sale of peaking capacity or from establishing time-of-day, seasonal rates, or other rate forms.

The Ninth Circuit has recognized this authority, finding that "the statute does not require BPA to impose any particular type of rate on its customers. Rather it restricts BPA only to 'sound business principles' in setting rates to meet its revenue requirements." *City of Seattle v. Johnson*, 813 F.2d 1364, 1367 (9th Cir. 1987). Thus, the Administrator's primary rate setting obligation is to set rates to meet BPA's revenue requirements, consistent with sound business principles. *See* 16 U.S.C. § 839e(a)(1).

In fact, the Ninth Circuit has previously approved FERC confirmation of rates--much like the ones at issue here--that were designed "to price electricity on the basis of the cost of producing it in the future, rather than on the embedded costs of production." Central Lincoln Peoples' Utility District. v. Johnson, 735 F.2d 1101, 1121 (9th Cir.1984). The Court noted that the Northwest Power Act "specifically allows the Administrator latitude in choosing rate forms" and has, as a main purpose, encouraging "conservation and efficiency." *Id.* at 1122 (*citing* 16 U.S.C. § 839e(e) and 16 U.S.C. § 839(1). The point of such rate-making is to "encourage efficiency and conservation by enabling customers to make informed consumption decisions based on the costs of producing each type of electric power." *Id.* at 1121. This is exactly the same logic used to develop the rate for capacity without energy in this proceeding. Despite SCE's assertions to the contrary, it is a proper exercise of statutory rate-making authority that "permits rate forms' designed to give BPA customers price signals'." *Id.* at 1122 (*citing* H.R. Rep. No. 976, Part II, 96th Cong., 2d Sess. (1980) at 53).

Section 7(f) also specifically provides the Administrator broad discretion in the development of rates for surplus power sales. Section 7(f) does not require that rates for regional sales of surplus firm power be limited to the embedded cost of system resources and purchased power costs. Rather, the provision permits the Administrator to set rates for such sales "based upon the cost . . .of additional resources which, in the determination of the Administrator, are applicable to such sales."

Language in other BPA rate directives similar to that found in section 7(f) has been held not to limit the Administrator's broad discretion to set rates. In *Pacific Power & Light v. Duncan*, 499 F. Supp. 672 (D. Or. 1980), plaintiffs contended that section 7 of the Bonneville Project Act imposed a cost of service standard. 16 U.S.C. § 832f. That section requires, in part, that rates shall be set "having regard to the recovery of the cost of producing" the power sold, and be "based upon an allocation of costs." The court rejected the argument:

> Despite all the references to cost, the two quoted passages do not support an inference that cost is the <u>only</u> basis upon which rates may be computed. The qualifying phrases "having regard to," "may include," and "to the maximum extent practicable," indicate that the discretion granted in 16 U.S.C. §§ 825s, 832e, 838g . . . was not significantly altered by the requirement to <u>consider</u> costs in calculating rates.

*Id.* at 683 (emphasis in original). SCE's interpretation to the contrary would frustrate the Administrator's section 7(a) cost recovery obligations and create conflict with BPA's obligation to establish rates consistent with sound business principles. 16 U.S.C. § 839e (a)(1). The "based upon" language in section 7(f) cannot reasonably be interpreted to require that the price be capped at BPA's embedded costs, in part because BPA's embedded cost for any given sale of surplus power is not susceptible to rote calculation, and in part because the ultimate amount of recovery is generally dictated by market conditions. In some cases, market conditions will permit BPA to recover only a portion of its embedded costs. Thus, capping rates in the manner proposed by SCE would deny BPA potential opportunities to offset market-dictated below cost sales with above market sales.

Finally, SCE asserts that BPA is setting the rate for capacity without energy inconsistent with section 7(k) of the Northwest Power Act. FPS-96R-B-SO-01, at 17. However, the rate setting procedures contained in section 7(k) apply only to the establishment of rates for the sale of extra-regional nonfirm energy. 16 U.S.C. § 839e(k). Section 7(k) does not apply to rates for the sale of surplus firm energy and capacity. *See United States Dep't of Energy--Bonneville Power Admin.*, 23 F.E.R.C. ¶ 61,161, 61,354 (1983).

