relied upon the same general methodology to develop rates and price power products. Tr. 197-200. BPA believes SCE misrepresents BPA's statements in cross-examination about how BPA has used this methodology in other matters by failing to fully explain the questions asked and the nature of the responses. Tr. 197-200. The argument that Mr. Bolden's testimony should be stricken is also without merit. To the extent SCE had a right to strike the testimony, all objections not made by the close of the hearing are waived.

BPA also believes its response to SO-BPA-90 was accurate and that it fully responded to all data requests. Grosz, *et al.*, FPS-96R-E-SO-03, Attachment 8. BPA maintains, as well, that any differences between the rate for capacity without energy under the proposed modification to the FPS-96 rate schedule and other rate schedule or contracts are well-founded and do not render the proposed rate unreasonable.

***Evaluation***

The methods relied upon by BPA in developing the rates contained in this proceeding are sound. The methodologies have been applied to develop other prices for products contained in other power contracts. Tr. 197-198. There is nothing unique about using a proxy plant approach to develop marginal costs. Procter, *et al.*, FPS-96R-E-BPA-05, at 15. There is nothing extraordinary about using the West Coast's incremental, or marginal, resource to estimate the costs of that service. These are straightforward methods. *Id.* Further, the fact that BPA changes its method over time is not exceptional either. BPA has provided a number of explanations for the use of a CCCT in this case. *Id.* at 19. BPA has also explained why it is inappropriate to simply apply rates from a different rate schedule to the FPS-96 rate schedule in this circumstance. *Id.* at 3-7.

SCE's assertion that BPA is inappropriately attempting to extract a significantly higher price from SCE, when compared to other customers, is simply false. SCE presents no information to substantiate this assertion. Furthermore, these rates are rates of general applicability available for any contracts for capacity without energy which require posted rates and are entered into after the proposed rates go into effect. *Id.* at 3. Second, SCE refers to several other contracts, which allegedly include capacity without energy products. Grosz, *et al.*, FPS-96R-E-SO-04, Attachment 2. SCE argues that the rate in this proceeding far exceeds the rates contained in those contracts. Grosz, *et al.*, FPS-96R-B-SO-01, at 23-25. However, what SCE fails to note is that these contracts have a fundamentally different approach to pricing. FPS-96R-E-SO-04, Attachment 2. The SCE contract uses a rate schedule for pricing the Option Capacity and, as a result, the rate for that product is inextricably tied to the fluctuations in rates in the rate schedule to which the contract is tied. All the other contracts referenced by SCE contain specifically identified fixed rates or formula rates. The fact that these other customers negotiated different terms cannot now be pointed to as evidence that BPA's methodology underlying the rates being developed in this proceeding lack merit.

SCE's reliance on the cross-examination testimony is also misplaced. A full review of the transcript demonstrates that Mr. Bolden's explanation goes well beyond the interpretation SCE wishes to give it.

Q. I made the distinction, it did not have to do with application, it had to do with the product, itself. Have you used this new methodology for any other customer that you have used in the FPS-96R case?

MR. BURGER: Mr. Bolden, do you understand the question?

A. (Mr. Bolden) We are not using this method to develop any other rate--is that the question? We did not develop any other rate using this particular method.

BY MS. FISHER:

Q. Did you use it to develop any other price for a product called capacity without energy?

A. (Mr. Bolden) Yeah. We used this--not currently using these exact numbers, but used the same method to develop a capacity market value that we used to evaluate other prospective contracts.

Q. I did not ask you that. I said have you used it, that is as of this date?

A. (Mr. Bolden) I have used the method, yes.

Tr. 197-198.

During redirect, the following exchange occurred;

BY MR. BURGER:

Q. Mr. Bolden, Ms. Fisher's last couple of questions related to the use of the CCCT analysis to price other products, and I believe you answered that you had never used it to price that product. That product meaning what?

A. (Mr. Bolden) The particular capacity without energy that is exercised and utilized in the manner that I am imagining the SCE contract be used.

Q. Have you ever used that general methodology of the CCCT to price other products for Bonneville?

A. (Mr. Bolden) Yes, in particular, resource backup products.

Tr. 199-200.

