limiting issues raised in the rate case, thwarting the ability to verify the marginal cost analysis, and foreclosing inquiry into other rates. *Id.*

**BPA's Position**

BPA's proposed rate correction is appropriate and permitted by the contract. BPA has implemented its contract with SCE in good faith and in a fair manner. To the extent SCE's argument claims a breach of contract, its claim is outside the scope of this proceeding.

***Evaluation***

BPA has properly exercised its ratemaking authority to correct a clear error in the FPS-96 rate schedule. FPS-96R-E-BPA-01, at 1-2. This action is consistent with BPA's contract with SCE. Grosz, *et al.*, FPS-96R-E-SO-03, Attachment 1. To the extent questions regarding BPA's alleged violation of its duty of good faith and fair dealing are breach of contract claims, they should be resolved in another forum.

***Decision***

*BPA's ratemaking action is appropriate. To the extent questions regarding BPA's alleged violation of its duty of good faith and fair dealing are breach of contract claims, they should be resolved in another forum.*

### 3.7 Seasonally Adjusted Rates

***Issue***

*Whether it is appropriate in this proceeding to determine the issue of whether SCE's contract allows for seasonally adjusted rates.*

**Parties Position**

In SCE's Brief on Exceptions, SCE contends that its contract with BPA does not allow for seasonally adjusted rates for capacity without energy. FPS-96R-R-SO-01, at 25.

**BPA's Position**

This issue was not addressed in SCE's Initial Brief and thus is deemed waived. To the extent the issue has not been waived, BPA believes questions regarding the ability to charge seasonally adjusted rates under SCE's contract are issues of contract interpretation and are beyond the scope of the issues in this proceeding.

BPA also believes that questions regarding rights and obligations under SCE's contract are beyond the scope of this proceeding. Whether the contract prohibits seasonally adjusted rates should be addressed in another forum.

***Evaluation***

SCE's contention that the contract does not allow for seasonally adjusted rates is a matter being raised for the first time in the Brief on Exceptions. SCE's Initial Brief did not address this issue. Under BPA's Rules of Procedure a party's failure to raise the issue in its initial brief is deemed to be a waiver of the issue. Procedures, § 1010.13(b).

Whether SCE's contract prohibits BPA from charging seasonally adjusted rates is a matter of contractual interpretation beyond the scope of this proceeding. SCE's contract rights are not at issue in this proceeding. The scope of this proceeding is defined by the FRN. The FRN stated: "Pursuant to Rule 1010.3(f) of BPA's Procedures the Administrator limits the scope of this hearing to issues respecting the correction of the FPS-96 rate schedule as described in section II hereof. Other provisions of the existing FPS-96 rate schedule are not matters for the purpose of this hearing." 64 Fed. Reg. 44361 (1999). Section II of the FRN provides: "The purpose of the proposed changes to the Firm Power Products and Services (FPS-96) rate schedule is to clarify and establish the rates that apply to the capacity without energy product." *Id.* at 44363. Whether or not seasonally adjusted rates are appropriate for SCE's contract is beyond the scope of this proceeding.

***Decision***

*The issue of whether the SCE contract provides for products to be sold at seasonally adjusted rates is a matter of contract interpretation beyond the scope of this proceeding.*

## 4.0 PROCEDURAL ISSUES

### 4.1 Expedited Hearing

***Issue***

*Whether BPA's use of an expedited rate proceeding limited SCE's participation and resulted in a record that is neither full nor complete.*

**Parties' Position**

SCE argues in its brief that BPA has failed to follow the requirements of section 7 of the Northwest Power Act, and that SCE has consistently been denied procedural rights conferred by the Act and BPA's own procedural rules. FPS-96R-B-SO-01, at 6-7. SCE argues that the nature and complexity of the issues in this matter, including issues surrounding discovery, have made it virtually impossible to compile a full and complete record within the time frame provided by the expedited case schedule. *Id.* at 7. Therefore, SCE concludes that BPA's use of an expedited proceeding was inappropriate. *Id.*

In SCE's Brief on Exceptions, SCE reargues its contention that the expedited rate proceeding was inappropriate. FPS-96R-R-SO-02, at 32. Because BPA had never used the methodology employed to establish the proposed rates before this proceeding, SCE believes the process was complicated. SCE further contends that because BPA represented the proposed rate as being one of limited applicability, as opposed to one of general applicability, BPA discouraged participation in the proceeding. *Id.* at 33.

