## 5.0 CONCLUSION

As required by law, the rates established and adopted in this ROD have been set to recover the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and all other costs and expenses incurred by the Administrator in carrying out the requirements of the Northwest Power Act and other provisions of law. In addition, these rates have been designed to be as low as possible consistent with sound business principles, to encourage the widest possible use of BPA's power, to equitably allocate the recovery of transmission costs between Federal and non-Federal users, and to satisfy BPA's other ratemaking obligations. The Hearing Officer has assured that all interested parties and participants were afforded the opportunity for a full and fair evidentiary hearing, as required by law.

BPA must evaluate the proposed rates in a section 7(i) proceeding pursuant to the Northwest Power Act. BPA must also evaluate the potential environmental impacts of the proposed rates and alternatives thereto, as required by NEPA. In this instance, the environmental analysis provided by the Business Plan Final EIS details the environmental impacts of this final FPS-96R rate proposal. The environmental analysis contained in the Business Plan Final EIS has been considered in making the decisions in this Record of Decision.

Based upon the record compiled in this proceeding, the decisions expressed herein, and all requirements of law, I hereby adopt the attached Firm Power Products and Services FPS-96R Rate Schedule as final Bonneville Power Administration rates. In accordance with Federal Energy Regulatory Commission Requirements, 18 C.F.R. section 300.10(g), the Administrator hereby certifies that the Firm Power Products and Services FPS-96R Rate Schedule adopted herein is consistent with applicable laws and is the lowest possible rate consistent with sound business principles.

Issued at Portland, Oregon, this 15th day of March, 2000.

[signature]

Administrator

BONNEVILLE POWER ADMINISTRATION

JUNE 1996

# 1996 FINAL RATE PROPOSAL

## WHOLESALE POWER RATE DEVELOPMENT STUDY

WP-96-FS-BPA-05

025256

BONNEVILLE POWER ADMINISTRATION

BPA F 1323.04
Electronic Version
Approved by
BIOT 1/11/93
(94-89)
(Previously BPA
1392A)

additional costs are allocated to the PF Exchange rate due to the section 7(b)(2) rate test. The PF Exchange rate includes rate components similar to the rate components of the PF Preference rate. The PF Exchange demand charge is the same as the PF Preference demand charge. The PF Exchange energy charges are seasonally differentiated the same as the PF Preference energy charges.

Unlike the PF Preference rate, the PF Exchange rate contains a single energy rate for all hours. That is, the PF Exchange rate does not contain HLH and LLH energy charges. The PF Exchange rate also includes charges for Load Shaping, Load Regulation, and transmission service under the Network Integration (NT) rate, which are also included in the services provided PF Preference customers.

Finally, the PF Exchange rate includes an adjustment (or adder) for the section 7(b)(2) rate test. The section 7(b)(2) rate test is described in the Section 7(b)(2) Rate Test Study and Documentation (WP-96-FS-BPA-07 and WP-96-FS-BPA-07A).

4.7 Firm Capacity Without Energy

Firm capacity without energy is a product that allows customers to purchase power from BPA during HLH and requires return of the associated energy within 24 hours. Firm capacity without energy is available under the PF-96 and NR-96 rate schedules for Computed Requirements customers purchasing under the 1981 Contract. Firm capacity without energy also is available under the FPS-96 rate schedule, at negotiated prices and terms that may vary from those in the PF and NR rate schedules.

BPA F 1321.04 Electronic Version Approved by SSDT 1/11/93 (04-89) (Previously BPA 1392A)

The rates for firm capacity without energy under the PF-96 and NR-96 rate schedules are calculated by summing BPA's annual generation demand charge of $0.87 per kilowatt and the differentials between HLH and LLH energy charges for each of the six energy seasons for each rate schedule. The differentials between HLH and LLH energy charges for the PF rate are calculated using the energy rates as published in the PF-96 rate schedule. The differentials between HLH and LLH energy charges for the NR rate are calculated using the Total Allocated Costs NR rate; *see* Table RDS52 in section 3.5 of the WPRDS Documentation. For both the PF and the NR capacity rate calculations, each season's energy rate differential in mills per kilowatthour is converted to dollars per kilowatt-month assuming a standard 50-hour per week capacity product and an average number of weeks per month. *See* section 7.1 of the WPRDS Documentation, WP-96-FS-BPA-05A.

