By "demand charge associated with the successor rate," both SCE and BPA anticipated that the demand charge would have the same characteristics as the demand charge in SP-87; specifically a demand charge that would be the same as the demand charge applicable to BPA's Pacific Northwest ("PNW") contract customers for surplus firm power. Kendall Decl., ¶ 7. In 2000, BPA refused to provide Option Capacity to SCE unless SCE paid a demand charge associated with a newly developed capacity without energy rate,[1] a rate not applicable or relevant to the demand charge contained in SP-87 and its successors because it is a different product Grosz Decl., ¶ 4, Exhibits 5-6. By refusing to sell option capacity to SCE at the rate required by the Contract, BPA breached the Contract and damaged SCE in the amount of $31,594,436.

## II. FACTUAL BACKGROUND

### A. Negotiating History Of The Contract

SCE and BPA negotiated the Demand Charge for the pricing of the Option Capacity to be the same as that charged to BPA's PNW contract customers to provide an objective basis for the rate and one that would result in parity with rates applied to BPA's firm power customers. The pricing mechanism for the Option Capacity was a particular concern to SCE during the negotiation of the Contract. Kendall Decl, ¶ 7. Initially, it attempted to negotiate a specified price for Option Capacity similar to other firm capacity obtained in the contract for the entire term of the Contract. Kendall Decl., ¶ 7. BPA was unwilling to accommodate that request. Kendall Decl., ¶ 7. On its part, BPA wanted the right to charge any rate from its various rate schedules that it chose and change the rate at its sole discretion. Kendall Decl. ¶ 7. SCE was unwilling to agree to that. Kendall Decl., ¶ 7.

It was important to SCE that it either pay a pre-determined price, or if it had to pay a price that was subject to adjustment by BPA, that it pay a price that was tied to a tariff rate that PNW customers would likely take service under. If SCE's rate for Option Capacity was tied to such a tariff rate, BPA would have less ability to charge an unreasonably high rate for SCE's Option Capacity to benefit itself to SCE's detriment because of

[1] The demand charge BPA claims applies for this new product can be found in section II.A.1.3.2 of the FPS-96R rate schedule. The demand charge applicable under the terms of the Contract can also be found in section II.A.1.1.1 of the FPS-96R schedule and is more than 10 times lower. Exh. 7.

likely vigorous opposition to such a rate from BPA's PNW customers. BPA's PNW customers are generally known to need energy as opposed to capacity given the large amount of capacity in comparison to the amount of energy available in the hydroelectric systems in the PNW. Accordingly, these customers are more likely to purchase capacity with energy products from BPA, rather than capacity without energy products. It was thus very important that the Option Capacity rate be tied to the demand charge associated with a capacity with energy product, as opposed to a capacity without energy product only. This assured SCE that its interest in desiring an equitable and reasonable rate for Option Capacity was aligned with PNW customers' interest in desiring an equitable and reasonable rate for the capacity with energy product. SCE believed that PNW customers would take an active role in any attempts by BPA to increase rates affecting them to inequitable and unreasonable levels. Thus, SCE would benefit from this alignment of interest. SCE understood that otherwise, an "Edison only" rate would in effect give BPA unilateral pricing rights, thus likely rendering SCE's option worthless. Kendall Decl. ¶ 7,8.

The Contract, as negotiated, specified the Surplus Power rate, thus satisfying SCE's requirements for a rate not subject to arbitrary revisions by BPA. The Contract specifies with precision the price SCE is to pay for Option Capacity. In particular, Exhibit 1, Section 12(a)(4) states:

> Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or, if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized Representatives may agree upon another applicable rate schedule.

The Contract also specifies how SCE is to pay for the energy associated with the Option Capacity. It gives BPA the unilateral authority to require SCE to pay for the energy associated with the Option Capacity, rather than returning it. This hardly describes a Capacity (Exhibit 1) without Energy product. The Contract (Exhibit 1) provides as follows in section 12 (a)(3):

> Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9 (c)(1).

