IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 03-2869C<br>(Judge Lettow) |

**SOUTHERN CALIFORNIA EDISON'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

I. NATURE OF THE CASE ........ 1

II. ISSUE PRESENTED ........ 2

III. PROCEDURAL AND FACTUAL BACKGROUND ........ 2

A. The Contract Negotiations For Option Capacity Pricing ........ 2

B. The Contract Terms For Option Capacity ........ 4

C. The Contractually Negotiated Price For SCE's Option Capacity Was Not Mandated By Statute Or Set Under Bonneville's Statutory Ratemaking Authority ........ 5

D. Bonneville Refused To Honor The Contractual Terms For Option Capacity Pricing ........ 6

1. Bonneville first breached the Contract in 1999 ........ 6

2. After its 1999 breach, Bonneville initiated the "Expedited Rate Case." ........ 7

a. The Expedited Rate Case did not develop an Option Capacity rate ........ 7

b. Bonneville prevented the development of an administrative record ........ 8

3. Bonneville continued to breach the Contract in 2000 ........ 10

E. Procedural History After Bonneville Breached The Contract ........ 10

IV. ARGUMENT ........ 11

A. Introduction And Summary Of Argument ........ 11

B. The Legal Standard For Review ........ 12

C. The Federal Circuit's Holding In *City Of Burbank* Demonstrates That This Court Has Jurisdiction Over Breach Of Contract Claims ........ 13

1. *City Of Burbank* recognized that Court of Federal Claims jurisdiction extends to contract actions against Bonneville unless the contractual provision at issue is statutorily mandated or was the subject of an administrative proceeding that generated a record ........ 14

2. The Federal Circuit's holdings in *City of Burbank* mandate jurisdiction in this Court ........ 18

a. SCE is not challenging a statutorily mandated rate ........ 19

b. There is no administrative record as required by *City of Burbank* ........ 22

**TABLE OF CONTENTS**
(continued)

**Page**

(i) There is no administrative record .................................... 22

(ii) The record is required: need for an administrative record has not been "called into question." ...................... 23

D. The "True Nature" Of Bonneville's Conduct At Issue Here Is Its Failure To Abide By The Terms Of A Contract; SCE Is Not Challenging A Final Agency Action Or The Implementation Of A Final Agency Action ................... 26

E. The Ninth Circuit's Transfer Of This Case To This Court Required A Determination That Jurisdiction Is Proper In This Court ..................................... 29

F. Bonneville Has Taken Inconsistent Positions In The FPS-96R Rate Case And In This Proceeding Regarding The Proper Forum For Jurisdiction ............. 31

V. CONCLUSION ......................................................................................... 32

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Burbank v. Bonneville Power Adm.*,
2004 WL 171534 (E.B.C.A.)(January 13, 2004) ....................25

*Central Lincoln Peoples' Utility District v. Johnson*,
735 F.2d 1101 (9th Cir. 1984)....................29

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988) ....................30

*City of Burbank v. United States*,
273 F.3d 1370 (2001)....................passim

*City of Burbank v. United States*,
47 Fed. Cl. 261 (2000) ....................10, 15

*Clark v. Busey*,
959 F.2d 808 (9th Cir. 1992)....................30

*Clearwater Constructors, Inc. v. United States*,
56 Fed.Cl. 303 (2003) ....................12

*Commonwealth Edison Co. v. United States*,
46 Fed.Cl. 29, 35....................23

*Compliance Corp. v. United States*,
22 Cl.Ct. 193 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir.1992)....................23

*CP Nat'l Corp. v. Jura*,
876 F.2d 745 (9th Cir. 1989)....................28

*Forelaws on Board v. Johnson*,
709 F.2d 1310 (9th Cir. 1983)....................28

*Friedman v. Kantor*,
977 F. Supp. 1242 (Ct. Int'l Trade 1997)....................30

*M-S-R Public Power Agency v. Bonneville Power Administration*,
297 F.3d 833 (9th Cir. 2002)....................12, 13

*Pacific Power & Light Co. v. BPA*,
589 F.Supp. 539 (D.Or. 1984)....................29

*Pacific Power & Light v. Bonneville Power Admin.*,
795 F.2d 810 (9th Cir. 1985)....................28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Pub. Util. Dist. No. 1 of Clark County v. Johnson*,
855 F.2d 647 (9th Cir. 1988)....................passim

*Puget Sound Energy v. United States*,
47 Fed.Cl. 506 (2000)....................23

*Puget Sound*,
27 Fed.Cl. at 510-511....................24

*Southern California Edison v. United States*,
38 Fed.Cl. 54 (1997)....................23

*Transmission Agency of Northern California v. Sierra Pacific Power Co.*,
295 F.3d 918 (9th Cir. 2003)....................23, 24

**FEDERAL STATUTES**

16 U.S.C. § 839a....................13

16 U.S.C. § 839e(i)....................15

16 U.S.C. § 839e(i)(1)-(6)....................5

16 U.S.C. § 839f(e)....................13

16 U.S.C. § 839f(e)(1)....................15

28 U.S.C. § 1491(a)(1)....................12, 14, 15

28 U.S.C. § 1631....................11, 30

**OTHER REGULATIONS**

51 FR 10911....................5

51 FR 47108 (December 30, 1986)....................passim

53 FR 29936....................5

1989 WL 260428 (January 30, 1989)....................22

1986 WL 79324 (September 29, 1986)....................5

| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | BPA definitions (excerpt) | 1 - 2 |
| 2 | Qualification Statement of Robert Procter | 3 - 6 |
| 3 | Cross-Examination taken November 22, 1999 (Procter) | 7 - 10 |
| 4 | Letter from Harold Ray to Stephen Oliver dated May 24, 2000 | 11 - 12 |
| 5 | Letter from Virginia Grosz to Mark Miller dated January 15, 1999 | 13 |
| 6 | Arbitration agreement dated June 2, 1999 | 14 - 16 |
| 7 | Federal Register, Notice of Proposed Correction of Action, August 13, 1999 | 17 - 23 |
| 8 | Administrator’s Final Record of Decision, March 2000 | 24 - 27 |
| 9 | Order transferring Petition For Review to the United States Court of Federal Claims, dated March 18, 2002 | 28 – 29 |
| 10 | Administrator’s Record of Decision, November 1988 | 30 – 34 |
| | Declaration of Robert Kendall | 35 – 38 |
| | Declaration of Virginia Grosz | 39 - 40 |

## I.

## NATURE OF THE CASE

Prior to its motion to dismiss, Bonneville Power Administration ("Bonneville") not only admitted, but affirmatively advocated, that the dispute now before this Court is contractual – whether Bonneville abided by the terms of the parties' 1988 contract. In order to avoid the jurisdiction of this Court, Bonneville now seeks to transform that dispute into one over statutory ratemaking. That misdirection permeates Bonneville's Motion. This case, however, is not a challenge to a rate or ratemaking, no matter how many times Bonneville repeats its mantra.

Southern California Edison ("SCE") filed a claim for breach of contract against Bonneville, an agency under the Department of Energy of the United States government, under the requirements of the Contract Disputes Act ("CDA"). When Bonneville denied the claim, SCE filed a complaint in this Court. SCE contends that Bonneville breached the parties' contract by refusing to apply the contractually negotiated price to one of the products, Option Capacity, sold by Bonneville to SCE under the contract.

