IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 03-2869C<br>(Judge Lettow) |

# SOUTHERN CALIFORNIA EDISON'S APPENDIX TO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Index to Appendix


| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | BPA definitions (excerpt) | 1 - 2 |
| 2 | Qualification Statement of Robert Procter | 3 - 6 |
| 3 | Cross-Examination taken November 22, 1999 (Procter) | 7 - 10 |
| 4 | Letter from Harold Ray to Stephen Oliver dated May 24, 2000 | 11 - 12 |
| 5 | Letter from Virginia Grosz to Mark Miller dated January 15, 1999 | 13 |
| 6 | Arbitration agreement dated June 2, 1999 | 14 - 16 |
| 7 | Federal Register, Notice of Proposed Correction of Action, August 13, 1999 | 17 - 23 |
| 8 | Administrator's Final Record of Decision, March 2000 | 24 - 27 |
| 9 | Order transferring Petition For Review to the United States Court of Federal Claims, dated March 18, 2002 | 28 – 29 |
| 10 | Administrator's Record of Decision, November 1988 | 30 – 34 |
| | Declaration of Robert Kendall | 35 – 38 |
| | Declaration of Virginia Grosz | 39 - 40 |

# EXHIBIT 1

**BPA Definitions - R**

A B C D E FGH IJK L M NO PQ R S TUV WXYZ

**raceway**
Any channel for enclosing and for loosely holding wires, cables or busbars.

**radial line**
A power transmission circuit fed from one end only. Also see network line.

**radial system**
A power system in which independent feeders branch out from a common source of electrical supply.

**radiant energy**
Energy traveling as a wave motion, such as low-temperature, infrared radiation emitted from the sun.

**radiation**
The process of emitting: energy waves, such as heat and light from the sun to the earth or heat from the earth to space; particles of matter from the disintegration of the nuclei of atoms, such as gamma rays.

**radioactive contamination**
1) The presence of unwanted radioactive matter. 2) Deposition of radioactive material in any place where it may harm persons or make products or equipment unsuitable or unsafe for some specific uses.

**radioactivity**
The spontaneous disintegration or change in energy state of an unstable nucleus of an atom accompanied by the emission of alpha, beta, or gamma rays.

**radio frequency**
Frequency in the portion of the electromagnetic spectrum between audible frequencies and infrared frequencies. Present practical limits are roughly 10 kilohertz to 100,000 megahertz.

**radio influence field (RIF)**
The radio noise field emanating from transmission system equipment or circuits.

**radio influence voltage (RIV)**
The radio noise voltage appearing on transmission system conductors or equipment.

**radio interference (RI)**
Impairment of the reception of a wanted radio signal by an unwanted radio signal or disturbance, usually expressed in microvolts. Usually the result of partial electrical discharges (corona).

**radome**
An enclosure for protecting an antenna from the harmful effects of its physical environment but not affecting its electrical performance.

**radon**
An odorless, colorless, tasteless inert gas formed by the natural breakdown, or radioactive decay, of the radium that occurs in trace amounts in soils and rocks.

**radon progeny**
The short-lived decay products of radon that can attach to water vapor, dust, and smoke particles.

**rain shadow**
The area of noticeably less rainfall on the lee side of a mountain or mountain range than on the windward side. Caused by condensation and precipitation from moist air occurring as air flows up and over the windward side of a mountain or mountain range so the air descending the leeward side is much drier.

**rake**
The angle or distance that a pole is tilted; may be in line or traverse to the line.

**ramp rate**
1) The amount of conservation that a program can acquire annually. 2) The rate at which the power output of a generator or generating project can be increased or decreased.

**RAS**
See remedial action scheme.

**RASP**
See Regional Assessment of Supplementation Projects.

**rate base**
The value, specified by a regulatory authority, upon which a utility is permitted to earn a specified rate of return.

**rate case**
The process under 7(i) of the Pacific Northwest Electric Power Planning and Conservation Act in which BPA informs customers of its intention to adjust the power rates it intends to charge its customers for a following period (usually two years) and holds public hearings before submitting the proposed rates to the Federal Energy Regulatory Commission for approval.

**rate ceiling**
Rate cap. An upper limit, represented either by a number or a formula, above which a particular rate may not rise.

**rate design**
The development of electricity prices for various customer classes in order to meet revenue requirements dictated by operating needs and costs (such as revenue requirements, rate stability, fairness, efficiency, ease of administration).

**rate filing**
The formal process of submitting BPA's proposed rate changes to the Federal Energy Regulatory Commission for approval.

**ratepayer**
1) A utility, large industry, or Federal agency that buys power from BPA. 2) More generally, anyone who pays for the end use of electricity.

**rate pool**
A combining of loads, as specified by various provisions of section 7 of the Pacific Northwest Electric Power Planning and Conservation Act, to which a single rate shall apply.

**rates (BPA)**

# EXHIBIT 2

QUALIFICATION STATEMENT OF

ROBERT J. PROCTER

Witness for the Bonneville Power Administration

*Q. Please state your name, employer, and business address.*

A. My name is Robert J. Procter. I am employed by the Bonneville Power Administration (BPA), 905 NE. 11th Avenue, Portland, Oregon.

*Q. In what capacity are you employed?*

A. I am a Public Utilities Specialist, Power Products, Pricing and Rates in the Power Business Line.

*Q. Please state your educational background.*

A. In 1972, I first received an Associate in Arts degree in History Humanities from Bucks County Community College in Newtown, Pennsylvania. I then received a Bachelor of Arts degree in Economics from the University of California-Berkeley in 1976. Next, I received a Master of Science degree in Agricultural Economics from Purdue University in 1979, and, finally, I earned a Doctor of Philosophy degree in Agricultural Economics from Michigan State University in 1985. Throughout my education for my Bachelor of Arts degree and graduate degrees, one of my primary focuses has been on microeconomic, or production economics. I have taken a great deal of coursework in Price Theory. I have also taken a good deal of coursework in Welfare Theory, or the study of when Price Theory does not result in socially effective results in markets and public policy responses to these results. This work was complemented by a good deal of coursework in Public Finance with an emphasis on the rationale for various governmental policies in inefficient markets and also a year of coursework in Industrial Organization. My coursework in Industrial Organization included the study of industrial structure, choice, and market performance as well as antitrust theory and law, and finally, the economics of regulated industries. My Master's Thesis examined the

economics of residential solar for heating and hot water. It also examined the effects of various tax incentives for residential solar development and also the effects of different rate designs and rate levels on the economics of residential solar for heating and hot water. This analysis was performed using a Fortran based computer model I developed for this analysis. Also at Purdue University, I worked in the Economics department adapting a Fortran based tax model developed for New York State for use in Indiana. At Michigan State, I participated in a research project that evaluated the distributional effects of a lifeline utility rate structure that was being proposed for adoption by the Michigan legislature. My dissertation examined the farm economics of switching from a more soil erosive tillage system to a less soil erosive tillage system. This work involved investment-disinvestment theory and attempted to develop an approach to reflecting the foregone crop value due to less future soil productivity from greater erosion in today's decision of whether or not to change tillage equipment. This research was performed using a BASIC computer model I developed to run on one of the first versions of the P.C. and it basically integrated an engineering model of tillage system and soil erosion with a crop economics model. Also at Michigan State, a good deal of my coursework was in the areas of microeconomics and quantitative methods. In the area of quantitative methods, I took a great deal of coursework in linear and non-linear programming, including lecturing and tutoring in a graduate level Operations Research class. I also took a year of coursework in dynamic optimatization in Engineering. also attended the National Association of Regulatory Utility Commissioners' Annual Regulatory Studies Program in 1987, and studied various aspects of electric utility ratemaking practices.

*Q. Please summarize your professional experience.*

A. After completing my coursework at Michigan State, I was first employed at the General Accounting Office in Washington D.C. I was assigned to a number of projects during my approximately 18 months of employment with G.A.O. One project brought me to

the Northwest on a number of occasions – an analysis of the Columbia Basin Project. I was initially employed at BPA in January, 1986 in the Office of Conservation as an Industry Economist.

During the approximately three years I worked in the Office of Conservation, I prepared economic studies and analyses in support of BPA's cost-effectiveness of Model Conservation Standards. I worked with models used to stimulate energy use in buildings to estimate the potential for conservation in the Pacific Northwest. My responsibilities included development of the tests for cost-effectiveness and consumer economic feasibility, development of the models employed in those analyses, and all public involvement supporting document preparation. After this work was completed and BPA and the Northwest Power Planning Council revised the Model Conservation Standards for new residential construction, I was assigned to work on the development of the Conservation Surcharge Policy. My responsibilities included the development of that policy including working with a group of representatives from various utility and other interests involved with policy development with BPA.

Following these assignments, I began working in the Planning Branch of the Office of Energy Resources approximately in 1989 or 1990. During this time I was involved in various efforts associated with development and implementation of BPA's competitive acquisitions and Resource Contingency programs.

This effort included development of the evaluation methods first implemented in the competitive acquisitions program. A significant part of that effort included development of criteria used to value various aspects of independent power projects, such as the seasonality of energy production, the ability to displace energy purchase, the ability to delay online data, and the quantity of onpeak energy production. My responsibilities also included assisting in contract negotiation.

