IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN CALIFORNIA EDISON COMPANY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

CASE NO. 03-2869C

(Judge Lettow)

**PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 2

II. CONTENTIONS OF FACT ..... 2

- A. SCE And BPA Entered The 1988 Agreement To Take Advantage Of Complementary Systems ..... 3
- B. The Negotiation of the Option Capacity Provisions Of The Contract ..... 4
- C. The Option Capacity Product ..... 6
- D. BPA Attempts To Dishonor The Parties' Agreement In 1999 ..... 9
- E. BPA Initiates The "Expedited Rate Case." ..... 11
- F. BPA Breaches The Agreement In 2000 ..... 12
- G. SCE Suffers Damages of $31.5 Million As A Result Of BPA's Breach ..... 13

III. CONTENTIONS OF LAW ..... 13

- A. The Contract Terms Are Unambiguous And Make Clear That BPA Breached Its Contract With SCE ..... 13
  1. The meaning of Section 12(a)(4) is clear ..... 13
  2. Parol evidence is inadmissible to supplement, modify or interpret the terms of the Agreement ..... 18
- B. SCE Suffered Damages Of $31.5 Million As A Result Of BPA's Breach ..... 20
  1. BPA has the burden to show that SCE either should have accepted BPA's offer of Option Capacity at the improper, and substantially higher, rate, or entered into a series of forward contracts to replace Option Capacity ..... 22
  2. SCE was not required to accept BPA's offer of Option Capacity at the improper, and substantially higher, rate ..... 23
  3. Neither was SCE required to enter into risky forward contracts to mitigate its damages ..... 25

IV. CONCLUSION ..... 29

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Barron Bancshares, Inc. v. United States*,
366 F.3d 1360 (Fed. Cir. 2004)....................14, 15, 18, 19
*Capital Properties, Inc. v. United States*,
56 Fed. Cl. 427 (2003)....................15
*Citizens Fed. Bank v. United States*,
66 Fed. Cl. 179 (2005)....................23, 24, 25, 27
*Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*,
137 F.3d 1455 (11th Cir. 1998)....................22, 24
*Hess Energy, Inc. v. Lightning Oil Co.*,
338 F.3d 357 (4th Cir. 2003)....................27
*Home Savings of Amer. v. United States*,
399 F.3d 1341 (Fed. Cir. 2005)....................22
*Hughes Communications Galaxy, Inc. v. United States*,
998 F.2d 953 (Fed. Cir. 1993)....................15
*In re Kellet Aircraft Corp.*,
186 F.2d 197 (3d Cir. 1951)....................22, 24
*Indiana Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005)....................20
*Int'l Transducer Corp. v. United States*,
30 Fed. Cl. 522 (1994)....................19
*Lockheed Martin IR Imaging Sys., Inc. v. West*,
108 F.3d 319 (Fed. Cir. 1997)....................15
*McAbee Constr., Inc. v. United States*,
97 F.3d 1431 (Fed. Cir. 1996)....................15, 18, 19
*NVT Technologies, Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004)....................14, 20
*Old Stone Corp. v. United States*,
450 F.3d 1360 (Fed. Cir. 2006)....................22
*Record Steel and Constr., Inc. v. United States*,
62 Fed. Cl. 508 (2004)....................20
*Sacramento Municipal Utility Dist. v. United States*,
70 Fed. Cl. 332 (2006)....................24
*Tennessee Valley Authority v. United States*,
69 Fed. Cl. 515 (2006)....................20, 21, 22, 26
*Textron Defense Sys., v. Widnall*,
143 F.3d 1465 (Fed. Cir. 1998)....................14
*Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City*,
611 F.2d 465 (3rd Cir. 1979)....................22, 24

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

### State Cases

*Cain v. Grosshans & Petersen, Inc.*,
196 Kan. 497 (Kan. 1966) ........ 23

### Federal Rules

RESTATEMENT 2D CONTRACTS § 350, Comment g ........ 26

### Treatises

ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1053, at 273 (Interim ed. 2002)..... 27

## I. INTRODUCTION

Plaintiff is Southern California Edison Company, a public electric utility that provides energy to millions of customers in Southern California ("SCE"). Defendant is the United States of America, acting through the Bonneville Power Administration, part of the Department of Energy ("BPA").

There is no dispute that SCE and BPA were parties to a long-term Sale and Exchange Agreement (the "Agreement"), executed in 1988 and effective during the time period relevant to this case. Nor is there any dispute as to the terms of that Agreement – they were set forth expressly in a written document that both parties acknowledge was a full and complete expression of their agreement.

The sole matters in dispute are as follows: (1) the meaning of a section of the parties' Agreement -- that governing the price at which BPA was obligated to provide SCE with a power product entitled "Option Capacity"; (2) whether BPA's failure to provide Option Capacity to SCE in the year 2000 at the price that SCE contends is provided for in the Agreement constituted a breach of the parties' Agreement; and (3) if so, the damages suffered by SCE as a result of that breach.

## II. CONTENTIONS OF FACT[1]

As discussed in detail below, the Agreement expressly required BPA to provide Option Capacity to SCE at the "demand charge associated with the contract rate" of a specific BPA rate schedule – which, in the year 2000, was FPS-96R. BPA's failure to do so in 2000 breached the Agreement, causing SCE to suffer damages in the amount of $31.5 million.

Because the Agreement is entirely unambiguous, the factual background relating to the negotiation and the intent of the parties constitutes irrelevant and inadmissible parol evidence. SCE will set forth these facts below solely for the purpose

---

[1] To the extent that any of the contentions of fact herein are deemed to be contentions of law, or vice versa, Plaintiff hereby incorporates them by reference into the appropriate section herein.

of providing background, along with the facts relating to BPA's breach and SCE's damages.[2]

**A. SCE And BPA Entered The 1988 Agreement To Take Advantage Of Complementary Systems.**

To fix the terminology: Capacity is the ability to deliver energy. For example, a reservoir that stores water has a certain capacity (determined by the amount of water that the reservoir can store). If the water stored in the reservoir is released from the top reservoir to the lower reservoir, this water can be turned into energy by turning electric turbines located between the two reservoirs. Energy is the term used to decribe the power source that operates light bulbs and refrigerators. If the water in the reservoir runs through the turbines for a hour, it may produce, for example, 10 megawatt hours (MWh) of energy. Water converted into energy during the day, when demand for energy is high, can then be pumped back up to the top reservoir at night, using energy that is less expensive, since demand is less at night.

