IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | CASE NO. 03-2869C<br>(Judge Lettow)<br><br>Hearing Date: November 27, 2006<br>Time: 10:00 a.m.<br><br>Trial Date: December 4, 2006 |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE PAROL EVIDENCE; DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF**

**PLAINTIFF'S MOTION TO EXCLUDE PAROL EVIDENCE**

Plaintiff Southern California Edison Company ("SCE") hereby moves the Court for an order precluding the introduction of parol evidence to supplement or interpret the express terms of the 1988 Sale and Exchange Agreement ("Agreement") between SCE and Defendant United States of America, acting through the Bonneville Power Administration ("BPA"). This Motion is brought on the grounds that the terms of the Agreement are complete and unambiguous, thus making it improper to permit the introduction of parol evidence.

This Motion will be heard at the parties' Pre-Trial Conference, scheduled for November 27, 2006 at 10:00 a.m., or as soon thereafter as the matter may be heard. This Motion is based upon the attached Plaintiff's Brief, the Declaration of Joseph J. Ybarra., filed herewith, the pleadings and other papers on file in this matter, matters of which this Court may take judicial notice, and oral argument of counsel at the hearing hereon.

Respectfully submitted,

s/Charles D. Siegal

Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Telephone: (213) 683-9194
Facsimile: (213) 687-3702
**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON**
DATED: October 27, 2006

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9502
Facsimile: (213) 687-3702

**PLAINTIFF'S BRIEF**

## I. INTRODUCTION

SCE has set forth the facts of this case in some detail in its Memorandum of Contentions of Fact and Law. It will not repeat them at length here. What is most relevant is that there is no dispute that SCE and BPA were parties to a long-term Sale and Exchange Agreement, executed in 1988 and in place during the time period relevant to this case. Neither is there any dispute that the Agreement expressly sets forth the terms of the parties' understanding in a written document that both parties acknowledge was a full and complete expression of their agreement.

The parties dispute only the *meaning* of the Agreement term that governs the price of "Option Capacity" – a product that BPA was obligated to sell to SCE under the Agreement. As discussed below, the Agreement meant exactly what it says: It expressly required BPA to provide Option Capacity to SCE at the price set forth expressly in the Agreement – the "demand charge associated with the contract rate."

BPA would have this Court re-write the Agreement so that it permitted BPA to charge a "Demand Charge – Capacity without energy Sales," a price seven to 15 times higher than the price required by the Agreement, and one that makes reference to a product that SCE was not even purchasing. BPA can attempt to reach this result only by introducing parol evidence. The Agreement, entered into after a lengthy negotiation, constitutes the final expression of the parties' intentions. Given that the language of the Agreement is clear and ambiguous, SCE submits that the admission of parol evidence would be improper. It therefore asks the Court to grant this Motion and exclude the introduction of parol evidence.

## II. STATEMENT OF FACTS

SCE and BPA engaged in lengthy negotiations with respect to the content and the price of Option Capacity. SCE presents the following description, not to show the substance of the discussions, but to show that the Agreement was the product of complete, arms-length and good faith negotiations.

The idea of Option Capacity first surfaced in late 1986 or early 1987 and incorporated into the Agreement.[1] Initially, SCE attempted to negotiate a cost-based price for Option Capacity for the entire term of the Agreement, similar to the other firm power SCE was purchasing under the Agreement.[2] BPA would not accommodate that request.[3] On its part, BPA wanted the right to charge a negotiated rate or a rate applicable only to exports and primarily to California exports.[4] SCE rejected that proposal.[5]

As a fallback position, SCE insisted that it be treated in a manner similar to BPA's Pacific Northwest customers.[6] SCE believed that tying the price for Option Capacity to a rate used by BPA's Pacific Northwest customers would protect SCE's interests by diminishing BPA's ability to manipulate the price of Option Capacity to benefit itself, because other regional customers would take an active role in any attempts by BPA to increase a rate affecting them, thereby protecting SCE's interests. An "Edison only" rate, on the other hand, would have given give BPA essentially unilateral pricing rights, thereby reducing the value of Option Capacity to SCE.

