IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 03-2869C<br><br>(Judge Lettow)<br><br>Hearing Date: November 27, 2006<br>Time: 10:00 a.m.<br><br>Trial Date: December 4, 2006 |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS, DR. SAMUEL VAN VACTOR; DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF**

**PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DR. VAN VACTOR**

Plaintiff Southern California Edison Company ("SCE") hereby moves the Court for an order excluding the testimony of Defendant's expert witness, Dr. Samuel Van Vactor. The grounds for this Motion are that Dr. Van Vactor's testimony is not relevant or reliable, and thus should be excluded pursuant to Federal Rule of Evidence 702 and the holding of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

This Motion will be heard at the parties' Pre-Trial Conference, scheduled for November 27, 2006 at 10:00 a.m., or as soon thereafter as the matter may be heard. This Motion is based upon the attached Plaintiff's Brief, the Declaration of Joseph J. Ybarra., filed herewith, the pleadings and other papers on file in this matter, matters of which this Court may take judicial notice, and oral argument of counsel at the hearing hereon.

Respectfully submitted,

s/ Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Facsimile: (213) 687-3702
**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON**
DATED: October 26, 2006

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560

Telephone: (213) 683-9502
Facsimile: (213) 687-3702

## PLAINTIFF'S BRIEF

## I. INTRODUCTION AND FACTUAL BACKGROUND

BPA's damage expert, Dr. Van Vactor:

"There is *not* a damage calculation in [my] report that I would stand by… ."

There are two principal issues in this case: (1) whether defendant United States, acting through the Bonneville Power Administration ("BPA"), breached the terms of its 1988 Sale and Exchange Agreement with plaintiff-electric utility Southern California Edison Company ("SCE") by failing to provide Option Capacity to SCE in the year 2000; and (2) if so, the proper measure of SCE's damages.

Both SCE and BPA intend to offer expert testimony with respect to the proper measure of SCE's damages. SCE's expert, Dr. Edward Kahn, has opined that, assuming a breach of contract is established, SCE's damages were $31.5 million – which constitutes the market value of the energy that SCE was entitled to receive from BPA as part of Option Capacity, less the contract price of Option Capacity.[1]

BPA, in turn, intends to offer the "expert" opinion of Dr. Samuel Van Vactor. Dr. Van Vactor, like SCE's damages expert, is an economist. However, unlike Dr. Kahn, Dr. Van Vactor has no opinion on what specific damages, SCE actually suffered as a result of BPA's breach.[2] Instead, Dr. Van Vactor opines only that SCE's damages *should* be measured on the date that SCE was informed of BPA's breach, which,

1.

[1] As part of the 1998 restructuring of the California electricity market, all California utilities, including SCE, were required to bid their energy resources into (and purchase their energy demand out of) a newly-formed California public corporation, the Power Exchange ("PX"). Thus, had SCE received Option Capacity from BPA in the year 2000, SCE would have been required to bid that energy into the PX day-ahead market and, upon doing so, would have been paid the PX day-ahead market price for that energy. Thus, SCE's damages are the difference between that market price and the contract price of Option Capacity.

[2] A true and correct copy of Dr. Van Vactor's Expert Report is attached as Exhibit A to the Declaration of Joseph J. Ybarra, attached hereto (hereinafter, "Ybarra Decl."). Excerpts from Plaintiff's deposition of Dr. Van Vactor are attached as Exhibit B to the Ybarra Decl.

according to Dr. Van Vactor, "is the consensus among the law and economics community, ascribed by everyone from Judge Richard A. Posner to Professors Carlton and Fisher..." (Ybarra Decl., Exh. A p. 6).

As Dr. Van Vactor's own language demonstrates, the proper date on which SCE's damages *should* be measured is a *legal*, not factual, issue, and thus, as will be discussed below, one on which expert testimony is inadmissible. This is particularly true where, as here, the "expert" offering the opinion has no legal training.

As an economist, what Dr. Van Vactor would have been qualified to do is take his opinion on how SCE's damages *should* be measured and *apply it*, using a consistent and reliable economic method. But Dr. Van Vactor has not done that. Indeed, by Dr. Van Vactor's own *admission*, he has no opinion on what SCE's actual damages were. Indeed, and also by Dr. Van Vactor's own *admission*, to the extent that he even *tried* to determine SCE's actual damages, his calculations are inaccurate and the product of an inconsistently-applied methodology.

In short, the crucial part of Dr. Van Vactor's opinion is outside his area of expertise and invades the province of the Court; Dr. Van Vactor expressly disavows the remainder of his opinion. As such, Dr. Van Vactor's testimony runs afoul of Rule of Evidence 702 and the holding of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and must be excluded.

## II. ARGUMENT

### A. Expert Testimony Must Be Relevant And Reliable, Or It Must Be Excluded.

Federal Rule of Evidence 702 permits witnesses qualified as experts to offer opinion testimony *only* if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue..." and:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert,* 509 U.S. at 589. The duty of regulating such testimony falls to the trial judge who, as gatekeeper, "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert*'s requirements of relevance and reliability to all expert testimony); *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1302 (Fed. Cir. 2002) (holding that *Daubert*'s requirements must be met in a bench trial).

Whether expert testimony is "relevant" is determined by whether such testimony will "assist the trier of fact to understand the evidence or to determine a *fact* in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702) (emphasis added). Thus, "it is impermissible for a [expert] witness to testify as to the governing law." *Crowley v. Chait*, 322 F. Supp. 2d 530, 550 (D.N.J. 2004); *see also Mid-State Fertilizer Co. v. Exchange Nat'l. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (affirming trial court's exclusion of expert testimony by an economist where the economist "gave a legal rather than an economic opinion."); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510-11 (2d Cir. 1977) (expert testimony as to the governing law is inadmissible because "[t]he applicable law…could, in no sense, be a question of fact to be decided by the jury.").

Evaluating the reliability of expert testimony involves a "flexible" inquiry focused on the "principles and methodology" underlying the proposed submission. *Daubert*, 509 U.S. at 594-95; *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (quoting *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999)) (characterizing the *Daubert* inquiry as "fact-specific"). In addition

to demonstrating the validity of the methodology employed, the party proffering the evidence must also demonstrate that the expert has actually applied the methodology and "followed it faithfully." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) (remand decision); *see also id.* at 1315-16 ("something doesn't become 'scientific knowledge' just because it's uttered by a scientist"); Fed. R. Evid. 702 Advisory Committee's Notes (1998) ("The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.").

Submissions falling short of *Daubert*'s "standard of evidentiary reliability," 509 U.S. at 590, whether they apply a faulty methodology or improperly apply a valid one, are inadmissible.

