# APPENDIX

# Index To Appendix

| Description | Page(s) |
| --- | --- |
| Contract No. DE-MS79-88BP92275, between Bonneville Power Administration and Southern California Edison - Excerpts | 1-10 |
| Bonneville Power Administration's SP-87 Rate Schedule | 11-12 |
| Bonneville Power Administration's FPS-96 Rate Schedule | 13-18 |
| Bonneville Power Administration's FPS-96R Rate Schedule | 19-25 |

Contract No. DE-MS79-88BP92275

SALE AND EXCHANGE AGREEMENT

executed by the

UNITED STATES OF AMERICA

DEPARTMENT OF ENERGY

acting by and through the

BONNEVILLE POWER ADMINISTRATION

and

SOUTHERN CALIFORNIA EDISON COMPANY

Index to Sections


| Section | | Page |
|---|---|---|
| 1. | Term of Contract | 4 |
| 2. | Exhibits | 5 |
| 3. | Definitions | 5 |
| 4. | Point of Delivery | 10 |
| 5. | Amounts of Surplus Firm Power | 10 |
| 6. | Conversion to Capacity-Energy Exchange | 14 |
| 7. | Capacity-Energy Exchange | 23 |
| 8. | Scheduling Provisions | 32 |
| 9. | Payment and Rates | 37 |
| 10. | Transmission Limitations | 48 |
| 11. | Transmission for Other Arrangements | 50 |




EXHIBIT #1

(k) "Intertie" means the portion of the extra high voltage electric transmission system between California and the Pacific Northwest in which the Parties have an ownership or contractual interest. Said extra high voltage transmission consists, for the purpose of this Agreement, of two 500-kV AC lines extending from John Day Substation in Oregon to Vincent Substation in Southern California, a 1000-kV DC line extending from Celilo Substation in Oregon to Sylmar Substation in Southern California, two 220-kV AC lines between Vincent Substation and Sylmar Substation, and expansions, improvements, or additions thereto.

(l) "Option Capacity" means the capacity made available by Bonneville to Edison pursuant to section 12.

(m) "Option Energy" means the energy made available by Edison to Bonneville pursuant to section 12.

(n) "Peaking Energy" means the energy associated with the capacity made available by Bonneville to Edison pursuant to section 7(a) when all or a portion of the power sale has converted to an exchange pursuant to section 6.

(o) "Peaking Replacement Energy" means energy which Edison is obligated to deliver to Bonneville to replace the Peaking Energy supplied by Bonneville.

(d) Conversion During Last Year.

This Agreement shall convert from a surplus firm power sale to a seasonal capacity-energy exchange on July 1, 2008.

7. Capacity-Energy Exchange.

Upon conversion to an exchange, Bonneville shall make capacity available to Edison for the period June 1 through October 31 each year, except for periods of transition as provided in section 6. Edison shall be obligated to provide Peaking Replacement Energy to Bonneville as specified in section 7(b), unless Bonneville elects compensation as specified in section 7(f). In exchange for Bonneville making capacity available, Edison shall deliver Exchange Energy as specified in section 7(c), unless Bonneville elects compensation as specified in section 7(f). Edison shall also make available Supplemental Energy to Bonneville, as specified in section 7(d).

(a) Peaking Capacity and Energy.

During periods of complete or partial conversion to an exchange, Bonneville shall make available to Edison firm peaking capacity in any hour in an amount equal to the then-effective Contract Demand less the then-effective capacity made available to Edison under the power sale provisions hereunder. Peaking Energy shall be delivered pursuant to the scheduling provisions of section 8(b), in daily

amounts, Monday through Saturday, including holidays, up to 10 MWh per MW of firm peaking capacity, and in Calendar Week amounts up to 50 MWh per MW of firm peaking capacity.

(b) Peaking Replacement Energy.

Edison shall be obligated to deliver Peaking Replacement Energy to Bonneville for the amounts of Peaking Energy delivered to Edison, unless Bonneville elects other compensation pursuant to section 7(f).

Deliveries of Peaking Replacement Energy shall be made during hours as scheduled by Edison at up to 100 percent of the firm peaking capacity being provided as an exchange, subject to Bonneville's right to limit such return deliveries to not less than 60 percent of the firm peaking capacity being provided as an exchange on any such hour except that Bonneville may not, unless agreed by Edison, restrict return deliveries during more than 60 hours for any period from the hour ending 0800 Monday to the following Monday at the hour ending 0800. The Parties shall endeavor to accomplish return deliveries at the first available opportunity.

To the extent Bonneville is not exercising its right to limit return deliveries, Edison shall return at rates up to 100 percent and make return deliveries within 24 hours.

To the extent Bonneville restricts return deliveries to less than 100 percent on any hour, the restricted quantity of Peaking Replacement Energy may either be returned by Edison on hours other than the hours described below or be returned on the next available return hour on which Bonneville can accept Peaking Replacement Energy; provided, however, that Bonneville is not obligated to accept Peaking Replacement Energy on any return hour above a level equivalent to 60 percent of the firm peaking capacity being provided under the exchange.

