# EXHIBIT A

## Hockey, Martin (CIV)

**From:** Joseph.Ybarra@mto.com
**Sent:** Monday, September 18, 2006 1:46 PM
**To:** Hockey, Martin (CIV)
**Cc:** Charles.Siegal@mto.com; Dan.Munson@mto.com
**Subject:** SCE v. BPA-Further Expert Documents

**Attachments:** SCE-AG02502.PDF; SCE-AG02604.PDF

SCE-AG02502.PDF (3 MB) SCE-AG02604.PDF (2 MB)

Marty,

Attached are further documents supporting Ed Kahn's expert opinion. My apologies for not providing these sooner. I was of the impression (mistaken, I guess) that these had been provided along with the Claim letter or our Complaint. In any event, I wanted to make sure you had them before next week's depositions, so here they are.

Please contact me if you have any questions.

Joe

# EXHIBIT B

Southern California Edison

vs.

United States of America
Bonneville Power Administration

Civil Action No. 1:03-cv-02869-CFL

Supplemental Report of
Samuel A. Van Vactor, Ph.D.
November 15, 2006

Table of Contents

1. Introduction and purpose ........ 3
2. Estimated versus actual damages ........ 3
3. The economic efficiency objective ........ 4
4. The value of the capacity option in May 2000 ........ 5
5. Using forward values to establish damages ........ 7
6. Conclusion ........ 8

## 1. Introduction and purpose

My name is Samuel A. Van Vactor. I have been asked by Counsels for the U.S. Department of Justice (DOJ) and the Bonneville Power Administration (BPA) to supplement the Report that I submitted on August 11, 2006 concerning SCE's damage claim. My background and experience are detailed in the previous report.

At the time of my August 11, 2006 report I was unable to complete my estimate of possible damages, because SCE had not provided data on the specific hours it claims BPA should have delivered power. These data first became available to me on September 28, 2006 and not in electronic form until several weeks later.

## 2. Estimated versus actual damages

It is important to recognize that SCE's damage claim of $31.5 million is not based on actual costs: "In 2000, when BPA refused to sell Option Capacity to SCE at the demand charge associated with the contract rate, SCE nonetheless developed and kept a daily ***mock*** schedule of deliveries and returns, as it would have if BPA had performed."[1] (Emphasis added). SCE did not attempt to purchase capacity and energy under a similar contract, nor did it seek to obtain a contemporaneous estimate of what demand charges in such a contract would cost or what the replacement costs of energy in the forward market would be. Following the alleged breach, SCE did not buy replacement power in the quantities specified in their damage claim at the points of delivery and hours indicated. Or, if they did do so, they have not provided any evidence as to actual payments made. SCE's damage claim is simply a hypothetical re-construction of possible costs, developed with the overwhelming advantage of hindsight.

---

[1] Plaintiff Southern California Edison Company's memorandum of contentions of fact and law, p. 13.

SCE's actual power costs during the five months relevant to the BPA contract were a complex composite of historic purchase contracts from small independent generators and out-of-state suppliers, their own generating resources, purchases from PX and CAISO day-ahead and day-of markets, and the PX's block forward market. Many of these costs have been and continue to be mitigated by refunds and other litigation surrounding the California Energy Crisis. SCE notes that the "non-breaching party 'need only pursue reasonable mitigation alternatives…'"[2] SCE's mitigation strategy appears to have been simply the development of a mock schedule of power purchases and sales that were never realized. As such, it provides wide latitude for SCE or BPA to calculate a variety of damage claims.[3]

### 3. The economic efficiency objective

The confusion that clouds SCE's damage estimate arises from its notion that the non-breaching party may make any type of claim and may pick and choose prices and costs to best advantage, long after the alleged breach. As explained in my August 11, 2006 report I strongly disagree. It is incumbent on all parties in a contract to value the benefits and costs of default at the time the decision to breach is made. To do anything else risks a misallocation of resources and a reduction in economic efficiency.

SCE points out that it refused to pay the extra $13.4 million in capacity charges asked by BPA, concluding: "SCE ultimately chose not to accept that offer, not because BPA had breached the parties' Agreement, but because the offer did not make economic sense at the time."[4] Put another way, in May 2000 SCE believed that it had a cheaper way to buy power. In similar fashion, BPA believed that it could not

---

[2] Plaintiff Southern California Edison Company's memorandum of contentions of fact and law, p. 22

[3] In my August 11, 2006 report, I described one scenario built on realistic assumptions in which SCE suffered no damages at all.

