**No. 03-2869C**
**(Judge Lettow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**SOUTHERN CALIFORNIA EDISON,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**MARTIN F. HOCKEY, JR.**
**Senior Trial Counsel**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Telephone: (202) 307-6288**

**OF COUNSEL:**

**JON D. WRIGHT**
**RICHARD A. GREENE**
**Office Of The General Counsel**
**Bonneville Power Admin.**
**905 N.E. 11th Avenue**
**Portland, OR 97208**

**November 17, 2006**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE

Defendant's Memorandum Of Contentions Of Fact And Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONTENTIONS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. The Negotiations of the Option Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Pricing of Option Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. The Contract Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Revisions To The SP Rate Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV. Changes in Bonneville's Rate Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V. Edison Requests Option Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI. Bonneville Corrects Its Mistake Through The FPS-96R Rate Proceeding . . . . 11

VII. Edison Fails To Exercise The Capacity Option In 2000 . . . . . . . . . . . . . . . . . . . 12

VIII. Edison's Damage Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. Edison Failed To Properly Exercise The Option Capacity Provision . . . . . . . . 15

II. Bonneville Did Not Breach The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. The Plain Language Of The Rate Schedule . . . . . . . . . . . . . . . . . . . . . . . 16

B. The Plain Language Of The Contract Establishes That Edison Was Purchasing Capacity Without Energy . . . . . . . . . . . . . 18

C. The "Capacity Without Energy" Rate Is The Applicable Rate In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF CONTENTS

**PAGE**


D. The Presence Of A Cash-Out Provision Does Not Change The Nature Of The Product Edison Was Purchasing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. The Contract Provided Bonneville With The Right To Apply FPS-96R To The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV. Edison's Reference To Contra Proferentem Is Misplaced . . . . . . . . . . . . . . . . . . 24

V. Edison's Lost Profits Claim Is Limited By The Principles Of Causation, Foreseeability, And Certainty, As Well As The Duty To Mitigate . . . . . . . . . . . 25

A. Edison Cannot Sustain Its Burden Of Proving Causation . . . . . . . . . . . . 25

B. Edison Cannot Sustain Its Burden Of Proving Foreseeability . . . . . . . . . 27

C. Edison Cannot Sustain Its Burden Of Proving Reasonable Certainty . . . 29

D. Edison Had An Obligation To Mitigate Its Alleged Damages . . . . . . . . 30

E. The Time For Measuring Damages Is At the Time Of The Breach . . . . 32

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

Alliant Techsystems, Inc., v. United States,
178 F.3d 1260 (Fed. Cir. 1999) . . . . . . . . . . 15

Estate of Berg v. United States,
231 Ct. C 687 F.2d 377 (1982) . . . . . . . . . . 27, 33

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . 25

Bohac v. Department of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 28

Bristol-Myers Squibb Co. v. United States,
48 Fed. Cl. 350 (2000) . . . . . . . . . . 17, 24

Cal. Energy Resources Conservation & Dev. Comm’n v. Bonneville Power Admin.,
831 F.2d 1467 (9th Cir. 1987) . . . . . . . . . . 23

Cal. Energy Resources Conservation & Dev. Comm'n v. Bonneville Power Admin,
754 F.2d 1470 (9th Cir. 1985) . . . . . . . . . . 23

California Fed. Bank v. United States,
54 Fed. Cl. 704 (2002), aff'd 395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 26

City of Burbank, Glendale, and Pasadena v. United States,
464 F.3d 1280 (Fed. Cir. 2006) . . . . . . . . . . 19

Civic Plaza National Bank v. First National Bank in Dallas,
401 F.2d 193 (8th Cir. 1968) . . . . . . . . . . 15

Consumer Ice Co. v. United States,
201 Ct. Cl. 116 (1973) . . . . . . . . . . 24

Demarco Durzo Development Co., v. United States,
69 Fed. Cl. 262 (2005) . . . . . . . . . . 15

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

Everett Plywood Corp. v. United States,
206 Ct. Cl. 244, 512 F.2d 1082 (1975) . . . . . . . . . . 31

Franklin Federal Savings Bank v. United States,
60 Fed. Cl. 55 (2004) . . . . . . . . . . 31

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir.1991) . . . . . . . . . . 17

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 26, 27

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . 27, 28

McAbee Constr., Inc. V. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . 17

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . 25, 26, 30

Middleton v. United States,
175 Ct. Cl. 786 (1966) . . . . . . . . . . 31

Midwest Indus. Painting v. United States,
4 Cl. Ct. 124 (1983) . . . . . . . . . . 31

New England Tank Indus. of New Hampshire, Inc. v. United States,
861 F.2d 685 (Fed. Cir. 1988) . . . . . . . . . . 15

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975) . . . . . . . . . . 27

Northern Paiute Nation v. United States
9 Cl. Ct. 639 (1986) . . . . . . . . . . 32-33

Portland General Elec. Co. v. Johnson,
754 F.2d 1475 (9th Cir. 1985) . . . . . . . . . . 23

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . 27

Quiman S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . 25, 31

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . 25, 30

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . 31

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 25

Southern California Edison v. United States,
69 Fed. Cl. 66 (2005) . . . . . . . . . . 16

Southern Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) . . . . . . . . . . 25

Sun Cal, Inc. v. United States,
25 Cl. Ct. 426 (1992) . . . . . . . . . . 30

Teg-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006) . . . . . . . . . . 19

Three Crown Ltd. Partnership v. Salomon Brothers,
906 F. Supp. 876 (S.D.N.Y. 1995) . . . . . . . . . . 31

Transnor Ltd. v. BP North America Petroleum,
736 F. Supp. 511 (S.D.N.Y. 1990) . . . . . . . . . . 31

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . passim

Westfed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2003) . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**STATUTES** **PAGE(s)**

16 U.S.C. § 837 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 839c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**MISCELLANEOUS**

5 A. Corbin, Corbin on Contracts (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

E. Allen Farnsworth, Farnsworth On Contracts (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Restatement (Second) of Contracts (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SOUTHERN CALIFORNIA EDISON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 03-2869C** |
| | ) | **(Judge Lettow)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**Defendant's Memorandum Of Contentions Of Fact And Law**

Pursuant to Appendix A, ¶ 14(b) of the Rules of the Court, defendant respectfully submits its memorandum of contentions of fact and law.

INTRODUCTION

This case involves a contract between the plaintiff, Southern California Edison ("Edison") and the Bonneville Power Administration ("Bonneville"). One of the provisions of that contract, section 12(a), provided Edison with an option to call on Bonneville's capacity during the peak summer months of June through October. When exercised, the option required Bonneville to stand ready to deliver energy to Edison on the particular days and hours requested by Edison and required Edison to return the energy called upon to Bonneville within 24 hours. Edison could request delivery of energy during "on-peak" hours, i.e., when demand was high during the middle of the day, and return the energy during "off-peak" hours, when demand was low. The price for the service provided by Bonneville was tied to a Bonneville rate schedule, which the contract provided could be superseded in accordance with law. This dispute involves a successor rate schedule that went into effect in May 2000, which contains two prices for capacity, differentiated by the type of capacity product desired. The parties dispute which of the prices is applicable to the capacity product being purchased under section 12(a) of the contract.

