IN THE

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 03-2869C<br><br>(Judge Lettow)<br><br>Hearing Date: November 27, 2006<br>Time: 10:00 a.m.<br><br>Trial Date: December 4, 2006 |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS, DR. SAMUEL VAN VACTOR; SUPPLEMENTAL DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF**

## I. INTRODUCTION

BPA accuses SCE of trying to impose upon BPA a duty to establish damages. To the contrary, SCE has always acknowledged its duty to prove its damages and will present expert testimony that will more than satisfy that obligation. SCE moved to exclude the testimony of BPA expert Dr. Samuel Van Vactor because his testimony is an unabashed attempt to set forth the *legal standard* for computing SCE's damages: something that SCE's damages expert does not do, and, more importantly, something that is not permissible for any expert to do because the issue is within the exclusive province of the Court to determine.

Dr. Van Vactor submitted his expert report ("Report") on August 11, 2006 – just ten days after BPA first approached him about testifying in this case.[1] Dr. Van Vactor's Report makes two points: His first, and most significant, point is that the "legal and economic literature" support his opinion that damages should be measured on the day that the plaintiff learned of the breach. Dr. Van Vactor's principal citation for that premise is a secondary source – Judge Richard Posner's textbook, *Law and Economics*. Dr. Van Vactor provides no independent economic analysis of this issue – not his own, or anyone else's. There is thus no doubt about what Dr. Van Vactor's testimony was designed to accomplish in this regard – to offer evidence regarding a legal proposition as to how to measure damages in this case. For that reason, SCE has moved to exclude it.

The second subject of Dr. Van Vactor's Report is a more traditional expert damages analysis, consisting of two computations of SCE's damages. SCE moved to exclude that testimony because, at deposition, Dr. Van Vactor conceded that neither computation was accurate. Now, in its Opposition brief, BPA suggests that "it really didn't mean it", and that the calculations merely suggest "various alternative courses available to Edison." Defendant's Opposition to Plaintiff's Motion *in Limine* to Exclude

---

[1] Van Vactor Depo. p. 10, ln. 6-22. The excerpts of Dr. Van Vactor's deposition cited herein are attached as Exhibit A to the Supplemental Declaration of Joseph J. Ybarra, attached hereto.

the Testimony of Dr. Samuel Van Vactor ("Opp'n") at 4.

For his part, Dr. Van Vactor now attempts to submit a Supplemental Report, with new damages computations.[2] Setting aside its dubious reliability, this Supplemental Report is procedurally defective, and should be stricken by the Court. BPA has not even sought leave to submit the new report, likely because it has no basis to do so. At his deposition, Dr. Van Vactor expressly testified that he was able to compute SCE's damages based upon data provided to BPA in 2002, as support for SCE's administrative claim against BPA. Dr. Van Vactor's failure to accurately do so prior to his deposition (*in October 2006*) is thus his own fault, not SCE's. There is no basis for Dr. Van Vactor to now submit a Supplemental Report -- *after* the date for expert reports set by the Court, after Dr. Van Vactor has been deposed, and only *two-and-a-half weeks before trial*.[3]

In the end, BPA is proffering Dr. Van Vactor for no reason other than to bolster its *legal* argument that SCE's damages should be measured as of May 22, 2000 – when SCE learned that BPA intended to breach the Agreement. Using Dr. Van Vactor's testimony for this purpose is improper. Accordingly, SCE requests that the Court exclude Dr. Van Vactor's testimony in its entirety.

## II. ARGUMENT

### A. Dr. Van Vactor's Testimony Invades The Province Of The Court.

The proper measure of damages (as opposed to the calculation of damages) is a legal conclusion, "well beyond the bounds of permissible expert testimony." *Housing Works, Inc. v. Turner*, 362 F.Supp.2d 434, 448 (S.D.N.Y. 2005)

---

[2] Dr. Van Vactor's Supplemental Report is attached as Exh. B to BPA's Opp'n. This Supplemental Report was not produced to SCE until the filing of BPA's Opposition brief on November 15, 2006. Supplemental Declaration of Joseph J. Ybarra ("Ybarra Supp. Decl."), attached hereto, ¶ 3.

[3] Moreover, at deposition, BPA's counsel represented that Dr. Van Vactor had not been asked to perform any additional work. Van Vactor Depo. p. 137, lns. 12-22.

(citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) and other cases).