***Decision***

*BPA is properly relying on marginal cost analysis to set posted rates for capacity without energy. Section 7(k) of the Northwest Power Act does not apply to these rates.*

## 2.3 Setting the Rate for Capacity Without Energy Equal to NR-96

***Issue***

*Whether the rate for capacity without energy in FPS-96R should be set equal to the rates for capacity without energy contained in the NR-96 rate schedule.*

**Parties' Position**

SCE's Brief on Exceptions argues that there is no distinction between the capacity without energy product under SCE's contract and capacity without energy under the NR-96 rate schedule. FPS-96R-R-SO-01, at 29. Therefore, SCE concludes that the FPS-96 rates for a capacity without energy product should be the same as the rates established for the capacity without energy product in the NR-96 rate schedule for the term of the NR-96 rates, i.e., through September 30, 2001. FPS-96R-B-SO-01, at 17. For the remaining five years of the FPS-96 rate schedule (i.e., through September 30, 2006), SCE recommends that BPA either negotiate a new rate for the remainder of the term of SCE's contract or initiate a rate proceeding similar to this proceeding.

Moreover, SCE argues that BPA has failed to articulate a sound rationale for changing methods from those underlying the pricing of this product in BPA's 1996 rate proceeding. *Id.* at 18. SCE alleges that BPA is attempting to extract a significantly higher price from SCE than BPA charges other customers for the same product and that nothing in its contract with BPA permits such a

differential. *Id.* SCE also contends that BPA has admitted that the rate for capacity without energy in NR-96 is the appropriate successor rate for SCE's Option Capacity based upon statements made in a separate contract arbitration. *Id.* at 20.

**BPA's Position**

BPA's rebuttal testimony declined to adopt SCE's proposal to use the NR-96 rate in the manner suggested by SCE. FPS-96R-E-BPA-05, at 5-6. BPA is proposing a rate of general applicability to be effective through September 30, 2006. 64 Fed. Reg. 44362 (1999). It is BPA's position that using the approach proposed by SCE would require BPA to ignore new information about the market cost of resources on the West Coast. Procter, *et al.*, FPS-96R-E-BPA-05, at 13. BPA believes that SCE's proposal would result in less efficient use of existing resources than will be the case when capacity without energy prices are set equal to the cost of the incremental resources on the West Coast system. *Id.*

BPA asserts that the proposed rates are not an attempt to extract a higher price than BPA charges for the same product from other customers. BPA stated in its rebuttal testimony that the rates being proposed are rates generally applicable to future sales of capacity without energy under the FPS-96 rate schedule. *Id.* at 3.

BPA also notes that a "baseball" style arbitration is far removed from a rate making proceeding and the issues there are limited to a prior delivery period that is not even subject to the rates being developed here. Thus, BPA argues that any statements made in that context are not germane. FPS-96R-E-BPA-06; FPS-96R-E-BPA-07; and FPS-96R-E-BPA-09.

***Evaluation***

SCE's case has not provided any analytical support substantiating the contention that the rate for capacity without energy in the NR-96 rate schedule is more appropriate than the proposed rates. SCE merely argues that since those rates already exist, the only equitable thing to do is for BPA to apply them until the NR-96 rates expire in 2001. FPS-96R-B-SO-01, at 17. This argument lacks analytical justification and would require BPA to ignore any new information that impacts the development of rates in the market today. Procter, *et al.*, FPS-96R-E-BPA-05, at 5. By contrast, BPA has presented arguments supported by evidence in the record demonstrating that it is more reasonable to develop a rate for this product using the incremental cost of the marginal resource. Procter, *et al.*, FPS-96R-E-BPA-05, at 15-19; and Procter, *et al.*, FPS-96R-E-BPA-03, at 1-5.