While SCE attempts to characterize Mr. Bolden's testimony as supporting its argument that the method relied upon in FPS-96R is unique and has never before appeared in a BPA rate proceeding, the facts are to the contrary. Tr. 197-200. Mr. Bolden only testified that to his knowledge BPA had never used this same method and the same inputs. *Id.* at 198. Mr. Bolden also testified that BPA has used this method to price resource backup products. *Id.* at 200.

SCE's request to have a portion of Mr. Bolden's above referenced testimony stricken lacks factual or legal support. SCE should have made any such motion to strike the testimony before

the close of the hearing. Failing to do so waives the objections. Even if the objection had not been waived, it would not be sustainable. The cross-examination question is framed very narrowly and seeks to determine whether Mr. Bolden ever used the same inputs and methodology in setting rates for another product. SCE appears to argue that Mr. Bolden's negative response to the question is inconsistent with his later testimony that he used the same methodology to price backup resources. The record does not indicate, however, that the same inputs and methodology were used by Mr. Bolden to price that product or any other product. Nor does the record indicate whether Mr. Bolden used the methodology as part of a rate-setting process. SCE cannot use its own failure to clarify these salient issues as a platform to argue that the testimony is somehow defective or less than candid. Thus, on the merits, SCE is not entitled to the remedy requested.

SCE's other arguments that it is being unfairly charged a higher rate are similarly without merit. It is true, of course, that BPA is proposing rates that are based on a change in methodology from 1996. Procter, *et al.*, FPS-96R-E-BPA-05, at 19. As noted previously, these rates are not limited in application to SCE's contract, but will be generally applicable to contracts requiring a posted rate for capacity without energy. SCE's identification of a number of contracts using other pricing methods offers no assistance to SCE's position. Grosz, *et al.*, FPS-96R-E-SO-04, Attachment 2. The existence of such contracts merely acknowledges that the parties to different contracts may have different needs at different times and places. Negotiating a contract with a fixed price or price formula and negotiating a contract with a price tied to a rate schedule are simply different pricing strategies. The fact that contracts contain price terms that are dissimilar from the rate proposed in this proceeding is not relevant to the issue of whether there are analytical shortcomings with respect to the proposed rate.

As to SCE's assertion that BPA's response to SO-BPA:90 was not truthful, the record provides no support for such an allegation. FPS-96R-B-SO-01, at 26. SCE's data request specifically asked, in part, for the following: "Please provide all work papers, materials, and documentation to support any market analyses used or considered in developing the 96-FPS rates and the FPS-96R rate." SO-BPA:90. SCE contends that when BPA failed to reference and produce a document generated by Mr. Bolden and Ms. Holland in response to this request, it failed to fulfill its discovery obligations. FPS-96R-E-SO-01, at 26. The document in question was not part of the rate development process in this proceeding or in the development of other rates under FPS-96. Tr. 105. Rather, the document in question was generated to assist Mr. Miller in negotiating a resolution of a contractual dispute between BPA and SCE. *Id.*

SCE suggests that the $0.87/kW-month demand charge from BPA's 1996 rates schedules applies to this product. FPS-96R-B-SO-01, at 25. BPA's rebuttal testimony addresses the methods underlying the pricing of the demand charge in FPS-96 and why it is not appropriate to apply that charge to the Option Capacity in SCE's contract. FPS-96R-E-BPA-05, at 3-5.

***Decision***

*BPA is proposing a rate of general applicability that does not unfairly charge any customer or customer group a higher rate for the same product.*

## 2.8 Applicability of the Rates Proposed in This Proceeding

*Issue*

*Whether BPA's purpose in initiating this proceeding is to punitively retaliate against SCE for exercising its rights to the Option Capacity.*

**Parties' Position**

SCE argues that BPA's purpose in developing the rates in this proceeding is solely to punish SCE for exercising its contract rights. FPS-96R-B-SO-01, at 28. SCE argues that the "adjustment," as SCE calls it, was not to correct an inadvertent omission but rather is intended to change pricing in order to extract a much higher price from SCE than its contract contemplates. *Id.*

**BPA's Position**

BPA's purpose in initiating this rate proceeding was to correct an oversight in the FPS-96 rate schedule because it (a) did not clearly reflect BPA's intent to negotiate rates for the capacity without energy product; and (b) did not include posted prices for capacity without energy. FPS-96R-E-BPA-01, at 1-3. Further, since the capacity without energy rates contained in NR-96 and PF-96 expire on September 30, 2001, the rates contained in this proceeding may be the only posted rates for capacity without energy available after that date. Procter, *et al.*, FPS-96R-E-BPA-05, at 5. As BPA has indicated in other parts of this ROD, these rates may also be applied to contracts for capacity without energy entered into after the rates become effective. *Id.* at 3.