**BPA's Position**

In the Federal Register Notice initiating this proceeding, BPA noted that the proposed corrections for the FPS-96 schedule would not impact any other part of the FPS-96 schedule, or any other rate schedule. The issues would therefore be fewer and of more limited scope than the issues in a proceeding to adjust all BPA power rates. 64 Fed. Reg. 44361, 44362 (1999). The purpose of the proposed adjustments to the FPS-96 schedule was limited to establishing the posted rate that would apply to a single product, the capacity without energy product. Rate Adjustment Study, FPS-96R-E-BPA-01, at 1. In addition, BPA believes it was necessary to establish a posted rate for this product before June 2000 in order to accommodate the Sale and Exchange Agreement by and between BPA and SCE. Procter, *et al.*, FPS-96R-E-BPA-05, at 9.

BPA does not believes that the marginal cost methodology used to develop these rates was novel. Tr. 121-122. BPA also believes that the lack of broad participation in this proceeding is a not a result of BPA misleading parties about the scope of the proposed change. Pr. Tr. 8.

***Evaluation***

SCE concludes that an expedited proceeding was inappropriate in this case, but provides no legal or coherent factual rationale for its conclusion other than to note that the proceeding has been

complicated by discovery disputes. FPS-96R-B-SO-01, at 7. However, BPA's testimony establishes that BPA does not currently have a posted rate for a capacity without energy product in the FPS-96 rate schedule. Procter, *et al.*, FPS-96R-E-BPA-03, at 2-3. BPA's direct testimony also states that the Sale and Exchange Agreement between BPA and SCE specified the demand charge in the Contract Rate section of the current surplus power rate schedule as the applicable rate for a capacity without energy product. *Id.* at 4. SCE specifies that SCE may purchase the capacity without energy product from BPA during the five-month period from June-October. Grosz, *et al.*, FPS-96R-E-SO-03, Attachment 1. Therefore, it was necessary for BPA to use an expedited proceeding to develop this rate in the event that SCE should elect to purchase this product for the delivery period June-October 2000. The fact that the only existing contract subject to this rate will be the SCE Sale and Exchange Agreement is irrelevant. Neither BPA's proposal nor its decision to apply the expedited procedures to this proceeding would have been different if there were additional existing contracts requiring this rate.

BPA's general rate proceeding, which was commenced approximately the same time as this proceeding, is not scheduled to be completed, with the issuance of a Final ROD by BPA, until April 21, 2000. However, FERC rules require that BPA's rates for which interim approval by the Commission is requested must be filed no later than 60 days in advance of the proposed effective date. 18 C.F.R. § 300.10 (a)(3)(ii). Even if the general rate case does conclude on schedule, this would have made it impossible for BPA to have a posted rate for the capacity without energy product in the FPS-96 schedule in time to accommodate the SCE Agreement.

SCE states in its brief that the issues in this proceeding were complex and that formulating a full and complete record was "virtually impossible within the time frame of this proceeding." FPS-96R-B-SO-01, at 7. In fact the single substantive issue to be addressed by the parties in this proceeding concerned the technical and economic validity of the methodology proposed by BPA for establishing rates for the capacity without energy product in the FPS-96 schedule. Procter, *et al.*, FPS-96R-E-BPA-03, 4-5.

BPA's Procedures Governing Bonneville Power Administration Rate Hearings specifically provide for the use of expedited rate proceedings. 51 Fed. Reg. 7611 (1986). Section 1010.10 of the Procedures contemplates a 90-day process from initiation of an expedited proceeding to issuance of the Final Record of Decision (ROD). BPA's proposed schedule in the FRN, however, extended the time for this proceeding beyond the 90-day time frame to 115 days. 64 Fed. Reg. 44,361, 44,363 (1999). At the prehearing conference, SCE objected to the proposed schedule, and following negotiations with BPA and other parties at the pre-hearing conference, it was agreed that the Hearing Officer would propose to the Administrator that the schedule be extended an additional 43 days. Pr. Tr. 33. At the pre-hearing conference counsel for SCE stated that SCE

> "would certainly support the revised schedule and very much appreciate Bonneville's willingness to make this a speedy proceeding, if not an expedited one. And Bonneville is willing to support us on that, and it's most appreciated." Pr. Tr. 27.

The Administrator approved the new schedule and the date for the final ROD was moved from December 6, 1999, to January 18, 2000. Therefore, in an attempt to accommodate SCE's requests, a schedule was developed for this proceeding that actually extended by nearly two-thirds the time normally afforded for expedited proceedings.