4.8 Energy Return Surcharge

The Energy Return Surcharge applies to customers purchasing capacity under the PF and NR rate schedules who return energy during offpeak hours to BPA at a rate greater than 60 percent of amount of capacity purchased. The methodology for calculating the surcharge is the same as the methodology used in the 1993 final rate proposal except that the surcharge for the 1996 rate proposal is calculated for the six energy seasons. The energy return surcharge for each season is a mills per kilowatthour charge for energy returned during a single offpeak hour at more than 60 percent of the difference between a purchaser's Billing Demand and Computed Average Energy Requirement for the billing month.

The energy return surcharge is designed to account for the reduction of sustained peak capability due to higher rates of energy return. Given an 8-hour limitation per day for peaking services, the most efficient energy return during offpeak hours to maximize sustained peak capability is

025318

# Final Firm Power Products and Services Rate Adjustment Proposal (FPS-96R)

**Appendix: Revised FPS-96 Rate Schedule**

# SCHEDULE FPS-96R
# FIRM POWER PRODUCTS AND SERVICES

## SECTION I. AVAILABILITY

This rate schedule is available for the purchase of Firm Power, Capacity without energy, Supplemental Control Area Services, Shaping Services, and Reservation and Rights to Change Services for use inside and outside the Pacific Northwest during the period beginning October 1, 1996, and ending September 30, 2006.

Products and services available under this rate schedule are described in the reprint of the 1996 GRSPs for FPS-96, Section III.A of BPA's General Rate Schedule Provisions (GRSPs). BPA is not obligated to enter into agreements to sell products and services under this rate schedule or make power or energy available under this rate schedule if such power or energy would displace sales under the PF-96, NR-96, IP-96, or VI-96 rates schedules or their successors. Sales under the FPS-96 rate schedule are subject to BPA's GRSPs. Transmission service over Federal Columbia River Transmission System facilities shall be charged under the applicable transmission rate schedule. Ancillary services shall be available under, or at charges consistent with, the Ancillary Products and Services (APS) rate schedule.

This rate schedule supersedes the Surplus Firm Power (SP-93) and Emergency Capacity (CE-95) rate schedules. Rates under contracts that contain charges that escalate based on rates listed in this rate schedule shall include applicable transmission charges. For sales under this rate schedule, bills shall be rendered and payments due pursuant to BPA's Billing Procedures and/or as agreed to in purchase agreements.

## SECTION II. RATES, BILLING FACTORS, AND ADJUSTMENTS

For each product, the rate(s) for each product along with the associated billing factor(s) are identified below. Applicable adjustments, charges, and special rate provisions are listed for each product. This rate schedule contains four subsections, corresponding to the products offered under this rate schedule:

Section II.A. Firm Power and Capacity without energy.

Section II.B. Supplemental Control Area Services.

Section II.C. Shaping Services.

Section II.D. Reservation and Rights to Change Services.

## A. *FIRM POWER AND CAPACITY WITHOUT ENERGY*

### 1. RATES AND BILLING FACTORS

### 1.1 Contract Rate

The demand charge in the Contract Rate applies to purchases of a firm capacity with no energy return product exclusively, that is, a firm power sale product. Firm capacity with energy return (Capacity without energy) is available under the FPS-96 rate schedule at the prices identified in section 1.3. Contracts entered into on or before September 30, 1996, that refer to the demand charge in the Contract Rate section of the then applicable surplus power schedule for pricing this product will be priced under section 1.3.