This provision further distinguishes the price SCE agreed to pay from that which would be paid under a "firm capacity without energy" rate, under which customers must return energy during light load hours only and BPA has no option to require a cash payment. The Contract expressly permits *BPA* to select from two options: SCE returns energy during hours specified in the Contract[2] *without* paying any heavy load hour-light load hour ("HLH-LLH") energy price differential, or SCE purchases energy at a contract rate. Exh. 1, §12 This provision was important to BPA since it anticipated that it would often require SCE to pay for the energy rather than return it. Such payments would provide an important source of revenue for BPA. However, it was important to structure the contract in this manner so that BPA could continue to count on the energy if it were necessary to serve its firm requirements. Kendall Decl.,¶10. In fact, BPA took advantage of this feature: in 1999, BPA required SCE to purchase energy for more than half of the option period. While BPA has described the absence of an HLH-LLH differential as a "loophole" and the reason why SCE should be paying a Capacity without Energy demand charge, it is in fact precisely the benefit of the bargain that SCE sought and obtained in this part of the Contract. The HLH-LLH differential existed in 1987 and yet the Contract does not require SCE to pay an additional increment for it. Kendall Decl., ¶ 7.

Nothing in the Contract or the negotiating history suggests that BPA could modify the rate by creating a "demand charge" applicable to a different product, rather than the demand charge in the Contract. The only demand charge permitted in the Contract is found in BPA's tariffs for surplus firm power supplied to its PNW contract customers and others. Exh. 1, *passim.*

Unlike the rate for Capacity without Energy under the FPS-96 rate schedule, the SP-87 schedule has both a demand component and an energy component. The SP-87 schedule was superseded by the SP-93 schedule. Exh. 4 at 4. In turn, in BPA's 1996 General Rate Case the SP-93 schedule was superseded by the FPS-96 schedule. Exh. 4 at 4. Like SP-87 (at page 22 of Appendix A to Exh. 1), the FPS-96 schedule (Exh. 8) has a rate with both an energy charge and a demand charge; the latter is $0.87/kW-month. The FPS-96 demand charge for firm power is the price SCE is required to pay for Option Capacity under the Contract. In 1999, BPA instituted an "expedited rate case" to replace FPS-96 with FPS-96R.

---

[2] The Contract hours include heavy load hours.

Again, like, SP-87, the FPS-96R schedule has a rate with both an energy charge and a demand charge; the latter is $0.87/kW-month. Again, the FPS-96R demand charge for firm power is the appropriate price under the Contract for Option Capacity .

**B. Present Dispute**

On January 15, 1999, SCE informed BPA that it would exercise its option to purchase 250 MW of Option Capacity during June through October 1999, at the FPS-96 demand charge of $0.87/kW-month. Grosz Decl., ¶ 8 and Exh. 9. BPA informed SCE that it believed SCE was not entitled to purchase Option Capacity at the FPS-96 demand charge rate. Grosz Decl., ¶ 9 and Exh. 10. There followed several months of discussions. Eventually, BPA and SCE agreed that SCE would take the capacity and the parties would submit the dispute over the capacity rate to arbitration as to 1999. Grosz Decl., ¶ 9. In July 2000, the arbitrator ruled in SCE's favor.

On May 22, 2000, despite the availability of an applicable contract rate, BPA demanded that SCE pay for Option Capacity at the rate in section 1.3.2 of the FPS-96R rate schedule, a newly developed demand charge that is not the demand charge found in the successor to SP-87.[3] This demand charge represents the demand charge for a different type of product than the product purchased by SCE and a demand charge that was not agreed upon by the parties.

As noted above, according to BPA, since the contract demand charge for firm power in the FPS-96[4] schedule fails to include an energy component,[5] SCE is attempting to take advantage of a "loophole" in the Contract by taking energy during HLH periods and returning it during LLH periods. Exh. 4 at 4. Purporting to close that "loophole," BPA asserted that SCE is purchasing a product that is a "firm capacity without energy" or a "firm capacity with energy return" product solely. Its new price is based on that contention. BPA has never relied upon or referred to any specific language of the Contract to support its contention that it may charge a "firm capacity without energy" or a "firm capacity with energy return" price.

---

[3] The demand charge found in the successor to SP-87 can be found in section 1.1.1 of the FPS-96R rate schedule.

[4] Superceded by FPS-96R which has the same demand charge for firm power as FPS-96.

[5] SCE already pays for the energy separately.

Moreover, BPA's actual motive was simply to rid itself of its obligation to SCE. BPA's manager for this contract candidly admitted to *Clearing Up* in January 2000: "OK, fine—take it at 87 cents for one year, and we'll adjust the rate and make it prohibitively expensive in the future." Exhibit 11.