Bonneville has now moved the Court to dismiss for lack of subject matter jurisdiction, contending that the Ninth Circuit has exclusive jurisdiction. Bonneville's contention rests on fundamental misunderstandings of both the nature of SCE's claim and the current state of the law. Bonneville insists that SCE is challenging a new, statutory rate that Bonneville developed in 2000 and intended to apply to SCE's 1988 contract. Not so. SCE's Complaint seeks damages caused by Bonneville's failure to comply with the arms-length negotiated terms of the parties' contract. SCE does not challenge a statutory rate established by Bonneville years later. Under the binding precedent of the Federal Circuit in *City of Burbank v. United States*, 273 F.3d 1370 (2001), the proper focus of the jurisdictional inquiry is (1) whether

the term of the parties' contract at issue was statutorily mandated or was developed through arms-length negotiations, and (2) whether at the time the contract was negotiated *that term* was set pursuant to mandatory statutory requirements. In order to determine proper jurisdiction, the Court thus must look to the events that occurred when the contract was negotiated and entered into in 1988, not Bonneville's 2000 Expedited Rate Case. Such an analysis leads but to one conclusion: this Court has exclusive jurisdiction over this contract dispute.

## II.

## ISSUE PRESENTED

Whether this Court has jurisdiction over SCE's breach of contract claims against the United States.

## III.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. The Contract Negotiations For Option Capacity Pricing.

In 1988, SCE and Bonneville entered into a twenty-year contract (the "Contract") for the sale or exchange of power. Contract (attached as Exhibit 1 to Complaint),[1] §§ 1, 23. Under the terms of the Contract, SCE has an option to purchase 250 MW of capacity ("Option Capacity") from June to October at a price based upon a specific published Demand Charge in Bonneville's surplus firm power rate schedule. Contract, § 12.

The pricing mechanism for the Option Capacity was carefully negotiated, as it was of particular concern to SCE. Declaration of Robert W. Kendall, ¶ 6, SCE's Appendix at 36. Initially, SCE attempted to negotiate a specified price for Option Capacity for the entire term of the Contract, similar to other firm capacity SCE obtained via the Contract. Kendall Decl., ¶ 6,

[1] Hereinafter, "Contract, § __".

SCE's Appendix at 36. Bonneville would not accommodate that request. Kendall Decl., ¶ 6, SCE's Appendix at 36. On its part, Bonneville wanted the right to charge any price from its various rate schedules at its choice and to change the price at its sole discretion. Kendall Decl., ¶ 6, SCE's Appendix at 36. SCE was unwilling to agree to that. Kendall Decl., ¶ 6, SCE's Appendix at 36.

As a fallback position, SCE insisted that it be treated in a manner similar to Bonneville's numerous customers in the Pacific Northwest. Tying the price to a rate charged to other Bonneville customers was important to SCE because Bonneville would have less ability to manipulate SCE's Option Capacity price to benefit itself, as other customers would take an active role in any attempts to increase a rate affecting them, protecting SCE's interests. Kendall Decl., ¶ 6, SCE's Appendix at 36. An "Edison only" rate, on the other hand, would in effect give Bonneville unilateral pricing rights, thus rendering SCE's option worthless.[2]

Ultimately, the parties agreed on a contractually negotiated price tied to a rate for which Bonneville had already requested approval – the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule already approved by Bonneville and used by other Pacific Northwest customers. The demand charge was not a posted rate for the same product that SCE was purchasing as Option Capacity. The SP-87 rate schedule demand charge for capacity only provides the customer with the ability to pay for power obtained at the specified energy rate, but SCE's contract presumes that power will be returned unless Bonneville chooses to require SCE to pay for it at a price negotiated in the Contract, not the SP-87 rate for energy. Kendall Decl., ¶ 7, SCE's Appendix at 36-37.

---

[2] The parties could have as easily associated the price for Option Capacity with another objective index, such as the Dow Jones Industrial Average or the Standard and Poors 500. In either case, once the ratio of the index to the price was established, SCE could have confidence that Bonneville could not manipulate it.

**B. The Contract Terms For Option Capacity.**

Section 12 of the Contract obligates Bonneville to sell Option Capacity to SCE. Pursuant to subsection (4), the price for capacity is set at the Demand Charge of the Contract Rate associated with the successor rate to SP-87, a surplus firm power rate. In relevant part, section 12 reads:

> (12) Option Capacity and Option Energy
>
> Bonneville shall have the obligation to provide Option Capacity to Edison and Edison shall have the obligation to provide Option Energy to Bonneville.
>
> (a) Option Capacity.
>
> Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a). For any year in which such capacity is requested, Bonneville shall make the Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity.
>
> …
>
> (3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9(c)(1). If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).
>
> (4) Edison shall pay for Option Capacity at the *demand charge* associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized representatives may agree upon another applicable rate schedule.

(Emphasis added.)

### C. The Contractually Negotiated Price For SCE's Option Capacity Was Not Mandated By Statute Or Set Under Bonneville's Statutory Ratemaking Authority.

When the Contract was executed in 1988, the Option Capacity pricing was not mandated by statute or submitted to the statutory process required for rates of general application. See 16 U.S.C. § 839e(i)(1)-(6). Bonneville did not hold an administrative hearing on the Contract to set the price for Option Capacity, nor did it submit the Option Capacity pricing to the Federal Energy Regulatory Commission ("FERC") or publish a Federal Register Notice regarding the proposed price, all acts mandated by statute. *Id*. In July 1987, a year prior to the execution of the Contract, Bonneville sought FERC approval for the SP-87 rate. Its notice in the rate approval did not mention the Contract or SCE. 51 FR 47108 (December 30, 1986).[3]

Subsequent to the signing of the 1988 Contract, Bonneville established several successor rates to the SP-87 rate schedule. In its 1993 rate case,[4] Bonneville established SP-93

---

[3] Bonneville did raise the other provisions of the Contract with FERC. On March 31, 1986, during the course of Contract negotiations, Bonneville filed a notice with FERC seeking approval of the formula rates contained in the proposed SCE Contract for Surplus Firm Power. 51 FR 10911 at 3-4 (March 31, 1986). Bonneville did not request approval of the Option Capacity price. The FERC orders issued as a result of the rate application show that FERC was not considering the Option Capacity price. 1986 WL 78587 (FERC) (September 29, 1986); 1986 WL 79324 (FERC) (December 19, 1986).

On August 9, 1988, Bonneville published a notice in the Federal Register of an application to extend the time frame for expiration of the rates that were negotiated in the Contract and approved in 1986 for Surplus Firm Power (used during the sale mode) only, not Option Capacity. 53 FR 29936 at 4-9 (August 9, 1988). Bonneville's notice expressly stated that "the proceeding involves a single discrete rate of very limited application." *Id*. at 10. In response, on January 30, 1989, FERC issued an order approving various Bonneville rates, but made no order on Option Capacity pricing. 1989 WL 260428 (FERC) (January 30, 1989). The FERC Order granting Bonneville's request notes, as a "background fact" only, that the Contract required a charge for Option Capacity at the "demand charge in Bonneville's SP-87 contract rate or its successor." *Id*. at 4. The Order does not purport to approve of that pricing. *Id*., *passim*.

[4] As defined by Bonneville on its website listing of definitions, Exhibit 1 to SCE's Appendix at 1-2 (hereafter "Exhibit __ at __".):

as the successor rate schedule to SP-87. In its 1996 rate case, Bonneville established FPS-96 as the successor to SP-93. November 22, 1999 testimony of Bob Procter, Public Utilities Specialist, Power Products, Price and Rates in the Power Business Line[5] of Bonneville, at Administrative Hearing, Case No. BPA Docket FPS-96R, Exhibit 3 at 8, 135:7-17. Bonneville had previously admitted that FPS-96 is the successor to the SP-87 rate schedule. February 12, 1999 letter from Mark Miller to Virginia Grosz, at p. 1, Bonneville's Appendix at 88-92.

Each of these successor schedules contains a "demand charge associated with the contract rate," as required under the Contract. The demand charge associated with the contract rate in the FPS-96 rate schedule is $.87 per kilowatt hour.[6] SCE did not participate in any of the proceedings establishing that schedule.