In August 1994, I was appointed to my present position in rates. Since that time, I have had a number of assignments including assisting in the development of methods for unbundled products costing, development of BPA's stranded cost strategy, drafting of BPA's proposed subscription strategy, and work on various rate issues. Over the past several years, I have been responsible for the development and implementation of the LB CRAC mechanism designed to adjust rates twice annually to account for augmentation costs. I am the staff lead in rates for the LB CRAC methodology. My responsibilities have included development of the LB CRAC methodology, documentation of that methodology, development of the EXCEL model that implements that methodology. Currently, I run the LB CRAC model developed to implement the methodology. I operate that model and am the staff lead on issues involving the LB CRAC and augmentation cost recovery. Twice annually I develop the rate adjustments to be applied to May 2000 rates for augmentation costs. I also am the staff lead for explaining that analysis in LB CRAC workshops.

*Q. Please state your experience as a witness in previous proceedings.*

A. I have been a witness in previous rate proceedings. I believe that I was a witness in the 1996 rate case. I have also been a witness in the FPS rate case held concurrently with BPA's 2000 rate case. The FPS rate case was designed to revise a capacity rate from the 1996 rate case. I have also been a witness in an arbitration proceeding conducted under a power sales contract with Southern California Edison involving the capacity rate in the FPS rate schedule.

# EXHIBIT 3

UNITED STATES OF AMERICA
US DEPARTMENT OF ENERGY
BEFORE THE BONNEVILLE POWER ADMINISTRATION

Proposed Firm Power Products )
) Case No. BPA Docket FPS-96R
and Services Rate Schedule )

CROSS-EXAMINATION

DATE TAKEN: November 22, 1999

TIME: 9:00 a.m.

PLACE: Bonneville Power Administration
Portland, Oregon

COURT REPORTERS: Teresa L. Rider RPR, CSR

Jaime S. Morrocco, RPR, CM

RIDER & ASSOCIATES
COURT REPORTERS
P.O. Box 245
Vancouver, Washington 98666

of the expiring rate schedule is replicated in its successor. It really is dependent on what the product mix is.

Q. So in your estimation the fact that a product is priced by reference to a specific rate schedule would not require you to price the same product in the future?

A. (Mr. Procter) Well, the section that you're referring to here in the rebuttal is we're talking at the rate schedule here, that SP-93 is the successor rate schedule to SP-87. And FPS-96 is the successor rate schedule to SP-93. We're talking rate schedule over here. There's a lot -- the ground underneath those rate schedules shifting dramatically over that period of time. Products were changing, rate design was changing. There were so many things that were changing. So we're just talking about what rate schedule was succeeded by which other rate schedule.

Q. We're not doing any analysis as to whether or not the products that are being priced are consistent with, the same as or otherwise different than the prior rate schedule?

A. (Mr. Procter) Well, you need to look at the particulars of the specific rate schedules and understand the products that were being developed, and for which that rate schedule was putting rates in place. Now, that

witnesses about what is meant by this term and that term and this clause and that clause. That's something you folks should be doing together either in another forum or at some kind of a discussion meeting. But we're not here to try all that today.

MS. FISHER: Well, the difficulty -- it would be my preference to be in another forum. The difficulty is the Federal Registry Notice and the testimony says the Administrator is going to determine in this rate case that this applies to SCE. And on the basis, as you describe it, that that contractual dispute is not within the province of the Administrator --

HEARING OFFICER EDWARDS: I didn't say it wasn't within the province of the Administrator. I said it wasn't within the province of this particular hearing at this point in time. I do not have the authority to abrogate your hearing on some of the grounds that you had raised earlier, so the hearing is going to go forward and be concluded. And your job is to show that this proposed rate schedule is unreasonable, unfair or discriminatory, that's your job. And if you can show that, then you're welcome to bring any evidence that's going to go to that point. But with respect to arguing whether or not everybody agrees on what capacity without energy is for the purpose of defining SCE's contract, that's going far

beyond the scope here. Contract interpretation Bonneville may say it's red and you may say it's yellow, but you've got to resolve that somewhere else. We aren't going to be able to do that here. All we're looking at is this new rate schedule, the pricing that is being proposed. How and when it applies to SCE's contract is something else again.

Now, the reason why it has been brought and whether or not it was intended to show some kind of punishment against SCE is the matter that you're entitled to try and prove. But not the interpretation of your contract and how and why the rate schedule might fit it.

MS. FISHER: Then could I ask the Court's indulgence to give a brief recess so I don't ask those questions, and I can actually go through in some thoughtful manner and try to reformulate or reject some of the questions I have prepared for today?

HEARING OFFICER EDWARDS: That's a good idea.

MR. BURGER: I was going to say it's 2:30. It's about time for a break, anyway.

HEARING OFFICER EDWARDS: Will 15 minutes do it?

MS. FISHER: 20.

HEARING OFFICER EDWARDS: We'll be in recess until ten minutes to 3:00.

(Hearing in recess.)

# EXHIBIT 4

SOUTHERN CALIFORNIA
EDISON
An EDISON INTERNATIONAL℠ Company

Harold B. Ray
Executive Vice President

May 24, 2000

Mr. Stephen Oliver, Vice President
Bulk Marketing & Transmission Services
Bonneville Power Administration
Post Office Box 3621
Portland, OR 97208-3621

Dear Mr. Oliver:

Re: BPA/SCE Power Sale and Exchange Agreement ("Agreement")
Contract No. DE-MS79-88BP92275

This letter serves as a response to your letter of May 22, 2000 in which you requested a definite statement from Southern California Edison Company ("SCE") regarding the election of the Option Capacity now that the Federal Energy Regulatory Commission ("FERC") has granted interim approval for the FPS-96R rate schedule, effective May 22, 2000.

Your May 22, 2000 letter states that SCE has not expressed a "definite statement" indicating its "desire to commence [*sic*] delivery and [its] willingness to pay the effective rate for the Option Capacity product." To the contrary, on April 27, 2000, pursuant to Section 12(a) of the above-entitled Agreement, SCE exercised its option to take 250 MW of Option Capacity from Bonneville Power Administration (BPA) from June 1, 2000 to October 31, 2000 at the effective rate of $3.144/kW-month, including transmission charges. I reaffirmed that election by letter to you of May 1, 2000. It is Edison's position that: (1) the only applicable Option Capacity rate is the FPS-96 contract demand rate in effect on May 1, 2000, when the Option Capacity had to be exercised; (2) a Capacity without Energy type rate does not apply to the Option Capacity; and (3) the FPS-96R rate is improper both substantively and procedurally.

Your May 22, 2000 letter demands that Edison agree to pay for the Option Capacity at the Capacity without Energy rate approved by the FERC on an interim basis as of May 22, 2000. You state unconditionally that, absent such an assurance, BPA will not deliver the Option Capacity for which SCE exercised its option on April 27, 2000 and will release the corresponding transmission reservation. By taking that position, BPA has breached the Agreement. In demanding the rate of $13.85/kW-month (including transmission), BPA is in effect asking SCE to pay an additional $13.4 million. In order to mitigate the risk to SCE and its ratepayers, SCE hereby declines to accede to BPA's improper conditions. However, should BPA agree to provide the Option Capacity the

P. O. Box 800
2244 Walnut Grove Ave.
Rosemead, CA 91770

Mr. Stephen Oliver, Vice President
May 24, 2000
Page 2

entire season at the FPS-96 contract demand rate, the proper rate under the Agreement, SCE will accept delivery of that Option Capacity beginning June 1, 2000.

SCE reserves its rights to seek relief in any appropriate forum.

Very truly yours,

cc: Judith A. Johansen

# EXHIBIT 5

EDISON

Virginia Grosz
Contracts Manager

Telephone (626) 302-3263
Facsimile (626) 302-3254

January 15, 1999

Mark E. Miller
Bonneville Power Administration
Bulk Power Marketing - PSB/5
PO Box 3621
Portland, OR 97208

Subject: BPA-Edison Sale & Exchange Agreement
(Contract No. DE-MS79-88BP92275)

Dear Mark:

As we recently discussed, Edison is considering exercising its option, pursuant to Section 12(a) of the above-referenced Agreement, to receive an additional 250 MW of capacity (Option Capacity) from June 1, 1999 to October 31, 1999. As indicated in Section 12(a)4 of the above-referenced Agreement and in accordance with Bonneville Power Administration's (Bonneville) 1996 Wholesale Power and Transmission Rate Schedules, Edison would pay for the Option Capacity at the following demand charge:

Firm Power Charges

- Demand Charge (FPS-96) = $0.87/kw/month

Transmission Charges

- Point-to-Point Firm Transmission Rate (PTP-96) = $1.000/kw/month
- Southern Intertie Transmission Rate (IS-96) = $1.274/kw/month

**TOTAL DEMAND CHARGES = $3.144/kw/month or $786,000/month**

This letter serves as a preliminary, non binding notice to Bonneville of Edison's exercise of its option to receive Option Capacity. Pursuant to Section 12(a)2, Edison will provide Bonneville with a final notice by May 1, 1999.

If you have any question regarding Edison's request, please contact me at (626) 302-3263 or Jill P. Horswell at (818) 302-3286.

Sincerely,

Virginia Grosz

Virginia Grosz

# EXHIBIT 6

Department of Energy

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

June 2, 1999

In reply refer to: PSB

Mr. Harold B. Ray
Executive Vice President
Southern California Edison
2244 Walnut Grove Ave.
Rosemead, CA 91770

Dear Mr. Ray:

This letter is a follow up to our telephone conversation on April 10, 1999. The topic of our discussion was Option Capacity, as defined in Section 12(a) of the Sales and Exchange Agreement, Contract No. DE-MS79-88BP92275.