Capacity and energy are separate products but are often purchased together. "Capacity with energy" commonly refers to a product that includes capacity – the reservation of a specific amount of energy, to be delivered by the seller at a later date – and energy, which, if and when requested by the purchaser, can be paid for in cash or by returning an equivalent amount of energy to the seller at a later time. "Capacity without energy" – as defined by BPA[3] – includes capacity, but if and when the purchaser

---

[2] SCE is informed that BPA intends to introduce parol evidence at trial. At set forth *infra*, SCE believes that governing Federal Circuit case law requires the exclusion of such evidence and has merely discussed such evidence here as background.

[3] "Capacity without energy" is not a common term in the industry, but rather one that BPA (not SCE) came to use well *after* the parties' Agreement was executed. In its 1996 rate case, BPA defined a product called "Capacity without energy." As SCE understands it, BPA defines it as a capacity product where the purchaser receives energy during industry standard On-Peak hours (*i.e*, Monday through Saturday, hour ending 7 through hour ending 22) but rather than paying for the energy in cash, the purchaser must return an equivalent amount of energy to BPA within 24 hours during industry standard Off-Peak hours (*i.e,* Monday through Saturday, hour ending 23 though hour ending 06 and all day Sunday).

takes energy, it cannot pay for that energy in cash, but rather must return an equivalent amount of energy to the seller at a later time.

Prior to the Agreement at issue here, SCE and BPA were parties to an Exchange Agreement, which was executed in 1966 and scheduled to terminate in 1986. The value of that contract (and the instant Agreement) arose from the complementary demands for power in the BPA and SCE service territories. Demand for power in BPA's service territory (the Pacific Northwest) is highest in the Winter, when the demand for heat is high. Conversely, the highest demand in SCE's service territory is in the Summer, primarily due to a high air-conditioning load.

The 1966 Agreement between BPA and SCE operated for 20 years and, in the mid-1980s, both parties wished to continue its benefits. Accordingly, in 1984, SCE and BPA initiated negotiations on a new agreement. Robert Kendall, manager of SCE's Power Contracts Department at the time, was in charge of the negotiations on behalf of SCE. Walt Pollock led the negotiations from the BPA side.

### B. The Negotiation of the Option Capacity Provisions Of The Contract.

SCE received 550 MW of capacity from BPA under the 1966 Agreement. SCE sought the same or similar amount of capacity when negotiating the 1988 Agreement. Such capacity was important to SCE for planning purposes, as it provided a firm resource from which SCE could meet the demands of its customers.

Unfortunately, BPA sought an Agreement whereby it would provide SCE with only 250 MW of firm capacity. Thus, to reach something close to the 550 MW provided by the 1966 Agreement, SCE proposed "capacity insurance." By this proposal, which SCE first made in 1987, SCE would have the option to call on an additional 250 MW of capacity from BPA during SCE's high-usage period of June through October. Although SCE did not plan to call on this capacity insurance (which came to be known as "Option Capacity") each year, SCE did intend to – and indeed did – include Option

Capacity in its resource plan, filed with the California Public Utilities Commission ("CPUC"). It was also important to SCE that it be able to exercise its right to the Option Capacity when SCE deemed it necessary and economically sensible to do so, and, once exercised, BPA would be obligated to reserve that capacity (and associated energy) for SCE.

SCE and BPA engaged in lengthy negotiations with respect to how to price the Option Capacity. Initially, SCE attempted to negotiate a specified price for Option Capacity for the entire term of the Agreement, similar to the 250 MW of baseload capacity that SCE was purchasing under the Agreement. BPA would not accommodate that request. On its part, BPA wanted the right to charge any price from its various rate schedules and to change the price at its sole discretion. SCE rejected that proposal.

As a fallback position, SCE insisted that it be treated in a manner similar to BPA's Pacific Northwest customers. SCE believed that tying the price for Option Capacity to a rate used by BPA's Pacific Northwest customers would better protect SCE because other regional BPA customers would have a vested interest in any attempt by BPA to increase the rate, thereby restricting BPA's ability to manipulate the price of Option Capacity to benefit itself. An "Edison only" rate, on the other hand, would have given BPA essentially unilateral pricing rights, thus reducing the value of Option Capacity to SCE.[4]

Ultimately, *BPA proposed*, and the parties agreed on, a price tied to a rate for which BPA had already requested Federal Energy Regulatory Commission ("FERC") approval – the demand charge associated with the contract rate of BPA's SP-87 rate schedule. This rate was acceptable to SCE as a price for Option Capacity because it was used by many of BPA's Pacific Northwest customers for the purchase of firm power.

---

[4] The parties could have as easily associated the price for Option Capacity with another objective index, such as the Dow Jones Industrial Average or the Standard and Poor 500. In either case, once the ratio of the index to the price was established, SCE could have confidence that BPA could not manipulate it unilaterally.

Thus, SCE believed that it had a modicum of leverage against BPA's unilateral authority to change the price charged to SCE, as any change in SP-87's demand charge would necessarily affect numerous BPA customers, in addition to SCE.

Importantly, the SP-87 demand charge was not chosen because it matched identically the product that BPA and SCE called "Option Capacity." The SP-87 rate schedule was for the purchase of "surplus firm power", defined by BPA as "firm power (*capacity, energy or capacity and energy*) in excess of the amount required to meet BPA's existing contractual obligations to provide firm service."

Had the parties intended in 1987 to tie the price for Option Capacity to a BPA rate for a "capacity without energy"-type product, which is how BPA now characterizes Option Capacity, they could easily have done so. BPA's CF-87 rate schedule, which was in place at the time, provided for the sale of "firm capacity" – which BPA defined as capacity where "[t]he energy associated with this capacity must be returned to BPA." By BPA's own admission, the parties could have agreed to set the price for Option Capacity at the price set forth in rate schedule CF-87, or its successor. They did not. Rather, they tied it to a capacity *with* energy product.