Ultimately, *BPA proposed,* and the parties agreed on, a price tied to a rate for which BPA had already requested Federal Energy Regulatory Commission ("FERC") approval – the demand charge associated with the contract rate within BPA's SP-87 rate schedule.[7] BPA agreed to insert the "demand charge associated with the contract rate" language into the Agreement, so as to accommodate SCE's request that the provision point to a specific rate within

---

[1] Deposition of Robert Kendall ("Kendall Dep."), at 43:9-25. The Kendall deposition is attached as Exhibit A to the Declaration of Joseph J. Ybarra ("Ybarra Decl."), attached hereto.

[2] Kendall Dep., at 81:17-83:9.

[3] *Id.*

[4] Kendall Dep., at 83:24-85:19.

[5] *Id.*

[6] Kendall Dep., at 86:3-87:14.

[7] Deposition of Larry Kitchen – March 14, 2006 ("Kitchen Dep."), at 20:4-23. The deposition of Mr. Kitchen is attached as Exh. B to the Ybarra Decl.

the SP-87 rate schedule.[8] This rate was acceptable to SCE as a price for Option Capacity because it was used by many of BPA's Pacific Northwest customers for the purchase of firm power. Thus, SCE believed that it had a modicum of leverage against BPA's unilateral authority to change the price charged to SCE, as any change in SP-87's demand charge would necessarily affect numerous BPA customers, in addition to SCE

The parties ultimately agreed to this language in the Agreement, which was executed by SCE and BPA in July and October 1988, respectively. At deposition, BPA acknowledged that there were no oral agreements between the parties that varied these terms.[9]

## III. ARGUMENT

### A. The Contract Terms Are Unambiguous.

The parties dispute the price that SCE was required to pay upon exercising its right to Option Capacity under the Agreement. With respect to this issue, the Agreement states as follows:

> Edison shall pay for Option Capacity at the *demand charge associated with the contract rate* of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized Representatives may agree upon another applicable rate schedule.

Agreement, § 12(a)(4) (emphasis added).

---

[8] Deposition of United States of America, represented by Lawrence Kitchen - June 21, 2006 ("PMK Dep.") at 33:16-34:1. The PMK Dep. is attached as Exh. C to the Ybarra Decl.

[9] PMK Dep., at 7:24-8:9. Even absent the admission, the Agreement is integrated as a matter of law. "The written lease extension agreement is clear, specific, and unambiguous. As a result, the court must conclude that it constitutes an integrated expression of the parties' final intent. '"[T]he written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it."' *California Sand and Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 26 (1990), *aff'd*, 937 F.2d 624 (Fed.Cir.1991) (Table), *cert. denied*, 502 U.S. 1057 (1992) (quoting *Brawley v. United States*, 96 U.S. 168, 173, 187)." *Cooper Realty Co. v. United States*, 36 Fed. Cl. 284, 289-90 (1996).

### 1. The meaning of Section 12(a)(4) is clear.

"When construing a contract, a court first examines the plain meaning of its express words." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004); *see also NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Contract interpretation begins with the language of the written agreement.").[10] The plain language of the Agreement entitled SCE to purchase Option Capacity at the "demand charge associated with the contract rate" of SP-87, or, if SP-87 was not in effect, its successor rate schedule. Between 1988 (when the Agreement was executed) and 2000 (when this dispute occurred), there were a series of "successor" rate schedules to SP-87, including both FPS-96 and FPS-96R. Each of those successor rate schedules, including FPS-96R (the one in place in the year 2000), contained a demand charge associated with a contract rate. Pursuant to the plain language of the Agreement, SCE was entitled to pay that rate for Option Capacity.

### 2. BPA cannot establish its position without modifying the contractual language.

BPA contends that the terms of the Agreement did not entitle SCE to pay the "demand charge associated with the contract rate" of FPS-96R, but rather permitted BPA to charge SCE the Posted Rate for "Capacity without energy Sales", which did not exist in SP-87 or any of its successors prior to FPS-96R, but was part of FPS-96R. For the reasons set forth below, BPA's position is illogical and inconsistent with the plain language of the Agreement.