**B. Dr. Van Vactor's Opinion Is Not Relevant Because Dr. Van Vactor Offers No Opinion On Plaintiff's Damages.**

As an economist, Dr. Van Vactor (like plaintiff's expert, Dr. Kahn) might be qualified to conduct an economic analysis of SCE's actual damages and offer an opinion as to what those damages are. But Dr. Van Vactor has not done that. Indeed, at deposition, Dr. Van Vactor admitted, on several occasions, that he had no opinion on the actual damages suffered by SCE.

> Q But in this report – again, appreciate it if you'd just say yes or no – there is not a calculation of what Edison's damages – the damages Edison actually suffered were; isn't that correct?
>
> A There is not a damage calculation in this report that I would stand by and say, this is a completely and totally fair estimate of what the damages should have been. It's not precisely that. It's a little bit ---

(Ybarra Decl., Exh. B at pp. 71:22 – 72:5); (*see also* Ybarra Decl., Exh B at p. 66:1-2) ("And let me once again state the purpose was not to come up with an

alternative damage number, per se.").

Because he has not done an actual damages calculation, Dr. Van Vactor's testimony reduces solely to an opinion that SCE's damages *should* be measured on the date that SCE learned of BPA's breach. But Dr. Van Vactor has not even applied that opinion to determine what SCE's actual damages were as of that date; his opinion is only that the date of default is the proper date on which to conduct such an analysis.

> Q So is there any place in your report where you have an accurate forward analysis of Edison's damages?
>
> A I think that the point is that it was the obligation of SCE to estimate what its damages would have been on the day of default. And that's not the methodology that they used.
>
> Now, I think, in cooperation with SCE, working on what was going on and the information that they have, we *could* come to a pretty precise and accurate estimate. But I didn't make a hard-and-fact-conclusion with regard to what the damages were...

(Ybarra Decl., Exh. B at p. 61:12-22) (emphasis added); (*see also* Ybarra Decl., Exh. B at pp. 109:25-110:2) ("Q: Okay, well, you say – I mean, your position is that the value of the contract has to be valued as of the day of the breach; is that correct?; A: That's my view. That's my opinion.").

The proper date on which to measure SCE's actual damages is, however, a question of law, not fact. Indeed, that precise question has been addressed by the Uniform Commercial Code, the Restatement of Contracts and the courts – not coincidentally, in a manner directly opposite to Dr. Van Vactor's opinion. U.C.C. § 2-713(1)(a) (2003 amendments) ("the measure of damages in the case of wrongful failure to deliver by the seller...is the difference between the market price at the time for tender under the contract and the contract price..."); REST. (1ST) CONTRACTS § 338 (1932) ("The rules for determining the damages recoverable for an anticipatory breach are the same as in the case of a breach at

the time fixed for performance."); *Hess Energy, Inc. v. Lightning Oil Co., Ltd.*, 338 F.3d 357, 365 (4th Cir. 2003) (holding that, under both the UCC and Virginia common law, the measure of a buyer's damages against a repudiating seller is the difference between the contract price and the market price on the date of performance).

In sum, the core of Dr. Van Vactor's testimony relates not to the actual calculation of damages, but to the time at which damages should be measured. That choice is a legal, not economic, decision. Courts and legislatures have weighed in on it. For that reason, Dr. Van Vactor provides no assistance and the Court should exclude his testimony.

**C. To The Extent That Dr. Van Vactor Actually Attempted To Measure SCE's Damages, Dr. Van Vactor's Opinion Is Unreliable And Should Be Excluded.**

To the limited extent that Dr. Van Vactor even attempted to *apply* his opinion that SCE's damages should be measured as of the date that SCE learned of BPA's breach, Dr. Van Vactor did so in a way that he admits is inconsistent and inaccurate. As such, to the limited extent that Dr. Van Vactor attempted to perform an economic analysis to determine SCE's actual damages, his opinion is wholly unreliable and must be excluded. *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) (remand decision) (holding that, in addition to demonstrating the validity of the methodology employed, the party proffering the expert opinion must also demonstrate that the expert has actually applied the methodology and "followed it faithfully"); Fed. R. Evid. 702 Advisory Committee's Notes (1998) ("The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.").

So as to *attempt* an economic analysis of SCE's damages as of the date

that it learned of BPA's breach, Dr. Van Vactor set forth to analyze SCE's damages had it covered the loss of BPA's energy by purchasing an equivalent amount of energy in the California PX's Block Forward Market ("BFM") on May 22, 2000 – the date that BPA informed SCE that it would not provide Option Capacity. (Ybarra Decl., Exh. B at pp. 12:19-13:11); (Ybarra Decl, Exh. A at p. 6) ("Had SCE simply bought peak-hour forward contracts at the date of default for the months of the BPA contract, there would have been little or no damages.").

There are some obvious flaws in that approach, as Dr. Van Vactor conceded. First, by Dr. Van Vactor's own admission, to do so, SCE would have had to overbuy energy –in fact, because of the limited types of products available on the BFM, SCE would have been required to buy nearly twice as much energy – 516,000 MWh – in the BFM to make sure that it covered the entirety of the 275,000 MWh that it was entitled to receive from BPA. (Ybarra Decl., Exh. B at p. 24:1-8) (acknowledging that SCE would have needed to purchase 516,000 megawatts to cover the energy it was entitled to receive from BPA). According to Dr. Van Vactor, SCE could have then *re-sold* the excess hours in the market. Thus, SCE would have had to expose itself to even greater potential losses had the market price of energy declined between the date SCE entered into the forward contract and the date that the energy was delivered to SCE and then re-sold to a third party. (Ybarra Decl., Exh. B at p. 24:9-12) ("And possibly, if the market had been poor, they would have taken a loss on those extra hours, and that would have been something they could have charged to BPA.").

Second, there is a substantial question whether the forward contracts that Dr. Van Vactor says SCE should have purchased as cover were even similar enough to the Option Capacity product so as to serve as an appropriate replacement for Option Capacity. Dr. Van Vactor argued that SCE should purchase 6 X 16 contracts (96 set hours per week) to replace Option Capacity (50 hours per week with flexibility to select hours the day before). No case requires a non-breaching party to buy such a different

"cover" good. In addition, there is also a substantial question as to whether those forward contracts could constitute an adequate replacement for Option Capacity, given that, by Dr. Van Vactor's own admission, had SCE done so, it would have been exposed to a potentially even greater loss on account of BPA's breach than it actually suffered.[3] For the moment, SCE will set aside those questions – as they arguably go to the weight of Dr. Van Vactor's opinion, as opposed to its reliability.

Even setting aside the foregoing issues, Dr. Van Vactor's opinion is wholly unreliable (and thus inadmissible) because Dr. Van Vactor did not actually perform a consistent and accurate analysis of SCE's actual damages had it purchased the very forward contracts that Dr. Van Vactor says SCE should have purchased. Rather, Dr. Van Vactor applied a methodology that used both forward prices from the BFM and *ex post facto* prices from the PX day-ahead market – an entirely separate market. Dr. Van Vactor agreed that a consistent methodology would have used only forward prices from the BFM – something that Dr. Van Vactor did not do.