Edison shall deliver all Peaking Replacement Energy by the hour ending 0800 on Monday for the week beginning the previous Monday at the hour beginning 0800 during which capacity was made available by Bonneville. The hours for these return deliveries are as follows:

(1) hour beginning 2200 on Monday to hour ending 0800 on Tuesday
(2) hour beginning 2200 on Tuesday to hour ending 0800 on Wednesday
(3) hour beginning 2200 on Wednesday to hour ending 0800 on Thursday
(4) hour beginning 2200 on Thursday to hour ending 0800 on Friday
(5) hour beginning 2100 on Friday to hour ending 0900 on Saturday
(6) hour beginning 2100 on Saturday to hour ending 0900 on Sunday
(7) hour beginning 2100 on Sunday to hour ending 0800 on Monday

If Edison desires to extend the hours for return delivery, Bonneville shall accept deliveries during additional hours prior to the hour ending 0800 on Monday, except that Bonneville shall have the right to

restrict the level of deliveries on any return hours to no less than 60 percent of the firm peaking capacity being provided under the exchange.

The Parties' schedulers or dispatchers may agree to hours other than the above or delay the return beyond the hour ending 0800 Monday following the week of delivery of the Peaking Energy by Bonneville.

(c) Exchange Energy.

During periods of complete or partial conversion to an exchange, Edison shall deliver Exchange Energy to Bonneville in exchange for Bonneville's obligation to make capacity available during the preceding June through October. Edison shall deliver each year's total amount of Exchange Energy in equal weekly amounts, or pro rata portions thereof, during the period November 16 through March 31 in accordance with schedules established by Edison pursuant to section 8(b). The total amount of Exchange Energy to be delivered during said period shall be determined by a ratio of kilowatthours for each kilowatt of Contract Demand associated with the exchange. Such total amount shall be proportionately reduced for any portion of the June through October period during which the power sale is in effect. The amount of this ratio for each year is set forth in Exhibit D.

during June through September in exchange for delivery of 80 MW to WWP during December through February.

12. Option Capacity and Option Energy.

Bonneville shall have the obligation to provide Option Capacity to Edison and Edison shall have the obligation to provide Option Energy to Bonneville.

(a) Option Capacity.

Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a). For any year in which such capacity is requested, Bonneville shall make Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity.

(1) Edison shall schedule the energy associated with this Option Capacity and the return of such energy in accordance with the scheduling provisions for Peaking Energy and Peaking Replacement Energy, respectively, pursuant to section 8(b).

(2) Unless otherwise agreed by the Authorized Represen- tatives, Edison shall provide Bonneville with 1-month's written notice for the Option Capacity.

(3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate specified in section 9(c)(1). If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).

(4) Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized Representatives may agree upon another applicable rate schedule.

(b) Option Energy.

Upon Bonneville's request, and in addition to other obligations under this Agreement, Edison shall provide Option Energy to Bonneville during a period of 13-calendar weeks, or less, depending upon the amount requested by Bonneville, ending no later than April 15 each year. The amount of Option Energy available shall be a maximum of 48,000 MWh each calendar week up to a maximum of 624,000 MWh each Delivery Year.

(1) Bonneville shall provide Edison with at least 8-weeks' preliminary written notice prior to the start of each week's deliveries.

13. Restriction of Deliveries.

Pursuant to Public Law No. 88-552, Bonneville shall have the right to restrict all or a portion of the capacity and the energy associated with the power sale if such capacity or energy is needed to meet the capacity or Energy Requirements of Any Pacific Northwest Customer, as the case may be, consistent with Public Law No. 88-552 and Public Law No. 96-501. Such restrictions to Edison shall be limited to the amounts and duration necessary to cover the projected Northwest needs in specific months. The sale of capacity and energy to Edison under this Agreement shall continue in months during which such capacity and energy is not needed in the Northwest.

During any period that Bonneville restricts the delivery of energy as provided above, Bonneville shall make capacity available to Edison at the Contract Demand or the pro rata amount of Contract Demand in the event of a partial restriction of energy. Prior to the effective date of the restriction, Edison shall give notice to Bonneville of the amount of capacity it desires for the anticipated duration of the restriction. Terms for the delivery of such capacity and the proportionate amount of the exchange ratio, and for the delivery of Peaking Replacement Energy and Exchange Energy, shall be as provided in section 7, except that deliveries of Exchange Energy shall be made on a weekly basis during the period capacity is delivered to Edison.

Edison shall not use energy delivered under this Agreement to serve any load such that restriction on a 60-day notice would adversely impact the reliability of service to its customers, and Edison hereby acknowledges full responsibility if such adverse impact occurs.

(c) Nothing contained in this contract shall, in any manner, be construed to abridge, limit, or deprive any party hereto of any means of enforcing any remedy, either at law or in equity, for the breach of any of the provisions of this contract which it would otherwise have.

IN REFERENCE TO RATES

3. Equitable Adjustment of Rates.

Unless otherwise specifically provided for in the contract:

(a) The Contractor shall pay Bonneville for the electric power, capacity or energy made available under this contract at the rates specified in the contract.