[4] Plaintiff Southern California Edison Company's memorandum of contentions of fact and law, pp. 23-24.

provide the capacity and energy obligations in the contract for less than the extra $13.4 million. In economic terms, there was no longer a "gain from trade" inherent in the contract and it should have been (and was) dissolved. As Judge Posner and others have argued, it is important that "economic" breach should be encouraged and this requires that the cost and benefits should be calculated using consistent assumptions between both parties and a commonly understood standard for determining damages.

## 4. The value of the capacity option in May 2000

SCE's motive for entering into the BPA contract was to acquire power for its load in its service territory in Southern California. Had the contract been executed for the summer of 2000, BPA would have delivered power to the Intertie between Oregon and California. SCE would have added those MWhs to its supply portfolio bid into the PX and CAISO markets and, in turn, drawn out power for its load in Southern California. BPA's supply was an offset to SCE's expected demand. Consequently, a reasonable mitigation strategy by SCE would be to acquire power directly for its service territory load from alternative sources, which it obviously did. This strategy had the additional advantage of avoiding unnecessary CAISO and PX trading fees.[5]

In my August 11, 2006 report I established that SCE could have bought On-Peak power during the week of May 22, 2000 for the coming five months through the PX's block forward market. If they had done so I estimated that they would have paid slightly less than $83 per MWh. This power block of 96 hours per week is, however, larger than the 50 hours available under the BPA contract. Moreover, SCE would have the right to select which 50 out of the 96 on-peak hours they wished to take. Consequently, $83 is too low a price. At the time, however, I did not have a means

---

[5] Some of these costs were not trivial and so far have not been included in SCE's damage estimates. For example, the purchase and resale of power at the northern border of the California grid should have included PX and CAISO fees.

to adjust the figure upward, because I did not know which hours SCE intended to select.

Now that SCE's data are available, the $83 per MWh can be adjusted based on the expected market conditions for the summer of 2000 and the historic relationship of hourly prices. To make the relative adjustment I reviewed hourly prices during a similar time period in 1999. I analyzed hourly prices from June 3 through November 2, 1999. (I shifted the calendar two days forward for 1999 data, so that weekend days would coincide, matching On-Peak times).

Table 4.1 summarizes my calculations.

**Table 4.1**
**Calculation of Forward Value of Hours Selected by SCE**

| Hour Ending | MWh Bought | Percentage of Total | 1999 Average Price | 1999 Total Value | Number of Hours | 1999 Proportion | 2000 Expected Price (99) | 2000 Expected Value (99) |
|---|---|---|---|---|---|---|---|---|
| 10 | 2,750 | 1.04% | $26.71 | $73,441 | 11 | 70.5% | $58.51 | $160,896 |
| 11 | 7,250 | 2.75% | $35.33 | $256,175 | 29 | 93.3% | $77.41 | $561,230 |
| 12 | 22,750 | 8.64% | $35.15 | $799,562 | 91 | 92.8% | $77.00 | $1,751,689 |
| 13 | 25,500 | 9.69% | $39.94 | $1,018,476 | 102 | 105.4% | $87.50 | $2,231,288 |
| 14 | 28,250 | 10.73% | $45.91 | $1,296,969 | 113 | 121.2% | $100.58 | $2,841,413 |
| 15 | 28,250 | 10.73% | $50.92 | $1,438,617 | 113 | 134.4% | $111.57 | $3,151,737 |
| 16 | 28,250 | 10.73% | $52.58 | $1,485,422 | 113 | 138.8% | $115.20 | $3,254,279 |
| 17 | 26,250 | 9.97% | $49.17 | $1,290,677 | 105 | 129.8% | $107.72 | $2,827,629 |
| 18 | 23,750 | 9.02% | $45.36 | $1,077,380 | 95 | 119.7% | $99.38 | $2,360,335 |
| 19 | 25,250 | 9.59% | $40.99 | $1,034,989 | 101 | 108.2% | $89.80 | $2,267,466 |
| 20 | 23,000 | 8.74% | $39.25 | $902,747 | 92 | 103.6% | $85.99 | $1,977,749 |
| 21 | 22,000 | 8.36% | $37.27 | $819,852 | 88 | 98.4% | $81.64 | $1,796,141 |
| **TOTAL** | 263,250 | 100.00% | $43.66 | $11,494,307 | 1,053 | 115.3% | $95.66 | $25,181,851 |
| | | | | | | | | |
| **On-Peak Hours (6X16, 250 Mhw)** | | | $37.89 | $19,548,928 | 2,064 | 100.0% | **$83.00** | $42,828,000 |
| **SCE Selected Hours** | | | $43.66 | $11,494,307 | 1,053 | 115.3% | **$95.66** | $25,181,851 |
| **Unselected On-Peak Hours** | | | $31.87 | $8,054,620 | 1,011 | 84.1% | **$69.82** | $17,646,149 |

Most of the hours SCE selected fell between noon and 8 PM, the "super peak" period. Had SCE selected the same hours in 1999 that they selected in 2000, they would have paid an average of about $44 per MWh. In contrast, the average price for On-Peak hours in 1999 was about $38 per MWh. SCE's selected hours were 15.3% more valuable than the On-Peak block as a whole.