## CONTENTIONS OF FACT

I. The Negotiations of the Option Capacity

A. Capacity

1. Beginning in 1985, representatives from Edison and Bonneville participated in negotiations to replace a 20-year term exchange agreement that was about to expire. The primary focus of the negotiations was a 250 megawatt ("MW") power sale and exchange feature of the new contract. Near the end of the negotiations, the parties discussed adding additional value to the proposed contract through an exchange of options. Specifically, Bonneville would provide Edison with an option for 250 MW of "capacity" while Edison would provide Bonneville with an option for up to 624,000 megawatt hours ("MWh") of "energy." On October 18, 1988, contract no. DE-MS79-88BP92275 ("Contract") was agreed to by the parties, which included a provision at section 12 of the Contract providing Edison an option to purchase 250MW of capacity during the months June through October of each year. Section 12(a) of the Contract is entitled "Option Capacity."

2. The terms "capacity" and "energy" had a general industry meaning at the time of the negotiations. "Capacity" simply refers to the ability of a generator to produce energy. For example, if a generator has the capability of producing 100MW, but is only producing 75MW at the moment, it has 25MW of "capacity" available. "Energy," by contrast, refers to the actual amount of power that is consumed by a load over an hour (referred to as megawatt-hours).

3. Capacity and energy are related, but different, products. A party purchasing a "capacity" product (or, in this case, exercising an option for capacity) is buying the right to have a generator stand ready to send energy, typically during periods of peak loads. The purchaser

pays a reservation fee or charge to the generator for this service, regardless of whether the purchaser actually calls on the energy. If and when the energy is actually called on, the purchaser then must either return the energy at a later time or pay for it after the fact. The return provision constitutes the primary way the generator ensures that it remains whole on a net-energy basis and distinguishes it from an energy sale The value of this transaction, then, from the generator's perspective (i.e., Bonneville) is not the value of the energy but the rate paid by the capacity purchaser (i.e., Edison) for keeping sufficient capacity on reserve in the event that the purchaser calls upon the generation to produce energy.

4. A party purchasing energy, in contrast, pays for the total megawatt-hours of energy actually consumed. In this setting, the rate paid by the buyer will typically include both a demand charge and an energy charge. Because both charges are paid by the buyer, it makes little difference how the cost of providing the energy is allocated between the two charges.

5. The Option Capacity provided for in the Contract was an option for 250MW of "capacity" available during the five months from June through October, generally when Edison experiences its heaviest loads.

6. The parties used varying terminology to describe the Option Capacity. Bonneville generally referred to it as "naked capacity" or "capacity-only." This description merely represents the obligation of Edison to return any energy to Bonneville within a 24-hour period. The capacity was "naked" or "only" because the buyer (in this case, Edison) did not have any right or expectation that it would not return the energy.

7. Edison frequently referred to the option for capacity as "capacity insurance." There was no cost to Edison unless the option was exercised, at which point Edison was

obligated to pay Bonneville for the right to call upon 250MW of capacity during the delivery period. The primary value to Edison for having "capacity insurance" was a regulatory benefit. By including an option for capacity from Bonneville, Edison could represent to the California Public Utilities Commission ("CPUC") in its planning documents that it had an additional 250MW of capacity available from Bonneville. Without this option, Edison could have been required by the CPUC to obtain sufficient resources to meet the retail requirements load in Edison's service territory.

B. Pricing of Option Capacity

8. After reviewing its rate schedules, Bonneville's and Edison's negotiators agreed upon the demand charge in the SP (Surplus Power)-87 rate schedule as the applicable beginning rate for the Option Capacity. In fact, SP-87 was the only rate schedule in existence at the time which could be used for sales outside the Pacific Northwest region. Pursuant to statutory requirements, sales outside the Pacific Northwest could be made only if the product was surplus to Bonneville's needs (i.e., there was no market for the power in the Pacific Northwest at "any established rate"). See 16 U.S.C. §§ 837(c) and (d); 16 U.S.C. 837a; 16 U.S.C. 839c(f).

9. From Bonneville's perspective, the demand charge in the SP-87 rate schedule was appropriate because it would allow Bonneville to fully recover Bonneville's costs of providing capacity. From Edison's perspective, the rate was acceptable because Edison was interested in the planning value of holding the option rather than actual exercise of the option. The fact that Edison did not call the option for an entire decade supports the view that the rate was not expected to be "in the money" for Edison. Thus, when the Contract was entered into, the parties

were all satisfied with pricing the capacity at a rate that is nearly *double* the rate that Edison now claims was within Edison's reasonable expectations at the time of contracting.

10. Bonneville's witnesses will testify that Bonneville included the phrase "the demand charge associated with the contract rate" in section 12(a)(4) of the Contract solely to help Edison identify the rate in the SP-87 rate schedule that was applicable to the Option Capacity at the time of contracting. It was not intended to provide Edison any special "protections" or otherwise limit Bonneville's ability to adjust its rate schedules in the future. Indeed, Edison had received such protection for the power sale component of the Contract, by negotiating an elaborate formula rate that was not subject to equitable adjustment through Bonneville's administrative process.

II. <u>The Contract Language</u>

11. Contract section 12(a) provides "Upon Edison's request, and in addition to other obligations under this Agreement, Bonneville shall provide 250 MW of capacity to Edison on the same delivery terms as Peaking Energy specified in section 7(a). For any year in which such capacity is requested, Bonneville shall make Option Capacity available for the 5-month delivery period of June through October and Edison shall pay for such capacity." Section 12(a) further provides the following relevant guidance concerning the provision and return of the energy associated with the capacity product:

> (1) Edison shall schedule the energy associated with this Option Capacity and the return of such energy in accordance with the scheduling provisions for Peaking Energy and Peaking Replacement Energy, respectively, pursuant to section 8(a).
>
> * * *
>
> (3) Edison shall return to Bonneville the energy provided with the Option Capacity unless Bonneville elects to have Edison pay for the energy at the rate

specified in section 9(c)(1). If Edison returns the energy, Edison shall make deliveries as specified in section 7(b).

(4) Edison shall pay for the Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 rate schedule or if the SP-87 rate schedule is no longer in effect, a successor rate schedule. The Parties' Authorized Representatives may agree upon another applicable rate schedule.

12. The Contract's general provisions further provide at section 3:

(a) The Contractor shall pay Bonneville for the electric power, capacity or energy made available under this contract at the rates specified in the contract.

(b) To the extent the contract references Bonneville rates or rate schedules of general applicability for purposes of payment for electric power, capacity or energy made available, the following provisions apply:

> (1) Bonneville shall establish and periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.

* * *

> (3) The purchaser shall pay Bonneville for the electric power, capacity or energy made available under this contract during the period commencing on each Rate Adjustment Date and ending at the beginning of the next Rate Adjustment Date at the rate specified in any rate schedule available at the beginning of such period for service of the class, quality, and type provided for in this contract, and in accordance with the terms thereof, and of the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule. New rates shall not be effective on any Rate Adjustment Date unless they have been approved on a final or interim basis by a governmental agency designated by law to approve Bonneville rates. Rates shall be applied in accordance with the terms thereof, the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule and the terms of this contract.