As each of his first Expert Report, his deposition testimony and his remarkably argumentative Supplemental Report make clear, Dr. Van Vactor is doing exactly what has been prohibited by the courts – offering an "expert" opinion on the proper way to measure damages, a legal issue:

Van Vactor Report at 6: "BPA cannot be responsible for the fact that SCE chose to take a chance with the vagaries of the spot power market when it did not have to do so."[4]

Van Vactor Report at 10: "There is a large array of *legal* and economic literature related to damage calculations in the event of contract breach." (Emphasis added.) Dr. Van Vactor then cites Posner's *Law and Economics* text.

Van Vactor Report at 10: "In the event of contract breach, the buyer is *obligated* to cover the contract with a forward purchase of a similar or identical commodity on the date of breach." (Emphasis added.)

Van Vactor Depo. p. 25, lines 9-12:[5] "The *obligation* SCE had at the time of this default, if indeed there was a default, was to value the contract, how much is that contract worth over the next five months." (Emphasis added.) *See also* Van Vactor Depo. p. 36, lines 12-14; p. 61, lines 14, 16.

Van Vactor Depo. p. 81, lines 4-6: "Well, I have no opinion as to what SCE should have done. My opinion concerns what their *obligation* to Bonneville is." (Emphasis added.)

Van Vactor Supplemental Report at 7: "It is incumbent on all parties in a

---

[4] Dr. Van Vactor's Expert Report is attached as Exhibit A to the Declaration of Joseph J. Ybarra, attached to SCE's Opening Motion.

[5] The excerpts of Dr. Van Vactor's deposition cited herein are attached as Exhibit A to the Supplemental Declaration of Joseph J. Ybarra, attached hereto.

contract to value the benefits and costs of default at the time the decision to breach is made."[6]

Each of the foregoing is a legal statement. Law imposes obligations; economics does not. Van Vactor repeatedly states legal conclusions – ones that are not supported by any economic analysis. Indeed, BPA admits as much in its Opposition: "Dr. Van Vactor's expert testimony [calls] into question the *legitimacy* of Edison's damage theory . . . ." (Opp'n at 5) (emphasis added). BPA, in short, makes SCE's point: Dr. Van Vactor brings nothing to the table except legal dictum. That should not be allowed under the guise of expert testimony.

### B. Dr. Van Vactor Has No Basis To Opine On The "Reasonableness" Of SCE's Actions.

The primary purpose of BPA's Opposition brief is to make excuses for the deficiencies found in Dr. Van Vactor's two original damages calculations, something that BPA now contends was not the fault of Dr. Van Vactor, but the result of SCE's failure timely to provide information. This is patently false. But even setting that issue aside for the moment, neither Dr. Van Vactor's old damages computations nor the one offered in his new Supplemental Report are relevant to the issue that BPA contends they are relevant to – "the unreasonableness of Edison's decision in 2000 to ignore various courses that would have dramatically limited any damages resulting from a finding of breach by the government." ( Opp'n at 6.)[7]

[6] Although Dr. Van Vactor follows this with a sentence about "economic efficiency," he never explains his economic efficiency argument.

[7] If there was any question as to whether this was the true matter on which Dr. Van Vactor intends to testify, that question was put to rest by BPA's Opposition brief. *See also*, Opp'n at 4 ("The unifying theme of Dr. Van Vactor's report is that Edison's actions when faced with the alleged breach by the Government were unreasonable.")

There are two problems with accepting the above statement as the basis for the relevance of Dr. Van Vactor's testimony. *First,* Dr. Van Vactor vigorously denied at his deposition that he knew what SCE had done in the Summer of 2000. Given his lack of knowledge, Dr. Van Vactor cannot provide an opinion on whether SCE's actions were unreasonable.[8]

*Second,* Dr. Van Vactor lacks any basis to testify on what he believes Edison *should have done*. Indeed, at deposition, Dr. Van Vactor was asked whether he has any basis to opine on the reasonableness of the actions taken by SCE. Dr. Van Vactor testified unequivocally that he did not, and that he did not intend to testify on the merits of what SCE did or did not do. For example:

> Q So do you have any basis for saying that what they [SCE] did do was unreasonable?
>
> A I don't think I said that in my report.
>
> Q Well, that's -- you didn't. I'm just asking whether you -- you don't have a -- so you didn't make that statement about what they did do?
>
> A I didn't make that statement, no.[9]
>
> * * *
>
> Do you have any reason to believe that what Edison did -- actually did, as a business entity, was unreasonable?
>
> A From what I understand about their circumstances, given their concern to get their standard costs paid off and all the rest, what they did was reasonable, in terms of taking a gamble. They were hoping prices would be lower and they would do better than as it turned out they did.