Further, adopting SCE's proposal would not utilize existing resources efficiently since it would under-price the product relative to a more valid approach to determining the incremental, or marginal cost, of this product. Procter, *et al.*, FPS-96R-E-BPA-05, at 13. Nor would setting the rates equal to NR-96 until September 30, 2001, achieve BPA's objective of establishing posted rates for a capacity without energy product in FPS-96 for the remaining period of time for which the FPS-96 rate schedule is in effect (i.e., through September 30, 2006). 64 Fed. Reg. 44362 (1999).

As to the argument that BPA cannot substantiate the rates being proposed in BPA's direct case, BPA has clearly identified the steps taken in the development of its rates. FPS-96R-E-BPA-01, at 4. BPA addressed why it is reasonable to use a CCCT to estimate the costs used to develop these rates. Procter, *et al.*, FPS-96R-E-BPA-03, at 5. The focus of BPA's rationale has been the fact that the incremental resource on the West Coast system is a CCCT. Procter, *et al.*, FPS-96R-E-BPA-05, at 15. In turn, the fixed costs of a CCCT form a reasonable basis for determining the incremental cost of a capacity product--the fixed costs being the cost of the capacity of the incremental resource. Procter, *et al.*, FPS-96R-E-BPA-03, at 5.

BPA also outlined the difference between instantaneous and sustained peaking concepts in its rebuttal testimony. Procter, *et al.*, FPS-96R-E-BPA-05, at 3-5. In that testimony, BPA explained the historical context of rate development in BPA's 1996 proceeding and how it impacts the development of rates in this proceeding. As BPA explained:

> In 1987, BPA did not distinguish between "capacity" and "demand" in its marginal cost analysis (MCA) or its power products. In 1987, the demand charge was based on BPA's generation costs allocated to demand, or capacity, spread across the peak period. Therefore, the demand charge in the contract rate section of the SP-87 rate schedule contains a rate for a sustained peaking capability power product.
>
> In contrast, in 1996, the MCA for the first time distinguished between Demand and Capacity. BPA's 1996 Final MCA defined capacity as the maximum number of kilowatthours (kWh) a utility must be prepared to produce within the heavy load hours during each week of a given month. In contrast, demand was defined as a number of kilowatthours that a utility must be prepared to produce during the hour of its monthly peak energy load. The difference between capacity and demand, as defined in the MCA, is the difference between being prepared to meet sustained and instantaneous peaks. This distinction did not exist back in 1987 when the SP-87 rate schedule was developed and SCE's contract with BPA was negotiated. This is one reason why BPA has asserted that the $0.87/kW-mo demand charge in the contract rate section of FPS-96 is not the correct rate for the Option Capacity product in SCE's contract.
>
> To reiterate, the demand charge in WP-96 reflects a new power product--instantaneous peaking. In turn, the $0.87/kW-mo. for this instantaneous peaking product was posted as the demand charge component of the contract rate of a firm power sale. This is why the $0.87/kW-mo. demand charge is not the correct rate for a capacity without energy product. *Id.*

SCE's final argument in support of applying the NR-96 rate is the contention that BPA's response to an interrogatory, in a separate contract arbitration case, supports the application of the NR-96 rate. FPS-96R-B-SO-01, at 20. While a cursory reading of the interrogatory response could allow such an impression, SCE fails to provide any context by way of explaining the nature of that arbitration proceeding. Doing so demonstrates that SCE's contention is without merit. FPS-96R-E-BPA-06; FPS-96R-E-BPA-07 and FPS-96R-E-BPA-09.