*Evaluation*

There is nothing in the record to support the allegation that the proposed rates are intended to be punitive in nature. The rates being develop here are rates of general applicability and, pending the outcome of the general power rate case, could be the only posted rates for capacity without energy once the PF-96 and NR-96 rate schedules expire. To the extent that these rates may apply to SCE's contract, which is beyond the scope of this rate proceeding, the proposed change in rates conforms to the notice requirements contained in that contract.

*Decision*

*The purpose of this proceeding is to establish rates for capacity without energy sales under the FPS-96 rate schedule. BPA is not being guided by any improper motive and there no evidence to suggest otherwise.*

## 2.9 Value of Capacity Without Energy vs. Value of Capacity

***Issue***

*Whether it is relevant, for purposes of this proceeding, to compare the value of a capacity without energy product to the value of a general capacity product.*

**Parties' Position**

SCE raises in its Brief on Exceptions the argument that the capacity without energy it purchases under its contract is "less valuable than a general ability to buy capacity." FPS-96R-R-SO-01, at 27. Because BPA can determine whether SCE returns or pays for the energy, SCE argues, the proposed rate is unfair and discriminatory. *Id.*

**BPA's Position**

This issue was not addressed in SCE's Initial Brief and thus is deemed waived. To the extent that it is not waived, the fact remains that in this proceeding BPA is establishing rates of general applicability for a capacity without energy product. This is different than a capacity product in which the energy is not returned, which in fact is a power sale. Because they are two entirely different products, it is not possible to argue objectively whether one is more or less valuable than the other. Each customer is in the best position to make a subjective determination regarding which product is more suitable given present needs and conditions. With respect to BPA's contract right to decide whether or not SCE is to return the energy, once again, it is BPA's position that the product being priced in this proceeding is a capacity product where the energy is returned. The issue of what conditions would apply if BPA were to decide under the terms of the SCE agreement that SCE may keep the energy goes beyond the scope of this proceeding.

***Evaluation***

SCE's Initial Brief did not raise questions regarding the value of SCE's contract right to Option Capacity, and they are being raised for the first time in SCE's Brief on Exceptions. Under the BPA Rules of Procedure, a party's failure to raise the issue in the initial brief is deemed to be a waiver of the issue. *See* Procedures, § 1010.13(b).

In any case, the issue of whether SCE's rights to buy Option Capacity are less valuable than a traditional capacity product is beyond the scope of this proceeding. The scope of this proceeding is defined by the FRN and SCE's contract rights are not at issue. The FRN stated: "Pursuant to Rule 1010.3(f) of BPA's Procedures the Administrator limits the scope of this hearing to issues respecting the correction of the FPS-96 rate schedule as described in section II hereof. Other provisions of the existing FPS-96 rate schedule are not matters for the purpose of this hearing." 64 Fed. Reg. 44361 (1999). Section II of the FRN provides: "The purpose of the proposed changes to the Firm Power Products and Services (FPS-96) rate schedule is to clarify and establish the rates that apply to the capacity without energy product." *Id.* at 44363. To the

extent there are issues related to the relative value of the Option Capacity under SCE's contract, they are clearly beyond the scope of this proceeding.

***Decision***

*For the purposes of this proceeding, the question of whether the value of a capacity without energy product is greater or less than the value of a general capacity product is not relevant. The value of SCE's contract rights is a matter of contract interpretation beyond the scope of this proceeding.*

## 3.0 SCE CONTRACT ISSUES

### 3.1 Ability to Change Rates Applicable to SCE's Contract

***Issue***

*Whether the proposed modification to the FPS-96 rate schedule is precluded by the contract between SCE and BPA.*

**Parties' Position**

In its Brief on Exceptions, SCE contends that its contract with BPA requires that any rate for the purchase of Option Capacity under the contract must be a rate of general applicability. SCE further maintains that the proposed rate cannot be a rate of general applicability because only SCE's contract currently meets the criteria set forth in the FRN. FPS-96R-R-SO-01, at 10. SCE maintains that its position is supported by the fact BPA did not indicate that the rate would be applied to any circumstance other than SCE's contract until BPA filed its rebuttal testimony. *Id.* at 9. SCE argues that comments of BPA counsel at the pre-hearing conference that the rate would be more generally available are not sufficient to rebut the contention or change the nature of the proceedings. *Id.* at 10.