SCE contends in its Brief on Exceptions that the methodology employed by BPA to establish rates was both new and novel and as a consequence it was inappropriate to use an expedited rate proceeding to set the rates. FPS-96R-R-SO-01, at 32. Whether the propose rate methodology was new or novel is not relevant, unless it somehow prohibits the development of a full and complete record or it limits a party's ability to participate. SCE contends that a full and complete record was not developed due to the expedited nature of this proceeding, the limited discovery, the inability to fully analyze data, and abbreviated hearing. *Id.* at 33. SCE fails to provide any evidentiary or legal support for these conclusions. The record in this proceeding, however, does provide substantial evidence to the contrary. *See* section 4.3 of ROD. A review of the transcript from the hearing is devoid of any request by SCE for additional time to continue cross-examination. As noted above SCE cross-examined BPA witnesses for almost an entire day. Contrary to SCE's apparent contentions, it was given considerable latitude during cross-examination to question BPA witnesses. Additionally, as noted in section 4.2 of the ROD, discovery problems were a creation of SCE's own making. Documents were made available to SCE for inspection and copying in September. Rather than availing itself of the opportunity to review these materials SCE chose to file a motion to compel. When the motion was denied, SCE found itself with little time to review the materials available. It was not the expedited nature of this proceeding that caused SCE problems with discovery, but rather, SCE's limited opportunity to review materials was a consequence of its own decisions.

The other issue SCE raised in the Brief on Exceptions involves a concern that the FRN may have misled parties about the scope of this proceeding thus limiting participation and leading to a incomplete record. SCE has provided no evidentiary or legal support for this conclusion. The record does provide evidence to the contrary. There are 65 parties to this proceeding and they account for a large percentage of BPA's customer classes. Each party has been served with all of the filings in this proceeding. BPA's filings have indicated that it considers the proposed rates to be generally applicable rates. Procter, *et al.*, FPS-96R-E-BPA-05, at 3. In addition, at the prehearing conference, which all parties to this proceeding were expected to attended, BPA unequivocally stated that the proposed rates would be generally applicable. Pr. Tr. 8. Any doubts about the applicability of the rate to future contracts should have been erased at that time. Speculation about the lack of active participation in this proceeding by other parties does not demonstrate the lack of a full and complete record. This is particularly true given the evidence to the contrary.

***Decision***

*BPA must secure interim approval from FERC prior to June 2000 for a posted rate for the capacity without energy product in the FPS-96 schedule. The substantive issues with respect the proposed rate were limited, and the schedule adopted by the Administrator, including the addition of time added at the request of SCE, has afforded the parties ample time to present their cases.*

### 4.2 Discovery Issues

*Issue*

*Whether the Hearing Officer erred by denying certain SCE discovery requests resulting in a record that is neither full nor complete.*

**Parties' Position**

SCE claims in its brief that the direct case filed by BPA was inadequate for SCE to understand BPA's proposal. According to SCE, this fact, combined with the omission of clarification of BPA's initial proposal, prompted a need for extensive discovery of BPA through data requests. FPS-96R-B-SO-01, at 7. SCE states that it filed 92 data requests to elicit information to determine whether BPA erred in developing the FPS-96 rate in 1996, and if so, whether the proposed corrections to the rate are consistent with the assumptions, policy and methods used to establish BPA's power rates in 1996. *Id.*

SCE argues that BPA was obligated to explain through these data requests any differences between the way a capacity without energy product was priced in 1996 and BPA's proposal for pricing that product in this proceeding. *Id.* at 8. In addition, SCE asserts it was entitled to know why any changes in methodology were being proposed, and to have BPA articulate a sound basis for any inconsistencies, assumptions, or policies employed in developing rates in the concurrent 2002 rate proceedings. *Id.* They state that BPA was obligated through the data requests to articulate why it had chosen the specific methodology it did in light of the "inequitable rate increase resulting from the use of that methodology." *Id.*