#### 1.1.1 Demand Charge

The charge for demand shall be $0.87 per kilowatt per month in all months of the year, *multiplied by*
the Contract Demand unless otherwise agreed by BPA and the Purchaser.

#### 1.1.2 Demand Charge – Capacity without energy Sales

See section 1.3 for pricing.

#### 1.1.3 Energy Charge

*The total monthly charge for energy shall be the sum of (1) and (2):*

(1) the applicable HLH rate for that month, *multiplied by* the Purchaser's HLH Contract Energy unless otherwise agreed by BPA and the Purchaser; and

(2) the applicable LLH rate for that month, *multiplied by* the Purchaser's LLH Contract Energy unless otherwise agreed by BPA and the Purchaser.

| *Applicable Months* | *HLH Rate* | *LLH Rate* |
|---|---|---|
| September – December | 49.63 mills/kWh | 46.45 mills/kWh |
| January – March | 50.39 mills/kWh | 47.25 mills/kWh |
| April | 44.74 mills/kWh | 42.73 mills/kWh |
| May – June | 24.36 mills/kWh | 21.21 mills/kWh |
| July | 29.94 mills/kWh | 26.09 mills/kWh |
| August | 42.68 mills/kWh | 37.06 mills/kWh |

### 1.2 Flexible Rate

Demand and/or energy charges may be specified at a higher or lower average rate as mutually agreed by BPA and the Purchaser. Billing factors shall be Contract Demand and Contract Energy unless otherwise agreed by BPA and the Purchaser.

### 1.3 Capacity without energy

#### 1.3.1 Flexible Rate

*For sales not covered by section 1.3.2 the rate(s) for Capacity without energy sales shall be as mutually agreed by BPA and the Purchaser.*

1.3.2 Posted Rate

The posted rates shall be applied to contracts entered into on or before September 30, 1996, that include Capacity without energy provisions where payment shall be at the demand charge associated with the Contract Rate of the then applicable surplus power rate schedule. These rates may also be applied to contracts for Capacity without energy entered into on or after June 1, 2000. For sales pursuant to such contracts the monthly charge for Capacity without energy shall be the applicable rate for that month, *multiplied by* the Purchaser's Contract Demand associated with the purchase of Capacity without energy.

| *Applicable Months* | *Rate* |
|---|---|
| September – December | $12.20/kW-mo. |
| January – March | $8.95/kW-mo. |
| April | $8.13/kW-mo. |
| May – June | $6.68/kW-mo. |
| July | $10.78/kW-mo. |
| August | $16.04/kW-mo. |

## 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

### 2.1 Rate Adjustments

| *Rate Adjustment* | *Section* |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

### 2.2 Special Rate Provisions

| *Special Rate Provisions* | *Section* |
|---|---|
| Cost Contributions | II.D. |

## B. *SUPPLEMENTAL CONTROL AREA SERVICES*

### 1. RATES AND BILLING FACTORS

The charge for Supplemental Control Area Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Supplemental Control Area Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

#### 2.1 Rate Adjustments

| ***Rate Adjustment*** | ***Section*** |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

#### 2.2 Special Rate Provisions

| ***Special Rate Provisions*** | ***Section*** |
|---|---|
| Cost Contributions | II.D. |

## C. *SHAPING SERVICES*

### 1. RATES AND BILLING FACTORS

The charge for Shaping Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for use of Shaping Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

#### 2.1 Rate Adjustments

| *Rate Adjustment* | *Section* |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

#### 2.2 Special Rate Provisions

| *Special Rate Provisions* | *Section* |
|---|---|
| Cost Contributions | II.D. |

## *D. RESERVATION AND RIGHTS TO CHANGE SERVICES*

### 1. Rates and Billing Factors

The charge for Reservation and Rights to Change Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Reservation and Rights to Change Services shall be as established by BPA or mutually agreed by BPA and the Purchaser.