## III. DISCUSSION

### A. Liability

#### 1. Breach of contract

SCE's and BPA's obligations to one another are set forth in the Contract, and their relations in this matter are governed by ordinary contract law. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934). A Supreme Court majority recently reaffirmed *Lynch* in this respect. *See United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (Souter, Stevens, Breyer, O'Connor, JJ.); *id.* at 919-24 (Scalia, Kennedy, Thomas, JJ., concurring).

The Contract gives SCE an option to purchase at the demand charge for SP-87 or its successor, but BPA unequivocally refused to perform unless SCE paid the price for a product that it does not even contend is a successor rate to SP-87. The BPA Administrator has no right unilaterally to modify or amend the terms of a contract. In order for a party to modify a contract it must give the other party consideration, which BPA has not done.

Courts, and in particular the Court of Federal Claims, have routinely refused to permit the United States to modify its existing obligations without consideration. For example, in *Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655 (2001) ("APC"), the parties entered into an agreement that "was mutually beneficial, at least at its inception." *Id.* at 656. As here, from one side, that perception changed. APC sued over a dispute that had arisen and entered into a settlement agreement. Just five months later, Congress passed a statute that unilaterally modified three essential features of the settlement. *Id.* at 657. APC again sued and the court found the United States to have materially breached the contract. It wrote:

> The archetypical repudiation, therefore, occurs when one party to a contract attempts to unilaterally alter the contract or to condition his

> performance on terms that were not part of the bargain. *See, e.g., Louisiana-Pacific Corp. v. United States*, 228 Ct. Cl. 363, 366, 656 F.2d 650, 652 (1981)("It is hornbook law ... that the Government cannot terminate or change one of its contracts in whole or in part without consent of the other contracting party, without being held liable in damages for breach of contract"); *SMS Data Prods. Group, Inc. v. United States*, 17 Cl. Ct. 1, 9 (1989); see also, E. Allen Farnsworth, FARNSWORTH ON CONTRACTS § 8.21 (2d ed.1998)(demand for performance on terms that go beyond the contract is a repudiation when coupled with threat of nonperformance in the event terms are not accepted).
>
> The result is no different where the government as a party to the contract commits this same sin through subsequent legislation.

*Id.* at 659 (citing *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000)). *See also Contempo Design, Inc. v. Chicago & Northeast Ill. Dist. Council of Carpenters*, 226 F.3d 535, 550-51 (no new consideration for alleged modification) (7th Cir. 2000); *United States, ex rel. Excavation Concrete & Masonry Corp. v. A.C.S. Sys. Assocs., Inc.*, 2001 U.S. Dist. LEXIS 5213, *8-*9 (S.D.N.Y. 2001) (no consideration for alleged modification); *Williamsburg Drapery Co. v. United States*, 177 Ct. Cl. 776, 789 (1966) (no consideration for alleged modification by plaintiff).

Here, BPA has done exactly what the Court of Federal Claims forbade in *APC*. BPA's attempt to apply the capacity without energy rate in FPS-96R to SCE's Option Capacity represents a unilateral attempt to rewrite the Contract. To date, BPA has failed and refused to comply with the express terms and conditions of the Contract. Instead, BPA has demanded a rate that is not based on the SP-87 rate or its successor and, indeed, represents a completely different product than the one SCE buys from BPA. There is no statutory authority allowing BPA to ignore its contractual obligations or to unilaterally amend contracts which it voluntarily entered into and has received benefit from over the course of more than a decade.

**2. Breach of the duty of good faith and fair dealing**

There was no basis to support BPA's refusal to provide the Option Capacity until and unless SCE agreed to a new rate. Strong-arm tactics such as this violate BPA's obligations under the Contract and under law and violated BPA's obligations of good faith and fair dealing. Rather than deal in good faith with its counterparty, BPA has – as it promised – charged a prohibitively high rate.