**D. Bonneville Refused To Honor The Contractual Terms For Option Capacity Pricing.**

**1. Bonneville first breached the Contract in 1999.**

In 1999, SCE considered exercising its option to purchase Option Capacity under the Contract for the first time. It informed Bonneville that it was doing so. *See* January 15, 1999 letter from Virginia Grosz at SCE to Mark Miller at Bonneville, Exhibit 5 at 13. In response,

---

The process under 7(i) of the Pacific Northwest Electric Power Planning and Conservation Act in which BPA informs customers of its intention to adjust the power rates it intends to charge its customers for a following period (usually two years) and holds public hearings before submitting the proposed rates to the Federal Energy Regulatory Commission for approval.

[5] Mr. Procter had, since 1994, assisted Bonneville in developing rates, and worked on a number of rate issues and methodologies. Qualification Statement of Robert J. Procter, from Bonneville Web Site, Exhibit 2 at 3-6.

[6] Bonneville sets forth the succeeding rate schedules at p. 9 of its Motion. However, its schedule is misleading to the extent that the $0.87 rate for FPS-96 is shown in comparison to higher rates in previous schedules. This is because Bonneville unbundled transmission charges in the FPS-96 schedule. SCE has never contended that it would only pay $0.87 for Option Capacity, but has always agreed to pay $3.144/kW-month, which includes transmission charges. *See*, May 24, 2000 letter from Harold Ray to Stephen Oliver at 1, Exhibit 4 at 11-12.

Bonneville stated that it would *not* provide the Option Capacity at the FPS-96 rate even though "[t]he Firm Power Products and Services (FPS-96) rate schedule *is a successor* to SP-87." Bonneville's Appendix at 88 (emphasis added).

Bonneville attempted to justify deviating from the Contract's stated price by claiming that the FPS-96 schedule was one designed to price a "capacity with energy" product instead of a "capacity without energy" product, the product Bonneville asserts SCE is purchasing.[7] *Id*. at p. 2. Bonneville further claimed that it had made a mistake in the FPS-96 schedule – it meant to state that capacity without energy "would be sold at a negotiated price." *Id.* at p. 2. The Contract, however, clearly requires a price based on the successor to the SP-87 schedule and says nothing about the nature of the product sold under that schedule.

Contrary to Bonneville's contention, Motion at 11-12, the parties did not reach an agreement on this first dispute, instead, they litigated the dispute through a binding arbitration on the price to be paid, and Bonneville agreed to deliver the Option Capacity to SCE in the interim. Arbitration Agreement Exhibit 6 at 14-16.

**2. After its 1999 breach, Bonneville initiated the "Expedited Rate Case."**

**a. The Expedited Rate Case did not develop an Option Capacity rate.**

On August 13, 1999, Bonneville filed a notice in the Federal Register that it intended to sell its capacity without energy product at a negotiated rate. Exhibit 7 at 17-23. The Notice stated that a corrected rate (FPS-96R) would be developed that would apply only to

---

[7] Bonneville is also wrong in characterizing the Option Capacity as a capacity without energy product (which means a product in which the energy delivered to SCE is returned, but is not otherwise paid for). The Contract clearly states that Bonneville can, at its option, require that SCE pay for the energy received rather than returning it. Contract, § 12(a)(4). Further in 1999 Bonneville *did* require SCE to pay for the energy over one-half the time rather than return it, making this a capacity *with* energy product.

Bonneville's contracts entered prior to 1996 that called for pricing capacity without energy under the FPS-96 schedule, that is, only SCE ("Expedited Rate Case"). *Id.*

SCE believed that Bonneville was contractually required to apply only the price called for in the Contract – the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or its successors. Grosz Decl., ¶ 2, SCE's Appendix at 39. However, faced with a rate case Bonneville claimed would affect the price under the Contract, SCE litigated the Expedited Rate Case. It did not wish to waive any argument, and, if it could succeed at preventing the new rate, it would avoid the need to bring this breach of contract action. Grosz Decl., ¶ 3, SCE's Appendix at 39-40.

In summary, Bonneville and SCE negotiated a price for Option Capacity in their 1988 Contract. That negotiated price was defined in the Contract as the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or its successor rates. The Contract terms permit Bonneville to create successor rates to the SP-87 rate schedule and apply those successor rates to the Option Capacity. The Contract does not permit what Bonneville attempted here – when the parties could not agree on a new price, Bonneville refused to apply the successor rate, which all parties agree was FPS-96, and instead sought to apply a *different* rate. The successor rate to SP-87 (previously found in the FPS-96 rate schedule) is still listed today in the FPS-96R rate schedule (the demand charge associated with the contract rate) and should be the price paid by SCE.

**b. Bonneville prevented the development of an administrative record.**

As part of the Expedited Rate Case, SCE offered evidence regarding the Option Capacity terms of the Contract. In response, on November 2, 1999, Bonneville filed a Motion to Strike Portions of SCE's Direct Testimony in that proceeding. In that motion, BPA affirmatively

argued that whether the rate at issue applied to SCE's contract "is an issue of contractual interpretation":

> **Contractual Obligations under BPA's Contract with SCE**
>
> Part of SCE's direct case is premised upon the notion that the rate being established in this proceeding does not apply to its contract with BPA. To support this proposition, SCE points to various contractual provisions. The entire line of questioning should be stricken because the issues raised are not relevant and do not respond to issues raised by BPA's initial proposal. See, Special Rules of Practice to Govern These Proceedings, FPS-96R-O-01. The scope of this proceeding is framed by the FRN [Federal Register Notice]. *Whether the rate set in this proceeding applies to SCE's contract is an issue of contractual interpretation. If a rate for capacity without energy is established in this rate proceeding and BPA applies it to SCE's contract, SCE may pursue any concerns it has with this determination through a contract action in the proper forum*. Bringing questions of contractual interpretation into this rate proceeding provides no substantive evidence regarding the appropriate nature of the rate being established.

Motion to Strike, (emphasis added). Bonneville's Appendix at 171.

At the subsequent administrative hearing on the proposed rate, the Administrative Law Judge agreed with Bonneville, stating that whether the rate being determined would apply to SCE's Contract, was "going far beyond the scope here." Transcript of November 22, 1999 Hearing at 140:23-141:1. Exhibit 3 at 9-10. Further, SCE was not permitted to argue its "interpretation of [SCE's] contract and how and why the rate schedule might fit it." *Id*. at 141:11-12.

In the Final Record of Decision for the expedited proceedings, Bonneville noted that SCE was precluded from litigating its Contract dispute during the hearing: "Questions regarding the applicability of the proposed rates to SCE's contract are beyond the scope of this proceeding."

> Applicability of the rate to SCE's contract should be raised in the proper forum.

Exhibit 8 at 27.

Bonneville issued the Final Record of Decision issued on FPS-96R in March, 2000. *Id.* at 25]. At that point Bonneville sought FERC approval of the rate. Motion at 14. FERC issued its final decision approving the rate on April 16, 2001. *Id.* at 15.

**3. Bonneville continued to breach the Contract in 2000.**

Bonneville's second breach of the Contract occurred in May 2000, when it again refused to allow SCE to exercise its contractual right to take Option Capacity at the expressly negotiated price set forth in the Contract. Bonneville's breach was identical to its 1999 breach. In both instances, the breach was Bonneville's refusal to sell at the negotiated contractual price. The intervening rate proceeding had had no impact on the nature of Bonneville's breach – its refusal to abide by the terms of the parties' Contract. The breach caused SCE to incur damages in the amount of $32 million. The contract cause of action had completely accrued by October 2000 (existence of contract, breach, caused damages), prior to FERC's 2001 final approval of the FPS-96R rate.

**E. Procedural History After Bonneville Breached The Contract.**

In June, 2000, SCE filed a Petition in the Ninth Circuit. It sought relief for two claims: breach of contract and improper ratemaking. Bonneville's Appendix at 101. At that time, the law governing the jurisdiction of the Ninth Circuit for breach contract cases against Bonneville had been called into question by the decision of the Court of Federal Claims in *City of Burbank v. United States*, 47 Fed. Cl. 261 (2000), which held that breaches of contract against Bonneville were to be litigated in the Ninth Circuit. When SCE filed its petition, the Court of Federal Claims decision was on appeal at the Federal Circuit, but no decision had been issued.