The issues we agreed were under contention are 1) appropriate Capacity charge for the delivery period June through October, 1999, and 2) payment for energy losses and associated transmission during that period.

Our agreement, in principle, was that Bonneville (BPA) would deliver the Option Capacity at the agreed to Point of Delivery (POD) for the June through October, 1999 delivery period and concurrent with that delivery, Bonneville and Edison shall participate in binding arbitration on the two issues listed above. We agreed that the parties would use their best efforts to conclude the arbitration on or before October 31, 1999.

On May 14, 1999, Edison sent to BPA a sheet containing its proposed conditions for this arbitration, which included a proposal that the arbitrator would decide whether the 2000 delivery period should be subject to the arbitration. BPA is not willing to arbitrate any issue with regard to the Option Capacity product for any delivery period other than 1999. Attached are more specific elements of the arbitration.

The other issue not discussed, but important to delivery, is the applicable Point of Delivery. A letter from Edison to Bonneville dated April 22, 1999, states: "Edison is willing to take delivery at Nevada Oregon Border (NOB) only." Consistent with that representation, the designated POD for the 1999 Option Capacity delivery shall be the Nevada Oregon Border (NOB).

The mutually agreed decision on the applicable Point of Delivery and the arbitration's decision on the demand charge and the losses will not prejudice any position taken by either party with respect those issues for subsequent delivery periods.

If you are in agreement with the principles provided in this letter and in the attached arbitration conditions, please sign the concurrence line provided below and return one original to me.

Sincerely,

Allen L. Burns
Vice President, Power Marketing

Concurrence: Harold B. Ray 6-28-99
Date

Enclosure:
Binding Arbitration Conditions

## BINDING ARBITRATION CONDITIONS

**1. Type of Arbitration**

The decision of the arbitrator will be binding. Based on the parties' submittals, the arbitrator will be authorized to adopt either of the parties' stated positions and to grant the relief requested by that party, as set forth below. The arbitrator's decision must be consistent with the terms and conditions of the Sale and Exchange Agreement between the parties. The arbitrator's final decision will have no binding precedential, res judicata or collateral estoppel effect. The result of the arbitration, and evidence submitted by either party in the arbitration, may be cited by either party in any future proceeding. The scope of the arbitration will be limited to resolving the following issues for the delivery period June 1, 1999 through October 31, 1999:

Issue 1: Demand Charge

BPA: $3.964/kW/month for capacity ($1.69/kW-month) and transmission ($2.274/kW-month)
Edison: $3.144/kW/month for capacity ($0.87/kW-month) and transmission ($2.274/kW-month)

Issue 2: Transmission Losses

BPA: Edison should pay for energy losses and associated transmission to the Point of Delivery in the amount of $375,000.
Edison: Edison is not responsible for losses.

**2. Rules of Arbitration**

Both parties agree to conduct the arbitration in accordance with the American Arbitration Association (AAA) Commercial Arbitration Rules unless expressly described otherwise in this document or by written mutual agreement during the course of the arbitration. A procedural schedule will be developed based on the following format:
(1) submission of initial briefs and evidentiary materials; (2) discovery (as limited by section 5); (3) submission of rebuttal materials; (4) conference with the arbitrator to clarify issues; and (5) submission of final brief or other materials as required or requested by the arbitrator.

**3. Arbitrator Selection**

Arbitrator should be selected from the AAA Energy Panel in accordance with the AAA Rules.

**4. Payment of Arbitration Costs**

Each party shall be responsible for its own costs of arbitration, including legal fees up to $100,000. Any arbitration costs and legal fees incurred by the prevailing party above $100,000, but not in excess of $300,000, shall be paid by the losing party.

**5. Discovery**

In order to expedite the arbitration and to minimize expenses, no discovery would be permitted for either side; however, each side will be allowed to request documents or submit interrogatories to the extent that such discovery is reasonably necessary to prepare opening submissions and rebuttal. Issues pertaining to discovery that cannot be mutually resolved by the parties will be submitted to the arbitrator, whose decision shall be binding.

**6. Billing**

Pending resolution of the dispute through arbitration, BPA shall bill Edison $3.144/kW-month and Edison shall not pay for losses. If BPA prevails in the arbitration on issue 1 Edison will pay to BPA the difference between the parties' positions with interest calculated based on the Large Bank Prime Rate published in the Wall Street Journal. If BPA prevails on Issue 2 Edison will pay to BPA $375,000 with interest calculated based on the Large Bank Prime Rate published in the Wall Street Journal.

# EXHIBIT 7

federal register

Friday
August 13, 1999

## Part III

# Department of Energy

## Bonneville Power Administraiton

2002 Proposed Wholesale Power Rate Adjustment, Public Hearing, and Opportunities for Public Review and Comment

System Obligations include, but are not limited to, the transmission costs associated with the return of the Canadian Entitlement, and transactions related to the Pacific Northwest Coordination Agreement, Mid-Columbia Hourly Coordination, and the Canadian Non-Treaty Storage Agreement.

51. Total Plant Load

Total Plant Load means a DSI customer's total electrical energy load at facilities eligible for BPA service during any given time period whether the customer has chosen to serve its load with BPA power or non-Federal power.

52. Total Retail Load (TRL)

Total Retail Load is all electric power consumption including distribution system losses, within a utility's distribution system as measured at metering points, adjusted for unmetered loads or generation. No distinction is made between load that is served with BPA power and load that is served with power from other sources. For DSIs, Total Retail Load is called Total Plant Load.

53. Utility Distribution Company

A company that owns and maintains the distribution facilities used to serve end-use customers.

**BPA's New 1996 General Rate Schedule Provisions for Power Rates**

A. Targeted Adjustment Charge for Uncommitted Loads

1. Availability

The Targeted Adjustment Charge for Uncommitted Loads (TACUL) pertains to the PF rate schedule. The TACUL applies after December 7, 2000, to purchases to serve customer loads that were uncommitted during the 1996 rate case which are returned to BPA firm power requirements service during a period prior to FY 2002. Customers subject to the TACUL are those that reduced their purchases from BPA by adding firm resources to serve load under: (1) 1981 power sales contracts that expire on or before July 31, 2001, as may be amended; (2) Amendatory Agreement No. 7 (AA7) to the 1981 power sales contracts, or new "1996" power sales contracts where the customer provides BPA notice after December 7, 1998, consistent with the terms of the customer's power sales contract, for requirements service for the period prior to FY 2002. This charge will be in effect through September 30, 2001.

This rate schedule amends the PF–96 rate schedule, which went into effect October 1, 1996.

2. Energy Charge

The TACUL is a monthly mills/kWh adjustment to the HLH and LLH energy rates specified in the 1996 rate schedule, and is applied to that portion of the customer's load that is subject to the TACUL. The TACUL rate adjustment will be established based on the following formula:

TACUL = [(Incr $ * Incr Amt) – (Rate $ * Incr Amt)]/TACUL Amt

Where:

TACUL Amt = The amount of load subject to the TACUL, determined monthly.

Rate $ = The monthly PF energy rate shown in the applicable rate schedule.

Inventory Amt = Amount of energy available to serve this load based on an annual energy Federal system firm resource capability as defined in the Loads and Resources Study, and updated if BPA determines that is necessary.

Incr $ = Monthly cost to BPA, plus a handling fee, of incremental power for HLH and LLH expressed in mills/kWh (see below). These costs also may include where applicable, wheeling, ancillary, and other charges BPA may incur in purchasing power from other entities such as, but not limited to, the California ISO or the California PX.

Incr Amt = Amount of incremental power required, determined monthly and defined as the TACUL Amt minus the Inventory Amt. (If there is no available Inventory Amt the Incr Amt will equal the TACUL Amt).

Incr $ is greater than Rate $ (If Incr $ is less than Rate $, the TACUL is 0 mills/kWh).

TACUL is the monthly rate adjustment in mills/kWh. BPA will calculate the cost (Incr $) per month in mills/kWh of the additional power per month (Incr Amt) for a specific Customer request. BPA will establish the cost of the additional power by the following methods:

a. BPA will establish the price based on BPA's monthly cost to purchase the incremental load by purchases of resources at market, or the monthly cost of BPA recallable power contracts, averaged, whichever is less.

b. A price plus handling fee calculated based on the following index.

BPA will calculate the price per month for HLH and LLH, based on an index calculated according to the following:

Price of HLH = ⅓ HLH (DJ Mid C) + ⅓ HLH (California PX) + ⅓ (NYMEX Mid C)

Price of LLH = ½ LLH (DJ Mid C) + ½ LLH (PX)

Where the California PX basis is adjusted to DJ Mid C

Where:

DJ Mid C = Dow Jones Firm On-peak (HLH) and Firm Off-peak (LLH) Mid-Columbia Electricity Price Index

California PX = California Power Exchange Day-Ahead Zonal Prices (Constrained)—the average of NW1 (Captain Jack/Malin—COB) and NW3 (NOB) for HLH and LLH

NYMEX Mid C = the New York Mercantile Exchange Futures Electricity Closing Price at Mid-C for the applicable month

California PX prices will be adjusted for basis difference between COB/NOB and the Mid-C using the IS/PTP Rates contained in BPA's 1996 Transmission Rate Schedules.