### C. The Option Capacity Product

Section 12 of the Agreement, *which was drafted by BPA*, obligates BPA to sell Option Capacity to SCE, if SCE exercises the option. Pursuant to subsection 4, the price for Option Capacity is set at the demand charge associated with the contract rate of SP-87 or its successor. In relevant part, Section 12 reads as follows:

> (12) Option Capacity and Option Energy
>
> Bonneville shall have the obligation to provide Option Capacity to Edison and Edison shall have the obligation to provide Option Energy to Bonneville.
>
> (a) Option Capacity.
>
> Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking



1212802.11

> Energy specified in section 7(a). For any year in which such capacity is requested, Bonneville shall make the Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity.
>
> . . .
>
> (3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9(c)(1). If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).
>
> (4) Edison shall pay for Option Capacity at the *demand charge associated with the contract rate* of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized representatives may agree upon another applicable rate schedule.

(Emphasis added.)

The Agreement expressly provides that the "demand charge associated with the contract rate" could be updated by successor rate schedules to SP-87, and, in fact, it was. BPA enacted successor rate schedules to SP-87 in multiple years through 1996, including SP-89, SP-91, SP-93 and FPS-96. Each contained a contract rate demand charge. Until FPS-96, transmission was bundled with the demand charge; in FPS-96, transmission was unbundled from the demand charge and would need to be paid separately by the customer. The demand charge for each rate from SP-87 through FPS-96, including transmission costs, was relatively constant, ranging from $3 to $5 per kilowatt per hour.

The Agreement required SCE to exercise its right to Option Capacity, if it chose to do so, by May 1st of any year. If SCE exercised the option, it would pay the demand charge, which is the cost for the capacity (*i.e.*, the cost to have the energy available should SCE need it). If SCE later chose to take the energy, SCE would request a specific amount of energy, up to 250 MWh, the day before such energy was to be provided to BPA. From June through October, SCE could order from BPA up to 250



1212802.11

MWh of energy for up to 50 hours a week, but could not receive more than 10 hours of energy in any single day.[5] Irrespective of whether SCE took all 50 hours per week or 0 hours per week, SCE was not entitled to receive a return of its demand charge, which was the cost for exercising the option (and thereby reserving the capacity to deliver the energy) in the first place.

Once SCE requested and received energy from BPA pursuant to the Option Capacity provision, there were two possible modes of payment for that energy, either of which could be chosen by BPA. First, BPA could require SCE to return an equivalent amount of energy during the return hours specified in the contract (*i.e*, hours that are different than the return hours of BPA's "capacity without energy" product). Operationally, in this mode, SCE would receive energy from BPA for any 10 hours per day that SCE chose (including, if SCE so chose, the expensive "on-peak" hours), and SCE would purchase energy from the California Power Exchange ("PX") during the cheapest hours of the day (typically at night and within the hours allowed under the contract) to return to BPA.[6]

Alternatively, BPA could require that SCE pay for the energy it received at a rate set forth in the Agreement. Agreement, § 12(a)(4).[7] BPA's witnesses have uniformly testified that this "cash out" feature of Option Capacity had utility to BPA. Indeed, in 1999, the only year in which BPA provided Option Capacity to SCE, BPA *did* require SCE to pay for the energy rather than return it more than half the time.

---

[5] The return hours are set forth expressly in Section 7(b) of the Agreement. The hours SCE was contractually entitled to request the energy are different that the hours defined by BPA under its "Capacity without energy" product.

[6] Prior to the restructuring of the California energy market in 1998, when SCE was required to sell off many of its generating plants, SCE would have generated the power itself at night when it had excess capacity.

[7] Perhaps because Option Capacity is manifestly not "capacity without energy," the Agreement does not even mention "capacity without energy," much less say that "Option Capacity" is "capacity without energy."

### D. BPA Attempts To Dishonor The Parties' Agreement In 1999.

In 1999, SCE exercised its right to purchase Option Capacity under the Agreement for the first time. In response, BPA stated that it would *not* provide the Option Capacity at the demand charge associated with the contract rate of the FPS-96 rate schedule, even though, by BPA's own admission, FPS-96 was the then-applicable successor to SP-87.

BPA attempted to justify its position by claiming that the FPS-96 schedule was designed to price a "capacity with energy" product instead of a "capacity without energy" product, which, according to BPA, SCE was purchasing under the Agreement.[8] BPA further claimed that it had made a mistake in the FPS-96 schedule – it meant to state that capacity without energy "would be sold at a negotiated price." BPA did not state how, if at all, the sale of Option Capacity at a "negotiated price" would be consistent with terms of the parties' Agreement.

SCE and BPA arbitrated the dispute over the price to be paid in 1999, and BPA agreed to deliver the Option Capacity to SCE at the FPS-96 price pending the result of the arbitration. The arbitrator found for SCE.

### E. BPA Initiates The "Expedited Rate Case."

On August 13, 1999, BPA initiated a proceeding to seek "expedited" approval from FERC for a revision to FPS-96.[9] BPA stated that it intended to revise FPS-96 to make clear that it intended to sell a capacity without energy product under FPS-96 only at a "negotiated rate." BPA further stated that the "corrected" rate schedule (to be called FPS-96R) would apply only to BPA's contracts entered into prior to 1996 that called for pricing capacity without energy under the FPS-96 schedule. BPA has

---

[8] With a capacity without energy product, as BPA defined the product in its 1996 General Rate Schedule Provisions, the buyer must return to the seller an equivalent amount of energy to that received by the buyer, usually within 24 hours and during standard off-peak hours.

[9] Under BPA procedures, BPA conducts a proceeding before one of its administrative law judges, which results in the determination of a rate, supported by a record of decision. It then submits the rate to FERC for final approval.

since conceded that it was aware at the time that the only such contract was its Agreement with SCE.

BPA's FPS-96R rate schedule has various rates. One, in Section 1.1.1, is precisely the same demand charge associated with the contract rate contained in the FPS-96 rate schedule. BPA has admitted that it did not change that rate because it would have affected a number of customers other than SCE – thereby making it far more difficult for BPA to receive approval.

FPS-96R also contains an entirely new rate – entitled "Demand Charge – Capacity without energy Sales" – set forth in Section 1.1.2 of FPS-96R. There are two possible prices for "Capacity without energy Sales" under FPS-96R. First, under Section 1.3.1, the parties can agree upon a negotiated rate. Second, under Section 1.3.2, if unable to agree on a rate, the customer must pay a posted rate for capacity that ranges up to *fifteen times* the demand charge of FPS-96 (and still in FPS-96R under Section 1.1.1), depending on the month of the year. (In addition, the schedule provides a separate and distinct rate.)