*First*, the words "Capacity without energy Sales" do *not* appear anywhere in Section 12(a)(4) of the Agreement. BPA's position thus requires the Court to insert terms not present in the Agreement, which is impermissible. *Barron Bancshares*, 366 F.3d at 1375 (where

---

[10] Of course, contract interpretation is a question of law for the Court. *Textron Defense Sys., v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998).

a written contract is the final understanding of the parties, "[t]he parol evidence rule is a rule of substantive law that prohibits the use of external evidence to *add* to or otherwise modify the terms…") (emphasis added).[11]

*Second*, acceptance of BPA's position would require the Court to disregard the express language of the Agreement. Section 12(a)(4) states expressly that SCE "shall pay for Option Capacity at *the demand charge associated with the contract rate*" of SP-87 or its successor. BPA does not dispute, nor could it, that both the FPS-96 and FPS-96R rate schedules contained a contract rate-demand charge. Nonetheless, BPA contends that the Agreement did not require it to provide Option Capacity at that rate, but rather permitted BPA to pick a rate of its choosing in FPS-96R (in this case, the one for "Capacity without energy Sales") and charge SCE that rate. Of course, this requires one to disregard the words "demand charge associated with the contract rate" set forth *expressly* in the Agreement, which, again, is impermissible under the standard rules of contract interpretation. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996) ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'") (*citing Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993); *Capital Properties, Inc. v. United States*, 56 Fed. Cl. 427, 431 (2003) ("[I]nterpretation of the contract 'must assure that no contract provision is made inconsistent, superfluous, or redundant.'") (*quoting Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997)).

In short, BPA cannot reach its result without modifying the contractual language. It provides no legal justification for doing so.

---

[11] BPA acknowledged that "capacity without energy" was not a term it used in 1988. PMK Dep., at 29:15-24.

**B. Parol Evidence Is Inadmissible To Supplement, Modify Or Interpret The Terms Of The Agreement.**

SCE is informed that BPA will attempt to introduce several kinds of parol evidence at trial.[12] First, BPA intends to introduce evidence of discussions and understandings that pre-dated the execution of the Agreement. Second, BPA intends to introduce "course of dealing" evidence; *e.g.*., that SCE did not try to exercise its right to Option Capacity until 1999, according to BPA, at a time when SCE knew the price was incorrectly low. Putting aside the absence of any probative value of that "evidence" as to the meaning of the Agreement, it is inadmissible.

Federal Circuit case law is clear that, where a written agreement is an expression of the parties' final understanding, a court may not consider external evidence to *supplement* or *modify* the terms of the contract. *Barron Bancshares*, 366 F.3d at 1375 (finding error where the trial court considered extrinsic evidence to supplement the terms of a fully integrated contract); *McAbee Constr.*, 97 F.3d at 1434 (holding that the parol evidence rule prohibits the use of extrinsic evidence to add or modify the terms of a fully integrated agreement).[13]

Similarly, parol evidence is not admissible to *interpret* the terms of a written contract unless those terms are ambiguous. *Barron Bancshares*, 366 F.3d at 1375-75 ) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *McAbee Constr.*, 97 F.3d at 1434-35 (same).

---

[12] SCE offered to stipulate that neither party would submit parol evidence; BPA rejected that stipulation.

[13] The parol evidence rule applies to both statements and course of dealing evidence. *Alves v. United States*, 133 F.3d 1454, 1459 (Fed. Cir. 1998).

A contract term is ambiguous *only* if it is susceptible to more than one *reasonable* meaning. *Barron Bancshares*, 366 F.3d at 1375-75; *McAbee Constr.*, 97 F.3d at 1434-35 (same). The Court's duty is to "'ascertain analytically whether *vel non* an ambiguity existed' in the meaning of the contract." *Int'l Transducer Corp. v. United States*, 30 Fed. Cl. 522, 526 (1994). A party's subjective, unexpressed intent is accorded no role in this exercise. *Id.*

Here, there is no dispute that the Agreement was the full and final expression of the parties' agreement. Both sides acknowledge that there are no oral or other agreements that have modified the terms of the Agreement at issue. As such, parol evidence is inadmissible to supplement or modify the express terms of Section 12(a)(4).

Neither is the Agreement ambiguous in any way. As set forth above, to accept BPA's position, the Court would have to both *add* language to Section 12(a)(4) ("Capacity without energy Sales") and *delete* language from that same Section ("the demand charge associated with the contract rate"). BPA provides no explanation, persuasive or otherwise, as to how the parties so badly mis-drafted the Agreement such that the Court must both *add* and *subtract* language to reach the true intent of the parties. In short, BPA's position is simply not reasonable. As such, because the language within the four corners of the Agreement contains no ambiguity, any attempt by BPA to introduce parol evidence at trial to interpret (or, in this case, change) the express terms of the Agreement should be denied.