> Q Okay. So it would have been consistent to use forward prices throughout this [Table 7.2] to calculate the 110, the number instead of the 110, correct?
>
> A That would be a – I think that's a logically-consistent approach. I don't disagree with that approach, yes.
>
> Q Okay. And you knew that at the time? I mean, you knew that a logically-consistent approach when you did this would have been to use a forward price for this number?
>
> A Well, you know, essentially, what you're saying is the – on the one hand, we'll go in and we'll over-purchase more than we need in order to be sure we've got the ten hours, and then we'll sell those unclaimed hours forward to net it out to find out what our true damages is. And I would say yes, I would agree that that methodology is consistent with the theory that I proposed. Of course, the unknown is we have no way of knowing what those unclaimed hours would sell for in the forward market.

1.

[3] As to this question – whether SCE actually should have covered by purchasing forward contracts – Dr. Van Vactor has no knowledge or expertise. (Ybarra Decl., Exh. B at p. 94:17-20).



1219039.2

Q But we have a way of estimating what it would be?

A It might have been done, yes. With better and more information.

.....

Q And the reason you didn't do that at the time?

A Well, there were two reasons. One was that it was more speculative, and I did want to keep it concrete. I wanted to illustrate the issues here. The second reason was time. It would have taken [a] considerable amount of time to go through and do a reliable analysis of historical prices and the relationship during those various hours.

(Ybarra Decl., Exh. B at pp. 49:10-50:9; p. 52:4-11).

Dr. Van Vactor further acknowledged that, had he used a consistent forward methodology, SCE's actual damages would have been higher than Dr. Van Vactor estimated (Ybarra Decl., Exh. B at pp. 58:23-59:9), and that higher number would have been a more accurate measure of SCE's damages.

Q And don't you agree that [a consistent forward valuation] would have been a more accurate way of doing it, doing your analysis?

A Either methodology is inherently speculative, and there is speculation involved in this.

I think today if I were to do this table, given the knowledge that I have, based upon the new report by Dr. Kahn and others, I would proceed in the manner we've talked about. And I would attempt to do an estimate, and *that would probably be a better – a better – totally consistent valuation of how you might proceed…*

(Ybarra Decl., Exh. B at p. 52:12-22) (emphasis added). Indeed, because he had not done a consistent and accurate analysis of SCE's damages, Dr. Van Vactor admitted that, "[t]here is *not* a damage calculation in this report *that I would stand by…* ." (Ybarra Decl., Exh. B at pp. 71:22-72:5) (emphases added).

In short, even assuming, *arguendo*, that Dr. Van Vactor could offer a reliable opinion as to what SCE's actual damages would have been had it purchased forward contracts to replace Option Capacity, he has not done so.

Rather, by his own admission, Dr. Van Vactor has applied an inconsistent methodology to arrive at numbers that underestimate SCE's damages and are flat out incorrect. As such, Dr. Van Vactor's opinion is wholly unreliable and should be excluded.

## III. CONCLUSION

For the reasons set forth above, Plaintiff Southern California Edison Company respectfully requests the Court to exclude the testimony of Dr. Van Vactor in its entirety.

Respectfully submitted,

s/Charles D. Siegal

Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Telephone: (213) 683-9194
Facsimile: (213) 687-3702

**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY**
DATED: October 26, 2006

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9502
Facsimile: (213) 687-3702

**DECLARATION OF JOSEPH J. YBARRA**

I, Joseph J. Ybarra, declare as follows:

1. I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel for plaintiff Southern California Edison Company ("SCE") in this action. Unless otherwise stated herein, I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify to them.

2. Attached as Exhibit A is a true and correct copy of Dr. Van Vactor's Expert Report, excluding exhibits, dated August 11, 2006.

3. Attached as Exhibit B is a true and correct copy of relevant excerpts of the transcript of the deposition of Dr. Van Vactor, taken on September 28, 2006.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 24th day of October, 2006, in Los Angeles, California.

s/Joseph J. Ybarra

# EXHIBIT A

Southern California Edison

vs.

United States of America
Bonneville Power Administration

Civil Action No. 1:03-cv-02869-CFL

Report of
Samuel A. Van Vactor, Ph.D.
August 11, 2006

EXHIBIT
Van Vactor
1
9-28-06

## Table of Contents


**1. Introduction ........ 3**
1.1 Task and credentials ........ 3
1.2 Compensation ........ 4
1.3 Previous testimonies ........ 4
1.4 Reservations ........ 5
**2. Summary of findings ........ 5**
**3. SCE's damage claim ........ 6**
**4. Key differences between the power market in 1988 and 2000 ........ 7**
4.1 The benefits of regional exchange ........ 7
4.2 The creation of the Western System Power Pool (WSPP) ........ 8
4.3 California carves up the market ........ 8
**5. Pertinent elements of the CalPX market in 2000 ........ 9**
**6. The correct way to value contract breach ........ 10**
**7. Valuation of the BPA-SCE capacity option ........ 11**
7.1 Contract obligations ........ 11
7.2 SCE's participation in the CalPX Block Forward Market ........ 13
**8. Conclusion ........ 16**

# 1. Introduction

## 1.1 Task and credentials

My name is Samuel A. Van Vactor. I am an energy economist. I have been asked by Counsels for the U.S. Department of Justice (DOJ) and the Bonneville Power Administration (BPA) to analyze the damage claim made by Southern California Edison (SCE) concerning the valuation of its option to purchase capacity and associated energy during the year 2000, as defined in the Sale and Exchange Agreement between BPA and SCE executed on October 18, 1988. Although it is not yet established that any damages are due SCE, I have been asked to demonstrate how such damages should be calculated in the instance that BPA is determined to have liability.

My Curriculum Vitae (CV), including activities and published works, is attached as Exhibit A. Briefly, my background is as follows: I have a Ph.D. from the University of Cambridge in the United Kingdom and I frequently participate in the University's Electricity Policy Research Group. I have served as an economist at the U.S. Treasury in Washington D.C. and as a senior economist at the International Energy Agency in Paris, France. Since 1981 I have worked as a consulting economist, through my own firm, Economic Insight, Inc. (EII) in Portland, Oregon, and with Dr. Arlon Tussing of ARTA, Inc. in Seattle, Washington.

In 1996, EII began publishing a daily newsletter, the *Energy Market Report*, on the emerging Western electricity market, which had adopted a trading paradigm often referred to as bilateral trade. At the same time, California was preparing to deregulate its electricity market. California planned to set up two independent organizations to manage the flow of electricity and conduct a statewide auction for power. The organization of the auction market was vested in the California Power Exchange (CalPX). In October 1997 I was hired by the CalPX to advise them on how to better integrate their auction scheme with existing bilateral trade.