(b) To the extent the contract references Bonneville rates or rate schedules of general applicability for purposes of payment for electric power, capacity or energy made available, the following provisions apply:

(1) Bonneville shall establish and periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.

(2) As used in this section, the words "Rate Adjustment Date" mean any date as specified by Bonneville in a notice of intent to file revised rates as published in the Federal Register; provided, however, that such date shall not occur sooner than (A) 9 months from the date that such notice of intent is published; or (B) 12 months from any previous Rate Adjustment Date. By giving written notice to the purchaser 45 days prior to such Rate Adjustment Date, Bonneville may delay such Rate Adjustment Date for up to 90 days if Bonneville determines either that the revenue level of the proposed rates differs by more than 5 percent from the revenue requirements indicated by most recent repayment studies entered in the hearings record or that external events beyond Bonneville's control will prevent Bonneville from meeting such Rate Adjustment Date. Bonneville may cancel a notice of intent to file revised rates at any time (A) by written notice to the Purchaser; or (B) by publishing in the Federal Register a new notice of intent to file revised rates which specifically cancels a previous notice.

(3) The purchaser shall pay Bonneville for the electric power, capacity or energy made available under this contract during the period commencing on each Rate Adjustment Date and ending at the beginning of the next Rate Adjustment Date at the rate specified in any rate schedule available at the beginning of such period for service of the class, quality, and type provided for in this contract, and in accordance with the terms thereof, and of the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule. New rates shall not be effective on any Rate Adjustment Date unless they have been approved on a final or interim basis by a governmental agency designated by law to approve Bonneville rates. Rates shall be applied in accordance with the terms thereof, the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule and the terms of this contract.

# 1987 Wholesale Power Rate Schedules

## and General Rate Schedule Provisions

EXHIBIT
#4

Bonneville
POWER ADMINISTRATION

# SHORT-TERM SURPLUS FIRM POWER RATE

## SECTION I. AVAILABILITY

This rate schedule is available for the purchase of Surplus Firm Power for the period ending September 30, 1992, including purchases under the Western Systems Power Pool (WSPP) agreements. BPA is not obligated to make power or energy available under this rate schedule if such power or energy would displace sales under the IP-87, VI-87, PF-87, or NR-87 rate schedules. Schedule SP-87 supersedes schedule SP-85 and associated GRSPs, except in the case of contracts for sales under schedule SP-85 which become effective on or before September 30, 1987. Sales under this schedule are made subject to BPA's General Rate Schedule Provisions.

## SECTION II. RATE

### A. Contract Rate

#### 1. Demand Charge

a. For contracts that specify 12 months of service per year, $51.48 per kilowatt per year of Contract Demand billed monthly at the rate of $4.29 per kilowatt of Contract Demand occurring during all Peak Period hours in each billing month.

b. For contracts that specify service for fewer than 12 months per year, the monthly demand charge shall be assessed only for the specified service months at the rate of $4.29 per kilowatt of Billing Demand occurring during the Peak Period plus:

$$\frac{\$4.29\ (12 - \text{specified service months})\ .25}{\text{specified service months}}$$

c. No demand charge during Offpeak Period hours

#### 2. Energy Charge

24.3 mills per kilowatthour of Billing Energy.

### B. Flexible Rate

Energy charges or demand and energy charges may be specified at a higher or lower average rate as mutually agreed by BPA and the purchaser. In no case shall the rate exceed 100 percent of the fixed and variable unit costs of generation and transmission of BPA's highest cost resource including exchange resources. No resource cost determination is needed for sales at less than or equal to the Contract rate.

### C. Intertie Charge

Rates in sections II.A and II.B that equal or exceed the Contract rate shall be increased by the following charges for transactions over the Pacific Northwest-Pacific Southwest Intertie.

1. $.36 per kilowatt per month of billing demand and
2. 0.69 mills per kilowatthour of billing energy.

Rates in section II.B having an energy-only charge that equals or exceeds 30.2 mills per kilowatthour shall be increased by 1.4 mills per kilowatthour for transactions over the Pacific Northwest-Pacific Southwest Intertie.

## SECTION III. BILLING FACTORS

The billing factors shall be the Measured Demand and Measured Energy, unless otherwise specified in the contract.

## SECTION IV. ADJUSTMENTS AND SPECIAL PROVISIONS

### Power Factor Adjustment

The adjustment for power factor for BPA customers that are billed for Short-Term Surplus Firm Power on metered amounts, when specified in this rate schedule or in the contract, shall be made in accordance with the provisions of both this section and section III.C.1 of the General Rate Schedule Provisions (GRSPs). The adjustment shall be made if the average leading power factor or average lagging power factor at which energy is supplied during the billing month is less than 95 percent.

To make the power factor adjustment, BPA shall increase the billing demand or energy by one percentage point for each percentage point or major fraction thereof (0.5 or greater) by which the average leading power factor or average lagging power factor is below 95 percent. BPA may elect to waive the adjustment for power factor in whole or in part.