Given that the forward market established an expected price of $83 per MWh for the five summer months, the SCE selected hours could be expected to sell for 15% more, or about $96 per MWh. Likewise, in reciprocal fashion SCE's unselected hours, out of the On-Peak block, would be expected to be worth about $70 per MWh.

## 5. Using forward values to establish damages

Once the relative value of SCE's selected and unselected hours are determined, it is a simple matter to estimate appropriate damages. Indeed, the two tables I provided in my August 11, 2006 can be revised to include an estimated forward value for SCE's selected and unselected hours.

Table 5.1
Comparison of "Super" Peak Power Costs as of May 22, 2000

| | MWh Volume | Average Price per MWh | Value | SCE's Claimed Cost | Net Damages |
|---|---|---|---|---|---|
| SCE's Claim | 263,250 | $192 | $50,582,069 | $18,987,634 | $31,594,435 |
| Estimated Forward Value | 263,250 | $96 | $25,181,851 | $18,987,634 | $6,194,217 |

Table 5.1 estimates the value of SCE's damages directly, utilizing the $96 per MWh figure derived in Table 4.1. Instead of the $50.6 million of value estimated by SCE for its selected hours, the forward analysis produces a figure of $25.2 million. When offset by SCE's costs of $19 million, the calculation produces a damage estimate of $6.2 million.[6]

[6] SCE might argue that expected costs for returned power should also be substituted for the "actual" costs it calculated. If a similar methodology is applied to SCE's selected return hours it results in an expected cost of $16 rather than $19 million. However, this figure should be offset by at least one set of PX and CAISO fees, which would raise the cost to about $17.5 million, resulting in total damages of about $7.7 million.

Table 5.2
Calculation of SCE Net Covered Position

| | MWh Volume | Average Price per MWh | Value | SCE's Claimed Cost | Net Damages |
|---|---|---|---|---|---|
| Peak Hours over period | 516,000 | $150 | $77,218,500 | | |
| SCE's Claim | (263,250) | $192 | ($50,582,069) | $18,987,634 | $31,594,435 |
| Unclaimed Hours | 252,750 | $105 | $26,636,431 | | |
| | | | | | |
| Estimated SP-15 Cost | 516,000 | $83 | $42,828,000 | | |
| Less "resold" hours | (252,750) | $70 | ($17,646,149) | | |
| Net Cost to SCE | 263,250 | | $25,181,851 | $18,987,634 | $6,194,217 |

Table 5.2 is somewhat more complex than Table 5.1. SCE could argue that they could not have bought the selected hours in a forward market. As I pointed out, however, they could have bought 516 thousand MWh of On-Peak power in the PX's block forward market for about $83 per MWh. The surplus hours could then have been resold in the PX. If SCE had done so, the sales would have completely eliminated damages. That, however, would not have been the expectation in May 2000. At the time SCE would have expected to resell these hours at a loss – about $13 per MWh less than they paid. Taking into account both purchase and resale, damages are estimated, again, at $6.2 million.

## 6. Conclusion

Following a contract breach, actual costs to replace the contract are often seen as a reasonable basis on which to calculate damages. In this case, however, SCE has not calculated damages on actual costs. Instead, they crafted a hypothetical cost based on prices of a slate of commodities that they "would have bought and sold." Since they based prices on the daily spot market, their calculation could not be completed until the damage period was through, which gave SCE the clear advantage of hindsight. Were the spot market the only means by which SCE could have covered the contract, their calculation would have been more reasonable. SCE, however, had other

options to procure power; they were the largest buyer in the PX's block forward market. If the California power market had collapsed instead of exploding, SCE doubtlessly would have calculated damages on the basis of losses in the block forward market. This is why economists believe that parties subject to a contract breach should not be allowed to pick and choose the basis of mitigation after events have transpired.

Samuel A. Van Vactor, Ph.D.
Portland, Oregon
November 15, 2006