13. Contract section 13 prohibits long term power sales by including a call-back provision in the Contract.

III. Revisions To The SP Rate Schedule

14. The initial rate for the Option Capacity under the SP-87 rate schedule was $6.15-kw/month. By the terms of the SP-87 rate schedule, this included the following charges: (1) the base demand charge of $4.29 kw/month; (2) a $1.501 kw/month partial year demand adder that applied to any contract that took service for less than 12 months[1]; and (3) a transmission charge for delivery over Bonneville's Southern Intertie.

15. As Bonneville adjusted and modified its rates in successor rate schedules, the rate for the Option Capacity steadily increased. From 1988 to 1995, the price for the capacity with associated transmission rose from $6.15 kw-month in SP-87 to $7.66 kw-month in SP-93. The following chart illustrates how the rate adjusted over the years through Bonneville's rate proceedings:

| **Rate Schedule** | **Demand Charge** | **Demand Adder (partial year)** | **Transmission Charges (Intertie South)** | **Total (Kw/Month)** |
|---|---|---|---|---|
| SP-87 | $4.290 | $1.5015 | $0.360 | **$6.15** |
| SP-89 | $4.290 | $1.5015 | $0.360 | **$6.15** |
| SP-91 | $4.580 | $1.6030 | $0.450 | **$6.63** |
| SP-93 | $5.151 | $1.8029 | $0.706 | **$7.66** |

16. Edison did not exercise the Option Capacity in any of these years. Nevertheless, Edison continued to receive the regulatory benefit of representing to the CPUC that it had an additional 250MW of capacity from Bonneville available to call on, and as such, could avoid entering high cost resource acquisitions with other suppliers.

[1] This applied to the Option Capacity provision because Edison could take the capacity for only five months (June – October) and thus, was taking service for less than 12 months.

IV. Changes in Bonneville's Rate Structure

17. In 1996, the Federal Energy Regulatory Commission ("FERC") issued a number of orders which required utilities across the country to open up their transmission systems to allow competitors access to the energy markets. To ensure the implementation of these open access orders, FERC required all utilities to separate their energy and transmission services into two separate and distinct products. This process, known as "unbundling," radically changed the regulatory world within which Bonneville and Edison had traditionally operated.

18. In response to the industry transformation, Bonneville restructured all of its wholesale power and transmission rates. Thus, the FPS-96 rate schedule, the immediate successor to SP-93, was developed using a fundamentally different cost allocation methodology than had traditionally been used by Bonneville in the design of its power rates, to include SP-87 through SP-93. These differences changed the demand charges in two significant ways.

19. First, in FPS-96, Bonneville removed, or "unbundled" transmission costs from the demand charge in the rate schedule. Traditionally, power sales had been priced as "delivered" products with no separately identified charges for transmission. The SP series of rate schedules, including SP-87 and its progeny, all included the cost of transmission over Bonneville's transmission network system in the demand charge. A party that purchased capacity or energy from Bonneville and paid the demand charge under one of Bonneville's previous rate schedules could receive the capacity or energy on most of Bonneville's transmission system without having to pay an additional fee. After FERC issued its open access orders, Bonneville removed the costs of transmission from the demand charge and recovered transmission costs under a new transmission-only rate schedule. As a result, the demand charges in all of the power rate

schedules, including the FPS-96, were reduced.

20. Second, in FPS-96, the demand charge in the rate was redesigned to be used *only* with a firm energy sale which would incur *both* the demand charge and the energy charge. In other words, unlike the SP demand charge, the FPS-96 demand charge was not designed to recover the cost of Bonneville "standing ready" with generation capacity to serve a capacity obligation. Instead, the demand and energy charges in the FPS-96 were designed to be used *together*. Since both of these charges were expected to always apply to a single transaction, it was not significant how Bonneville redistributed the costs associated with capacity among the two charges. The energy charge was thus increased from 26.30mills/kW-hour in the SP-93 rate schedule to a range of 21.21mills/kW-hour to 50.39mills/kW-hour depending on the month and time of the energy delivery in FPS-96. Conversely, the demand charge was reduced to only $.87 kw-month to mirror the demand charges in Bonneville's other power sales rate schedules (which were applying a similar approach). This re-designed demand charge did not recover the cost of capacity.

21. FPS-96 was a considerable departure from the SP rate schedule demand charges. The SP demand charges were designed to fully recover the cost of capacity. They included such features as the "partial year demand adder" (adding as much as $1.50 kw-month to the demand charge in each SP rate schedule since 1987). However, the FPS-96 rate schedule contained no such feature. In the FPS-96 rate schedule, these costs were split between the energy and demand charge with the intent that the energy charge would always accompany the demand charge.

22. Rather than set a fixed or "posted price" for surplus capacity sales in the FPS-96 rate schedule, Bonneville decided to use its ability to negotiate rates under FPS-96 with

individual parties. Bonneville made it clear in rate case documents that it intended to sell capacity at "negotiated rates." In the context of developing the FPS-96 rate schedule, Bonneville's rates staff failed to recognize that there might be customers who had a pre-existing right to purchase capacity at a posted rate (i.e., the demand charge) and who would not be required, by contract, to negotiate a rate for capacity. By 1996, most of Bonneville's customers that purchased capacity-only products had either negotiated specific formulas into their contracts or had agreed to use other rate schedules.

V. Edison Requests Option Capacity

23. In January 1999, two and a half years *after* the FPS-96 rate schedule had been in place, Edison notified Bonneville that it intended to exercise the option for capacity for the first time.

24. Combined with the associated transmission charge ($2.27 kw-month), the total cost for the Option Capacity (according to Edison) was $3.14 a kilowatt-month – a reduction of almost 60% from the SP-93 rate of $7.66 kw-month. Edison did not dispute that it was required to pay transmission costs associated with the capacity purchased pursuant to the FPS-96 rate schedule.

25. Following Edison's request to purchase capacity, Bonneville reviewed its 1996 rate case to determine the basis for the $.87 kw-month demand charge. From this review, it became clear that Bonneville had not considered Edison's option to purchase capacity when Bonneville designed the demand charge for the FPS-96 rate schedule. Because a rate for the capacity Edison was purchasing did not exist, Bonneville offered to negotiate a new rate for the capacity, as Bonneville contemplated in the rate case. Ultimately, after an arbitration on this

issue, Bonneville provided Edison the Option Capacity at the demand charge in the FPS-96 rate schedule.

VI. Bonneville Corrects Its Mistake Through The FPS-96R Rate Proceeding

26. In August 1999, Bonneville commenced a 7(i) proceeding to adjust the FPS-96 rate schedule. In accordance with the General Provisions of the Contract, Bonneville issued a Federal Register Notice which gave notice to Edison that Bonneville intended to equitably adjust the rates in the FPS-96 rate schedule, replacing FPS-96 with FPS-96R.