---

[8] Van Vactor Depo. p. 29:9-19.

[9] Van Vactor Depo. at 29:20 – 30:1.

> And that was not an unreasonable business decision on their part.[10]

In view of Dr. Van Vactor's testimony at deposition, it is quite remarkable that BPA is now attempting to cast him in the role of one who would testify that SCE's actions were unreasonable. BPA cannot, at this late date, reconfigure its expert's testimony to relate to something that it does not – particularly where, as here, its expert has already testified that he has no basis to offer an opinion on the subject for which his testimony purportedly is offered.

### C. Having Abandoned His Prior Computations Of Damages, Dr. Van Vactor Should Not Now Be Permitted To Offer New Ones.

As set forth in SCE's Opening Motion (*see* pp. 7-9), Dr. Van Vactor conceded at his deposition that the two damages computations in his Expert Report were inaccurate. Recognizing that it cannot escape the legal effect of that testimony for the admissibility of Dr. Van Vactor's opinions, BPA does not defend those computations. Instead, BPA contends that Dr. Van Vactor's testimony does not raise a *Daubert* reliability concern because the deficiencies in Dr. Van Vactor's original computations have been rectified by virtue of his Supplemental Report. ("[E]ven assuming Edison's challenge to the August 2006 calculations raises a *Daubert* reliability concern, Dr. Van Vactor's additional calculations eliminate any suggestion of inconsistency… .") (Opp'n at 10.)

If necessary, SCE will address the deficiencies in Dr. Van Vactor's Supplemental Report in a Motion to Strike. Suffice it to say here that his new calculation suffers from the same biases as his old ones. Rather than choosing a reasonable

---

[10] Van Vactor Depo. at 106:14-23.

representation of the market for calculating his numbers, Dr. Van Vactor has apparently selected a very low cost year (1999), rather than the year of BPA's breach (2000) or an equally available higher cost year (such as 1998) that more closely resembled the conditions in 2000.

Setting aside the foregoing, Dr. Van Vactor should not even be permitted to offer his new Supplemental Report. The Court entered a Scheduling Order on April 3, 2006, which required expert reports to be exchanged by August 11, 2006.[11] BPA has not sought relief from that Order. Nor has it sought leave to offer the Supplemental Report, and its attempt to offer it now, well *after* Dr. Van Vactor's deposition was taken and only *2 ½ weeks before trial*, violates the Rules of the Court. *See* RCFC 26(a)(2)(B) (requiring that a party identify its expert witnesses and provide a written report that is "a complete statement of all opinions to be expressed and the basis and reason therefor…"); RCFC 37(c)(1) (a party failing to provide the information required under Rule 26(a) is not permitted to use such evidence at trial, unless the failure to do so is harmless).

BPA has no excuse for offering the Supplemental Report at this late juncture. In its Opposition brief, BPA contends that Dr. Van Vactor was forced to do a Supplemental Report because SCE did not provide BPA with certain data that Dr. Van Vactor needed to make his calculation until a week before his deposition. (Opp'n at 2.) BPA's argument conflicts with Dr. Van Vactor's own deposition testimony. Dr. Van Vactor testified quite clearly that he did not need this information to calculate his own "damages estimate" because he had sufficient information from the materials that SCE provided to BPA in 2002 in connection with SCE's administrative claim. *See* Van

---

[11] A true and correct copy of this Court's Scheduling Order is attached hereto as Exh. B.

Vactor Depo. at 45-48 ("No, I did not need his present report [Dr. Kahn's] to do this table. I prepared it on the basis of his earlier declaration, that's correct.")

In addition, BPA entirely fails to explain why it did not correct Dr. Van Vactor's Report earlier than it did. By its own admission, BPA received the information that it contends was necessary on September 18, 2006. (Opp'n at 2.) As pointed out above, at Dr. Van Vactor's deposition, BPA's counsel specifically represented that Dr. Van Vactor had not been asked to perform any additional work,[12] even though, at the time, BPA had the documents that it now complains it lacked. Nonetheless, BPA chose to wait until now – two months later and on the eve of trial – to correct the errors in Dr. Van Vactor's Report. It is simply too late, as the admission of Dr. Van Vactor's Supplemental Report at this stage will undoubtedly prejudice SCE, who has not had an opportunity to even depose Dr. Van Vactor on that Supplemental Report.[13]

## III. CONCLUSION

For the reasons set forth above, Plaintiff Southern California Edison Company respectfully requests that the Court exclude the testimony of Dr. Van Vactor in its entirety.