The arbitration between BPA and SCE is for the past delivery year (May-September 1999), a period that does not involve future deliveries that would be covered by the proposed rate. *Id.* In addition, the arbitration is "baseball" arbitration where each side is required to assert a position; the arbitrator must select one of the two proposals and cannot fashion an alternative. *Id.* BPA and SCE were required to identify for the arbitrator specific rates that they believe should apply to capacity without energy sales under the contract. *Id.* SCE identified the $0.87 demand charge as the appropriate rate. BPA has proposed only that the average rate for capacity without energy in NR-96 be adopted as the remedy for the short-term issue of the 1999 delivery period. *Id.*

***Decision***

*BPA is not required to set the rates for capacity without energy in the FPS-96R rate schedule equal to the existing rates for capacity without energy in NR-96, nor would it be appropriate to do so, given BPA's objectives and responsibilities.*

**2.4 Use of New York Mercantile Exchange (NYMEX)**

***Issue***

*Whether BPA's use of NYMEX prices to seasonally shape the rates is appropriate.*

**Parties' Position**

SCE argues that the CCCT costs are not accurately portrayed because BPA relied upon only a single day of NYMEX numbers as the basis for shaping the prices. FPS-96R-B-SO-01, at 21; and FPS-96R-R-SO-01, at 25. Further, SCE argues that BPA itself concedes that the NYMEX index is inappropriate because BPA does not use the NYMEX index in its 2002 rate proposal. FPS-96R-B-SO-01 at 22. SCE also argues that BPA offered no proof that the NYMEX numbers for the year 2000 would be applicable during 2001-2006. *Id.* SCE also claims that BPA erred in extrapolating out six years using a single NYMEX 2000 forecast. *Id.*

**BPA's Position**

BPA believes it was appropriate to use NYMEX futures prices to seasonally shape the fixed costs of a CCCT. Procter, *et al.*, FPS-96R-E-BPA-03, at 5. BPA believes that the use of a single day to shape the prices is reasonable.

***Evaluation***

SCE's argument reflects a fundamental misunderstanding about how the NYMEX prices were used in the rate development process. BPA explained the rationale for using the NYMEX numbers in its direct case. FPS-96R-E-BPA-01, at 4. In addition, the description found in the study is elaborated on in testimony. Procter, *et al.*, FPS-96R-E-BPA-03, at 4-5. The NYMEX prices had nothing to do with the pattern of CCCT costs across time, as SCE's argument seems to suggest. *Id.* The patterns of CCCT costs across time are embedded in the levelization of those costs. The levelization of CCCT costs transforms a pattern of CCCT costs across time into a flat,

level CCCT cost. FPS-96R-E-BPA-01, at 4. The sole function of the NYMEX prices is to develop a set of seasonal rates for capacity without energy using the seasonal pattern contained in the FPS-96 rate schedule. *Id.* How BPA went about converting the levelized CCCT cost using the NYMEX numbers was explained in both the study (Procter, *et al.*, FPS-96R-E-BPA-01, at 4) and the testimony in BPA's direct case (Procter, *et al.*, FPS-96R-E-BPA-03, at 5).

Using NYMEX to seasonalize the CCCT levelized costs that are flat across time is reasonable. SCE presents no testimony proposing the use of some other technique to seasonally adjust rates. SCE merely asserts that the method BPA selected is wrong on its face and implies that BPA should use more current data. Grosz, *et al.*, FPS-96R-E-SO-01, at 22. If BPA were to use more current NYMEX prices the result would only be a different scaling of the levelized CCCT costs across seasons. Different NYMEX numbers have no effect on the levelized CCCT costs. Procter, *et al.*, FPS-96R-E-BPA-03, at 4-5. BPA simply scaled the CCCT costs into seasonal values using NYMEX. Further, BPA did not extrapolate the NYMEX numbers from June 1999 to the period 2001-2006. *Id.*

***Decision***

*Use of NYMEX for the sole purpose of developing a seasonal pattern to apply to the levelized CCCT costs is a reasonable method of portraying the CCCT costs for the seasonally adjusted rate for capacity without energy.*

### 2.5 Developing a Seasonal Pattern to the CCCT Costs

***Issue***

*Whether it is appropriate to develop a seasonal pattern using the CCCT costs.*

**Parties' Position**

In SCE's Brief on Exceptions, SCE argues that it is not appropriate to seasonally adjust the CCCT costs. FPS-96R-R-SO-01, at 25. SCE contends that the cost of producing power does not vary seasonally. Therefore, seasonally adjusting the price is not reasonable. *Id.*

**BPA's Position**

BPA believes that it is reasonable to develop a set of rates for capacity without energy for FPS-96 using the same seasonality adjustments that were used in both the FPS-96 rate schedule as well as the seasonality used for capacity without energy in the NR-96 rate schedule.