**BPA's Position**

The contractual provisions related to SCE's Option Capacity product (a product for capacity without energy) state explicitly that the rate for the product may be changed on nine months' notice. Grosz, *et al.*, FPS-96R-E-SO-03, Attachment 1. No other showing is required.

Furthermore, notwithstanding SCE's arguments to the contrary, the rate is one of general applicability. *See* section 3.4 *infra.* BPA believes that SCE's arguments rely upon the faulty underlying assumption that, because a rate may apply to only one current contract, it cannot be a rate of general application.

***Evaluation***

SCE maintains that its contract with BPA requires the applicable rate to be established in a certain fashion. FPS-96R-B-SO-01, at 13-14. Specifically, SCE alleges that, in spite of the provision stating that BPA can change the rate on nine months' notice, BPA is obligated to set the rate applicable to its contract without regard to recovery of its costs. *Id.* SCE does not explain why the Administrator would set a rate for a contract based on an approved rate schedule that can be changed on nine months' notice but at the same time agree that the rate would be set in the future without regard to cost recovery, a directive which is at the core of BPA's statutory responsibility.

Thus, SCE's suggestion that BPA is somehow motivated by a desire to evade a contractual responsibility is without merit. BPA has a contractual right to change the rate, and a responsibility to set the rate in accordance with statutory directives.

To the extent that SCE's argument goes beyond trying to show improper motive or bias in the rate-making process, that is a matter outside the scope of this administrative proceeding as it is defined by the FRN and as articulated by the Hearing Officer. Therefore, with regard to a substantive claim that BPA has breached its contract with SCE because the contract precludes the correction of a particular rate, that is a separate legal issue. The scope of this proceeding is defined by the FRN. The FRN stated: "Pursuant to Rule 1010.3(f) of BPA's Procedures the Administrator limits the scope of this hearing to issues respecting the correction of the FPS-96 rate schedule as described in section II hereof. Other provisions of the existing FPS-96 rate schedule are not matters for the purpose of this hearing." 64 Fed. Reg. 44361 (1999). Section II of the FRN provides: "The purpose of the proposed changes to the Firm Power Products and Services (FPS-96) rate schedule is to clarify and establish the rates that apply to the capacity without energy product." *Id.* at 44363.

While BPA has not breached its contractual obligations to SCE, if SCE disagrees, it may raise those matters in a separate contract action. The Hearing Officer noted that questions regarding the applicability of the rate to SCE's contract should be raised in the proper forum. Tr. 163-164.

SCE's Brief on Exceptions also argues that the proposed rate is flawed because it is not a rate of general applicability. SCE bases this argument on an underlying assumption that because it is a rate currently applicable to only one contract it cannot be a rate of general applicability. SCE provides no legal or factual support for this position. Rather than providing legal support for its position, SCE creates a new category: rates it refers to as rates of limited applicability. The designation of the proposed rates as ones of "limited applicability" is a designation without any legal significance. The fact that BPA is aware of only one <u>currently existing</u> contract to which the rates may apply does change the general applicability of the proposed rates. The proposed rates are rates of general applicability (*see* section 3.4 *infra*) and to the extent questions exist about whether the rates proposed in this proceeding apply to SCE's contract, that matter will be resolved in another forum.

***<u>Decision</u>***

*BPA's contract with SCE gives BPA the right to revise rates for the Option Capacity product in the SCE contract, and the present proceeding is a proper exercise of the Administrator's rate-making authority.*

## 3.2 <u>Risk Management and Rate Development</u>

***<u>Issue</u>***

*Whether BPA can revise the rates to reflect business risks.*

**<u>Parties' Position</u>**

SCE claims that BPA stated in the prehearing conference that it was adjusting this rate in an effort to fully recover its costs. FPS-96R-B-SO-01, at 13. SCE contends that in 1989, when

BPA submitted the Sales and Exchange agreement to FERC, BPA acknowledged that it was assuming a risk that it may not fully recover its costs through contract revenues. *Id.* Based on the risks assumed by BPA under the contract, SCE argues that "BPA has no right now to claim that a failure to recover rates is an appropriate basis for initiating this proceeding solely to develop a rate applicable to SCE's contract." *Id.* at 14.