SCE believes that BPA gave misleading and incomplete answers to the data requests and that the responses it did give were virtually useless. As a consequence SCE filed a motion to compel responses to certain of the data requests. FPS-96R-B-SO-01, at 8. SCE argues that the Hearing Officer improperly made the legal determination that because the rate at issue in this proceeding was not developed in the 1996 rate case, the manner in which other non-related 1996 rates were developed is not relevant. *Id.* at 9. SCE argues the Hearing Officer thereby made a legal determination on an issue SCE feels was not briefed and was beyond the scope of her authority. *Id.* SCE maintains that it required responses to its data requests regarding a number of different rates developed in BPA's 1996 general rate case because even if those rates were for products that were only similar to the capacity without energy product, the information it sought was relevant and important to making its case. FPS-96R-B-SO-01, at 10. SCE contends that the FPS-96 rate schedule, as well as the PF-96 and NR-96 rate schedules and contract demand charge, were "related" rates that were within the scope of inquiry in this proceeding. *Id.* at 10. Finally, SCE contends BPA has been allowed to develop the rate "in a vacuum without explaining why it no longer follows the 1996 approach." *Id.*

In SCE's Brief on Exceptions, it realleges the argument that it did not have sufficient meaningful discovery. FPS-96R-R-SO-01, at 34. SCE believes the record was restricted to only those facts that BPA wanted and precluded any contrary view. *Id.* SCE complains that the Hearing Officer denied the motion to compel, even though statements in support were untrue. SCE claims

additional prejudice because the order denying SCE's motion to compel issued on a Friday, October 17 was not received until Monday, October 20. Additionally, SCE argues that when BPA produced the record for the 1996 Rate Case, it was too voluminous for SCE to analyze.

**BPA's Position**

SCE contends that denial of its motion to compel is evidence that it was deprived of the opportunity to fully develop its case, but SCE's brief does not identify any individual data requests or groups of requests, which resulted in the apparent inability to fully present its case. It is BPA's position the Hearing Officer did not err in denying SCE's motion to compel.

BPA believes it fulfilled all of its discovery obligations, and the order on the motion to compel supports this position, Order, FPS-96R-O-06, but that in any case SCE has been provided with all the materials it would need to evaluate BPA's proposal and present its own case in response. BPA also does not believe the Hearing Officer made a determination that materially impacted SCE's presentation of its case. BPA believes SCE was not prohibited by the Hearing Officer's discovery order from using the NR-96 and PF-96 rate schedules and demand charge in developing or presenting its case. BPA believes its direct case and rebuttal testimony fully explains the methodology behind the proposed rates, and therefore that BPA did not develop these rates "in a vacuum."

BPA believes SCE's arguments in the Brief on Exceptions also lack merit. BPA believes it complied with all discovery obligations. BPA believes any problems that SCE experienced in discovery were a consequence of its own making since all materials requested were made available for inspection and copying in September. BPA believes that SCE cannot now argue it was denied discovery when it failed to afford itself of the opportunity to review the materials when made available.

***Evaluation***

SCE appears to argue that it was improperly denied relevant discovery by the Hearing Officer in two ways, FPS-96R-B-SO-01, at 9-10, and that as a result it was not provided sufficient information in this proceeding to prepare its case. *Id.* SCE also contends that the Hearing Officer's decision precluded it from determining whether BPA used different assumptions and methodologies from BPA's 1996 proceeding. *Id.* Neither of these arguments is supported by the facts.

Rather than identifying the data requests alleged to support its argument, SCE merely makes a generic contention that BPA's responses did not fulfill its requirements under the discovery rules and the Hearing Officer's order upholding BPA's responses was likewise in error.

However, it appears there were two groups of data requests that may be the source of SCE's concern. One group of the requests in the motion to compel involved requests for analysis of information BPA had not developed as part of its initial proposal. These data requests, in general, sought to elicit a comparative analysis between the 1996 (WP-96) and 2002 (WP-02) rate cases and the present rate proceeding. BPA explained in response to these requests that the

requested analysis had not been performed, but that it would make the underlying information available to SCE so that it could perform the comparisons it was seeking from BPA. In addition to making the materials generally available to SCE, BPA produced for SCE the entire record from the WP-96 proceeding. As a party to the WP-02 proceeding, SCE had previously been provided all studies, documentation and testimony from that proceeding. Therefore, SCE was provided all materials that could have been relevant to preparing the comparative analysis that it claims was critical to both its understanding of BPA's proposal in this case, and to the preparation of its own case in response. The Rules of Procedure Governing Rate Hearings state that no party shall be required "to perform any new study or to run any analysis or computer program" in response to a data request. Procedures, § 1010.8(b). Thus no party can compel another party through a data request to perform the type of comparative analysis SCE's data requests sought.