### 2. ADJUSTMENTS, CHARGES, AND SPECIAL RATE PROVISIONS

There are no additional adjustments, charges, or special rate provisions for the Reservation and Rights to Change Services.

**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

February 12, 1999

In reply refer to: PBS-5

Ms. Virginia Grosz
Contracts Manager
Southern California Edison
2244 Walnut Grove Ave.
Room 290
Rosemead, CA 91770

Re: Bonneville-Edison Sale & Exchange Agreement
(Contract No. DE-MS79-88BP92275)

Dear Ms. Grosz:

We are in receipt of your letter dated January 15, 1999, indicating that Southern California Edison (Edison) is considering exercising its option, pursuant to section 12(a) of the above referenced Agreement, to receive an additional 250 MW of capacity from June 1, 1999, to October 31, 1999. The letter includes prices for the firm power and transmission charges Edison believes would be applicable to such a transaction. The purpose of this letter is to explain both why the charges listed in your letter are incorrect, and how the product will be priced should you wish to exercise your option.

As you note, pursuant to section 12 of the Sale and Exchange Agreement, Edison may request that Bonneville deliver to Edison 250 MW of capacity during the five month period June-October, in addition to other capacity delivered by Bonneville under the Agreement. This is referred to in the Agreement as "Option Capacity." This is a firm capacity without energy product, which means Edison returns the energy to Bonneville at a later time, rather than paying money for it. The terms of Edison's return obligations are governed by the Agreement, although Bonneville can opt to have Edison pay for such energy pursuant to a cash out rate formula in the Agreement. With regard to the price for the Option Capacity, section 12(a)(4) states that:

> Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties Authorized Representatives may agree upon another applicable rate.

The Firm Power Products and Services (FPS-96) rate schedule is a successor to SP-87. Your letter lists a price for the Option Capacity, exclusive of the applicable transmission charges,

of $0.87/kW/month, as listed in the FPS-96 demand charge contract rate section. This would appear on its face to be a correct application of section 12(a)(4), which directs the parties to use the rate found in that section of the schedule. However, the FPS-96 contract rate demand charge section was designed and priced to be sold with a separate energy product (firm capacity with energy), not for a firm capacity without energy product, which is what Edison is buying when it purchases Option Capacity under section 12 of the Agreement.

The $0.87/kW/month price is - and was at the time the schedule was adopted - substantially below the actual cost of the capacity without energy product.

Unlike in the FPS-96 schedule, the contract rate demand charge in SP-87, and for each of the three successor surplus power rate schedules up to FPS-96, *was* priced to provide the firm capacity without energy product Edison may purchase under section 12 as Option Capacity. Under these schedules, surplus firm power included: 1) firm energy; 2) firm energy with capacity; *and* 3) firm capacity without energy, and the demand charge in the contract rate was priced to reflect the value of capacity, with or without energy.

Pursuant to product unbundling that Bonneville did in the 1996 rate case, separate sections for the firm capacity without energy product were included in the PF-96 and NR-96 rate schedules. Consistent with this product unbundling, the FPS-96 schedule intended to unbundle its capacity and energy products. Although clarifying language was mistakenly omitted from the FPS-96 schedule, it was Bonneville's intent that the firm capacity without energy product would be sold at a negotiated price. This fact is demonstrated in Bonneville's 1996 Wholesale Power Rate Development Study (WPRDS). Section 4.7 of the WPRDS states in pertinent part that:

> Firm capacity without energy is available under the PF-96 and NR-96 rate schedules for Computed Requirements customers purchasing under the 1981 Contract. ***Firm capacity without energy is also available under the FPS-96 rate schedule, at negotiated prices and terms that may vary from those in the PF and NR rate schedules***. (emphasis added)

Bonneville erred in the FPS-96 schedule when it failed to expressly state in that schedule that the firm capacity without energy product would be priced at a negotiated rate, and that the demand charge in the contract rate was for a firm capacity with energy product exclusively. The fact that an error was made is reflected in the quoted language, and in the fact that the $0.87/kW/month price is (and was at the time the rate schedule was developed) priced below Bonneville's cost for a firm capacity without energy product, and the fact that the FPS-96 contract rate demand charge contains no differentiation in price between months, as there is in the earlier successor rate schedules to SP-87.