BPA has intentionally removed one of the bases for SCE to enter into the Contract. Its doing so violated its duty of good faith and fair dealing. *Hubbard v. United States*, 52 Fed. Cl. 192, 196 (2002) is uncannily on point. There a rental service contracted to have a facility on a Navy base, but the base commander moved the office to a less desirable location. The Court of Federal Claims found that the Navy acted in bad faith. A passage from the case shows that it mirrors what BPA did here:

> Although Captain Gorthy [the base commander] did testify that he would not have moved the Rent All Center if he thought it would lose revenue, it is clear that he had made his decision to move the office without consulting, or really considering the concerns of, Mr. Hubbard [the plaintiff]. Indeed, Captain Gorthy fully acknowledged that he was willing to keep the Rent All Center in place if Mr. Hubbard increased the cut of the revenue that the Exchange would take. . . . While the court can in some respects only hazard a guess as to Captain Gorthy's motives for the move, it is clear to the court that the stated reasons for the move were pretextual, and that the move was engineered in bad faith, without regard, indeed, with deliberate and bad faith disregard, for the legitimate business interests of Mr. Hubbard.[2]
>
> [2] Captain Gorthy revealed something about his motives during his testimony. In response to questions about a proposal Mr. Hubbard made to make certain improvements, Captain Gorthy testified that it was his "gut feeling" that "it would have been in the best interest of the Navy to

> completely remove itself from any type of long-term contract." He also testified that he believed "that the Navy could run and manage and operate a mini-storage complex, as good, if not, better than an outside contractor." The logical inference to be drawn is that Captain Gorthy was hostile to a contracting relationship, such as this one, which approximated a partnership.

*Id.* at 196. Likewise, it is obvious that BPA wanted out of its Contract with SCE.

As noted above, SCE bargained for a rate that was of general applicability and available to BPA's other customers in the PNW. When BPA brought its expedited rate case to establish FPS-96R, it made it clear that the proposed rate applied to "[c]ertain BPA contracts executed prior to October 1, 1996", which BPA stated was a rate applicable *only* to SCE. Thus BPA was nullifying SCE's objective of tying the Contract to a rate of general applicability, applicable to parties both inside and outside the PNW, an objective that was adopted by the terms of the Contract. Grosz Dec., ¶¶ 10-11, Exhibit 12 at 2. BPA's breach is all the more egregious in light of its timing. Based on evidence SCE has developed in its claim relating to BPA's unlawful conversion of the Contract from a sale mode to an exchange mode, it appears that BPA's breach was motivated by a desire to sell the Option Capacity to others at a higher rate in the volatile California power market.

**B. Damages**

SCE hereby demands, as a matter of right, payment in the amount of $31,594,436. This amount represents SCE's damages for BPA's breach of contract and nonperformance. The amount includes the cost to SCE to acquire additional capacity from June 1, 2000 through October 31, 2000. It has been adjusted to give BPA all credits to which it may be entitled. The total damages reflect the loss occasioned by BPA's refusal to comply with the Contract through the 2000 delivery season by calculating the value that would have been received by SCE for the energy that would have been delivered ($50,582,069), less the cost to SCE for having to return or pay for the energy and pay the contract rate demand charge:

| | |
|---|---|
| Total Value SCE would have received absent BPA's Breach | $ 50,582,069 |
| Cost to SCE | $ 18,987,634 |
| **NET DAMAGES** | **$ 31,594,436** |

Declaration of Ed Kahn and Exhibit 13.

## IV. CONCLUSION

To summarize, SCE asserts that the Contract provides that Option Capacity be made available to SCE at the rate of $0.87/kW-month based upon the Demand Charge in the successor rate to SP-87. It is undisputed that the demand charge for firm power in the FPS-96R is the successor to the demand charge for firm power in the SP-87 rate schedule. BPA refused to comply with the Contract unless SCE agreed to modify the Contract by changing the pricing mechanism and using a newly developed demand charge for Capacity without Energy. BPA demanded that SCE pay a rate greater than 10 times more than the applicable rate, in excess of $11.00/kW-month. Because the proposed rate had no connection with the demand charge found in the successor rate schedule as required by the Contract, SCE was prevented from exercising its option to acquire additional capacity. SCE's damages are based upon the costs it incurred in replacing the capacity it was entitled to obtain from BPA. Therefore, based upon the foregoing, SCE makes demand upon BPA for the damages it incurred as a result of BPA's nonperformance and breach of Contract in the total amount of $ 31,594,436.

SOUTHERN CALIFORNIA EDISON COMPANY

BY: [signature]
Harold B. Ray
Executive Vice President

cc: Leon Bass, Jr., Esq.
Kevin Cini
Virginia Grosz
Jill Horswell

**CERTIFICATION**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which SCE believes the Government is liable; and that I am duly authorized to certify SCE's claim.