Since the breach that would lead to damage had occurred in May 2000, if the *City of Burbank* case from this Court remained in effect, SCE would have had to file to avoid the ninety day statute of limitations applicable to actions against Bonneville in the Ninth Circuit.[8]

On December 17, 2001, the Federal Circuit reversed the Court of Federal Claims' *City of Burbank* holding. *City of Burbank v. United States*, 273 F.3d 1370 (Fed. Cir. 2001). Within days after the Federal Circuit decision, SCE filed a Motion for Clarification explaining why the action was a breach of contract action and that it now belonged in the Court of Federal Claims, Bonneville's Appendix at 115-131. Over Bonneville's objections, the Ninth Circuit transferred the Petition to this Court based on the federal transfer statute 18 U.S.C. § 1631 and *Pub. Util. Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 650 (9th Cir. 1988) ("*Clark County*") (Exhibit 9 at 28).[9]

SCE dismissed the Petition in this Court, without prejudice, in order to file a claim with Bonneville as required by the Contracts Disputes Act. SCE filed its pending Complaint in 2002, after Bonneville denied the claim.

## IV.

## ARGUMENT

### A. Introduction And Summary Of Argument.

The sole issue before this Court is whether the Court has jurisdiction to hear the contract claim brought by SCE. Under the Federal Circuit opinion in *City of Burbank*, it clearly does. In *City of Burbank*, the Federal Circuit expressly held that where a dispute arises out of a breach of contract, as it does here, jurisdiction rests in the Ninth Circuit only if (1) the

---

[8] SCE's petition was concededly premature to the extent it applied to the ratemaking.

[9] In *Clark County*, the Ninth Circuit held that jurisdiction belonged in the Court of Federal Claims rather than Ninth Circuit if the decision being reviewed is a breach of contract made outside the administrative record. *Id*.

contractual provision is statutorily mandated by the Northwest Power Act, or (2) the contractual provision in question is a rate Bonneville set by following the procedural requirements of the Act, including notice and comment and the generation of an administrative record. 273 F.3d at 1379. Neither condition obtains here.

Bonneville attempts to distinguish *City of Burbank* by mischaracterizing the facts of this case and by attempting to shift this Court's focus away from the circumstances surrounding the development of the Contract in 1988 to an irrelevant ratemaking procedure many years later. The jurisdictional issue before this Court, however, solely centers on the development of the parties' Contract. When viewed correctly, it is clear that jurisdiction rests with this Court. First, the challenge here – as in *City of Burbank* – is not to a statutorily mandated rate set pursuant to a final agency action or its implementation, but rather to the breach of the terms of a freely negotiated arms-length transaction. Second – as in *City of Burbank* – the parties' negotiations of the terms of the Contract (and the issues before this Court) fall outside any administrative record.

### B. The Legal Standard For Review.

The legal standard for reviewing a motion to dismiss for lack of jurisdiction is clear. "[A complaint] will not be dismissed for lack of jurisdiction . . . , unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Clearwater Constructors, Inc. v. United States*, 56 Fed.Cl. 303, 307 (2003). Bonneville cannot meet this standard.

The Tucker Act gives the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government and its agencies. 28 U.S.C. § 1491(a)(1); *M-S-R Public Power Agency v. Bonneville Power Administration*, 297 F.3d 833, 840 (9th Cir. 2002). Congress has carved out a limited exception to that grant in the Northwest Power Act ("Act"), 16

U.S.C. § 839a, *et seq*. That Act gives the Ninth Circuit exclusive jurisdiction over certain "final agency actions" of Bonneville. Northwest Power Act, § 9(e), 16 U.S.C. § 839f(e); *cf*. *M-S-R*, 297 F.3d at 840 (claims "based on contractual commitments rather than final agency actions fall outside [the Ninth Circuit's] original jurisdiction"). Section 9(e)(5) of the Act gives the Ninth Circuit original jurisdiction over attacks on agency actions that are "final actions and decisions taken pursuant to this chapter by the Administrator [of Bonneville]…, or the implementation of such final actions." *Id*.[10] Thus, in order to determine the proper court for jurisdiction of an action against Bonneville, the Court must determine whether the actions complained of are contractual in nature or whether they fall under the definition of a final agency action.

As set forth more fully below, SCE's case before this Court asserts that Bonneville breached a negotiated contract term that was not set through an agency action statutorily mandated. SCE is not challenging the Expedited Rate Case or the rate established in that case. Bonneville can add rates to its rate schedule as it wishes. What Bonneville may not do is fail to comply with the unambiguous terms of the Contract by refusing to apply the Option Capacity price set by the Contract. Accordingly, this Court has jurisdiction under the Tucker Act and the Contract Disputes Act.

### C. The Federal Circuit's Holding In *City Of Burbank* Demonstrates That This Court Has Jurisdiction Over Breach Of Contract Claims.

Bonneville claims that the Federal Circuit's opinion in *City of Burbank* requires dismissal of this case. In fact, just the opposite is true. In *City of Burbank*, the Federal Circuit

[10] In *M-S-R*, the Ninth Circuit held that the plaintiff was challenging a *statutory* agency requirement in how Bonneville forecast excess federal power, and therefore the Ninth Circuit retained jurisdiction over that claim. The court then determined, however, that the plaintiff's challenges to the timeliness of Bonneville's notices of excess federal power arose from *obligations contained only in the contract* between Bonneville and M-S-R and dismissed the contract claim for lack of jurisdiction. 297 F.3d at 841.

addressed and decided identical issues facing this Court under virtually identical facts and found jurisdiction exists in this Court.

### 1. ***City Of Burbank*** **recognized that Court of Federal Claims jurisdiction extends to contract actions against Bonneville unless the contractual provision at issue is statutorily mandated or was the subject of an administrative proceeding that generated a record.**

In *City of Burbank*, the plaintiff brought two contract claims before this Court. The Court dismissed both counts, holding that they fell within the exclusive jurisdiction of the Ninth Circuit. 273 F.3d at 1372.[11] On appeal, the Federal Circuit flatly disagreed: "We hold that both counts relate to alleged breaches of contract based on facts outside of an administrative record and therefore fall with the Court of Federal Claims' Tucker Act jurisdiction, 28 U.S.C. § 1491(a)(1), rather than within the exclusive jurisdiction of the Ninth Circuit under § 839f(e)." *Id.* at 1372. The Federal Circuit recognized that, when Bonneville "agrees to sell electric energy to an entity outside the Pacific Northwest, some of the contractual provisions are mandated by statute." *Id*. at 1373. On the other hand, it recognized that Bonneville "freely negotiates other provisions, which are not mandated by statute." *Id*. Under the latter scenario, jurisdiction lies with this Court.

The facts of *City of Burbank* closely resemble those here. Burbank's contract with Bonneville, like SCE's, was a sale or exchange agreement. *Id*. The contract set forth the prices payable by Burbank when the contract was in the sale mode. The price was specified in the contract for 1988 to 1992. Starting in 1993, the prices payable by Burbank were determined by applying an adjustment ratio provided in the contract to the posted Bonneville power charges in the Pacific Northwest. Those posted rates were established by an administrative proceeding

---

[11] In the alternative, the trial court dismissed the claims without prejudice for failing to comply with CDA requirements. *Id*.

pursuant to 16 U.S.C. § 839e(i). *Id*. at 1373-74. Burbank alleged that Bonneville breached the contract after it changed the rate the parties had negotiated, *id*. at 1375, just as Bonneville is attempting to do here.[12]

The trial court found that "[l]ooking to the substance of plaintiff's claims, both involve defendant's administrative decisions made in the execution of a [Bonneville] final action, namely the sale of electric power outside the Pacific Northwest." *Id*. at 1376 (*quoting City of Burbank*, 47 Fed.Cl. at 267). The trial court determined that the only time the Court of Federal Claims has jurisdiction is when the "claims are found to be based on actions *wholly outside the statutory authority* of the Regional Act." *Id*. (emphasis provided by Federal Circuit). The trial court also found that it did not have jurisdiction over the claim that Bonneville misapplied its rates to the contract, because the contractual provisions concerning the application of rates are based directly on statutory requirements, and that challenges to the rates Bonneville charges for electric energy had uniformly been held to fall under the Ninth Circuit's jurisdiction. *Id*. at 1376-77.