Issued in Portland, Oregon, on July 30, 1999.

**Jack Robertson,**

*Deputy Administrator.*

[FR Doc. 99–20805 Filed 8–12–99; 8:45 am]

BILLING CODE 6450–01–P

---

**DEPARTMENT OF ENERGY**

**Bonneville Power Administration**

**Proposed Correction of Errors in the Firm Power Products and Services Rate Schedule (FPS–96): Clarifying the Applicability of the FPS–96 Contract Rate to Certain Capacity With Energy Return Contracts, Public Hearing, and Opportunity for Public Review and Comment**

AGENCY: Bonneville Power Administration (BPA), Department of Energy (DOE).

ACTION: Notice of Proposed Correction of Errors in the Firm Power Products and Services Rate Schedule (FPS–96): Clarifying the Applicability of the FPS–96 Contract Rate to Certain Capacity With Energy Return Contracts.

SUMMARY: BPA unbundled its wholesale power and transmission products in its 1996 rate case. Pursuant to this unbundling, several of BPA's wholesale power rate schedules included separate rates for sales of firm capacity with energy returns (commonly referred to as capacity without energy). Although clarifying language was mistakenly omitted from the FPS–96 rate schedule, the record established that it was BPA's intent that the firm capacity with energy returns product would be sold at a negotiated price.

Certain BPA contracts executed prior to October 1, 1996, provide that BPA supply capacity without energy at the demand charge in the Contract Rate of

the then applicable surplus firm power rate schedule. BPA erred in the FPS–96 rate schedule when it failed to expressly state in that schedule that the capacity without energy product would be priced at a negotiated rate. The demand charge in the Contract Rate section of FPS–96 was priced to be sold only in conjunction with the purchase of the separate energy product in that section. This action is intended to correct those errors.

DATES: The prehearing conference will be held on August 24, 1999, from 1:00 p.m. to 4:00 p.m., Room 223, 911 N.E. 11th, Portland, Oregon. Written comments by participants must be received by October 13, 1999, to be considered in the Record of Decision (ROD).

ADDRESSES: BPA's initial rate proposal in this proceeding will be available for examination on August 24, 1999 at BPA's Public Information Center, BPA Headquarters Building, 1st Floor, 905 N.E. 11th, Portland, Oregon. Written comments should be submitted to Mr. Michael Hansen, Public Involvement and Information Specialist; Bonneville Power Administration; P.O. Box 12999; Portland, Oregon 97212. The prehearing conference will be held on August 24, 1999, from 1:00 p.m. to 4:00 p.m., Room 223, 911 N.E. 11th, Portland, Oregon. To request documents in this proceeding by telephone, call BPA's document request line: (503) 230–4328 or call toll-free 1–800–622–4519. Please request the document by its listed title. BPA's initial proposal for FPS–96R will also be available on BPA's website at *www.bpa.gov/power/ratecase.*

*Responsible Official:* Ms. Diane Cherry, Manager for Power Products, Pricing and Rates, is the official responsible for the development of BPA's wholesale power rates.

SUPPLEMENTARY INFORMATION:

**Part I—Introduction and Procedural Background**

*A. Relevant Statutory Provisions Governing This Rate Proceeding*

Section 7 of the Northwest Power Act, 16 U.S.C. 839e, contains a number of general directives that the BPA Administrator must consider in establishing rates for the sale of electric energy and capacity. In particular, section 7(a)(1), 16 U.S.C. 839e(a)(1), provides in part that:

> [S]uch rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System (including irrigation costs required to be repaid out of power revenues) over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this Act and other provisions of law.

Rates established by BPA are effective on an interim or final basis when approved by FERC. 16 U.S.C. 839e(a)(2). In addition to the Northwest Power Act, BPA ratemaking is governed by the Bonneville Project Act, 16 U.S.C. Section 832 *et seq.*, the Federal Columbia River Transmission System Act, 16 U.S.C. Section 838 *et seq.*, and the Flood Control Act of 1944, 16 U.S.C. 825s.

Section 7(i) of the Northwest Power Act, 16 U.S.C. 839e(i), requires that BPA's rates be set according to certain procedures. These procedures include issuance of a Federal Register notice announcing the proposed rates; one or more hearings; the opportunity to submit written views, supporting information, questions, or arguments; and a decision by the Administrator based on the record developed during the hearing process. This proceeding will be governed by BPA's "Procedures Governing Bonneville Power Administration Rate Hearings," 51 FR 7611 (March 5, 1986), which implement and, in most instances, expand these statutory requirements.

Pursuant to section 1010.3(c) of the Procedures Governing Bonneville Power Administration Rate Hearings (BPA Procedures), this hearing will be conducted under Rule 1010.10, which governs Expedited Rate Proceedings. The expedited procedures will be used rather than the procedures for General Rate Proceedings conducted under Rule 1010.9. The procedures for General Rate Proceedings are intended for use when the Administrator proposes to revise all, or substantially all, of BPA's wholesale power and transmission rates. The proposed correction of the FPS–96 schedule does not impact any other part of the FPS–96 rate schedule, or any other rate schedule, and will be applicable to a very limited number of contracts. Therefore, the issues in this rate proceeding will be fewer and of more limited scope than the issues in a proceeding to adjust all BPA rates. BPA believes that the Expedited Rate Proceeding will be adequate to develop a full and complete record and to receive public comment and argument related to the proposed corrections. If more time is required, the Hearing Officer may request under section 1010.10(b) of the BPA Procedures that the BPA Administrator grant an extension.

*B. Background*

On July 17, 1995, BPA filed a notice in the Federal Register proposing new wholesale power and transmission rates to be effective on October 1, 1996, including the FPS–96 rate schedule. BPA's initial rate proposal was filed on July 10, 1995, and was supported by written testimony and studies. Parties to the proceeding filed their rebuttal to BPA's direct case and their own direct testimony on September 8, 1995. On December 8, 1995, litigants filed rebuttal to the parties' direct cases. BPA also filed a supplemental rate proposal on December 8, 1995, which consisted of written testimony and studies.

Parties filed their direct cases in response to BPA's supplemental rate proposal on January 26, 1996. Testimony responding to the parties' supplemental cases was filed on February 12, 1996. Rebuttal testimony was filed by all litigants on February 14, 1996. Cross-examination began on February 20, 1996. Parties submitted initial briefs on April 22, 1996. Oral argument before the BPA Administrator and Deputy Administrator was held on April 30, 1996. A Draft ROD was published and distributed to parties on May 4, 1996. Parties filed briefs on exceptions on May 30, 1996. BPA published its Final ROD on June 17, 1996.

BPA filed its proposed rates, including the FPS–96 schedule, with FERC on July 26, 1996. On September 25, 1996, FERC granted interim approval of the proposed rates effective October 1, 1996. United States Dept. of Energy-Bonneville Power Administration, 76 FERC ¶ 61,314 (1996). On July 30, 1996, FERC issued an order granting final confirmation and approval of BPA's rates, including the FPS–96 rate schedule. United Stated Dept. of Energy-Bonneville Power Administration, 80 FERC ¶ 61,118 (1997). The FPS–96 rate was approved for a 10-year period ending September 30, 2006.

*C. Proposed Schedule Concerning This Rate Proceeding*

BPA's initial rate proposal in this proceeding will be available for examination on August 24, 1999, at BPA's Public Information Center, BPA Headquarters Building, 1st Floor: 905 N.E. 11th, Portland, Oregon, and will be provided to parties at the prehearing conference to be held on August 24, 1999, from 1:00 p.m. to 4:00 p.m., Room 223, 911 N.E. 11th, Portland, Oregon.

To request documents in this proceeding by telephone, call BPA's document request line: (503) 230–4328

or call toll-free 1-800-622-451... Please request the document by its listed title. BPA's initial proposal for FPS-96R will also be available on BPA's website at *www.bpa.gov/power/ratecase.*

As noted above, BPA will release its proposed revisions to the FPS-96 rate schedule on August 24, 1999. BPA expects to publish a final ROD on December 6, 1999. The following proposed schedule is provided for informational purposes. A final schedule will be established by the Hearing Officer at the prehearing conference:

August 24—Prehearing Conference (BPA files Direct Case) and deadline for petitions to intervene.
September 17—Data Requests on BPA's Direct Case Due.
September 24—Data Responses Due.
October 4—Parties' Direct Cases (including rebuttal to BPA's Direct Case).
October 12—Data Requests on Parties' Direct Cases Due.
October 13—Close of Public Comment.
October 19—Data Responses Due.
October 26—Litigants' Rebuttal Cases (no discovery).
November 2—Cross-Examination.
November 9—Initial Briefs.
November 17—Draft Record of Decision.
November 27—Briefs on Exceptions.
December 6—Final Record of Decision.

The procedural schedule established for Docket No. FPS-96R will provide an opportunity for interested persons to review BPA's proposed rates, to participate in the rate hearing, and to submit oral and written comments. During the development of the final rate proposal, BPA will evaluate all written and oral comments received in the rate proceeding. Consideration of comments and more current data may result in the final rate proposal differing from the rates proposed in this Notice.

BPA expects to file its ROD with FERC by January 6, 2000, requesting that the proposed revisions go into effect on or before June 1, 2000.

## Part II—Purpose and Scope of Hearing

The purpose of the proposed changes to the Firm Power Products and Services (FPS-96) rate schedule is to clarify and establish the rates that apply to the capacity without energy product.