SCE believed (and believes) that BPA was contractually required to apply only the price called for in the Agreement – the demand charge associated with the contract rate of BPA's SP-87 rate schedule or its successors. However, faced with a rate case that BPA claimed would affect the price for Option Capacity under the Agreement, SCE intervened in BPA's Expedited Rate Case proceeding. There, SCE argued (among other things) that the new proposed rate could not be applied to the Option Capacity product purchased by SCE under the Agreement. The Administrative Law Judge rejected SCE's argument, ruling that the applicability of the new rate to the Agreement was an issue of contract interpretation, and thus outside the scope of the rate proceeding. After the ALJ approved the rate, SCE filed a protest at FERC, which was also denied.

Although SCE objected to the new rate, no other entity did – because no other entity was affected by it. BPA issued its Final Record of Decision on FPS-96R in

March 2000. FERC gave interim approval to the rate on May 19, 2000, and FPS-96R became effective on an interim basis on May 22, 2000.

### F. BPA Breaches The Agreement In 2000.

On April 27, 2000, SCE wrote to BPA and stated, "Pursuant to Section 12(a) of the … Agreement, Southern California Edison Company (Edison) hereby exercises its option to receive an addition 250 MW of capacity (Option Capacity) from June 1, 2000 to October 31, 2000." SCE stated that its exercise was at the demand charge associated with the contract rate set forth in FPS-96.

In its response, dated May 22, 2000, BPA wrote to SCE and stated that it had not received from SCE a "definite statement from Southern California Edison indicating both your desire to commence delivery and your willingness to pay the effective rate." By the "effective rate," BPA meant the "Capacity without energy Sales" rate in FPS-96R.

BPA gave SCE until May 24, 2000 to respond.[10] On May 24, SCE faxed a letter to BPA and pointed out that it had exercised the option in its April 27 letter and reiterated that it remained ready to pay the contract rate demand charge set forth in FPS-96 (and, indeed, also in FPS-96R) for Option Capacity. BPA refused to deliver at that price.

The evidence will show that SCE carefully considered whether to purchase Option Capacity at the new, higher price for "Capacity without energy Sales" set forth in FPS-96R – notwithstanding that SCE believed this to be a breach of the

---

[10] SCE is informed that BPA intends to argue that SCE did not properly exercise its right to Option Capacity in the year 2000. As these facts demonstrate, that is patently incorrect. The Agreement states that SCE is required to give BPA one-month's written notice of SCE's intent to exercise its right to Option Capacity. Agreement, § 12(a)(2). By virtue of its April 27, 2000 letter, SCE did so. Further, in BPA's May 22, 2000 letter to SCE, BPA expressly gave SCE until May 24, 2000 to determine whether its wished to purchase Option Capacity at the improper, and substantially higher, rate at which BPA was willing to sell it. SCE timely responded to this offer, reaffirming that it would accept Option Capacity at the proper rate under the Agreement, but not at the higher rate being proposed by BPA.

Agreement by BPA, and notwithstanding that this price was about $13.4 million above the price that SCE believed was proper. However, because SCE's market price projections at that time showed that SCE would be better off buying replacement energy on the market than accepting BPA's new, higher rate, SCE rejected BPA's offer to provide Option Capacity at the new, higher rate.

**G. SCE Suffers Damages of $31.5 Million As A Result Of BPA's Breach.**

SCE's damage calculation is straightforward, but requires an understanding of the regulatory situation in California in 2000. The following is a very simplified overview.

As part of the 1998 restructuring of the California electricity market, all California utilities were required to bid their resources into and purchase their demand out of a newly-formed California public corporation, the Power Exchange ("PX"). Each utility, such as SCE, would submit a schedule of its power requirements to the PX. Similarly, all sellers, including SCE (which continued to own generating stations[11]), also bid their power into the PX at various prices. The PX then assembled sufficient power to meet the scheduled demand, and the price of the last MW needed to meet the demand for each hour became the "market clearing price" that was paid for all power purchased for that hour, no matter what price it had been bid in at. That was the price SCE received for the power it bid in to the PX, as well as the price SCE had to pay for the larger amount of power that it bought out of the PX. The difference between what SCE bought in the PX and what SCE sold in to the PX was called SCE's "net short" position. During the peak hours in the summer of 2000, SCE's net short position exceeded 4000 MW 260 on occasions and exceeded 5000 MW on 13 occasions.

In 1999, when SCE took and received Option Capacity, it developed a procedure for deciding when it would order energy from BPA (which SCE was not

---

[11] As part of the restructuring, SCE was required to sell off much of its generating capacity and had in fact sold all of its gas-fired plants.

required to do, but could do at its option). By the terms of the Agreement, SCE was required to inform BPA of the amount of energy and the hours for which it was requesting that energy by 9:30 a.m. on the preceding day. Because SCE paid for that energy by purchasing an equivalent amount of energy from the PX at night and returning that energy to BPA (unless BPA elected to exercise its cash out right), SCE forecast the price of energy during the contract return hours (10 p.m. to 9 a.m.) and, if the forecasted return hour price was lower than the on-peak price that SCE would receive for selling to the PX the energy it received from BPA, SCE ordered the energy from BPA (within the contractual limitations).

In 2000, when BPA refused to sell Option Capacity to SCE at the demand charge associated with the contract rate, SCE nonetheless developed and kept a daily mock schedule of deliveries and returns, as it would have if BPA had performed. That schedule showed the energy associated with the Option Capacity that SCE would have requested from BPA (on a day-ahead basis), the PX price that SCE would have received for that energy, and the PX price SCE would have incurred to purchase an equivalent amount of power to return to BPA. The difference between what SCE would have received for the energy associated with the Option Capacity that BPA was obligated to provide it and the cost of the power SCE would have returned to BPA, plus the appropriate demand charge, constitutes SCE's damages. SCE calculates that amount to be $31,594,436.

## III. <u>CONTENTIONS OF LAW</u>

### A. The Contract Terms Are Unambiguous And Make Clear That BPA Breached Its Contract With SCE.

The parties dispute the price that SCE was required to pay upon exercising its right to Option Capacity under the Agreement. As set forth above, with respect to this issue, the Agreement states as follows:

> Edison shall pay for Option Capacity at the *demand charge associated with the contract rate* of Bonneville's SP-87 rate

> schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized Representatives may agree upon another applicable rate schedule.

Agreement, § 12(a)(4) (emphasis added).