## IV. CONCLUSION

For each of the foregoing reasons, Plaintiff Southern California Edison Company respectfully requests that the Court grant its Motion and exclude any and all parol evidence offered by either party to interpret or supplement the express terms of the parties' Agreement .

Respectfully submitted,

s/Charles D. Siegal

Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Telephone: (213) 683-9194
Facsimile: (213) 687-3702
**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON**
DATED: October 27, 2006

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9502
Facsimile: (213) 687-3702

## DECLARATION OF JOSEPH J. YBARRA

I, Joseph J. Ybarra, declare as follows:

1. I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel for plaintiff Southern California Edison Company ("SCE") in this action. Unless otherwise stated herein, I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify to them.

2. Attached as Exhibit A is a true and correct copy of relevant excerpts from the deposition of Robert Kendall, taken by Defendant.

3. Attached as Exhibit B is a true and correct copy of relevant excerpts from the deposition of Lawrence Kitchen, taken by Plaintiff on March 14, 2006.

4. Attached as Exhibit C is a true and correct copy of relevant excerpts from the person most knowledgeable deposition of Defendant, taken by Plaintiff on June 21, 2006.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 24th day of October, 2006, in Los Angeles, California.

s/Joseph J. Ybarra

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | ) Case No. 03-2869C |

CERTIFIED COPY

DEPOSITION OF ROBERT KENDALL

Los Angeles, California

Tuesday, May 9, 2006

Reported by:
REBECCA CORRAL
CSR No. 7021
Job No. 917782B

level or major issue level. Others were more involved in the drafting to implement, if you will, the agreements on the various issues.

So as an example, Leah Bell was probably most involved in the -- along with our lawyer, whoever it was, whether it is Susan or Ann, as I mentioned, in the actual drafting, but I was most involved in the major issues of policy issues.

Q Well, we are going to -- we already talked briefly about option capacity and we are going to now talk more exclusively about option capacity. And I guess my first question is: When do you recall -- slightly different from an earlier question -- when do you recall the concept of an option capacity being raised during the course of the negotiations?

A As I answered to a previous question, we had always wanted to purchase between 5- and 600 megawatts from Bonneville. When Bonneville made it clear to us that they would not sell us the full 5- to 600 megawatts as a firm sale, the concept of capacity insurance, I think, is first called.

And then an option capacity emerged some time in the late '86 or early '87 time frame, some time in there. It was Edison who came up with the concept and floated it by Bonneville.

A No, that was a prevailing concept or tenet that we had for all the products that we purchased under the contract. Our desire was to get a cost-based rate for base capacity, as well as option capacity.

Q Did I then mischaracterize cost-based? I am trying to determine when I --

MR. SIEGAL: You said "most interested." I don't think the witness has said that Edison was most interested in that.

MR. HOCKEY: That Edison was most interested; in other words, Edison was not -- I am sorry, all right.

MR. SIEGAL: Just ask the question.

BY MR. HOCKEY:

Q Edison's desire was to have the rate be a cost-based rate?

A Yes.

Q Were there any discussions relating to the capacity product related to attempting to identify a fixed price for the product?

A For option capacity?

Q Yes.

A Yes. We had desired, as I mentioned, to buy the full 550 megawatts that we wanted at a fixed price under the same -- under one set of pricing, if you will. That was what we started the negotiations trying

to get and Bonneville would not agree to that.

Q And that discussion took place in terms of the overall attempt to obtain 550 megawatts?

A That, plus when we carved out the capacity insurance/option capacity, we tried to get a cost-based rate was our, if you will, our objective, but we were not able to achieve this.

Q When you say "cost-based rate," you are equating that with a fixed price?

A I am saying -- no, not necessarily. It could be -- it wouldn't necessarily have to be a fixed price. It could be an escalating price. It could be a formula price, but one that is tied to Bonneville's cost as opposed to some kind of an opportunity cost-based rate, which is -- which relies on -- more on what the market is willing to pay for the product as opposed to what their costs of producing the product are.

Q Did Edison ever propose to Bonneville cost-based prices for the option capacity product?

A We proposed the concept. We did not propose a specific number dollar price, to my recollection.

Q Was there -- did you receive any reaction to that proposal of the concept?

A Their response was, essentially, well, we define cost -- this is Bonneville talking -- we define

cost as including our opportunity cost. So we had a, if you will, a fundamental disagreement as to what cost was. They defined cost as actual cost -- or strike that.