The CalPX opened for business on March 31, 1998. Over the course of the next several years, I assisted the CalPX in the design and implementation of what became known as the "block forward market." Later, I will describe how this market operated and its relevance to SCE's damage calculation.

### 1.2 Compensation

I am being compensated at a rate of $325 per hour for the research and testimony. As of the completion of this report I have worked approximately 38 hours.

### 1.3 Previous testimonies

In the past five years I have been deposed or have testified on the following cases:

- Testimony for the Transactions Finality Group, before the Federal Energy Regulatory Commission, Docket No. EL01-10-000, September 2001 in Washington, D.C., concerning Pacific Northwest electricity price refunds.
- Deposition on behalf of Sempra in SoCalGas v. Exxon Popco, San Diego, October 2001, concerning the California gas market.
- Deposition and testimony on behalf of Coral Energy, before the Federal Energy Regulatory Commission, Docket No. EL02-62-000, September 2002 and January 2003, San Francisco and Washington, D.C. Testimony concerned California's long-term electricity supply contracts.
- Deposition and testimony on behalf of Robert Barman in Barman v. Unocal, et. al., September 2003, Portland, Oregon, concerning gasoline marketing.
- Testimony for Portland General Electric before the Oregon Department of Energy, concerning the cost of power resources, Portland, Oregon, June 2004.
- Testimony on behalf of Gaz de France in a dispute with ENI, concerning the valuation of North Sea natural gas, Geneva, Switzerland, February 2005.

- Deposition on behalf of Gallo, in E.& J. Gallo Winery v. Encana Corporation Case No. CV F 03-5412 AWI (LJO), July 2005, San Francisco, regarding the California gas market.
- Testimony on behalf of the Trans-Asiatic Oil Company (majority ownership by the Government of Israel) in its dispute with the National Iranian Oil Company (owned by the Government of Iran), concerning the calculation of damages associated with contract default. Testimony in Zurich, Switzerland, May 24-25, 2006.

### 1.4 Reservations

This report is based on the information available to me at the time of preparation. I reserve the right to revise my opinions in light of new data or information. In this instance, such a reservation is particularly important, because SCE has yet to provide any details on how they calculated damages. If I have misinterpreted their methodology, elements of this report will have to be changed.

## 2. Summary of findings

SCE claims a total of nearly $32 million in damages. That figure, derived by Dr. Edward Kahn (using Hourly Zonal Prices from the CalPX), is based upon a value for capacity and energy that would have been delivered by BPA ($50,582,069), less cost ($18,987,634). Dr. Kahn's approach misapplies CalPX data to a contract executed a decade before the exchange was created, when the market structure was quite different. By the time of the alleged default in May 2000, the structure of the Western power market had evolved from cost-based trade between utilities to a multi-participant market, including independent marketers, futures exchanges, and independent generators, with market-based prices. Furthermore, contracts had shifted from separate capacity and energy components to a simplified system where both were rolled into a single price per MWh.

By May of 2000, SCE had several options besides the hourly market to cover the volumes stipulated in the contract without incurring the prices calculated by Dr. Kahn. Although SCE was required to operate exclusively within the CalPX, it could have bought much cheaper forward contracts, or executed the BPA option while protesting the price.

The main problem with Dr. Kahn's approach is that he used prices for electricity that were calculated days, weeks, and months after the date of contract breach, which raises a variety of economic and legal concerns. The correct approach for calculating damages for breach of contract is to determine the current value of the right to future deliveries. This is the consensus among the law and economics community, ascribed by everyone from Judge Richard A. Posner to Professors Carlton and Fisher, and is the conventional standard for commodity trading.

Had SCE simply bought peak-hour forward contracts at the date of default for the months of the BPA contract, there would have been little or no damages. BPA cannot be responsible for the fact that SCE chose to take a chance with the vagaries of the spot power market when it did not have to do so.

### 3. SCE's damage claim

SCE claims a total of nearly $32 million in damages. According to their complaint filed on December 30, 2003: "damages represent the total value ($50,582,069) that SCE should have received for energy that would have been delivered had BPA not breached the contract, less the cost ($18,987,634) that SCE would have incurred for returning the energy or paying for it at the proper contract rate." (Complaint, p. 9).

SCE's expert, Dr. Edward Kahn, elaborates to some extent, explaining that his analysis relies on public data taken from the records of the CalPX from June through October 2000. Specifically, he gathered hourly price data from three pricing points

within the operating area of the California Independent System Operator (CAISO). Two of those points are on the Oregon border – COB (California-Oregon Border, also known as NW1) and NOB (Nevada-Oregon Border, also known as NW3). These points represent the historic demarcation of ownership change as power passes between the Pacific Northwest system and California utilities. The third pricing point is known as SP-15 (South of Path 15). The CAISO grid had 24 pricing zones, but the two most important were NP-15 (essentially the service territory of PG&E) and SP-15 (the service territory of SCE and SDG&E). These three pricing points are cited in the SCE-BPA contract, although operations and nomenclature are different under the deregulated electricity market.

Dr. Kahn valued "the energy SCE would have received at the PX Hourly Zonal price for NOB. Return energy is valued at the PX Hourly Zonal price for SP15." (Kahn ¶ 9). In a footnote, Dr. Kahn also explained that he used PX Hourly prices for COB for four days when NOB prices were missing. In short, Dr. Kahn relied on the CalPX's hourly spot market for electricity to determine the value of energy SCE would have received. As will be explained, such a valuation is not appropriate in the event of contract breach.

## 4. Key differences between the power market in 1988 and 2000

### 4.1 The benefits of regional exchange

Before turning to a critique of Dr. Kahn's damage calculation, it is useful to provide a brief sketch of the enormous changes that occurred in the Western electricity market between 1988 and 2000.

The Pacific Northwest hydroelectric system normally provides surplus power to California in the late spring and early summer from mountain snowmelt. On the other hand, peak power demand in the Northwest normally occurs in winter months, because electricity is used extensively for space heating in the region. In contrast,

Southern California has mild winters and its peak electricity demand occurs in the summer. The benefits of seasonal exchange between the two regions were huge, which is why the Pacific DC Intertie was built.

### 4.2 The creation of the Western System Power Pool (WSPP)

Initially, FERC approved such regional exchanges on a cost-sharing basis. Success in natural gas market liberalization, however, encouraged FERC to experiment with market-based pricing in the power market. The experiment began in the Western market in 1987 with the creation of the WSPP. The experiment was a success and within a decade, trade had greatly expanded, marketers were allowed to participate, and new arrangements to manage price risk, such as the New York Mercantile Exchange (NYMEX) electricity contracts, were created. In this new environment, the twenty-year exchange contract between SCE and BPA was an artifact of a bygone era.