27. The FPS-96R rate proceeding modified the original FPS-96 rate schedule in three ways. First, Bonneville added language to the Contract Rate section of the rate schedule to make it clear that the $.87-kw-month demand charge was only intended to be used in conjunction with a firm power sale (i.e., "the Contract Rate applies to purchases of firm capacity with no energy return product exclusively, that is, a firm power sale product."). Rate Schedule 1.1.

Second, Bonneville added a new demand charge (identified in section 1.1.2 and priced in section 1.3) that was applicable as a stand alone rate for capacity (i.e., "firm capacity with energy return (Capacity without Energy)"). Much like the SP-87 and its progeny, this demand charge captured Bonneville's cost of "standing ready" with generation to serve a capacity-only obligation like that in the Option Capacity. Because this rate was designed to price this service alone, Bonneville made clear that it applied to contracts that allowed the purchaser to buy capacity but not the underlying energy.

Third, the FPS-96R was further clarified to state that the Capacity without Energy demand charge would apply "to contracts entered into on or before September 30, 1996, that include Capacity without Energy provisions where payment shall be at the demand charge

associated with the Contract Rate of the then-applicable surplus power rate schedule."

28. Edison intervened in Bonneville's rate case. Edison submitted over 90 data requests, offered direct and rebuttal testimony, and briefed fully the issues regarding Bonneville's new capacity rate. In response to Edison's concerns, the capacity rate was changed from an initial rate ranging from $8.30/kw-month - 19.93/kw-month to a reduced range of $6.68/kw-month – 16.04/kw-month. In total, Bonneville and Edison spent more than a year litigating the merits of the FPS-96R rate case from the administrative hearing level, to FERC, and then finally, before the United States Court of Appeals for the Ninth Circuit.

29. On March 21, 2000, Bonneville submitted to FERC the FPS-96R rate schedule for approval. Bonneville requested that FERC grant interim approval of the rate by May 1, 2000. If given interim approval by FERC, as a matter of law, the FPS-96R rate schedule would become the "successor" to the FPS-96.

30. On May 22, 2000, FERC approved the FPS-96R rate schedule on an interim basis. Thus, the FPS-96 rate schedule no longer existed, and was superseded by the FPS-96R.

VII. Edison Fails To Exercise The Capacity Option In 2000

31. On April 27, 2000, four days before Bonneville's requested approval date for the FPS-96R rate schedule, Edison notified Bonneville that it wanted to take Option Capacity at the demand charge in the FPS-96 rate schedule. However, Edison reserved the right to "revoke the election made herein if a higher rate became effective for the entire or any part of the delivery season."

32. Bonneville responded on April 28, 2000 pointing out that the Contract did not give Edison the right to conditionally elect to take the Option Capacity. Nonetheless, Bonneville

reiterated that it would stand ready to provide Option Capacity at the then-effective rate.

33. On May 1, 2000, Edison sent another letter to Bonneville which, like its previous April 27, 2000 letter, reasserted its position that it would only take the Option Capacity if it would be charged at the FPS-96 demand charge. Bonneville rejected this interpretation of the option provision, but stated that it would give Edison until May 24, 2000, to provide a definitive statement regarding Option Capacity. Bonneville also conveyed to Edison that Edison's exercise of the option for capacity at the rates contained in FPS-96R would not act as a waiver of any claim Edison may possess.

34. In correspondence dated May 24, 2000, Edison asserted that it was entitled to purchase the capacity under the demand charge in the FPS-96 rate schedule. Edison further stated that it would not take the capacity at the new effective rate because it did not believe it was buying the products identified in the rate schedule and because the FPS-96R was "improper both substantively and procedurally."

VIII. Edison's Damage Claim

35. The inclusion of the Option Capacity provision in the Contract was designed to be used for Edison's planning purposes in its submissions to the CPUC. To the extent the option was ever called upon, it would be used to cover a resource shortage experienced by Edison. In 1996, FERC issued a series of orders leading to deregulation of the electric utility industry. In 1998, the California PX day-ahead market began operation. Edison was required to both purchase power from the PX and sell power into the PX. Ironically, the creation of the PX also provided an avenue by which Edison could use the capacity provided by Bonneville pursuant to section 12 of the Contract as a means to arbitrage in the PX. The parties did not anticipate at the

time of contract formation that Edison would purchase capacity from Bonneville pursuant to section 12 of the Contract for purposes of arbitraging in a then non-existent power market.

36. In 1999, Edison sold the capacity obtained from Bonneville into the California PX day-ahead market and achieved profits from such action. In 2000, Edison anticipated selling the capacity obtained from the Option Capacity section into the PX again. Although Edison did not purchase capacity pursuant to section 12 of the Contract from Bonneville in 2000, as it made an economic decision that the cost of obtaining the capacity would exceed what the PX market would bear in returns, Edison kept a running tally of what it "might have realized" in profits had it bid the capacity into the PX day-ahead market, as it had in 1999. Edison has used the results of its 2000 collection of potential profit in the day-ahead market as the basis for its damage claim in this action. If the PX market had resulted in low prices for capacity, Edison would have made no claim against Bonneville for lost profits.

37. In May 2000, Edison could have purchased capacity from Bonneville at the *fixed* capacity charge in the FPS-96R. In its May 24, 2000 letter to Bonneville, Edison flatly admits that its total cost exposure under the FPS-96R rate schedule is $13.4 million for the entire summer of 2000. Edison admits in its Memorandum of Contentions of Fact and Law ("Memorandum") at 24, that with hindsight, it realizes that it should have purchased the capacity at the fixed capacity charge of section 1.1.2 of FPS-96R.

38. In addition, Edison possessed other options available from the power exchange market itself. Edison could have purchased a five-month power contract, known as a Block Forward Contract, to cover its position for the summer. This type of contract is simply a fixed-price contract for a block of power that Edison could have taken for the entire summer to replace

the energy associated with the Option Capacity. If Edison had taken this approach, its damages would have been significantly less than what is alleged, and indeed, perhaps Edison would have had no damages.

## CONTENTIONS OF LAW

### I. Edison Failed To Properly Exercise The Option Capacity Provision

A foundational question this Court will have to address before even considering which rate in the FPS-96R applies to Edison's contract is whether Edison properly exercised its right to the Option Capacity. To properly exercise an option "the . . . acceptance of the offer had to be in exact accord with the terms of the contract." Demarco Durzo Development Co., v. United States, 69 Fed. Cl. 262, 274 (2005) (quoting New England Tank Indus. of New Hampshire, Inc. v. United States, 861 F.2d 685, 687 (Fed. Cir. 1988)). Therefore, an attempted exercise of an option is ineffective, unless it is in "exact accord" with the terms of the option. Id; see also Alliant Techsystems, Inc., v. United States, 178 F.3d 1260, 1275 (Fed. Cir. 1999).