Respectfully submitted,

s/Charles D. Siegal

Charles D. Siegal
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor

[12] Van Vactor Depo. p. 137, lns. 12-22.

[13] At a minimum, if BPA is permitted to offer Dr. Van Vactor's Supplemental Report, SCE should be permitted to take Dr. Van Vactor's deposition again. If, as SCE expects, that deposition testimony establishes that Dr. Van Vactor's Supplemental Report is as unreliable as his original one, SCE will then move to strike it.

Los Angeles, CA 90071-1560
Telephone: (213) 683-9181
Telephone: (213) 683-9194
Facsimile: (213) 687-3702

**COUNSEL OF RECORD FOR PLAINTIFF SOUTHERN CALIFORNIA EDISON COMPANY**

DATED: November 20, 2006

**OF COUNSEL:**
Leon Bass
SOUTHERN CALIFORNIA EDISON
2244 Walnut Grove Avenue, Room 359
Rosemead, CA 91770
Telephone: (626) 302-6967
Facsimile: (626) 569-4145

Joseph J. Ybarra
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9502
Facsimile: (213) 687-3702

**SUPPLEMENTAL DECLARATION OF JOSEPH J. YBARRA**

I, Joseph J. Ybarra, declare as follows:

1. I am an attorney with the law firm of Munger, Tolles & Olson LLP, counsel for plaintiff Southern California Edison Company ("SCE") in this action. Unless otherwise stated herein, I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify to them.

2. Attached as Exhibit A is a true and correct copy of relevant excerpts of the transcript of the deposition of Dr. Van Vactor, taken on September 28, 2006.

3. Prior to the filing of BPA's Opposition brief on November 15, 2006, SCE had not been provided Dr. Van Vactor's Supplemental Report.

4. Attached as Exhibit B is a true and correct copy of the Scheduling Order entered by the Court in this matter.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 20th day of November, 2006, in Los Angeles, California.

s/Joseph J. Ybarra

# EXHIBIT A

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

| | | |
|---|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY,<br>Plaintiff,<br><br>vs.<br><br>UNITED STATES,<br>Defendants. | ) | No. 03-2869C |

DEPOSITION OF SAMUEL A. VAN VACTOR

Los Angeles, California

Thursday, September 28, 2006

Reported by:

SHERRYL DOBSON, RPR

CSR No. 5713

JOB No. 920216

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendants. | No. 03-2869C |

Deposition of SAMUEL A. VAN VACTOR, taken on behalf of Plaintiff, at 355 South Grand Avenue, 35th Floor, Los Angeles, California, beginning at 11:22 a.m. and ending at 4:56 p.m., on Thursday, September 28, 2006, before SHERRYL DOBSON, Certified Shorthand Reporter No. 5713.

Power Point slides. I might have, if I saved them.

Q Okay. So that's the only -- in the briefings that you gave to Bonneville's administrator, have you ever discussed the option capacity issue?

A No.

Q Okay. When was the first time you heard about the dispute between Edison and Bonneville relating to option capacity?

A July of this year.

Q Okay. And how did you hear about it?

A I was telephoned by BPA attorneys.

Q And who at BPA called you?

A John -- well, Richard, who is here, and John Wright, who is not here.

Q Okay. And what did they say?

A They said that they had a dispute with SCE and wanted to know if I had any conflicts and would I be available, and I had no conflicts, so I agreed to meet with them.

Q Okay. And that was in July of 2006?

A Near the end of July, yes. No, I believe the meeting was actually the first of August, thereabouts.

Q So you've been deposed. You know that -- well, let me strike that for a second.

Was there any written communications between

have purchased 516,000 to cover all the hours that would have potentially been hours it would have purchased from BPA, and then -- so it would have had a surplus of power. So it could then have sold that in the spot market; is that correct?

A First let me make an important point. I think the text says that SCE could have done this. It doesn't say SCE should have done this. And there's more than a slight nuance to that. The obligation SCE had at the time of this default, if indeed there was a default, was to value the contract, how much is that contract worth over the next five months.

Now, I had a very limited amount of time and not a lot of information about how to value that contract. I proposed a couple of methodologies here. Both are significantly less than SCE's claim.