***Evaluation***

SCE's contention that it is improper to seasonally adjust the proposed rates is not supported by any legal analysis. Section 7(e) of the Northwest Power Act grants the Administrator considerable rate design discretion. Section 7(e) provides that "[n]othing in this chapter prohibits the Administrator from establishing, in rate schedules of general application, a uniform

rate or rates for sale of peaking capacity or from establishing time of day, seasonal rates or other rate forms." 16 U.S.C. § 839e(e) (emphasis added). The seasonality adjustments for the proposed rate for capacity without energy are consistent with the adjustments made in other rate schedules for the same product. Thus, the proposed adjustments are appropriate.

***Decision***

*BPA's statutory rate directives specifically allow seasonally adjusted rates and the seasonally adjusted rate at issue here is a proper exercise of that authority.*

## 2.6 Link Between Pricing Capacity Without Energy and SCE's Contract

***Issue***

*Whether the capacity without energy product in this proceeding reflects the product purchased under SCE's contract.*

**Parties' Position**

SCE argues that the approach taken by BPA to develop a rate for capacity without energy mistakenly assumes that SCE only purchases capacity and not energy. FPS-96R-B-SO-01, at 22. SCE contends that BPA analysts did not take into consideration an aspect of the SCE contract in which BPA has the discretion to require SCE to return the energy. *Id.* SCE argues that BPA cannot require SCE to return the energy and then also price SCE's option capacity punitively. *Id.*

**BPA's Position**

BPA maintains it did not mistakenly assume that SCE only purchases capacity and not energy under its contract. Procter, *et al.*, FPS-96R-E-BPA-05, at 15. BPA stated that it was developing rates of general applicability and as such BPA was not merely pricing a product for SCE's contract. *Id.* It is BPA's position that the proposed rate for capacity without energy has been developed in a manner that is also consistent with the capacity without energy option under SCE's contract. *Id.*

***Evaluation***

SCE's contention that the rate proposed for FPS-96R does not sufficiently reflect the terms of SCE's contract for Option Capacity is not relevant to this proceeding. FPS-96R-B-SO-01, at 22. BPA is developing rates of general applicability that may apply to more than just the SCE contract. Procter, *et al.*, FPS-96R-E-BPA-05, at 3. The underlying premise of each of SCE's arguments is a contention that SCE's contract with BPA requires the Option Capacity to be priced in a particular fashion. Questions of this nature are matters of contract interpretation and lie outside the scope of this proceeding. What is at issue is whether the proposed rates are appropriate and have a sound analytical foundation. While BPA believes the rate will be applicable to the Option Capacity under the SCE contract, that issue is not relevant to this

proceeding. Any forthcoming legal dispute regarding applicablility of the rate to SCE's contract will take place elsewhere.

BPA is proposing rates for a capacity without energy product where the energy is returned to BPA. Procter, *et al.*, FPS-96R-E-BPA-05, at 18. The proposed rates were developed to apply to potential power sales under contracts other than SCE's. *Id.* at 3. By using a CCCT to develop rates for a capacity without energy product, BPA was able to mirror certain characteristics of the option capacity under SCE's contract. *Id.* at 15. In BPA's rebuttal testimony BPA stated:

> Q. *SCE appears to imply (Grosz, et al., FPS-96R-E-SO-03, at 16, lines 13-18) that BPA did not consider the product contained in SCE's contract when BPA set the rates contained in FPS-96R. Do you agree?*
>
> A. No. BPA did in fact consider the product SCE may purchase as Option Capacity in that contract. BPA used the fixed costs of a CCCT to price this product because a CCCT produces power in a fashion that is consistent with the Option Capacity under SCE contract (in addition to being consistent with incremental, or marginal cost, principles). Another reason BPA selected the fixed costs of a CCCT is as SCE states in its testimony the Option Capacity product in SCE's contract has no load shaping or load following associated with it. Grosz, *et al.*, FPS-96R-E-SO-03, at 16. BPA also wants to note that the product contained in SCE's contract is a fairly standard capacity without energy product and that, as BPA noted in section 5, the rates being developed in this proceeding would be applicable to any new contracts requiring a posted rate for a capacity without energy product, especially since after September 30, 2001, the FPS-96 rate schedule will be the only rate schedule which contains posted rates for capacity without energy.