**BPA's Position**

BPA believes that SCE has mischaracterized the issue before FERC when approval of the contract was sought. The risk of a revenue shortfall referred to in the filing with FERC and in the subsequent order applies to the surplus firm power sale portion of the contract and not the pricing of the capacity without energy product at issue in this proceeding.

***Evaluation***

BPA must consider a wide variety of risks in the rate development process. Once rates are put into place, BPA continues to bear revenue recovery risk during the rate period. On a planning basis, the setting of the amount of planned net revenues for risk and treasury payment probability are ways in which risk protection can be incorporated into rates. Risk emanating from particular contract provisions, as in this situation, can be mitigated in part by making the rate subject to change on notice to the other party. The fact that BPA may bear other significant risks throughout a rate period in no way absolves BPA of the responsibility to use sound business practices once rates are established, and to revise rates in a manner that comports with statutory and contractual requirements when it is reasonable to do so. This is exactly what BPA has done in this proceeding.

BPA did not assume the risk that it might not recover its costs on the Option Capacity product. The contract explicitly states that BPA may change the rate on nine months' notice. FPS-96R-E-SO-03, Attachment 1. This provision completely mitigates the risk that BPA would be in the position of not recovering its costs, except for the notice period, which itself is practically co-extensive with the time frame in which BPA would be able to put a new rate into effect. *Id.* Where BPA has identified an error in the establishment of a rate that results in a customer receiving a windfall by paying a rate that was not intended to apply to a product, BPA has not just the authority, but the statutory responsibility, to correct the error and price the product properly. *Id.*

SCE's contention that BPA assumed the risk that the revenues under the contract would not cover BPA's costs misinterprets the FERC ruling. SCE's contract involved the sale of separate and distinct products. One product available under the contract was a 250 MW surplus firm power sale, another was the Option Capacity, to which the capacity without energy rate in this proceeding would apply. The surplus firm power sale started at 28.5 mils per kWh and escalated upward based on a formula in the contract that was tied to weighted average of oil and gas prices. There was no guarantee that this formula would match BPA's costs. The Option Capacity, by contrast, was tied to a BPA rate. The rate for the capacity without energy would be tied to the recovery of BPA's aggregate costs and as a consequence there would be no risk of under recovery for this product under the contract. *See* ROD section 1.5, *supra*. Therefore, the

question before FERC was whether BPA could assume the risk of a revenue shortfall under the surplus firm power portion of the contract, not the Option Capacity portion. FERC stated in its order, "Bonneville assumes some risk that the revenues earned from *the sale of surplus firm power*. Bonneville states that it expects to fully recover its costs." *United States Dep't of Energy--Bonneville Power Admin.*, 46 FERC ¶ 61,094, 61,397 (1989) (emphasis added). It is relevant to note in this connection that the surplus firm power component of the contract is based on a completely separate rate schedule—i.e., SC-86. *Id.*

***Decision***

*BPA has properly established posted rates for capacity without energy to reflect business risks in accordance with statutory directives.*

**3.3 Necessary Rates Development**

***Issue***

*Whether the FPS-96 rate schedule contained all the necessary rates when it was developed.*

**Parties' Position**

SCE maintains that BPA did not omit a necessary rate under the FPS-96 rate schedule. FPS-96R-B-SO-01, at 16. In support of its position, SCE points to the ROD from the 1996 rate case where the new FPS rate schedule was designed to give BPA flexibility in its ability to price products to meet market competition. *Id.* Despite the focus of the FPS-96 rate schedule, SCE believes that BPA's surplus power obligations were not ignored under this rate schedule. *Id.* In support of this, SCE cites a discussion of SCE's contract in PacifiCorp's 1996 brief, the transcript from the 1996 hearings, and BPA's ROD on Excess Federal Power. *Id.*

In SCE's Brief on Exceptions, SCE reasserts the contention that no rate was omitted from the FPS-96 rate schedule. In support of this position, SCE contends that SCE's contract requires Option Capacity to be priced at the contract demand charge in the FPS-96 rate schedule. FPS-96R-B-SO-02, at 12. SCE also contends that it did not become involved in the 1996 Rate Case because it believed the demand charge to be the appropriate rate. *Id.* at 12. SCE claims it was satisfied with the proposed demand charge and therefore did not actively participate in the 1996 Rate Case. *Id.* at 13.