A second group of SCE's data requests asked BPA to provide materials which were background materials to the CCCT power plant capital costs study used to develop the proposed rates. In developing the proposed rates, BPA stated it did not independently evaluate the assumptions relied upon by the Northwest Power Planning Council (NWPPC) to develop the capital costs. Procter, *et al.*, FPS-96R-E-BPA-03, at 4. Rather than evaluating the assumptions, BPA adopted the materials because BPA believed the study was sound and reliable. *Id.*[1] In its direct case, however, BPA included a summary of the materials used from the NWPPC's power plan to give some guidance to the reader about the development of those capital costs. *Id.*, at 4-5.

In addition, BPA also identified how that cost data was used in developing its proposed rates. Specifically, BPA has: 1) identified the proxy plant method as the approach to rate estimation; 2) identified the plant being used; 3) identified the cost of that plant as developed by the NWPPC in conjunction with discussion with the owner of the plant; 4) identified how the plant cost data were used by BPA in developing the proposed rates; and 5) provided access to the Power Plan from which the information could be obtained. In short, all the material that SCE could have conceivably required to evaluate BPA's proposal on this particular issue, and formulate its own case in response, was provided to SCE, notwithstanding anything in the Hearing Officer's order on discovery.

In a related argument, SCE states that it was not afforded the opportunity to explore and compare the proposed rate to "related" rates from the 1996 case. SCE contends that the Hearing Officer made a separate error when she made a "legal finding" that "since the Rate at issue in this docket was never developed in the 1996 case, how the other non-related 1996 rates were developed is not relevant." Order, FPS-96R-O-06, at 3. SCE argues the Hearing Officer made no factual inquiry to determine what 1996 rates were "related." FPS-96R-B-SO-01, at 10. SCE fails to explain what relevant rates it was denied the opportunity to compare to the rate being proposed in this proceeding. In its brief, SCE notes that the rates under the PF-96 and NR-96 rate schedules were "related." *Id.* However, the fact that the Hearing Officer did not require BPA to conduct a comparative analysis of certain existing rates with its proposed rates did not prevent SCE from doing so and, in fact, SCE did so in its testimony. Grosz, *et al.*, FPS-96R-E-SO-04, at 2 and 8.

[1] In its brief SCE has not challenged BPA's use of the study.

In this respect, SCE's interpretation of the impact of the Hearing Officer's order regarding this aspect of the discovery dispute is wrong. Reviewing the paragraph as a whole demonstrates that SCE is interpreting the sentence much more broadly than was intended. The relevant portion of the order states:

> A review of the data request and responses contained under tab B which are still the subject of dispute, do not require additional responses. Those data requests seek information that is beyond the scope of this hearing, or ask for contract interpretation or other legal analysis that BPA is not required to provide. Some additional information was given to SCE, even in response to these disputed data requests and that should be sufficient for SCE to make its direct case. Since the Rate at issue in this docket was never developed in the 1996 case, how the other non-related 1996 Rates were developed is not relevant. As BPA pointed out, it has made no attempt to use the same methodology here that it used in 1996.

FPS-96R-O-06, at 3.

The order did not preclude SCE from raising the PF-96 and NR-96 rate schedules, or any other rate or analysis or other issue contained in the WP-96 rate case. Rather, the order merely states that some of the data requests involve matters outside the scope of the proceeding. The Hearing Officer correctly limited the discovery to the issues framed by the FRN. The decision did not preclude SCE from presenting evidence, but rather only shaped BPA's obligation to respond to the discovery request.

Finally, SCE contends the Hearing Officer's order allowed BPA to develop its rates "in a vacuum without explaining why it no longer follows the 1996 approach." FPS-96R-B-SO-01, at 10. BPA did not develop this rate in a "vacuum" and SCE has presented no evidence that it did so. BPA's rate directives do not require that it continue to follow the same methodology in perpetuity in developing rates. BPA explained in its rebuttal testimony the reasoning behind the change in methodology for pricing the capacity without energy product and these are sound reasons for the change. Procter, *et al.*, FPS-96R-E-BPA-05, at 13. Most importantly, SCE was in no way denied any materials needed to evaluate BPA's proposal or formulate its response, either by BPA or by the Hearing Officer's discovery order. SCE's complaint is that BPA did not conduct certain pieces of analysis that SCE wanted it to conduct, but BPA is under no obligation to perform any and all analysis or comparative analysis that the parties feel is relevant. Procedures, §1010.8(b).