Because the FPS-96 contract rate demand charge is not applicable to a capacity without energy product, Bonneville is unable to provide Edison with Option Capacity at the demand charge posted in that section. However, we stand ready to negotiate a fair and equitable price for

the Capacity Option product that is mutually acceptable to the parties, either for the upcoming delivery year alone, or for additional years through a contract amendment. In addition, we will need to discuss how Edison would like to deal with the issue of energy losses associated with deliveries by Bonneville.

In the event that Bonneville and Edison are unable to reach a mutually acceptable rate, Bonneville will use its ratemaking authorities, as provided by section 7 of the Pacific Northwest Power Planning and Conservation Act, 16 U.S.C. 839, 839e(a)(1), to rectify the error introduced in the FPS-96 schedule. Current indications are the corrected contract rate demand charge used for capacity without energy will be in the range of $11.00 per kW per month.

Although we feel that transmission is secondary to the larger demand charge issue, I wanted to address the underlying charges the BPA Power Business Line (PBL) would pass on to Edison under a Capacity Option sale. Section 4 of the Agreement provides that deliveries shall be at the California-Oregon Border (COB) and/or the Nevada-Oregon Border (NOB), with the share at each to be specified by Edison. A request by Edison that deliveries be made at both COB and NOB would result in the purchase of 250 MW on both paths in order to maintain firm deliveries, and consequently double the transmission charges of choosing only one point of delivery (POD). Thus:

| | |
|---|---|
| | PTP (network) N-S = $1.00 X 250MW = $250,000 |
| | PTP (Intertie-COB) N-S = $1.274 X 250MW = $318,500 |
| | PTP (network) N-S= $1.00 X 250MW = $250,000 |
| | PTP (Intertie-NOB) N-S= $1.274 X 250MW = $318,500 |
| Total | $1,137,000 per month |

If Edison chooses only one POD, the costs would be one-half of this amount.

A second transmission issues concerns transmission losses. Because of Federal Energy Regulatory Commission (FERC) rules requiring unbundling of power and transmission products, transmission losses are no longer embedded in the overall transaction price and have a separate charge associated with the service. Specifically, there are two components associated with transmission losses. First, compensation for the energy associated with losses is addressed in Attachment A, Exhibit C Section 1(g)(2)(a), (b) and (c) of Bonneville's Open Access Transmission Tariff (OATT). The loss factors that are to be applied are in Exhibit C Section 2. Second, additional transmission capacity is necessary to support the delivery of losses. Edison may choose to purchase addition transmission capacity to support the loss amount. Under this option, Edison would apply the Network and IS loss factors from Exhibit C Section 2 of the OATT to calculate the total amount of transmission capacity necessary to support the delivery for losses. If Edison chose both COB and NOB as the POD the additional transmission capacity loss charges would look like this:

PTP (network) N-S= 1.9% x 250MW = 5MW X $1.00 = $ 5,000
PTP (Intertie-COB) N-S= 3.0% X 250MW = 8MW X $1.274 = $ 10,192
PTP (network) N-S= 1.9% X 250MW = 5MW X $ 1.00 =$5,000
PTP (Intertie-NOB) N-S= 3.0% X 250 MW = 8MW X $1.274 = $10,192
Total Additional Costs for TX losses =$30,384 per month

If Edison were to choose either COB or NOB as the POD the additional loss charges would be one-half of this amount. Alternatively, Edison could choose to forgo purchasing this additional transmission capacity for losses, and simply be subject to unauthorized increase charges, which would be billed to Edison if incurred.