SOUTHERN CALIFORNIA EDISON COMPANY

BY: ______________________
Harold B. Ray
Executive Vice President

HBR:xxx

UNITED STATES OF AMERICA
U.S. DEPARTMENT OF ENERGY
BEFORE THE
BONNEVILLE POWER ADMINISTRATION

| | | |
|---|---|---|
| 1996 FIRM POWER SERVICES RATE | ) | |
| SCHEDULING CORRECTION | ) | BPA DOCKET FPS-96R |
| PROCEEDING | ) | |

Motion of the Bonneville Power Administration (BPA)
to Strike Portions of Southern California Edison's (SCE)
Direct Testimony

On October 27, 1999, SCE filed testimony in support of its direct case. FPS-96R-E-SC-03. BPA moves for an order striking the following: 1) testimony regarding settlement discussions between the parties over contractual disputes; 2) testimony involving objections to discovery or the expedited nature of this proceeding; 3) testimony discussing legal obligations under the Sale and Exchange contract between BPA and SCE; 4) general testimony concerning legal obligations under BPA statutes. As discussed more fully below, such subject matter is not appropriate for testimony in this proceeding.

**Testimony about Settlement Discussions**

Throughout SCE's testimony, responses describe SCE's version of settlement discussions and negotiations between the parties over contractual issues between SCE and BPA.[1] While BPA disputes SCE's characterization of the settlement discussions, these negotiations and the positions taken by the parties should not be admitted.

[1] The questions and corresponding answers that are specifically at issue here are set forth in Attachment A. In Attachment A BPA provides the entire question and answer at issue, highlights the portion BPA is moving against and specifically states why the highlighted portion should be stricken.

The rate-making procedures required by § 7(i) of the Northwest Power Act are for the purpose of establishing BPA's power and transmission rates in conformity with the various rate directives found in BPA's organic statutes. It is not a forum for resolving contractual disputes between BPA and its customers. The Federal Register Notice (FRN) describes the limited nature of this proceeding. In the FRN, the Administrator stated, "Pursuant to Rule 1010.3(f) of BPA's Procedures, the Administrator limits the scope of this hearing to issues respecting the correction of the FPS-96 rate schedule as described in section II hereof. Other provisions of the existing FPS-96 rate schedule are not rate matters for the purposes of this hearing." Section II of the FRN provides, "The purpose of the proposed changes to the Firm Power Products and Services (FPS-96) rate schedule is to clarify and establish the rates that apply to the capacity without energy product." This proceeding will result in a rate of general application. A recitation of the negotiating history between BPA and SCE serves no legitimate legal purpose in attaining that goal.

The Special Rules of Practice Governing These Proceedings, FPS-96R-O-01, prohibit parties from filing testimony that is not relevant to the issues in the proceeding.[2] As issues are framed in the FRN, testimony regarding settlement discussions, or the lack of these discussions, is not relevant to the issues in this proceeding. BPA's direct case contains no discussion of the settlement negotiations between the parties and SCE cannot make it an issue by interjecting it in this fashion.

While not directly applicable, the Federal Rules of Evidence (FRE 408) also provide useful guidance regarding the admissibility of settlement discussions. FRE 408

[2] Relevance. Evidence should be keyed to specific contentions or subjects. This relationship should be indicated by a heading or statement for the evidence (or portion of evidence) presented, specifically the contention or topic in support of which or in opposition to which the evidence is submitted, or the purpose for which the evidence is offered. However, these headings and statements will not constitute evidence.

prohibits the introduction of settlement discussions except in certain very limited circumstances.[3] The underlying purpose behind FRE 408 is to encourage open and free settlement discussions. This policy is just as relevant to BPA's contract disputes and administrative proceedings as it is to litigation in the Federal Courts. Permitting SCE to bring such negotiations into the rate proceeding would undermine the policy of promoting settlement of claims and issues. The testimony should be stricken.

**Discovery Complaints**

SCE posits a second category of questions and responses that deal generally with SCE's complaints about BPA's compliance with discovery obligations and the expedited nature of this proceeding. These discovery complaints generally center on allegations that BPA either failed to produce materials or produced them in an untimely manner. Again, such questions and the responses are not a proper subject for testimony in this matter. BPA's compliance or noncompliance with discovery requests are not proper subjects for testimony in this proceeding. See, Special Rules of Practice to Govern These Proceedings, FPS-96R-O-01. As previously noted the scope of this proceeding is defined by the FRN. There is no testimony or documentary evidence submitted in BPA's direct case, which involves discovery issues or expedited nature of the case.