Burbank appealed and, after a detailed examination of the contours of Ninth Circuit versus Court of Federal Claims jurisdiction, the Federal Circuit reversed. It began by noting that the Court of Federal Claims has jurisdiction over government contract disputes "unless a specific jurisdictional statute grants jurisdiction to another court." *Id*. at 1377 (citing 28 U.S.C. § 1491(a)(1)).

Section 839f(e)(1) of 16 U.S.C. lists eight actions that "shall be final actions subject to judicial review." "Extra-regional sales of electric energy by [Bonneville] constitute one of these eight express final actions" set forth in 16 U.S.C. § 839f(e)(1). *City of Burbank*, 273

---

[12] Burbank also alleged a second breach of contract based on Bonneville's failure to follow the notice provisions of the contract applicable to conversions to the exchange mode. *Id.* at 1376.

F.3d at 1377-78. Nonetheless, the Court held that § 839f(e)(1) does *not* vest the Ninth Circuit with exclusive jurisdiction over Burbank's claims. Looking to the events and circumstances at the time the contract was *first negotiated*, the Court held that jurisdiction did not reside with the Ninth Circuit because, as here, Burbank alleged that Bonneville breached a contract into which it entered without following administrative procedures or generating an administrative record.

> First, although § 839f(e)(1) designates extra-regional power sales contract as "final actions subject to judicial review," that section fails to specify the court in which the judicial review is to occur. It is only § 839f(e)(5) that vests jurisdiction over challenges to "final agency actions and decisions taken pursuant to this chapter" exclusively in the Ninth Circuit. Second, § 839f(e)(2) limits review of the final actions articulated in § 839f(e)(1) to the administrative record compiled in accordance with the Administrative Procedures Act ("APA"). *Thus, Burbank's claims fall outside the express jurisdictional grant of § 839f(e)(1) because they allege that [Bonneville] breached a contract into which it entered without following APA procedures, and, consequently, without generating an administrative record.*

*Id*. at 1378 (citations omitted, emphasis added).

The Federal Circuit held that the trial court had interpreted the Northwest Power Act too broadly. As the Court noted, reading the language to mean that any breach of a contract by Bonneville in which the contract itself was "authorized" by the Northwest Power Act is subject to Ninth Circuit jurisdiction, would render the statute meaningless. *City of Burbank*, 273 F.3d at 1378-79. The Court concluded that such an interpretation would

> impermissibly render meaningless the limitation that § 839f(e)(2) places on the express list of final actions in §839f(e)(1). . . .
>
> Second, . . . to include all power sales contracts the Northwest Power Act authorizes [Bonneville] to enter would render meaningless other language in § 839f(e)(5). . . .[It] would read out the language indicating that jurisdiction over 'suits challenging other actions under this chapter' rests with other appropriate courts.

*Id*. at 1379.

Thus, the Federal Circuit held:

> In the context of power sales contracts, an alleged breach challenges an action taken "pursuant to" the Northwest Power Act in one of two instances: (1) when the *contractual provision* is *mandated* by the Act, or (2) when the *contractual provision* is a rate [Bonneville] set *by following the procedural* requirements of § 839e(i), including notice-and-comment and the generation of an administrative record.

*Id*. (some emphasis in original). When disputed contractual provisions are statutorily mandated or established pursuant to the APA with an administrative record, the Ninth Circuit has exclusive jurisdiction, even when the plaintiff calls the action a breach of contract claim. *Id*. at 1380. Not so, however, under the circumstances presented in *City of Burbank* and here where the terms of the contract are negotiated in an arms-length transaction outside an administrative record.

> In contrast, where, as here, the alleged breaches of contract pertain to terms that were freely negotiated in an arms-length transaction and where the facts pertinent to those negotiations fall outside an administrative record, nothing in § 839f(e)(5) grants jurisdiction to the Ninth Circuit. Such claims must be brought before the Court of Federal Claims.

*Id*., citing *Public Util. Dist. No. 1 of Clark County*, 855 F.2d at 650. ("We therefore hold that claims involving alleged contractual breaches by the agency and based on allegations of facts outside an administrative record must be heard in the claims court.")

Applying those principles to the facts of *City of Burbank*, the Federal Circuit observed that although Bonneville is required under the Northwest Power Act to insert a rate adjustment feature in its contracts, the particulars of the terms of Burbank's contract (a price tied to a "PF" rate from one of Bonneville's rate schedules) were individually negotiated. In other words, the specific price mechanism was not statutorily mandated. *Id*. at 1381.

Additionally, the Federal Circuit noted that Burbank was not challenging the implementation of a final action.

> According to the term's plain meaning, as well as common sense, "implementation " of PF rates simply cannot refer to every action [Bonneville] takes that references (or is based on) those rates. Rather, "implementation" is limited to applying rates to those who were contemplated as rate-payers in the administrative proceeding that determined the rates.

*Id*.

**2. The Federal Circuit's holdings in *City of Burbank* mandate jurisdiction in this Court.**

As set forth above, the facts in this case are virtually identical to those in *City of Burbank*. SCE, like Burbank, alleges (1) that Bonneville breached a contract; (2) the provision breached is not statutorily mandated; and (3) the provision was entered into by Bonneville without needing to follow, and without following, APA procedures, and consequently, without generating an administrative record. Thus, just as in *City of Burbank*, the claims here "fall outside the express jurisdictional grant of § 839f(e)(1)." *Id*. at 1378.

Bonneville attempts to distinguish *City of Burbank* by mischaracterizing the facts of this case and by attempting to shift this Court's focus away from the circumstances surrounding the development of the Contract in 1988 to an irrelevant ratemaking procedure many years later. The jurisdictional issue before this Court, however, solely centers on the development of the parties' Contract. When viewed correctly, it is clear that jurisdiction rests with this Court. First, the challenge here – as in *City of Burbank* – is not to a statutorily mandated rate set pursuant to a final agency action or its implementation, but rather to the breach of the terms of a freely negotiated arms-length transaction. Second – as in *City of Burbank* – the parties' negotiations of the terms of the Contract (and the issues before this Court) fall outside any administrative record.

**a. SCE is not challenging a statutorily mandated rate.**

Like *City of Burbank*, SCE's contract ties the price SCE must pay for Option Capacity to a posted rate in the Bonneville rate schedule, but that linkage is not mandated by the Northwest Power Act. Indeed, Bonneville never argues that it is. As in *City of Burbank*, the price term was freely negotiated between the parties. Thus, SCE's challenge is not to a statutorily mandated rate set by a final agency action or its implementation, and is outside the jurisdiction of the Ninth Circuit. *Id.* at 1381.