The FPS-96 rate schedule includes a Contract Rate demand charge section, which contains a rate of $0.87/kW/month. The demand charge in this section was designed and priced to be used exclusively in conjunction with the purchase of the separate energy product included in the same section of FPS-96. The Contract Rate demand charge was not intended to apply to capacity without energy.

The FPS-96 rate schedule is a successor to the Surplus Firm Power (SP-93) rate schedule. However, prior to the product unbundling in the FPS-96 rate schedule, the Contract Rate demand charge in BPA's Surplus Firm Power rate schedules (SP-93, SP-91, SP-89 and SP-86) was priced to provide capacity without energy. The Contract Rate demand charge in each of these Surplus Firm Power rate schedules included: (1) firm energy; (2) firm capacity without energy; and (3) firm power. In addition, the demand charge in the Contract Rate in those schedules was priced to reflect the value of capacity, with or without energy.

Pursuant to BPA's product unbundling in the 1996 rate case, separate sections for the capacity without energy product were included in the Priority Firm Power (PF-96) and New Resource Power (NR-96) rate schedules. Consistent with this product unbundling, the FPS-96 rate schedule was also designed to unbundle capacity and energy products. Although clarifying language was mistakenly omitted from the FPS-96 rate schedule, it was BPA's stated intent that the capacity without energy product would be sold at a negotiated price, not under the Contract Rate demand charge. This is established by BPA's Final 1996 Wholesale Power Rate Development Study (WPRDS), WP-96-FS-BPA-01. Section 4.7 of the WPRDS states in pertinent part that:

> Firm capacity without energy is available under PF-96 and NR-96 rate schedules for Computed Requirements customers purchasing under the 1981 Contract. Firm capacity without energy is also available under the FPS-96 rate schedule, at negotiated prices and terms that may vary from those in the PF and NR rate schedules.

BPA entered into some contracts prior to the establishment of the FPS-96 rate schedule that provide for BPA to supply, under specified circumstances, capacity without energy, and further provide that such product should be priced under the Contract Rate demand charge section of the then applicable Surplus Firm Power rate schedule. As noted previously, the FPS-96 rate schedule is the successor to all prior Surplus Firm Power rate schedules. BPA erred in the FPS-96 rate schedule when it failed to expressly state in that schedule that contracts providing for capacity without energy would no longer be sold at the Contract Rate demand charge, but rather would be priced at a negotiated rate, and that the demand charge in the Contract Rate section in FPS-96 was for a firm power sale product. The fact that an error was made is reflected in the above quoted language from the WPRDS, and in the fact that the $0.87/kW/month price does not, and did not at the time the rate schedule was developed, recover the costs to BPA associated with providing energy during high cost periods and taking energy back during lower cost periods.

Because some contracts may require a posted, as opposed to a negotiated, rate for capacity without energy, BPA is proposing to post seasonally adjusted rates that may be used in instead of a negotiated rate. The posted rates shall be available only for those contracts in effect on or before October 1, 1996, that provide for capacity without energy to be priced at the Contract Rate demand charge in the then applicable Surplus Firm Power rate schedule.

BPA has assessed the potential environmental effects of its rate proposal, as required by the National Environmental Policy Act (NEPA), as part of BPA's Business Plan Environmental Impact Statement (EIS). The analysis includes an evaluation of the environmental impacts of a range of rate design alternatives for BPA's power services and an analysis of the environmental impacts of the rate levels resulting from the rates for such services under the business structure alternatives. BPA's proposal to revise the FPS-96 schedule falls within the range of alternatives evaluated in the Final Business Plan EIS. Comments on the Business Plan EIS were received outside the formal rate hearing process, but will be included in the rate case record and considered by the Administrator in making a final decision establishing BPA's revisions to the 1996 rate schedules. The Business Plan EIS was completed in June 1995.

Pursuant to Rule 1010.3(f) of BPA's Procedures, the Administrator limits the scope of this hearing to issues respecting the correction of the FPS-96 rate schedule as described in section II hereof. Other provisions of the existing FPS-96 rate schedule are not rate matters for the purposes of this hearing.

## III. Public Participation

### *A. Distinguishing Between "Participants" and "Parties"*

BPA distinguishes between "participants in" and "parties to" the hearings. Apart from the formal hearing process, BPA will receive comments, views, opinions, and information from "participants," who are defined in the BPA Procedures as persons who may submit comments without being subject to the duties of, or having the privileges

of. parties. Participants' written and oral comments will be made part of the official record and considered by the Administrator. Participants are not entitled to participate in the prehearing conference; may not cross-examine parties' witnesses, seek discovery, or serve or be served with documents; and are not subject to the same procedural requirements as parties.

Written comments by participants will be included in the record if they are submitted on or before October 13, 1999. Participants' written views, supporting information, questions, and arguments should be submitted to the address noted above. The second category of interest is that of a "party" as defined in Rules 1010.2 and 1010.4 of the BPA Procedures, 51 FR 7611 (1986). Parties may participate in any aspect of the hearing process.

*B. Petitions for Intervention*

Persons wishing to become a party to BPA's rate proceeding must notify BPA in writing. Petitioners may designate no more than two representatives upon whom service of documents will be made. Petitions to intervene shall state the name and address of the person requesting party status and the person's interest in the hearing.

Petitions to intervene as parties in the rate proceeding are due to the Hearing Officer by August 24, 1999. The petitions should be directed to: Christopher Jones, Hearing Clerk—LP, Bonneville Power Administration, 905 N.E. 11th Ave., P.O. Box 12999, Portland, Oregon 97212.

Petitioners must explain their interests in sufficient detail to permit the Hearing Officer to determine whether they have a relevant interest in the hearing. Pursuant to Rule 1010.1(d) of BPA's Procedures, BPA waives the requirement in Rule 1010.4(d) that an opposition to an intervention petition be filed and served 24 hours before the prehearing conference. Any opposition to an intervention petition may instead be made at the prehearing conference. Any party, including BPA, may oppose a petition for intervention. Persons who have been denied party status in any past BPA rate proceeding shall continue to be denied party status unless they establish a significant change of circumstances. All timely applications will be ruled on by the Hearing Officer. Late interventions are strongly disfavored. Opposition to an untimely petition to intervene shall be filed and received by BPA within two days after service of the petition.

*C. Developing the Record*

Cross-examination will be scheduled by the Hearing Officer as necessary following completion of the filing of all litigants' direct and rebuttal testimony. Parties will have the opportunity to file initial briefs at the close of any cross-examination. After the close of the hearings, and following submission of initial briefs, BPA will issue a Draft ROD that states the Administrator's tentative decision(s). Parties may file briefs on exceptions, or when all parties have previously agreed, oral argument may be substituted for briefs on exceptions. When oral argument has been scheduled in lieu of briefs on exceptions, the argument will be transcribed and made part of the record. The record will include, among other things, the transcripts of any hearings, written material submitted by the participants, and evidence accepted into the record by the Hearing Officer. The Hearing Officer then will review the record, supplement it if necessary, and certify the record to the Administrator for decision.

The Administrator will develop the final corrections to the FPS–96 rate schedule based on the entire record. The basis for the final corrections to the rate schedule will be expressed in the Administrator's Final ROD. The Administrator will serve copies of the ROD on all parties and will file the final proposed rate corrections, together with the record, with FERC for confirmation and approval. See 18 CFR Part 300.

**IV. Summary of the Proposal**

Below are the proposed corrections intended to the FPS–96 rate schedule.

1. Title to Section II. A. is corrected from "Firm Power" to "Firm Power and Capacity Without Energy Sales'

2. The following language will be added to 1.1 Contract Rate section of FPS–96:

The demand charge in the Contract Rate applies firm power sales. Firm capacity without energy is available under the FPS–96 rate schedule at the prices identified in section 1.3 unless otherwise agreed to by BPA and the Purchaser.

3. New FPS–96 Section 1.3:

1.3 Capacity Without Energy

Unless otherwise agreed to by the parties, the monthly charge for capacity without energy shall be the applicable rate for that month, multiplied by the Purchaser's Contract Demand associated with the purchase of capacity without energy.

| Applicable months | Rate |
|---|---|
| September–December | $15.16/kW-mo. |
| January–March | 11.11/kW-mo. |
| April | 10.10/kW-mo. |
| May–June | $8.30/kW-mo. |
| July | 13.39/kW-mo. |
| August | 19.93/kW-mo. |

The rates in the Contract Rate Section II.A.1.1 of FPS–96 apply only to a firm power sale.

**V. The Revised FPS–96 Rate Schedule**

The revised FPS rate schedule is set forth below. An interlined version of the revised rate schedule will be available for examination on August 24, 1999, at BPA's Public Information Center, BPA Headquarters Building, 1st Floor; 905 N.E. 11th, Portland, Oregon, and will be provided to parties at the prehearing conference to be held on August 24, 1999, from 1:00 p.m. to 4:00 p.m., Room 223, 911 N.E. 11th, Portland, Oregon. In addition, the interlined version of this revised rate schedule will be posted on BPA's website that same day. The website may be reached via www.bpa.gov/power/ratecase.

**Schedule FPS–96**

**Firm Power Products and Services**

*Section I. Availability*

This rate schedule is available for the purchase of Firm Power, Capacity Without Energy, Supplemental Control Area Services, Shaping Services, and Reservation and Rights to Change Services for use inside and outside the Pacific Northwest during the period beginning October 1, 1996, and ending September 30, 2006.