### 1. The meaning of Section 12(a)(4) is clear.

SCE's position is simple and entirely consistent with the plain language of the Agreement – unless the parties agreed otherwise (which, as both sides acknowledge, they did not), SCE was entitled to purchase Option Capacity at the "demand charge associated with the contract rate" of SP-87, or, if SP-87 was not in effect, its successor rate schedule. *See, e.g., Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) ("When construing a contract, a court first examines the plain meaning of its express words."); *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Contract interpretation begins with the language of the written agreement.").[12]

There is no factual dispute that, in 2000, when SCE exercised the option, FPS-96 was the successor rate schedule in place (later, the successor rate schedule became FPS-96R) and it contained a contract rate demand charge. Nor do the parties dispute that FPS-96R also contained a contract rate demand charge. It was $0.87 per kilowatt per month (not including transmission, which increased the price to $3.44 per kilowatt per month) – the same contract rate demand charge set forth in FPS-96. SCE's position is that, because the Agreement expressly states that SCE shall pay "*the demand charge associated with the contract rate*" of SP-87 or its successor (in this case, both FPS-96 and FPS-96R), BPA was required to provide Option Capacity at this rate, and its

[12] Of course, contract interpretation is a question of law for the Court. *Textron Defense Sys., v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998).

failure to do so constitutes a breach of the parties' Agreement.

Conversely, BPA contends that the terms of the Agreement did not entitle SCE to pay the "demand charge associated with the contract rate" of FPS-96R, but rather permitted BPA to charge SCE the rate for "*Capacity without energy Sales*" set forth in FPS-96R. For the reasons set forth below, BPA's position is inconsistent with the plain language of the Agreement and illogical.

*First*, the words "Capacity without energy Sales" do *not* appear anywhere in Section 12(a)(4) of the Agreement, and thus BPA's position requires the Court to insert terms not present in the Agreement, which is impermissible. *Barron Bancshares*, 366 F.3d at 1375 (where a written contract is the final understanding of the parties, "[t]he parol evidence rule is a rule of substantive law that prohibits the use of external evidence to *add* to or otherwise modify the terms…") (emphasis added).

*Second*, BPA's position asks the Court to disregard the express language of the Agreement. Section 12(a)(4) states expressly that SCE "shall pay for Option Capacity at *the demand charge associated with the contract rate*" of SP-87 or its successor. BPA does not dispute, nor could it, that FPS-96R (like FPS-96) contained a contract rate-demand charge. It was $0.87 per kilowatt per month (not including transmission costs). Nonetheless, BPA contends that the Agreement did not require it to provide Option Capacity at that rate, but rather permitted BPA to pick a rate of its choosing in FPS-96R (in this case, the one for "Capacity without energy Sales") and charge SCE that rate. Of course, this requires one to disregard the words "demand charge associated with the contract rate" set forth *expressly* in the Agreement, which, again, is impermissible under the standard rules of contract interpretation. *McAbee Constr., Inc. v.*

*United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'") (*citing Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993); *Capital Properties, Inc. v. United States*, 56 Fed. Cl. 427, 431 (2003) ("[I]nterpretation of the contract 'must assure that no contract provision is made inconsistent, superfluous, or redundant.'") (*quoting Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997)).

*Third*, and finally, although the Court should not consider parol evidence in interpreting the Agreement (*see infra*), if it does, the parol evidence in this case establishes that BPA's position is illogical. As discussed above, in negotiating the pricing of Option Capacity, SCE first sought a fixed price – a request that was rejected by BPA. BPA, in turn, sought the right to charge SCE any rate from any of its various rate schedules – a request that was rejected by SCE. SCE then sought, and received, a price for Option Capacity that was tied to a rate that several of BPA's Pacific Northwest customers used for the purchase of surplus firm power – the demand charge associated with the contract rate of SP-87. SCE sought this rate because it would provide some measure of cost certainty. Although BPA could change the demand charge associated with the contract rate of SP-87 or its successors, to do so, BPA would have to change a rate utilized by many of its customers, not just SCE, and thus likely face significant opposition should it attempt to do so.[13]

BPA's present position – that it was entitled to develop an entirely new

---

[13] BPA's excuse that it mistakenly failed to include a capacity without energy rate in FPS-96 carries no weight. In the 1987 negotiations, BPA suggested SP-87, a capacity with energy schedule, as the rate for Option Capacity. It may not now turn around and say SCE must use a capacity without energy rate.

capacity without energy rate in FPS-96R and apply that rate only to SCE – runs in the face of SCE's express intent in negotiating the language of the Agreement. Indeed, BPA's present position eliminates the purpose of the contract language linking the price for Option Capacity to a specific rate, here the "demand charge associated with the contract rate." It would provide BPA with the exact power that SCE rejected – the power to change SCE's cost for Option Capacity at its sole discretion. If SCE had intended to agree to this (which it did not), SCE would not have rejected BPA's initial request to price Option Capacity at any rate in any of its various rate schedules. Indeed, BPA's present position ignores the fact that SCE refused this request during the parties' negotiations.

BPA's attempt to rely on the General Provisions of the Agreement (Exh. B to the Agreement) is also misplaced.[14] BPA is correct that Section 3 of the General Provisions does refer to BPA's rate schedules, but that does not change the analysis.

---

[14] Section 3 of the General Provisions of the Agreement (set forth in Exh. B to the Agreement) states, in pertinent part:

> 3. <u>Equitable Adjustment of Rates.</u>
>
> Unless otherwise specifically provided for in the contract:
> (a) The Contractor shall pay Bonneville for the electric power, capacity or energy made available under this contract at the rates specified in the contract.
> (b) To the extent the contract references Bonneville rates or rate schedules of general applicability for purposes of payment for electric power, capacity or energy made available, the following provisions apply:
> (1) Bonneville shall establish and periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.
> (2) …
> (3) The purchaser shall pay Bonneville for the electric power, capacity or energy made available under this contract during the period commencing on each Rate Adjustment Date and ending at the beginning of the next Rate Adjustment Date at the rate specified in any rate schedule available at the beginning of such period for service of the class, quality, and type provided for in this contract, and in accordance with the terms thereof, and of the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule… .



1212802.11

Indeed, the first sentence of the Section renders the Section entirely inapplicable, as it states that the Section applies <u>only</u> if <u>not</u> "*otherwise specifically provided for in the contract...*" Agreement, Exh. B, Sect. 3.