They defined cost as opportunity cost and we defined cost as their actual cost to produce the product. And so we were never able to resolve that disconnect or disagreement on any of the products, including option capacity.

Q So limiting this discussion now to the option capacity product, how was -- just explain to me, and it may be a timeline-type response, what occurred that led to the selection of what's been identified in the contract on page 53 as an SP-87 rate schedule?

A How did we get to that point?

Q Exactly.

A The process, and I don't recall the exact timeline of the process, but the steps were that we discussed, as part of the -- when we, if you will, rolled out or initially proposed the concept, a cost-based -- what Edison defined as a cost-based rate, without putting a number in it, they were not willing to go with any kind of concept like that.

They proposed, instead, going with a, if you will, a negotiated rate such that the rate would be

determined through negotiations of the parties more at the time the product was exercised. In lieu --

Q I didn't mean to interrupt.

A You wanted me to do the whole process or you want to take it up in pieces?

Q I will be rude and just interrupt you along the way, just so in an attempt to identify individuals who may have been -- or you may recall have been involved at the various steps.

I tell you that now, so next step, if you wanted to just identify the individuals, if you can recall them, you can avoid my interruptions, but at least at this earlier stage, as far as the exchanges that are taking place between the parties, do you recall who was involved in those exchanges?

A Specifically saying that for Bonneville, that they wanted to go to -- they proposed a negotiated rate.

Q Exactly.

A Either Pollock or Sienkowitz in a follow-up meeting, this is not the same one we referred to, we talked about earlier. This was another meeting. Is my recollection it was one of the two of them that was pushing for either a negotiated rate or the other concept that came that they proposed in that same time frame.

It may have been at that same meeting or maybe a subsequent meeting, I think it was in the same meeting, that in lieu of that, Bonneville would establish a new rate schedule that would be applicable for exports, primarily California, that would have contained within that rate schedule a rate that would be used for this option capacity.

Again, under the argument that this is a product that may very well be in several contracts and so this is not just an Edison issue, it is an export issue and, therefore, since we want to treat everybody equally or nondisparately, it makes sense to have a special rate schedule for that.

Q Okay. So that may be the same meeting, may be a meeting shortly thereafter, so what's the next, then, step in the timeline?

A Edison rejected that and I think we rejected it right then and there at that meeting, is my recollection.

Q Would that have been both of the proposals or --

A Both of the proposals, both the negotiated rate and a California -- what we kind of call the California only rate schedule because we were primary entities. We rejected that, and I believe it came up in another

meeting and it wasn't completely dropped, but we had no interest in that approach.

We came back with, in the same meeting, is my recollection, is kind of a principles that we need finished, we could not have a cost-based rate, then we wanted to have a rate that was in an existing rate schedule, and that it was a rate that was applicable to Northwest utilities and that there were purchases being made under that rate schedule by Northwest entities.

And the reason for that was we felt that based on our lack of success in a number of Bonneville FERC rate cases, and they were rate cases actually that started at Bonneville that showed a record of decision and then went to FERC, we were very unsuccessful in those.

And Bonneville seemed -- in our view and based on our experience, had been more responsive to satisfying the needs and, if you will, keeping the rates kind of in check, low, for rate schedules in which Northwest entities, especially the -- both the publics and the privates, but especially the publics made purchases from. So we were interested in, if you will, kind of aligning ourselves or getting in a class of customers, which included Pacific Northwest entities.

And so we argued that this was very important

to us because we didn't trust Bonneville, frankly, to keep our rate, even if we started with a rate that was reasonable, to keep a reasonable rate during a 20-year contract. And since we wanted to be in a class with the Northwest entities, that meant that we needed to point to a rate schedule or use a rate schedule where it was both the capacity and an energy rate.

Because the bulk of the Northwest utilities, as we discussed previously, are driven by the energy needs, not by capacity needs, and so we wanted an energy product to also be in that rate schedule even though we were really not interested in using the energy rate in such a rate schedule necessarily to price the energy in the contract.

Q How was this -- these principles, how were these principles received by, to your understanding, by Bonneville?

A They were not well-received at all. They really wanted us to go with the negotiated rate or the separate rate schedule, and they kept pushing us in that direction, that that would really meet our needs, and they threw up a number of barriers with respect to the other rate schedules, but they left the meeting saying that they would think about it some more and get back to us.