Under the WSPP, trade evolved to create a set of standardized products and a standardized contract. The products broke into a 16-hour on-peak block of power and an 8-hour off-peak block. On-peak power was delivered six days a week between 6 AM and 10 PM. Off-peak power was delivered in the remaining hours and all day on Sundays and holidays. The WSPP contract was widely used as a generic envelope and deals were summarized in a single "confirmation" page.

In the WSPP block trading, as in the California system that was to follow, the separate pricing of "capacity" and "energy" sales largely disappeared. Instead, each block had a single price, per MWh, which encompassed both aspects.

### 4.3 California carves up the market

The deregulation of the California power industry, however, disrupted the fluid trading of the WSPP. The three largest private utilities in the state, Pacific Gas &

Electric (PG&E), San Diego Gas & Electric (SDG&E), and SCE, were required to divest a large portion of their generation assets. Furthermore, after considerable debate, California rejected the WSPP bilateral trade model in favor of an hourly day-ahead auction through a centralized exchange: the CalPX. To ensure the exchange's success, PG&E, SDG&E, and SCE were required to bid their hourly generation into the auction and to purchase all their power to meet load through the CalPX. Existing purchase contracts were treated like each company's own generation.

### 5. Pertinent elements of the CalPX market in 2000

The CalPX was modeled on established power exchanges in the United Kingdom and Scandinavia. Bidding began on March 31, 1998 and the exchange operated successfully until the California energy crisis of 2000-2001.

The California deregulation scheme had a number of key flaws, which have been detailed in a variety of analytical papers and will not be repeated here. There was, however, one significant flaw in CalPX's design that is highly relevant to this dispute. As explained, the CalPX auction was hourly, while most WSPP trading occurred in on-peak and off-peak blocks. Moreover, the auction occurred once a day, every day, one day ahead of delivery. In the initial design, SCE, PG&E, and SDG&E, as utilities regulated by the California Public Utility Commission (CPUC), had no way to manage the risk of price spikes – they would be victims of daily price fluctuations. In contrast, WSPP traders could enter into long-term contracts and could hedge daily price volatility using the NYMEX futures contract or "over-the-counter" (OTC) deals with financial and energy institutions.

CalPX's managers understood the flaws in the trading scheme and were determined to correct it by introducing the block forward market. The CalPX created a set of standardized "contracts for difference," which allowed the utilities to continue purchasing through the CalPX and, at the same time, hedge the price. The CPUC

ratified the scheme and trading in forward contracts began in July 1999. It is not necessary to detail the mechanics of how the contracts worked. Suffice to say that they were, in effect, long-term purchase contracts for the utilities. They could fix a volume of electricity and price for the coming months and quarters, rather than rely on the daily fluctuating price in the CalPX.

## 6. The correct way to value contract breach

There is a large array of legal and economic literature related to damage calculations in the event of contract breach. The fundamental point made by all is that damages are to be calculated on the date of default. The value of the commodity or service at a later date is irrelevant. The issue is not how much the commodity will cost in the future; it is how much will it cost today to secure deliveries in the future.

No less an authority than Judge Richard A. Posner frames the issue this way:

> Now for a problem in buyers' damages. A contracts with B to sell 1,000 widgets for delivery on January 11, 1996 at a price of $1 per widget. On July 11, 1995, A tells B that he is not going to be able to sell him widgets…On breach day the price of widgets is $2. B could go into the market and "cover" by signing another forward contract (i.e., a contract for future delivery – on January 11, 1996) for 1,000 widgets and then his damages would be $1,000 assuming the current and forward prices are the same, $2 on the date of cover. Instead, B waits till January 11 and on that day buys 1,000 widgets for immediate delivery at the then price of $3 per widget, thereby losing $2,000. Should he be able to collect the larger loss? He should not (the answer in economics and also in law). For suppose the market price had fallen between July and January below the contract price, say to 50¢. Then B would have had a gain from waiting that would not be credited to A. Allowing B to wait enables him to gamble at no risk to himself. (Posner, p. 139)

Judge Posner's clear example follows earlier economic analysis of Professors Dennis Carlton and Franklin Fisher. (Carlton 1984, Fisher and Romaine 1990).

The idea that a stream of future deliveries of a commodity should be valued on the day of contract breach and not on the dates on which the commodity is supposed to be delivered is a widely accepted principal of financial accounting and commodity trading. The International Swaps and Derivatives Association (ISDA) includes in its contract prototype the definition and measurement of the

"Close-out Amount," in the event of contract termination. "Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable." (ISDA, p. 23)

Admittedly, estimating the fair value of a complex electricity capacity option is a difficult task, but that does not relieve the aggrieved party from the obligation. The Financial Accounting Standards Board (FASB) puts it this way: "the fair value of a financial instrument [contract] is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale." (FASB, p. 2). "For financial instruments that do not trade regularly, or that trade only in principal-to-principal markets, an entity should provide its best estimate of fair value." (FASB, p. 8).

In the event of contract breach, the buyer is obligated to cover the contract with a forward purchase of a similar or identical commodity on the date of breach. Even if the buyer takes no action, damages are to be calculated as of that date of default, using appropriate forward prices and other reliable information. In May of 2000, no one could guess that the California electricity and gas markets would spin out of control for fourteen months. Thus, spot prices from the CalPX during the summer of 2000 are inappropriate for a damage estimate.

## 7. Valuation of the BPA-SCE capacity option

### 7.1 Contract obligations

Because the market structure had changed, SCE's expert bundled energy and capacity, valuing BPA's obligation in dollars per MWh. I will do the same.

During the five-month period from June 1 through October 31 there were 153 days, slightly less than twenty-two weeks. The period contained 22 Sundays and 2 holidays, which, along with hours from 10 PM at night until 6 AM the next morning every day, are considered the off-peak period. Remaining hours, 6 AM until 10 PM Monday through Saturday (excluding holidays) are classified as peak.

Section 12A, pages 52-53 of the SCE-BPA contract specifies that: "Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a)." Section 7(a) (pages 23-24) states: "Peaking Energy shall be delivered pursuant to the scheduling provision of section 8 (b), in daily amounts, Monday through Saturday, including holidays, up to 10 MWh per MW of firm peaking capacity, and in Calendar Week amounts up to 50 MWh per MW of firm peaking capacity." I interpret this to mean that if SCE chose to exercise the full capacity option, BPA would be required to provide 2,500 MWh of power per day to a maximum of 12,500 MWh of power per week during peak hours. During the 5-month period (21 weeks and six days), this would amount to about 275,000 MWh.