Bonneville's obligation to provide the capacity is, as a matter of law, predicated on a valid notice from Edison that expressly and unconditionally elects to take the Option Capacity in accordance with the term of the Contract. Alliant Techsystems, Inc., 178 F.3d at 1275. As the above factual contentions establish, Edison's notification letters all fall short of being an "unqualified, absolute, unconditional or unequivocal" expression of assent to the terms of the option clause. Civic Plaza National Bank v. First National Bank in Dallas, 401 F.2d 193, 197 (8th Cir. 1968). Rather, each notification attempts to add new specifications to the terms of the option or provide qualifications to the election. Bonneville, therefore, was under no legal obligation to make the capacity available in the summer of 2000, and did not breach the contract.

## II. Bonneville Did Not Breach The Contract

To the extent the Court concludes that the Option Capacity provision was properly exercised, the Government's demand that Edison pay for the option capacity product pursuant to paragraph 1.1.2 of the then existing rate schedule, FPS-96R, was proper.

### A. The Plain Language Of The Rate Schedule

Edison does not now seriously dispute that the FPS-96R rate schedule was the "successor rate schedule" to the SP-87 rate schedule in section 12(a)(4) of the Contract. Nor does Edison challenge (at this point) that Bonneville was allowed to amend the FPS-96 rate schedule, and create the FPS-96R rate schedule in the manner that it did.[2] Rather, the issues that Edison raise before this Court focus on the application of the rates in the FPS-96R rate schedule to the Option Capacity provision. As noted previously, the FPS-96R rate schedule contains two demand charges. The first, identified in section 1.1.1., is entitled "demand charge." The second, identified in section 1.1.2, is entitled "demand charge – Capacity without Energy." Stated as such, these two rates are both "demand charges" that are contained in a "successor rate schedule" (i.e., the FPS-96R). Edison argues that the former applies, while we maintain that the latter is the applicable rate. Because FPS-96R distinguishes between the types of capacity services available pursuant to that rate schedule, the fundamental question before this Court is which of the two capacity services is Edison purchasing in the Option Capacity provision. Once this question is resolved, the Court is left only to apply the FPS-96R rate schedule to the terms of the Contract.

---

[2] As the Court noted in its November 10, 2005 opinion in this case, Edison's challenge is *not* to the FPS-96R rate schedule, but to which of the two rates is applicable to the Option Capacity. Southern California Edison v. United States, 69 Fed. Cl. 66, 68-69 (2005).

Edison contends that the plain language of the Contract requires a finding that the applicable demand charge is found at section 1.1.1. In support of this suggestion, Edison requests that the Court focus myopically on the phrase "demand charge" in the contract, and find the similar phrase "demand charge" in the rate schedule to be applicable. However, a closer look at the rate schedule reveals that this selective reading of the FPS-96R rate schedule is inconsistent with the plain language of the Contract, the rate schedule and applicable precedent. See McAbee Constr., Inc. V. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (the Court must "interpret the contract in a manner that gives meaning to all of its provisions and makes sense.").

In the paragraph preceding the Contract Rate section, the FPS-96R rate schedule *defines* when the section 1.1.1 demand charge applies. FPS-96R clearly provides that the section 1.1.1 demand charge is for services of "capacity with no energy return product exclusively, that is, a firm power sale product." Since these rate and rate schedule provisions are incorporated as part of the Contract, this Court must consider this explanatory language when determining which rate in the FPS-96R rate schedule is the applicable rate. See General Provision at § 3(b)(3); see also Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350, 357-358 (2000) ("An interpretation that gives reasonable meaning to all contract parts is preferred over an interpretation that leaves a portion of the contract " 'useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result[,]'" citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991)). Edison's plain language argument must fail, then, unless Edison is able to point to some contractual language which defines the product Edison is purchasing as "capacity with no energy return" (i.e., capacity with energy, or a "firm power sale"). That, Edison cannot do. Nowhere in the Contract does it refer to the Option Capacity as

"capacity with energy" or a "firm power sale." To the contrary, as established below, the Contract describes the capacity product being sold pursuant to section 12 as one involving the return of energy, which is defined in the FPS-96R rate schedule as capacity without energy.

B. The Plain Language Of The Contract Establishes That Edison Was Purchasing Capacity Without Energy

Under the terms of section 12(a) of the Contract, Edison was provided with an option to purchase capacity; hence, the title of the contract subsection, "Option Capacity." The Contract defines "Option Capacity" as "the capacity made available by Bonneville to Edison pursuant to section 12." Contract § 3(l) (emphasis added). Section 12(a) describes capacity as Bonneville's delivery of energy to Edison during peak use hours and Edison's return of that energy to Bonneville within 24 hours, during off-peak hours. Contract §§ 7(b), 12(a)(1), (3). Thus, the transaction leaves Bonneville in an "energy-neutral" position, as any energy delivered to Edison associated with the provision of capacity is returned to Bonneville within 24 hours. Accordingly, the Contract provides for a "capacity with energy return," or "capacity without energy product."

Moreover, the plain language of the SP-87 rate schedule establishes that rates in that schedule were designed to recover Bonneville's costs of producing a variety of products, including "capacity, energy, or capacity with energy." See SP-87 Definitions. When Bonneville suggested the demand charge in the SP-87 rate schedule, it did so with the expectation that Edison understood that it was purchasing "capacity", that is, "capacity without energy." Our witnesses will support this conclusion by testifying that the reason Bonneville chose the demand charge in the SP-87 rate schedule was because it fully recovered the cost of providing "capacity-only" products such as that contained in the Option Capacity provision.

Edison attempts to define "capacity" as "capacity with energy." Memorandum at 3, 6. Of course, in reaching this conclusion, Edison cites no provision of the Contract, but instead, makes general statements of fact that will have to be supported with extrinsic evidence. However, as we established above, the Contract plainly provides that Edison was purchasing "capacity without energy," because the energy must be returned. Moreover, the Government's witnesses will confirm that at the time of contract award, Edison understood it was purchasing capacity without energy (also known as "naked capacity" or "capacity-only") and that Edison's proffered interpretation of the term "capacity" to mean "capacity with energy" could never have been what was intended pursuant to the Contract as it would have violated statutory limitations placed upon Bonneville regarding the long-term sale of power that were specifically incorporated into the Contract. See Contract § 13.

Thus, in contrast to Edison's suggestion, the Contract, when read in conjunction with the FPS-96R rate schedule, does not point the Court directly to the section 1.1.1 demand charge. Rather, in order for the Court to make a determination as to which demand charge applies to the Option Capacity, it must first understand what the parties intended by referring to the phrase "capacity." The Contract plainly answers this question. The additional evidence of the Government's witnesses, which is consistent with this contractual interpretation, and, indeed, does not modify or supplement the language of the Contract, confirms what the parties meant by referring to "capacity" in the Option Capacity provision. See Teg-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006). See generally, City of Burbank, Glendale, and Pasadena v. United States, 464 F.3d 1280, 1284 (Fed. Cir. 2006)(A principal objective in deciding what contractual language means is to discern the parties' intent at contract signing).