Q Excuse me. You say Edison had an obligation to value that contract.

Is that based on your economic understanding?

A It is based on my economic understanding.

Q Okay. And so there's no legal analysis that goes into that?

A The standard in commodity markets, which began as an economic argument, I understand, primarily

to either go out and buy power or the buyer buys power and charges the seller for the power they didn't get.

Q Okay. But under those contracts, did the purchaser of the power have an option to say, well, I'm not going to be taking power?

A I do not recall on this one.

Q Okay. So let's go back to the chart.

A Okay.

Q You said you had an opinion as to -- I mean, I'm sorry, you said that you didn't know specifically what SCE did; is that correct? Strike that.

You said that you believed they continued just to buy power.

A Well, we know they bought power.

Q Right.

A I do not know what their specific strategy was for procuring that power. I didn't -- I didn't know of it when I wrote my report, and I didn't hear anything today that enlightened me.

Q So do you have any basis for saying that what they did do was unreasonable?

A I don't think I said that in my report.

Q Well, that's -- you didn't. I'm just asking whether you -- you don't have a -- so you didn't make that statement about what they did do?

A I didn't make that statement, no.
Q Okay. Thank you.
Okay. So back to 7.2.
We know how you derived the hundred and 10. And so what I was asking was, if Edison had purchased forward power at the price you have derived, the $83, for 516,000 megawatt hours of power, then it would have had these forward contracts, and the power would be delivered the sort of standard contracts you're talking about, correct?
A Yes.
Q Okay. So then it could sell off what it did not use in the hours that it would have asked BPA to deliver; is that correct?
A The "sell off" is in quotes. The "resold" is in quotes. They would obviously use it, because they were in deficit most of this period.
But the point is it has a value to them at that point, and that value was indeed higher than what they paid for it, as it turned out. Ex post, we know that.
Q But we didn't know at the time it would be higher --
A No.
Q -- is that correct?

7 -- "This consists" -- or I begin again. "I estimate the net damage to be 31.5 million. This consists of 50.6 million that SCE had to pay as cover, the amount that SCE paid to purchase the energy that BPA should have delivered under the terms of the contract minus the 18.9 million it would have cost" -- and the operable word here is "would have cost" -- "SCE to purchase that energy from BPA had BPA adhered to the terms of the contract."

In other words, there's no way out of the 18 million. Those hours had to be returned to BPA -- to fulfill the BPA contract you had to use the spot market. But the point is the BPA contract wasn't fulfilled. And since the BPA contract wasn't fulfilled, then the only obligation SCE had was to cover those hours directly.

Q I think we're missing each other here.

A Yes.

Q And I think you answered maybe my next question.

What I'm asking about is the hundred and ten dollar cost here. You said the resold hours.

Edison, under your construct, could have bought 516,000 megawatt hours in the block-forward market on May 22, and then it should have known that it would have had a surplus of hours for at least the shoulder hours of those -- that time? And I call -- you

A Yes.

Q Do you have an estimate of how much lower?

A Well, we know that the average of the ten hours of super-peak if we want to call it that.

Q Yeah, okay.

A And the six hours plus one weekend day of less valuable peak time -- we know the average of that was $83. So presumably, the super-peak hours would have been a bit more. And the less valuable the unclaimed hours, as they're labeled here, would have been a bit less. So it would have been somewhat less than $83 a megawatt hour.

Q But you don't know how much, or do you?

A I haven't done the calculation, no. You know, part of the -- there were two reasons for that. The first being that we had a very limited time frame to get this report out, and the second was, more importantly, we didn't have much to go on, in terms of what Dr. Kahn was proposing for damages.

Q Well, but this is a different theory than Dr. Kahn's theory, correct? I mean, you had his numbers.

A We had a --

Q Strike that.

This is a different theory than his theory?

A Yes.

Q Okay. So you didn't need his numbers to do this theory?

A I'm not entirely sure that's correct, because one of my primary missions here was to critique what they had done and to say why it was inappropriate. And certainly, it would have helped me -- it would have greatly enriched my analysis, had I had more details on what he had done.

Q Well, you had his declaration from 2002 on the damages, correct?

A Yes, I did have that.

Q Okay. So that told you basically what he had done, correct?

A I -- yes, I understood a couple of key points.

Q And the numbers that were missing were the numbers that you could get by going to the University of California Energy Institute Web site, right?