Procter, *et al.*, FPS-96R-E-BPA-05, at 15.

If the energy is not returned, then the energy must also be paid for and the price of the energy is not included in the rates proposed in this proceeding. *Id.* at 18. To develop the energy charges, BPA would include fuel costs and other variable costs associated with operating the CCCT. *Id.* This is a fairly simple calculation and BPA could certainly add this to the rates proposed in this proceeding; but the resulting capacity and energy prices would be for a different product and a different type of power service than the product for which BPA is developing rates in this proceeding.

***Decision***

*Questions regarding the applicability of the proposed rates to SCE's contract are beyond the scope of this proceeding. The methodology BPA used, however, is a reasonable means to set a rate for a capacity without energy product.*

## 2.7 Equitable Pricing of Capacity Without Energy

***Issue***

*Whether BPA is establishing rates in this proceeding to apply to SCE that exceed rates charged for capacity without energy available to other customers.*

**Parties' Position**

SCE argues that the methodology used by BPA to develop the rates in this proceeding has not been used to develop rates for any other product. FPS-96R-B-SO-01, at 23. In support of its position, SCE states that BPA's witness, Mr. Bolden, testified that the methodology used to develop the proposed rates had not been used for any other rate except to price backup resources. *Id.* at 25. Moreover, SCE states that the methodology used to develop the proposed rate is different from the methodology employed in 1996 and that BPA has provided no justification for the change. *Id.*

SCE also asserts that the rates in this proceeding are excessive when compared to similar products for the remainder of the current rate period through September 30, 2001. *Id.* SCE also argues that BPA's other contracts for capacity without energy do not have prices as high as those being developed in this proceeding. *Id.* at 23-24. SCE believes these contracts demonstrate that the proposed rates are inequitable. *Id.*

SCE also asserts that BPA was incorrect when it stated in data response SO-BPA:90 that there is no basis for comparison between FPS-96R and FPS-96. *Id.* at 26. SCE then compares the $0.87/kW-month demand charge with what SCE refers to as a capacity charge of $6.29/kW-mo that appears to be about 36 percent lower than the rate proposed in BPA-05, Attachment C. *Id.* at 26-27. SCE also argues that SCE Exhibit 1 demonstrates that the capacity charge reflects the demand charge and the 50-hour per week charge (sustained peak). *Id.* at 26. SCE also argues that the WP-96 demand charge is $0.87/kW-month, and that there is a 50-hour per week charge (sustained peak) of $5.42 and a capacity charge of $6.29/kW-month. *Id.* at 26.

In SCE's Brief on Exceptions, SCE reargues the point that BPA cannot price a product dramatically different from the way it prices similar products sold to other customers. FPS-96R-R-SO-01, at 24. SCE believe that because BPA charges significantly less for similar products under the NR and PF rates schedules, the rates are therefore unsupportable. *Id.* SCE also contends in its Brief on Exceptions that the Administrator did not analyze the rates charged to others for similar products. *Id.* at 28. Finally, SCE also contends Gery Bolden, a BPA witness, admitted that this methodology used to set the rates was not used in any other rate case and since this fact was never acknowledged before cross examination the testimony should be stricken. *Id.* at 20.

**BPA's Position**

BPA believes the marginal cost analysis used to develop the proposed rates is appropriate for the product. Procter, *et al.*, FPS-96R-E-BPA-05, at 15-16. Contrary to SCE's assertions, BPA has