**BPA's Position**

The record shows that BPA intended to establish a posted rate for capacity without energy sales in its NR-96 and PF-96 rate schedules. FPS-96R-E-BPA-01, at 2. Unlike the NR-96 and PF-96 rate schedules, the FPS-96 rate schedule contains no posted rates for a capacity without energy product because BPA intended to negotiate rates for capacity without energy under the flexible pricing provisions of that rate schedule. *Id.*

BPA believes the contract demand charge in the FPS-96 rate schedule does not apply to the Option Capacity (capacity without energy) product under SCE's contract because it is a charge under BPA's rate schedules associated with an entirely different product. *Id.* at 3-4. See ROD section 2.3, *supra*. It is not proper to rely on SCE's lack of participation in the 1996 rate case as an indication of anything more than a waiver of its right to state a position in that rate filing. *Id.* at 13.

***Evaluation***

SCE's argument is not supported by the facts. The 1996 WPRDS and Final Record of Decision state unequivocally that BPA intended to establish a posted rate for capacity without energy in the PF-96 and NR-96 rate schedules. The same documents just as clearly indicate that the capacity without energy product could be offered under FPS-96, but only at negotiated rates. SCE attempts to muster factual support for its contention by referencing PacifiCorp's 1996 brief, the transcript from the 1996 hearings and BPA's Record of Decision on Excess Federal Power. However, these documents were not made a part of the record in this proceeding. Since the Administrator's decision must be based on evidence in the record, the materials referred to cannot be relied upon. 16 U.S.C. § 839e(i)(5). Furthermore, even assuming these materials were in the record, SCE provides no specific explanation how these documents allow one to conclude "BPA did not omit a necessary rate under the FPS-96 rate schedule." FPS-96R-B-SO-01, at 16.

In its Brief on Exceptions, SCE contends that the contract demand charge in the FPS-96 rate schedule demonstrates that no rate was omitted from that rate schedule. As section 2.3 of this ROD explains in detail, the contract demand charge is for a product different from the capacity without energy product. SCE's contention that the demand charge is the appropriate rate for its contract is also addressed in section 2.3 and, as noted there, it is a matter of contract interpretation that is beyond the scope of the issues in this proceeding. In short, an inadvertent oversight in 1996 provides no justification for SCE to receive a windfall now.

***Decision***

*The FPS-96 rate schedule did not contain all of the necessary rates it should have contained to apply to the power products marketed by BPA under the rate schedule. Instead, it omitted a posted rate for capacity without energy.*

### 3.4 Contract Demand Charge

***Issue***

*Whether the contract demand charge under BPA's FPS-96 rate schedule is the appropriate charge for Option Capacity under SCE's contract.*

**Parties' Position**

SCE argues that the rate charged for Option Capacity is controlled by the contract. SCE argues that the contract states that the price for Option Capacity is set by the contract demand charge.

FPS-96R-B-SO-01, at 14. SCE states "FPS-96 contains a general contract demand charge, which applies by the terms of the SCE contract to the price BPA can charge for capacity." *Id.* "Even if the contract demand charge does not apply, notwithstanding the express contract provisions saying it does, BPA cannot price this product dramatically differently than it prices the same product for sale to its other customers." *Id.*

In SCE's Brief on Exceptions, SCE contends that the DROD confuses the distinctions between the contract demand rate in the contract and the contract demand charge in the FPS-96 rate schedule. FPS-96R-R-SO-01, at 13. The contract authorizes the capacity to be priced at the contract demand rate charged other customers, and SCE believes that BPA cannot develop a rate to apply only to SCE's contract. *Id.* SCE maintains the proposed rate forces it to purchase the product at an artificially higher rate than is charged other customers under other rate schedules. *Id.*

**BPA's Position**

As stated above, BPA did not post a rate for capacity without energy in the FPS-96 rate schedule, nor was the demand charge developed in a manner that takes into account the costs of such a product. Procter, *et al.*, FPS-96R-E-BPA-05, at 3. Thus, it would not be appropriate to use the contract demand charge as the basis for a rate for capacity without energy under the FPS-96 rate schedule. *Id.* at 3-4. To the extent that SCE is arguing it is entitled, by contract, to a rate based on a contract demand charge, that is a contract issue beyond the scope of this proceeding.