SCE's Brief on Exceptions makes the seemingly contradictory and inaccurate contentions about the discovery process. In its Brief on Exceptions, SCE states: "What little discovery that was produced was not produced until after that date, (October 17) allowing SCE less than a week to analyze the materials produced. And what was produced? More than 80 volumes of materials from the 1996 rate case with no indication of where to find any of the materials requested." FPS-96R-R-SO-01, at 34 (*parenthetical added*).

SCE's complaints about discovery in the Brief on Exceptions do not accurately reflect the circumstances. In those instances where SCE sought materials in response to data requests, BPA

made those materials available for inspection and copying. These materials were available for inspection after BPA responded to the data request on September 24, 1999. Rather than availing itself of the opportunity to inspect and copy the materials requested, SCE chose to file the motion to compel and in addition sought to extend the time for the rate proceeding. The Hearing Officer denied all of SCE's requests for documents and gave SCE an additional 11 days to file its direct case. The extension of time was significantly less than the extension sought by SCE in its motion. FPS-96R-O-06. Even though not required by the Hearing Officer's order, BPA voluntarily produced the record from the 1996 Rate Case. These documents were part of the materials previously made available for inspection. To the extent that SCE did not have time to analyze the materials, it is a problem of its own creation.

SCE also takes the contradictory positions that BPA produced very little material yet the materials produced were more than it could successfully analyze in the time allotted. Apparently, when BPA voluntarily produced materials SCE considered it to be very little material. *Id.* Yet, SCE acknowledges and complains in its Brief on Exception, that 80 volumes of the 1996 rate case record BPA voluntarily produced were more than SCE could successfully analyze. SCE cannot have it both ways. It cannot argue that BPA produced little material and still maintain that it was overwhelmed by the amount of materials voluntarily produced by BPA. Any problems SCE had reviewing the materials BPA voluntarily produced is a problem of its own making by not availing itself of the opportunity to review the materials before the order on the motion to compel.

***Decision***

*The Hearing Officer's denial of SCE's motion to compel did not deny SCE materials critical to its case or the ability to present those materials in any way it desired.*

## 4.3 Complete Record

***Issue***

*Whether the Hearing Officer erred by not allowing SCE a sufficient opportunity to present evidence to establish a complete record.*

**Parties' Position**

SCE argues that the record demonstrates its inability to present a full and complete record. FPS-96R-B-SO-01, at 10-13. SCE contends that the Hearing Officer erred when she struck portions of SCE's direct testimony that addressed discovery issues. *Id.* at 10. SCE believes that striking portions of its testimony related to discovery disputes "improperly gives the appearance that SCE failed without explanation to address certain issues, when in fact SCE could not address the issues due to a limitation on discovery." *Id.* at 10-11.

Second, SCE argues that the Hearing Officer foreclosed further inquiry into contract matters during cross-examination after acknowledging the relevance of this matter in her order on the motion to strike. *Id.* at 11.

Third, SCE argues that the Hearing Officer's decision granting SCE's motion for leave to file supplemental testimony evidences an apparent desire by the Hearing Officer "to limit the record and evidence SCE was able to bring forth." *Id.* SCE also argues that it was an error to strike SCE's reply to BPA's memoranda in opposition to SCE's motion to file supplemental testimony. *Id.*

Fourth, SCE argues that there was "fundamental unfairness" in the manner in which cross-examination was conducted. *Id.* at 11. SCE believes that BPA attempted to improperly frustrate SCE's cross-examination by making objections to questions in a way that mischaracterize SCE's question. In addition, SCE alleges that BPA used objections "to tell the BPA witnesses what they were to say in response" to SCE's questions. *Id.* Finally, SCE contends that the Hearing Officer "solicited objections or completed the objections raised by BPA before sustaining them" and that the Hearing Officer unfairly supported BPA in its inappropriate actions during cross-examination. *Id.*

SCE argues that, compared to the nature of cross-examination in the 1996 proceeding, the cross-examination in this proceeding was substantively different. *Id.* SCE contends that a comparison demonstrates that SCE's questions were neither objectionable nor inappropriate. *Id.* SCE contends that the record is notable for the number of questions BPA refused to answer on cross-examination with the assistance of the Hearing Officer. *Id.* at 12. In addition, SCE feels that its opportunity to present its case was thwarted by the Hearing Officer when she is alleged to have asked SCE to speed up or conclude its cross-examination. *Id.*

Finally, SCE argues that BPA's decision to waive cross-examination of SCE's witnesses deprived SCE of the opportunity to correct factual inaccuracies made by BPA witnesses. *Id.*

**BPA's Position**

BPA's position is that striking the testimony related to discovery issues was appropriate given the limited scope of issues in this proceeding. The testimony in question involved complaints that BPA failed to produce discovery materials or produced them in an untimely manner. As discussed more fully above BPA believes that it complied with all discovery requests. BPA believes that SCE has offered no evidence demonstrating how it suffered procedural due process harm as a result of the order denying certain aspects of SCE's request to file supplemental testimony.