Grand total costs for COB and NOB POD selection:

| | |
|---|---|
| Cost of Transmission Capacity for deliveries | = $1,137,000 |
| Cost of Loss Transmission Capacity | = $ 30,384 |
| Grand Total Transmission costs | = $1,167,384 per month |

Grand Total for COB or NOB POD selection:

| | |
|---|---|
| Cost of Transmission Capacity for deliveries | = $568,500 |
| Cost of Loss Capacity | = $ 15,192 |
| Grand Total Transmission costs | = $583,692 per month |

Under either scenario, the grand total costs will be higher if Edison elects to return the energy portion of losses.

I hope this helps to clarify the costs associated with purchasing Option Capacity. We apologize for the confusion regarding the power portion of the pricing applicable to Option Capacity, but I want to reiterate that Bonneville is prepared to negotiate an appropriate price if Edison decides it wishes to exercise its option rights.

Sincerely,

Mark Miller
Account Executive

cc:
Jill Horswell
Mgr. Power Contracts, Energy Supply & Marketing
Southern California Edison

Kevin R. Cini
Mgr. Energy Supply & Marketing
Southern California Edison

UNITED STATES OF AMERICA
U.S. DEPARTMENT OF ENERGY
BEFORE THE BONNEVILLE POWER ADMINISTRATION

| | | |
|---|---|---|
| Bonneville Power Administration's FPS-96R Rate Adjustment | ) ) ) | BPA Docket FPS-96R |

# INITIAL BRIEF
# OF
# SOUTHERN CALIFORNIA EDISON

December 2, 1999

Ann L. Fisher
1425 SW 20th Ave., Suite 202
Portland, OR 97201
(503) 721-0181

Attorney for
Southern California Edison

FPS-96R-B-SO-01

UNITED STATES OF AMERICA
U.S. DEPARTMENT OF ENERGY
BEFORE THE BONNEVILLE POWER ADMINISTRATION

| | |
|---|---|
| Bonneville Power Administration's FPS-96R Rate Adjustment ) ) ) ) | BPA Docket FPS-96R<br><br>**SOUTHERN CALIFORNIA EDISON'S INITIAL BRIEF** |

INTRODUCTION AND STATEMENT OF THE CASE

Southern California Edison (SCE) submits this Initial Brief to set forth SCE's position regarding the Bonneville Power Administration's (BPA) efforts to 1) improperly develop a rate in an expedited 7(i) proceeding under the Pacific Northwest Power Planning and Conservation Act, 16 USC Sec. 839e(a), (*Regional Act*) that applies only to SCE's contract and to no other; 2) amend the terms of the Power Sale and Exchange Agreement, Contract No. DE-MS79-88BP92275, dated October 18, 1988 by and between SCE and BPA (SCE's contract) by use of such a proceeding; 3) utilize a methodology to develop such rate that is inconsistent with the 1996 wholesale power rate case methodology and the currently pending 2002 rate case methodology and which results in a rate substantially higher than rates charged to other BPA customers with comparable service; and 4) develop such rate without consideration of alternative methodologies and consideration of a full and complete record.

SCE submits that the purpose of the instant proceedings is to force a rate upon SCE that is not contemplated by its contract, a rate of such magnitude that SCE would likely determine that it would not be prudent to exercise its rights under its contract to purchase option capacity and thereby free BPA of its legal obligation to supply capacity under SCE's contract without complying with the contracts' early termination provisions. BPA's use of the expedited 7(i) proceeding in this manner lacks fundamental fairness and is inconsistent with BPA's mandates under the statutes cited below. Further, even if BPA has broad and unfettered discretion to use a 7(i) proceeding to develop a rate applicable to only a specific customer under a specific contract, BPA's methodology is inconsistent with its general obligations to set rates having regard to the recovery of the cost of generation and transmission, to encourage the most widespread use of BPA power, and to set rates at the lowest possible rates to consumers consistent with sound business practices. *Regional Act, Sec. 7(k), 16 USC Sec. 839e(k).* The rate