Further, SCE has had its opportunity to raise its discovery issues by way of its motion to compel. There has been a ruling on that motion. The Hearings Officer's order

[3] Rule 408. Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed at either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is resented in the course of compromise negotiations. This rule also does not require exclusion when the evidence offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. (emphasis added)

clarified BPA's obligations to respond to SCE's data requests and lengthened the time SCE had to file its direct case. BPA complied with the order and to the extent necessary provided additional information or materials to SCE. If SCE has concerns with either BPA's compliance with its discovery obligations or the order of the Hearings Officer on the motion to compel, those concerns should be raised at the appropriate time and in the appropriate manner. They serve no useful purpose in assisting the Administrator to develop the factual record necessary to determine the appropriate rate for this product.

**Contractual Obligations under BPA's Contract with SCE**

Part of SCE's direct case is premised upon the notion that the rate being established in this proceeding does not apply to its contract with BPA. To support this proposition, SCE points to various contractual provisions. This entire line of questioning should be stricken because the issues raised are not relevant and do not respond to issues raised by BPA's initial proposal. See, Special Rules of Practice to Govern These Proceedings, FPS-96R-O-01. The scope of this proceeding is framed by the FRN. Whether the rate set in this proceeding applies to SCE's contract is an issue of contractual interpretation. If a rate for capacity without energy is established in this rate proceeding and BPA applies it to SCE's contract, SCE may pursue any concerns it has with this determination through a contract action in the proper forum. Bringing questions of contractual interpretation into this rate proceeding provides no substantive evidence regarding the appropriate nature of the rate being established.

SCE also incorrectly assumes that BPA is setting a rate only for its contract. This proceeding is designed to establish rates of general application--not merely to address the

issues with SCE's contract. While SCE's contract brought this issue to light, it does not follow that the rate is applicable only to that contract.

This FPS rate for capacity without energy would apply to any customer purchasing the product at a posted rate under this rate schedule. While BPA believes SCE has a contract to which the rate will apply, the Administrator is authorized to enter into additional contracts for the sale of this product until the rate schedule expires on September 30, 2006. Therefore, any contention that SCE may make that this proceeding is merely to set a rate for its contract fails to fully convey the nature of this proceeding.

**Legal Opinion Regarding Obligations under BPA Statutes**

SCE's direct testimony also expounds upon BPA's statutory obligations. Testimony submitted in this case must contain evidence, not legal argument. See, Special Rules of Practice to Govern These Proceedings, FPS-96R-O-01.[4] SCE provides its legal interpretation of the BPA's statutory obligations. This testimony should be stricken. SCE will not be prejudiced by striking this testimony because SCE will be free to use such material at the proper stage of this case, in its legal briefs.

The procedures do provide some latitude for a technical witness to testify about his or her understanding of BPA's statutes to the extent the testimony involves the technical, as opposed to, the legal obligations of the statutes to the rate making process. [5] Here SCE's evidence does not help explain the technical application of the rate-making statute but ventures into legal analysis or argument designed to advocate a particular

[4] General

Argument and legal opinion will not be received into evidence. They are the province of the lawyer, not the witness. They should be presented in briefs or legal memoranda. Legal memoranda, where appropriate will be welcome.

[5] According to the Qualifications Statements, none of SCE's witnesses set forth education or experiences that qualify them to render a legal opinion or to interpret BPA's statue. In addition, none of the witnesses

point of view. This type of legal argument should be reserved for the briefs filed at the conclusion of this hearing.

**Conclusion**

The questions and responses that BPA believes should be stricken are provided under Attachment A. The individual questions or groups of questions and their responses are provided along with a brief explanation of why BPA believes that particular piece of testimony should be stricken. BPA has highlighted those portions of the questions and responses it believes should be stricken. For the reasons stated above and those in Attachment A, BPA moves the Hearings Officer for an order striking those portions of SCE's testimony.

Dated this 2nd day of November, 1999.

Peter Burger
Attorney
Bonneville Power Administration

---

provides any evidence that they have had any prior involvement in a BPA rate proceeding that might provide a basis for a technical opinion about BPA's rate making statutes.