Bonneville's arguments to the contrary are grounded on the assertion that SCE is really challenging the development of the FPS-96R rate in the Expedited Rate Proceeding. Bonneville is wrong. It is irrelevant to SCE's contractual claim whether Bonneville tried to apply a newly developed rate or an old rate to the parties' Contract. So long as it differed from the terms of the Contract, it constituted a breach. Bonneville's failure to apply the freely negotiated rate set forth in the Contract is the sole issue before this Court

Bonneville seizes on allegations in the Complaint regarding the Expedited Rate Case. Motion at 29-30. It is obvious that they are purely background. SCE states its claim in the Complaint:

> 24. The Demand Charge of $.87/kW-month in the FPS-96 rate schedule is listed as Rate 1.1.1 of the FPS-96R schedule and is still the successor "demand charge associated with the contract rate of Bonneville's SP-87 rate schedule." The Posted Rate BPA added at 1.3.2 of the FPS-96R rate schedule is not the successor to the "demand charge associated with the contract rate of Bonneville's SP-87 rate schedule." Therefore, under the unambiguous terms of the Contract, it is not the rate that applies to Option Capacity. BPA's refusal to provide Option Capacity at the price specified in the Contract was a breach of the Contract.
>
> . . . .
>
> 30. BPA's refusal in May 2000 to provide Option Capacity to SCE for the June through October 2000 time period unless SCE

> paid the FPS-96R Posted Rate, which is not a successor rate to the demand charge in the SP-87 schedule, was a breach of Section 12 of the Contract.

Bonneville asserts "the purported contractual issues raised by SCE are inextricably linked to challenging the development and implementation of a rate that was established subject to Bonneville's administrative procedures." Motion at 23. SCE's claim, however, does not challenge the development of the FPS-96R; it challenges Bonneville's failure to apply the *contractual* price, regardless of the nature of the rate it applied. If Bonneville wished SCE to pay anything other than a successor rate to SP-87 for Option Capacity, it was required to renegotiate the Contract with SCE and amend it. Bonneville could not simply ignore its contractual obligations or unilaterally effect a modification of the Contract, without consideration.

Bonneville also argues that, because the successors to the SP-87 rate would be set under the statutory scheme, including notice-and-comment, administrative hearing and FERC approval, the Contract rate falls within Bonneville's statutory mandate. The Federal Circuit, however, expressly rejected such reasoning in *City of Burbank*. The contract in *City of Burbank* had a price escalation clause tied to the rates posted in certain Bonneville rate schedules. When Bonneville set a successor rate through the mandated statutory procedure, including the creation of an administrative record, Burbank's rates would rise according to a contractually based formula applied to those rates. The fact that the successor *rate* would be set under a statutory scheme, did not, the Court held, convert Burbank's breach of contract claim into a ratemaking claim. *City of Burbank*, 273 F.3d at 1381. Accordingly, proper jurisdiction rested in the Court of Federal Claims.

SCE's price is also tied to a posted Bonneville rate – the demand charge in SP-87 – and it, too, could rise or fall according to the rate cases Bonneville brought to set the successor

rates. As in *City of Burbank*, that fact does not make the contractually negotiated Option Capacity rate set forth in SCE's Contract a statutorily mandated rate. Breach of that contract provision thus falls within the jurisdiction of this Court.

Bonneville further claims that SCE *is* the intended ratepayer for FPS-96R, taking SCE outside of the holding in *City of Burbank*. Again, Bonneville misunderstands the nature of SCE's claim and the proper focus of this Court's inquiry – 1988, when the Contract was negotiated and entered into. At the time the Contract was executed, SCE, as a purchaser of Option Capacity, was not an intended rate payer of the already existing SP-87 rate. Nor could it be. In the first place, under the Option Capacity provision of the Contract SCE was not buying one of the products governed by that rate – Option Capacity is not the same as any of the products defined by SP-87. Kendall Decl., ¶ 7, SCE's Appendix at 36-37. SP-87 requires the customer to pay for energy received at the rate posted in the schedule. Option Capacity under the Contract presumes that energy will be returned, but allows Bonneville to require payment at a price set forth in the Contract. In the second place, there was no Contract in existence when the rate was developed. Further, the Contract price, the only price applicable to this proceeding, was not set in accordance with or mandated by the Northwest Power Act. The development of some new rate a dozen years later is irrelevant to this inquiry.

Finally, Bonneville intimates that it is required to set rates to cover costs. Motion at 5. That is not true for particular rates, but for its rate structure generally. As it wrote in seeking approval of the SC-86 rate, which is referenced in a different part of the Contract:

> There is some risk that revenues from the rate will not recover the costs of the surplus firm power sold. This risk is manageable, however. If revenues projected to be received are less than the costs allocated to the surplus firm power sold, the variance will be recovered from BPA's other customer classes.

Administrator's Record of Decision (November 1988) Exhibit 10 at 33 (emphasis added). In its order accepting BPA's Record of Decision, the FERC took that into account: "In order to obtain [the] benefit [from the Agreement], BPA assumes some risk that the revenues earned from the sale of the surplus firm power will not recover the costs of the surplus firm power." FERC Order, 1989 WL 260428 (January 30, 1989). SCE is not challenging a statutorily mandated rate.

**b. There is no administrative record as required by *City of Burbank*.**

As Bonneville correctly notes, in *City of Burbank* the Federal Circuit held that the Ninth Circuit has jurisdiction over breach of contract claims only "(1) when the contractual provision is mandated by the Act, or (2) when the contractual provision is a rate [Bonneville] set by following the procedural requirements of Section 839e(i), including notice-and-comment *and the generation of an administrative record*." *City of Burbank*, 273 F.3d at 1379 (underlined emphasis in original; italics added). The court found that its holding was "consistent with Ninth Circuit precedent." *Id*. at 1380. (citing *Pub. Util. Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 650 ("*Clark County*") ("[C]laims involving [the] alleged contractual breaches by the agency and based on allegations of facts outside an administrative record must be heard in the claims court.")).

**(i) There is no administrative record.**

Notwithstanding Bonneville's claims, there is no administrative record here regarding the negotiated contractual price for Option Capacity, because Bonneville did not follow any of the procedural requirements of § 839e(i), including notice-and-comment or the generation of an administrative record or approval by FERC in adopting the Option Capacity price. The reason is simple — it was never submitted to an administrative hearing *in 1988 when the Contract was signed*.

**(ii) The record is required: need for an administrative record has not been "called into question."**

Faced with the fact that there is no administrative record, Bonneville argues that the holding in *City of Burbank* that an administrative record is necessary for Ninth Circuit jurisdiction is no longer good law and should not be followed by this Court. Motion at 24-25. Bonneville is wrong.

As this Court has repeatedly held, the Federal Circuit's decisions are binding precedent:

> Under the doctrine of *stare decisis*, questions of law decided by the United States Court of Appeals for the Federal Circuit constitute binding precedent upon this Court.

*Commonwealth Edison Co. v. United States*, 46 Fed.Cl. 29, 35 and n.5 (2000) (*citing Compliance Corp. v. United States*, 22 Cl.Ct. 193, 204-05 n.9 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir.1992)); *Southern California Edison v. United States*, 38 Fed.Cl. 54, 62 (1997) ("So far as this court is concerned, it must accept the [Federal Circuit] decision as controlling precedent . . . .") Because the legal issues resolved in *City of Burbank* by the Federal Circuit are identical to the legal issues to be decided here, *City of Burbank* is binding on this Court until the Federal Circuit disapproves it.

Even if, as Bonneville wrongly suggests, Ninth Circuit authority overrides that of the Federal Circuit, there is no such authority. Indeed, the "recent" Ninth Circuit cases upon which Bonneville relies either are distinguishable on their face, or pre-date *City of Burbank*.

In support of its novel claim that these cases "bring[] into question" the *City of Burbank* holding," Motion at 25, Bonneville primarily relies on *Transmission Agency of Northern California v. Sierra Pacific Power Co.*, 295 F.3d 918, (9th Cir. 2003) ("*TANC*") and *Puget Sound Energy v. United States*, 47 Fed.Cl. 506 (2000). Neither case supports Bonneville's

argument. *TANC* does not mention *City of Burbank.* In *TANC*, the Ninth Circuit did not need to reach and never reached the question of the role of an administrative record in determining jurisdiction based on *Clark County*. Instead, it held that the *facts* of *TANC* were distinguishable from *Clark County*. "Unlike the petitioner's claim in [*Clark County*] *TANC's* inverse condemnation and breach of contract claims cannot be separated out from [Bonneville's] final administrative decision." *TANC*, 295 F.3d. at 926. Bonneville relies on the following statement from a *footnote* in *TANC*: "The key test under 9(e)(5) is whether there is a challenge to a final administrative decision or its implementation, not the existence or adequacy of an administrative record." *Id*. at 927, n.5. But that statement is *dicta* since the decision was based on the factual distinction, not the presence or absence of an administrative record.