Products and services available under this rate schedule are described in the reprint of the 1996 GRSPs for FPS–96, Section III.A of Bonneville Power Administration (BPA's) General Rate Schedule Provisions (GRSPs). BPA is not obligated to enter into agreements to sell products and services under this rate schedule or make power or energy available under this rate schedule if such power or energy would displace sales under the PF–96, NR–96, IP–96, or VI–96 rates schedules or their successors. Sales under the FPS–96 rate schedule are subject to BPA's GRSPs. Transmission service over Federal Columbia River Transmission System facilities shall be charged under the applicable transmission rate schedule. Ancillary services shall be available under, or at charges consistent with, the Ancillary Products and Services (APS) rate schedule.

This rate schedule supersedes the Surplus Firm Power (SP–93) and

Emergency Capacity (CE-95) rate schedules. Rates under contracts that contain charges that escalate based on rates listed in this rate schedule shall include applicable transmission charges. For sales under this rate schedule, bills shall be rendered and payments due pursuant to BPA's Billing Procedures and/or as agreed to in purchase agreements.

*Section II. Rates, Billing Factors, and Adjustments*

For each product, the rate(s) for each product along with the associated billing factor(s) are identified below. Applicable adjustments, charges, and special rate provisions are listed for each product. This rate schedule contains four subsections, corresponding to the products offered under this rate schedule:

Section II.A. Firm Power and Capacity Without Energy
Section II.B. Supplemental Control Area Services
Section II.C. Shaping Services
Section II.D. Reservation and Rights to Change Services

*A. Firm Power and Capacity Without Energy*

1. Rates and Billing Factors

1.1 Contract Rate

The demand charge in the Contract Rate applies to purchases of a firm capacity with no energy return product exclusively, that is, a firm power sale product. Firm capacity with energy return (Capacity without Energy) is available under the FPS-96 rate schedule at the prices identified in section 1.3. Contracts entered into on or before September 30, 1996, that refer to the demand charge in the Contract Rate section of the then applicable surplus power schedule for pricing this product will be priced under section 1.3.

1.1.1 Demand Charge

The charge for demand shall be $0.87 per kilowatt per month in all months of the year, multiplied by the Contract Demand unless otherwise agreed by BPA and the Purchaser.

1.1.2 Demand Charge—Capacity Without Energy Sales

See section 1.3 for pricing.

1.1.3 Energy Charge

The total monthly charge for energy shall be the sum of (1) and (2):

(1) The applicable Heavy Load Hour (HLH) rate for that month, multiplied by the Purchaser's HLH Contract Energy unless otherwise agreed by BPA and the Purchaser; and

(2) The applicable Light Load Hour (LLH) rate for that month, multiplied by the Purchaser's LLH Contract Energy unless otherwise agreed by BPA and the Purchaser.

| Applicable months | HLH rate (mills/kWh) | LLH rate (mills/kWh) |
|---|---|---|
| September–December | 49.63 | 46.45 |
| January–March | 50.39 | 47.25 |
| April | 44.74 | 42.73 |
| May–June | 24.36 | 21.21 |
| July | 29.94 | 26.09 |
| August | 42.68 | 37.06 |

1.2 Flexible Rate

Demand and/or energy charges may be specified at a higher or lower average rate as mutually agreed by BPA and the Purchaser. Billing factors shall be Contract Demand and Contract Energy unless otherwise agreed by BPA and the Purchaser.

1.3 Capacity Without Energy

1.3.1 Flexible Rate

For sales not covered by section 1.3.2 the rate(s) for capacity without energy sales shall be as mutually agreed by BPA and the Purchaser.

1.3.2 Posted Rate

The posted rates are available exclusively for contracts entered into on or before September 30, 1996, that include Capacity without Energy provisions where payment shall be at the demand charge associated with the Contract Rate of the then applicable surplus power rate schedule. For sales pursuant to such contracts the monthly charge for Capacity without Energy shall be the applicable rate for that month, multiplied by the Purchaser's Contract Demand associated with the purchase of Capacity without Energy.

| Applicable months | Rate |
|---|---|
| September–December | $15.16/kW-mo. |
| January–March | $11.11/kW-mo. |
| April | $10.10/kW-mo. |
| May–June | $8.30/kW-mo. |
| July | $13.39/kW-mo. |
| August | $19.93/kW-mo. |

2. Adjustments, Charges, and Special Rate Provisions

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

2.1 Rate Adjustments

| Rate adjustment | Section |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

2.2 Special Rate Provisions

| Special rate provisions | Section |
|---|---|
| Cost Contributions | II.D. |

*B. Supplemental Control Area Services*

1. Rates and Billing Factors

The charge for Supplemental Control Area Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Supplemental Control Area Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

2. Adjustments, Charges, and Special Rate Provisions

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

2.1 Rate Adjustments

| Rate adjustment | Section |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |
| Unauthorized Increase Charge | II.R. |

2.2 Special Rate Provisions

| Special rate provisions | Section |
|---|---|
| Cost Contributions | II.D. |

*C. Shaping Services*

1. Rates and Billing Factors

The charge for Shaping Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for use of Shaping Services shall be as established by BPA or as mutually agreed by BPA and the Purchaser.

2. Adjustments, Charges, and Special Rate Provisions

Adjustments, Charges, and Special Rate Provisions are described in the GRSPs. Relevant sections are identified below.

2.1 Rate Adjustments

| Rate adjustment | Section |
|---|---|
| Energy Return Surcharge | II.H. |
| Reactive Power Charge | II.O. |

| Rate adjustment | Section |
|---|---|
| Unauthorized Increase Charge ...... | II.R. |

2.2 Special Rate Provisions

| Special rate provisions | Section |
|---|---|
| Cost Contributions ...................... | II.D. |

*D. Reservation and Rights to Change Services*

1. Rates and Billing Factors

The charge for Reservation and Rights to Change Services shall be the applicable rate(s) times the applicable billing factor(s), pursuant to the agreement between BPA and the Purchaser.

The rate(s) and billing factor(s) for Reservation and Rights to Change Services shall be as established by BPA or mutually agreed by BPA and the Purchaser.

2. Adjustments, Charges, and Special Rate Provisions

There are no additional adjustments, charges, or special rate provisions for the Reservation and Rights to Change Services.

Issued in Portland, Oregon, on July 30, 1999.

**Jack Robertson,**

*Deputy Administrator.*

[FR Doc. 99-20804 Filed 8-12-99; 8:45 am]

BILLING CODE 6450-01-P

# EXHIBIT 8

# Final Firm Power Products and Services Rate Adjustment Proposal (FPS-96R)

**Administrator's Record of Decision** FPS-96R-A-02

# FIRM POWER PRODUCTS AND SERVICES (FPS-96R) RATE ADJUSTMENT

## ADMINISTRATOR'S FINAL RECORD OF DECISION

BONNEVILLE POWER ADMINISTRATION

U.S. DEPARTMENT OF ENERGY
March 2000

rate or rates for sale of peaking capacity or from establishing time of day, seasonal rates or other rate forms." 16 U.S.C. § 839e(e) (emphasis added). The seasonality adjustments for the proposed rate for capacity without energy are consistent with the adjustments made in other rate schedules for the same product. Thus, the proposed adjustments are appropriate.

***Decision***

*BPA's statutory rate directives specifically allow seasonally adjusted rates and the seasonally adjusted rate at issue here is a proper exercise of that authority.*

**2.6 Link Between Pricing Capacity Without Energy and SCE's Contract**

***Issue***

*Whether the capacity without energy product in this proceeding reflects the product purchased under SCE's contract.*

**Parties' Position**

SCE argues that the approach taken by BPA to develop a rate for capacity without energy mistakenly assumes that SCE only purchases capacity and not energy. FPS-96R-B-SO-01, at 22. SCE contends that BPA analysts did not take into consideration an aspect of the SCE contract in which BPA has the discretion to require SCE to return the energy. *Id.* SCE argues that BPA cannot require SCE to return the energy and then also price SCE's option capacity punitively. *Id.*

**BPA's Position**

BPA maintains it did not mistakenly assume that SCE only purchases capacity and not energy under its contract. Procter, *et al.*, FPS-96R-E-BPA-05, at 15. BPA stated that it was developing rates of general applicability and as such BPA was not merely pricing a product for SCE's contract. *Id.* It is BPA's position that the proposed rate for capacity without energy has been developed in a manner that is also consistent with the capacity without energy option under SCE's contract. *Id.*

***Evaluation***

SCE's contention that the rate proposed for FPS-96R does not sufficiently reflect the terms of SCE's contract for Option Capacity is not relevant to this proceeding. FPS-96R-B-SO-01, at 22. BPA is developing rates of general applicability that may apply to more than just the SCE contract. Procter, *et al.*, FPS-96R-E-BPA-05, at 3. The underlying premise of each of SCE's arguments is a contention that SCE's contract with BPA requires the Option Capacity to be priced in a particular fashion. Questions of this nature are matters of contract interpretation and lie outside the scope of this proceeding. What is at issue is whether the proposed rates are appropriate and have a sound analytical foundation. While BPA believes the rate will be applicable to the Option Capacity under the SCE contract, that issue is not relevant to this

proceeding. Any forthcoming legal dispute regarding applicablility of the rate to SCE's contract will take place elsewhere.