In addition, even if applicable (which it is not), Section 3 states only that BPA is entitled to adjust its own rate schedules, and to the extent the Agreement provides for SCE to pay a rate tied to a particular rate schedule, BPA has the authority to adjust those rates in accordance with applicable law. SCE does not contest this point, but it is irrelevant. SCE acknowledges that, had BPA adjusted the "demand charge associated with the contract rate" of FPS-96, SCE would have been required to pay that adjusted rate. BPA did not do that. Instead, when it developed FPS-96R, BPA left the "contract rate demand charge" unchanged and created a wholly new rate for "capacity without energy sales." The creation of this new rate was also within BPA's power. What BPA could not do was apply this new rate to its Agreement with SCE, which *expressly* provided for another rate. BPA's doing so breached the Agreement.

**2. Parol evidence is inadmissible to supplement, modify or interpret the terms of the Agreement.**

Because Section 12(a)(4) of the Agreement is unambiguous, parol evidence cannot and should not be considered to supplement, modify or interpret its terms as a matter of law.[15] Federal Circuit case law is clear that, where a written agreement is an expression of the parties' final understanding, a court may not consider external evidence to *supplement* or *modify* the terms of the contract. *Barron Bancshares*, 366 F.3d at 1375 (finding error where the trial court considered extrinsic evidence to

---

[15] BPA has informed SCE that it intends to introduce parol evidence at trial. After this Memorandum is filed, will file a Motion in Limine to preclude BPA from introducing such evidence. SCE has also included a brief discussion of the parol evidence issue herein.

supplement the terms of a fully integrated contract); *McAbee Constr.*, 97 F.3d at 1434 (holding that the parol evidence rule prohibits the use of extrinsic evidence to add or modify the terms of a fully integrated agreement).

Similarly, parol evidence is not admissible to *interpret* the terms of a written contract unless those terms are ambiguous. *Barron Bancshares*, 366 F.3d at 1375-76 ) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *McAbee Constr.*, 97 F.3d at 1434-35 (same).

Here, there is no dispute that the Agreement was the full and final expression of the parties' agreement. Both sides acknowledge that there are no oral or other agreements that have modified the terms of the Agreement at issue. As such, parol evidence is inadmissible to supplement or modify the express terms of Section 12(a)(4).

Neither are the terms of Section 12(a)(4) ambiguous in any way. A contract term is ambiguous *only* if it is susceptible to more than one *reasonable* meaning. *Barron Bancshares*, 366 F.3d at 1375-76; *McAbee Constr.*, 97 F.3d at 1434-35 (same). The Court's duty is to "'ascertain analytically whether *vel non* an ambiguity existed' in the meaning of the contract." *Int'l Transducer Corp. v. United States*, 30 Fed. Cl. 522, 526 (1994). A party's subjective, unexpressed intent is accorded no role in this exercise. *Id.*

As set forth above, to arrive at BPA's position, the Court would have to both *add* language to Section 12(a)(4) ("capacity without energy sales") and *delete* language from the Section ("the contract rate associated with the demand charge"). BPA provides no explanation, persuasive or otherwise, as to how the parties so badly mis-

drafted the Agreement, demonstrating that its interpretation of Section 12(a)(4) is simply not reasonable. The parol evidence rule thus precludes the introduction of extrinsic evidence to interpret the terms.[16]

### B. SCE Suffered Damages Of $31.5 Million As A Result Of BPA's Breach.

If BPA breached its contractual obligation to provide Option Capacity to SCE, the fact of SCE's damages can hardly be disputed. Between June and October 2000, SCE would have received $50,582,069 for the energy it should have received from BPA, which SCE would have bid into the PX (as it was required to do). In turn, had BPA performed, SCE would have incurred costs in an amount of only $18,987,634 for that energy – the capacity payment to BPA ($3,930,000) plus the cost of purchasing off-peak power in the PX to return to BPA. The difference between these two numbers – the $50,582,069 that SCE would have received in the PX for the energy from BPA, less the $18,987,634 that SCE would have paid to purchase that energy from BPA – constitutes SCE's damages. This amount is $31.5 million. *See, e.g., Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515, 522 (2006) ("It is a basic tenet of contract law that '[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.'") (*quoting Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)).

---

[16] Moreover, although the Court need not reach this issue because the terms of the Agreement are clear, to the extent the Court finds any question as to the proper interpretation of Section 12(a)(4), the Court should construe the terms against BPA because it drafted the language at issue. *Record Steel and Constr., Inc. v. United States*, 62 Fed. Cl. 508, 517 (2004) ("The general rule for choosing between competing interpretations of ambiguous contract language is *contra proferentem*, which requires that ambiguities be construed against the drafter."). There is no reasonable argument that any ambiguity in Section 12(a)(4) that did exist was "so patent and glaring" that it should be construed against SCE. *Record Steel*, 62 Fed. Cl. at 517; *NVT Technologies*, 370 F.3d at 1162 ("A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'").

There is no credible argument that SCE's damages were not caused by BPA's breach, or that SCE's damages were unforeseeable or unduly speculative. *Tennessee Valley Authority*, 69 Fed. Cl. at 523, 528 (holding that, to recover damages for breach of contract, the plaintiff must show that its damages were reasonably foreseeable, that the breach was a substantial factor in causing those damages, and that the damages claimed are not speculative). As a result of BPA's breach, SCE could not bid the energy BPA was obligated to provide it into the PX market. Had SCE been able to do so, SCE would have received over $50 million for that energy – based on the *actual* hourly market-clearing prices in the PX day-ahead market in this period. Deducting from this the amount that SCE would have paid to BPA to purchase return energy, the difference is $31.5 million – the loss suffered by SCE as a result of BPA's breach.

BPA has produced an expert report contending that, assuming a breach is established, SCE's damages are not $31.5 million, but instead are "capped" at one of two numbers: (1) the difference between the contract price at which BPA was required to provide Option Capacity to SCE in the year 2000 (*i.e*, the contract rate demand charge set forth in FPS-96 and FPS-96R) and the price at which BPA was willing to provide Option Capacity to SCE in 2000 (*i.e.*, the price for "Capacity without energy Sales" in FPS-96R); or (2) the cost to SCE of entering into forward contracts that would have provided SCE with sufficient energy to cover that which BPA was obligated to provide to SCE, but did not.

For the reasons set forth below, SCE's damages are not capped at either of these two amounts, and SCE is entitled to recover its full damages of $31.5 million.