I, ROBERT KENDALL, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of ______________,

2006, at ________________________, ________________.
(City) (State)

______________________________________
ROBERT KENDALL

I, the undersigned, a Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed by name.

Dated: MAY 24 2006

R. Corral

REBECCA CORRAL
CSR NO. 7021

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--o0o--

ORIGINAL

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03-2869C |
| | ) (Judge Lettow) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

DEPOSITION OF LAWRENCE E. KITCHEN

Taken in Behalf of the Plaintiff

March 14, 2006

Reported By:
Jeris Clark
Job No. 916433A

discussions in that meeting about option capacity or option energy?

A. No.

Q. When is the first time that you remember a discussion occurring with respect to option capacity or option energy? 09:28

A. Actually, the only discussion I remember is the negotiations we had over the language on the price.

Q. Is that at one meeting or was it over a period of time or --- 09:28

A. My memory of the negotiations is that I think Bonneville drafted some language and at that point Edison said, Well, we don't know what price we're getting for the capacity.

And we said, Well, we'll point to a price in the '87 rate schedule but that's as much of a guaranty in price that we're willing to give you. 09:29

Q. Okay. And Bonneville drafted language that pointed to a particular price in the '87 schedule?

A. That's correct. 09:29

Q. Which '87 schedule?

A. Well, it's the language in the contract. So I think it's the SP-87.

Q. How did Bonneville happen to select the particular language in SP-87 that it selected? 09:30

**Deposition Correction Sheet**

Lawrence E. Kitchen
Examination Date: March 14, 2006
Case #: 03-2869C

| Page # | Line # | Correction |
|---|---|---|
| 13 | 18 | Delete "basically", insert "third" between "the" and round" |
| 22 | 13 | Delete "peak and" and replace with "peaking" |
| 23 | 13 | Delete ", in a sense," and replace with "included" |
| 28 | 23 | Delete "but" |
| 34 | 15 | Change "Uh-huh" to "yes" |
| 34 | 18 | Change "Uh-huh" to "yes" |
| 44 | 3 | Insert "have any" after "don't" |
| 44 | 3 | Delete "would" |
| 44 | 4 | Insert "using these terms' after "draft" |
| 46 | 2 | Delete the first "is" and insert a comma after " California" |
| 46 | 2 | Delete the second "is" and insert "in explaining how" |
| 56 | 21 | Delete "and" after Edison |
| | | |

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, addition or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this 10th day of April,
2006, at Portland, Oregon.
[City]

[signature]
LAWRENCE E. KITCHEN

(As a matter of firm policy, the records of this transcript will be destroyed three years from the date appearing on the following certificate, unless notice is received otherwise from any party or counsel hereof.)

I, Jeris Clark, a Certified Shorthand Reporter for the States of Oregon and Washington, do hereby certify that LAWRENCE E. KITCHEN, appeared before me as mentioned in the caption herein; that the witness was first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to print; and, that the foregoing transcript, Pages 1 to 66, inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said proceedings, and of the whole thereof. This witness at the time of their statement did request the right to review.

Witness my hand at Wilsonville, Oregon, this 20th day of March, 2006.




Jeris Clark
Certified Shorthand Reporter
OR Certificate No. 90-0009
WA Certificate No. CL-AR-KJ-L4290C

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN CALIFORNIA EDISON COMPANY,

Plaintiff,

vs. Case No. 03-2869C

UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF LAWRENCE KITCHEN

Taken in behalf of the Plaintiff

June 21, 2006

* * *

DUPLICATE ORIGINAL

do that. Okay?
A. Yes.
Q. Is there any reason, sitting here today, why you can't give a full and complete deposition?
A. No.
Q. Okay. And you understand that today, you are not here to testify in your personal capacity but as a representative of the United States.
A. Yes.
Q. Okay. I'd like the witness to look at Exhibit 1.
Have you seen Exhibit 1 prior to today?
A. No.
Q. This is a notice of today's deposition. Can you tell me sort of, in your own words, what topics you are here to testify on behalf of United States.
A. My understanding, there was -- let's see. Question number 1, which is negotiations regarding the pricing of option capacity. Question number 2, any and all oral agreements between Southern California Edison and the United States related to the pricing of option capacity. And question number 7, any and all contracts to which the United States is or has