According to Dr. Kahn, SCE should have received $50,582,069 in value for the energy that would have been delivered, valued at the PX Hourly Zonal price. This works out to an average of $183.93 per MWh. Dr. Kahn's calculation, however, is based on spot prices – prices that were determined days, weeks, and months after the date of default. Whether or not his numerical calculations are correct, he has asked the wrong question. If damages are to be calculated correctly, the value of the energy must be based on forward prices determined on the day of default.

### 7.2 SCE's participation in the CalPX Block Forward Market

As noted, a key element of the California deregulation plan was mandatory buying and selling in the CalPX. This meant that SCE had to schedule its generation and load through the CalPX, but it did not mean it always had to pay the PX Hourly Zonal price. In May of 2000, SCE had the option to purchase power in the CalPX's block forward market, where (as it turned out) prices were much lower.

SCE was quite familiar with the CalPX's forward market and how it worked. In fact, it was the largest participant. According to my records from the CalPX, 22.8 million MWh were traded in the forward market from its inception in July 1999 through September 2000. During that period, SCE bought 12.4 million MWh, or 54% of the total trade. (For details see Exhibit B).

As established earlier, SCE had an obligation to "cover" the alleged default, when it occurred or as soon as practical thereafter, which I assume to be May 22, 2000. If SCE had properly covered the contract on or near this date, it would have paid significantly less than what it now claims.

Table 7.1
Comparison of On-Peak Power Costs in the CalPX

| | MWh Volume | Average Price per MWh | Value | SCE's Claimed Cost | Net Damages |
|---|---|---|---|---|---|
| SCE's Claim | 275,000 | $184 | $50,582,069 | $18,987,634 | $31,594,435 |
| Estimated CalPX 5-Month Forward Cost for SP-15 on-peak power | 275,000 | $83 | $22,825,000 | $18,987,634 | $3,837,366 |

Table 7.1 summarizes and compares the results. There are some differences between the estimated CalPX costs in this table and SCE's claim that require elaboration. BPA was to deliver the power at NOB. The CalPX did not have a forward delivery point for NOB, so I have used SP-15 instead. Most of the time prices at NOB and SP-15 were comparable. In any case, delivery at SP-15 advantages SCE, since it is the zone in which the power will be consumed. If SCE had purchased the power from BPA it would have had to schedule the supply at NOB and then re-schedule its purchases at SP-15, paying CAISO fees for both transactions.

According to contemporary records, there were no trades of CalPX forward power the week of May 22 that match exactly the five-month package SCE should have bought. CalPX power was sold in monthly packages for immediately forthcoming months and then in quarterly or annual packages for far-forward purchases. In other words, SCE could have bought power for peak delivery in June, the third quarter, and the fourth quarter, overlapping the BPA contract months. In addition, there were no trades of SP-15 power of any type during the fourth week in May 2000, so value must be inferred from other sources.

Fortunately, the CalPX is not the only source of price information. During this period, NYMEX also actively traded futures contracts for on-peak power. Prices are available for power delivered at the California-Arizona border (Palo Verde) for four business days of the crucial week in May. NYMEX's forward prices are available for June, July, August, September, and October, so an average for a five-month block during the week of May 22, 2000 can be easily calculated and averages just over $82 per MWh. Power prices at Palo Verde were nearly identical to prices at SP-15 during this period, so NYMEX's prices represent an accurate estimate of what SCE would have had to pay for five months of peak power at SP-15. To give SCE the benefit of doubt, I have rounded the expected cost of 5 months of SP-15 forward peak power to $83 per MWh. This is the basis for the estimate in Table 7.1.

SCE would undoubtedly point out that the peak hours in the CalPX forward market and those in the BPA contract were not identical. That is, under the SCE-BPA capacity option arrangement, SCE could only take power during ten hours, not sixteen. Since not all hours are valued the same, SCE would most likely have taken power at the peak of the peak. Indeed, this seems to be the methodology employed by Dr. Kahn. His estimate of the cost of CalPX spot power averaged more than the full 16-hour peak period average. This does not, however, mean that SCE could not have covered its position using the CalPX forward market. To do so, it would have had to purchase ten contracts of 25 MW each for the sixteen-hour peak over the five months. The less valuable hours could then be resold on the CalPX spot market. If they sold for less than the average forward price, the difference could be charged to BPA. If they sold for more, BPA should get a credit. I have completed this calculation in Table 7.2.

Table 7.2
Calculation of SCE Net Covered Position

| | MWh Volume | Average Price per MWh | Value | SCE's Claimed Cost | Net Damages |
|---|---|---|---|---|---|
| Peak Hours over period | 516,000 | $149.65 | $77,218,500 | | |
| SCE's Claim | (275,000) | $183.93 | ($50,582,069) | $18,987,634 | $31,594,435 |
| Unclaimed Hours | 241,000 | $110.52 | $26,636,431 | | |
| Estimated SP-15 Cost | 516,000 | $83.00 | $42,828,000 | | |
| Less "resold" hours | (241,000) | $110.52 | ($26,636,431) | | |
| Net Cost to SCE | 275,000 | | $16,191,569 | $18,987,634 | ($2,796,065) |

There are a many nuances to the calculations presented in Tables 7.1 and 7.2. I have, for example, not included CalPX fees or CAISO fees. I was unable to do so at this time, because I do not have details on how Dr. Kahn made his calculation. These possible adjustments do not, however, prevent me from reaching a firm conclusion: Had SCE covered its position on or near May 22, 2000, there would have been no

damages attributable to BPA, or they would have been negligible. BPA cannot be responsible for the fact that SCE chose to take a chance with the vagaries of the spot power market when it did not have to do so.

## 8. Conclusion

There are other ways to view the SCE claim. Most contract defaults are straightforward: the supplier simply doesn't deliver the commodity. This dispute was more complicated: BPA was willing to deliver the commodity. (In fact, BPA's records indicate that SCE bought power at NOB in quantities comparable to the contract volumes and that BPA was the largest seller at that delivery point.) The dispute was not about electricity deliveries; it was about the price.

There was nothing to have prevented SCE from exercising the option while protesting the price. Had they done so, damages would have been significantly less than the $32 million claimed. SCE made the risky decision to rely on the spot market and the consequences of that choice should not be the responsibility of the Bonneville Power Administration.

Samuel A. Van Vactor, Ph.D.
Portland, Oregon
August 11, 2006

**References**

Carlton, Dennis W., "Futures Markets: Their purpose, Their History, Their Growth, Their Successes and Failures," *Journal of Futures Markets*, p. 237, 1984.

FASB, "Statement of Financial Accounting Standards, No. 107, Disclosures about Fair Value of Financial Instruments"

Fisher , Franklin M. and Romaine, R. Craig, "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting and Auditing*, Winter/Spring 1990, p. 145.

ISAD, "2002 Master Agreement."

Posner, Richard A., *Economic Analysis of Law*, fifth edition, Aspen Law and Business, 1998.