C. The "Capacity Without Energy" Rate Is The Applicable Rate In This Case

Turning then to the FPS-96R rate schedule, which is the successor rate schedule to SP-87, the Court need only look to the explanatory language in section 1.1. to find the appropriate rate. The FPS-96R defines "Capacity without Energy" as "firm capacity with energy return." See FPS-96R Rate Schedule, Section II.A.1.1. The rate schedule further clarifies that for:

> [c]ontracts entered into on or before September 30, 1996, that refer to the demand charge in the Contract rate section of the then applicable surplus power schedule for pricing [capacity without energy] will be priced at section 1.3.

Id. Thus, the appropriate rate in FPS-96R is that found at paragraph 1.1.2, providing a demand charge for capacity without energy.

The Option Capacity provision in the contract meets all parts of the rate definition contained in FPS-96R. First, as noted in section 12(a)(3) of the Contract, Edison is required to return the energy associated with the Option Capacity. See Contract, § 12(a)(3)("Edison *shall* return to Bonneville the energy provided with the Option Capacity. . ."). In other words, within any one 24-hour period, Bonneville would send and receive the same number of megawatts, leaving the transaction "energy neutral." This service is known as a capacity with return energy obligation, or a Capacity without Energy as defined in the FPS-96R rate schedule. The use of the phrase "without Energy" refers to the fact that the purchaser does not possess the right to keep the energy, but must return it within a prescribed amount of time. The Option Capacity product thus meets the definition of "Capacity without Energy" because Edison had to return the energy.

Second, the Option Capacity provision also meets the second part of the FPS-96R rate schedule definition in that it contained a provision that referred to the "demand charge" of the

"applicable surplus power schedule" for its pricing. See Section 12(a)(4)("Edison shall pay for Option Capacity at the demand charge associated with the contract rate of Bonneville's SP-87 [i.e., surplus power] rate schedule. . ."). Thus, as defined in the FPS-96R rate schedule, which is the undisputed *successor rate schedule* to SP-87, the only applicable rate to the Option Capacity provision was the 1.1.2 demand charge (i.e., the Capacity without Energy charge).

D. The Presence Of A Cash-Out Provision Does Not Change The Nature Of The Product Edison Was Purchasing

We anticipate that Edison will argue at trial that the Option Capacity in the Contract is not the same service as the "Capacity Without Energy" service defined in the FPS-96R rate schedule. For support, Edison may point to Bonneville's elective right contained in section 12(a)(4) of the Contract to require Edison to buy the energy rather than return it, i.e., "cash out." Edison will likely argue that this additional feature makes the Option Capacity service something different from the Capacity Without Energy service.

The "cash-out" provision, by its plain terms, is held at the option of the Government and has no effect upon the nature of the capacity transaction identified in section 12 of the Contract. Indeed, at the time Edison chooses to exercise the capacity option, it has no basis to presume that Bonneville will do anything other than require the return of the energy delivered within 24 hours pursuant to the plain terms of the Contract.

Indeed, as the evidence will establish, the additional right to purchase or "cash out" the return energy from Edison is an acceptable feature of a Capacity Without Energy service. It is standard practice for Bonneville to settle out the return obligation of a Capacity Without Energy service through a number of ways, including having the buyer purchase the energy, delay return, or limit return in order to avoid operational inefficiencies associated with taking in too much

return energy during off-peak hours. These and other means of handling the return energy in no way change the underlying capacity based feature of the service purchased.

Edison will be unable to present any evidence that it ever considered the service in the Option Capacity as anything but a capacity with a return energy obligation. That is, Edison will not be able to present any evidence that demonstrates that Edison viewed the Option Capacity service as a firm power sale. In short, the Capacity Without Energy demand charge in the FPS-96R rate schedule is the rate for the service that Edison is purchasing under section 12(a)(4) of the Contract.

III. The Contract Provided Bonneville With The Right To Apply FPS-96R To The Contract

As noted above, Edison does not seriously dispute that Bonneville possessed the right to create "successor rate schedules" to the SP-87 by conducting a 7(i) rate proceeding as required by the Northwest Power Act. Rather, Edison disputes that Bonneville could in any way *apply* those rate schedules to the Contract. To make such a finding, the Court must find that the Contract in some way impairs Bonneville's ability to adjust its rates, or gives Edison some special protections from Bonneville rate proceedings. In fact, the Contract does no such thing.

The Contract unambiguously provides that Bonneville possessed the right to change the rate schedules applicable to the Option Capacity in a section 7(i) proceeding. Section 12(a)(4) of the contract states that once the SP-87 is "no longer in effect", the new price for the Option Capacity will be in accordance with a "successor rate schedule." The only legal method of removing or altering an approved Bonneville rate schedule is by initiating a rate proceeding under section 7(i) of the Northwest Power Act. See California Energy Resources Conservation and Development Commission v. Bonneville Power Admin., 831 F.2d 1467, 1472-73 (9th Cir.

1987) citing Portland General Elec. Co. v. Johnson, 754 F.2d 1475, 1481 (9th Cir. 1985), and Cal. Energy Resouces Conservation & Dev. Comm'n v. Bonneville Power Admin, 754 F.2d 1470, 1474 (9th Cir. 1985). Thus, based on the plain language of the Contract, Bonneville had the right to change the successors to the SP rate schedule by conducting a section 7(i) proceeding. The General Provisions to the Contract further provide that Bonneville could create "successor rate schedules." The General Provisions to the Contract, which "shall be deemed to be a part of the contract body to which they are an exhibit," provide at § 3(b):

> Bonneville shall establish and periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.

The pricing provision in section 12(a)(4) references the SP-87 *rate schedule*, and therefore is subject to this provision. Thus, Bonneville had the right to "periodically review and revise rates" in accordance with the 7(i) process (i.e., "applicable law") for sales of capacity made under the contract.

Once these rates were set in place, the Contract required that Edison pay the rate or rates associated with the particular types of services Edison was purchasing in the contract. Section 3(b)(3) of the General Provisions provides:

> [t]he purchaser shall pay Bonneville for the electrical power, capacity or energy made available under this contract during the period commencing on each Rate Adjustment Date . . . at the rate specified in any rate schedule available at the beginning of such period for service ***of the class, quality, and type*** provided for in this contract, and in accordance with the terms thereof, and of the General Rate Schedule Provisions as changed with, incorporated in or referred to in such rate schedule.

Thus, Bonneville not only had the clear contractual right to set rates in its rate cases, but Edison had the unambiguous contractual obligation to pay Bonneville in accordance with the rates for the "service of the class, quality, and type provided for" in the Contract.

All these provisions establish that Bonneville could do just what it did in the FPS-96R rate proceeding. That is, Bonneville could design its rates through a 7(i) rate proceeding to create a single rate for a product called "capacity without energy." If Edison was purchasing a product that met the definition of "capacity without energy" as defined in the rate schedule, Edison was obligated by the Contract to pay Bonneville at the rate identified in the rate schedule. General Provision §3(b)(3). If Edison believed the rate Bonneville was developing was too high, Edison could avail itself of the procedural protection in the 7(i) rate proceeding, which, in fact, it did.