A Not entirely, because I didn't know which hours out of the 16 were being claimed by SCE. That was the largest missing unknown.

Q So when you did -- but in your calculation, looking at the 516, that doesn't depend on anything in Dr. Kahn's calculation, right?

A That's correct.

Q And the 83 doesn't depend on anything in

Dr. Kahn's calculation, correct?
A That's correct.
Q And the 241 doesn't depend on anything in Dr. Kahn's calculation?
A As it turns out, that does depend on his numbers, because I had estimated the claim at being 275,000 megawatt hours, and apparently that estimate was somewhat higher than what SCE is actually claiming. So this table is not directly comparable to his data.
Q Okay. That's right. That's my point.
The 275 is your understanding of what -- the 241 is 516 less 275?
A That's correct.
Q Okay. Now, the 275 doesn't depend on anything Dr. Kahn did, correct?
A That's correct.
Q Okay. So of those numbers there, none of them depend on Dr. Kahn, and the 110 doesn't depend on anything Dr. Kahn did either, correct?
A No, that's not correct.
Q And why is that?
A All right. The -- if you look at the value column, the SCE's claim number of 50,582 -- or 50,582,000 comes directly from Dr. Kahn. And in order to get at the estimate of unclaimed hour per megawatt hour value, I had

to subtract that from my estimate of the total value of the 25 megawatt -- 10, 25-megawatt contracts at 77 million, subtract that to get 26.6 million, and then divide into that in order to calculate what the average price per megawatt hour is. So there is an interdependence here, yes.

Q So the 50 million was in his 2002 declaration?

A Yes, that's correct. That's where I --

Q Nothing other than what his -- what you had from his 2002 declaration that you needed to get these numbers, correct?

A (No audible response)

Q To compute your numbers here.

A No, I did not need his present report in order to do this table. I prepared it on the basis of his earlier declaration, that's correct.

Q Now, what hours did you assume were the -- I think we've been using the term "shoulder hours" -- when you did your analysis?

A I made no assumption. This is purely arithmetic calculation. It's a remainder. It's the leftover. If we know that the value of the hours being claimed, the 10 hours, the super-peak hours, was $50.6 million, you proceed by arithmetic calculation what the remainder was.

Q Okay. So this calculation which is consistent reflects a situation that SCE couldn't have done?

A They couldn't have done this, but they could have done what's in Table 7.2.

Q Which is --

A That's entirely feasible.

Q It's feasible, but that's not a consistent calculation?

A It's -- the methodology uses a mix of forward prices and spot prices. But it is feasible for SCE to do that.

Q So is there any place in your report where you have an accurate forward analysis of Edison's damages?

A I think that the point is that it was the obligation of SCE to estimate what its damages would have been on the day of default. And that's not the methodology that they used.

Now, I think, in cooperation with SCE, working on what was going on and the information that they have, we could come to a pretty precise and accurate estimate. But I didn't make a hard-and-fast conclusion with regard to what the damages were. I sim -- my primary point is that the calculation that was done by SCE is incorrect.

Q Okay. But you don't have in here an actual calculation of SCE's damages?

Q Assuming that SCE covered in the spot market, do you have an opinion as to whether it should have done something else?

A Well, I have no opinion as to what SCE should have done. My opinion concerns what their obligation to Bonneville is.

Q And that opinion is based on your understanding of the economics of the situation?

A The economics of the situation that has led to the formulation of how these valuations are done in commodity markets.

Q Well, are you talking about Edison's obligation to Bonneville? Is that its legal obligation?

A Well, it's the -- the point in time in which an economic valuation is to be done, in terms of damages should be at the point in time of the default or the bad act or whatever it is. And that's consistent with economic theory. It's consistent with the general approach of common law, as I understand it, but I'm not going to try to represent that, because I'm not an attorney.

Q Okay. So you say it's consistent with economic theory.

I think you've said in your declaration -- by the way, have you provided us with the drafts of your

Q And is that an economic theory or a legal theory?

A It's an economic theory.

Q Okay. And do you know of any cases that don't adopt that theory?

A I've just explained that I -- I'm perfectly willing to amend my text here to say there's none that I know about. It's certainly the body of knowledge that I'm aware of.

Q You have no -- I think before you distinguished between what Edison might do as a rational businessperson and what you take to be Edison's obligations to Bonneville.

Do you have any reason to believe that what Edison did -- actually did, as a business entity, was unreasonable?