BPA's rate directives allow it to price different products differently. Moreover, SCE will be purchasing this product at the same posted rate available to any other customer purchasing the same product at a posted rate under the FPS-96 rate schedule.

BPA believes that questions regarding whether SCE's contract requires that capacity without energy be priced at the contract demand rate under the FPS-96 rate schedule are ultimately matters of contract interpretation. BPA believes, however, that the contract demand rate under the FPS-96 rate schedule was designed and created to price a product different from the capacity without energy product SCE purchases under its contract. *Id.* at 4-5.

***Evaluation***

As noted above, the demand charge in the FPS-96 rate schedule was designed to be used only in conjunction with a contemporaneous sale of energy. Procter, *et al.*, FPS-96R-E-BPA-05, at 3-4. The energy charge in BPA's power rate schedules was designed to account for seasonal and diurnal differences in the market value of the firm power product. 1996 Wholesale Power and Transmission Rate Schedules at 62. As explained in detail in BPA's rebuttal testimony, the contract demand charge is for an instantaneous peaking product as opposed to a sustained peaking product, such as capacity without energy. Procter, *et al.*, FPS-96R-E-BPA-05, at 3-4.

BPA did not intend for the demand charge to set the charge for capacity without energy. The problem arises only because the implications of the precise language in SCE's contract were not considered when BPA generically set its wholesale power rates in the 1996 rate case.

Questions regarding whether SCE's contract terms and conditions control the rate charged for Option Capacity are matters of contractual interpretation beyond the scope of this proceeding. Whether SCE's contract should be interpreted in a manner so that the contract demand charge under the FPS-96 rate schedule is the contract demand rate under SCE's contract is a question of contract interpretation and is beyond the scope of this proceeding. Finally, SCE provides no legal support for its contention that BPA cannot price this product "dramatically differently" from the way it prices the product for other customers. FPS-96R-B-SO-01, at 14. Nor is there a factual predicate for such an allegation. BPA charges all customers the same posted rate when they purchase under a specific rate schedule.

***Decision***

*The contract demand charge under BPA's FPS-96 rate schedule is not the appropriate charge for capacity without energy as described in SCE's contract.*

**3.5 Generally Applicable Rates**

***Issue***

*Whether the rates developed in this proceeding are rates of general applicability or whether they are rates solely to be applied to one contract.*

**Parties' Position**

SCE contends that the rate proposed is not one of general applicability. FPS-96R-B-SO-01, at 13. SCE argues that BPA's own documents indicate that BPA intends to apply these rates only to contracts executed on or before September 30, 1996, for a capacity without energy product that require a posted rate under the FPS rate schedule. *Id.* Further, SCE argues that BPA's own materials indicate that the only contract they know of which meets these conditions is the contract with SCE. *Id.* Therefore, SCE concludes the rate is not one of general applicability, but is designed to improperly alter SCE's contract. *Id.*

In SCE's Brief on Exceptions, SCE contends that BPA cannot adjust the rate for Option Capacity under its contract, unless it is a rate of general applicability. FPS-96R-B-SO-02 at 14. If the rate is generally applicable, SCE maintains that the rate cannot be amended in this proceeding. *Id.* at 14. SCE argues that the FRN defines the proposed rate as being not generally applicable. In addition, SCE believes this is evidenced by BPA's failure to give notice to potential new customers and, the fact that no revenues or sales were projected under the proposed rate. *Id.* at 14. SCE maintains that BPA cannot modify the FPS-96 rate schedule at all. *Id.* at 14-15. They contend that the FPS-96 rate schedule was designed only for negotiated rates as part of BPA's Excess Federal Power policy and as such, BPA is prohibited from posting a rate under that schedule. *Id.* at 15. SCE states that the rates set in this proceeding are not applicable to other BPA contracts. *Id.* at 26.

**BPA's Position**

BPA believes the proposed rate is one of general applicability. Procter, *et al.*, FPS-96R-E-BPA-05, at 3. It has been BPA's stated opinion from the outset that there are two distinct classes of contracts to which this rate can apply. *Id.* The first category consists of contracts executed on or before September 30, 1996. *Id.* The second category consists of contracts executed in the future between BPA and its customers which apply the relevant portion of the FPS-96 rate schedule. *Id.* SCE's contention in its Brief on Exceptions, that proper notice to potential new customers was not given, is misplaced. BPA believes any confusion about the general applicability of the rate was cured at the pre-hearing conference. BPA also believes that its decision not to project any sales or revenues under this proposed rate does not change its general applicability..