BPA believes cross-examination was not fundamentally unfair and that the manner in which BPA made objections during SCE's cross-examination was reasonable.

BPA believes that its decision to waive cross-examination did not wrongfully deny SCE the ability to rebut factual matters. SCE had a full and fair opportunity during its cross-examination of BPA's witnesses to rebut any factual matters.

***Evaluation***

Despite the very limited issues in this proceeding, SCE filed thirty-nine pages of testimony in its direct and supplemental cases. SCE cross-examined BPA witnesses for virtually an entire day and at the end of the hearing submitted several documents into the record, including the NR-96 rate schedule. SCE has produced a substantial record given the limited issues in this proceeding.

SCE's initial contention that striking testimony from its direct case regarding discovery issues created a procedural deficiency is without merit. Striking the testimony did not deprive SCE of its right to raise any issue or to create a record of its position in this rate proceeding. In fact, SCE has raised these issues in its brief, (*see* FPS-96R-B-SO-01, at 8), which is the appropriate manner in which a party should raise procedural issues, rather than raising legal argument through lay testimony.

Furthermore, SCE misinterprets the order on the motion to strike. SCE was not precluded from presenting arguments about discovery issues to the Administrator. Rather, the Hearing Officer properly ruled that these matters were not appropriate for testimony. The order states that "[t]hese kinds of arguments are inappropriate for testimony and should be raised by counsel at the proper time." FPS-96R-O-08, at 5. In fact, SCE raised the very issues in question in its brief. FPS-96R-B-SO-01, at 8-9.

SCE next contends that the Hearing Officer's decision to "quickly foreclose" further inquiry on the contract related matters resulted in an incomplete record. FPS-96R-B-SO-01, at 11. SCE's contention is without merit. The applicability of the rate proposed in this proceeding to SCE's contract may be an issue of contract dispute between BPA and SCE, but it is not an issue in this rate proceeding. The order correctly limited SCE from turning this proceeding into an examination of SCE's contract rights. The order, however, specifically states that "its contract is relevant to the extent it may be used to demonstrate the necessity of and the reasons for, proposing a change in the rate schedule." FPS-96R-O-08, at 2. The portion of the transcript, referenced by SCE in its brief, demonstrates the Hearing Officer's intent was not to foreclose discussion, but rather was directed to focus on the issues relevant to this rate proceeding.

> HEARING OFFICER EDWARDS: Certainly you're entitled to explore the basis of the rate, the methodologies used in calculating that rate and the reasons for calculating that rate. It does seem to me, though, Ms. Fisher, that with respect to SCE and its contract you're tending to put the cart before the horse, here. You're looking at it as if the interpretation of SCE's contract is absolutely vital to whether or not the rate schedule is a rate schedule which should be adopted or not. When, in fact, the rate schedule, whether or not it's a rate of universal application or whether it's applicable to SCE, the underlying foundation of that rate is what should be explored to determine the reasonableness for the rate, per se, without concern for

what contract it will be applied to at any point in time.

Now, when I permitted you earlier in the proceeding to bring in some evidence based on your allegations of prejudice or bias, what I was seeing there was that you were making a claim that the motivation for introducing the rate schedule at this point in time in this proceeding and for pricing it the way it was priced was strictly to single out SCE for some kind of punishment; for whatever reason, I have no idea.

MS. FISHER: Yes, that would be consistent with my --

HEARING OFFICER EDWARDS: But I haven't heard much evidence yet that goes to whether or not that has even taken place, because just a disagreement over the terms of the contract is not going to establish the kind of bias we're looking at, here, because contract interpretation is something people argue over all the time. And when the rate schedule is adopted, whether or not it applies to SCE's contract would be determined after the fact in that case, because you're saying, well it doesn't apply. Well, if it doesn't apply, then why do you care about the rate schedule? If it can't possibly apply, then you shouldn't be in here arguing about it now. But if in fact what you have is some evidence to show that this rate schedule has been designed particularly targeted at SCE for some unfair purpose, then that's what you should be focusing on, not whether or not your contract says this or that or whether Bonneville is correct when it says this term means X and you claim it means Y. That isn't why we're here.