proposed in this docket is based, not on actual costs of transmission and generation, but on what BPA views as "market value" for a product for which no market currently exists. (See testimony of Gary Bolden at cross-examination TR p. 146, lines 6-11.) Finally BPA's characterization of the proposed rate as a correction of an error or omission is an unlawful attempt to set a new rate without following the mandates for rate developed under the *Regional Act*. There is already a filed and approved rate in the 1996 rate schedule applicable to SCE's contract. BPA cannot now claim "error" to insert a new rate without review of the loads and resources, cost allocations, and other ratemaking obligations inherent in developing a new rate.

The following defects are present in this matter, as discussed in greater detail below:

1. The hearing officer failed to permit the development of an adequate record. SCE has not been permitted to use either discovery or hearings to locate the facts for or adduce a full evidentiary record.
2. BPA has failed to provide substantial evidence on the Record or articulate a rational basis for its decision. An agency is obligated to provide substantial evidence in the record and articulate a rational basis for its decision. *Electricity Consumers Resource Council v. FERC*, 747 F2d 1511 (DC Cir 1984.) Moreover, the *Regional Act* expressly holds BPA to this standard.
3. BPA has failed to explain why it has departed from what it did in the 1996 rate case and in the concurrent 2002 rate case. Where an agency departs from what it has previously done, it must acknowledge the difference and explain its departure. *State of Texas v. US*, 866 F2d 1546, 1557 (5th Cir 1989); *K. Davis, 4 Administrative Law Treatise Sec. 201.11* (1983). Not only has BPA failed to articulate a rational basis for its departure, it has taken the position that it has no obligation to articulate to the only party with an interest in the issue its rationale for and basis of the change. This position is unconscionable and has no place in a fundamentally fair proceeding. As discussed by the Court in *California Energy Resources v BPA*, 754 F2d 1470 (9th Cir. 1985), without an opportunity to challenge what BPA has done, the right to participate in this proceeding has been rendered meaningless.
4. The proposed rate is egregious, unfair, unreasonable, and is inconsistent with BPA's statutory obligations. BPA has departed from accepted rate making methodology to

develop a rate based upon "market." By using this methodology, BPA has effectively priced SCE's option capacity above any reasonable measure. The rate is higher than the rate charged for similar products and over-recovers BPA's costs. BPA has failed to meet its statutory mandates to price the product at the lowest possible price consistent with sound business practices and in so doing, has discriminated against SCE. It is disingenuous to claim, as BPA appears to do, that the world has changed and that it must price "capacity" sales in order to recover its costs when it has indicated that it sees no reason to price similar products to other customers consistent with this new approach. BPA has chosen to single SCE out for its "new" methodology, despite the different treatment to its other customers and despite the express terms of SCE's contract.

## BACKGROUND

BPA has asserted that it made an error or omission in developing the FPS 96 rates (which are approved for a ten-year period though 2006) by failing to include a posted contract demand charge specifically applicable to SCE's contract. While BPA has claimed that this is a rate for general applicability, by its Federal Register Notice (at page 44363) and its own testimony (FPS 96R-E-BPA-03, page 3 lines 9-11, 24-26), the proposed rate is only applicable to contracts executed prior to October 1, 1996 which price a capacity by reference to a contract demand charge. BPA has determined that there is only one contract that meets those criteria: SCE's.

Relevant portions of SCE's contract are set forth in SCE's direct testimony. As can be readily seen, the contract provides that SCE (Edison) may purchase a specified amount of capacity during certain months of the year on a preschedule basis, the price of which is to be based upon the contract demand charge listed in SP-87 or its replacement. In this proceeding, BPA asserts that the FPS-96 rate is the replacement to SP-87. It is not clear whether the FPS-96 rate schedule actually prices the same product as SCE purchased under SP-87. Even if FPS-96 is