Bonneville attempts to buttress its argument that *TANC* stands for the proposition that a formal administrative record is not required by presenting a lengthy quote from the *Puget Sound* decision, which the court in *TANC* cited to support footnote 5. Motion at 26. The citation to *Puget Sound*, however, is of no precedential value on this issue. *Puget Sound* relied, almost entirely, on the *City of Burbank* decision that was *reversed* by the Federal Circuit. *Puget Sound*, 27 Fed.Cl. at 510-511. Although its reliance on the lower court ruling may have been proper at the time it was written, in light of the subsequent Federal Circuit decision, *Puget Sound* has no relevance here. Surprisingly, Bonneville's improper reliance on *Puget Sound* – a decision that rests on an overruled authority – permeates its argument. Motion at 2, 26, 29, and 39.

Bonneville made – and lost – the same argument regarding the continued viability of *City of Burbank* before the Energy Board of Contract Appeals ("EBCA"). Following the decision in *City of Burbank*, the trial court dismissed the case without prejudice. Burbank filed a claim with Bonneville under the Contracts Disputes Act making the identical claims that it had

originally filed in the Court of Federal Claims and, following Bonneville's denial of those claims, appealed the decision to the EBCA. *Burbank v. Bonneville Power Adm.*, 2004 WL 171534 (E.B.C.A.) at 1-4 (January 13, 2004) ("*Burbank EBCA*"). In *Burbank EBCA,* Bonneville argued, as it does here, that both the Federal Circuit's decision in *Burbank* and the Ninth Circuit's decision in *Clark County* are contradicted in *TANC* on the issue of whether Ninth Circuit jurisdiction requires an administrative record.

The Board concluded that:

> [T]he law relating to Ninth Circuit jurisdiction under the Northwest Power Act has not changed since the decision in *Burbank II*. Accordingly, the doctrines of res judicata and stare decisis compel us to follow the decision in *Burbank II*. We, thus, conclude that we have jurisdiction over Counts I and II of the Cities' appeals.

*Id*. at p.8

As it does here, Bonneville relied on footnote 5 in *TANC*, quoted *supra*. The EBCA expressly found, however, that footnote five does *not* contradict *Clark County* or *City of Burbank*:

> Additionally, the Ninth Circuit in footnote 5 made no statement on whether the action challenged requires an administrative record for the Ninth Circuit to have jurisdiction. Footnote 5 says that the key test is whether there is a challenge to a final administrative decision or its implementation. The Court made no statement regarding what happens after that inquiry has been determined.

*Burbank EBCA* at 8.

* * *

Accordingly, under the Federal Circuit's holding in *Burbank*, this Court has exclusive jurisdiction over SCE's claim that Bonneville breached a freely negotiated contractual rate when it failed to apply that rate to SCE's request for Option Capacity.

**D. The "True Nature" Of Bonneville's Conduct At Issue Here Is Its Failure To Abide By The Terms Of A Contract; SCE Is Not Challenging A Final Agency Action Or The Implementation Of A Final Agency Action.**

Bonneville argues, and SCE agrees, that the "true nature" of the conduct challenged governs the question of jurisdiction. Where the parties disagree is what the "true nature" of the claims here is. The "true nature" of Bonneville's conduct at issue is its failure to abide by a term of a contract negotiated at arms length outside statutory mandate. In its Motion, Bonneville argues, "In this case, SCE is . . . essentially requesting this Court to review the establishment and implementation of a rate established pursuant to section 7((i) of the Northwest Power Act." Motion at 27. This is simply not so. What happened in 2000 has no bearing on the circumstances surrounding the development of the parties' Contract in 1988 – the focus of this jurisdictional inquiry. Since 1999, SCE consistently has maintained that Bonneville is bound by the freely negotiated terms of its Contract, and that if it wishes to apply a different price from that specified in the Contract, it must either reach a new agreement with SCE or terminate the Contract. Bonneville's attempt to unilaterally reform the Contract through use of the ratemaking process is irrelevant to the jurisdictional question before this Court; the only relevant fact is that Bonneville refused to abide by the negotiated terms of the parties' Contract.

A review of the time-line of the key events surrounding this controversy illustrates the contractual nature of this dispute. In 1999, SCE sought to exercise its option under the Option Capacity clause. Under the express terms of the Contract, the price to be applied was the successor rate to SP-87, the FPS-96 demand charge. Contract, § 12(a)(4). Bonneville refused to sell the Option Capacity to SCE unless the two parties negotiated a new price, claiming it had made a mistake in setting that rate. Bonneville Appendix at 88-89. When the parties could not agree, the matter was litigated in a binding arbitration. In May 2000, SCE again sought to exercise its option. This time, rather than attempting to avoid the Contract term

by negotiating a new price structure, Bonneville pointed at the not-yet-final FPS-96R rate. In so doing, it did not even argue that FPS-96R was a successor to SP-87.

Bonneville thus breached the Contract twice, when it refused to abide by the pricing terms of the Contract in 1999 and again in 2000. If, in 1999, the parties had not agreed to litigate through an arbitration, Bonneville could not have avoided jurisdiction in this Court. Bonneville cannot avoid the jurisdiction of this Court now by creating a new rate and attempting to force it on SCE as the Contract price.

Bonneville cites statements made by SCE in the course of the ratemaking proceedings and the Ninth Circuit proceedings as "evidence" of the "true nature" of SCE's claim before this Court. *See* Motion at 30-33. Those statements do not change the fact that the claim before this Court is for breach of contract. As explained above, because of the yet to be reversed decision of the Court of Federal Claims in *City of Burbank*, which appeared to hold that SCE's breach of contract was properly before the Ninth Circuit, SCE could not sit on the sidelines and risk being accused of having waived its contractual arguments. SCE's petition raised two issues: (1) the breach of contract; and (2) a request for review of the rate proceedings. Bonneville Appendix at 101. The latter request was premature, but the breach of contract action was not. Two days after the Federal Circuit issued its *City of Burbank* decision, SCE filed a Motion for Clarification. Bonneville Appendix at 151. In the Motion, SCE explained the relief it sought, why its claims were contractual and why the new Federal Circuit *City of Burbank* opinion required that the case be transferred to this Court. The review of the ratemaking was no longer part of SCE's case. Bonneville's Appendix at 115 *et seq.* Bonneville's reliance on proceedings outside this Court is simply a red herring.

To support its argument regarding the "true nature" of SCE's claims, Bonneville also relies on several cases. These cases too, however, either pre-date the Federal Circuit's decision in *City of Burbank*, or are distinguishable on their facts. As set forth above, Bonneville's reliance on *Puget Sound* fails as the opinion was based on the Court of Federal Claims decision in *City of Burbank*, subsequently reversed by the Federal Circuit. Bonneville's reliance on *CP Nat'l Corp. v. Jura*, 876 F.2d 745 (9th Cir. 1989) is similarly misplaced. That decision stands for the unremarkable proposition that the petitioner's characterization of its claim is not determinative.[13] Not surprisingly, in *City of Burbank*, the Federal Circuit reviewed *CP Nat'l Corp.* and determined that it was *consistent* with its holding. *City of Burbank*, 273 F.3d at 1380. Bonneville's reliance on *Pacific Power & Light v. Bonneville Power Admin.*, 795 F.2d 810 (9th Cir. 1985) and *Forelaws on Board v. Johnson*, 709 F.2d 1310 (9th Cir. 1983) also does not aid it. In addition to being Ninth Circuit opinions issued decades before the Federal Circuit

[13] In *CP Nat'l Corp.*, the Ninth Circuit also affirmed its holding in *Clark County*, that an action based on breach of "contractual commitments made outside the scope of any administrative record" is not within the jurisdiction of the Ninth Circuit. *Id*. at 747-48.

examined these issues in *Burbank*, the cases differ both procedurally and factually and reach results *consistent* with *City of Burbank*.[14]

Looking at the "true nature" of the claim here reveals a simple truth: SCE's claim is for breach of contract, not to statutory ratemaking or its implementation.