BPA is proposing rates for a capacity without energy product where the energy is returned to BPA. Procter, *et al.*, FPS-96R-E-BPA-05, at 18. The proposed rates were developed to apply to potential power sales under contracts other than SCE's. *Id.* at 3. By using a CCCT to develop rates for a capacity without energy product, BPA was able to mirror certain characteristics of the option capacity under SCE's contract. *Id.* at 15. In BPA's rebuttal testimony BPA stated:

> Q. *SCE appears to imply (Grosz, et al., FPS-96R-E-SO-03, at 16, lines 13-18) that BPA did not consider the product contained in SCE's contract when BPA set the rates contained in FPS-96R. Do you agree?*
>
> A. No. BPA did in fact consider the product SCE may purchase as Option Capacity in that contract. BPA used the fixed costs of a CCCT to price this product because a CCCT produces power in a fashion that is consistent with the Option Capacity under SCE contract (in addition to being consistent with incremental, or marginal cost, principles). Another reason BPA selected the fixed costs of a CCCT is as SCE states in its testimony the Option Capacity product in SCE's contract has no load shaping or load following associated with it. Grosz, *et al.*, FPS-96R-E-SO-03, at 16. BPA also wants to note that the product contained in SCE's contract is a fairly standard capacity without energy product and that, as BPA noted in section 5, the rates being developed in this proceeding would be applicable to any new contracts requiring a posted rate for a capacity without energy product, especially since after September 30, 2001, the FPS-96 rate schedule will be the only rate schedule which contains posted rates for capacity without energy.

Procter, *et al.*, FPS-96R-E-BPA-05, at 15.

If the energy is not returned, then the energy must also be paid for and the price of the energy is not included in the rates proposed in this proceeding. *Id.* at 18. To develop the energy charges, BPA would include fuel costs and other variable costs associated with operating the CCCT. *Id.* This is a fairly simple calculation and BPA could certainly add this to the rates proposed in this proceeding; but the resulting capacity and energy prices would be for a different product and a different type of power service than the product for which BPA is developing rates in this proceeding.

***Decision***

*Questions regarding the applicability of the proposed rates to SCE's contract are beyond the scope of this proceeding. The methodology BPA used, however, is a reasonable means to set a rate for a capacity without energy product.*

# EXHIBIT 9

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 18 2002

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>Petitioner,<br><br>v.<br><br>BONNEVILLE POWER ADMINISTRATION,<br><br>Respondent. | No. 00-70720<br><br>ORDER |

RECEIVED
MAR 20 2002
LEON BASS, JR

Before: CANBY, W. FLETCHER and PAEZ, Circuit Judges

Petitioner's motion for clarification of the court's October 16, 2001, order is denied.

Respondent's motions to dismiss this petition for review for lack of jurisdiction, suspend the briefing and to stay further action are denied.

Pursuant to 28 U.S.C. § 1631, this petition for review is transferred to the United States Court of Federal Claims. *See Public Utility Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 651 (9th Cir. 1988).

The Clerk shall transfer this petition for review to the United States Court of Federal Claims located at 717 Madison Place, N.W., Washington, D.C. 20005, and close this docket.

Leon Bass Jr. , Esq.
Southern California Edison Company
2244 Walnut Grove Avenue
Rosemead, CA 91770

vt
00-70720

# EXHIBIT 10

88 NOV -2 AM 9:47

MODIFIED SC-86 RATE SCHEDULE

ADMINISTRATOR'S RECORD OF DECISION

NOVEMBER 1988

Bonneville Power Administration
U.S. Department of Energy

ATTACHMENT 4

ORIGINAL

C. <u>Benefits of Proposed Modified SC-86 Rate</u>

The proposed Modified SC-86 rate is a product of contract negotiations between BPA and SCE. Thus the rate is designed to benefit both parties. Parker and Clark, BPA, SCE-86M-E-BPA-01, 5-6. The rate reflects both parties' expectations about market conditions over the term of the contract.

The level and design of the proposed Modified SC-86 rate are projected to meet BPA's goal for the rate of producing a stable, predictable revenue stream that over the term of the contract will recover at least BPA's opportunity cost of the power. <u>Id</u>., 5. BPA's opportunity cost is the average revenue BPA could expect to recover by selling surplus firm power in the short-term economy energy market. Selling surplus firm power on the economy energy market is BPA's most reasonable alternative to long-term sales. <u>Id</u>., 6.

The actual average revenue for BPA surplus firm power during the period from October 1985 through August 1987 was only 17.6 mills/kWh. <u>See</u> Supplementation of Official Record, Final Modified SL-87 Rate Proposal, F.E.R.C. Docket EF87-2011-005, WP-87-MSL-FS-01, Item 13 at 23. In comparison, the Modified SC-86 rate begins at 28.5 mills/kWh in FY 1989. Parker and Clark, BPA, SCE-86M-E-BPA-01, 4.

BPA's forecasted present value revenues from the proposed Modified SC-86 rate are $387 million. <u>Id</u>., 6. If the same amount of energy were sold in the economy energy market at BPA's per-unit opportunity cost, present value revenues would be $266 million. <u>Id</u>. The present value benefit to BPA of the SCE sale thus is $121 million ($208 million in nominal terms). <u>Id</u>. <u>See</u> Parker and Clark, BPA, SCE-86M-E-BPA-01, Attachment 4. Higher BPA revenues over the long term will enhance BPA's ability to keep its customers' rates low and stable and to repay the U.S. Treasury as scheduled. Parker and Clark, BPA, SCE-86M-E-BPA-01, 7.

The proposed rate is set above BPA's opportunity cost of the power to reflect the benefits of a long-term sale to SCE. These benefits include the avoidance of fuel costs for SCE's own generation and the deferral of the need to acquire new resources. <u>See</u> Armstrong, BPA, SC-86-E-BPA-01, 8.

1. <u>Enhanced Stability and Predictability of BPA's Rates</u>

BPA's customers have declared that stability and predictability of their BPA power rates are important to them. In recent years BPA has controlled many of its costs and is striving to stabilize its revenues. Stable costs and revenues permit BPA to establish stable rates for its customers. BPA's sales of nonfirm energy and surplus firm power have been especially unstable sources of revenue for BPA. Amounts of these sales and the prices BPA can receive for

them depend on several factors outside of BPA's control, such as water conditions in the Northwest and California and prices of oil and natural gas to California utilities. Parker and Clark, BPA, SCE-86M-E-BPA-01, 7.

The volatility of those factors and BPA's limited ability to control them increases the risk of BPA's not recovering its revenue requirement within a rate period. Id. Such risk can cause BPA's rates to be unstable. Sales on a long-term basis, such as the surplus firm power sale to SCE, will provide BPA with predictable revenues for the term of the power sale. Stable revenues in turn would enhance BPA's ability to maintain low and stable rates and to repay the U.S. Treasury as planned. Id.

Provisions for downward adjustments to the floor rate do not significantly reduce the stability or eliminate the benefits to BPA. The floor rate is adjustable downward based on "trigger" prices of oil and gas, SCE's alternate fuel sources for generating power. Id., 5. The floor rate adjustment, although unlikely to occur, would allow SCE's rate for BPA power to move closer to SCE's prices for alternate sources of energy when market conditions warrant. Id., 9-10. A downward adjustment of the floor rate could reduce BPA's revenue from the SCE sale. However, reduction of the floor rate would not eliminate BPA's benefits of the SCE sale. BPA still would recover more revenue than if it sold the surplus firm power at opportunity cost in the economy energy market, for economic conditions (low gas and oil prices) causing a floor rate reduction likewise result in a reduction in prices in the economy energy market. Id., 8. BPA's opportunity cost is determined largely by oil and gas prices to California utilities, since opportunity cost is based on prices that BPA can receive in the economy energy market. Id. BPA expects that it would receive present value benefits of $156 million even in the unlikely case that low oil and gas prices occur and the floor rate must be adjusted. Parker and Clark, BPA, SCE-86M-E-BPA-01A, Attachment 5 at 1.

Even if the floor rate is adjusted, given the volatility of oil and gas prices, BPA's revenues from economy energy sales are significantly more unstable and unpredictable than projected revenues from the contract. Parker and Clark, BPA, SCE-86M-E-BPA-01, 9. The short-term nature of economy energy sales makes them subject to frequent price fluctuation. Id.

In addition, implementation of the floor rate adjustment is unlikely. Id., 9. BPA's medium case forecast of the price of gas and oil to SCE is significantly higher than the trigger value for the floor rate adjustment in every year. BPA's low case forecast (assuming only a ten percent probability that the price of gas and oil will be lower) is higher than the trigger in all but two years. DRI's low case forecast, which is the source of data for rate escalation in the proposed contract, shows gas and oil prices higher than the trigger in every year. Id. See Parker and Clark, BPA, SCE-86M-E-BPA-01, Attachment 6. These forecasts reinforce BPA's expectations that an adjustment to the floor rate is unlikely. Id., 10.

The negotiated rate ceiling is approximately equal to BPA's full cost of surplus firm power. The ceiling will escalate based on BPA's average system cost, so will track BPA's costs over the term of the rate. Parker and Clark, BPA, SCE-86M-E-BPA-01, 7. BPA forecasts that the Modified SC-86 rate will increase to the ceiling after five years. Id., Attachment 3. The Modified SC-86 rate thus would recover nearly the full cost of the power.

The ceiling, furthermore, protects SCE from having to pay uneconomic prices for power. Unlike the floor, the ceiling is not adjustable because the contract provides BPA with an option to convert the power sale to a capacity-energy exchange when gas and oil prices are very high.