1. **BPA has the burden to show that SCE either should have accepted BPA's offer of Option Capacity at the improper, and substantially higher, rate, or entered into a series of forward contracts to replace Option Capacity.**

The breaching party bears the burden of proof to establish that the plaintiff's response to its breach was unreasonable. *Tennessee Valley Authority*, 69 Fed. Cl. at 523; *see also Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (finding that the government failed to meet its burden to show that the plaintiff's mitigation efforts were unreasonable).

Both the Federal Circuit and this Court have held repeatedly that, when mitigating damages from a breach of contract, the non-breaching party "need only pursue reasonable mitigation alternatives..." *Tennessee Valley Authority,* 69 Fed. Cl. at 529 n. 17; *Home Savings of Amer. v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (same). "Reasonable conduct 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.'" *Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City*, 611 F.2d 465, 471 (3rd Cir. 1979) (*quoting In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1951).) In other words, "[i]n determining whether a victim's conduct was reasonable a court must consider that 'the necessity for decision-making was thrust upon him by the defendant, and judgments made at times of crisis are subject to human error,' and should 'allow the injured party a wide latitude in determining how best to deal with the situation.'" *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.*, 137 F.3d 1455, 1474 (11th Cir. 1998); *see also Tennessee Valley Authority,* 69 Fed. Cl. at 529 (holding that a plaintiff's mitigation efforts were reasonable when it considered and rejected other potential means of mitigating its damages from the Government's breach).

Applying the standard set forth above, this Court has "repeatedly rejected attempts by the Government to come in years after the fact and claim that the nonbreaching parties failed to mitigate properly." *Citizens Fed. Bank v. United States*, 66 Fed. Cl. 179, 185 (2005). As set forth in detail below, the result should be no different here.

**2. SCE was not required to accept BPA's offer of Option Capacity at the improper, and substantially higher, rate.**

BPA's argument that SCE's damages are capped at the difference between the contract price for Option Capacity and the improper, and substantially higher, price at which BPA was willing to sell Option Capacity to SCE in 2000 fails as a matter of law and fact.

As a matter of law, BPA's position would require this Court to disregard a fundamental principle of mitigation – that the law "does not require a party to mitigate in a way that requires continued dealing with the breaching party." *Citizens Fed. Bank*, 66 Fed. Cl. at 186 (*citing Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 502 (Kan. 1966) ("An innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement.")). BPA's position, of course, runs directly contrary to this principle.

BPA's argument also fails as a matter of fact, because, notwithstanding BPA's breach, SCE carefully evaluated whether to take BPA's offer of Option Capacity at the improper and substantially higher price at which BPA was willing to sell it. SCE ultimately chose not to accept that offer, not because BPA had breached the parties'

Agreement, but because the offer did not make economic sense at the time.[17] Based on SCE's forecast of market prices, the new (and improper) price being offered by BPA was higher than the anticipated price for energy in the PX day-ahead market. For this reason, SCE rejected BPA's offer. *Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City*, 611 F.2d 465, 471 (3rd Cir. 1979) (*quoting In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1951) ("Reasonable conduct 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.'").

Admittedly, in retrospect, SCE would have been better off accepting BPA's demand and suing for the difference, as energy prices in the PX day-ahead market skyrocketed in the summer 2000 as a result of California's energy crisis. But neither SCE nor anyone else knew this would occur at the time of BPA's breach, and SCE cannot now be penalized for making a reasoned business decision based on the information available to it at the time – particularly where the necessity for that business decision was thrust upon SCE by BPA's breach. *Hale Container Line, Inc.*, 137 F.3d at 1474; *Citizens Fed. Bank*, 66 Fed. Cl. at 185 (holding that it is not the task of the court to "second guess" a team of skilled business managers, and "Monday-morning quarterbacking is irrelevant to an award of mitigation."); *Sacramento Municipal Utility Dist. v. United States*, 70 Fed. Cl. 332, 367 (2006) ("Where a choice is required between two reasonable courses of action, the party that caused the injury may not complain that

[17] Nor did SCE have any contractual obligation to take BPA's offer of Option Capacity at this higher price. The Agreement only states, "Pending resolution of a disputed matter, the Parties shall continue performance of their respective obligations pursuant to this Agreement." Agreement, § 20. Of course, the Agreement did not impose an "obligation" on SCE to take Option Capacity at any price; it certainly did not impose an "obligation" on SCE to take Option Capacity at the improper price offered by BPA in 2000.

one course, rather than the other, was chosen.").

### 3. Neither was SCE required to enter into risky forward contracts to mitigate its damages.

BPA's alternative position – that SCE was required to enter into forward contracts on the California PX's Block Forward Market ("BFM") to replace the energy that BPA wrongfully failed to provide, and that SCE's damages should be limited to the difference between the cost of Option Capacity and the cost of those forward contracts – fails for similar reasons.[18]

*First*, BPA's position – that SCE should have replaced BPA's energy by entering into inherently risky forward contracts – violates another fundamental principle of the law on mitigation – that "plaintiffs are not required to undertake measures that would entail a risk of further economic damage." *Citizens Fed. Bank*, 66 Fed. Cl. at 186.

According to BPA, on the day that SCE became aware that BPA would not provide Option Capacity at the price specified in the parties' Agreement, SCE should have entered the BFM and purchased an equivalent amount of energy or, at least, that its damages should be limited because it "could" have done so. BFM contracts work as follows: the buyer agrees to purchase from the PX a specified amount of energy, to be delivered in the future (normally, 1-7 months after the date of contract) at a specified price. On the other side, a seller, whose identity is unknown to the buyer, agrees to sell

---

[18] BPA offers this position through the testimony of its expert witness, Dr. Samuel Van Vactor. There are numerous defects with Dr. Van Vactor's opinion – most principally that, by Dr. Van Vactor's own admission, his damages calculations are incorrect. Indeed, Dr. Van Vactor proposed two calculations to challenge SCE's damage calculations, and, in his deposition, conceded that the first calculation was infeasible and the second was incorrect. Shortly after the filing of this Memorandum, SCE will file a Motion to Exclude the testimony of Dr. Van Vactor, to be heard at the Pre-Trial Conference.

that energy to the PX.[19] Of course, if the market price of energy increases after the time of contract, the buyer wins the bet, as the seller is obligated to provide energy at a price below that now prevailing on the market. However, if the price of energy decreases, the buyer loses, as it has purchased energy at a price higher than that now prevailing on the market.