Q. What record of decision was that?
A. I think Rich had a copy of a record of decision. I don't know if it was signed or not, but it was a contemporaneous document we drafted, describing the terms of the contract.
Q. Okay. So that would have been in 1988.
A. Yes.
Q. Did you speak with anyone else at BPA or outside of BPA that was involved in the negotiations of the contract in preparation for your deposition today?
A. Well, in the discussion was Dave Armstrong. He was responsible for pricing at that time. And I think he sat in on some of the sort of negotiating overview sessions.
Q. And he was in this meeting that you had with your lawyers; is that correct?
A. That's correct.
Q. Okay. Anyone else in that meeting?
A. I don't think so, no.
Q. And other than Mr. Armstrong, did you speak with anyone else who was involved in the negotiations?
A. No.
Q. What about with respect to topic number 2, any and all oral agreements, what did you do to

prepare yourself to testify on that topic?
A. I read the question.
Q. Okay. And I take it from your response that there are no oral agreements that you're aware of with respect to the pricing of option capacity.
A. That's correct.
Q. Okay. So no oral agreements between SCE and BPA with respect to option capacity.
A. That's correct.
Q. Okay. Will you tell me your current position with BPA.
A. I'm an account executive in the bulk power hub.
Q. How long have you had that position?
A. Since 1996.
Q. How long have you been with BPA?
A. Since 1979. I took one year off to travel.
Q. I'd like to show the witness what's been marked as Exhibit No. 1, sale and exchange agreement by and between Bonneville and Southern California Edison.
A. You have two Exhibit No. 1's.
MR. YBARRA: That's a good point.
(Discussion off the record)
(Exhibit 6 marked)
Q. (BY MR. YBARRA:) Mr. Kitchen, is Exhibit 6 the

respect to the drafting of 12(a)(4)?
A. No. I still think 12(a)(4) is clear.
Q. When you negotiated 12(a)(4), you had a demand charge associated with the contract rate of SP-87, right?
A. M-hm, yes.
Q. And that was what you intended to point to, at least for the time that SP-87 was in effect, right?
A. That's correct.
Q. And once SP-87 was no longer in effect, you intended to point to a successor rate schedule, right?
A. That's correct.
Q. What charge in the successor rate schedule did you intend to point to?
A. Whatever the rate schedule said would be the charge for a capacity without energy product.
Q. Okay. Why didn't you write it to say, for example, if the SP-87 rate schedule is no longer in effect, the rate for capacity without energy in the successor rate schedule?
A. Because we didn't speak in that language in those days.
Q. Did you ever tell Edison that that was your

successor rate schedule to SP-87, right?
A. That's correct. And I think the language in -- let's see -- in Exhibit B, section 3, makes it clear that -- pretty much section 3 in Exhibit B, sort of 3B3, basically says the purchaser will pay for the capacity based upon the terms specified in the rate schedule.
Q. What provision of that page are you looking to, sir?
A. The section 3B3.
Q. You see towards the top at the beginning of section 3, it does say "unless otherwise specifically provided for in the contract," right?
A. Right.
Q. I just want to make sure I understand your testimony right. The language "demand charge associated with the contract rate," that was inserted into the contract at Edison's request, right?
A. M-hm.
Q. And it was inserted into the contract at Edison's request because Edison wanted to know which charges set forth in SP-87 it would be paying if it requested option capacity, right?

A. That's correct.
Q. Okay. And your interpretation of the meaning of this section is if SP-87 is not in effect, Bonneville can charge any rate set forth in the successor rate schedule, not necessarily the demand charge associated with the contract rate.
A. That's correct.
Q. All right. Did you at any time tell Edison that "If SP-87 is not in effect, we're no longer limited by the language demand charge associated with the contract rate. We can charge you any rate set forth in the successor"?
A. Actually, I'm pretty sure I did, yes.
Q. Do you specifically recall telling that to anyone?
A. We had a discussion of what this language meant. And we had a discussion that the language in Exhibit B controlled; you know, that basically we were not limited in the future as to what we charged under this. And so I'm sure I had discussions with Charlie and Leah saying, "You're buying at our published rate schedule."
Q. Did you specifically tell them that "Should there be a successor to SP-87 around, you're no longer limited to using the demand charge