# EXHIBIT B

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

| | | |
|---|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, Plaintiff, | ) | |
| vs. | ) | No. 03-2869C |
| UNITED STATES, Defendants. | ) | |

DEPOSITION OF SAMUEL A. VAN VACTOR

Los Angeles, California

Thursday, September 28, 2006

Reported by:

SHERRYL DOBSON, RPR

CSR No. 5713

JOB No. 920216

If you need a break at any time, let me know. We're happy to take a -- and we take a break, typically, on the hour, but that's not soon enough, tell me, and we'll take a break.

A Yes.

Q Okay?

Any reason we shouldn't be taking your deposition this morning?

A None that I can think of.

Q You haven't had any medications that, to your understanding, might affect your ability to answer questions?

A No.

Q Okay. And as I understand your -- the basis of your opinion, it's that the damages should have been computed on -- based on forward market prices; is that right?

A Yes.

Q Okay. And that's what you think -- you think that when Edison learned that Bonneville was not going to be supplying power, it should have gone into the forward market and purchased contracts to cover what Bonneville wasn't going to provide?

A Edison should have made best efforts to cover the contract with devices that were available to them at

that time, yes.

Q By that you mean forward contracts?

A Right. There would have been a variety of options, but the primary one at the time was the block-forward market of the PX.

Q Other than the block-forward market, what options were available?

A For Southern California Edison, it would be limited, because under California regulation, it was my understanding they had to purchase exclusively from the PX in one form or another.

Q Okay. So the only thing that they could have done was either buy in the PX market, so the day-ahead market, the day-of market, they could buy in the ISO real-time market, or buy in the block-forward market, which is a PX market?

A That's correct. And with regard to the ISO market, that's essentially a default market. Not having covered yourself elsewhere, if you are still net-deficit, then the ISO would buy on your behalf and charge you whatever the cost was.

Q Correct.

A Basically.

Q Let me mark as Exhibit 1 in your deposition your report.

And -- but it had to buy 516,000 megawatts to do that?

A To ensure that it covered each and every one of those 10-hour, 50 hours per week period of those higher valued hours that were inherent in the BPA contract, yes. Then they would have fully covered. They would have guaranteed that each of those hours were covered.

And possibly, if the market had been poor, they would have taken a loss on those extra hours, and that would have been something they could have charged to BPA.

Q Okay. And I guess that's my question to you.

The scenario that you're positing here says that Edison should have covered by purchasing this -- almost twice as much as what it needed, and then it would have had a surplus of power, which it could have, in your view, sold off at a certain price? Is that correct?

A That's a possibility. But I would say that the proper way to value this would be to put an estimate on those higher peak hours. If you go back to Table 7 --

Q Let me just stick with this table for a second. I'm just trying to understand what you think Edison should have done.

And as I understand this table, Edison should

Q Okay. Just to be clear, if the number that is presently hundred and 10 dollars and 52 cents is less, that would increase Edison's damages, correct? Under your analysis.
A Regarding this table, yes --
Q Yes.
A -- it is arithmetically true that the lower that number, the greater would be the damages calculated in this table.
Q Okay. So it would have been consistent to use forward prices throughout this to calculate the 110, the number instead of the 110, correct?
A That would be a -- I think that's a logically-consistent approach. I don't disagree with that approach, yes.
Q Okay. And you knew that at the time? I mean, you knew that a logically-consistent approach when you did this would have been to use a forward price for this number?
A Well, you know, essentially, what you're saying is the -- on the one hand, we'll go in and we'll over-purchase more than we need in order to be sure we've got the ten hours, and then we'll sell those unclaimed hours forward to net it out to find out what our true damages is.

And I would say yes, I would agree that that methodology is consistent with the theory that I proposed. Of course, the unknown is we have no way of knowing what those unclaimed hours would sell for in the forward market.

Q But we have a way of estimating what it would be?

A It might have been done, yes. With better and more information.

Q Would that have been public information?

A A methodology that I would propose at this time or would have done at that time would be to look at, historically, what the relationship between the prices were if, for example, you sort out the specific -- if you take the entire array of a couple years of Cal PX data and you look at the ten most valuable hours during these five months and then you look at the remaining hours in the 16 by 6 block and see what kind of price differential in there, that would give you a relative sense of the relative values.

And if, for example, it worked out that the super-peak hours -- let's call them that for the moment -- were, say, $5 more valuable than the on-peak hours, that would give you an absolute figure between the two, and if you wanted to take a percentage to perhaps be

Q And is there a way do this in a non-ex-post way?

A Yes. In the manner that I described.

Q And the reason you didn't do that at the time?

A Well, there were two reasons. One was that it was more speculative, and I did want to keep it concrete. I wanted to illustrate the issues here. The second reason was time. It would have taken considerable amount of time to go through and do a reliable analysis of historical prices and the relationship during those various hours.

Q And don't you agree that would have been a more accurate way of doing it, doing your analysis?

A Either methodology is inherently speculative, and there is speculation involved in this.

I think today if I were to do this table, given the knowledge that I have, based upon the new report by Dr. Kahn and others, I would proceed in the manner that we've talked about. And I would attempt to do an estimate, and that would probably be a better -- a better -- totally consistent valuation of how you might proceed on the basis of trying to sort out how much -- remember, the fundamental issue here is how much more valuable are those super-peak hours out of the 6 by 16 than the $83 that I used.

Q Okay.

A Yes.

Q Now, in Table 7.2 I think we've agreed or you've agreed that a consistent way to do this would be on a forward basis for the resold hours, correct?

A I wouldn't disagree with that, right. You know, not -- I haven't run the numbers. I don't know how it would work out, and I'm not entirely sure at this point in time what methodology I would employ were I to do that. But I would agree that the resold hours in a forward contract are going to be less than a hundred and 10 dollars per megawatt hour.

Q Okay. And in fact, they'd be lower than $83 an hour?

A I would -- I would be reasonably certain that they would be lower than $83. Unless we got some very unusual pricing.

Q Okay. And you just don't know how much lower they would be --

A No.

Q -- at this point?

A Don't know today.

Q And you would agree that that would lower the damage amount, correct?