## IV. Edison's Reference To Contra Proferentem Is Misplaced

In its Memorandum, Edison makes a passing reference that the Court should construe the language of section 12(a)(4) against Bonneville because "it drafted the language at issue." Memorandum at note 16. However, it is well settled that *contra proferentem* is inapplicable where the contract terms are negotiated. See Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350, 360 (Fed. Cl. 2000); Consumer Ice Co. v. United States, 201 Ct. Cl. 116, 122-123 (1973). In making this argument, Edison conveniently ignores the declarations and testimony of its own witnesses in their depositions, and even statements Edison made earlier in this vary same filing. As noted on page five of Edison's Memorandum, "Edison and Bonneville engaged in lengthy negotiations with respect to how to price the Option Capacity." Memorandum at 5. Edison's claim for construction against the Government, therefore, should be ignored.

V. Edison's Lost Profits Claim Is Limited By The Principles Of Causation, Foreseeability, And Certainty, As Well As The Duty To Mitigate

Edison's lost profits claim, like all contract claims for expectancy damages, is subject to the requirements of proving causation, foreseeability, and certainty, as well as avoidability (mitigation). Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (rejecting claim for lost profits resulting from a reduction of a bank's regulatory capital); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[C]ontract law precludes recovery for speculative damages."); see Restatement (Second) of Contracts §§ 350-52 (1981). Edison cannot satisfy its burden of meeting any (let alone all) of these requirements to recover the lost profits it alleges.

A. Edison Cannot Sustain Its Burden Of Proving Causation

Edison cannot meet the causation standard in this Court even if all reasonable inferences are drawn in its favor. For Edison to satisfy its burden of proving causation, its alleged damages must flow "inevitably and naturally, not possibly nor even probably" from the breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) (quoted in Wells Fargo, 88 F.3d at 1022-23); Ramsey v. United States, 121 Ct. Cl. 426, 433, 101 F. Supp. 353 (1951); Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 304 (2003). This test is the appropriate causation test for breach of contract actions and requires a close, direct, and inevitable nexus between the breach and the harm alleged. See Quiman S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997) (plaintiff bears the burden "to establish clear proof that it was injured as a direct result of defendant's alleged breach"), aff'd, 178 F.3d 1313 (Fed. Cir. 1999).

The causation standard precludes any award of damages stemming from independent business decisions. For example, the Federal Circuit has rejected a contractor's claim that, absent the breach, it would not have purchased additional insurance for a space launch which it claimed it obtained precisely because of the breach. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001). The court reasoned: "Hughes made the independent business decision to obtain launch insurance. This intervening cause precludes the award of increased insurance costs as direct damages." Id. at 1071; see also Myerle, 33 Ct. Cl. at 26 (barring recovery of lost profits "such as would have been realized by the party from other independent and collateral undertakings"); accord Wells Fargo Bank, 88 F.3d at 1022-23.

In this case, Edison made an economic decision not to purchase the capacity from Bonneville at the higher rate contained in section 1.1.2 of FPS-96R. This economic decision, based upon Edison's predictions of what the PX day-ahead market would bear, was the direct cause of Edison's failure to make a profit from speculating with the additional capacity that the exercise of the option may have provided. Moreover, the instability of the PX market itself intervened in the events that may have led Edison to loose out on a speculative opportunity. As Edison admits in its Memorandum, it did not foresee that the PX day-ahead market would continue to rise throughout the summer of 2000, but it is willing to impose such an unforeseeable event upon Bonneville. See Memorandum at 24.

The evidence establishes that the alleged breach did not directly and inevitably lead Edison to realize a smaller gain from its participation in the PX day-ahead market. Rather, independent business decisions, the creation of an entirely new market structure and the vagaries of that market constituted intervening and superseding causes directly resulting in Edison's

failure to maximize its gain on the PX. Hughes Communications, 271 F.3d at 1071; California Fed. Bank v. United States, 54 Fed. Cl. 704 (2002) (prudent management choices and independent business decisions break the chain of both causation and foreseeability), aff'd 395 F.3d 1263 (Fed. Cir. 2005).

B. Edison Cannot Sustain Its Burden Of Proving Foreseeability

In addition to this Court's requirement for causation, contract damages are also limited by Edison's burden of proving the foreseeability of its alleged lost profits. Wells Fargo, 88 F.3d at 1022-24 (rejecting suggestion that foreseeability was demonstrated by the "regulated nature of the banking industry"); see Restatement § 352 cmt. a ("the requirement of certainty is distinct from that of foreseeability"). This limitation bars recovery where the breaching party cannot reasonably be said to have contemplated the alleged harm at the time of contracting. Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 714-15 (1975); see Estate of Berg v. United States, 231 Ct. Cl. 466, 687 F.2d 377, 383 (1982).

In particular, recovery is barred where the breaching party could not have foreseen, at the time of contracting, that the other party would have entered into the transaction that allegedly would have produced the claimed profits. Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300-01 (Fed. Cir. 1986) (plaintiff failed to show Government's ability to foresee dealings with any tenant at contract date; nor did plaintiff set forth facts demonstrating its, or other companies', commercial leasing practices; nor did it present any evidence to show that these practices were known to Government at time of contract).

To be foreseeable, "the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach.'" Landmark Land Co. v.

United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting 5 A. Corbin, Corbin on Contracts, § 1012 at 88 (1964)). "'Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'" Landmark, 256 F.3d at 1378 (quoting Restatement § 351(2)). "The concept of 'consequential damages' in contract law relates to the concept of foreseeability at the time the contract is executed, not . . . foreseeability at the time of the breach." Bohac v. Department of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001). Moreover, the actual loss must have been foreseeable. "'The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.'" Landmark, 256 F.3d at 1378 (quoting Restatement § 351 cmt. a). This encompasses the magnitude of the alleged actual loss (i.e., the amount of the claimed damages).

In the context of this case, it would have to have been foreseeable to Bonneville at the time of Contract award that Edison not only would call on the capacity to address a resource shortfall, as the parties anticipated, but would have been using the capacity provided by section 12 of the Contract to realize a gain in the California PX day-ahead market. Moreover, Bonneville would have had to expect that the PX day-ahead market would experience unprecedented volatility during the summer of 2000.

However, the California PX day-ahead market did not exist in 1988 at the time of contract award. The PX did not come into existence until 1998,[3] after the Government's

[3] We do not dispute that bi-lateral markets existed in 1988, but these cannot be equated with the highly active PX market that Edison was required to use beginning in 1998.

deregulation of the electric industry in 1996, and ten years after contract award. Moreover, Edison itself admits in its Memorandum that it did not foresee the volatility of the PX day-ahead market when it elected not to purchase the capacity from Bonneville in May 2000. Memorandum at 24. As Edison has stated:

> Admittedly, in retrospect, SCE would have been better off accepting BPA's demand and suing for the difference, as energy prices in the PX day-ahead market skyrocketed in summer of 2000 as a result of California's energy crisis. But neither SCE nor anyone else knew this would occur at the time of BPA's breach . . .

Memorandum at 24. Thus, Edison has already conceded that its lost profit claim was not foreseeable at the time of breach, let alone at the time of contract award.