A From what I understand about their circumstances, given their concern to get their standard costs paid off and all the rest, what they did was reasonable, in terms of taking a gamble. They were hoping prices would be lower and they would do better than as it turned out they did. And that was not an unreasonable business decision on their part.

Q Just to be clear, what they did was buying in the spot market? When you say what they did was not

price, and then sue 'em. It doesn't make any sense for me to depend on the spot market if SCE had known that.
But we can presume --
Q Okay. So I understand, you're not articulating a legal opinion here?
A No.
Q And if the law is contrary to what you're saying, then it's contrary to what you're saying?
A I couldn't possibly give you a legal opinion.
Q Okay.
A I'm giving you an economic efficiency opinion.
Q Okay. Trial is a mere two months away.
Are you planning to do any further work on this case between now and trial?
A I will do what I'm asked to do. As long as it's acceptable -- reasonable -- you know, within the bounds of the rules here.
Q Well, have you been asked to do any further work?
A As of today -- the possibility of moving ahead with -- well, I mean, I think we'd have to see what --
MR. HOCKEY: He hasn't been asked.
THE WITNESS: -- comes -- fair enough.
BY MR. SIEGAL:
Q Okay. Yeah, I mean, it's nice that we can get

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: OCT 04 2006

Sherryl Dobson

SHERRYL DOBSON
CSR No. 5713

# Deposition Correction Sheet

Deposition of Samuel A. Van Vactor
Date of Deposition: September 28, 2006
Los Angeles, California
Southern California Edison Company v. United States
Case No. 03-2869C

| Page No. | Line No. | Correction |
|---|---|---|
| 5 | 12 | spell ed |
| 6 | 3 | recent ^was for |
| 8 | 17 | Replace "Krutchet" with "Cotchett" |
| 10 | 13 | Replace "John" with "Jon" |
| 13 | 9 | Add "s" to regulation |
| 28 | 2 | Replace "motivation" with "provisions" |
| 31 | 13 | place not between is...my |
| 54 | 15 | strike "in" from ineffectively |
| 57 | 3 | insert "not" befor obligated, strike after |
| 84 | 18 | interpreted, not interpret |
| 96 | 23 | "so" becomes "some" |
| 109 | 16 | Replace "forward" with "to" |
| 130 | 15 | Replace "sheet" with "site" |
| | | |
| | | |

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this 30th day of October, 2006, at Portland, Oregon.
Day Month City

[signature]

Samuel A. Van Vactor

Subscribed and sworn before me this is 30th day of October, 2006.
Day Month

Multnomah, Oregon
County State

[signature]
Notary Signature

Linda I. McDonald, Notary Public
Notary Name

My commission expires: 5-15-07
Date

OFFICIAL SEAL
LINDA I MC DONALD
NOTARY PUBLIC-OREGON
COMMISSION NO. 368683
MY COMMISSION EXPIRES MAY 15, 2007

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 03-2869C

(Filed: April 3, 2006)

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

SCHEDULING ORDER

The court acknowledges receipt of the parties' Joint Status Report, filed on March 31, 2006. Pursuant to Appendix A of the Rules of the Court of Federal Claims ("RCFC"), and in light of the parties' Joint Status Report, and for good cause shown, discovery and other preparatory steps for trial shall proceed in accord with the following schedule:

| **Event** | **Date** |
|---|---|
| Completion of Fact Discovery | July 14, 2006 |
| Exchange of any Expert Report(s) | August 11, 2006 |
| Completion of Expert Depositions | September 15, 2006 |
| Meeting of Counsel | September 25, 2006 |
| Plaintiff's Pre-Trial Submissions | October 9, 2006 |
| Defendant's Pre-Trial Submissions | November 6, 2006 |
| Pre-Trial Conference | November 27, 2006 @ 10:00 a.m. at the National Courts Building |
| Commencement of Trial | December 4, 2006 @ 9:30 a.m. at the National Courts Building |

It is so **ORDERED.**

s/Charles F. Lettow
Charles F. Lettow
Judge

NOTICE OF FILING

I hereby certify that on November 20, 2006, a copy of the **REPLY IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS, DR. SAMUEL VAN VACTOR; SUPPLEMENTAL DECLARATION OF JOSEPH J. YBARRA IN SUPPORT THEREOF** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also certify that, pursuant to General Order 2003-42, Paragraph I(5), I forwarded a courtesy copy of the Memorandum to the Court.

s/Joseph J. Ybarra