In its Brief on Exceptions, SCE raises for the first time the contention that BPA is legally prohibited from amending the FPS rate schedule to add a posted rate for capacity without energy. This issue was not raised in SCE's Initial Brief and is therefore waived. To the extent the issue has not been waived, BPA believes it not only has the right, but also, the obligation to modify a rate schedule when it finds such an egregious omission like the one being corrected here.

***Evaluation***

The applicability of the FPS-96 rate correction is quite simple. The rate applies to existing and future contracts that reference that portion of the FPS-96 rate schedule that is being corrected in this proceeding. *Id.* Currently, BPA is only aware of one existing contract, with SCE, that would apply the corrected rate. *Id.* If there were others, they would also be properly subject to the revised rate. *Id.* In addition, the proposed rate applies to future contracts that reference the corrected section of the FPS-96 rate as the price that applies to that new power sale. There has been some confusion regarding the applicability of the rate proposed in this proceeding, but the record shows that it has been BPA's intent from the outset that this be a rate of general applicability. BPA counsel Mr. Casad's statements at the prehearing conference clearly demonstrate BPA's intent:

> KURT CASAD: If I could make a couple of points,
> also. I think that the rate at issue, while there may
> only be one current contract using that particular rate,
> does not preclude the possibility that BPA would enter
> into subsequent contracts with customers during the rate
> period that would apply that same rate that's being
> revised.
>
> Pr. Tr. 8.

The language in the FRN should not be narrowly interpreted so as to preclude BPA from using the rates developed in this proceeding in the future. The language in the FRN was intended only to alert existing contract holders how this proposed rate would be applied. The language in the FRN was not intended to be interpreted as a limitation to general applicability of the rate. Indeed, it would be absurd to correct an error in the rate and then fail to charge the corrected rate to future sales of the product. BPA has posted rates for capacity without energy under the NR-96

and PF-96 rate schedules which are set to expire on September 30, 2001. *Id.* The modification to the FPS-96 rate schedule will assure that BPA has posted rates for capacity without energy after the expiration of the current posted rates.

SCE raises for the first time in its Brief on Exceptions the argument that BPA is prohibited from amending the FPS rate schedule. Under the BPA Rules of Procedures, a party who fails to raise an issue in its initial brief is deemed to have waived that issue. 1010.13 (b) and (d). SCE's Initial Brief does not contain any arguments regarding legal impediments to amending the FPS rate schedule. By failing to raise this issue in the initial brief it is deemed waived.

Even if the issue has not been waived, SCE provides no legal or evidentiary support for this position. SCE's argument that the FPS rate schedule was designed to allow BPA only to have negotiated rates, prohibiting posted rates, as proposed in this proceeding, is not supported by any evidentiary, statutory, or legal reference. The argument also ignores the simple fact that the FPS-96 rate schedule does contain posted rates. While SCE is correct that the FPS-96 rate schedule was designed, in part, to provide BPA a certain amount of flexibility in the market to negotiate rates for the sale of products, it also contains posted rates for energy and a demand charge. In fact, SCE contends that the posted rate for the contract demand charge is the appropriate rate for its contract.

As noted above, BPA is legally required to establish rates to recover its costs. See Section 1.3 ROD. In this situation, where BPA has identified an error in the establishment of a rate that results in a customer receiving a windfall by paying a rate that was not intended to apply to a product, BPA has the statutory responsibility to correct the error and price the product properly. *Id.*

***Decision***

*This proposed rate is one of general applicability, which applies to existing and future contracts for power sales of the capacity without energy product.*

**3.6 Good Faith and Fair Dealing**

***Issue***

*Whether the proposed rate correction violates BPA's general obligation of good faith and fair dealing under its contract with SCE.*

**Parties' Position**

SCE argues that BPA cannot use its general ratemaking authority to propose rates that "renegotiate" the contract or "reprice" products available under the contract in a manner that violates its obligation of good faith and fair dealing. FPS-96R-B-SO-01, at 15.

In SCE's Brief on Exceptions, SCE restates its earlier contention that BPA violated the duty of good faith and fair dealing. FPS-96R-B-SO-02, at 15. SCE maintains BPA violated this duty by