Tr. 163-165.

The Hearing Officer noted in this exchange that there was limited relevance to contract related matters. SCE was free to explore contract issues within the context of the rate issues relevant to this proceeding.

SCE's next argument involves the Hearing Officer's decision granting SCE's request to present supplemental testimony. Without explaining how its procedural due process rights were harmed, SCE contends it was harmed when it was denied the opportunity to file supplemental testimony. The source of SCE's concern may be the finding that only three (Nos. 1, 4 and 7) of the interrogatory responses accompanying the testimony were relevant. The order noted, however, that "[t]he other interrogatories and document requests, however, either refer to Nos. 1, 4 or 7 or

they provide no support for the issues raised in this proceeding." FPS-96R-O-09, at 2. In addition, SCE's supplemental testimony does not reference any of the rejected interrogatories or document requests. SCE's testimony merely references the interrogatories that were allowed under the order. Given the absence of any reference to the rejected material in SCE's testimony and no demonstration in its brief regarding how the rejected elements prejudiced its case, there is no support in the record for SCE's position.

SCE's next argument is that cross-examination was fundamentally unfair due to the manner in which BPA made objections during SCE's cross-examination. SCE did not raise this concern with the Hearing Officer during the hearing. SCE now believes the tactics employed were somehow unfair. However, SCE does not specify what objections crossed the line and how this prohibited SCE from presenting its case and developing the record it felt was appropriate. SCE contends that cross-examination in BPA's 1996 rate proceeding was fundamentally different. FPS-96R-B-SO-01, at 11. SCE makes this contention without offering any evidentiary support. The record does not support the allegation that cross-examination in the 1996 hearing was conducted in a fundamentally different manner.

SCE's final and most puzzling contention is that it was improper for BPA to waive cross-examination. SCE apparently wanted to use BPA's cross-examination as a means for SCE's witnesses to rebut alleged inaccurate statements by BPA witnesses. BPA was not obligated to cross-examine SCE's witnesses. Furthermore, if BPA witnesses made inaccurate statements in their direct rebuttal or cross-examination testimony, SCE had the opportunity to confront the witnesses with evidence that would impeach their testimony during cross-examination.

***Decision***

*SCE was not denied its fundamental due process rights to develop a full and complete record in this proceeding.*

## 4.4 Environmental Considerations

In response to the need for a sound policy to guide its business direction under changing wholesale electricity market conditions, BPA developed a Business Plan. BPA's Business Plan Final Environmental Impact Statement (BP EIS) (DOE/EIS-0183, June 1995) evaluated six alternative business directions. The BP EIS was intended to support a number of business decisions, including rates for products and services to be implemented in the 1995 and 1996 rate cases and future rate cases. The 19 key policy issues analyzed in the BP EIS included rates-related issues, such as bundling and unbundling products and services and pricing. In the Business Plan Record of Decision (BP ROD) (August 15, 1995), the Administrator selected the Market-Driven alternative. As documented in that ROD, this alternative struck a balance between marketing and environmental concerns. By competing successfully in the wholesale electric utility market, BPA ensured the financial strength necessary to maintain a high level of support for public benefits.

Consistent with the tiered ROD procedure established in the BP ROD, the Administrator reviewed the BP EIS and determined the actions embodied in the 1996 rates proposal were

adequately covered within the scope of the BP EIS. BPA's final 1996 rate proposal was found to be consistent with BPA's Business Plan, the BP EIS and the BP ROD. This determination was documented in section 14.3 (Environmental Analysis) of the 1996 Final Rate Proposal, Administrator's Record of Decision. WP-96-A-02, at 526.

The proposed adjustments to the FPS-96 rate schedule clarify the FPS-96 rate schedule and establish a posted rate that will apply to the capacity without energy product. As discussed previously, this clarification is consistent with the 1996 Final Rate Proposal, Administrator's Record of Decision (WP-96-A-02, at 323) which noted that the capacity without energy product would be offered under the FPS-96 rate at negotiated, rather that posted, rates. Therefore, the National Environmental Policy Act compliance for this Firm Power Products and Services Rate Adjustment is provided by the 1996 Final Rate Proposal, Administrator's Record of Decision.