**E. The Ninth Circuit's Transfer Of This Case To This Court Required A Determination That Jurisdiction Is Proper In This Court.**

Bonneville makes three arguments regarding the impact of the transfer order issued by the Ninth Circuit to this Court: (1) that the transfer does not confer jurisdiction on this Court; (2) that the Ninth Circuit never made any jurisdictional findings when it issued the transfer order; and (3) that the Ninth Circuit's denial of SCE's motion for clarification is proof that it was not making a jurisdictional finding. Motion at p. 34-36. None of those arguments is apposite.

SCE has never claimed that the mere fact that the Ninth Circuit transferred this case to this Court is dispositive of whether this Court has jurisdiction or displaces this Court's duty to examine the issue. Paragraph four of the Complaint states: "By this [transfer] action, the

---

[14] In *Pacific Power*, the plaintiff brought suit in district court seeking declaratory relief. *Id*. at 812. The district court dismissed the case for lack of jurisdiction, stating that "'my exercise of jurisdiction would necessarily impact the course of the [pending] rate case.'" *Id*. at 813 (quoting *Pacific Power & Light Co. v. BPA*, 589 F.Supp. 539, 543-44 (D.Or. 1984)). That the Ninth Circuit has exclusive jurisdiction of disputes presently pending in a statutory rate proceeding adds nothing to this case. Similarly, in *Forelaws*, the plaintiff, an environmental protection group, challenged Bonneville's entry into long-term power contracts expressly allowed under the Northwest Power Act by filing suit in the district court. The plaintiff was not challenging a breach of any contract between the environmental group and Bonneville; rather, it was a challenge to Bonneville's power to enter into the contracts in the first instance.

Bonneville's citation of *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101 (9th Cir. 1984) is also of no help. It is cited for the obvious point that the Ninth Circuit has jurisdiction over determining if Bonneville has properly discharged its *statutory* duties. Motion at 27. In *Central Lincoln*, the plaintiffs were directly challenging the rates set by Bonneville in its initial ratemaking proceedings under the Northwest Power Act. 735 F.2d at 1105. SCE is challenging Bonneville's compliance with its *contractual* duties.

Ninth Circuit indicated that it agreed that jurisdiction was not proper in the Ninth Circuit and belonged in the Court of Federal Claims." This statement is a proper statement of the law. The transfer statute, 28 U.S.C. § 1631, states:

> Whenever a civil action is filed in a court . . ., including a petition for review of administrative action, . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court *in which the action or appeal could have been brought at the time it was filed or noticed* . . . . (emphasis added).

The plain meaning of the statute requires that two determinations must be made before a court can use the transfer statute: (1) that it lacks jurisdiction; and (2) that the transferee court has jurisdiction. *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."). If both those determinations are not made, the transfer court must dismiss the action.

> However, transfer is not warranted under section 1631 if the district court would also lack jurisdiction over an action. . . . Therefore the bar of non-justiciability will prevent any federal court from assuming jurisdiction over these claims. The Supreme Court has held that section 1631 "confers on [a federal court] authority to make a single decision upon concluding that it lacks jurisdiction--whether to dismiss the case or 'in the interest of justice,' to transfer it to a [court] that has jurisdiction." Accordingly, the statute would not authorize transfer to a court that would similarly lack jurisdiction.

*Friedman v. Kantor*, 977 F. Supp. 1242, 1250 (Ct. Int'l Trade 1997) (*quoting Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988)). *Christianson*, 108 S.Ct. at 2178 (When the first court transfers a case under the federal statute, it has already determined that the transferee court has jurisdiction, even if it "did not explicate its rationale"). Contrary to the argument advanced by Bonneville, we thus must presume that the

Ninth Circuit did not ignore the requirement to examine jurisdiction in this Court prior to transferring the case and that its jurisdictional determination is implicit in its Order.[15]

### F. Bonneville Has Taken Inconsistent Positions In The FPS-96R Rate Case And In This Proceeding Regarding The Proper Forum For Jurisdiction.

Bonneville claims it has not made inconsistent jurisdictional arguments. Motion at 35. Citing to SCE's Complaint, Bonneville claims that SCE incorrectly alleges that Bonneville has taken inconsistent positions with regard to jurisdiction. Motion at 35, citing SCE Complaint at ¶¶ 6, 11. Bonneville then devotes considerable argument to demonstrating that the position it took *in the Ninth Circuit* was completely consistent with the position it takes here and that it never acquiesced to jurisdiction in this Court. Motion at 35-39. Bonneville misses the point. In paragraphs 7, 8 and 9 of its Complaint, SCE alleges that Bonneville was inconsistent in the arguments it made in the Expedited Rate Case – *not* the Ninth Circuit – and the position it now takes regarding jurisdiction.[16]

As set forth above, during the Expedited Rate Case, Bonneville actively litigated the issue of whether the breach of contract issues should be excluded from the ratemaking case. In its successful Motion to Strike Portions of SCE's Direct Testimony, for example, it argued that the breach of contract issue had no place in the ratemaking proceeding and should be brought "in the proper forum." Bonneville's Appendix at 171. As discussed above, under *Clark*

---

[15] Finally, Bonneville claims that the Ninth Circuit could not have decided jurisdiction because it denied SCE's motion for clarification. However, in its motion for clarification, SCE asked for alternative relief, making a straight denial or approval of the motion impossible. The fact of transfer indicates the Ninth Circuit *did* rule on jurisdiction and it provided its reasons by citing *Clark County*.

[16] Bonneville cites cases and repeats arguments it made in the Ninth Circuit regarding lack of jurisdiction to review the rate case because FERC had not yet filed its final order when SCE filed its Petition in 2000. However, SCE's breach of contract claim, which is the claim now before this Court, is independent of the rate review and was timely filed within ninety days of the 2000 breach.

*County* and *City of Burbank*, the "proper forum" for a breach of contract claim is the Court of Federal Claims.[17]

## V.

## CONCLUSION

For each of the forgoing reasons, Plaintiff Southern California Edison respectfully requests this Court to deny Defendant United States' Motion to Dismiss for lack of jurisdiction.

Respectfully submitted,

s/ Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Facsimile: (213) 687-3702
**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON**
DATED: January 28, 2005

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Marsha Hymanson
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9502
Facsimile: (213) 687-3702

[17] Bonneville now argues that the "proper forum" meant that SCE should have requested review in the Ninth Circuit after final rate approval. Motion at 35-36. However, as both *Clark County* and *City of Burbank* held, an administrative record is required for Ninth Circuit review. There is no administrative record on the breach of contract issue because Bonneville precluded the making of such a record. The "proper forum" for this claim is the Court of Federal Claims.

NOTICE OF FILING

I hereby certify that on January 28, 2005, a copy of the foregoing SOUTHERN CALIFORNIA EDISON’S OPPOSITION TO DEFENDANT’S MOTION TO DISMISS and SOUTHERN CALIFORNIA EDISON’S APPENDIX TO OPPOSITION TO DEFENDANT’S MOTION TO DISMISS were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court’s electronic filing system. Parties may access this filing through the Court’s system. I also certify that, pursuant to General Order 2003-42, Paragraph I(5), I forwarded a courtesy copy of the Opposition and Appendix to the Court.

s/ Charles D. Siegal