2. Long-Term Cost Recovery

There is some risk that revenues from the rate will not recover the cost of the surplus firm power sold. This risk is manageable, however. If revenues projected to be received are less than the costs allocated to the surplus firm power sold, the variance will be recovered from BPA's other customer classes. Parker and Clark, BPA, SCE-86M-E-BPA-01, 10. See also Administrator's Record of Decision, 1987 Final Rate Proposal, WP-87-A-02, p. 214. BPA must set its rates to recover its entire revenue requirement for the rate test period from rates during that period. Parker and Clark, BPA, SCE-86M-E-BPA-01, 10. The method for allocating any variance will be determined during the relevant rate proceeding. Id.

BPA has demonstrated elsewhere that the risk of cost under-recovery from economy energy sales is significant. Economy energy prices and revenues historically have been volatile. Historically, sales of surplus firm power on the spot market have not allowed BPA to recover the cost of the power. See Administrator's Record of Decision, 1987 Final Rate Proposal, F.E.R.C. Dockets EF87-2011-000 & EF87-2021-000, WP-87-A-02, at 213, and Administrator's Record of Decision, Final Modified SL-87 Rate Proposal, F.E.R.C. Docket EF87-2011-005, WP-87-MSL-A-01, at 15. BPA seeks to manage this risk by diversifying its marketing efforts by selling power on both the long- and short-term markets. Id., 17. The long-term surplus firm power sale to SCE is part of this diversification effort and will provide higher and more stable revenues than will economy energy sales. Id., 14.

Revenues from the proposed Modified SC-86 rate represent less than 1.5 percent of BPA's annual revenue requirement through FY 1993. Parker and Clark, BPA, SCE-86M-E-BPA-01, 10. Compare Final Section 7(b)(2) Study Documentation - 1987 Final Rate Proposal, F.E.R.C. Dockets EF87-2011-000 & EF87-2021-000, WP-87-FS-05A, pp. 185-189 with Parker and Clark, BPA, SCE-86M-E-BPA-01, Attachment 4, p. 1. Because revenue from the Modified SC-86 rate is projected to be a small percentage of BPA's total annual revenue requirement, the risk is slight that a reallocation of any underrecovery of this revenue would significantly affect total loads and revenues.

The original SC-86 rate provided for a long-term sale to SCE of up to 550 megawatts. 36 F.E.R.C. at 61,848. In contrast, the sale at the proposed Modified SC-86 rate is limited to 250 megawatts, thus presenting significantly less risk of revenue underrecovery than the original SC-86 rate.

BPA expects that the proposed Modified SC-86 rate will improve BPA's revenue recovery and will recover revenue greater than BPA's opportunity cost of the power. Parker and Clark, BPA, SCE-86M-E-BPA-01, 6, 10. The long-term contract also will provide BPA with stable, predictable revenues for the term of the power sale. Id., 7. Higher, more stable revenues for BPA mean lower, more stable rates for BPA's customers. Id., 10. Higher, more stable revenues also enhance BPA's ability to repay the U.S. Treasury as scheduled. Id., 7.

# KENDALL DECLARATION

# DECLARATION OF ROBERT KENDALL

I, Robert Kendall, do hereby declare and say:

1. From 1984 until 1993, I was employed by Southern California Edison Company ("SCE") as its Manager of Power Contracts. In that capacity, I was involved in negotiations leading to the contract with Bonneville Power Administration ("Bonneville") designated the 1988 Sale And Exchange Agreement Contract No. DE-MS79-88BP 92275 (the "Contract"). I was also involved in administering that contract as well as a predecessor 1966 exchange contract between Bonneville and SCE. I make this declaration based on my personal knowledge and if called upon to testify, could and would competently testify to the facts set forth herein.

2. Bonneville and SCE face markets that are mirror images. Historically, Bonneville has been capacity-rich and energy-poor; its peak loads occur during the winter. On the other hand, SCE has regularly needed additional capacity to serve peak loads that occur during the summer months. This difference between Bonneville's and SCE's systems is often referred to as "seasonal diversity." To allow both entities to take advantage of this seasonal diversity, during the early 1960's they were instrumental in obtaining Congressional approval for and building the Pacific Northwest-Pacific Southwest transmission intertie project for the movement of large amounts of power between the two regions.

3. In addition, SCE and Bonneville have entered into several mutually beneficial contracts, such as the 1966 exchange contract, providing for the trading of power over these lines. One of these contracts is relevant to the instant proceedings.

4. In 1985, the 1966 contract was coming to the end of its term and the parties began to discuss a successor contract. Following lengthy negotiations in which a number of alternative

successor contracts were explored in detail, SCE and Bonneville entered into the Contract, which has a 20-year term, in October 1988.

5. It is important to note that since the 1988 Contract was signed, SCE has relied on its right to obtain 250 MW of Option Capacity under the pricing and other terms set forth in the Contract to serve its customers demands and meet its contractual obligations to other utilities. This reliance was evidenced by the fact that since the signing of the Contract, the Option Capacity was regularly included in SCE's Future Generation Resource Program as a capacity resource that could be relied upon to meet SCE's customers' demands.

6. The pricing mechanism for the Option Capacity was a particular concern to SCE. Initially, it attempted to negotiate a specified price for Option Capacity similar to other firm capacity obtained in the contract for the entire term of the Contract. Bonneville was unwilling to accommodate that request. On its part, Bonneville wanted the right to charge any rate from its various rate schedules that it chose and change the rate at its sole discretion. SCE was unwilling to agree to that. SCE believed that it was important that it be treated in a manner similar to all other Bonneville ratepayers. In particular, if its price for Option Capacity was tied to the power rate charged to other Bonneville customers, especially Pacific Northwest customers, Bonneville would have less ability to manipulate SCE's Option Capacity price. I communicated to the negotiators at Bonneville SCE's concerns about tying the rate to the rate for a widely used product in the Pacific Northwest.

7. Since Pacific Northwest customers are typically capacity rich and energy poor, it was very important that the Option Capacity rate be tied to the demand charge associated with a Capacity with Energy product, as opposed to a Capacity without Energy product. As a matter of fact, in its 1987 rate schedules, Bonneville offered a Capacity without Energy rate schedule (CF-

87), which, with some small changes, could have served as the basis for pricing the Option Capacity. SCE would not have agreed to tying its Option Capacity price to such a rate schedule. The Contract, as negotiated, responded to SCE's concerns by specifying the SP-87 rate, a rate that did not match exactly the product that SCE was purchasing under the Option Capacity clause of the contract. For example, the SP-87 rate schedule demand charge for capacity only provides the customer with the ability to pay for power obtained at the specified energy rate, but SCE's contract presumes that power will be returned unless Bonneville chooses to require SCE to pay for it at a price negotiated in the Contract, not the SP-87 rate for energy. In negotiating this rate, I discussed with Bonneville negotiators the fact that the use of a rate that is widely used in the Pacific Northwest was more important than choosing a rate that was closer to the product description, but was not widely used.

8. The SP-87 rate is for surplus power. That is, SCE and Bonneville agreed to a price under which BPA must satisfy all its firm energy obligations before it is required to provide the Option Capacity.

9. The Contract gives *Bonneville* the unilateral authority to require SCE to pay for the power, rather than returning it. This provision was important to Bonneville since it anticipated that it would often require SCE to pay for the energy rather than return it. Such payments would provide an important source of revenue for Bonneville. However, it was important to

structure the contract in this manner so that Bonneville could continue to count on the energy if it were necessary to serve its firm requirements.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 25th day of January, 2005 at Westbury, New York.

Robert Kendall

# GROSZ DECLARATION

# DECLARATION OF VIRGINIA S. GROSZ

I, Virginia S. Grosz, do hereby declare and say:

1. From June 1995 until January 1997, I have been employed by Southern California Edison Company ("SCE") in its Energy Supply & Marketing Department. Since January 1997 I have been employed in SCE's Power Contracts Department. As such, I have been involved in the purchase of energy and capacity from Bonneville Power Administration ("Bonneville") under the Sale and Exchange Agreement Contract No. DE-MS79-88BP 92275 ("Contract"). From July 1999 to about June 2000, I was also assigned the added responsibility of doing long term trading, *i.e.*, buying long term monthly and quarterly electricity contracts for up to 12 months in advance. I participated as a witness in the Expedited Rate Case in which Bonneville attempted to create a new rate, FPS-96R, that it intended to apply to SCE's Contract. I have personal knowledge of the facts set forth herein and if called upon to testify, could and would competently testify thereto.

2. Pursuant to the Contract, SCE could purchase from Bonneville an additional 250 MW of capacity on an option basis for the June through October time period each year ("Option Capacity"). SCE believed that Bonneville was contractually required to apply only the price set forth in the Contract for Option Capacity – the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or its successors.

3. In 1999 Bonneville initiated the Expedited Rate Case to create a new rate it intended to apply to the Option Capacity provision of the Contract. Faced with a rate case Bonneville claimed would affect the negotiated price under the Contract, SCE litigated the Expedited Rate Case. I participated in that case. SCE had to protect its interest by being a Party

to the rate case. SCE thought that if it could succeed at preventing the addition of this rate in the FPS-96 rate schedule, it would avoid the need to bring this breach of contract action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 27th day of January 2005, at Rosemead, California.

Virginia S. Grosz