As this demonstrates, forward contracts are inherently risky endeavors. Indeed, assuming for the moment that SCE could have entered into a forward contract for a product that matched the Option Capacity product (as BPA concedes, it could not (*see infra*)), that contract could have *increased or decreased* the damages to SCE caused by BPA's breach – depending on what happened to prices on the energy market. If, for example, the price of energy decreased, SCE's damages would actually be higher by virtue of SCE's having "mitigated" its damages by entering into forward contracts. Undoubtedly, had this occurred, BPA would not be making its present argument.

The fact is that neither SCE nor anyone else knew what would happen to energy prices, and, for that reason, SCE was not required to mitigate its damages by entering into forward contracts that posed a risk of even greater damage to SCE. *See Tennessee Valley Authority*, 69 Fed. Cl. at 529 fn. 17 ("[A non-breaching party] is not required 'to take steps to avoid loss if those steps may cause other serious loss. [The non-breaching party] need not, for example, make other risky contracts…") (*quoting* RESTATEMENT 2D CONTRACTS § 350, Comment g).[20]

---

[19] The contracts BPA says SCE should have purchased are "6 X 16" – the hours from 6 AM to 10 PM, six days a week (Sundays are excluded).

[20] Moreover, as the facts will show, during the relevant time period, SCE was constantly evaluating the proper amount of power to purchase through forward contracts available on the BFM. Thus, in essence, BPA's position – that SCE should have bought even more energy on the

The case of *Hess Energy, Inc. v. Lightning Oil Co.*, 338 F.3d 357 (4th Cir. 2003), in instructive. In *Hess*, the defendant was found to have anticipatorily repudiated its contract to sell natural gas to Plaintiff Hess Energy, and the question was the proper measure of damages. *Hess Energy*, 338 F.3d at 358. The defendant's position was that, on the date that defendant informed plaintiff that it would not perform, plaintiff should have gone into the market and replaced the natural gas it was to receive from defendant by entering forward contracts similar to the one that plaintiff had with defendant. *Id.* at 360-61. Instead, according to the defendant, plaintiff sat idle while the price of gas rose, and then purchased its cover, thereby increasing its damages. *Id.*

The district court disagreed with defendant and awarded Hess its cost of cover at the later date, and the Court of Appeals affirmed. The Court of Appeals held that, under the UCC, a buyer's damages against a repudiating seller are based on the market price on the date of performance/delivery. *Id.* at 363. The Court of Appeals's reasoning is instructive here:

> When the seller of goods has promised delivery at a future time and prior thereto repudiates his contract, the buyer is not required to go into the market at once and make another contract for future delivery merely because there is reason to expect a rise in market price. If his [the buyer] forecast is incorrect and the price falls, his second contract on a high market increases the loss. If his forecast is correct and the price rises, his second contract avoids a loss and operates as a saving to the repudiator. But the risk of this rise or fall is exactly the risk that the repudiating seller contracted to carry. If at the time of repudiation he [the repudiating seller] thinks that the price will rise, so that his performance will become more costly, he can make his own second contract transferring the risk to a third party and thus hedge against his first risky contract.

*Id.* at 364 (*quoting* ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1053, at 273

---

BFM than it did – asks the Court to substitute its business judgment for that of SCE, which is impermissible. *Citizens Fed. Bank*, 66 Fed. Cl. at 185.

(Interim ed. 2002).).

In addition to violating fundamental principles of the law on mitigation of damages, BPA's position was not even feasible – as there was no product equivalent to Option Capacity even available on the BFM. As discussed *supra*, the Option Capacity product was exceedingly flexible. In energy-industry terminology, it allows the receipt of power to be "shaped." Once SCE requested and paid for the Option Capacity, BPA was required to make that energy available, but SCE was not required to take it. Rather, on each day in June through October, SCE could inform BPA of the amount of energy it wanted from BPA on the next day (other than Sundays, and up to specified limits) and the hours on which it wanted that energy delivered. If SCE did not want any power from BPA, or wanted less than it was entitled to receive, SCE did not have to order that energy.

The few products available on the BFM lacked any of this flexibility. The most heavily traded BFM product (and the one that BPA says SCE should have bought) was 6 X 16. In a 6 X 16 contract, the buyer obligates itself to purchase from the seller 25 MW of energy, for each of 16 hours a day, 6 days a week, at a specified price.[21] The buyer could contract to purchase 6 X 16 for a specified month or a specified quarter (3 months) of the year, but once the buyer entered into that contract, it was required to purchase 16 hours of energy for 6 days per week for the entire period of the contract – irrespective of whether the buyer needed that energy and irrespective of the prevailing

[21] As this illustrates, buying in the BFM would have required SCE to purchase even more energy than it needed to cover that lost from BPA's breach and assume proportionately more risk. Indeed, to lock in as much energy during the high-peak hours as SCE was entitled to receive from BPA under the Option Capacity provision, SCE would have had to buy nearly <u>twice</u> as much energy, and then sell off the rest.

price of energy on the market at the time of delivery. As such, the buyer lost any real-time flexibility with respect to whether or when to take the energy at issue – an important feature of the Option Capacity product.

In short, BPA's argument – that SCE's damages are limited to the difference between the price of Option Capacity and the price of a forward contract that provided for an equivalent amount of energy – fails as a matter of law and fact. As a matter of law, SCE was not required to enter risky forward contracts to mitigate its damages. As a matter of fact, the BFM did not offer a product even reasonably equivalent to the Option Capacity product, thus making mitigation in this manner impossible.

## IV. CONCLUSION

As set forth above, in the year 2000, BPA breached its long-term Agreement with plaintiff SCE, which required BPA to provide SCE with Option Capacity in the summer months. As a result of this breach, SCE suffered damages in the amount of $31.5 million. As such, this Court should enter judgment in favor of SCE on its breach of contract claim against BPA and award SCE damages of $31.5 million, plus interest since the date of filing.

Charles D. Siegal /jy
Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Facsimile: (213) 687-3702

**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY**

DATED: October 20, 2006

**OF COUNSEL:**

Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9194
Facsimile: (213) 687-3702

NOTICE OF FILING

I hereby certify that on October 20, 2006, a copy of the foregoing **SOUTHERN CALIFORNIA EDISON COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also certify that, pursuant to General Order 2003-42, Paragraph I(5), I forwarded a courtesy copy of the Memorandum to the Court.

s/ Charles D. Siegal