**Deposition Correction Sheet**

Deposition of Larry Kitchen on June 21, 2006, in Portland, Oregon
Southern California Edison Company v. United States
Case No. 03-2869C

| Page No. | Line No. | Correction |
|---|---|---|
| 7 | 14 | Delete "sort of" after the word "the" |
| 10 | 19 | Delete "—I mean, we" and insert "rates. We" |
| 10 | 24 | Delete "were—" |
| 12 | 5 | Delete "I mean," |
| 12 | 6 | Delete ", you know," |
| 12 | 9 | Change "things" to "terms" |
| 14 | 7 | Delete ",so" |
| 17 | 25 | Delete "I mean, there was—" |
| 18 | 1 | Delete "I" |
| 18 | 2 | Delete "mean, we" and insert "We" |
| 18 | 5 | Delete "we were" |
| 25 | 20 | Insert "rate schedule" after the word "current" |

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this 31st day of July, 2006, at Portland, Oregon.
Day Month City

[signature]
Larry Kitchen

Subscribed and sworn before me this is 31st day of July, 2006,
Portland, Multnomah, Oregon
City, County State

[signature: Linda I. McDonald]
Notary Signature

My commission expires: 5-15-07
Date

OFFICIAL SEAL
LINDA I MC DONALD
NOTARY PUBLIC-OREGON
COMMISSION NO. 368683
MY COMMISSION EXPIRES MAY 15, 2007

| | | |
|---|---|---|
| 26 | 18 | Delete "M-hm" and insert "Yes" |
| 28 | 12 | Delete "M-hm" and insert "Yes" |
| 29 | 6 | Delete "M-hm, yes" and insert "Yes" |
| 30 | 2 | Delete "would base their" and insert "were" |
| 41 | 9 | Delete "M-hm" and insert "Yes" |
| 54 | 21 | Delete "CRAC" and insert "Correct" |
| 58 | 20 | Delete "M-hm" and insert "Yes" |
| 59 | 21 | Delete "or a capacity—" |
| 59 | 23 | Delete "probably" |
| 60 | 3 | Replace "Yes" with "No" |
| 63 | 3 | Delete "You don't use—" |

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this 31st day of July, 2006, at Portland, Oregon.
Day Month City

[signature]
Larry Kitchen

Subscribed and sworn before me this is 31st day of July, 2006,
Portland, Multnomah, Oregon
City, County State

[signature]
Notary Signature

My commission expires: 5-15-07
Date

OFFICIAL SEAL
LINDA I MC DONALD
NOTARY PUBLIC-OREGON
COMMISSION NO. 368683
MY COMMISSION EXPIRES MAY 15, 2007

| | | |
|---|---|---|
| 63 | 8 | Delete, "you know. It's—" |
| 63 | 9 | Replace "while" with "While" |
| 70 | 3 | Delete "were" and insert "where we" |
| 73 | 24 | Replace "Bonneville" with "San Francisco" |
| 75 | 9 | Delete ", so" |
| 77 | 18 | Insert "part" after "Bonneville's" |
| 79 | 22 | Replace "or" with "at" |
| 80 | 17 | Replace "where" with "who" |
| 81 | 22 | Delete ", so" |
| 82 | 24 | Delete "M-hm" and insert "Yes" |
| 83 | 25 | Delete "You know, basically, he was – I mean, he" and replace with "He" |

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this 31st day of July, 2006, at Portland, Oregon.
Day Month City

[signature]
Larry Kitchen

Subscribed and sworn before me this is 31st day of July, 2006,
Portland, Multnomah, Oregon
City, County State

[signature: Linda I. McDonald]
Notary Signature

My commission expires: 5-15-07
Date

OFFICIAL SEAL
LINDA I MC DONALD
NOTARY PUBLIC-OREGON
COMMISSION NO. 368683
MY COMMISSION EXPIRES MAY 15, 2007

# C E R T I F I C A T E

I, Deelana Johnson, Certified Shorthand Reporter, do hereby certify that LAWRENCE KITCHEN personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, Pages 1 to 88, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 27th day of June, 2006.

Deelana Johnson

CERTIFIED SHORTHAND REPORTER CSR 90-0104 Deelana Johnson

Deelana Johnson
CSR No. 90-0104

NOTICE OF FILING

I hereby certify that on October 27, 2006, a copy of the foregoing PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE PAROL EVIDENCE; DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also certify that, pursuant to General Order 2003-42, Paragraph I(5), I forwarded a courtesy copy of the Motion to the Court.

s/Joseph J. Ybarra