A It would --

Q Raise, I'm sorry.
A It would increase --
Q Increase, thank you.
A -- SCE's damage amount.
Q Thank you.
A Yes.
Q And you haven't done that calculation, as you've said?
A I have not done that.
Q Okay. So the calculation in Table 7.2 is not just a true forward calculation?
A As we have discussed, as Dr. Kahn pointed out, it has an inconsistency in it, yes.
Q So it's the case, then, that even under your theory, this isn't an accurate way to measure SCE's damages?
A Well, I would refer you back to Table 7.1, which is where -- in 7.1 we simply valued the -- what I thought at the time was 275,000 megawatt hours. We simply valued it at the $83 per megawatt hour. And I'm explaining today and would agree today that that figure $83 ought to probably be adjusted up somewhat to reflect the -- a super-peak value. But that's fundamentally how you'd go about it.
And you could --

Q Okay. So this calculation which is consistent reflects a situation that SCE couldn't have done?
A They couldn't have done this, but they could have done what's in Table 7.2.
Q Which is --
A That's entirely feasible.
Q It's feasible, but that's not a consistent calculation?
A It's -- the methodology uses a mix of forward prices and spot prices. But it is feasible for SCE to do that.
Q So is there any place in your report where you have an accurate forward analysis of Edison's damages?
A I think that the point is that it was the obligation of SCE to estimate what its damages would have been on the day of default. And that's not the methodology that they used.
Now, I think, in cooperation with SCE, working on what was going on and the information that they have, we could come to a pretty precise and accurate estimate. But I didn't make a hard-and-fast conclusion with regard to what the damages were. I sim -- my primary point is that the calculation that was done by SCE is incorrect.
Q Okay. But you don't have in here an actual calculation of SCE's damages?

And let me once again state the purpose was not to come up with an alternative damage number, per se. The purpose was to demonstrate that the calculations made by SCE and Dr. Kahn are inappropriate, in terms of evaluating damages.

Q Okay. So when you have net damages of minus $2.796 million, that's really not intended to be net damages; is that right?

A Well, one advantage of Table 7.2, as we have discussed, is even though it has an inconsistent methodology, it was a feasible alternative. This is something SCE could have done. And had they done this, there would have been no damages at all.

Q Yes, but you would have put Edison in the position of buying 241,000 megawatt hours of power, which it then would have had to sell off at some point, not knowing what the price would have been?

A That's correct. And then they might have had a legitimate claim against BPA if they had taken a loss.

Q So as we sit here today, you have no opinion as to Edison's actual damages?

A As of today, I have not done a precise calculation of what Edison's damages were, nor have I been necessarily asked to.

Q Well, I understand that you might not have

It's a dispute about, theoretically, how you go about doing a valuation of this type.

MR. SIEGAL: I'd like to take a break for a minute or two, okay?

MR. HOCKEY: Sure.

(Brief recess taken.)

BY MR. SIEGAL:

Q Dr. Van Vactor, could you -- on this one if you could just give me a yes or no answer.

This report is not a calculation of what Edison's actual damages were; is that correct?

A Well, I'm not going to go precisely there, because I did do damage calculations. But what -- and the problem we're both having is the difference between what is a reasonable estimate of what the damages were as compared to what was feasible, given the estimates, Edison's constraints, and the like.

And yes, I did do damage calculations. They were to demonstrate that if you were to use the methodology I proposed, the damages would be significantly less than what is claimed.

Q But in this report -- again, appreciate it if you'd just say yes or no -- there is not a calculation of what Edison's damages -- the damages Edison actually suffered were; isn't that correct?

A There is not a damage calculation in this report that I would stand by and say, this is a completely and totally fair estimate of what the damages should have been. It's not precisely that. It's a little bit --

Q Thank you.

A -- like a range on one side and a range on the other.

Q Thank you.

We've talked a bit about, in the famous Figure 7.2, the estimate of the cost, the $18.9 million. And putting aside its -- well, is it possible to estimate that number on a forward basis? And by that number I mean the amount of the value of the off-peak hours that Edison returned.

A That's not the appropriate question.

Q I'm sorry, but that's the question I asked. I know you can tell me the appropriate question, but I'd like to talk about the question I asked.

A I know. It's a terrible temptation I have to reverse the table.

Q So let's keep the table going the same direction.

A Okay.

Q You want to have the question read back to

Q Okay. You keep saying that.

But your assumption is that SCE had to buy the power in the -- the peak power at the time it bought it, right? You've said that you're assuming they bought the power to cover their net deficit.

A Well, I mean, SCE had to buy power, yes. I mean, there's no question about that. But they didn't have to pay the price they paid. They could have paid a much lower price, had they selected a different type of product.

Q But SCE knew that it would have to buy the power -- and SCE would have to buy that power in the time period that it bought it, and it wasn't as if it were speculating and saying -- well.

You referred to -- strike that.

You say SCE -- well, strike that.

Do you know what reasoning SCE went through on or about May 22nd, when it decided -- or if it decided not to buy power in the forward market?

A No, I don't.

Q Okay. And have you seen any documents that would show what SCE did at any time during this period in deciding whether or not to buy additional power in the forward market?

A The only documents I've seen I've included as

A Either option was available to them, yes.

Q And as you sit here today, you don't have any reason to say that SCE's decision to buy in the spot market was an unreasonable business decision?

A It was unreasonable with respect to covering BPA power, but it wasn't unreasonable with respect to covering their own purchases.

Q Okay. When you say covering BPA's power, when you say it's unreasonable, as I understand your position, because it was unfair to burden BPA with that decision; is that right?

A I said in my report, and I hope very clearly, that when a default occurs, that the future value of the contract, the forward value of the contract, needs to be valued on the day of the breach. And that's what I'm sticking forward.

So if you're saying that you're not valuing the contract on the day of the breach, you're valuing it over a five-month period with the spot market, and you're using the term "reasonable" -- which is not necessarily something economists use -- you know, I hope you appreciate that -- I can't agree. And so no matter how many times you ask, I'm not going to be able to agree the way it's being phrased.

Q Okay. Well, you say -- I mean, your position

is that the value of the contract has to be valued as of the day of the breach; is that correct?

A That's my view. That's my opinion.

Q All right. And that opinion is an opinion based on an economic theory?

A Yes.

Q And the articles that you quoted to us?

A Yes.

Q And as you say, you're not aware of articles that go the other way?

A I'm not.

Q Okay. And that view is not based, I take it, on your view of the legal situation? It's not a legal analysis?

A No, no. It's an economic efficiency analysis.

Q Okay. And you understand that on May 22nd, Edison had to make a decision one way or another as to what it was going to do?

A Yes.

Q Okay. And you're not testifying, as I understand it, that, from Edison's perspective, as a business decision, it was unreasonable to make the decision the way it did?

A That's a fair way to put it. I mean, I -- I'm not saying SCE was stupid or anything like that. That's

I, SAMUEL A. VAN VACTOR, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of ____________, _______, at _________________________, _______________.

_______________________________
SAMUEL A. VAN VACTOR

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: OCT 04 2006

Sherryl Dobson

SHERRYL DOBSON
CSR No. 5713

NOTICE OF FILING

I hereby certify that on October 26, 2006, a copy of the **PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS, DR. SAMUEL VAN VACTOR; DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also certify that, pursuant to General Order 2003-42, Paragraph I(5), I forwarded a courtesy copy of the Memorandum to the Court.

s/Joseph J. Ybarra