C. Edison Cannot Sustain Its Burden Of Proving Reasonable Certainty

The Wells Fargo court explained that "not every injury resulting from a breach of contract is remediable in damages," 88 F.3d at 1022, and that "remote and consequential damages are not recoverable . . . especially . . . in suits against the United States." Id. at 1021. In Wells Fargo, the Federal Circuit held that allegations of lost profits on subsequent independent leveraged investments did not satisfy plaintiff's burden of proving that its damages were reasonably certain. Id. at 1023. If alleged lost profits "are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration." Wells Fargo, 88 F.3d at 1022-23 (quoting Ramsey, 121 Ct. Cl. at 433); see Myerle, 33 Ct. Cl. at 26 (noting that lost profits from "independent and collateral undertakings" are not recoverable, and that evidence of such "lost profits" is inadmissible).

These "independent and collateral undertakings" can include "the anticipated profits of [an] entire business enterprise" from its "overall business activities." Wells Fargo, 88 F.3d at 1022; Ramsey, 121 Ct. Cl. 426, 101 F. Supp. at 357-58 ("The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a normal result of the Government's delay in payment."). As the Federal Circuit ultimately held in Wells Fargo, in applying the reasonable certainty standard: "[A]ttempting to determine what would have happened if the [bank's leverage had not been affected by the breach] necessarily involves a highly speculative and conjectural inquiry." Wells Fargo, 88 F.3d at 1021. Given this, the claimed loss of income on subsequent independent leveraged investments that a plaintiff allegedly could have made had there been no breach was "too uncertain and remote" to form the basis of an award of lost profits. Wells Fargo, 88 F.3d at 1023.

The same is true of Edison's claim in this case. Indeed, the very nature of the claim, based upon Edison's independent economic decision to forgo not only the capacity on offer from Bonneville, but other forward contract options that could have been used to arbitrage the PX day-ahead market, establishes the independent and collateral undertakings that more directly resulted in Edison's lost profits.

D. Edison Had An Obligation To Mitigate Its Alleged Damages

It is black-letter law that a non-breaching party has a duty to attempt to mitigate its damages following another party's breach of contract. See, e.g., Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); Midwest Indus. Painting v. United States, 4 Cl. Ct. 124, 133 (1983); Franklin Federal Savings Bank v. United States, 60 Fed. Cl. 55, 60 (2004) (plaintiff "had the obligation under the law to mitigate damages"); see also Robinson v. United States, 305 F.3d

1330, 1336 (Fed. Cir. 2002); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 156 (2003); Middleton v. United States, 175 Ct. Cl. 786, 792 (1966); Restatement (Second) of Contracts § 350 (1981). Accordingly, Edison "may not recover those damages which could have been avoided by reasonable precautionary action on its part." Id.

Edison cannot recover expectancy damages if it "failed to take action to mitigate such damages," Quiman, 39 Fed. Cl. at 185, because this Court precludes plaintiffs, such as Edison, from recovering expectancy damages when they did not make sufficient efforts to mitigate their damages. See Everett Plywood Corp. v. United States, 206 Ct. Cl. 244, 512 F.2d 1082 (1975) (denying lost profits damages to a buyer of timber because there was no attempt to mitigate its losses by a cover transaction, such as procuring other timber as a substitute; nor evidence that such a substitute transaction would cost the plaintiff more than the withheld timber would have cost it); Restatement (Second) on Contracts § 350; 5 A. Corbin, Corbin On Contracts § 1039 (1964); E. Allen Farnsworth, Farnsworth On Contracts § 12.11 at 217 (1990). See also, Transnor Ltd. v. BP North America Petroleum, 736 F. Supp. 511, 522 (S.D.N.Y. 1990); Three Crown Ltd. Partnership v. Salomon Brothers, 906 F. Supp. 876, 887 (S.D.N.Y. 1995).

These decisions illustrate that a plaintiff should not be awarded "lost profits" related to its business decisions unless it can prove it attempted to acquire a substitute. In this instance, Edison claims that it is entitled to approximately $31 million in lost profits damages; however, it failed to take reasonable steps to mitigate the alleged harm. Specifically, Edison could have (1) purchased the capacity from Bonneville and invested the capacity into the PX market and (2) brought suit against Bonneville for the difference in cost between the two demand charges in FPS-96R. Such action would have been consistent with Edison's contractual obligation to

continue performance in the event of a dispute, Contract § 20, as well as enable Edison to benefit from the volatile PX day-ahead market and still pursue a claim for damages limiting the potential loss to the difference between the two demand charges in the FPS-96R rate schedule. Indeed, Edison admitted in its May 24, 2000 letter to Bonneville that its total damages would have been $13.4 million had it taken the Option Capacity at the disputed rate (which, of course, was explicitly subject to refund by FERC and without prejudice to SCE's rights).

Moreover, Edison had every opportunity to purchase a block of power in the California PX block forward market to cover its purported capacity needs during the summer of 2000. This "hedge" against the vagaries of the day-ahead spot market was well known to Edison, as they were one of the largest purchasers of block forward contracts in the California PX in 2000. As the evidence will establish, by purchasing a substitute block forward contract, Edison could have limited its exposure to around $6-7 million, and by investing excess block forward capacity in the day-ahead market, as it planned to do with the Option Capacity, it could have eliminated any damages resulting from its decision to forego Bonneville's capacity. Indeed, although Edison has characterized its damage claim as one for lost profits, Edison has failed to demonstrate that it did not purchase block forward contracts to off-set any capacity loss associated with its economic decision to forgo exercising the capacity option in the Contract.

E. The Time For Measuring Damages Is At the Time Of The Breach

Edison's claim is based upon measurements throughout the summer of 2000, and not at the time of the alleged breach, May 2000. However, the general rule in this Court is that damages must be assessed at the time of breach, not at the time of trial. As the Court explained in Northern Paiute Nation v. United States: "The general rule applied in the Court of Claims,

this Court's predecessor, seems to be that damages are measured at the time of breach." 9 Cl. Ct. 639, 643 (1986); see also Estate of Berg, 687 F.2d at 380 ("'As a general rule, our law has adopted the standard of market value at the time and place of the failure to perform as the basis for measuring the compensation to which the injured promisee is entitled.'") (quoting J. Murray, Contracts § 237 (2d rev. ed. 1974)). As established above, the damages measured at the time of the breach would be either the $13.4 million in price difference incurred by purchasing the capacity from Bonneville, or the $6-7 million associated with the purchase of a block forward cover contract. Edison's election to simply "wait and see" how the PX day-ahead market would play out, without taking any steps to obtain cover for the so-called lost capacity, is the exact opposite of mitigation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0319

Attorneys for Defendant

OF COUNSEL:

JON D. WRIGHT
RICHARD A. GREENE
Office Of The General
Counsel
Bonneville Power Admin.
905 N.E. 11th Avenue
Portland, OR 97208

November 17, 2006

Notice of Filing

I hereby certify that on November 17, 2006, a copy of the foregoing Defendant's Memorandum of Contentions of Fact and Law was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Martin F. Hockey, Jr.